# No. 26-1798

## In the United States Court of Appeals
FOR THE THIRD CIRCUIT

IN RE: NANCY WINKELMAN,

*Appellant*

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 22-mc-0051

# APPELLANT'S OPENING BRIEF

JAMES D. NELSON
ANDREW R. HELLMAN
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 739-3000

ERIC W. SITARCHUK
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
(215) 963-5000

*Counsel for Appellant Nancy Winkelman*

# TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS .......... iii
INTRODUCTION .......... 1
JURISDICTIONAL STATEMENT .......... 3
STATEMENT OF THE ISSUES .......... 4
STATEMENT OF RELATED CASES .......... 4
STATEMENT OF THE CASE .......... 5
I. Winkelman's Background .......... 5
II. Wharton Post-Conviction Proceedings .......... 8
III. The DAO's Concession of Relief .......... 10
A. The Capital Case Review Committee .......... 10
B. Wharton Proceedings on Remand .......... 12
C. Rule 11 Proceedings .......... 15
IV. Disciplinary Proceedings .......... 16
SUMMARY OF ARGUMENT .......... 21
STANDARD OF REVIEW .......... 25
ARGUMENT .......... 26
I. The district court erred as a matter of law in concluding that Winkelman violated the Pennsylvania Rules of Professional Conduct without requiring proof by clear and convincing evidence. .......... 26
II. The record lacks clear and convincing evidence to support the conclusion that Winkelman violated the Pennsylvania Rules of Professional Conduct. .......... 28
A. The record lacks clear and convincing evidence to support the conclusion that Winkelman knowingly made a false material statement in violation of Rule 3.3. .......... 29

# TABLE OF CONTENTS
# (continued)

**Page**


1. The record lacks evidence to support the conclusion Winkelman actually knew, in April 2019, that the DAO had not carefully reviewed the facts and law. ........ 31

2. The record lacks evidence to support the conclusion that Winkelman was culpable even absent actual knowledge of falsity........ 36

3. The record lacks evidence to support the conclusion of Winkelman's liability for George's violations. ........ 39

4. The record lacks evidence to support the conclusion that Winkelman knowingly made false statements to the Panel. ........ 41

5. The R&R lacks evidence to support the conclusion that Winkelman testified falsely before Judge Goldberg. ........ 48

B. The record lacks clear and convincing evidence to support the conclusion that Winkelman raised a frivolous claim in violation of Rule 3.1. ........ 49

III. The Panel's adversarial role in the hearing required its recusal from adjudicating the final decision against Winkelman. ........ 52

A. The Panel shifted from the role of arbiter to advocate at the hearing. ........ 54

B. The Panel impermissibly judged its own case in participating in the district court's adjudication of the final decision. ........ 58

CONCLUSION ........ 61

## TABLE OF CITATIONS

**Page(s)**

**CASES**

*Abulashvili v. Attorney General*,
663 F.3d 197 (3d Cir. 2011) .......... 60

*Adams v. Ford Motor Co.*,
653 F.3d 299 (3d Cir. 2011) .......... 25, 54

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984) .......... 35, 42

*Cities Serv. Oil Co. v. Dunlap*,
308 U.S. 208 (1939) .......... 26

*Clemmons v. Wolfe*,
377 F.3d 322 (3d Cir. 2004) .......... 53, 57

*Commonwealth v. Chmiel*,
30 A.3d 1111 (Pa. 2011) .......... 50

*Commonwealth v. Wharton*,
607 A.2d 710 (Pa. 1992) .......... 8

*Commonwealth v. Wharton*,
665 A.2d 458 (Pa. 1995) .......... 8

*Commonwealth v. Wharton*,
811 A.2d 978 (Pa. 2002) .......... 8

*Eckenrode v. Pa. R. Co.*,
164 F.2d 996 (3d Cir. 1947) .......... 42

*Epstein Fam. P'ship v. Kmart Corp.*,
13 F.3d 762 (3d Cir. 1994) .......... 25

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) .......... 40

**TABLE OF CITATIONS**
**(continued)**

**Page(s)**

*ICN Pharms., Inc. v. Khan*,
2 F.3d 484 (2d Cir. 1993) .......... 42

*In re Booker*,
611 F. App'x 834 (5th Cir. 2015) .......... 27

*In re Gianakas*,
917 F.2d 759 (3d Cir. 1990) .......... 27

*In re Medrano*,
956 F.2d 101 (5th Cir. 1992) .......... 27

*In re Murchison*,
349 U.S. 133 (1955) .......... 52, 54, 60

*In re Press*,
636 F. App'x 606 (3d Cir. 2016) .......... 25, 26

*In re Surrick*,
338 F.3d 224 (3d Cir. 2003) .......... 3, 25, 52

*Kendall v. Daily News Publ'g Co.*,
716 F.3d 82 (3d Cir. 2013) .......... 35, 42

*Kuswadi v. Attorney General*,
153 F. App'x 116 (3d Cir. 2005) .......... 42

*Martin v. Brown*,
63 F.3d 1252 (3d Cir. 1995) .......... 54

*McCann v. Newman Irrevocable Tr.*,
458 F.3d 281 (3d Cir. 2006) .......... 27

*McCarthy v. DEA*,
171 F.4th 245 (3d Cir. 2026) .......... 29, 30

**TABLE OF CITATIONS**
**(continued)**

**Page(s)**

*Off. Disciplinary Couns. v. Anon. Att'y*,
331 A.3d 523 (Pa. 2025) .......... 26, 29

*Off. Disciplinary Couns. v. Campbell*,
345 A.2d 616 (Pa. 1975) .......... 26

*Polselli v. Nationwide Mut. Fire Ins. Co.*,
23 F.3d 747 (3d Cir. 1994) .......... 25, 27

*Rodriguez-Gutierrez v. INS*,
59 F.3d 504 (5th Cir. 1995) .......... 42

*Schwartz v. Comcast Corp.*,
256 F. App'x 515 (3d Cir. 2007) .......... 34

*Smith v. Commonwealth*,
574 A.2d 558 (Pa. 1990) .......... 51

*Strickland v. Washington*,
466 U.S. 668 (1984) .......... 9, 13, 35

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
595 U.S. 178 (2022) .......... 40

*United States v. Green*,
544 F.2d 138 (3d Cir. 1976) .......... 55

*United States v. James*,
938 F.3d 719 (5th Cir. 2019) .......... 27

*United States v. Stadtmauer*,
620 F.3d 238 (3d Cir. 2010) .......... 40

*United States v. Vallejo*,
297 F.3d 1154 (11th Cir. 2002) .......... 27

## TABLE OF CITATIONS
## (continued)

**Page(s)**

*Vanalt Elec. Constr. Inc. v. Selco Mfg. Corp.*,
233 F. App'x 105 (3d Cir. 2007) .......... 33

*Wharton v. Superintendent Graterford SCI*,
95 F.4th 113 (3d Cir. 2024) .......... 5, 51

*Wharton v. Superintendent Graterford SCI*,
95 F.4th 140 (3d Cir. 2024) .......... *passim*

*Wharton v. Vaughn*,
2022 WL 1488038 (E.D. Pa. May 11, 2022) .......... 15

*Wharton v. Vaughn*,
2022 WL 4133291 (E.D. Pa. Sept. 12, 2022) .......... 15, 16

*Wharton v. Vaughn*,
371 F. Supp. 3d 195 (E.D. Pa. 2019) .......... 12, 13

*Wharton v. Vaughn*,
722 F. App'x 268 (3d Cir. 2018) (per curiam) .......... *passim*

*Wharton v. Vaughn*,
2012 WL 3535866 (E.D. Pa. Aug. 16, 2012) .......... 8

*Williams v. Beard*,
637 F.3d 195 (3d Cir. 2011) .......... 10, 38

*Williams v. Pennsylvania*,
579 U.S. 1 (2016) .......... *passim*

*Young v. United States*,
315 U.S. 257 (1942) .......... 13

*Zappala v. Brandolini Prop. Mgmt., Inc.*,
909 A.2d 1272 (Pa. 2006) .......... 49

## TABLE OF CITATIONS
## (continued)

**Page(s)**

**STATUTES**

28 U.S.C. § 1291 .......... 3

28 U.S.C. § 2241 .......... 3

28 U.S.C. § 2253 .......... 51

**OTHER AUTHORITIES**

Fed. R. Evid. 406 .......... 34

Fed. R. Evid. 614 .......... 54

Pennsylvania Rule of Professional Conduct 3.1 .......... *passim*

Pennsylvania Rule of Professional Conduct 3.3 .......... *passim*

Pennsylvania Rule of Professional Conduct 5.1 .......... 23, 40, 41

Pennsylvania Rule of Professional Conduct 8.4 .......... 23, 40, 41

## INTRODUCTION

Appellant Nancy Winkelman has had a long and distinguished career as an appellate lawyer, law firm practice leader, active member of the Bar, and revered mentor to younger lawyers. After three decades, Winkelman left a successful private practice to enter public service, joining the Philadelphia District Attorney's Office ("DAO"). Winkelman now faces a suspension from the practice of law that, close to the twilight of her career, is tantamount to a disbarment. As demonstrated here, that suspension rests on erroneous application of the Pennsylvania Rules of Professional Conduct, wholly unsupported factual conclusions, and a fundamental violation of due process.

Following disciplinary proceedings under Loc. R. Civ. P. 83.6(V), a three-judge disciplinary panel ("Panel") issued a Report and Recommendation ("R&R") concluding that Winkelman violated Pennsylvania Rules of Professional Conduct 3.3 and 3.1 and recommending a three-year suspension. Pursuant to Loc. R. Civ. P. 83.6(V)(E), the entire district court deliberated on the R&R. It was adopted by majority vote. Over Winkelman's objection, the Panel participated in those deliberations and that vote. JA3.

The R&R did not apply the correct burden of proof. Pennsylvania law requires proof of attorney misconduct by clear and convincing evidence. The R&R, however, does not refer to or apply that burden of proof, which alone requires reversal.

Further, the R&R's conclusions regarding both falsity and state of mind were not supported by either its own factual findings or the evidentiary record. This was compounded by clear factual errors by the Panel—including inaccurate descriptions of record evidence.

Structural error in the proceedings also requires reversal. The Panel appointed disciplinary counsel to prosecute the case. Disciplinary counsel prepared a Petition for Rule to Show Cause ("Petition") alleging disciplinary violations. However, at the hearing on the Petition, the Panel abandoned its position as neutral arbiter. Instead, it took on the role of advocate in prosecuting the case against Winkelman, essentially acting as additional, albeit much more aggressive, disciplinary counsel. In that role, the Panel conducted an extensive *in camera* investigation which went well beyond the party-developed record and any allegation in the Petition. It then used that investigation to prepare its own "script." With the benefit of the *in camera* investigation and "script," the Panel

extensively cross-examined Winkelman, including about topics far beyond *Wharton*—like District Attorney Lawrence Krasner (the "DA")'s political views and campaign statements, and cases in which Winkelman had no involvement. The Panel overruled objections to the scope of its own questioning.

Given its adversarial involvement, the Panel should have recused itself from participation in the final adjudication of the case—the full district court's deliberations and vote on whether to adopt the R&R. The court's unexplained denial of Winkelman's recusal motion is a violation of fundamental due process and independent reason to reverse.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 2241 and its inherent authority over disciplinary proceedings. *In re Surrick*, 338 F.3d 224, 229 (3d Cir. 2003). This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered its final order on March 9, 2026, JA3, and Winkelman filed her notice of appeal on April 7, 2026, JA1-2.

## STATEMENT OF THE ISSUES

I. Whether the district court erred in concluding that Winkelman violated the Pennsylvania Rules of Professional Conduct without applying the requisite burden of proof by clear and convincing evidence.

*Raised: JA542*

*Ruled Upon: JA3*

II. Whether the R&R and record support the district court's conclusion that Winkelman violated the Pennsylvania Rules of Professional Conduct.

*Raised: JA542-53*

*Ruled Upon: JA3*

III. Whether the district court erred in denying Winkelman's motion that the Panel, having abandoned its role of neutral arbiter, be recused from the district court's deliberations and final vote on the R&R.

*Raised: JA557-60*

*Ruled Upon: JA3*

## STATEMENT OF RELATED CASES

This Court has previously heard a related appeal concerning Rule 11 sanctions. *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140

(3d Cir. 2024); *see also Wharton v. Superintendent Graterford SCI*, 95 F.4th 113 (3d Cir. 2024) (appeal in underlying habeas proceeding); *Wharton v. Vaughn*, 722 F. App'x 268 (3d Cir. 2018) (per curiam) (same). Another related appeal is pending before this Court. *In re George*, No. 25-3264 (3d Cir. docketed Nov. 24, 2025).

## STATEMENT OF THE CASE

### I. Winkelman's Background

Winkelman graduated from law school in 1986. JA361 at 7:6-8. She and her husband had a daughter during law school who was born with several significant disabilities. JA361 at 7:12-14. After graduation, the family moved to the Philadelphia area, which afforded access to the best medical care for their child. JA361 at 7:10-16. Winkelman secured a clerkship with Third Circuit Judge Dolores Sloviter for the 1987-1988 term. JA361-62 at 7:11-8:1. After briefly working as a pre-clerkship associate at the law firm Schnader Harrison, Winkelman returned to Schnader as an associate in 1988. JA361-62 at 7:17-8:5.

Winkelman built a civil appellate practice at Schnader and made partner in the 1990s. JA362-63 at 8:9-9:17. She became a prominent and widely respected appellate practitioner over her more than 30 years

of practice at the firm. She received the ABA's John Minor Wisdom Public Interest and Professionalism Award and the 2020 American Inns of Court Professionalism Award from the Third Circuit. JA363-64 at 9:25-10:8. She served as President, and long-time board member, of the American Academy of Appellate Lawyers, and was co-founder and the first President of the Third Circuit Bar Association. JA295. At Schnader, she held leadership positions, including head of the appellate practice and co-chair of the litigation department. JA295; JA363 at 9:18-24. Winkelman has been a beloved mentor to young lawyers throughout her career. *See* JA328-54.

Winkelman devoted meaningful time to pro bono work at Schnader. JA366 at 12:12-13. She went to law school originally intending to do public interest work. However, her daughter's needs required her to work in the more lucrative private sector. JA365-66 at 11:24-12:14. By 2017, Winkelman had reached a point in her life where she could focus more on public service work. JA366 at 12:14-18. So she applied online for a one-year position as a line appellate assistant district attorney ("ADA") in Philadelphia. JA366 at 12:19-22.

The DA, who did not know Winkelman but was apparently impressed by her background, contacted her directly. JA367 at 13:3-9. At

the end of their first meeting, the DA asked Winkelman to serve as Supervisor of the Law Division. JA367 at 13:7-9. In response to Winkelman's concern that she lacked criminal law experience, the DA promised that he would hire an Assistant Supervisor "with deep criminal law background." JA367 at 13:10-22. The DA, as promised, hired long-time criminal lawyer Paul George as Assistant Supervisor of the Law Division. JA367-68 at 13:23-14:1.

Winkelman started at the DAO on January 2, 2018. JA365 at 19-21. What began as a one-year leave of absence soon became a permanent position. As Law Division Supervisor, Winkelman supervised up to a hundred employees across four units, and oversaw thousands of matters. JA369 at 15:12-18; JA371 at 17:6-15.

With the knowledge that she gained from the proceedings below, Winkelman recognized the deficiencies in how the DAO handled Wharton's case. She worked diligently to implement new processes within the DAO in an effort to prevent these failures from happening again. JA404 at 50:13-17, JA404-06 at 50:24-52:7, JA406-07 at 52:24-53:6. Winkelman resigned from her supervisory position in February 2025. JA364-65 at

10:25-11:18. Since then, she has worked as a line ADA, assisting with and mentoring younger ADAs on state court appeals. JA365 at 11:12-18.

## II. Wharton Post-Conviction Proceedings

In 1986, Robert Wharton was sentenced to death for his horrific crimes. The Supreme Court of Pennsylvania reversed that sentence. *Commonwealth v. Wharton*, 607 A.2d 710 (Pa. 1992). On remand, after three days of deliberations and initially deadlocking, a jury again sentenced Wharton to death. The Supreme Court affirmed. *Commonwealth v. Wharton*, 665 A.2d 458 (Pa. 1995). In 1996, Wharton sought collateral review under Pennsylvania's Post Conviction Relief Act ("PCRA"). The trial court denied his petition and the Supreme Court affirmed. *Commonwealth v. Wharton*, 811 A.2d 978 (Pa. 2002).

Wharton then filed a federal habeas petition, which Judge Goldberg denied. *Wharton v. Vaughn*, No. 01-6049, 2012 WL 3535866 (E.D. Pa. Aug. 16, 2012). This Court affirmed in part, vacated in part, and remanded Wharton's claim that his counsel had been ineffective at the penalty phase for failing to present mitigation evidence based on positive prison adjustment. *Wharton v. Vaughn*, 722 F. App'x 268 (3d Cir. 2018) (per curiam).

In that habeas appeal, this Court found that the Pennsylvania courts had unreasonably applied both the performance and prejudice prongs of *Strickland v. Washington*, 466 U.S. 668 (1984). *Wharton*, 722 F. App'x at 278-81. As to performance, the Court held that Wharton had made a prima facie showing under *Strickland*'s first prong of his counsel's deficient performance in failing to obtain his prison records. *Id.* at 282. The Court reasoned that, if "given an opportunity to question [counsel] in an evidentiary hearing," Wharton could potentially "be able to show that [counsel] acted unreasonably." *Id.*

Turning to prejudice, the Court found that Wharton had made the necessary "prima facie showing that there is a reasonable probability that at least one juror would have changed his or her vote if presented with this evidence." *Id.* at 284. It vacated the denial of Wharton's petition as to that claim and remanded to the district court. *Id.* The Court explained that "to determine whether Wharton's proffered evidence had a reasonable probability of changing at least one juror's vote, 'we must reconstruct the record and assess it anew. … [W]e must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony.'" *Id.* at 282-83

(quoting *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011)). This takes us to the DAO's concession of relief.

## III. The DAO's Concession of Relief

### A. The Capital Case Review Committee

In the spring of 2018, a few months after the DA took office, the DAO created the Capital Case Review Committee (the "CCRC"). JA371 at 17:19-23. The CCRC's purpose was to review post-conviction requests for death penalty relief and make recommendations to the DA. JA373 at 19:2-10. The CCRC's members were the DA; the First Assistant DA; the heads of the Homicide, Victim/Witness Services, and Conviction Integrity Units; and the Supervisor of the Law Division, Winkelman. JA374-75 at 20:12-21:1. George served as Reporter. JA376 at 22:15-18.

Winkelman's understanding of the CCRC process was that, before presenting, George would vet out cases that he did not believe raised potentially meritorious claims for relief. JA373 at 19:11-21. George then presented the remaining cases to the CCRC. JA373 at 19:22-24.

For the cases presented, George would research prior opinions, the petitioner's criminal history and other relevant information. JA1017 at 63:9-14, 63:20-23 (George testifying at Rule 11 hearing that his "own

preparation for these meetings included reading … Briefs filed by the prior Administration" and "Opinions in Appellate Courts addressing the issues"); JA377-78 at 23:10-14, 24:1-7, 24:15-18. A paralegal working at George's direction would prepare a memorandum containing basic background facts regarding each matter. JA377 at 23:10-20. At the CCRC meeting, George would expand on that memorandum and summarize the results of his research. JA378-79 at 24:22-25:8, 25:24-26:2; JA392-93 AT 38:25-39:8; JA310-11.[1]

Discussions of a particular case typically stretched across several meetings. JA376-77 at 22:24-23:6. The CCRC finally made a recommendation to the DA, who made the ultimate decision. JA377 at 23:7-9. If the decision was to concede relief, George would direct that a notice of concession be filed with the court. JA381-82 at 27:25-28:9. The CCRC did not prepare minutes of its meetings. JA305.

Available DAO records show that the CCRC first met to discuss the Wharton case on November 26, 2018. JA385-86 at 31:5-32:13 (discussing

---

[1] The record thus refutes the R&R's assertion that "Winkelman knew only what was in the memorandum." JA513 (citing JA377 at 23:15-20, where Winkelman testified about how the memorandum was prepared, not the scope of CCRC meetings).

JA320-27). George emailed the paralegal's background memorandum to the CCRC before the Committee met. JA385-86 at 31:5-32:13. The Committee did not make a decision on Wharton that day. After further deliberations, the DA decided to concede relief on or around January 14, 2019. JA394-96 at 40:17-42:3.

### B. Wharton Proceedings on Remand

Implementing the DA's decision to concede, at George's direction, ADA Max Kaufman, the supervisor of the federal litigation unit, filed the DAO's notice of concession on February 6, 2019. JA382 at 28:6-14; JA596-600. Two days later, Kaufman and Wharton's counsel filed a joint proposed order granting the conceded relief. JA601-02. Winkelman did not prepare, review in advance, or file either the notice of concession or proposed order. JA1048-50 at 94:11-18, 96:7-10 (Kaufman Rule 11 testimony); JA396-98 at 42:9-18, 44:18-22.

Judge Goldberg declined to adopt the proposed order. *Wharton v. Vaughn*, 371 F. Supp. 3d 195, 198-99 (E.D. Pa. 2019). Instead, he invited briefing on two issues that he found "not sufficiently address[ed]": (1) whether he had "the obligation—or even the authority—to grant Wharton's" petition "based solely on this concession"; and, (2) if he needed to

"make an independent determination on the merits," whether he "could do so on the current record, without conducting the evidentiary hearing directed by the Third Circuit." *Id.* at 199.

On April 3, 2019, the DAO filed its brief. JA 603-09. Kaufman, George, and Winkelman appeared on it, JA608, and Winkelman edited the brief before filing, JA401-02 at 47:17-48:3. As to Judge Goldberg's first issue, the DAO wrote: "A prosecutor is ethically obligated to concede relief when the prosecutor believes that justice so requires; in this situation, a court may, but is not required, to accept that concession." JA603. The DAO stated that "the District Attorney's Office carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in *Strickland v. Washington*, 466 U.S. 668 (1984)," and then specified the legal and factual bases for that determination. JA605-06.

The DAO concluded that its "judgment to concede penalty phase relief under the specific circumstances of this case" was "not binding on this Court" but "'entitled to great weight.'" JA607 (quoting *Young v. United States*, 315 U.S. 257, 258-59 (1942)). On Judge Goldberg's second

issue, the DAO agreed that if "the record is insufficient to rule on the remaining claim, the Court can conduct an evidentiary hearing." JA607.

Judge Goldberg then issued an order, in which he wrote that the DAO's supplemental brief had not "indicate[d] whether it did any investigation regarding Petitioner's adverse or negative adjustment to prison" and instead "appear[ed]" to "ha[ve] accepted the additional evidence offered by [Wharton] at face value." JA611-12. Noting a lack of adversity between the parties on the question of relief, the judge asked the Pennsylvania Office of Attorney General ("AGO") to file an amicus brief. JA612.

The AGO's amicus brief reported a fact that had not been raised in any of the prior *Wharton* proceedings: in 1986, Wharton had been convicted of attempting to escape from sheriff custody following a court appearance in City Hall. JA631-33. The AGO also reported that, in conceding relief, the DAO had not contacted the last living victim of Wharton's crimes and a number of family members, who the AGO alleged opposed the concession of relief. JA661-62.

### C. Rule 11 Proceedings

Judge Goldberg denied Wharton's habeas petition. *Wharton v. Vaughn*, 2022 WL 1488038, at *1 (E.D. Pa. May 11, 2022); *see also* JA953 (issuing a certificate of appealability). Based on his "preliminary conclusion that there ha[d] been a breach" of the DAO's "duty of candor," Judge Goldberg also commenced Rule 11 proceedings. *Wharton*, 2022 WL 1488038, at *21. On June 23, 2022, a hearing was held, with Kaufman, George, and Winkelman appearing. JA955. The same counsel represented both the DAO and all three individuals in the Rule 11 proceedings.

On September 12, 2022, Judge Goldberg imposed Rule 11 sanctions on the DAO, George, and Winkelman. *Wharton v. Vaughn*, 2022 WL 4133291 (E.D. Pa. Sept. 12, 2022). He found violations in the DAO's (1) submissions referring to its "careful review," in light of Wharton's unreported escape attempt conviction, *id.* at *5-9; and (2) description of its contacts with the victims' family, *id.* at *9-10. Judge Goldberg admonished George and Winkelman but "decline[d] to impose any monetary or non-monetary sanctions on" them, as "public servants who were following the policies and procedures of the Office that employed them." *Id.* at *13. He imposed an additional sanction on the DAO, requiring that the DA

"personally" write letters of apology to the victim and family, with copies to be "filed with the Court." *Id.* The DA did so.

This Court affirmed the Rule 11 sanctions. *Wharton v. Superintendent Graterford SCI*, 95 F.4th 140 (3d Cir. 2024). It emphasized that "Rule 11 requires only negligence, not bad faith," *id.* at 147, and held that Judge Goldberg had not abused his discretion in imposing sanctions, *id.* at 149-51. The Court concluded:

> George and Winkelman, both dedicated public servants, understandably worry about their professional reputations. The District Court did not find that they misled the court intentionally, nor do we. But they put their names on the brief. … As supervisors, they are responsible for the notice of concession that they approved. They made mistakes; they should have investigated more before approving the misstatements.

*Id.* at 151 (citation omitted).

## IV. Disciplinary Proceedings

Judge Goldberg referred the matter to the district court's Chief Judge, *Wharton*, 2022 WL 4133291, at *14 n.8, who referred it to a three-judge disciplinary panel (the "Panel"), JA12. The Panel then appointed disciplinary counsel, which filed its Petition for Rule to Show Cause on September 11, 2023, as to both George and Winkelman. JA13-41.

As to Winkelman, the Petition described its "question presented" as "whether Ms. Winkelman intentionally misled the Court on the facts and the law when she directed her subordinates to ask the Court to enter an order" granting Wharton's habeas petition. JA13. The Petition was answered by prior counsel who, at that time, also represented George and the DAO. JA42-90. After a conflicts hearing where both George and Winkelman testified, JA91-142, Winkelman engaged her own counsel and proceeded separately from George.

The Panel held a hearing on disciplinary counsel's Petition on March 28, 2025. JA355-496. Disciplinary counsel rested on the averments in the Petition and the exhibits attached to it. JA359 at 5:5-12.

Winkelman testified, at which time the Panel cross-examined her extensively. JA439-85. The Panel's questioning of Winkelman ventured far beyond the DAO's representations to Judge Goldberg in *Wharton*, and far beyond the allegations in the Petition. Its examination included many other cases handled by the DAO, JA458-60 at 104:17-106:25; JA462-77 at 108:7-123:6, and covered filings in other cases in which Winkelman had no involvement, JA474-76 at 120:22-122:10. And much of the Panel's questioning concerned the DA and his public statements, including

statements even before he was DA. *See* JA449-50 at 95:18-96:4 (DA's campaign statements); JA450-51 at 96:19-97:2 (DA's criticisms of individual prosecutors in general); JA471-72 at 117:16-118:6 (DA's criticisms of one specific prosecutor); JA481-84 at 127:1-130:4 (DA's selection and payment of outside counsel, and certain outside counsel's private practice); JA455 at 101:7-22 (DA's hiring of a Texas attorney into a unit of the DAO not involved here); JA484-85 at 130:5-131:2 (unrelated testimony by an ADA not involved here).

Winkelman's counsel objected to the Panel's "questioning," which had "gone far beyond the four corners of the order to show cause and the petition." JA485 at 131:18-25. Counsel added that, while disciplinary counsel and he had "exchanged the information" they "both intended to offer at this hearing," the Panel raised many "issues" that counsel "had not heard about until [its] questioning." JA486 at 132:2-9. The judge who had raised most of these alleged misconduct issues, and had just completed his extensive cross-examination, immediately overruled counsel's objection. JA486 at 132:16-17. The same judge added that he "didn't preview [his] script with" disciplinary counsel. JA491 at 137:4. Disciplinary counsel added that he "gave [Winkelman's] counsel fair notice of

what [disciplinary counsel] was going to do," but not "of what [the judge] was going to do," because he "didn't call [the judge] to find out." JA492 at 138:17-21. The judge concluded by explaining that he felt "a couple of colleagues" had "sign[ed] off on stipulations … not knowing what the story really was," and "that's important," and "why [he] brought" this line of questioning. JA493 at 139:11-21.

The Panel issued its Report and Recommendation ("R&R") on October 27, 2025. JA510-31. Although the Panel found Winkelman's "transgressions" to be "less serious than those of George," whom it had disbarred, it nonetheless recommended a three-year suspension from the district court's bar. JA529; *see also* JA530 ("We have found that George (not Winkelman) was the 'quarterback' of the DAO's misrepresentations.").

Disciplinary counsel did not contend, and the R&R did not find, that Winkelman knew of the escape attempt. Further, the R&R expressly found that Winkelman (unlike George) was not "responsible for misleading Judge Goldberg with respect to the DAO's communications with the Hart [victims'] family." JA531. It was those two issues that had been the basis for the Rule 11 sanctions previously imposed on Winkelman.

Instead, having failed to find proof that Winkelman was responsible for either of the transgressions that led to the Rule 11 sanctions and the disciplinary referral, the R&R purported to assign more generalized, albeit vague and unsupported, fault to Winkelman. It broadly found "that Winkelman knowingly made misrepresentations to effectuate a policy of vacating all death sentences," JA511, and described its decision as based on "Winkelman's knowing role in misleading Judge Goldberg and her false testimony before" the Panel, JA511-12. In so doing, the Panel failed to apply the correct standard of proof; reached conclusions unsupported by its own factual findings, much less the evidence; and violated due process by impermissibly engaging as zealous advocate for one side while purportedly also to act as a neutral arbiter for both sides.

Winkelman timely objected to the R&R. JA532-61. She also moved that the Panel recuse itself from the vote by the full district court on whether to accept the R&R because the Panel "acted as investigators and advocates" rather than "neutral arbiter[s]" in the hearing. JA557-60. Fearing that, if this request was denied, the Panel would again act as an unrebutted advocate during the full court's deliberations, Winkelman's

counsel also asked for oral argument before the full district court. JA560. Both requests were denied. JA562.

On March 9, 2026, the district court issued an order reflecting a "decision of the majority of Judges of [that] Court approving the" R&R. JA3. The order overruled Winkelman's objections, denied her recusal motion, and imposed a three-year suspension. JA3. The Panel members participated in both the deliberations and vote on whether to accept their R&R. *See* JA562.

## SUMMARY OF ARGUMENT

I. The district court erred in concluding that Winkelman violated the Pennsylvania Rules of Professional Conduct without requiring proof by clear and convincing evidence. Those Rules are Pennsylvania substantive law, so the Panel should have applied the heightened burden of proof that the Supreme Court of Pennsylvania requires. The district court's refusal to correct that error on Winkelman's objection alone requires reversal.

II. The Panel erred in concluding that Winkelman violated Pennsylvania Rules of Professional Conduct 3.3 and 3.1. The record does not

supply clear and convincing evidence (or even the inapplicable preponderance of the evidence) to support either conclusion.

A. The R&R erred in concluding that the DAO's representation that it had "carefully reviewed the facts and law" was a knowing false statement by Winkelman in violation of Rule 3.3. The R&R advances two sets of theories to support this conclusion, both of which fail.

The Panel mainly inferred Winkelman's actual knowledge of falsity of the "careful review" representation based on (i) the Panel's unsupported conclusion that Winkelman knew that the DAO failed to consider anti-mitigation evidence; and (ii) the Panel's post-hoc interpretation of this Court's 2018 *Wharton* remand order. But the record lacks evidence of George's supposed failure to review or consider anti-mitigation evidence in his review of the record, or that the CCRC failed to consider it. The Panel alternatively deemed Winkelman culpable, even in the absence of actual knowledge that George did not review anti-mitigation evidence, based on her failure to personally conduct an independent "inquiry" and "investigation." But the Panel did not suggest that it would generally be improper for a supervisor like Winkelman to rely on the work of a subordinate like George. Instead, the Panel found a unique

obligation in *this* case based on this Court's 2018 remand order, but that order by its terms did not require Winkelman to personally investigate anti-mitigation evidence beyond the existing record. Finally, the Panel made no findings about when Winkelman read that order or her contemporaneous understanding of it.

The Panel's secondary theories of Rule 3.3 violations fare no better. The Panel held Winkelman liable for George's statements in filings that Winkelman undisputedly had no involvement with, but it did so on an inapposite theory of "willful blindness." Pennsylvania Rules of Professional Conduct 5.1 and 8.4 govern in this context; disciplinary counsel did not charge and the Panel did not find a violation of either Rule, and the record evidence does not support such a conclusion. Finally, the Panel found violations in Winkelman supposedly testifying falsely before it and Judge Goldberg. But these findings rest on a general adverse credibility determination, which is an insufficient basis as a matter of law to establish false testimony in violation of Rule 3.3. Instead, there must be sufficient proof of specific knowingly false testimony. The few specific points of Winkelman's testimony that the Panel described as false on their face are not false at all, much less knowingly so.

B. The R&R concluded that Winkelman also violated Rule 3.1's prohibition against asserting frivolous claims. The Panel did not find, and could not have found, that the DA's concession of relief in *Wharton* was frivolous. Nor did the Panel identify any other issue asserted that was frivolous. Instead, the Panel relied on its critiques of the representations through which the DAO sought relief rather than whether the relief sought itself was frivolous. However, it is the frivolity of the issue asserted that is the question under Rule 3.1, not the quality of the representations made in seeking that relief.

III. An independent legal error arose from the Panel's abandoning its role as neutral arbiter in favor of becoming an interested advocate. The Panel prepared for the hearing by conducting an extensive *in camera* factual investigation; using the results of that examination to prepare a "script" to use as a road map to cross-examine Winkelman; and then extensively and aggressively cross-examining Winkelman, not only about the DAO's handling of *Wharton*, but about other cases, and even about the political views expressed by the DA. An unconstitutional potential for bias arises when a judge takes on the role of both adversary and adjudicator. That is what happened here when, having engaged in

aggressive advocacy, the Panel both authored the R&R and participated in the district court's vote on whether to approve and adopt it. This structural error independently requires reversal.

## STANDARD OF REVIEW

This Court reviews district courts' disciplinary decisions for abuse of discretion. *In re Surrick*, 338 F.3d 224, 229 (3d Cir. 2003) (reviewing reciprocal discipline); *see, e.g.*, *In re Press*, 636 F. App'x 606, 611 (3d Cir. 2016). The Court thus reviews legal rulings de novo and factual findings for clear error. *See Press*, 636 F. App'x at 611 (citing *Adams v. Ford Motor Co.*, 653 F.3d 299, 304 (3d Cir. 2011)). De novo review includes both "the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Epstein Fam. P'ship v. Kmart Corp.*, 13 F.3d 762, 766 (3d Cir. 1994); *see also Surrick*, 338 F.3d at 229 (citing same for "plenary" review of "legal precepts"). Whether the district court applied the proper burden of proof "is a question of law subject to plenary review." *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 750 (3d Cir. 1994).

## ARGUMENT

### I. The district court erred as a matter of law in concluding that Winkelman violated the Pennsylvania Rules of Professional Conduct without requiring proof by clear and convincing evidence.

As the R&R recognizes, the district court "applies the Pennsylvania Rules of Professional Conduct in attorney disciplinary proceedings." JA522; *accord* E.D. Pa. Loc. R. Civ. P. 83.6(IV)(B); *see also* JA523 (citing Supreme Court of Pennsylvania precedent in reciting legal standard).

Federal courts apply state burdens of proof as state substantive law, *see Cities Serv. Oil Co. v. Dunlap*, 308 U.S. 208, 212 (1939), including when applying state disciplinary rules. *See Press*, 636 F. App'x at 611 (where district court found violations of New Jersey disciplinary rules, applying New Jersey law to review for clear and convincing evidence).

The burden of proof that Pennsylvania law imposes in disciplinary proceedings is "clear and convincing evidence." *Off. Disciplinary Couns. v. Anon. Att'y*, 331 A.3d 523, 526, 539 (Pa. 2025). This is because attorney "[d]isciplinary proceedings are not strictly civil nor criminal in nature, but rather have been styled 'quasi-criminal.'" *Id.* at 534 (quoting *Off. Disciplinary Couns. v. Campbell*, 345 A.2d 616, 620 (Pa. 1975)).

But the Panel did not mention, let alone apply, the clear and convincing evidence standard. This Court should "not assume that the district court applied the proper standard in the absence of any explicit statement." *United States v. Vallejo*, 297 F.3d 1154, 1171 (11th Cir. 2002); *accord United States v. James*, 938 F.3d 719, 723 (5th Cir. 2019) (reversing where it was "not clear from the record what burden of proof the district court applied"); *In re Booker*, 611 F. App'x 834, 835-36 (5th Cir. 2015) (reversing where the lower courts "failed to cite this evidentiary standard and failed to specifically find that clear and convincing evidence supported the ethical violations"); *cf. In re Gianakas*, 917 F.2d 759, 761 (3d Cir. 1990) (where "the bankruptcy court's statements" on burden of proof were "not pellucid," finding no prejudice only because "the district court undertook to review the bankruptcy court's findings in light of" the proper standard).

The failure to require clear and convincing evidence was legal error that requires reversal. A "failure to apply the correct burden of proof" by itself requires "reversing the district court's decision." *Polselli*, 23 F.3d at 752; *see also McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 290 (3d Cir. 2006) (vacating and remanding for same reason); *In re Medrano*,

956 F.2d 101, 105 (5th Cir. 1992) (reversing attorney discipline disbarment where district court failed to require clear and convincing evidence and thus "applied the wrong evidentiary standard in reaching its conclusion").

## II. The record lacks clear and convincing evidence to support the conclusion that Winkelman violated the Pennsylvania Rules of Professional Conduct.

The R&R concludes:

> Winkleman [sic] misrepresented to Judge Goldberg. She did not and could not have had an objectively reasonable belief that her misstatements were true. She also failed to conduct a reasonably diligent inquiry as to the basis of those misstatements, and failed to inform herself about the facts of the case. Winkleman [sic] thus violated Rules 3.3 and 3.1, which imposed on her a duty of candor and a duty to present to the Court only assertions that have a basis in law and fact. Pa. R.P.C. 3.3, 3.1.

JA523. The R&R's broad and generalized conclusions leave ambiguity as to their precise factual basis. *See* JA527-28, JA529; *see also, e.g.*, JA511, JA525, JA530, JA531 (conclusions of nonspecific "misrepresentations").[2] But the R&R's stated reasoning does not support those broad conclusions. Rule 3.3 prohibits *knowingly* false statements, and each of the R&R's

[2] The R&R also asserts that Winkelman's "written misrepresentations and false testimony began in 2022," JA530, yet its conclusions primarily rest on filings from 2019.

theories of Winkelman's culpable knowledge fails. Rule 3.1 prohibits frivolous claims, yet the R&R focuses on critiques of Winkelman's conduct rather than whether she asserted a position that lacked a basis in law and fact.

"The clear and convincing standard requires evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, the truth of the precise facts in issue." *See Anon. Att'y*, 331 A.3d at 535 (brackets, quotation marks, and citation omitted). The record lacks clear and convincing evidence—or, indeed, even a preponderance of the evidence—to show that Winkelman knowingly made a false statement or asserted a frivolous issue.

### A. The record lacks clear and convincing evidence to support the conclusion that Winkelman knowingly made a false material statement in violation of Rule 3.3.

Rule 3.3 provides: "A lawyer shall not knowingly … make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Pa. R. Pro. Conduct 3.3(a)(1); *see McCarthy v. DEA*, 171 F.4th 245, 248 (3d Cir. 2026) ("Pa. R.P.C. 3.3 is violated only when an attorney 'knowingly' makes a false statement.").

"'Knowingly' … denotes actual knowledge of the fact in question." Pa. R. Pro. Conduct 1.0(f). This Court has thus emphasized that an attorney violates Rule 3.3 only when she in fact knows that her statements are false. *See McCarthy*, 171 F.4th at 248 ("While Attorney misrepresented the legal authorities he cited, it is debatable whether he knew such statements were false as he failed to read the cases.").

The R&R concludes that Winkelman "violated Rule 3.3" in that she (1) "misrepresented to Judge Goldberg"; (2) "failed to conduct a reasonable inquiry before making or ignoring such misstatements"; (3) "was willfully blind to the false statements made by George";[3] and "misrepresented to" (i.e., "testified falsely" before) (4) the Panel and (5) Judge Goldberg. JA527-28. The record lacks clear and convincing evidence to support the Panel's conclusions of violations on any of these five theories.

[3] These conclusions about misrepresentation to Judge Goldberg relate solely to "Winkelman's statements that the DAO conducted a 'careful' review of Wharton." JA525; *see also* JA530-31 (finding "George alone" responsible for statements about victim communications).

#### 1. The record lacks evidence to support the conclusion Winkelman actually knew, in April 2019, that the DAO had not carefully reviewed the facts and law.

The R&R concludes that Winkelman had actual knowledge of the falsity of "misrepresentations in the Supplemental Brief that she edited in which she reiterated that the DAO had 'carefully reviewed the facts and law.'" JA526. The Panel claimed that Winkelman supposedly "acknowledged … that George's presentation to the CCRC included no anti-mitigation evidence." JA525 (citing JA420 at 66:10-12). The Panel then observed that this Court's 2018 "Remand Order … explicitly referred to the anti-mitigation evidence in Wharton's prison record." JA526 (citing *Wharton*, 722 F. App'x at 282-83). From these premises, the Panel inferred "that Winkelman necessarily knew that there was anti-mitigation evidence that the CCRC, in its 'careful review,' never considered." JA526. Both necessary premises underlying this conclusion are unsupported by the record.

First, the Panel purported to rely on testimony in which Winkelman supposedly "acknowledged … that George's presentation to the CCRC included **no** anti-mitigation evidence." JA525 (emphasis in R&R) (citing JA420 at 66:10-12); *see also* JA517 ("Winkleman [sic] told us that she

remembered nothing about the CCRC meeting at which Wharton was considered, except George's failure to present anti-mitigation evidence and the CCRC's decision. [JA382] at 28:15-17.").

However, the cited testimony does not say that Winkelman remembered George's failure to present anti-mitigation evidence and the CCRC's decision. Instead, in the cited passage, Winkelman actually testified that she did not specifically recall the CCRC meeting at all. JA382 at 28:15-17. This was her consistent testimony throughout. *See* JA420 at 66:10-16; JA978 at 24:15-16 (consistent testimony at Rule 11 hearing).[4] The R&R does not cite any other record evidence to support its conclusion about George's presentation. In fact, what Winkelman testified was that, at the time she edited the supplemental brief in 2019, Winkelman understood the CCRC's process to be careful. *See* JA403 at 49:3-18. Thus, the R&R relies on a purported acknowledgement that Winkelman never made.

[4] Winkelman's lack of specific recollection is hardly surprising, given that the CCRC presentation occurred years before her testimony and was one of many dozens of cases that the CCRC considered. *See* JA464 at 110:14-16.

The record-evidence not only does not support the Panel's conclusion—it contradicts it. The uncontradicted evidence shows that George would review the records of prior proceedings and the defendant's criminal record, decide which cases warranted CCRC review, and then present his findings on those cases to the CCRC. *See* JA373 at 19:16-21; JA378 at 24:1-7, 24:15-18.

The Panel suggested that "Winkelman knew only what was in the memorandum presented to the CCRC that George prepared for each case," JA513 (citing JA377 at 23:15-20[5]), and it emphasized that the paralegal's memorandum "mentioned none of the anti-mitigation evidence in Wharton's prison record," JA517. But Winkelman testified that the custom and practice at CCRC meetings was for George to expand on the paralegal's memorandum and summarize the results of his own research. JA378-80 at 24:22-25:8, 25:24-26:2; JA392-83 at 38:25-39:9. The Panel did not discredit that testimony or make any contrary finding. Such custom and practice evidence is relevant and probative. *See, e.g.*, *Vanalt Elec. Constr. Inc. v. Selco Mfg. Corp.*, 233 F. App'x 105, 108 (3d Cir. 2007);

[5] The Panel cited Winkelman's testimony about how the memorandum was prepared, not the scope of CCRC meetings. JA377 at 23:15-20.

*Schwartz v. Comcast Corp.*, 256 F. App'x 515, 518-19 (3d Cir. 2007); *see also* Fed. R. Evid. 406.

No evidence was presented by either disciplinary counsel or the Panel that contradicted this evidence. On the contrary, admitted contemporaneous documentation supported it. A June 2018 email from George, on which Winkelman is copied, explains that the information to be reviewed included "reported opinions of appellate courts," "mitigation packets submitted by defense counsel," and "[o]ther information, such as the names and whereabouts of the victim's family," and "the criminal history of the defendant." JA319.

The record evidence thus establishes that the practice and process of the DAO as Winkelman understood it was for George to research thoroughly the prior case record; vet out cases that he believed did not warrant review by the CCRC; and then present the results of his research and findings to the CCRC. And the evidence is uncontradicted that this was Winkelman's understanding of the process at the time the brief in question was filed. This is entirely consistent with an understanding that "the District Attorney's Office carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria

articulated in Strickland v. Washington"—the relevant statement in the supplemental brief. JA605.

And the Panel discrediting Winkelman's testimony about her lack of recollection of the CCRC meeting does not support a finding that she in fact recalled George presenting no anti-mitigation evidence. *See, e.g.*, *Kendall v. Daily News Publ'g Co.*, 716 F.3d 82, 97 (3d Cir. 2013) ("When testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984))).

Second, the Panel could not reasonably infer what Winkelman "necessarily knew" from the remand order because the record lacks any evidence about Winkelman's contemporaneous knowledge of that order or her understanding of its contents. The R&R makes no factual findings about when Winkelman reviewed the remand order, or how she understood it in 2019, when the brief at issue was submitted. Instead, the R&R refers to Winkelman's current understanding of the remand order, rather than her understanding at the time at issue. *See* JA516, JA517, JA520, JA521. In its cross-examination of Winkelman, the Panel likewise

focused on her present understanding of the remand order, not how she understood it at the relevant time. *See* JA389-91 at 36:2-38:22; JA431 at 77:3-24. Put simply, the Panel made no findings of any actual knowledge regarding any unconsidered anti-mitigation evidence in 2019.

The Panel thus erred in both necessary premises of its conclusion that Winkelman actually knew that the DAO's review was not "careful."

#### 2. The record lacks evidence to support the conclusion that Winkelman was culpable even absent actual knowledge of falsity.

The R&R concludes alternatively that, even if Winkelman lacked actual knowledge, that would "not reduce her culpability" due to her lack of personal "inquiry" and "investigation":

> Any ignorance was the result of her failure to conduct the "reasonably diligent inquiry" required before she made the misleading statements to Judge Goldberg. 3.3(a)(1) cmt. 3. Indeed, she testified before us that she made no inquiry and conducted no investigation, notwithstanding the Third Circuit's explicit Remand direction that the Parties to "take account of the anti-mitigation evidence that the Commonwealth would have presented." [JA440-44] at 86:24-87:2, 89:23-90.5; <u>Wharton v. Vaughn III</u>, 722 F. App'x at 282-83.

JA526-27 (errors in original).

The Panel made no findings to suggest that it was unreasonable for Winkelman, as George's supervisor, to generally rely on his factual

review rather than her own independent inquiry and investigation. Instead, the Panel reasoned that it was unreasonable to do so in this particular case, because of what the R&R characterized as "the Third Circuit's explicit Remand direction" for the DAO to develop anti-mitigation evidence absent from the existing record. JA527. That logic is faulty because the Panel never analyzed the 2018 remand order itself and instead seems to have found that obligation, at least as to the DAO, in this Court's *subsequent Rule 11 decision*, issued years after the statement at issue in the April 2019 brief was made.

The Panel read the 2018 remand order as "the Circuit's instruction" *specifically to "the Parties" and, thus, to the DAO* "to reconstruct the record to include anti-mitigation evidence" absent from the existing record. JA522; *accord, e.g.*, JA525 ("the Third Circuit ordered the Parties to 'reconstruct the record'").

Yet, the remand opinion itself did not say that the "Parties" should reconstruct the record. Instead, it said, in the one paragraph the Panel cited:

> As for *Strickland*'s prejudice prong, to determine whether Wharton's proffered evidence had a reasonable probability of changing at least one juror's vote, "***we*** must reconstruct the record and assess it anew. In so doing, ***we*** cannot merely

> consider the mitigation evidence that went unmentioned in the first instance; ***we*** must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the petitioner's mitigation testimony." *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011).

*Wharton*, 722 F. App'x at 282-83 (emphases added). The Court in *Wharton* then itself weighed the newly proffered evidence in the context of the existing record. *See id.* at 283.

The *Wharton* remand order thus could fairly be read as guiding reviewing *courts* on how to examine on postconviction review the existing record evidence rather than as creating obligations for parties to expand the record with new evidence. To be sure, this Court in the 2024 Rule 11 opinion construed the 2018 remand order as the Panel did here. *Wharton*, 95 F.4th at 149 ("Our order remanding the case directed the parties to look beyond the record."). But what was written in 2024 logically cannot support inferences about Winkelman's knowledge in 2019.

Finally, even if Winkelman read and understood the 2018 remand opinion to require the **DAO** to conduct an independent review of anti-mitigation evidence, it does not require that she, rather than the DAO, conduct one. And the Court's finding that she knew the DAO failed to do so fails for reasons already explained. *See supra* Section II.A.1.

### 3. The record lacks evidence to support the conclusion of Winkelman's liability for George's violations.

The R&R repeatedly faults Winkelman for alleged misrepresentations by George. *See, e.g.*, JA511 ("We further find that she was willfully blind to, and complicit in, George's misrepresentations to Judge Goldberg."); JA525 ("Moreover, the evidence shows that Winkelman acquiesced in George's misstatements that she knew were false."); JA531 ("Winkelman … turned a blind eye to many of George's misrepresentations.").

This theory of willful blindness appears to be the R&R's basis for blaming Winkelman for statements in "the Notice of Concession and the Joint Proposed Order." JA525-26 (citing JA596-600, JA601-02). Winkelman did not prepare, sign, or file either the notice or the proposed order. JA599, JA601. Instead, as the R&R acknowledges, "Kaufman submitted the Notice and Joint Proposed Order at George's direction." JA518. Further, the record evidence is uncontradicted that Winkelman did not review or otherwise provide direction as to the contents of either. *See* JA398 at 44:6-22 (Winkelman's testimony before the Panel); JA1048-50 at 94:11-18, 96:7-10 (Kaufman's testimony at the Rule 11 hearing). The

Panel did not find otherwise, so it seems to have found Winkelman's fault via George.

However, the Pennsylvania Rules of Professional Conduct explicitly set forth, in Rules the violation of which was neither charged nor found here, the limited circumstances when a lawyer may be charged with responsibility for the misconduct of another. Specifically, Pennsylvania Rules of Professional Conduct 5.1 and 8.4 govern when lawyers may be held responsible for the ethical violations of others. *See* Pa. R. Pro. Conduct 5.1 cmt. 7 ("Apart from this Rule [5.1] and Rule 8.4(a), a lawyer does not have disciplinary liability for the conduct of a partner, associate or subordinate."). Yet, the Panel did not address either Rule. Instead, the Panel cited inapposite "willful blindness" cases that did not involve charged ethical violations, much less application of the Pennsylvania Rules of Professional Conduct.[6]

And even if these violations had been charged, the record lacks clear and convincing evidence to support a conclusion that Winkelman violated

[6] *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 768 (2011) ("civil lawsuits for induced patent infringement"); *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 187 (2022) ("copyright law"); *United States v. Stadtmauer*, 620 F.3d 238, 256 (3d Cir. 2010) ("criminal tax prosecutions").

them. A lawyer is not responsible for another's ethical violations unless she either "orders or, with knowledge of the specific conduct, ratifies the conduct involved" (Rule 5.1(c)(1)) or "knowingly assist[s] or induce[s] another to" violate the Rules (Rule 8.4(a)). There is no evidence that Winkelman ordered, ratified, knowingly assisted, or knowingly induced any ethical violations by George with respect to the notice of concession and proposed order because the only relevant record evidence shows that Winkelman was not involved with these submissions at all. *See* JA382 at 28:10-14; JA398 at 44:15-22.

**4. The record lacks evidence to support the conclusion that Winkelman knowingly made false statements to the Panel.**

The R&R also finds that Winkelman's provided "false testimony" at the hearing. JA511, JA530. But Rule 3.3 requires a specific and knowing "false statement of material fact or law." Mere adverse assessments of credibility are insufficient.

The R&R reflects the Panel's sweeping determinations not to credit Winkelman's testimony when it contradicted the Panel's theories. *See* JA511, JA517, JA527. But a "finding that testimony lacked credibility does not alone justify the conclusion that false testimony has been given."

*Kuswadi v. Attorney General*, 153 F. App'x 116, 120 (3d Cir. 2005) (quoting *Rodriguez-Gutierrez v. INS*, 59 F.3d 504, 507 (5th Cir. 1995)). While a factfinder "may simply disregard" testimony it discredits, that adverse credibility determination "is not considered a sufficient basis for drawing a contrary conclusion" that the testimony is *in fact false*. *Kendall*, 716 F.3d at 97 (quoting *Bose*, 466 U.S. at 512); *accord Eckenrode v. Pa. R. Co.*, 164 F.2d 996, 999 n.8 (3d Cir. 1947) ("[A] belief that testimony is false will not support an affirmative finding that the reverse of that testimony is true."). Discrediting Winkelman's testimony thus cannot support the Panel's conclusion that she violated Rule 3.3; only finding that Winkelman in her testimony *knowingly made a false statement* would. *See Kuswadi*, 153 F. App'x at 120 ("Nothing in the record indicates that the IJ affirmatively concluded that Kuswadi intentionally falsified her testimony," notwithstanding the IJ's "determination that Kuswadi's testimony … was not credible."); *ICN Pharms., Inc. v. Khan*, 2 F.3d 484, 493 (2d Cir. 1993) (distinguishing "a finding as to willfully false testimony" from "an ordinary credibility determination in the course of resolving a disputed issue of fact").

The specific findings of false testimony both are facially flawed and find no support in the record. *First*, the R&R states that "Winkelman testified falsely that she did not expect Judge Goldberg to sign the DAO's Joint Proposed Order." JA527 (citing JA422 at 68:17-24). The cited testimony shows she did not:

> Q: Now let me ask you, did you have an expectation, **you personally**, that Judge Goldberg would sign the order?
>
> **A: I didn't know one way or another.**
>
> Q: I mean, usually when lawyers come to you and say, hand up a stipulation, right, there's no one arguing the other side, and they hand it up, Judge Goldberg presumably could have signed the order, right?
>
> A: Yes.

JA422 at 68:17-24 (emphases added).

There is nothing false about this statement. No lawyer can "know one way or another" whether a judge "would" sign a **proposed** order, even if he "could" sign it.

Further, Winkelman was not involved in preparing or filing the proposed order. The Panel rejected Winkelman's testimony about not "know[ing]" whether Judge Goldberg would sign the letter as false on the rationale that "[t]here would have been no point in urging an order to

Judge Goldberg that Winkelman did not expect him to sign." JA527. But, indisputably, **Winkelman** did not urge the order on Judge Goldberg. *See supra* at 39-40.

*Second*, the Panel suggests that Winkelman testified falsely in her failure to readily adopt the Panel's label of "policy" for the DAO regularly conceding capital cases. The Panel stated that it did "not credit her testimony that there is no such policy." JA511; *see also* JA528 ("a DAO policy she denied exists").

It is true that Winkelman was not comfortable adopting the "policy" label pressed on her by the Panel in cross-examination. *See* JA456 at 102:10 (pausing on "the word policy"). But an exchange with Judge Pappert negates any suggestion that this was false testimony, much less knowingly so:

> [Q:] How can you say that there was no policy in the District Attorney's Office not to seek the death penalty? Did you think he needed to write that in a memorandum?
>
> A: I think you're right, Judge Pappert. I'm being too technical about the word policy.

JA457-58 at 103:23-104:2. That is hardly false or misleading.

Further, there was no evidence of a "policy" in the record, other than inferences drawn from the DAO regularly conceding relief. Disciplinary

counsel called no witnesses to testify that there was any such policy. No documents were offered or admitted into evidence referencing or memorializing any such policy.

Instead, the Panel appears to have relied on Winkelman's own testimony as the basis for inferring the existence of such a policy. Winkelman readily admitted that the DAO regularly conceded relief in capital cases, and testified that she could not recall any occasion on which the CCRC did not recommend death penalty relief. JA381 at 27:21-24. Winkelman consistently responded candidly to the Panel's many questions on the topic, across multiple hearings. *See* JA103 at 13:7-10 (conflicts hearing); JA117 at 27:2-5 (same); JA461 at 107:7-12 (disciplinary hearing). Winkelman's unquestioned testimony about what the DAO *actually did* shows that the focus on the "policy" label is semantic rather than substantive.

Winkelman further explained that she was reluctant to adopt the term "policy" because George and his counsel had represented to the Panel that there were cases where the DAO did not concede death penalty relief, JA458 at 104:3-16, which, if correct, would contradict the notion of a uniform policy. But Winkelman forthrightly explained that she

had no independent knowledge of whether that was in fact correct. JA458 at 104:6-22; JA413 at 59:3-11. That is a reasoned reluctance, not false testimony.

Whether one wants to characterize the DAO's concessions in capital cases as a policy, a practice, or an approach based on its consistent findings of constitutional violations,[7] Winkelman's testimony was truthful. The choice of terminology may reflect varying viewpoints, but not an ethical transgression.

*Third*, the R&R finds "untrue" testimony regarding the April 2019 supplemental brief in Winkelman supposedly testifying that, "because she had no actual knowledge of the anti-mitigation evidence, she lacked any wrongful intent warranting discipline." JA526 (citing JA397-98 at 43:12-44:5). But the R&R does not cite Winkelman ever testifying to that effect. The testimony that the Panel cited does not concern anti-mitigation evidence at all. JA397-98 at 43:12-44:5 (Winkelman testifying about insufficiency of the DAO's "communications with the victim's family," for

[7] The DAO consistently conceding relief in capital cases is hardly surprising, given the high rate of judicial reversals of death penalties (approximately 75%) in Philadelphia that occurred even before the current DA took office. *See* JA465 at 111:15-22.

which the Panel rightly held Winkelman had no responsibility). Winkelman in fact never testified that she had no actual knowledge of anti-mitigation evidence—only that she did not remember the specifics of the relevant CCRC meeting, but that the custom was for George to thoroughly review the relevant records and present his findings to the CCRC. *See* JA378-80 at 24:22-25:8, 25:24-26:2; JA392-93 at 38:25-39:8; *see also* JA1017 at 63:9-14 (George's consistent testimony at Rule 11 proceeding). The record simply does not reflect the testimony the Panel deemed "untrue."

In any event, the Panel also did not find that Winkelman in fact had actual knowledge of the anti-mitigation evidence. Instead, as discussed above, *supra* Section II.A.1, the Panel simply inferred from the remand opinion "that Winkelman necessarily knew that there was anti-mitigation evidence that the CCRC … never considered." JA526; *see also* JA520. The R&R does not find any facts about when Winkelman read the remand order, or what she otherwise knew about it in 2019, so it cannot support its conclusion that any testimony as to no actual knowledge would have been untrue.

*Finally*, the Panel suggested that Winkelman made a false statement to it through the joint answer filed by then-counsel for both George and Winkelman. The Panel found falsity in the statement that "the CCRC's 'careful review of the records … *included anti-mitigation evidence*.'" JA525 (emphasis in R&R) (quoting JA66[8]); *see also* JA521 (same). The Panel concluded that this statement was false, supposedly because "Winkelman acknowledged, however, that George's presentation to the CCRC included **no** anti-mitigation evidence." JA525 (emphasis in R&R) (citing JA420 at 66:10-12). Once again, Winkelman in fact never "acknowledged" that; rather, as discussed above, she testified that she did not recall that CCRC meeting. *See* JA420 at 66:10-12 (testifying to lack of recollection); *see supra* at 32 (discussing Panel's mischaracterization). The R&R's conclusion of falsity in this regard is thus once again without support in the record.

### 5. The R&R lacks evidence to support the conclusion that Winkelman testified falsely before Judge Goldberg.

The R&R claims that Winkelman testified falsely before Judge Goldberg when she "denied knowing about any anti-mitigation evidence."

---

[8] The Panel erroneously cited JA74.

JA520 (citing JA988 at 34:6-18). However, that is not what she testified to, and her actual testimony was not false. What the Panel described as testimony denying "knowing about anti-mitigation evidence" was actually testimony solely that she "was not aware of [Wharton's] escape" attempt before the AGO filed its amicus brief. JA988 at 34:10-11. The Panel did not find that Winkelman knew about the escape attempt before then, nor is there any evidence that would support such a conclusion. Thus, her actual testimony is not what the R&R describes, and is not false.

### B. The record lacks clear and convincing evidence to support the conclusion that Winkelman raised a frivolous claim in violation of Rule 3.1.

Rule 3.1 provides: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law." Pa. R. Pro. Conduct 3.1 (emphasis added); *see also Zappala v. Brandolini Prop. Mgmt., Inc.*, 909 A.2d 1272, 1279 (Pa. 2006) ("Rule 3.1 … bars a lawyer from bringing or defending a proceeding unless there is a non-frivolous basis for doing so."). "A frivolous issue is one lacking in **any** basis in law

or fact, but is distinguishable from an issue that simply lacks merit." *Commonwealth v. Chmiel*, 30 A.3d 1111, 1189 (Pa. 2011) (emphasis in original).

The R&R concludes that "Winkelman repeatedly violated Rule 3.1," JA529, but it does not discuss the only thing relevant to this rule—whether the issues raised in the supplemental brief that Winkelman signed supporting the DAO's concession of relief lacked any basis in law or fact. They did not.

To start, the supplemental brief itself—which the R&R does not analyze—specified the DAO's legal and factual basis for conceding relief. JA605-07. And Judge Goldberg's and this Court's opinions in Wharton's case belie any notion that the DAO's concession was frivolous. In 2018, this Court concluded that Wharton's final claim could have merit notwithstanding the anti-mitigation evidence that the Panel faulted the DAO for failing to consider. *See Wharton*, 722 F. App'x at 283 ("We recognize that Wharton's proffered evidence does, at least to a degree, 'cut both ways.' But in light of the positive elements of that evidence and the fact that the jury at the second penalty hearing was deadlocked at one

point, we conclude that Wharton has made a prima facie showing under *Strickland*'s prejudice prong.").

Then, despite denying relief, Judge Goldberg concluded that Wharton had made "a 'substantial showing of the denial of a constitutional right'" and granted a certificate of appealability—necessarily rejecting any claim that relief for Wharton would be frivolous. JA953 n.1 (quoting 28 U.S.C. § 2253(c)(2)). And this Court affirmed Judge Goldberg's denial only after engaging with the DAO's arguments, *see Wharton*, 95 F.4th at 123-25, never remotely suggesting that they were "frivolous." That those claims ultimately "lack[ed] merit" does not mean they were frivolous. *Smith v. Commonwealth*, 574 A.2d 558, 562 (Pa. 1990).

Rather than engage the relevant inquiry, the R&R focused on critiquing Winkelman's conduct. It first objected that "Winkelman informed herself of virtually nothing respecting [Wharton's] case" through independent inquiry and investigation and instead relied on George, and then that "Winkelman urged Judge Goldberg to sign the Joint Proposed Order." JA528. Not only are these objections unsupported, *see supra* at 36-37, 39-40, but they also concern Winkelman's purported individual

conduct; rather than the legal and factual basis of the DAO's position. The latter is all that is relevant here.

The Panel also objected to Winkelman's response "after the OAG revealed the anti-mitigation evidence." JA529. Some of this critique lacks support in the record,[9] but all of it is beside the point of the contemporaneous legal and factual basis for the DAO's position in the supplemental brief that Winkelman edited.

## III. The Panel's adversarial role in the hearing required its recusal from adjudicating the final decision against Winkelman.

Federal courts' inherent disciplinary authority must be "exercised within the parameters of due process." *Surrick*, 338 F.3d at 231 (citation omitted). "[D]ue process guarantee[s] that 'no man can be a judge in his own case.'" *Williams v. Pennsylvania*, 579 U.S. 1, 9 (2016) (quoting *In re*

[9] No record evidence supports the assertion that "Winkelman acknowledged that after the OAG revealed the anti-mitigation evidence—including Wharton's violent escape attempt—she did not look into the matter further or suggest to the DAO, George, or the Committee that the ineffectiveness concession be revisited." JA529. Winkelman testified that she could not recall a specific conversation from six years earlier but believed that she "would have gone to" the DA with "this new piece of evidence," because the concession "was his final decision." JA430-31 at 76:21-77:2. George's testimony at the conflicts hearing was consistent with Winkelman's, *see* JA129 at 39:7-19, and there is no contrary evidence in the record.

*Murchison*, 349 U.S. 133, 136 (1955)). An "unconstitutional potential for bias" thus "exists when the same person serves as both accuser and adjudicator," as well as "[w]hen a judge has served as an advocate for the State in the very case the court is now asked to adjudicate." *Id.* at 8-9.

When, as in those circumstances, a judge's "personal involvement" in a case gives "rise to an unacceptable risk of actual bias," that judge's "participation in the case" amounts to structural error. *Id.* at 14. Such a structural "due process violation" requires reversal even if it did not affect the outcome or give rise to actual bias. *See id.* ("the participation of an interested judge is a defect 'not amenable' to harmless-error review, regardless of whether the judge's vote was dispositive"); *Clemmons v. Wolfe*, 377 F.3d 322, 328 (3d Cir. 2004) (finding plain error where federal judge previously presided over habeas petitioner's state criminal proceeding, such that his "failure to recuse … created an appearance of impropriety," even where "nothing in the record suggest[ed] that" the "conscientious and hard-working judge" harbored any "actual bias"). "Due process entitles [a litigant] to a proceeding in which he may present his case with assurance that no member of the court is predisposed to find against him." *Williams*, 579 U.S. at 16 (quotation marks and citation omitted).

The Panel here was not a neutral arbiter. Instead, it crossed the line into aggressive advocacy adverse to a party when it pursued a broad-ranging and *in camera* fact investigation, and then extensively cross-examined Winkelman, including regarding matters developed from the *in camera* investigation. Winkelman recognizes the somewhat hybrid nature of disciplinary proceedings. But a "fair trial in a fair tribunal is a basic requirement of due process," and case-specific "[c]ircumstances and relationships must be considered" in determining whether a given proceeding satisfies that requirement. *Murchison*, 349 U.S. at 136. An "unconstitutional potential for bias" arose here when the Panel, in its pursuit of advocacy, "serve[d] as both accuser and adjudicator." *Williams*, 579 U.S. at 8.

Exercising plenary review, this Court should find a due process violation and reverse. *Adams*, 653 F.3d at 304 (citing *Martin v. Brown*, 63 F.3d 1252, 1262 (3d Cir. 1995)).

### A. The Panel shifted from the role of arbiter to advocate at the hearing.

Although a "court may examine a witness regardless of who calls the witness," Fed. R. Evid. 614(b), a "judge abandons his proper role" when a judge "assumes that of an advocate" in questioning. *Id.* advisory

committee's note; *accord United States v. Green*, 544 F.2d 138, 147 (3d Cir. 1976). The Panel assumed the role of advocate in its pre-hearing factual investigation and adversarial examination of Winkelman.

That the Panel did its own investigation before the hearing, without seeking the parties' assistance, is clear from the record of the hearing: The Panel gathered its own information about, among other things:

- The DA's public statements and political views, JA449-50 at 95:18-96:4 (quoting "statements … from his campaign website, comments he made on TV, and comments he made to the *Enquirer*");
- The DA's "criticisms" of some of his prosecutorial "predecessors," including "based on" interactions "in his own private practice," JA450-51 at 96:19-97:2;
- Winkelman's prior counsel's representation of "exonerated defendants" in Section "1983 actions" and other civil lawsuits, JA483-84 at 129:17-130:4 ("Did you know that in 12 of [31], over a third of them, Mr. Rudovsky and his firm are representing the exonerated defendants?");
- Various state-court proceedings involving the DAO, JA472-73 at 118:7-119:25; and

- Many federal filings by the DAO in matters other than Wharton, *e.g.*, JA458-60 at 104:17-106:25; JA462-72 at 108:7-118:6; JA475-76 at 121:4-122:10; JA479-80 at 125:23-126:9; JA475 at 121:13-14 ("And I looked at that, and that didn't sound to me like something Judge Robreno would do, so I looked into that.").

The Panel then leveraged its investigation to rigorously examine Winkelman—going far beyond clarifying or elucidating the testimony the parties presented, and even going so far as to prepare in advance a "script" to aid it in its cross-examination. The Panel questioned Winkelman at far greater length than disciplinary counsel. *Compare* JA408-34 (approximately 26 pages of examination by disciplinary counsel, in which the Panel also participated), *with* JA439-85 (approximately 46 pages of examination by the Panel alone). The Panel also repeatedly interrupted Winkelman's direct examination to question her. *See* JA362 at 8:17-25; JA375-76 at 21:2-22:13; JA390-92 at 36:2-38:23; JA401 at 47:5-8.

The Panel likewise ventured far beyond the allegations of the Petition for Rule to Show Cause. It questioned Winkelman about, among other things:

- Other cases handled by the DAO, *e.g.*, JA458-60 at 104:17-106:25; JA462-77 at 108:7-123:6;
- DAO employees not involved in any filings at issue here, JA455 at 101:7-22; JA484-85 at 130:5-131:2;
- The DA's statements while campaigning for office, JA449-50 at 95:18-96:4; and
- Any DAO "policy … with respect to the selection of use of outside counsel" to be "paid with taxpayer dollars," JA481-82 at 127:14-128:25.

This questioning included filings in other matters that were not in the record prior to the hearing, and which Winkelman had nothing to do with. *E.g.*, JA474-82 at 120:22-122:10.

Through its investigation and adversarial questioning, the Panel "served as an advocate for the State in the very case [it later] adjudicate[d]," creating an "unconstitutional potential for bias." *Williams*, 579 U.S. at 8-9. Whether the Panel members "proceeded with any sort of ill motive" is not the issue. *Clemmons*, 377 F.3d at 328. "[W]hether a judge harbors an actual, subjective bias" is irrelevant; the record here raises a

"serious question" as to the adversarial nature of the Panel under the governing "objective standard." *Williams*, 579 U.S. at 8.

### B. The Panel impermissibly judged its own case in participating in the district court's adjudication of the final decision.

Because the Panel engaged in interested advocacy at the hearing, it could no longer serve as neutral arbiter in the proceeding. An "unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case." *Williams*, 579 U.S. at 8.

The adversarial nature of the Panel's approach is underscored by the apparent failure to inform disciplinary counsel or Winkelman's counsel in advance. *See* JA492 at 138:17-21. The Panel's choice to surprise Winkelman (and all counsel) with questions far beyond the charges only highlights the inappropriate adversarial nature of its questioning.

After the Panel rested, Winkelman's counsel objected that the Panel's examination "ha[d] gone far beyond the four corners of the order to show cause and the petition," and moved to strike any responsive "testimony on the basis of relevance." JA485 at 131:19-25. Disciplinary counsel and he had "exchanged the information [they] both intended to offer at this hearing," but Winkelman's counsel "had not heard about"

many of "alleged misconduct issues … until the questioning" by the Panel and thus was "not prepared to respond to any of it." JA486 at 132:2-13. Disciplinary counsel conceded that he "didn't give counsel fair notice of what [the Panel] was going to do" because he "didn't call [the Panel] to find out." JA492 at 138:17-21.

The Panel overruled this objection to its own questioning. *See* JA486-87 at 132:16-133:10 ("I will take you up on your objection and I will overrule it, and here is why. … All of what I was getting into was relevant for many reasons … ."); *see also* JA493 at 139:4-14 ("Everything that I asked, that wasn't anything I asked that was a secret. … [L]est there be anybody thinking that this was unfair surprise or that anybody got blindsided here, I disagree.").

The Panel specifically defended its broadest questioning, including about filings not previously in the record. *See* JA493 at 139:16-21 ("[A]ll those other cases were listed for us as the purported basis for why judges of this Court should sign off on stipulations because our colleagues had done so. And there are a couple of colleagues who did so not knowing what the story really was, and that's important. And that's why I brought it."); *see also* JA474-76 at 120:22-122:10 (questioning Winkelman about

motion she had not signed). This exchange captures the "serious question [that] arises as to whether [a] judge, even with the most diligent effort, could set aside any personal interest in the outcome" of a matter where that "judge has served as an advocate." *Williams*, 579 U.S. at 9.

Winkelman moved the Panel to recuse itself from the full court's vote on its R&R, first and foremost for that reason. JA557-60. The district court could have cured the resulting potential for bias either by appointing a new panel or by the Panel simply recusing itself from the court's final vote on the R&R. The district court took neither path. Instead, it denied Winkelman's motion without explanation and allowed the Panel to participate in adopting its own R&R. This was error.

Because the Panel had shifted its role from arbiter to advocate at the hearing, participating in the district court's final adjudication of the matter made the Panel "a judge in [its] own case." *Murchison*, 349 U.S. at 136. "Circumstances and relationships must be considered," *id.*, in determining whether, under an "objective standard," an "impermissible risk of actual bias" arises, *Williams*, 579 U.S. at 8; *cf. Abulashvili v. Attorney General*, 663 F.3d 197, 207-08 (3d Cir. 2011) ("It is difficult to conclude that Abulashvili received a 'fair and full hearing' when the IJ

ceased being the 'neutral arbiter' due process demands and assumed the role of an advocate instead."). The Panel's advocacy at the hearing *and* participating in the district court's final adjudication created this unacceptable risk. *See Williams*, 579 U.S. at 8. The "failure to recuse" in these circumstances "constitutes structural error," *id.* at 14, and this Court should reverse.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's order imposing a three-year suspension and remand with directions to enter judgment for Winkelman. In the alternative, the Court should reverse and remand for a new evidentiary hearing before a new three-judge panel.

Dated: August 20, 2026

Respectfully submitted,

s/ *Eric W. Sitarchuk*

ERIC SITARCHUK
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
(215) 963-5000

JAMES D. NELSON
ANDREW R. HELLMAN
MORGAN, LEWIS & BOCKIUS LLP

1111 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 739-3000

*Counsel for Nancy Winkelman*

## COMBINED CERTIFICATES OF COMPLIANCE

In accordance with Local Appellate Rules 28.3(d) and 46.1(e), I certify that all attorneys whose names appear on this brief are members in good standing of the bar of this Court or have filed an application for admission.

In accordance with Local Appellate Rule 31.1(c), I certify that the texts of the electronic brief and paper copies are identical and that Microsoft Defender Offline scanned the file and did not detect a virus.

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,684 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), according to the word count of Microsoft Word 365. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in Century Schoolbook 14-point font, a proportionally spaced typeface.

Dated: August 20, 2026

s/ Eric W. Sitarchuk
ERIC W. SITARCHUK

# No. 26-1798

## In the United States Court of Appeals
FOR THE THIRD CIRCUIT

IN RE: NANCY WINKELMAN,

*Appellant*

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 22-mc-0051

# JOINT APPENDIX
# VOLUME I (JA1 to JA3)

JAMES D. NELSON
ANDREW R. HELLMAN
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 739-3000

ERIC W. SITARCHUK
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
(215) 963-5000

*Counsel for Appellant Nancy Winkelman*

# JOINT APPENDIX – VOLUME I


| **Description** | **Date** | **Page No.** |
|---|---|---|
| Notice of Appeal (Dkt. No. 75) | 2026.04.07 | JA1 |
| Order Approving and Adopting the Disciplinary Panel's October 27, 2025 Report and Recommendation (Dkt. No. 70) | 2026.03.09 | JA3 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN THE MATTER OF<br>NANCY WINKELMAN | MISCELLANEOUS<br>NO.: 2:22-MC-00051-PD |

**RESPONDENT NANCY WINKELMAN'S NOTICE OF APPEAL**

**NOTICE IS HEREBY GIVEN** that Respondent Nancy Winkelman hereby appeals to the United States Court of Appeals for the Third Circuit from this Court's March 9, 2026 Order Approving and Adopting the Disciplinary Panel's October 27, 2025 Report and Recommendation, ECF No. 70. Respondent appeals this Order under 28 U.S.C. § 1291 (granting jurisdiction of appeals from "all final decisions of the district courts of the United States . . .").

Respectfully submitted,

Dated: April 7, 2026

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ *Eric W. Sitarchuk*

Eric W. Sitarchuk
eric.sitarchuk@morganlewis.com
Bradie R. Williams
bradie.williams@morganlewis.com
2222 Market Street
Philadelphia, PA 19103-3007
Telephone: +1.215.963.5000
Facsimile: +1.215.963.5001

Attorneys for Respondent

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2026, a true and correct copy of the foregoing was filed via the Court's CM/ECF system for electronic service on all counsel of record.

*/s/ Eric W. Sitarchuk*
Eric W. Sitarchuk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN THE MATTER OF** | : | **MISCELLANEOUS** |
| | : | |
| **NANCY WINKELMAN** | : | **No. 22-mc-51** |
| | : | |

## ORDER

**AND NOW**, this 9th day of March, 2026, after careful consideration of this matter, including: the October 27, 2025 Report and Recommendation from Judges Paul S. Diamond, Gerald J. Pappert, and John M. Gallagher, in which they recommend that Ms. Winkelman be suspended from our bar for three years; Ms. Winkelman's Objections to and Motion Regarding the Report and Recommendation; all related submissions; and the March 9, 2026 decision of the majority of Judges of this Court approving the Report and Recommendation, **IT IS HEREBY ORDERED AS FOLLOWS:**

1. The October 27, 2025 Report and Recommendation (Doc. No. 64) is **APPROVED** and **ADOPTED**;
2. Ms. Winkelman's Objections to the Panel's Report and Recommendation are **OVERRULED** and her Motion is **DENIED**; and
3. Mr. Winkelman is suspended from the bar of the United States District Court for the Eastern District of Pennsylvania for three years, effective immediately.

It is **FURTHER ORDERED** that all filings in this matter, including the Panel's Report and Recommendation, remain **SEALED** pending the termination of all appeals and any further proceedings of this Court.

**BY THE COURT:**

**WENDY BEETLESTONE, C.J.**