No. 26-1798

# In the United States Court of Appeals
FOR THE THIRD CIRCUIT

IN RE: NANCY WINKELMAN,

*Appellant*

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 22-mc-0051

## JOINT APPENDIX
## VOLUME III (JA563 to JA1058)

JAMES D. NELSON
ANDREW R. HELLMAN
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, D.C. 20004
(202) 739-3000

ERIC W. SITARCHUK
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
(215) 963-5000

*Counsel for Appellant Nancy Winkelman*

## JOINT APPENDIX– VOLUME III


| **Description** | **Date** | **Page No.** |
|---|---|---|
| ***Wharton v. Vaughn*, E.D. Pa. No. 2:01-cv-06049-MSG** | | |
| Docket Entries | | JA563 |
| Notice of Concession (Dkt. No. 155) | 2019.02.06 | JA596 |
| Proposed Order (Dkt. No. 156-1) | 2019.02.08 | JA601 |
| DAO Supplemental Brief (Dkt. No. 162) | 2019.04.03 | JA603 |
| Order (Dkt. No. 165) | 2019.05.07 | JA610 |
| AGO Amicus Brief (Dkt. No. 171) | 2019.07.22 | JA614 |
| Wames Affidavit (Dkt. No. 176-2) | 2019.08.01 | JA665 |
| Transcript of Evidentiary Hearing (2021.03.16) (Dkt. No. 252) | 2021.03.25 | JA669 |
| Order (Dkt. No. 285) | 2022.05.11 | JA953 |
| Transcript of Rule 11 Hearing (2022.06.23) (Dkt. No. 309) | 2022.06.24 | JA955 |

CLOSED,HABEAS,DEATH,PENALTY

# United States District Court
# Eastern District of Pennsylvania (Philadelphia)
# CIVIL DOCKET FOR CASE #: 2:01-cv-06049-MSG

WHARTON v. VAUGHN
Assigned to: DISTRICT JUDGE MITCHELL S. GOLDBERG
Demand: $0
Case in other court: USCA for the Third Circuit, 07-09006
USCA FOR THE THIRD CIRCUIT, 13-09002
U.S.C.A., 21-09000
USCA, 22-02839
USCA, 22-09001
Cause: 28:2254dp Petition for Writ of Habeas Corpus (DEATH PENALTY)

Date Filed: 12/03/2001
Date Terminated: 05/11/2022
Jury Demand: None
Nature of Suit: 535 Habeas Corpus: Death Penalty
Jurisdiction: Federal Question

**Petitioner**

**ROBERT WHARTON** represented by

**ROBERT WHARTON**
AY-6874
SCI PHOENIX
P.O. BOX 244
COLLEGEVILLE, PA 19426-0244
PRO SE

**EDMUND J. CAMPBELL , JR.**
CAMPBELL ROCCO LAW, LLC
2701 RENAISSANCE BLVD
4TH FLOOR
KING OF PRUSSIA, PA 19406
610-992-5885
Email: ecampbell@campbellroccolaw.com
*TERMINATED: 01/21/2003*
*LEAD ATTORNEY*

**MICHAEL WISEMAN**
WISEMAN & SCHWARTZ
718 ARCH ST SUITE 702 NORTH
PHILADELPHIA, PA 19106
215-450-0903
Email: wiseman@wisemanschwartz.com
*TERMINATED: 09/09/2011*
*LEAD ATTORNEY*

**VICTOR JULIO ABREU**
FEDERAL PUBLIC DEFENDER'S OFFICE
SUITE 545 WEST THE CURTIS CENTER
PHILADELPHIA, PA 19106

215-928-0520
Email: victor_abreu@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Claudia Van Wyk**
American Civil Liberties Union Foundation
Capital Punishment Project
201 West Main Street
Suite 402
Durham, NC 27701
267-971-6991
Email: cvanwyk@aclu.org
*ATTORNEY TO BE NOTICED*

**ELIZABETH MCHUGH**
FEDERAL COMMUNITY DEFENDER
OFFICE - EDPA
SUITE 545 WEST THE CURTIS CENTER
601 WALNUT ST
PHILADELPHIA, PA 19106
215-928-0520
Email: elizabeth_mchugh@fd.org
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**DONALD T. VAUGHN** represented by **MAX COOPER KAUFMAN**
PHILADELPHIA DISTRICT ATTY'S
OFFICE
3 SOUTH PENN SQUARE
PHILADELPHIA, PA 19107
215-686-5747
Email: max.kaufman@phila.gov
*ATTORNEY TO BE NOTICED*

**NANCY WINKELMAN**
Philadelphia District Attorney's Office
3 South Penn Square
PHILADELPHIA, PA 19107
215-686-5700
Email: nancy.winkelman@phila.gov
*ATTORNEY TO BE NOTICED*

**PAUL M. GEORGE**
Philadelphia District Attorney's Office
3 South Penn Square
Philadelphia, PA 19107
215-686-5730
Email: paul.george@phila.gov
*ATTORNEY TO BE NOTICED*

**ROBERT M. FALIN**
MONTGOMERY COUNTY DISTRICT
ATTORNEY'S OFFICE
POBOX 311
NORRISTOWN, PA 19404-0311
610-278-3102
Email: rfalin@montcopa.org
*TERMINATED: 10/19/2011*

**THOMAS W. DOLGENOS**
DISTRICT ATTORNEY'S OFFICE
THREE SOUTH PENN SQUARE
PHILADELPHIA, PA 19107-3499
215-686-5701
Email: DAFed.Lit@phila.gov
*ATTORNEY TO BE NOTICED*

**Respondent**

**THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE** represented by

**JOHN S. SUMMERS**
Hangley Aronchick Segal Pudlin & Schiller
1735 Market Street
Ste 26th Floor
Philadelphia, PA 19103-6933
215-496-7007
Fax: 215-568-0300
Email: jsummers@hangley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ANDREW M. ERDLEN**
Hangley Aronchick Segal Pudlin & Schiller
1735 Market Street
26th Floor
Philadelphia, PA 19103
215-496-7036
Fax: 215-568-0300
Email: aerdlen@hangley.com
*ATTORNEY TO BE NOTICED*

**DAVID RUDOVSKY**
KAIRYS RUDOVSKY MESSING
FEINBERG & LIN, LLP
THE CAST IRON BLDG STE 501 SOUTH
718 ARCH STREET
PHILADELPHIA, PA 19106
215-925-4400
Fax: 215-925-5365
Email: drudovsky@krlawphila.com
*ATTORNEY TO BE NOTICED*

**NANCY WINKELMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **PENNSYLVANIA OFFICE OF ATTORNEY GENERAL** | represented by | **JAMES P. BARKER**<br>PA ATTORNEY GENERAL'S OFFICE<br>16TH FL STRAWBERRYSQ<br>HARRISBURG, PA 17120<br>717-705-0098<br>Email: jbarker@attorneygeneral.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**CARI L. MAHLER**<br>PA OFFICE OF ATTORNEY GENERAL<br>1000 MADISON AVENUE<br>SUITE 310<br>NORRISTOWN, PA 19403<br>610-631-6552<br>Email: cmahler@attorneygeneral.gov<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 12/03/2001 | 1 | MOTION BY PETITIONER ROBERT WHARTON TO PROCEED IN FORMA PAUPERIS . (lvj) (Entered: 12/04/2001) |
| 12/03/2001 | 2 | MOTION BY PETITIONER ROBERT WHARTON FOR APPOINTMENT OF COUNSEL PURSUANT TO TITLE 21 U.S.C. SECTION 848(q)(4)(B)1988 TO REPRESENT PETITIONER ON HIS APPLICATION AND PETITION FOR WRIT OF HABEAS CORPUS UNDER TITLE 28 U.S.C. SECTION 2254 , MEMORANDUM OF LAW. (lvj) (Entered: 12/04/2001) |
| 12/03/2001 | | Habeas Corpus Case Management Track. (lvj) (Entered: 12/04/2001) |
| 12/07/2001 | 3 | ORDER THAT PLFF'S MOTION TO PROCEED IN FORMA PAUPERIS IS GRANTED UNTIL FURTHER ORDER OF THE COURT. ( SIGNED BY CHIEF JUDGE JAMES T. GILES ) 12/10/01 ENTERED AND COPIES MAILED . (lvj) (kmk, ). (Entered: 12/10/2001) |
| 12/11/2001 | 4 | Certificate of death penalty case ( copy to usca) (lvj) (Entered: 12/12/2001) |
| 12/18/2001 | 5 | ORDER TO APPOINT EDMUND J. CAMPBELL, JR. ESQUIRE AS COUNSEL FOR PETITIONER UNDER THE CJA ( SIGNED BY CHIEF JUDGE JAMES T. GILES 12/19/01 ENTERED AND COPIES MAILED . (lvj) (kmk, ). (Entered: 12/19/2001) |
| 01/07/2002 | 6 | ORDER TO APPOINT EDMUND J. CAMPBELL, JR, ESQUIRE AS COUNSEL FOR PETITIONER UNDER THE CJA ( SIGNED BY CHIEF JUDGE JAMES T. GILES ) 1/8/02 ENTERED AND COPIES MAILED (lvj) (kmk, ). (Entered: 01/08/2002) |
| 03/27/2002 | 7 | MOTION BY PETITIONER ROBERT WHARTON FOR APPOINTMENT OF COUNSEL (lvj) (Entered: 03/28/2002) |
| 04/02/2002 | 8 | ORDER THAT PLFF'S MOTION FOR APPOINTMENT OF COUNSEL IS DENIED. ( SIGNED BY CHIEF JUDGE JAMES T. GILES ) 4/2/02 ENTERED AND COPIES MAILED (lvj) (kmk, ). (Entered: 04/02/2002) |
| 09/18/2002 | 9 | MOTION BY PETITIONER ROBERT WHARTON FOR APPOINTMENT OF NEW COUNSEL , CERTIFICATE OF SERVICE. (dt) (kmk, ). (Entered: 09/19/2002) |

| | | |
|---|---|---|
| 12/10/2002 | 10 | ORDER THAT PLFF'S MOTION FOR APPOINTMENT OF NEW COUNSEL IS DENIED. ( SIGNED BY CHIEF JUDGE JAMES T. GILES ) 12/10/02 ENTERED AND COPIES MAILED. (lvj) (kmk, ). (Entered: 12/10/2002) |
| 01/08/2003 | 11 | Petition of PETITIONER ROBERT WHARTON for a stay of execution, memorandum of law in support. (lvj) (Entered: 01/09/2003) |
| 01/15/2003 | 12 | UNOPPOSED MOTION BY PETITIONER ROBERT WHARTON FOR STAY OF EXECUTION AND REQUEST FOR CHANGE OF APPOINTED COUNSEL , CERTIFICATE OF SERVICE. (lvj) (kmk, ). (Entered: 01/16/2003) |
| 01/21/2003 | 13 | ORDER: PETITIONER'S MOTION FOR STAY OF EXECUTION AND REQUEST FOR CHANGE OF APPOINTED COUNSEL IS GRANTED; PETITIONER'S EXECUTION SCHEDULED FOR 2/13/03 IS STAYED FOR THE DURATION OF THE PROCEEDINGS AND UNTIL FURTHER ORDER OF THIS COURT; EDMUND CAMPBELL IS RELIEVED OF HIS ASSIGNMENT AND THE CAPITAL HABEAS CORPUS UNIT OF THE DEFENDER ASSOCIATION OF PHILA., FEDERAL COURT DIVISION, IS APPOINTED; COUNSEL SHALL FILE A PETITION FOR WRIT OF HABEAS CORPUS ON OR BEFORE 6/2/03. (SIGNED BY CHIEF JUDGE JAMES T. GILES) 1/21/03 ENTERED AND COPIES MAILED. (fb) (kmk, ). (Entered: 01/21/2003) |
| 05/28/2003 | 14 | PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE PETITION FOR A WRIT OF HABEAS CORPUS, CERTIFICATE OF SERVICE.(lvj, ) (kmk, ). (Entered: 05/29/2003) |
| 05/30/2003 | 15 | ORDER THAT PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE PETITION FOR WRIT OF HABEAS CORPUS IS GRANTED; PETITIONER'S HABEAS CORPUS PETITION IS NOW DUE BY 9/1/03. SIGNED BY JUDGE JAMES T. GILES ON 5/30/03. 6/2/03 ENTERED AND COPIES MAILED. (md, ) (kmk, ). (Entered: 06/02/2003) |
| 05/30/2003 | | Set deadline for Petitioner's Petition for Writ of Habeas Corpus: Petition due by 9/1/2003. (md, ) (Entered: 06/02/2003) |
| 08/25/2003 | 16 | PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE PETITION FOR A WRIT OF HABEAS CORPUS, CERTIFICATE OF SERVICE.(lvj, ) Additional attachment(s) added on 9/3/2003 (lvj, ). (Entered: 08/26/2003) |
| 08/28/2003 | 17 | ORDER THAT PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE PETITION FOR A WRIT OF HABEAS CORPUS IS GRANTED. PETITIONER'S HABEAS CORPUS PETITION IS NOW DUE ON OR BEFORE 9/22/03. SIGNED BY JUDGE JAMES T. GILES ON 8/28/03.8/29/03 ENTERED AND COPIES MAILED. (lvj, ) (kmk, ). (Entered: 08/29/2003) |
| 08/28/2003 | | PETITIONER'S HABEAS CORPUS PETITION DUE BY 9/22/2003. (lvj, ) (Entered: 08/29/2003) |
| 09/19/2003 | 18 | UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE PETITION FOR WRIT OF HABEAS CORPUS FILED BY PETITIONER ROBERT WHARTON,CERTIFICATE OF SERVICE.(np) (Entered: 09/22/2003) |
| 09/29/2003 | 19 | ORDER THAT PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE PETITION FOR A WRIT OF HABEAS CORPUS IS GRANTED. PETITIONER'S HABEAS CORPUS PETIITON IS NOW DUE ON OR BEFORE 10/06/03. SIGNED BY JUDGE JAMES T. GILES ON 9/29/03.9/30/03 ENTERED AND COPIES MAILED. (lvj, ) (kmk, ). (Entered: 09/30/2003) |

| | | |
|---|---|---|
| 10/06/2003 | 20 | PETITIONER'S MOTION TO FILE HABEAS CORPUS PETITION IN EXCESS OF PAGE LIMIT, CERTIFICATE OF SERVICE. (PETITION FOR A WRIT OF HABEAS CORPUS AND CONSOLIDATED MEMORANDUM OF LAW WITH EXHIBITS ATTACHED)(lvj, ) Additional attachment(s) added on 10/7/2003 (lvj, ). (Entered: 10/07/2003) |
| 10/07/2003 | 21 | ORDER THAT PETITIONER'S MOTION FOR PERMISSION TO FILE HIS PETITION FOR WRIT OF HABEAS CORPUS IN EXCESS OF THE PAGE LIMITS IS GRANTED. THE PETITION FOR A WRIT OF HABEAS CORPUS AND CONSOLIDATED MEMORANDUM OF LAW IS ACCEPTED FOR FILING. SIGNED BY JUDGE JAMES T. GILES ON 10/07/03.10/07/03 ENTERED AND COPIES MAILED. (lvj, ) (kmk, ). (Entered: 10/07/2003) |
| 10/07/2003 | 22 | PETITION for Writ of Habeas Corpus and consolidated memorandum of law, certificate of service and exhibits filed by ROBERT WHARTON.(lvj, ) (Entered: 10/08/2003) |
| 11/24/2003 | 23 | PRO SE PETITION FOR APPOINTMENT OF NEW COUNSEL, MEMORANDUM OF LAW, CERTIFICATE OF SERVICE. (lvj, ) (Entered: 11/24/2003) |
| 11/25/2003 | 24 | ORDER THAT THE GOVERNMENT SHALL ANSWER PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS BY 1/15/04. SIGNED BY JUDGE JAMES T. GILES ON 11/25/03. 11/26/03 ENTERED AND COPIES MAILED.(lvj, ) (Entered: 11/26/2003) |
| 11/25/2003 | | Update Answer Deadline DONALD T. VAUGHN. (lvj, ) (Entered: 11/26/2003) |
| 01/29/2004 | 25 | UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE RESPONSE NUNC PRO TUNC FILED BY RESPONDENT DONALD T. VAUGHN, CERTIFICATE OF SERVICE. (DOLGENOS, THOMAS) Modified on 1/30/2004 (np). (Entered: 01/29/2004) |
| 03/09/2004 | 26 | ORDER THAT RESPONDENTS' TIME FOR FILING A RESPONSE TO THE PETITION FOR WRIT OF HABEAS CORPUS IN THE ABOVE-CAPTIONED MATTER IS EXTENDED NUNC PRO TUNC TO APRIL 26, 2004. SIGNED BY JUDGE JAMES T. GILES ON 3/9/04.3/9/04 ENTERED AND COPIES MAILED. (lvj, ) (kmk, ). (Entered: 03/09/2004) |
| 03/09/2004 | | Update Answer Deadline DONALD T. VAUGHN. (lvj, ) (Entered: 03/09/2004) |
| 04/26/2004 | 27 | MOTION for Extension of Time to File Answer filed by RESPONDENT DONALD T. VAUGHN, Certificate of Service. (DOLGENOS, THOMAS) Modified on 4/28/2004 (fh) (Entered: 04/26/2004) |
| 04/29/2004 | 28 | ORDER THAT THE RESPONDENTS' TIME FOR FILING A RESPONSE TO THE PETITION FOR WRIT OF HABEAS CORPUS IS EXTENDED TO JUNE 17, 2004. SIGNED BY JUDGE JAMES T. GILES ON 4/29/04.4/30/04 ENTERED AND COPIES MAILED. (lvj, ) (kmk, ). (Entered: 04/30/2004) |
| 04/29/2004 | | Update Answer Deadline DONALD T. VAUGHN. (lvj, ) (Entered: 04/30/2004) |
| 06/17/2004 | 29 | MOTION for Extension of Time to File Response/Reply *to Petition for Writ of Habeas Corpus (Unopposed)* filed by DONALD T. VAUGHN.certificate of service. (DOLGENOS, THOMAS) (Entered: 06/17/2004) |
| 06/18/2004 | 30 | ORDER THAT RESPONDETS' TIME FOR FILING A RESPONSE TO THE PETITION FOR WRIT OF HABEAS CORPUS IS EXTENDED TO 8/9/04. ( SIGNED BY JUDGE JAMES T. GILES ON 6/17/04. ) 6/18/04 ENTERED AND COPIES MAILED.(gn, ) (kmk, ). (Entered: 06/18/2004) |

| | | |
|---|---|---|
| 07/16/2004 | 31 | PETITION by ROBERT WHARTON to proceed pro se, certificate of service. (lvj, ) (Entered: 07/16/2004) |
| 07/16/2004 | 32 | PRO SE PETITION by ROBERT WHARTON for appointment of new counsel, certificate of service. (lvj, ) (Entered: 07/16/2004) |
| 08/02/2004 | 33 | Amendment to petition for a writ of habeas corpus, certificate of service. (lvj, ) (Entered: 08/03/2004) |
| 08/09/2004 | 34 | MOTION for Extension of Time to File Answer *to federal habeas petition* filed by DONALD T. VAUGHN.certificate of service.(DOLGENOS, THOMAS) (Entered: 08/09/2004) |
| 08/09/2004 | 35 | ORDER THAT RESPONDENTS' TIME FOR FIING A RESPONSE TO THE PETITION FOR WRIT OF HABEAS CORPUS IS EXTENDED TO 9/8/04. SIGNED BY JUDGE JAMES T. GILES ON 8/9/04.8/10/04 ENTERED AND COPIES MAILED. (lvj, ) (kmk, ). (Entered: 08/10/2004) |
| 09/08/2004 | 36 | Response *to Petition for Writ of Habeas Corpus* by DONALD T. VAUGHN, Certificate of Service. (DOLGENOS, THOMAS) Modified on 9/9/2004 (np). (Entered: 09/08/2004) |
| 09/09/2004 | 37 | PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE REPLY TO THE COMMONWEALTH'S RESPONSE TO PETITION FOR A WRIT OF HABEAS CORPUS, CERTIFICATE OF SERVICE.(lvj, ) (Entered: 09/10/2004) |
| 09/10/2004 | 38 | ORDER THAT PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE RESPONSE/REPLY TO PETITION FOR A WRTI OF HABEAS CORPUS IS GRANTED. PETITIONER'S REPLY IS NOW DUE ON OR BEFORE 01/27/05. RESPONSES DUE BY 1/27/2005. SIGNED BY JUDGE JAMES T. GILES ON 9/10/04.9/13/04 ENTERED AND COPIES MAILED(lvj, ) (kmk, ). (Entered: 09/13/2004) |
| 01/25/2005 | 39 | PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE REPLY TO THE COMMONWEALTH'S RESPONSE TO PETITION FOR A WRIT OF HABEAS CORPUS FILED BY ROBERT WHARTON, CERTIFICATE OF SERVICE. (lvj, ) (Entered: 01/26/2005) |
| 01/28/2005 | 40 | ORDER THAT PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE REPLY TO THE COMMONWEALTH'S RESPONSE IS GRANTED. PETITIONER'S REPLY IS NOW DUE ON OR BEFORE 3/28/05. REPLIES DUE BY 3/28/2005. SIGNED BY JUDGE JAMES T. GILES ON 1/28/05.1/31/05 ENTERED AND COPIES MAILED. (lvj, ) (kmk, ). (Entered: 01/31/2005) |
| 01/28/2005 | | Set/Reset Deadlines: REPLIES DUE BY 3/28/2005. (lvj, ) (Entered: 02/01/2005) |
| 03/24/2005 | 41 | PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE REPLY TO THE COMMONWEALTH'S RESPONSE TO PETITION FOR A WRIT OF HABEAS CORPUS FILED BY ROBERT WHARTON.CERTIFICATE OF SERVICE. (wgc, ) (Entered: 03/25/2005) |
| 03/28/2005 | 42 | ORDER THAT PETITIONER'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE A REPLY TO THE COMMONWEALTH'S RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS IS GRANTED. PETITIONER'S REPLY IS DUE ON OR BEFORE 4/27/2005. SIGNED BY JUDGE JAMES T. GILES ON 3/28/05. 3/28/05 ENTERED AND COPIES MAILED. (jpd) (Entered: 03/28/2005) |
| 04/27/2005 | 43 | MOTION FOR 48 HOUR EXTENSION OF TIME TO FILE REPLY FILED BY ROBERT WHARTON,CERT OF SERV.(jmp, ) (Entered: 04/28/2005) |

| | | |
|---|---|---|
| 04/28/2005 | 44 | ORDER THAT THE PETITIONER'S MOTION FOR EXTENSION OF TIME TO FILE REPLY IS GRANTED. PETITIONER'S REPLY IS NOW DUE ON OR BEFORE APRIL 29, 2005. SIGNED BY JUDGE JAMES T. GILES ON 4/28/05.4/28/05 ENTERED AND COPIES MAILED AND E-MAILED. (lvj, ) (Entered: 04/28/2005) |
| 04/28/2005 | | REPLIES DUE BY 4/29/2005. (lvj, ) (Entered: 04/28/2005) |
| 04/29/2005 | 45 | PETITIONER'S MOTION TO FILE REPLY MEMORNADUM IN EXCESS OF PAGE LIMIT, CERTIFICATE OF SERVICE.(lvj, ) (Entered: 05/02/2005) |
| 04/29/2005 | 46 | Petitioner's memorandum in reply to respondents' response to petition for writ of habeas corpus, certificate of service. (lvj, ) Additional attachment(s) added on 5/5/2005 (lvj, ). (Entered: 05/02/2005) |
| 05/03/2005 | 47 | ORDER THAT PETITIONER'S MOTION TO FILE REPLY MEMORNADUM IN EXCESS OF PAGE LIMIT IS GRANTED. PETITIONER'S MEMORANDUM IN REPLY TO RESPONDENTS' RESPONSE TO PETITION FOR WRIT OF HABEAS CORPURS IS ACCEPTED FOR FILING. SIGNED BY JUDGE JAMES T. GILES ON 5/3/05.5/4/05 ENTERED AND COPIES MAILED. (lvj, ) (Entered: 05/04/2005) |
| 05/11/2005 | 48 | MOTION to Permit *Filing of a Sur-Reply* filed by DONALD T. VAUGHN.Certificate of Service.(DOLGENOS, THOMAS) (Entered: 05/11/2005) |
| 05/13/2005 | 49 | ORDER THAT RESPONDENTS MOTION FOR PERMISSION TO FILE A SUR-REPLY IS GRANTED. RESPONDENTS SHALL FILE THE SUR-REPLY NO LATER THAN 7/11/05. SIGNED BY JUDGE JAMES T. GILES ON 5/13/05.5/16/05 ENTERED AND COPIES MAILED AND E-MAILED. (lvj, ) (Entered: 05/17/2005) |
| 05/13/2005 | | Set/Reset Deadlines: REPLIES DUE BY 7/11/2005. (lvj, ) (Entered: 05/17/2005) |
| 07/12/2005 | 50 | MOTION for Extension of Time to File Response/Reply *(Sur-Reply) Nunc Pro Tunc* filed by DONALD T. VAUGHN.Certificate of Service.(DOLGENOS, THOMAS) (Entered: 07/12/2005) |
| 07/19/2005 | 51 | ORDER THAT RESPONDENTS' TIME FOR FILING A SUR-REPLY IS EXTENDED TO AUGUST 25, 2005. RESPONSES DUE BY 8/25/2005.. SIGNED BY JUDGE JAMES T. GILES ON 7/19/05.7/20/05 ENTERED AND COPIES MAILED AND E-MAILED(lvj, ) (Entered: 07/20/2005) |
| 07/19/2005 | | RESPONSES DUE BY 8/25/2005. (lvj, ) (Entered: 07/20/2005) |
| 08/25/2005 | 52 | Second MOTION for Extension of Time to File Response/Reply *to Petitioner's Memorandum in Reply to Respondents' Response to Petition for Writ of Habeas Corpus* filed by DONALD T. VAUGHN.Certificate of Service.(DOLGENOS, THOMAS) (Entered: 08/25/2005) |
| 08/29/2005 | 53 | ORDER THAT RESPONDENTS' TIME FOR FILING A SUR-REPLY IS EXTENDED TO 9/25/05. RESPONSES DUE BY 9/25/2005.. SIGNED BY JUDGE JAMES T. GILES ON 8/29/05.8/29/05 ENTERED AND COPIES MAILED AND E-MAILED. (lvj, ) (Entered: 08/29/2005) |
| 09/26/2005 | 54 | MOTION for Extension of Time to File *Sur-Reply* filed by DONALD T. VAUGHN.Certificate of Service.(DOLGENOS, THOMAS) (Entered: 09/26/2005) |
| 10/12/2005 | 55 | ORDER THAT RESPONDENTS' UNOPPOSED MOTION FOR ENLARGEMENT OF TIME TO FILE SUR-REPLY IS GRANTED. DEFTS SHALL FILE HIS MOTION ON OR BEFORE 10/26/05. . SIGNED BY JUDGE JAMES T. GILES ON 10/12/05.10/13/05 ENTERED AND COPIES MAILED AND E-MAILED. (lvj, ) (Entered: 10/13/2005) |

| | | |
|---|---|---|
| 10/12/2005 | | Set/Reset Deadlines: MOTIONS DUE BY 10/26/2005. (lvj, ) (Entered: 10/17/2005) |
| 10/26/2005 | 56 | MOTION for Extension of Time to File *Sur-Reply* filed by DONALD T. VAUGHN.Certificate of Service.(DOLGENOS, THOMAS) (Entered: 10/26/2005) |
| 11/01/2005 | 57 | ORDER THAT RESPONDENTS' TIME FOR FILING A SUR-REPLY IS EXTENDED TO 11/28/05. SIGNED BY JUDGE JAMES T. GILES ON 11/1/05. 11/2/05 ENTERED AND COPIES MAILED.(stb, ) (Entered: 11/02/2005) |
| 11/28/2005 | 58 | MOTION for Extension of Time to File *Sur-Reply (Unopposed)* filed by DONALD T. VAUGHN.Certificate of Service.(DOLGENOS, THOMAS) (Entered: 11/28/2005) |
| 11/28/2005 | 59 | ORDER THAT RESPONDENTS' TIME FOR FILING A SUR-REPLY IS EXTENDED TO 12/28/2005. SIGNED BY JUDGE JAMES T. GILES ON 11/28/05. 11/29/05 ENTERED AND COPIES MAILED.(kw, ) (Entered: 11/29/2005) |
| 12/28/2005 | 60 | MOTION for Extension of Time to File *Sur-Reply* filed by DONALD T. VAUGHN.Certificate of Service.(DOLGENOS, THOMAS) (Entered: 12/28/2005) |
| 01/03/2006 | 61 | ORDER THAT RESPONDENTS' UNOPPOSED MOTION FOR ENLARGEMENT OF TIME TO FILE SUR-REPLY IS GRANTED. DEFT SHALL FILE HIS MOTION ON OR BEFORE 1/12/06. SIGNED BY JUDGE JAMES T. GILES ON 12/29/05.1/4/05 ENTERED AND COPIES MAILED AND E-MAILED. (lvj, ) (Entered: 01/04/2006) |
| 01/03/2006 | | Set/Reset Deadlines: MOTIONS DUE BY 1/12/2006. (lvj, ) (Entered: 01/04/2006) |
| 01/12/2006 | 62 | Response *to Petitioner's Reply* by DONALD T. VAUGHN. (DOLGENOS, THOMAS) (Entered: 01/12/2006) |
| 01/13/2006 | 63 | PETITIONER'S UNOPPOSED MOTION FOR LEAVE TO FILE A SUR-REPLY, CERTIFICATE OF SERVICE.(lvj, ) (Entered: 01/17/2006) |
| 01/17/2006 | 64 | ORDER THAT PETITIONER'S UNOPPOSED MOTION TO LEAVE TO FILE A SUR-REPLY IS GRANTED. HE MAY FILE A SUR-REPLY ON OR BEFORE 3/14/06. . SIGNED BY JUDGE JAMES T. GILES ON 1/17/06.1/18/06 ENTERED AND COPIES MAILED. (lvj, ) Modified on 1/18/2006 (lvj, ). (Entered: 01/18/2006) |
| 01/17/2006 | | REPLIES DUE BY 3/14/2006. (lvj, ) (Entered: 01/18/2006) |
| 03/13/2006 | 65 | First MOTION for Extension of Time to File *Sur-Reply* filed by ROBERT WHARTON.Certificate of Service.(WISEMAN, MICHAEL) (Entered: 03/13/2006) |
| 03/14/2006 | 66 | ORDER THAT PETITIONER'S UNOPPOSED MOTION FOR A TEN DAT EXTENSION TO FILE A SUR-REPLY IS GRANTED. HE MAY FILE A SUR-REPLY ON BEFOR MARCH 24, 2006. . SIGNED BY JUDGE JAMES T. GILES ON 3/14/06.3/15/06 ENTERED AND COPIES MAILED. (lvj, ) (Entered: 03/15/2006) |
| 03/27/2006 | 67 | Second MOTION for Extension of Time to File Response/Reply *Unopposed Motion for Five Day Extension of Time to File Sur-Reply* filed by ROBERT WHARTON, Certificate of Service. (WISEMAN, MICHAEL) Modified on 3/28/2006 (np). (Entered: 03/27/2006) |
| 03/29/2006 | 68 | Memorandum Petitioner's Sur-Reply Memorandum re 67 Second MOTION for Extension of Time to File Response/Reply *Unopposed Motion for Five Day Extension of Time to File Sur-Reply Petitioner's Sur-Reply Memorandum in Support of Petition for Writ of Habeas Corpus* filed by ROBERT WHARTON. (WISEMAN, MICHAEL) (Entered: 03/29/2006) |
| 05/09/2006 | 69 | ORDER THAT ORAL ARGUMENT ON PETITION FOR WRIT OF HABEAS CORPUS SHALL BE HELD ON 10/10/06 AT 10:00AM IN COURTROOM 17A UNITED STATES COURTHOUSE.. SIGNED BY JUDGE JAMES T. GILES ON 5/4/06. |

| | | |
|---|---|---|
| | | 5/9/06 ENTERED AND COPIES MAILED AND E-MAILED.(lvj, ) (Entered: 05/09/2006) |
| 06/15/2006 | 70 | ORDER THAT PETITIONER'S 67 MOTION FOR EXTENSION OF TIME TO FILE A SUR-REPLY IS DENIED AS MOOT. . SIGNED BY JUDGE JAMES T. GILES ON 6/15/06.6/16/06 ENTERED AND COPIES MAILED AND E-MAILED. (lvj, ) (Entered: 06/16/2006) |
| 10/11/2006 | 71 | Minute Entry for proceedings held before Judge JAMES T. GILES : ORAL ARGUMENT ON MOTION FOR WRIT OF HABEAS CORPUS held on 10/11/06. (afm, ) (Entered: 10/11/2006) |
| 10/31/2006 | 72 | Response *to Amendment to the Petition for Writ of Habeas Corpus* by DONALD T. VAUGHN. (FALIN, ROBERT) (Entered: 10/31/2006) |
| 11/15/2006 | 73 | TRANSCRIPT of Proceedings held on 10/10/06 before Judge GILES. Court Reporter: CONNIE FLORES. HEARING ON PETITION FOR WRIT FOR HABEAS CORPUS (jl, ) (Entered: 11/15/2006) |
| 02/20/2007 | 74 | NOTICE by ROBERT WHARTON *Notice Correcting Statement of Counsel*, Certificate of Service. (WISEMAN, MICHAEL) Modified on 2/21/2007 (np). (Entered: 02/20/2007) |
| 10/15/2007 | 75 | Ex Parte Petition for Appointment of Counsel by ROBERT WHARTON, CERTIFICATE OF SERVICE. (gs) Modified on 10/17/2007 (afm, ). (Entered: 10/16/2007) |
| 10/22/2007 | 76 | ORDER THAT PETITIONER'S "EX PARTE PETITION FOR APPOINTMENT OF NEW COUNSEL" IS DENIED, ETC.. SIGNED BY JUDGE JAMES T. GILES ON 10/19/07. 10/22/07 ENTERED AND COPIES MAILED, E-MAILED.(pr, ) (Entered: 10/22/2007) |
| 11/15/2007 | 77 | NOTICE OF APPEAL as to 76 Order by ROBERT WHARTON. Copies to Judge, Clerk USCA, Appeals Clerk. (gs) (Entered: 11/15/2007) |
| 11/15/2007 | 78 | Clerk's Notice to USCA re 77 Notice of Appeal : (gs, ) (Entered: 11/15/2007) |
| 11/21/2007 | | NOTICE of Docketing Record on Appeal from USCA re 77 Notice of Appeal filed by ROBERT WHARTON. USCA Case Number 07-9006. (gs) (Entered: 11/21/2007) |
| 12/17/2007 | | Record Complete for Purposes of Appeal re 77 Notice of Appeal (om, ) (Entered: 12/17/2007) |
| 07/07/2008 | | (Pleadings #66, 71, 73 forwarded to USCA). (om, ) (Entered: 07/07/2008) |
| 07/23/2008 | 79 | ORDER of USCA as to 77 Notice of Appeal filed by ROBERT WHARTON re: The appeal is dismissed for lack of appellate jurisdiction. (gs) (Entered: 07/23/2008) |
| 09/17/2008 | 80 | ORDER THAT THIS CASE IS REASSIGNED FROM HONORABLE JAMES T. GILES TO HONORABLE STEWART DALZELL FOR ALL FURTHER PROCEEDINGS. SIGNED BY HONORABLE HARVEY BARTLE, III ON 9/17/08. 9/18/08 ENTERED AND COPIES E-MAILED TO COUNSEL.(gs) (Entered: 09/18/2008) |
| 11/13/2008 | 81 | ORDER THAT THIS CASE IS REASSIGNED FROM THE CALENDAR OF THE HONORABLE JUDGE STEWART DALZELL TO THE CALENDAR OF THE HONORABLE JUDGE MITCHELL S. GOLDBERG FOR ALL FURTHER PROCEEDINGS. SIGNED BY CLERK OF COURT MICHAEL E. KUNZ ON 11/13/08. 11/13/08 ENTERED AND COPIES MAILED TO PRO SE PLAINTIFF AND E-MAILED TO COUNSEL.(jpd) (Entered: 11/13/2008) |
| 11/19/2008 | | COPY OF ORDER DATED 11/13/08 AND ENVELOPE ADDRESED TO DONALD T. VAUGHN RETURNED BY THE U.S.P.S. FOR THE FOLLOWING: NO LONGER |

| | | |
|---|---|---|
| | | EMPLOYED HERE RETURN TO SENDER. (jpd) (Entered: 11/19/2008) |
| 11/21/2008 | 82 | ORDER THAT A STATUS CONFERENCE IS SET FOR 1/5/2009 AT 3:00 PM IN JUDGE'S CHAMBERS, ROOM 17614 BEFORE HONORABLE MITCHELL S. GOLDBERG. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 11/21/08. 11/21/08 ENTERED AND COPIES MAILED AND E-MAILED.(ah) (Entered: 11/21/2008) |
| 01/06/2009 | 83 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG: Status Conference held on 1/5/09. Court Reporter: esr. (lvj, ) (Entered: 01/06/2009) |
| 01/06/2009 | 84 | AMENDED SCHEDULING ORDER THAT THE PETITIONER SHALL FILE AN AMENDED PETITION BY 2/17/09. RESPONDENT SHALL FILE A RESPONSE TOB PETITION BY 3/17/09. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 1/5/09. 1/7/09 ENTERED AND COPIES MAILED, E-MAILED.(stb, ) (Entered: 01/07/2009) |
| 01/28/2009 | 85 | PETITIONER ROBERT WHARTON'S PETITION TO HOLD PROCEEDINGS IN ABEYANCE, CERTIFICATE OF SERVICE. (jpd) (Entered: 01/28/2009) |
| 02/05/2009 | 86 | ORDER THAT THE PETITIONER'S PETITION TO HOLD PROCEEDINGS IN ABEYANCE IS DENIED AS MOOT. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 2/5/09. 2/5/09 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 02/05/2009) |
| 02/17/2009 | 87 | MOTION to Amend/Correct *Petitioner's Motion to Amendment Petition for Writ of Habeas Corpus* filed by ROBERT WHARTON.. (Attachments: # 1 Exhibit Proposed Amendment to Complaint, # 2 Text of Proposed Order Proposed Order)(WISEMAN, MICHAEL) (Entered: 02/17/2009) |
| 03/12/2009 | 88 | Response TO MOTION TO AMEND by DONALD T. VAUGHN, Certificate of Service. (DOLGENOS, THOMAS) Modified on 3/13/2009 (nd). (Entered: 03/12/2009) |
| 06/02/2009 | 89 | ORDER THAT PETITIONER'S MOTION TO AMEND IS GRANTED; THE CLERK OF COURT IS DIRECTED TO DOCKET DOC. NO. 87-2, AS AN AMENDMENT TO PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS. RESPONDENT MAY FILE A RESPONSE TO PETITIONER'S AMENDMENT ON OR BEFORE 6/30/09.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 5/29/09.6/2/09 ENTERED AND COPIES E-MAILED TO COUNSEL.(pr, ) (Entered: 06/02/2009) |
| 06/02/2009 | 90 | Amended Petition for Writ of Habeas Corpus against DONALD T. VAUGHN filed by ROBERT WHARTON. (Attachments: # 1 amended petition-part 1)(pr, ) (Entered: 06/02/2009) |
| 06/02/2009 | | ***Set/Reset Deadlines: RESPONSES DUE BY 6/30/2009. (pr, ) (Entered: 06/02/2009) |
| 06/30/2009 | 91 | MOTION for Extension of Time to File Response/Reply *to Amendment to Petition for Writ of Habeas Corpus* filed by DONALD T. VAUGHN.Certificate of Service. (DOLGENOS, THOMAS) (Entered: 06/30/2009) |
| 07/02/2009 | 92 | ORDER THAT RESPONDENT'S MOTION FOR 14 DAY ENLARGEMENT OF TIME (DOC. NO. 91)IS GRANTED. RESPONDENT MAY FILE A RESPONSE TO PETITIONER'S AMENDMENT ON OR BEFORE 7/14/2009. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 7/2/09. 7/6/09 ENTERED AND COPIES MAILED AND E-MAILED. (jpd) (Entered: 07/06/2009) |
| 07/08/2009 | 93 | ORDER THAT ORAL ARGUMENT ON PETITIONER'S AMENDED PETITION FOR WRIT OF HABEAS CORPUS IS SET FOR 9/18/2009 AT 10:00 A.M. BEFORE HONORABLE MITCHELL S. GOLDBERG. SIGNED BY HONORABLE MITCHELL |

| | | |
|---|---|---|
| | | S. GOLDBERG ON 7/8/09. 7/9/09 ENTERED AND COPIES E-MAILED TO COUNSEL. (jpd) (VACATED AS PER ORDER OF THE COURT DATED 9/18/09 PAPER #96) (Entered: 07/09/2009) |
| 07/14/2009 | 94 | Response *to Amendment to Petition for Writ of Habeas Corpus* by DONALD T. VAUGHN with Certificate of Service. (DOLGENOS, THOMAS) Modified on 7/15/2009 (le, ). (Entered: 07/14/2009) |
| 09/17/2009 | 95 | LETTER FROM VICTOR J. ABREU, ESQUIRE DATED 9/16/09 ADDRESSED TO THE HONORABLE JUDGE MITCHELL S. GOLDBERG REGARDING MOTION TO AMEND AND AMENDMENT TO PETITION FOR WRIT OF HABEAS CORPUS. (jpd, ) (Entered: 09/17/2009) |
| 09/18/2009 | 96 | ORDER THAT THE COURT'S 7/8/09 ORDER SCHEDULING ORAL ARGUMENT IS VACATED. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 9/18/09. 9/18/09 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 09/18/2009) |
| 02/16/2010 | 97 | MOTION for Discovery *and Consolidated Memorandum of Law* filed by ROBERT WHARTON.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(ABREU, VICTOR) (Entered: 02/16/2010) |
| 03/05/2010 | 98 | Rquest for Extension of Time to File Response/Reply as to 97 MOTION for Discovery *and Consolidated Memorandum of Law* filed by DONALD T. VAUGHN, Certificate of Service. (DOLGENOS, THOMAS) Modified on 3/8/2010 (nd). (Entered: 03/05/2010) |
| 03/12/2010 | 99 | ORDER THAT RESPONDENTS REQUEST IS GRANTED. RESPONDENTS MAY FILE A RESPONSE TO PETITIONER'S MOTION FOR DISCOVERY ON OR BEFORE 4/4/10. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 3/12/10. 3/12/10 ENTERED AND COPIES MAILED AND E- MAILED. (jpd) (Entered: 03/12/2010) |
| 04/05/2010 | 100 | RESPONSE to Motion re 97 MOTION for Discovery *and Consolidated Memorandum of Law* filed by DONALD T. VAUGHN, Certificate of Service. (Attachments: # 1 Exhibit A)(DOLGENOS, THOMAS) Modified on 4/6/2010 (nd, ). (Entered: 04/05/2010) |
| 08/11/2011 | 101 | ORDER THAT ORAL ARGUMENT IS SET FOR 9/6/2011 AT 2:00 P.M. IN COURTROOM 4-B BEFORE HONORABLE MITCHELL S. GOLDBERG. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 8/11/11. 8/11/11 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 08/11/2011) |
| 08/12/2011 | 102 | MOTION to Withdraw *Appearance As Attorney* filed by DONALD T. VAUGHN.Certificate of Service.(FALIN, ROBERT) (Entered: 08/12/2011) |
| 08/26/2011 | 103 | ORDER THAT ORAL ARGUMENT IS SET FOR 10/12/2011 AT 2:00 P.M. IN COURTROOM 4-B BEFORE HONORABLE MITCHELL S. GOLDBERG. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 8/26/11. 8/26/11 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 08/26/2011) |
| 09/09/2011 | 104 | NOTICE of Withdrawal of Appearance by MICHAEL WISEMAN on behalf of ROBERT WHARTON(WISEMAN, MICHAEL) (Entered: 09/09/2011) |
| 10/13/2011 | 105 | Minute Entry for Oral Argument held before HONORABLE MITCHELL S. GOLDBERG held on 10/12/11. (jpd, ) (Entered: 10/13/2011) |
| 10/17/2011 | 106 | ORDER THAT PETITIONER'S MOTION FOR DISCOVERY AND CONSOLIDATED MEMORANDUM OF LAW (DOC. NO. 97)IS GRANTED IN PART AND DENIED IN PART. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 10/17/11. 10/17/11 ENTERED AND COPIES E- MAILED. (jpd) (Entered: 10/17/2011) |

| | | |
|---|---|---|
| 10/19/2011 | 107 | ORDER THAT ROBERT M. FALIN'S MOTION TO WITHDRAW APPEARANCE AS ATTORNEY (DOC. NO. 102) IS GRANTED. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 10/19/11.10/19/11 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 10/19/2011) |
| 11/14/2011 | 108 | TRANSCRIPT of Proceedings held on 10/12/2011 before Judge MITCHELL S. GOLDBERG. Court Reporter: STEPHEN SONNIE. (ems) (Entered: 11/14/2011) |
| 11/18/2011 | 109 | ORDER THAT AN EVIDENTIARY HEARING IS SET FOR 2/8/2012 AT 9:30 A.M. IN COURTROOM 4-B BEFORE HONORABLE MITCHELL S. GOLDBERG. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 11/18/11. 11/18/11 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 11/18/2011) |
| 01/31/2012 | 110 | MOTION for Order *for Issuance of Subpoenas for Witnesses to be Presented at the Evidentiary Hearing* filed by ROBERT WHARTON.Certificate of Service.(ABREU, VICTOR) (Entered: 01/31/2012) |
| 02/02/2012 | 111 | ORDER THAT THE MOTION FOR ORDER FOR ISSUANCE OF SUBPOENAS FOR WITNESSES TO BE PRESENTED AT THE EVIDENTIARY HEARING (DOC. NO. 110) IS DENIED AS MOOT. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 2/2/12. 2/2/12 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 02/02/2012) |
| 02/02/2012 | 112 | ORDER THAT THE SUPERINTENDENT OF SCI GRATERFORD PRODUCE BEFORE THIS COURT THE BODY OF ROBERT WHARTON #AY-6874 ON 2/8/12 AT 9:30 A.M. FOR AN EVIDENTIARY HEARING IN THE ABOVE CAPTIONED MATTER. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 2/2/12. 2/2/12 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 02/02/2012) |
| 02/09/2012 | 113 | ORDER THAT AN EVIDENTIARY HEARING IS SET FOR 2/10/2012 AT 10:00 A.M. IN COURTROOM 4-B BEFORE HONORABLE MITCHELL S. GOLDBERG. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 2/9/12. 2/9/12 ENTERED AND COPIES MAILED TO PRO SE PETITIONER AND E-MAILED. (jpd) (Entered: 02/09/2012) |
| 02/13/2012 | 114 | Minute Entry for Evidentiary Hearing Day 1 held before HONORABLE MITCHELL S. GOLDBERG on 2/8/2012. (Entered: 02/13/2012) |
| 02/13/2012 | 115 | Minute Entry for Evidentiary Hearing held before HONORABLE MITCHELL S. GOLDBERG on 2/10/2012. (Entered: 02/13/2012) |
| 02/13/2012 | 116 | ORDER THAT PETITIONER SHALL FILE A SUPPLEMENTAL BRIEF IN SUPPORT OF CLAIMS II AND III ON OR BEFORE 3/12/12; RESPONDENTS SHALL FILE A RESPONSE ON OR BEFORE 4/12/12. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 2/13/12. 2/13/12 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 02/13/2012) |
| 02/13/2012 | 117 | TRANSCRIPT of EVIDENTIARY HEARING held on 2/8/12 before Judge MITCHELL S. GOLDBERG. (jpd) (Entered: 02/13/2012) |
| 02/13/2012 | 118 | TRANSCRIPT of EVIDENTIARY HEARING held on 2/10/12 before Judge MITCHELL S. GOLDBERG. (jpd) (Entered: 02/13/2012) |
| 03/14/2012 | 119 | TRIAL BRIEF *Post-Hearing Brief* by ROBERT WHARTON. Certificate of Service (ABREU, VICTOR) (Entered: 03/14/2012) |
| 03/15/2012 | 120 | NOTICE of APPEARANCE of Claudia Van Wyk filed by ROBERT WHARTON. (VANWYK, CLAUDIA) Modified on 3/15/2012 (md). (Entered: 03/15/2012) |

| | | |
|---|---|---|
| 04/03/2012 | 121 | MOTION for Extension of Time to File *Post-Hearing Brief* filed by DONALD T. VAUGHN.Certificate of Service.(DOLGENOS, THOMAS) (Entered: 04/03/2012) |
| 04/03/2012 | 122 | ORDER THAT THE RESPONDNETS TIME FOR FILING A RESPONSE TO THE AMENDMENT OF THE ABOVE CAPTIONED PETITION FOR WRIT OF HABEAS CORPUS IS EXTENDED TO 4/27/12. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 4/3/12. 4/4/12 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 04/04/2012) |
| 04/23/2012 | 123 | Second MOTION for Extension of Time to File *Post-hearing brief* filed by DONALD T. VAUGHN.Certificate of Service.(DOLGENOS, THOMAS) (Entered: 04/23/2012) |
| 04/25/2012 | 124 | ORDER THAT THE RESPONDENTS' TIME FOR FILING A RESPONSE TO THE AMENDMENT OF THE ABOVE CAPTIONED PETITION FOR WRIT OF HABEAS CORPUS IS EXTENDED UNTIL 5/11/12. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 4/25/12. 4/25/12 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 04/25/2012) |
| 05/11/2012 | 125 | TRIAL BRIEF *Post-Hearing Brief* by DONALD T. VAUGHN. Certificate of Service (DOLGENOS, THOMAS) (Entered: 05/11/2012) |
| 08/16/2012 | 126 | MEMORANDUM AND/OR OPINION. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 8/16/12. 8/16/12 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 08/16/2012) |
| 08/16/2012 | 127 | ORDER THAT THE PETITION FOR HABEAS CORPUS (DOC. NO. 22, 33. 90) IS DENIED. A CERTIFICATE OF APPEALABILITY SHALL ISSUE AS TO PETITIONER'S CLAIMS THAT HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN CONNECTION WITH HIS TRIAL AND SUPPRESSION HEARING AND PETITIONER'S CONFRONTATION CLAUSE. THE CERTIFICATE OF APPEALBILTY IS DENIED IN ALL OTHER RESPECTS. THIS CASE SHALL BE MARKED CLOSED FOR STATISTICAL PURPOSES. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 8/16/12. 8/16/12 ENTERED AND COPIES MAILED. (jpd) Modified on 8/16/2012 (afm, ). (Entered: 08/16/2012) |
| 09/13/2012 | 128 | MOTION to Alter Judgment *Pursuant to R 59(e) and Consolidated Brief* filed by ROBERT WHARTON, Certificate of Service. (Attachments: # 1 Text of Proposed Order) (VANWYK, CLAUDIA) Modified on 9/14/2012 (fh) (Entered: 09/13/2012) |
| 10/22/2012 | 129 | MOTION for Extension of Time to File Response/Reply as to 128 MOTION to Alter Judgment *Pursuant to R 59(e) and Consolidated Brief* filed by DONALD T. VAUGHN.Certificate of Service.(DOLGENOS, THOMAS) (Entered: 10/22/2012) |
| 10/22/2012 | 130 | RESPONSE in Opposition re 128 MOTION to Alter Judgment *Pursuant to R 59(e) and Consolidated Brief* filed by DONALD T. VAUGHN. (DOLGENOS, THOMAS) (Entered: 10/22/2012) |
| 11/07/2012 | 131 | ORDER THAT RESPONDENT'S UNOPPOSED MOTION TO FILE RESPONSE TO MOTION UNDER RULE 59(e) OUT OF TIME DOC. NO. 129) IS GRANTED. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 11/7/12. 11/7/12 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 11/07/2012) |
| 04/30/2013 | 132 | ORDER THAT PETITIONER'S MOTION TO ALTER JUDGMENT (DOC. NO. 128) IS DENIED. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 4/30/13. 5/1/13 ENTERED AND COPIES E-MAILED. (jpd) (Entered: 05/01/2013) |
| 05/24/2013 | 133 | NOTICE OF APPEAL as to 132 Order on Motion to Alter Judgment, 127 Order (Memorandum and/or Opinion),, 126 Memorandum and/or Opinion by ROBERT |

| | | |
|---|---|---|
| | | WHARTON. receipt number N/A. IFP status below Copies to Judge, Clerk USCA, Appeals Clerk. (VANWYK, CLAUDIA) Modified on 5/28/2013 (nd). (Entered: 05/24/2013) |
| 05/24/2013 | 134 | Clerk's Notice to USCA re 133 Notice of Appeal, : (jpd, ) (Entered: 05/28/2013) |
| 06/03/2013 | | Record Complete for Purposes of Appeal re 133 Notice of Appeal,. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (afm, ) (Entered: 06/03/2013) |
| 06/10/2013 | | NOTICE of Docketing Record on Appeal from USCA re 133 Notice of Appeal, filed by ROBERT WHARTON. USCA Case Number 13-9002 (ems) (Entered: 06/10/2013) |
| 02/19/2014 | | (Copies of Pleadings #117, 118 forwarded to USCA). (om, ) (Entered: 02/19/2014) |
| 02/27/2014 | | (Copy of Pleadings # 73 and 108 forwarded to USCA).(om, ) (Entered: 02/27/2014) |
| 03/05/2014 | | (Copy of Pleading #22 forwarded to USCA). (om, ) (Entered: 03/05/2014) |
| 03/27/2014 | | (State Court Record forwarded to USCA) (om, ) (Entered: 03/27/2014) |
| 04/21/2014 | 135 | ORDER FROM USCA THAT THE DISTRICT COURT SHALL REQUEST THAT STATE COURT RECORD FROM THE PROTHONOTARY FOR THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY IN COMMONWEALTH v. WHARTON, CP-51-CR-0222581-1984, INCLUDING ALL TRANSCRIPTS AND APPELLATE PROCEEDINGS AND THE RELAVANT OPINIONS FROM MR. WHARTON'S POST CONVICTION AND APPELLATE PROCEEDINGS CERTIFIED COPIES ARE ACCEPTABLE. UPON RECEIPT OF THE STATE COURT RECORD THE DISTRCIT COURT SHALL FORWARD THE RECORD TO THE COURT OF APPEALS. (jpd) (Entered: 04/21/2014) |
| 05/15/2014 | 136 | ORDER THAT THE CLERK OF THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY SHALL FILE WITH THE CLERK OF THIS COURT COPIES OF ALL RECORDS, INCLUDING TRANSCRIPTS OF NOTES OF TESTIMONY AT ARRAIGNMENT, TRIAL, SENTENCING, SUPPRESSION HEARINGS, POST CONVICTION HEARINGS, PETITIONS, PLEADINGS, OPINIONS AND BRIEFS OF STATE COURT PROCEEDINGS IN THE MATTER OF COMMONWEALTH v. WHARTON, COURT OF COMMON PLEAS OF PHILADELPHIA,CP-51-CR-0222581-1984 WITHIN 30 DAYS OF THE DATE OF THIS ORDER. PRISONER STATE RECORD DUE BY 6/16/2014.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 5/15/14. 5/15/14 ENTERED AND COPIES E-MAILED TO COUNSEL AND FAXED TO CCP-PHILA. COUNTY.(pr, ) (Entered: 05/15/2014) |
| 06/11/2014 | | State Court Record (5 BOXES) received on 6/11/14 and forwarded to the Chambers of the Honorable Judge Mitchell S. Goldberg. (jpd) (Entered: 06/11/2014) |
| 06/12/2014 | | (STATE COURT RECORD FORWARDED TO USCA). (om, ) (Entered: 06/12/2014) |
| 07/18/2014 | 137 | RECEIPT OF STATE COURT RECORD (5 BOXES) ON 7/17/14 BY THE CHAMBERS OF THE HONORABLE JUDGE MITCHELL S. GOLDBERG. (jpd, ) (Entered: 07/18/2014) |
| 08/13/2014 | 138 | Certified Copy of Order from USCA dated 8/13/14 that Appellant's motion for permission to exceed the page limit governing that motion is GRANTED. Appellant's motion to expand the COA is granted in part and denied in part, etc. (pr, ) (Entered: 08/14/2014) |

| | | |
|---|---|---|
| 09/16/2014 | 139 | CERTIFIED COPY OF ORDER FROM USCA THAT THE FOREGOING MOTION FOR EXTENSION OF TIME TO FILE BRIEF AND APPENDIX UNTIL 11/21/14 IS GRANTED. (jpd) (Entered: 09/16/2014) |
| 11/18/2014 | 140 | CERTIFIED COPY OF ORDER FROM USCA THAT THE FOREGOING MOTION FOR EXTENSION OF TIME IS GRANTED. (jpd, ) (Entered: 11/18/2014) |
| 02/05/2015 | 141 | Certified Copy of Order from USCA THAT THE FOREGOING MOTION FOR EXTENSION OF TUME TO FILE BRIEF AND APPENDIX UNTIL 2/20/15 IS GRANTED. (jpd) (Entered: 02/06/2015) |
| 06/25/2015 | 142 | Certified Copy of Order from the USCA for the 3rd Circuit. The Foregoing Motion is Granted. Appellant's must be Filed and Served Within Sixty Days of the Date of This Order. (gs) (Entered: 06/26/2015) |
| 07/15/2015 | 143 | CERTIFIED COPY OF ORDER FORM THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT THAT NO ORDER STAYING THIS CASE PENDING THE MORATORIUM ANNOUNCED BY GOC. WOLF HAS BEEN ENTERED IN THIS CASE. ACCORDINGLY THE CASE WILL PROCEED WITH THE BRIEFING AS PRESENTLY SCHEDULED. (jpd, ) (Entered: 07/15/2015) |
| 09/08/2015 | 144 | CERTIFIED COPY OF ORDER FROM USCA THAT THE FOREGOING MOTION FOR EXTENSION OF TIME IS GRANTED. (jpd, ) (Entered: 09/08/2015) |
| 09/23/2015 | 145 | CERTIFIED COPY OF ORDER FROM USCA THAT THE FOREGOING MOTION IS GRANTED. APPELLANT WILL NOT BE GRANTED ANY ADDITIONAL EXTENSIONS OF TIME TO FILE HIS BRIEF (jpd). (Entered: 09/23/2015) |
| 12/02/2015 | 146 | CERTIFIED COPY OF ORDER FROM USCA THAT THE FOREGOING MOTION FOR EXPANSION OF WORD LIMIT FOR INITIAL BRIEF IS GRANTED. (jpd) (Entered: 12/02/2015) |
| 12/11/2015 | 147 | CERTIFIED COPY OF ORDER FROM USCA THAT THE FOREGOING MOTION IS GRANTED. (jpd, ) (Entered: 12/14/2015) |
| 12/23/2015 | 148 | Certified Copy of Order from the Court of Appeals re: Appellant's "Motion to Expand the Certificate of Appealability" is Denied, etc. (gs) Modified on 12/28/2015 (afm, ). (Entered: 12/23/2015) |
| 05/25/2016 | 149 | CERTIFIED COPY OF ORDER FROM THE USCA THAT THE FOREGOING MOTIONS ARE GRANTED.(jpd) (Entered: 05/25/2016) |
| 03/26/2018 | 150 | ORDER of USCA as to 133 Notice of Appeal, filed by ROBERT WHARTON THAT THE JUDGMENT OF THE DISTRICT COURT ENTERED 5/1/13 IS AFFIRMED IN PART, VACATED IN PART AND REMANDED FOR FURTHER PROCEEDINGS. COSTS WILL NOT BE TAXED. ALL OF THE ABOVE IN ACCORDANCE WITH THE OPINION OF THIS COURT. (jpd, ) (Entered: 03/26/2018) |
| 12/04/2018 | 151 | NOTICE of Appearance by PAUL M. GEORGE on behalf of DONALD T. VAUGHN with Certificate of Service(GEORGE, PAUL) (Entered: 12/04/2018) |
| 01/04/2019 | 152 | PETITIONER ROBERT WHARTON'S PETITION FOR APPOINTMENT OF COUNSEL. (jpd, ) (Entered: 01/07/2019) |
| 01/08/2019 | 153 | PETITIONER ROBERT WHARTON'S PETITION FOR APPOINTMENT OF NEW COUNSEL, CERTIFICATE OF SERVICE.(jpd, ) Modified on 1/11/2019 (lisad, ). (Entered: 01/09/2019) |
| 01/09/2019 | 154 | ORDERED THAT A STATUS CONFERENCE IS SET FOR 2/14/2019 AT 3:00 P.M. BEFORE HONORABLE MITCHELL S. GOLDBERG. THE SUPERINTENDENT OF |

| | | |
|---|---|---|
| | | SCI PHOENIX SHALL PRODUCE PETITIONER ROBERT WHARTON #AY-6874 TO APPEAR FOR THE CONFERENCE VIA VIDEO. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 1/9/19. 1/10/19 ENTERED AND COPIES MAILED TO PRO SE PETITIONER AND E-MAILED.(jpd, ) (Entered: 01/10/2019) |
| 02/06/2019 | 155 | NOTICE by DONALD T. VAUGHN *of Concession of Penalty Phase Relief* (KAUFMAN, MAX) (Entered: 02/06/2019) |
| 02/08/2019 | 156 | NOTICE by ROBERT WHARTON *Notice of Joint Filing of Proposed Order* (Attachments: # 1 Text of Proposed Order)(VANWYK, CLAUDIA) (Entered: 02/08/2019) |
| 02/12/2019 | 157 | ORDERED THAT COUNSEL ARE ADVISED THAT THE STATUS OF COUNSEL HEARING WILL PROCEED AS SCHEDULED. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 2/11/19. 2/12/19 ENTERED AND COPIES MAILED ATO PRO SE PETITIONER AND E-MAILED.(jpd, ) (Entered: 02/13/2019) |
| 02/19/2019 | 158 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG Status Conference held on 2/14/19. Court Reporter: ESR. (fdc, ) (Entered: 02/19/2019) |
| 02/19/2019 | 159 | ORDER THAT PETITION FOR APPOINTMENT OF NEW COUNSEL (DOC. NOS. 152 & 153) IS DENIED AS WITHDRAWN. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 2/19/19. 2/21/19 ENTERED AND COPIES MAILED TO PRO SE PETITIONER AND E-MAILED.(rf, ) (Entered: 02/21/2019) |
| 03/04/2019 | 160 | MEMORANDUM AND/OR OPINION. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 3/4/19. 3/4/19 ENTERED AND COPIES MAILED TO PRO SE PETITIONER AND E-MAILED.(jpd, ) (Entered: 03/04/2019) |
| 03/04/2019 | 161 | ORDERED THAT THE PARTIES' REQUEST THAT I ADOPT THE PROPOSED ORDER IS DENIED. IT IS FURTHER ORDERED THAT EACH PARTY MAY FILE WITHIN THRITY (30) DAYS OF THE DATE OF THIS ORDER A BRIEF ADDRESSING THE ISSUES RAISED IN THE ACCOMPANYING MEMORANDUM OPINION. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 3/4/19. 3/4/19 ENTERED AND COPIES MAILED TO PRO SE PETITIONER AND E-MAILED.(jpd, ) (Entered: 03/04/2019) |
| 04/03/2019 | 162 | Letter Response to Honorable Mitchell S. Goldberg re 161 Order (Memorandum and/or Opinion), 160 Memorandum and/or Opinion *Brief* by DONALD T. VAUGHN. (KAUFMAN, MAX) Modified on 4/4/2019 (lisad, ). (Entered: 04/03/2019) |
| 04/03/2019 | 163 | MOTION Expand the Record; Approval of Proposed Settlement *Petitioner's Motion to Expand Record, Motion for Approval of Proposed Settlement, and Consolidated Memorandum of Law Ordered by the Court* filed by ROBERT WHARTON.Certificate of Service. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(VANWYK, CLAUDIA) (Entered: 04/03/2019) |
| 05/03/2019 | 164 | PETITIONER ROBERT WHARTON'S RENEWED MOTION FOR APPOINTMENT OF COUNSEL, CERTIFICATE OF SERVICE.(jpd, ) Modified on 9/10/2019 (nd, ). (Entered: 05/06/2019) |
| 05/07/2019 | 165 | ORDERED THAT THE PEITIONER'S MOTION TO EXPAND RECORD, MOTION FOR APPROVAL OF PROPOSED SETTLEMENT AND CONSOLIDATED MEMORANDUM OF LAW ORDERED BY THE COURT (DOC. NO 163) IS GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART AS OUTLINED HEREIN, ETC. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 5/7/19.5/8/19 ENTERED AND COPIES MAILED TO PRO SE PETITIONER AND E-MAILED.(jpd, ) (Entered: 05/08/2019) |

| | | |
|---|---|---|
| 06/12/2019 | 166 | MOTION to Modify *or Reconsider Court Order* filed by ROBERT WHARTON.Certificate of Service.(VANWYK, CLAUDIA) (Entered: 06/12/2019) |
| 06/17/2019 | 167 | SUPPLEMENTAL CERTIFICATE OF SERVICE by ROBERT WHARTON re 166 MOTION to Modify *or Reconsider Court Order* (VANWYK, CLAUDIA) Modified on 6/18/2019 (lisad, ). (Entered: 06/17/2019) |
| 06/17/2019 | 168 | MOTION for Extension of Time to File *Amicus Brief* filed by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL. (Attachments: # 1 Text of Proposed Order)(BARKER, JAMES) (Entered: 06/17/2019) |
| 06/25/2019 | 170 | ORDERED THAT PETITIONER'S MOTION TO RECONSIDER OR MODIFY COURT ORDER (DOC. NO. 166) IS DENIED. THE PENNSYLVANIA ATTORNEY GENERAL'S MOTION FOR EXTENSION OF TIME TO FILE BRIEF OF AMICUS CURIAE (DOC. NO. 168) IS GRANTED. THE A.G.'S BRIEF SHALL BE FILED ON OR BEFORE 7/22/19. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 6/24/19. 6/26/19 ENTERED AND COPIES MAILED TO PRO SE PETITIONER AND E-MAILED. (jpd ) Modified on 6/27/2019 (lisad, ). (Entered: 06/26/2019) |
| 06/26/2019 | 169 | RESPONSE to Motion re 166 MOTION to Modify *or Reconsider Court Order* filed by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL. (Attachments: # 1 Text of Proposed Order)(BARKER, JAMES) (Entered: 06/26/2019) |
| 07/22/2019 | 171 | Response Brief of Amicus Curiae Pennsylvania Office of Attorney General re 170 Order on Motion to Modify,, Order on Motion for Extension of Time to File, by DONALD T. VAUGHN. (Attachments: # 1 Exhibit Part 1, # 2 Exhibit Part 2, # 3 Exhibit Part 3, # 4 Exhibit Part 4, # 5 Exhibit Part 5) (BARKER, JAMES) (Attachment 3 replaced on 7/23/2019) (fdc, ). (Entered: 07/22/2019) |
| 07/23/2019 | 172 | MOTION for Leave to File *a Reply to the Brief of Amicis Curiae* filed by ROBERT WHARTON.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(ABREU, VICTOR) (Entered: 07/23/2019) |
| 07/29/2019 | 173 | ORDERED THAT A MOTION HEARING ON PETITIONER'S RENEWED MOTION FOR APPOINTMENT OF COUNSEL IS SET FOR 8/28/2019 AT 3:00 P.M. BEFORE HONORABLE MITCHELL S. GOLDBERG. THE SUPERINTENDANT OF SCI PHOENIX SHALL PRODUCE THE BODY OF PLAINTIFF ROBERT WHARTON #AY-6874 TO APPEAR FOR THE CONFERENCE VIA VIDEO. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 7/29/19. 7/29/19 ENTERED AND COPIES MAILED TO PRO SE PETITIONER AND E-MAILED.(jpd, ) (Main Document 173 replaced on 7/30/2019) (jpd, ). (Entered: 07/29/2019) |
| 07/30/2019 | 174 | ORDERED THAT PETITIONER'S MOTION FOR LEAVE TO FILE (DOC. NO. 172) IS GRANTED AND PETITIONER SHALL FILE HIS REPLY ON OR BEFORE 8/23/19 AS OUTLINED HEREIN. IT IS FURTHER ORDERED THAT THE A.G.'S OFFICE MAY SUBMIT A REPLY NO LATER THAN 9/6/19. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 7/30/19. 7/30/19 ENTERED AND COPIES MAILED TO PRO SE PETITIONER AND E-MAILED. (jpd ) (Entered: 07/30/2019) |
| 07/31/2019 | 175 | Reply *to Attorney General's Amicus Brief* by DONALD T. VAUGHN. (Attachments: # 1 Certificate of Service, # 2 Affidavit Exhibit A) (GEORGE, PAUL) Modified on 8/1/2019 (lisad, ). FILED IN ERROR, REFILED AS DOC. 176 . Modified on 8/1/2019 (sg, ). (Entered: 07/31/2019) |

| | | |
|---|---|---|
| 08/01/2019 | 176 | Reply *CORRECTED to the Attorney General's Amicus Brief* by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL. (Attachments: # 1 Certificate of Service, # 2 Affidavit Exhibit A) (GEORGE, PAUL) Modified on 8/2/2019 (lisad, ). ). (Entered: 08/01/2019) |
| 08/12/2019 | 177 | MOTION for Leave to File *REPLY TO DISTRICT ATTORNEY AT TIME OF REPLY TO PETITIONER* filed by DONALD T. VAUGHN.MOTION FOR LEAVE TO REPLY TO DISTRICT ATTORNEY AT TIME OF REPLY TO PETITIONER.(BARKER, JAMES) (Entered: 08/12/2019) |
| 08/13/2019 | 178 | ORDERED THAT THE MOTION FOR LEAVE TO FILE IS GRANTED AS OUTLINED HEREIN AND THE ATTORNEY GENERAL MAY FILE A SINGLE RESPONSE TO THE REPLY BRIEFS OF THE PETITIONER AND PHILADELPHIA DISTRICT ATTORNEY ON OR BEFORE 9/6/19. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 8/13/19. 8/13/19 ENTERED AND COPIES MAILED TO PRO SE PETITIONER AND E-MAILED.(jpd, ) (Entered: 08/13/2019) |
| 08/19/2019 | 179 | NOTICE of Appearance by NANCY WINKELMAN on behalf of DONALD T. VAUGHN with Certificate of Service(WINKELMAN, NANCY) (Entered: 08/19/2019) |
| 08/23/2019 | 180 | MOTION to Stay *or Continuance and Consolidated Response to Amicus Brief and Court's Questions* filed by ROBERT WHARTON.Certificate of Service. (Attachments: # 1 Exhibit 1, # 2 Text of Proposed Order)(VANWYK, CLAUDIA) (Entered: 08/23/2019) |
| 08/26/2019 | 181 | MOTION to Set Aside *2254 Petition in Abeyance* filed by DONALD T. VAUGHN .Certificate of Service.(GEORGE, PAUL) Modified on 8/28/2019 (sg, ). (Entered: 08/26/2019) |
| 08/28/2019 | 182 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG Status Conference held on 8/28/19. Court Reporter: ESR. (jpd, ) Modified on 8/29/2019 (lisad, ). (Entered: 08/29/2019) |
| 09/04/2019 | 183 | ORDERED THAT PETITIONER'S RENEWED PETITION FOR THE APPOINTMENT OF COUNSEL (DOC. NO. 164) IS DENIED. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 9/4/19. 9/5/19 ENTERED AND COPIES E-MAILED.(jpd, ) (Entered: 09/05/2019) |
| 09/05/2019 | 184 | Letter to Hon. Mitchell S. Goldberg by ROBERT WHARTON re 180 MOTION to Stay *or Continuance and Consolidated Response to Amicus Brief and Court's Questions* (VANWYK, CLAUDIA) Modified on 9/6/2019 (lisad, ). (Entered: 09/05/2019) |
| 09/06/2019 | 185 | SUR-REPLY Brief to Reply Briefs re 172 MOTION for Leave to File *a Reply to the Brief of Amicis Curiae* filed by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL. Certificate of Service. (BARKER, JAMES) Modified on 9/9/2019 (lisad, ). (Entered: 09/06/2019) |
| 09/25/2019 | 186 | ORDER THAT PETITIONER'S "UNOPPOSED MOTION FOR STAY OR CONTINUANCE AND CONSOLIDATED RESPONSE TO AMICUS BRIEF AND COURT'S QUESTIONS" 180 AND THE "MOTION TO HOLD SEC. 2254 PETITION IN ABEYANCE" FILED BY THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE 181 ARE DENIED IN PART. SPECIFICALLY, TO THE EXTENT THAT THESE MOTIONS REQUEST THAT THIS MATTER BE STAYED PENDING THE PENNSYLVANIA SUPREME COURT'S DECISION IN COMMONWEALTH V. COX, THESE MOTIONS ARE DENIED. IN ALL OTHER RESPECTS, THESE MOTIONS ARE HELD UNDER ADVISEMENT. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 9/25/19.9/25/19 ENTERED & E-MAILED.(fdc) (Entered: 09/25/2019) |

| | | |
|---|---|---|
| 12/23/2019 | | Acknowledgement of Receipt of Return of original document addressed to Robert Wharton re: Document # 157 (Order), per Pennsylvania Department of Corrections Legal Mail Policy (nd, ) (Entered: 12/26/2019) |
| 02/12/2020 | 187 | MEMORANDUM AND/OR OPINION. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 2/12/20. 2/13/20 ENTERED AND COPIES E-MAILED.(jpd, ) (Entered: 02/13/2020) |
| 02/12/2020 | 188 | ORDERED THAT AN EVIDENTIARY HEARING ON PETITIONERS REMAINING § 2254 HABEAS CLAIM IS SCHEDULED FOR APRIL 1, 2020 AT 10:00 A.M. IN COURTROOM 4-B.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 2/12/20. 2/13/20 ENTERED AND COPIES E-MAILED.(jpd, ) (Entered: 02/13/2020) |
| 02/12/2020 | | Set/Reset Hearings: EVIDENTIARY HEARING SET FOR 4/1/2020 10:00 AM IN COURTROOM BEFORE HONORABLE MITCHELL S. GOLDBERG. (jpd, ) (Entered: 02/13/2020) |
| 02/24/2020 | 189 | MOTION to Continue *Hearing Date (Unopposed)* filed by ROBERT WHARTON.certificate of service. (Attachments: # 1 Text of Proposed Order)(VANWYK, CLAUDIA) (Entered: 02/24/2020) |
| 02/26/2020 | 190 | ORDERED THAT THE EVIDENTIARY HEARING ON PETITIONERS REMAINING § 2254 HABEAS CLAIM IS SCHEDULED FOR MAY 6, 2020 AT 10:00 A.M. IN COURTROOM 4-B. NO FURTHER CONTINUANCES SHALL BE GRANTED ABSENT EXTRAORDINARY CIRCUMSTANCES.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 2/26/20. 2/27/20 ENTERED AND COPIES E-MAILED.(jpd, ) (Entered: 02/27/2020) |
| 03/13/2020 | 191 | MOTION for Relief *for Leave to Supplement* filed by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL..(BARKER, JAMES) (Entered: 03/13/2020) |
| 03/13/2020 | 192 | NOTICE of Appearance by ELIZABETH MCHUGH on behalf of ROBERT WHARTON with Certificate of Service(MCHUGH, ELIZABETH) (Entered: 03/13/2020) |
| 03/27/2020 | 195 | MOTION to Continue *UNOPPOSED MOTION FOR CONTINUANCE OF HEARING DATE* filed by ROBERT WHARTON.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(MCHUGH, ELIZABETH) (Entered: 03/27/2020) |
| 03/30/2020 | 196 | ORDERED THAT THE MOTION FOR CONTINUANCE OF HEARING DATE 195 IS GRANTED. A TELEPHONE CONFERENCE IS SCHEDULED FOR 2:00 P.M. ON WEDNESDAY, APRIL 29, 2020, TO DISCUSS A RESCHEDULED DATE FOR THE HEARING. COUNSEL SHOULD DIAL IN AT 877-336-1828, ACCESS CODE 4305075.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 3/30/20. 3/30/20 ENTERED AND COPIES E-MAILED.(jpd, ) (Entered: 03/30/2020) |
| 03/30/2020 | | Set/Reset Hearings: TELEPHONE CONFERENCE SET FOR 4/29/2020 02:00 PM BEFORE HONORABLE MITCHELL S. GOLDBERG. (jpd, ) (Entered: 03/30/2020) |
| 04/06/2020 | 197 | ORDERED THAT THE ATTORNEY GENERALS MOTION PERTAINS IN PART TO THE POSSIBLE TESTIMONY OF SHARON THOMAS AT THE UPCOMING EVIDENTIARY HEARING (DATE TO BE DETERMINED). I NOTE THAT, PURSUANT TO 18 U.S.C. § 3771(B)(2)(A), THE VICTIMS OF CRIME OR FAMILY MEMBERS OF HOMICIDE VICTIMS HAVE THE RIGHT TO BE REASONABLY HEARD AT A FEDERAL HABEAS CORPUS PROCEEDING. THE ATTORNEY GENERAL ALSO REQUESTS TO EXPAND THE RECORD TO INCLUDE A LETTER FROM MS. THOMAS. THAT SAID, THE ADMISSIBILITY OF SHARON THOMASS TESTIMONY AND THE CONTENTS OF HER LETTER WILL BE DETERMINED AT A LATER DATE, AFTER THE ATTORNEY GENERAL AND ALL PARTIES HAVE |

| | | |
|---|---|---|
| | | HAD AN OPPORTUNITY TO BE HEARD ON THE RECORD AT A PRE-HEARING CONFERENCE AND/OR PRIOR TO THE HEARING ITSELF. THEREFORE, THE ATTORNEY GENERALS MOTION IS DENIED WITHOUT PREJUDICE AT THIS TIME AND WILL BE REVISITED ONCE A HEARING DATE IS SET. THE ATTORNEY GENERAL HAS ALSO RAISED AN ISSUE AS TO WHETHER SENIOR DEPUTY ATTORNEY GENERAL (SDAG) CARI MAHLER MAY PARTICIPATE AT THE UPCOMING HEARING. THE ATTORNEY GENERAL IS FREE TO SELECT WHICH ATTORNEY(S) WILL APPEAR ON ITS BEHALF AT THE HEARING. CURRENTLY, THERE IS NO MOTION TO EXCLUDE SDAG MAHLER, AND, AS SUCH, THE ISSUE OF HER PARTICIPATION IS NOT BEFORE ME. THEREFORE, THIS ASPECT OF THE ATTORNEY GENERALS MOTION IS ALSO DENIED WITHOUT PREJUDICE.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 4/6/20.4/6/20 ENTERED AND COPIES E-MAILED.(jpd, ) (Entered: 04/06/2020) |
| 04/23/2020 | 198 | ORDERED THAT THIS 23RD DAY OF APRIL, 2020, THE CALL IN DETAILS FOR THE TELEPHONE CONFERENCE SCHEDULED FOR WEDNESDAY, APRIL 29, 2020 AT 2:00 P.M. IS AS FOLLOWS: DIAL 703-724-3100; CONFERENCE CODE 2000049#; PIN 2020#.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 4/23/20. 4/23/20 ENTERED AND COPIES E-MAILED.(jpd, ) (Entered: 04/23/2020) |
| 04/28/2020 | 199 | NOTICE of Appearance by CARI L. MAHLER on behalf of PENNSYLVANIA OFFICE OF ATTORNEY GENERAL (MAHLER, CARI) (Entered: 04/28/2020) |
| 04/29/2020 | 200 | NOTICE of Hearing: TELEPHONE CONFERENCE RESCHEDULED FOR FOR 4/30/2020 AT 9:30 AM BEFORE HONORABLE MITCHELL S. GOLDBERG. COUNSEL SHOULD DIAL IN AS DIRECTED IN THE NOTICE. (sl, ) (Entered: 04/29/2020) |
| 04/30/2020 | 201 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG Telephone Conference held on 4/30/2020 (sg, ) (Entered: 04/30/2020) |
| 05/01/2020 | 202 | ORDERED THAT COUNSEL FOR THE PARTIES AND THE ATTORNEY GENERAL SHALL MEET AND CONFER REGARDING HOW THE EVIDENTIARY RECORD WILL BE DEVELOPED IN LIGHT OF THE COVID-19 PANDEMIC. COUNSEL SHALL CONSIDER THE PRESENTATION OF LIVE TESTIMONY, VIDEO TESTIMONY, AND/OR STIPULATIONS. WITHIN 45 DAYS OF THE DATE OF THIS ORDER, COUNSEL FOR THE PARTIES AND THE ATTORNEY GENERAL SHALL SERVE UPON ALL OTHER COUNSEL A COPY OF EACH EXHIBIT THE PARTY OR THE ATTORNEY GENERAL EXPECTS TO OFFER AT THE HEARING, TOGETHER WITH AN INDEX OF ALL EXHIBITS; A LIST OF ALL WITNESSES THAT THE PARTY OR THE ATTORNEY GENERAL EXPECTS WILL BE CALLED; AND ANY PROPOSED STIPULATIONS.BY NO LATER THAN JUNE 15, 2020, THE PARTIES SHALL FILE A JOINT STATUS LETTER WITH THE COURT REGARDING THESE DISCUSSIONS. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 5/1/20. 5/1/20 ENTERED AND COPIES E-MAILED.(jpd, ) (Entered: 05/01/2020) |
| 06/15/2020 | 203 | MOTION for Extension of Time to File *Joint Update* filed by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL.Certificate of Service.(BARKER, JAMES) (Entered: 06/15/2020) |
| 06/16/2020 | 204 | ORDERED THAT RESPONDENTS MOTION FOR EXTENSION OF TIME TO FILE 203 IS GRANTED. THE STATUS REPORT SHALL BE FILED WITH THE COURT ON OR BEFORE 6/30/20. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 6/16/20.6/17/20 ENTERED AND COPIES E-MAILED.(jpd, ) (Entered: 06/17/2020) |
| 06/30/2020 | 205 | STATUS REPORT by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL. (BARKER, JAMES) (Entered: 06/30/2020) |

| | | |
|---|---|---|
| 09/29/2020 | 206 | ORDERED THAT A TELEPHONE CONFERENCE IS SCHEDULED ON MONDAY, OCTOBER 5, 2020 AT 2:00 P.M. COUNSEL SHALL BE PREPARED TO IDENTIFY ANY WITNESSES WHO WILL TESTIFY AT THE HEARING AND DISCUSS COUNSELS AVAILABILITY AS WELL AS THE AVAILABILITY OF EACH WITNESS. COUNSEL SHOULD DIAL 571-353-2300, 427102124#, TO CONNECT. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 9/29/20. 9/30/20 ENTERED AND COPIES E-MAILED.(jaa, ) (Entered: 09/30/2020) |
| 10/05/2020 | 207 | NOTICE of Hearing: * TIME CHANGE * TELEPHONE CONFERENCE SET FOR 10/5/2020 AT 3:00 PM BEFORE HONORABLE MITCHELL S. GOLDBERG. COUNSEL SHOULD DIAL IN AS DIRECTED IN THE NOTICE. (sl, ) (Entered: 10/05/2020) |
| 10/06/2020 | 208 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG Telephone Conference held on 10/5/2020 (sg, ) (Entered: 10/06/2020) |
| 10/26/2020 | 209 | PETITIONER ROBERT WHARTON'S MOTION FOR RECUSAL, CERTIFICATE OF SERVICE. (jpd ) (Entered: 10/26/2020) |
| 11/10/2020 | 210 | TRANSCRIPT of held on 10/5/20, before Judge MITCHELL S. GOLDBERG. Court Reporter/Transcriber SUZANNE E. WHITE. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 12/1/2020. Redacted Transcript Deadline set for 12/11/2020. Release of Transcript Restriction set for 2/8/2021. (jpd, ) (Entered: 11/10/2020) |
| 11/10/2020 | 211 | Notice of Filing of Official Transcript with Certificate of Service re 210 Transcript - PDF, 11/10/20 Entered and Copies Emailed. (jpd, ) Modified on 11/12/2020 (lisad, ). (Entered: 11/10/2020) |
| 11/18/2020 | 212 | ORORDERED THAT AN EVIDENTIARY HEARING ON PETITIONERS REMAINING § 2254 HABEAS CLAIM SHALL BE HELD ON FEBRUARY 18, 2021 AT 9:00 A.M.; FEBRUARY 25, 2021 AT 1:00 P.M.; MARCH 8, 2021 AT 1:00 P.M.; AND MARCH 16, 2021 AT 9:00 A.M. THE PARTIES SHOULD REPORT TO COURTROOM 15-A ON ALL OF THE ABOVE DATES. PETITIONER SHALL APPEAR AT THE HEARING VIA VIDEOCONFERENCE FROM S.C.I. PHOENIX, THE STATE PENAL INSTITUTION AT WHICH HE IS BEING HELD. THE SUPERINTENDENT OF S.C.I. PHOENIX SHALL PRODUCE ROBERT WHARTON (AY-6874) TO APPEAR FOR THE HEARING VIA VIDEO. BY NO LATER THAN JANUARY 11, 2021, IF COUNSEL HAS NOT ALREADY DONE SO, COUNSEL SHALL SERVE A COPY OF EACH EXHIBIT THAT THE PARTY OR THE PENNSYLVANIA OFFICE OF THE ATTORNEY GENERAL EXPECT TO OFFER AT THE HEARING, TOGETHER WITH AN INDEX OF ALL EXHIBITS; A LIST OF ALL WITNESSES THAT THE PARTY OR PENNSYLVANIA OFFICE OF THE ATTORNEY GENERAL EXPECT WILL BE CALLED; AND ANY PROPOSED STIPULATIONS. BY NO LATER THAN JANUARY 18, 2021, THE PARTIES MAY FILE, IF NECESSARY, MOTIONS IN LIMINE. ANY RESPONSES TO MOTIONS IN LIMINE SHALL BE FILED BY NO LATER THAN FEBRUARY 1, 2021.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 11/17/20. 11/18/20 ENTERED AND COPIES MAILED TO PRO SE AND E-MAILED.(jpd, ) (Entered: 11/18/2020) |
| 01/18/2021 | 213 | MOTION re 212 Scheduling Order,,,,, Set Hearings,,,, filed by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL.PRE-HEARING MOTIONS OF AMICUS CURIAE PENNSYLVANIA OFFICE OF ATTORNEY GENERAL.(BARKER, JAMES) (Entered: 01/18/2021) |

| | | |
|---|---|---|
| 01/18/2021 | 214 | MOTION in Limine filed by ROBERT WHARTON.Certficate of Service.(VANWYK, CLAUDIA) (Entered: 01/18/2021) |
| 01/21/2021 | 215 | MOTION for Extension of Time to Submit Supplemental Expert Report filed by ROBERT WHARTON.Certificate of Service. (Attachments: # 1 Text of Proposed Order) (MCHUGH, ELIZABETH) (Entered: 01/21/2021) |
| 01/22/2021 | 216 | ORDERED THAT PETITIONER'S MOTION FOR EXTENSION OF TIME 215 IS GRANTED.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 1/22/21.1/22/21 ENTERED AND COPIES NOT MAILED TO PRO SE AND E-MAILED.(jpd, ) (Entered: 01/22/2021) |
| 01/26/2021 | | COPY OF DOC. NO. 216 HAS BEEN MAILED TO PRO SE, WHARTON. (bw, ) (Entered: 01/26/2021) |
| 02/01/2021 | 217 | RESPONSE to Motion re 213 MOTION re 212 Scheduling Order,,,,, Set Hearings,,,, filed by ROBERT WHARTON. (MCHUGH, ELIZABETH) (Entered: 02/01/2021) |
| 02/01/2021 | 218 | RESPONSE in Opposition re 214 MOTION in Limine filed by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL. (BARKER, JAMES) (Entered: 02/01/2021) |
| 02/02/2021 | 219 | NOTICE by ROBERT WHARTON re 217 Response to Motion *Petitioner's Hearing Exhibits Cited in Support of Petitioner's Responses to Attorney General's Pre-Hearing Motions* (VANWYK, CLAUDIA) (Entered: 02/02/2021) |
| 02/08/2021 | 220 | NOTICE of Hearing: PRE-HEARING TELEPHONE CONFERENCE ON THE RECORD SET FOR 2/9/2021 AT 2:00 PM BEFORE HONORABLE MITCHELL S. GOLDBERG. COUNSEL SHOULD DIAL IN AS DIRECTED IN THE NOTICE. (sl, ) (Entered: 02/08/2021) |
| 02/08/2021 | 221 | NOTICE by ROBERT WHARTON (VANWYK, CLAUDIA) (Entered: 02/08/2021) |
| 02/09/2021 | 222 | NOTICE of Hearing: ON THE RECORD TELEPHONE CONFERENCE RE: THE PARTIES' PRE-HEARING MOTIONS SET FOR 2/12/2021 AT 1:00 PM BEFORE HONORABLE MITCHELL S. GOLDBERG. COUNSEL SHOULD DIAL IN AS DIRECTED IN THE NOTICE. ENTERED 02/09/2021 AND COPIES E-MAILED. (sl, ) (Entered: 02/09/2021) |
| 02/11/2021 | 223 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG Pretrial Conference held on 2/9/2021. Court Reporter: LYNN GLIGOR. (sg, ) (Entered: 02/11/2021) |
| 02/12/2021 | 224 | MOTION for Order *Authorizing Payment for Witness Travel* filed by ROBERT WHARTON.Certificate of Service. (Attachments: # 1 Text of Proposed Order) (MCHUGH, ELIZABETH) (Entered: 02/12/2021) |
| 02/16/2021 | 225 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG. Motion Hearing held on 2/12/21. Court Reporter: Shannan Gagliardi. (jpd, ) Modified on 2/17/2021 (lisad, ). (Entered: 02/16/2021) |
| 02/26/2021 | 226 | Objections by DONALD T. VAUGHN *Objection to Attorney General's De Facto Intervention As A Party*. (WINKELMAN, NANCY) (Entered: 02/26/2021) |
| 02/26/2021 | 227 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG Evidentiary Hearing Day 1 held on 2/25/21. Court Reporter: ESR. (jpd, ) Modified on 3/1/2021 (lisad, ). (Entered: 02/26/2021) |

| | | |
|---|---|---|
| 02/26/2021 | 228 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG Evidentiary Hearing Day 1 held on 2/25/21. Court Reporter: ESR. (jpd, ) *DUPLICATE FILING OF DOC. 227 * Modified on 3/1/2021 (lisad, ). (Entered: 02/26/2021) |
| 03/01/2021 | 229 | Statement *in Response to District Attorney's Objection* by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL. (BARKER, JAMES) (Entered: 03/01/2021) |
| 03/02/2021 | 230 | NOTICE of Hearing: ON-THE-RECORD TELEPHONE CONFERENCE SET FOR 3/2/2021 AT 3:00 PM BEFORE HONORABLE MITCHELL S. GOLDBERG. COUNSEL SHOULD DIAL IN AS DIRECTED IN THE NOTICE. (sl, ) (Entered: 03/02/2021) |
| 03/02/2021 | 231 | Statement *re Participation of OAG* by ROBERT WHARTON. (VANWYK, CLAUDIA) (Entered: 03/02/2021) |
| 03/02/2021 | 232 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG Status Hearing held on 3/2/21. Court Reporter: SUSZANNE WHITE. (jpd, ) Modified on 3/4/2021 (lisad, ). (Entered: 03/03/2021) |
| 03/04/2021 | 233 | TRANSCRIPT of STATUS CONFERENCE HEARING held on 3/2/21, before Judge GOLDBERG. Court Reporter/Transcriber SUZANNE WHITE. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 3/25/2021. Redacted Transcript Deadline set for 4/5/2021. Release of Transcript Restriction set for 6/2/2021. (PROCEDING RECORDED BY STENOTYPE-COMPUTER)(JL ) (Entered: 03/04/2021) |
| 03/04/2021 | 234 | Notice of Filing of Official Transcript with Certificate of Service re 233 Transcript - PDF,, 3/4/21 Entered and Copies Emailed. (JL ) (Entered: 03/04/2021) |
| 03/05/2021 | 235 | Letter dated March 5, 2021 by ROBERT WHARTON. (VANWYK, CLAUDIA) (Entered: 03/05/2021) |
| 03/08/2021 | 236 | ORDERED THAT THE PETITIONER'S MOTION FOR ORDER 224 IS DENIED AS MOOT. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 3/8/21. 3/8/21 ENTERED AND COPIES NOT MAILED TO PRO SE AND E-MAILED. (jpd ) (Entered: 03/08/2021) |
| 03/08/2021 | | COPY OF ORDER #236 MAILED TO PRO SE (jpd, ) (Entered: 03/31/2021) |
| 03/09/2021 | 237 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG Evidentiary Hearing held on 3/8/21. Court Reporter: ESR. (jpd, ) Modified on 3/10/2021 (lisad, ). (Entered: 03/09/2021) |
| 03/09/2021 | 238 | TRANSCRIPT of Evidentiary Hearing DAY-1 held on 2/25/21, before Judge MITCHELL S. GOLDBERG. Court Reporter/Transcriber VERITEXT NATIONAL COURT REPORTING COMPANY MID-ATLANTIC REGION. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 3/30/2021. Redacted Transcript Deadline set for 4/9/2021. Release of Transcript Restriction set for 6/7/2021. (jpd, ) Modified on 3/10/2021 (lisad, ). (Entered: 03/09/2021) |
| 03/09/2021 | 239 | Notice of Filing of Official Transcript with Certificate of Service re 238 Transcript - PDF, 3/9/21 Entered and Copies E-mailed. Not mailed to pro se. (jpd, ) Modified on 3/11/2021 (lisad, ). (Entered: 03/09/2021) |

| | | |
|---|---|---|
| 03/10/2021 | 240 | Request for Transcripts by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL. (BARKER, JAMES) (Entered: 03/10/2021) |
| 03/10/2021 | | TRANSCRIPT REQUEST by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL. *FOR PDF SEE DOC. 240 * (lisad, ) (Entered: 03/11/2021) |
| 03/11/2021 | | COPY OF TRANSCRIPT NOTICE #239 MAILED TO PRO SE (jpd, ) (Entered: 03/11/2021) |
| 03/11/2021 | 241 | ORDER THAT THE DISTRICT ATTORNEY'S OBJECTION IS OVERRULED. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 3/11/21. 3/12/21 ENTERED AND COPIES NOT MAILED TO PRO SE AND E-MAILED.(mbh, ) (Entered: 03/12/2021) |
| 03/12/2021 | 242 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG Telephone Conference held on 3/12/2021 (sg, ) (Entered: 03/12/2021) |
| 03/15/2021 | | DOC. 241 MAILED TO PRO SE. (sg, ) (Entered: 03/15/2021) |
| 03/16/2021 | 243 | TRANSCRIPT of HEARING-EXCERPT-TESTIMONY OF DR. JOHN O'BRIEN held on 3/8/21, before Judge MITCHELL S. GOLDBERG. Court Reporter/Transcriber VERITEXT. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/6/2021. Redacted Transcript Deadline set for 4/16/2021. Release of Transcript Restriction set for 6/14/2021. (jpd, ) (Entered: 03/16/2021) |
| 03/16/2021 | 244 | Notice of Filing of Official Transcript with Certificate of Service re 243 Transcript - PDF,, 3/16/21 Entered and Copies Emailed and and Not Mailed to Pro Se. (jpd, ) (Entered: 03/16/2021) |
| 03/16/2021 | 245 | TRANSCRIPT of MOTION IN LIMINE HEARING held on 2/12/21, before Judge MITCHELL S. GOLDBERG. Court Reporter/Transcriber SHANNON GAGLIARDI. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/6/2021. Redacted Transcript Deadline set for 4/16/2021. Release of Transcript Restriction set for 6/14/2021. (jpd, ) (Entered: 03/16/2021) |
| 03/16/2021 | 246 | Notice of Filing of Official Transcript with Certificate of Service re 245 Transcript - PDF, 3/16/21 Entered and Copies Emailed and Not Mailed to Pro Se. (jpd, ) (Entered: 03/16/2021) |
| 03/17/2021 | | COPY OF TRANSCRIPT NOTICES # 244, #246 MAILED TO PRO SE (jpd, ) (Entered: 03/17/2021) |
| 03/17/2021 | 247 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG Evidentiary Hearing held on 3/16/2021. Court Reporter: ESR. (sg, ) Modified on 3/17/2021 (lisad, ). (Entered: 03/17/2021) |
| 03/19/2021 | 248 | TRANSCRIPT of Pretrial Hearing via Teleconference held on 2/9/21, before Judge MITCHELL S. GOLDBERG. Court Reporter/Transcriber LYNN GLIGOR. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/9/2021. Redacted Transcript Deadline set for 4/19/2021. Release of Transcript Restriction set for 6/17/2021. (jpd, ) (Entered: 03/19/2021) |

| | | |
|---|---|---|
| 03/19/2021 | 249 | Notice of Filing of Official Transcript with Certificate of Service re 248 Transcript - PDF,, 3/19/21 Entered and Copies Emailed and Not Mailed to Pro Se. (jpd, ) (Entered: 03/19/2021) |
| 03/22/2021 | | DOC. 249 MAILED TO PRO SE. (sg, ) (Entered: 03/22/2021) |
| 03/23/2021 | 250 | TRANSCRIPT of Excerpt of Evidentiary Hearing Day 2 held on 3/8/21, before Judge MITCHELL S. GOLDBERG. Court Reporter/Transcriber VERITEXT. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/13/2021. Redacted Transcript Deadline set for 4/23/2021. Release of Transcript Restriction set for 6/21/2021. (jpd, ) (Entered: 03/23/2021) |
| 03/23/2021 | 251 | Notice of Filing of Official Transcript with Certificate of Service re 250 Transcript - PDF,, 3/23/21 Entered and Copies Emailed and Not Mailed to Pro Se. (jpd, ) (Entered: 03/23/2021) |
| 03/24/2021 | | COPY OF TRANSCRIPT NOTICE #250 MAILED TO PRO SE (jpd, ) (Entered: 03/24/2021) |
| 03/25/2021 | 252 | TRANSCRIPT of EVIDENTIARY HEARINDG DAY 3 held on 3/16/21, before Judge GOLDBERG. Court Reporter/Transcriber VERITEXT LEGAL SOLUTIONS. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 4/15/2021. Redacted Transcript Deadline set for 4/26/2021. Release of Transcript Restriction set for 6/23/2021. (rf, ) (Entered: 03/26/2021) |
| 03/25/2021 | 253 | Notice of Filing of Official Transcript with Certificate of Service re 252 Transcript - PDF, 3/16/21 Entered and Copies Emailed and Mailed.. (rf, ) (Entered: 03/26/2021) |
| 03/31/2021 | 254 | ORDERED THAT AN EVIDENTIARY HEARING IN THE ABOVE-CAPTIONED CASE IS SCHEDULED FOR TUESDAY, MAY 11, 2021 AT 9:00 A.M. IN COURTROOM 15-A. PETITIONER SHALL APPEAR AT THE HEARING VIA VIDEOCONFERENCE FROM S.C.I. PHOENIX, THE STATE PENAL INSTITUTION AT WHICH HE IS BEING HELD. THE SUPERINTENDENT OF S.C.I. PHOENIX SHALL PRODUCE ROBERT WHARTON (AY-6874) TO APPEAR FOR THE HEARING VIA VIDEO.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 3/31/2021. 3/31/2021 ENTERED AND COPIES E-MAILED. NOT MAILED TO PRO SE.(sg, ) (Entered: 03/31/2021) |
| 04/01/2021 | | DOC. 254 MAILED TO PRO SE. (sg, ) (Entered: 04/01/2021) |
| 04/01/2021 | 255 | ORDER THAT UPON CONSIDERATION OF PETITIONERS PRO SE MOTION FOR RECUSAL (ECF NO. 209), IT IS HEREBY ORDERED THAT THE MOTION (ECF NO. 209) IS DENIED. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 4/1/2021.4/1/2021 ENTERED AND COPIES MAILED TO PRO SE AND E-MAILED. (sg, ) (Entered: 04/01/2021) |
| 04/12/2021 | 256 | TRANSCRIPT of STATUS CONFERENCE held on 4/30/2020, before Judge MITCHELL S. GOLDBERG. Court Reporter/Transcriber Ann Marie Mitchell, CRR, RDR, RMR. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 5/3/2021. Redacted Transcript Deadline set for 5/13/2021. Release of Transcript Restriction set for 7/12/2021. (sg, ) (Entered: 04/12/2021) |

| | | |
|---|---|---|
| 04/12/2021 | 257 | Notice of Filing of Official Transcript with Certificate of Service re 256 Transcript - PDF,, 4/12/2021 Entered and Copies Emailed. NOT MAILED TO PRO SE. (sg, ) (Entered: 04/12/2021) |
| 04/20/2021 | 258 | TRANSCRIPT of STATUS HEARING held on 2/14/2019, before Judge MITCHELL S. GOLDBERG. Court Reporter/Transcriber Veritext Court Reporting. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 5/11/2021. Redacted Transcript Deadline set for 5/21/2021. Release of Transcript Restriction set for 7/19/2021. (sg, ) (Entered: 04/20/2021) |
| 04/20/2021 | 259 | Notice of Filing of Official Transcript with Certificate of Service re 258 Transcript - PDF, 4/20/2021 Entered and Copies Emailed. (sg, ) (Entered: 04/20/2021) |
| 05/03/2021 | 260 | NOTICE of Hearing: TELEPHONE CONFERENCE SET FOR 5/4/2021 AT 3:30 PM BEFORE HONORABLE MITCHELL S. GOLDBERG. COUNSEL SHOULD DIAL IN AS DIRECTED IN THE NOTICE. (sl, ) (Entered: 05/03/2021) |
| 05/03/2021 | 261 | NOTICE OF APPEAL by ROBERT WHARTON. IFP GRANTED Copies to Judge, Clerk USCA, Appeals Clerk. (sg, ) (Entered: 05/04/2021) |
| 05/05/2021 | 262 | NOTICE of Docketing Record on Appeal from USCA re 261 Notice of Appeal filed by ROBERT WHARTON. USCA Case Number 21-9000 (sg, ) (Entered: 05/05/2021) |
| 05/07/2021 | 263 | Request for Transcripts by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL. (BARKER, JAMES) (Entered: 05/07/2021) |
| 05/10/2021 | 264 | NOTICE of Hearing: *TIME CHANGE* EVIDENTIARY HEARING SET FOR 5/11/2021 AT 10:00 AM IN Courtroom 15A BEFORE HONORABLE MITCHELL S. GOLDBERG. ENTERED AND COPIES E-MAILED 5/10/2021 (sl, ) (Entered: 05/10/2021) |
| 05/12/2021 | 265 | Request for Transcripts by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL. (BARKER, JAMES) (Entered: 05/12/2021) |
| 05/12/2021 | 266 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERG Evidentiary Hearing DAY 4 held on 5/11/21. Court Reporter: ESR. (JL ) (Entered: 05/12/2021) |
| 05/18/2021 | 267 | TRANSCRIPT of EVIDENTIARY HEARING DAY 4 held on 5/11/2021, before Judge GOLDBERG. Court Reporter/Transcriber VERITEXT NATIONAL COURT REPORTING COMPANY. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/8/2021. Redacted Transcript Deadline set for 6/18/2021. Release of Transcript Restriction set for 8/16/2021. (sg, ) (Entered: 05/18/2021) |
| 05/18/2021 | 268 | Notice of Filing of Official Transcript with Certificate of Service re 267 Transcript - PDF,, 5/18/2021 Entered and Copies Emailed. (sg, ) (Entered: 05/18/2021) |
| 06/23/2021 | 269 | ORDERED THAT AN EVIDENTIARYHEARING IN THE ABOVE-CAPTIONED CASE IS SCHEDULED FOR THURSDAY, AUGUST 5, 2021 AT 10:00 A.M.IN COURTROOM 11-A. PETITIONER SHALL APPEAR AT THE HEARING VIA VIDEOCONFERENCE FROM S.C.I.PHOENIX, THE STATE PENAL INSTITUTION AT WHICH HE IS BEING HELD. THE SUPERINTENDENT OF S.C.I.PHOENIX SHALL PRODUCE ROBERT WHARTON (AY-6874) TO APPEAR FOR THE HEARING VIA VIDEO.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON |

| | | |
|---|---|---|
| | | 6/23/2021. 6/23/2021 ENTERED AND COPIES E-MAILED. NOT MAILED TO PRO SE.(sg, ) (Entered: 06/23/2021) |
| 06/24/2021 | | ORDER 269 MAILED TO WHARTON. (fdc) (Entered: 06/24/2021) |
| 07/09/2021 | | COPY OF DOC. NO. 269 HAS BEEN MAILED TO WARDEN, JAMIE SORBER, AT SCI-PHOENIX. (bw, ) (Entered: 07/09/2021) |
| 08/05/2021 | 270 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERGin Courtroom 11A Evidentiary Hearing DAY 5 held on 8/5/2021. Court Reporter: ESR. (sg, ) (Entered: 08/05/2021) |
| 08/10/2021 | 271 | ORDER THAT BY NO LATER THAN SEPTEMBER 30, 2021, PETITIONER ROBERT WHARTON AND RESPONDENT THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE SHALL FILE BRIEFS BY NO LATER THAN OCTOBER 22, 2021, THE ATTORNEY GENERAL MAY FILE A BRIEF IN RESPONSE TO THESE ISSUES. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 8/10/21. 8/10/21 ENTERED & E-MAILED. NOT MAILED TO WHARTON. (fdc) (Entered: 08/10/2021) |
| 08/10/2021 | | Order 271 faxed to Philadelphia District Attorney's Office. (fdc) (Entered: 08/10/2021) |
| 08/11/2021 | | PAPER #271 MAILED TO PRO SE (JL ) (Entered: 08/11/2021) |
| 08/12/2021 | 272 | MOTION for Opportunity to Reply *(Partially Unopposed)* filed by ROBERT WHARTON.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(VANWYK, CLAUDIA) (Entered: 08/12/2021) |
| 08/12/2021 | 273 | ORDER THAT PETITIONER'S "PARTIALLY UNOPPOSED MOTION FOR OPPORTUNITY TO REPLY" IS GRANTED. BY NO LATER THAN 11/1/21 WHARTON MAY FILE A REPLY BRIEF NOT TO EXCEED 10 DOUBLE-SPACED PAGES. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 8/12/21.8/13/21 ENTERED AND COPIES NOT MAILED TO PRO SE AND E-MAILED.(mbh, ) (Entered: 08/13/2021) |
| 08/13/2021 | | COPY OF DOC. NO. 273 HAS BEEN MAILED TO PRO SE, WHARTON. (bw, ) (Entered: 08/13/2021) |
| 08/17/2021 | 274 | ORDER of USCA as to 261 Notice of Appeal filed by ROBERT WHARTON, order denying his pro se motion for recusal in this otherwise-counseled capital habeas case that remains pending before the District Court. Appellants motion to waive counsel and proceed pro se in this appeal is granted. However, as explained below, we must dismiss this appeal for lack of jurisdiction. (sg, ) (Entered: 08/17/2021) |
| 08/19/2021 | 275 | TRANSCRIPT of EVIDENTIARY HEARING, held on 8/5/2021, before Judge GOLDBERG. Court Reporter/Transcriber VERITEXT COURT REPORTING. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 9/9/2021. Redacted Transcript Deadline set for 9/20/2021. Release of Transcript Restriction set for 11/17/2021. (sg, ) (Entered: 08/19/2021) |
| 08/19/2021 | 276 | Notice of Filing of Official Transcript with Certificate of Service re 275 Transcript - PDF, 8/19/2021 Entered and Copies Emailed. (sg, ) (Entered: 08/19/2021) |
| 08/23/2021 | 277 | ORDER THAT MOTIONS (ECF NOS 213 AND 214) ARE GRANTED IN PART AND DENIED IN PART. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 8/23/21.8/23/21 ENTERED AND COPIES NOT MAILED TO PRO SE AND E-MAILED.(mbh, ) (Entered: 08/23/2021) |

| | | |
|---|---|---|
| 08/24/2021 | | DOC #277 MAILED TO WHARTON (rf, ) (Entered: 08/24/2021) |
| 09/30/2021 | 278 | Response *Commonwealth's Post-Hearing Brief* by THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE. (Attachments: # 1 Appendix A, # 2 Appendix B, # 3 Appendix C, # 4 Appendix D) (WINKELMAN, NANCY) (Entered: 09/30/2021) |
| 09/30/2021 | 279 | Post-Hearing Brief by ROBERT WHARTON. (VANWYK, CLAUDIA) Modified on 10/1/2021 (lisad, ). (Entered: 09/30/2021) |
| 10/22/2021 | 280 | NOTICE by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL re 271 Order, *Post Hearing Brief of Amicus Curiae, Pennsylvania Office of Attorney General* (MAHLER, CARI) (Entered: 10/22/2021) |
| 11/01/2021 | 281 | Memorandum in Support *of Petitioner Robert Wharton's Post-Hearing Brief* by ROBERT WHARTON. (VANWYK, CLAUDIA) (Entered: 11/01/2021) |
| 11/22/2021 | 282 | ROBERT WHARTON MOTION FOR A STAY AND FOR CERTIFICATION OF RECUSAL MOTION, CERTIFICATE OF SERVICE..(JL ) (Entered: 11/23/2021) |
| 02/08/2022 | 283 | ORDERED THAT PETITIONERS MOTION FOR A STAY AND CERTIFICATION (ECF NO. 282) IS DENIED. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 2/8/2022.2/8/2022 ENTERED AND COPIES E-MAILED. NOT MAILED TO PRO SE.(sg) (Entered: 02/08/2022) |
| 02/09/2022 | | MAILED OUT ORDER ENTRY 283 TO PETITIONER ON 2/9/22. (jaa, ) (Entered: 02/09/2022) |
| 05/11/2022 | 284 | MEMORANDUM AND/OR OPINION SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 5/11/22. 5/11/22 ENTERED AND COPIES E-MAILED, NOT MAILED TO PRO SE.(bw) (Entered: 05/11/2022) |
| 05/11/2022 | 285 | ORDER THAT THE COURT OF APPEALS FOR THE THIRD CIRCUIT, AND FOLLOWING EVIDENTIARY HEARINGS HELD ON FEBRUARY 25, 2021, MARCH 8, 2021, MARCH 16, 2021, MAY 11, 2021, AND AUGUST 5, 2021, AND UPON CONSIDERATION OF PETITIONER ROBERT WHARTONS PETITION FOR A WRIT OF HABEAS CORPUS AND CONSOLIDATED MEMORANDUM OF LAW 22 , PETITIONERS AMENDMENT TO PETITION FOR WRIT OF HABEAS CORPUS 33 , PETITIONERS SECOND AMENDMENT TO PETITION FOR WRIT OF HABEAS CORPUS 90 , THE RESPONSES AND REPLIES THERETO, AND THE POST-HEARING BRIEFS AND REPLY 278 279 280 281 , AND FOR THE REASONS SET OUT IN THE ACCOMPANYING MEMORANDUM OPINION, IT IS HEREBY ORDERED THAT THE PETITION FOR A WRIT OF HABEAS CORPUS IS DENIED. A CERTIFICATE OF APPEALABILITY SHALL ISSUE. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 5/11/22. 5/11/22 ENTERED AND COPIES E-MAILED, NOT MAILED TO PRO SE.(bw) (Entered: 05/11/2022) |
| 05/12/2022 | | DOCCS # 284 & 285 MAILED TO PRO SE (rf, ) (Entered: 05/12/2022) |
| 05/13/2022 | 286 | ORDER THAT FOR THE REASONS SET OUT IN MY MAY 11, 2022 MEMORANDUM OPINION, NOTING A POSSIBLE BREACH OF THE DUTY OF CANDOR TO THE COURT ON THE PART OF THE PHILADELPHIA DISTRICT ATTORNEYS OFFICE, IT IS HEREBY ORDERED THAT THE SUPERVISOR OF THE DISTRICT ATTORNEYS OFFICES FEDERAL LITIGATION UNIT, WHO SIGNED THE FEBRUARY 6, 2019 CONCESSION AND THEREAFTER SUBMITTED, ALONG WITH PETITIONERS COUNSEL, THE PROPOSED ORDER SUGGESTING THAT I GRANT THE PETITION FOR HABEAS CORPUS VACATING THE JURYS VERDICT, SHALL APPEAR FOR A HEARING ON JUNE 2, 2022, AT 9:30 A.M. IN COURTROOM 17-A TO ADDRESS THE CONCERNS RAISED IN MY |

| | | |
|---|---|---|
| | | OPINION. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 5/13/2022. 5/13/2022 ENTERED AND COPIES E-MAILED. NOT MAILED TO PRO SE.(sg) (Entered: 05/13/2022) |
| 05/16/2022 | | Copy of Doc. 286 mailed to Pro Se. (mas) (Entered: 05/17/2022) |
| 05/24/2022 | 287 | MOTION to Exclude *Max Kaufman from the June 2, 2022 Hearing, and*, MOTION to Continue *Hearing* filed by THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE, DONALD T. VAUGHN.Certificate of Service. (Attachments: # 1 Exhibit A - Affidavit of Max C. Kaufman, Esq.)(WINKELMAN, NANCY) (Entered: 05/24/2022) |
| 05/26/2022 | 288 | ORDERED THAT: 1. PURSUANT TO THE DISTRICT ATTORNEYS REQUEST FOR A POSTPONEMENT, THE HEARING SCHEDULED FOR JUNE 2, 2022 AT 9:30 A.M. IS RESCHEDULED FOR JUNE 10, 2022 AT 9:30 A.M. IN COURTROOM 17-A. 2. THE DISTRICT ATTORNEY ASKS THAT MAX KAUFMAN BE EXCUSED FROM THE JUNE 10 HEARING BECAUSE HE WAS NOT PART OF THE DECISION-MAKING PROCESS THAT LED TO THE CONCESSION. BECAUSE MR. KAUFMAN SUBMITTED AND SIGNED THE NOTICE OF CONCESSION OF PENALTY RELIEF, NOTICE OF PROPOSED ORDER, AND A BRIEF PURPORTING TO EXPLAIN THE BASIS FOR THE CONCESSION, AND DID SO ACTING AS A SUPERVISOR FOR THE DISTRICT ATTORNEYS OFFICE, HE SHALL BE PRESENT AT THE HEARING. SEE FED. R. CIV. P. 11(B)(2)-(4) (SUBMISSIONS TO THE COURT BY AN ATTORNEY CERTIFY THAT AFTER REASONABLE INQUIRY THE LEGAL CONTENTIONS ARE WARRANTED AND FACTUAL CONTENTIONS HAVE EVIDENTIARY SUPPORT). CONSEQUENTLY, THE DISTRICT ATTORNEYS OFFICES MOTION TO EXCUSE MR. KAUFMAN IS DENIED AND THE DISTRICT ATTORNEYS OFFICE IS DIRECTED TO FORWARD THIS ORDER TO MR. KAUFMAN.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 5/26/2022. 5/26/2022 ENTERED AND COPIES E-MAILED. NOT MAILED TO PRO SE.(sg) (Entered: 05/26/2022) |
| 05/27/2022 | | DOC. NO. 288 MAILED TO PRO SE ON 5/27/22. (amas) (Entered: 05/27/2022) |
| 05/31/2022 | 289 | MOTION to Continue *June 10, 2022 Hearing* filed by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL.Motion for Brief Continuance of June 10 2022 Hearing. (MAHLER, CARI) (Entered: 05/31/2022) |
| 06/01/2022 | 290 | NOTICE of Appearance by DAVID RUDOVSKY on behalf of THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE (RUDOVSKY, DAVID) (Entered: 06/01/2022) |
| 06/01/2022 | 291 | NOTICE of Appearance by JOHN S. SUMMERS on behalf of THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE with Certificate of Service(SUMMERS, JOHN) (Entered: 06/01/2022) |
| 06/01/2022 | 292 | NOTICE of Appearance by ANDREW M. ERDLEN on behalf of THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE with Certificate of Service(ERDLEN, ANDREW) (Entered: 06/01/2022) |
| 06/01/2022 | 293 | ORDER THAT UPON CONSIDERATION OF THE PENNSYLVANIA OFFICE OF THE ATTORNEY GENERALS MOTION TO CONTINUE THE JUNE 10, 2022 HEARING (ECF NO. 289), IT IS HEREBY ORDERED THAT THE MOTION IS DENIED. MS. MAHLER IS EXCUSED FROM ATTENDING THE JUNE 10 HEARING AND MR. BARKER SHALL BE PRESENT FOR THE ATTORNEY GENERALS OFFICE.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 6/1/2022.6/1/2022 ENTERED AND COPIES E-MAILED. NOT MAILED TO PRO SE. (sg) (Entered: 06/01/2022) |
| 06/02/2022 | | DOC. 293 MAILED TO PRO SE. (sg) (Entered: 06/02/2022) |

| | | |
|---|---|---|
| 06/02/2022 | 294 | MOTION to Continue *Hearing* filed by THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE.Certificate of Service. (Attachments: # 1 Text of Proposed Order)(SUMMERS, JOHN) (Entered: 06/02/2022) |
| 06/02/2022 | 295 | NOTICE OF APPEAL as to 285 Order (Memorandum and/or Opinion),,, 284 Memorandum and/or Opinion by ROBERT WHARTON. IFP Granted. Copies to Judge, Clerk USCA, Appeals Clerk. (MCHUGH, ELIZABETH) Modified on 6/2/2022 (lisad, ). (Entered: 06/02/2022) |
| 06/06/2022 | 296 | ORDER THAT UPON CONSIDERATION OF THE MOTION TO CONTINUE HEARING FILED BY THE PHILADELPHIA DISTRICT ATTORNEYS OFFICE (ECF #294), IT IS HEREBY ORDERED THAT THE MOTION IS GRANTED. THE HEARING SCHEDULED FOR JUNE 10, 2022 IS RESCHEDULED TO BE HELD ON THURSDAY, JUNE 23, 2022 AT 9:00 A.M. IN COURTROOM 17-A.. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 6/6/2022.6/6/2022 ENTERED AND COPIES MAILED TO PRO SE AND E-MAILED.(sg) (Entered: 06/06/2022) |
| 06/07/2022 | 297 | NOTICE of Docketing Record on Appeal from USCA re 295 Notice of Appeal filed by ROBERT WHARTON. USCA Case Number 22-9001 (sg) (Entered: 06/07/2022) |
| 06/08/2022 | 298 | ORDERED THAT A PRE-HEARING TELEPHONE CONFERENCE, ON THE RECORD, IS SCHEDULED FOR TUESDAY, JUNE 14, 2022 AT 9:00 A.M. COUNSEL SHALL DIAL IN AS FOLLOWS: (1) CALL: 888-684-8852; (2) ENTER ACCESS CODE: 2187450#; (3) PRESS # TO ENTER AS A PARTICIPANT. COUNSEL FOR ALL PARTIES AND THE ATTORNEY GENERALS OFFICE SHALL BE PRESENT FOR THE CONFERENCE. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 6/8/2022. 6/8/2022 ENTERED AND COPIES MAILED TO PRO SE AND E-MAILED. (sg) Modified on 6/9/2022 (sg). (Entered: 06/08/2022) |
| 06/09/2022 | 299 | NOTICE of Hearing: ON-THE-RECORD PRE-HEARING TELEPHONE CONFERENCE RESCHEDULED FOR 6/21/2022 AT 9:00 AM BEFORE HONORABLE MITCHELL S. GOLDBERG. COUNSEL SHOULD DIAL IN AS DIRECTED IN THE NOTICE. COUNSEL FOR ALL PARTIES AND THE ATTORNEY GENERAL'S OFFICE SHALL BE PRESENT FOR THE CONFERENCE. ENTERED 6/9/2022 AND COPIES E-MAILED. (sl) (Entered: 06/09/2022) |
| 06/17/2022 | 300 | MOTION to Vacate 286 Order,, *Motion to Cancel Hearing and Dismiss Allegations of Sanctionable Conduct* filed by THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE.Brief. (Attachments: # 1 Brief Brief in Response to MSG Orders, # 2 Exhibit Exhibits in Support of Brief in Response to MSG Orders)(SUMMERS, JOHN) (Entered: 06/17/2022) |
| 06/21/2022 | 301 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERGin Courtroom 17A Telephone Conference held on 6/21/2022 Court Reporter: ESR. (sg) (Entered: 06/21/2022) |
| 06/21/2022 | 302 | Emergency MOTION to Transfer *to the Chief Judge the Investigation of Possible Professional Conduct Violations or, in the Alternative, to Certify* filed by THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE.Memorandum, Certificate of Service. (Attachments: # 1 Exhibit A-B)(SUMMERS, JOHN) (Entered: 06/21/2022) |
| 06/21/2022 | 303 | Emergency MOTION to Continue *Hearing* filed by THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE.Certificate of Service.(SUMMERS, JOHN) (Entered: 06/21/2022) |
| 06/22/2022 | 304 | ORDERED THAT THE DISTRICT ATTORNEYS OFFICES MOTION TO CANCEL THE JULY 23 HEARING (ECF NO. 300) IS DENIED. SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 6/21/2022.6/22/2022 ENTERED AND COPIES E- |

| | | |
|---|---|---|
| | | MAILED. NOT MAILED TO PRO SE.(sg) Modified on 6/22/2022 (sg). (Entered: 06/22/2022) |
| 06/22/2022 | 305 | TRANSCRIPT of TELEPHONE CONFERENCE HEARING held on 6/21/2022, before Judge GOLDBERG. Court Reporter/Transcriber FOOTHILL TRANSCRIPTION COMPANY, INC.. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/13/2022. Redacted Transcript Deadline set for 7/25/2022. Release of Transcript Restriction set for 9/20/2022. (sg) (Entered: 06/22/2022) |
| 06/22/2022 | 306 | Notice of Filing of Official Transcript with Certificate of Service re 305 Transcript - PDF,, 6/22/2022 Entered and Copies Emailed. NOT MAILED TO PRO SE. (sg) (Entered: 06/22/2022) |
| 06/22/2022 | 307 | ORDER denying 302 MOTION TO TRANSFER. SIGNED BY CHIEF JUDGE JUAN R. SANCHEZ ON 6/22/2022. 6/22/2022 ENTERED AND COPIES E-MAILED.(stwe) (Entered: 06/22/2022) |
| 06/23/2022 | | PAPERS #304, #307 MAILED TO PRO SE (JL) (Entered: 06/23/2022) |
| 06/23/2022 | | PAPER #306 MAILED TO PRO SE (JL) (Entered: 06/23/2022) |
| 06/23/2022 | 308 | Minute Entry for proceedings held before HONORABLE MITCHELL S. GOLDBERGin Courtroom 17A Show Cause Hearing held on 6/23/2022. Court Reporter: ESR. (sg) (Entered: 06/23/2022) |
| 06/24/2022 | 309 | TRANSCRIPT of SHOW CAUSE HEARING held on 6/23/2022, before Judge GOLDBERG. Court Reporter/Transcriber O'CONNOR LEGAL, MEDICAL & MEDIA SERVICES, LLC. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/15/2022. Redacted Transcript Deadline set for 7/25/2022. Release of Transcript Restriction set for 9/22/2022. (sg) (Entered: 06/24/2022) |
| 06/24/2022 | 310 | Notice of Filing of Official Transcript with Certificate of Service re 309 Transcript - PDF, 6/24/2022 Entered and Copies Emailed. Mailed to pro se. (sg) Modified on 6/27/2022 (sg). (Entered: 06/24/2022) |
| 06/30/2022 | 311 | Letter dated 6/28/2022 by PENNSYLVANIA OFFICE OF ATTORNEY GENERAL (sg) (Entered: 06/30/2022) |
| 07/14/2022 | 312 | RESPONSE TO ORDER TO SHOW CAUSE by THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE. (SUMMERS, JOHN) (Entered: 07/14/2022) |
| 08/12/2022 | 313 | ORDER of USCA as to 295 Notice of Appeal filed by ROBERT WHARTON, Unopposed Motion by Appellant for Sixty (60) Day Extension of Timeto File Brief and Appendix, The foregoing motion is granted. (sg) (Entered: 08/12/2022) |
| 09/12/2022 | 314 | MEMORANDUM AND/OR OPINION SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 9/12/22. 9/12/22 ENTERED AND COPIES E-MAILED, NOT MAILED TO PRO SE.(bw) (Entered: 09/12/2022) |
| 09/12/2022 | 315 | ORDER THAT RESPONDENTS MOTION TO CANCEL HEARING AND DISMISS ALLEGATIONS OF SANCTIONABLE CONDUCT 300 , EMERGENCY MOTION TO CONTINUE HEARING 303 , AND RESPONSE TO ORDER TO SHOW CAUSE 312 , AND FOLLOWING A HEARING HELD ON JUNE 23, 2022, AND FOR THE REASONS SET OUT IN THE ACCOMPANYING MEMORANDUM OPINION, IT IS HEREBY ORDERED THAT RESPONDENTS MOTION TO CANCEL HEARING |

| | | |
|---|---|---|
| | | AND DISMISS ALLEGATIONS OF SANCTIONABLE CONDUCT (ECF NO. 300) IS DENIED. RESPONDENTS EMERGENCY MOTION TO CONTINUE HEARING (ECF NO. 303) IS DENIED. THE DISTRICT ATTORNEYS OFFICE OF PHILADELPHIA AND ITS ATTORNEYS AS SET FORTH IN THE ACCOMPANYING MEMORANDUM OPINION HAVE VIOLATED FEDERAL RULE OF CIVIL PROCEDURE 11(C). SIGNED BY HONORABLE MITCHELL S. GOLDBERG ON 9/12/22. 9/12/22 ENTERED AND COPIES E-MAILED, NOT MAILED TO PRO SE. (bw) (Entered: 09/12/2022) |
| 09/13/2022 | | COPY OF DOC. NOS. 314 AND 315 HAVE BEEN MAILED TO PRO SE. (bw) (Entered: 09/13/2022) |
| 09/13/2022 | 316 | ORDER of USCA as to 295 The foregoing motion by the Pennsylvania Office of the Attorney General for leave to file a brief as amicus is granted. The motion by Appellant to file a response to the motion by Attorney General is denied. (bw) (Entered: 09/13/2022) |
| 09/30/2022 | 317 | NOTICE OF APPEAL as to 315 Order (Memorandum and/or Opinion),,, by THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE. Filing fee $ 505, receipt number APAEDC-16211666. Copies to Judge, Clerk USCA, Appeals Clerk and (SUMMERS, JOHN) (Entered: 09/30/2022) |
| 10/04/2022 | 318 | NOTICE of Docketing Record on Appeal from USCA re 317 Notice of Appeal (Credit Card Payment) filed by THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE. USCA Case Number 22-2839 (sg) (Entered: 10/04/2022) |
| 10/11/2022 | 319 | Letter dated October 11, 2022 by THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE. (SUMMERS, JOHN) (Entered: 10/11/2022) |
| 04/01/2024 | 320 | ORDER of USCA as to 317 Notice of Appeal. ORDERED and ADJUDGED that the judgment of the District Court entered September 12, 2022, is AFFIRMED. Costs will be taxed against Appellants. All of the above in accordance with the Opinion of this Court. (Attachments: # 1 USCA OPINION)(bw) (Entered: 04/01/2024) |
| 07/29/2024 | 321 | MANDATE of USCA as to 295 Notice of Appeal filed by ROBERT WHARTON (Attachments: # 1 Mandate Letter, # 2 Opinion) (Entered: 07/29/2024) |
| 07/29/2024 | 322 | OPINION AND MANDATE of USCA as to 295 Notice of Appeal filed by ROBERT WHARTON, 133 Notice of Appeal, filed by ROBERT WHARTON, 317 Notice of Appeal (Credit Card Payment) filed by THE PHILADELPHIA DISTRICT ATTORNEY'S OFFICE, 77 Notice of Appeal filed by ROBERT WHARTON, 261 Notice of Appeal filed by ROBERT WHARTON (Attachments: # 1 opinion)(mas) (Entered: 07/29/2024) |


| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 08/20/2026 10:05:23 | | | |
| **PACER Login:** | jkoulas243516 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:01-cv-06049-MSG |
| **Billable Pages:** | 25 | **Cost:** | 2.50 |

**DISTRICT ATTORNEY'S OFFICE**
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499
(215) 686-8000

LAWRENCE S. KRASNER
DISTRICT ATTORNEY

February 6, 2018

Honorable Mitchell S. Goldberg
United States District Court Judge
United States District Court, Eastern District of Pennsylvania
U.S. Courthouse
601 Market Street, Room 7614
Philadelphia, PA 19106-1741

**RE: <u>Robert Wharton v. Donald T. Vaughn</u>, Civil Action No. 01-6049**

Dear Judge Goldberg:

Enclosed please find a copy of respondent's Notice of Concession of Penalty Phase Relief, which has been filed with the Court.

Respectfully Submitted,

Max C. Kaufman
Supervisor, Federal Litigation Unit

Enclosure

cc: Victor Abreu, Esquire
Claudia VanWyk, Esquire

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT WHARTON, Petitioner | : | CIVIL ACTION |
| v. | : | |
| DONALD T. VAUGHN, Respondent | : | NO. 01-6049 |

# NOTICE OF CONCESSION OF PENALTY PHASE RELIEF

1. Petitioner is a Pennsylvania state prisoner who was convicted of two counts of first-degree murder in 1985 and received two sentences.

2. In 2003, petitioner filed a petition for a writ of habeas corpus in federal court.

3. In 2012, this Court denied the habeas petition. The Court granted a certificate of appealability (COA) on two claims: that counsel was ineffective at the suppression hearing and at trial for not presenting evidence supporting the involuntariness of his confession, and that petitioner's rights under the Confrontation Clause were violated.

4. The Third Circuit Court of Appeals subsequently expanded the COA to include another ineffectiveness claim: that counsel was ineffective for not investigating petitioner's adjustment to prison or presenting evidence of that adjustment at the second penalty hearing.

5. On January 11, 2018, the Third Circuit Court affirmed in part and denied in part this Court's denial of petitioner's habeas petition. The Third Circuit affirmed the

denial of relief on the two guilt-phase claims, vacated the denial of the sentencing claim, and remanded to this Court for an evidentiary hearing on that surviving claim.

6. On December 3, 2018, the United States Supreme Court denied petitioner's petition for a writ of certiorari.

7. On January 4, 2019, petitioner filed in this Court a *pro se* motion for the appointment of new counsel.

8. On January 9, 2019, this Court scheduled a status conference for February 14, 2019.

9. Following review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office, communication with the victims' family, and notice to petitioner's counsel, respondent hereby reports to the Court that it concedes relief on petitioner's remaining claim of ineffective assistance at the second penalty hearing, and does not contest the grant of a conditional writ of habeas corpus with respect to petitioner's death sentences.

10. In addition, respondent agrees that, following the grant of a conditional writ as to petitioner's death sentences, it will not seek new death sentences in state court.

11. Because all of petitioner's other claims have been fully and finally litigated, the grant of sentencing relief on petitioner's penalty phase ineffectiveness claim in accordance with respondent's concession would end the litigation of this case in federal court. Thus, the grant of penalty phase relief would render moot petitioner's motion for new counsel, and eliminate the need for the scheduled status conference or other proceedings in this Court.

Respectfully submitted,

Max C. Kaufman
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-5747

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT WHARTON,<br>Petitioner | : | CIVIL ACTION |
| v. | : | |
| DONALD T. VAUGHN,<br>Respondent | : | NO. 01-6049 |

## CERTIFICATE OF SERVICE

I, MAX C. KAUFMAN, hereby certify that on February 6, 2019, a copy of the foregoing pleading was served by placing same, first-class postage prepaid, in the United States mail addressed to:

Shawn Nolan, Esquire
Victor Abreu, Esquire
Claudia VanWyk, Esquire
Defender Association of Philadelphia
Federal Court Division
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106
(215) 928-0520

Max C. Kaufman
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-5747

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT WHARTON, Petitioner, | : | CIVIL ACTION |
| v. | : | No. 01-6049 |
| DONALD T. VAUGHN, et al., Respondents. | : | **CAPITAL CASE** |

**NOTICE OF JOINT FILING**
**OF PROPOSED ORDER**

PLEASE TAKE NOTICE that the parties respectfully submit the accompanying proposed Order granting habeas corpus relief in part, as to the sentences of death, on the ground of counsel's ineffectiveness at the second penalty hearing.

Respectfully submitted,

/s/ Claudia Van Wyk
LEIGH M. SKIPPER
Chief Federal Defender, by
VICTOR J. ABREU
CLAUDIA VAN WYK
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Victor_Abreu@fd.org
Claudia_VanWyk@fd.org

*Counsel for Petitioner, Robert Wharton*

MAX C. KAUFMAN
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
215-686-5747
Max.Kaufman@phila.gov

*Counsel for Respondents*

Dated: February 8, 2019

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT WHARTON, | : | |
| Petitioner, | : | CIVIL ACTION |
| v. | : | No. 01-6049 |
| DONALD T. VAUGHN, et al., | : | **CAPITAL CASE** |
| Respondents. | : | |

**ORDER**

AND NOW, on this ___ day of February, 2019, upon consideration of the order of the Court of Appeals for the Third Circuit dated January 11, 2018, affirming this Court's denial of habeas corpus relief as to the guilt phase of petitioner's trial, and vacating its denial of relief on the claim that petitioner's counsel was ineffective at his second penalty hearing for failing to investigate and present evidence of his prison adjustment pursuant to *Skipper v. South Carolina*, and remanding for further proceedings on that claim,

AND upon a careful and independent review of all of the parties' submissions and all prior proceedings in this matter, it is hereby ORDERED that:

The petition for a writ of habeas corpus is granted in part, as to the sentences of death, on the ground of counsel's ineffectiveness at the second penalty hearing. Petitioner shall be released from custody unless the Commonwealth of Pennsylvania grants him a new sentencing hearing or resentences him to life without parole within 180 days. This deadline may be extended by this Court for good cause shown.

BY THE COURT:

____________________________

Mitchell S. Goldberg, U.S.D.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT WHARTON, Petitioner | : | CIVIL ACTION |
| v. | : | |
| TAMMY FERGUSON, Respondent | : | NO. 01-6049 |

## BRIEF

By order entered March 4, 2019, this Court invited the parties to submit briefs on the following issues: (1) whether the Court has the authority and/or the obligation to grant habeas relief to petitioner based solely on the District Attorney's concession of the remaining habeas claim, or whether the Court must independently review, and determine the merits of, that now-conceded claim; and (2) if the Court must make an independent determination on the merits, whether that is possible on the current record, without conducting the evidentiary hearing as directed by the United States Court of Appeals for the Third Circuit. This is the Commonwealth's brief.

### I. A prosecutor is ethically obligated to concede relief when the prosecutor believes that justice so requires; in this situation, a court may, but is not required, to accept that concession.

Prosecutors have an ongoing and abiding obligation to pursue justice. See American Bar Association Criminal Justice Standards, Rule 3.-1.2(a), 3.8.1. "The [prosecutor] is the representative not of any ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935).

This prosecutorial responsibility continues throughout the duration of a case. See, e.g., Commonweath v. DiPasquale, 431 Pa. 536, 540-41 (Pa. 1968) (District Attorney "has a [g]eneral and widely recognized power" to decide "whether and when to continue or discontinue a case"); see also United States v. Maloney, 755 F.3d 1044 (9th Cir. 2014) (en banc) (granting U.S. Attorney's Motion to Summarily Reverse the Conviction, Vacate the Sentence and Remand to the District Court; U.S. Attorney's motion based on trial prosecutor's improper closing argument).

Put another way, a prosecutor's responsibility includes changing course, if a prosecutor determines that the facts and law require a position different from that previously taken. This does not mean that the prior prosecutor's position was unethical or wrong. It means just that the current prosecutor is exercising his/her own independent judgment as s/he is ethically required to do.

For example, in 2012 Solicitor General Donald B. Verrilli acknowledged during oral argument in the U.S. Supreme Court that the government had changed its position on the question whether American courts have jurisdiction to hear cases involving alleged human rights abuses in other countries. Transcript of Oral Argument at 43-44, Kiobel v. Royal Dutch Petroleum Co., No. 10-1491, 569 U.S. 108 (2012). See also Brief for the United States as Amicus Curiae Supporting Neither Party, at n. 9, U.S. Airways Inc. v. McCutchen, No. 11-1285 (U.S. Sept. 5, 2012) (federal government changed position in U.S. Supreme Court in labor case); Brief for the United States as Amicus Curiae Supporting Petitioners, NLRB v. Murphy Oil USA, Nos. 16-285, 16-300, 16-1307, at 13 (same; Acting Solicitor General Jeffrey B. Wall stating, "after the change in

administration, the office reconsidered the issue and has reached the opposite conclusion").

Here, the District Attorney's Office carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfills the criteria articulated in Strickland v. Washington, 466 U.S. 668 (1984). More specifically, this Office determined that Wharton's remaining habeas claim – that his counsel was ineffective at his second penalty hearing for not investigating and presenting evidence of his adjustment to prison – is not lacking in merit.

The circumstances supporting this conclusion include the Third Circuit's ruling that the state court's rejection of the issue was not reasonable, and that the claim should therefore be reviewed under a non-deferential, *de novo* standard. See Wharton v. Vaughn, 722 Fed. Appx. 268, 280 (3d Cir. 2018).

In addition, the Commonwealth notes petitioner's argument that, following the Third Circuit's decision, Wharton's counsel at the second penalty hearing executed a declaration under penalty of perjury. In the declaration, counsel stated that "[i]f I were called to testify at [the evidentiary hearing ordered by the Third Circuit], I would explain that I was not operating under any strategy or tactic when I did not investigate and present evidence of Mr. Wharton's positive prison adjustment at his second penalty hearing and argue to the jury that Mr. Wharton's life should be spared because he posed no danger to inmates or staff if he were sentenced to life" (Declaration of William T. Cannon, Esq., July 3, 2018).

On the question of prejudice, even in the absence of any prison adjustment evidence, the sentencing jury initially reported that it was deadlocked on whether to

sentence Mr. Wharton to death. Ultimately, even without the evidence, the jury found the catch-all mitigating circumstance. These facts support petitioner's argument that if the prison adjustment evidence had been presented to the jury, "there is a reasonable probability that at least one juror would have voted against imposing the death penalty." Wharton, 722 Fed. Appx. at 281.

In light of the meritoriousness of Wharton's surviving claim, the District Attorney's Office has determined that continuing to seek affirmance of Wharton's death sentence does not justify further expenditure of judicial and legal resources, and years more of litigation.

Further, the concession procedure followed by the Commonwealth in this case repeatedly has been approved by the courts of this district. In at least six other cases, this Office's written notice of concession was, in material respect, the same as the notice filed here. See Speight v. Beard, No. 04-04110, Doc. 94 at 10 n.11 (E.D. Pa. Dec. 22, 2014); Lambert v. Folino, No. 10-01339, Doc. 91 (E.D. Pa. April 10, 2018); Mason v. Wetzel, No. 17-3759, Doc. 25 (E.D. Pa. June 1, 2018); Brown v. Beard, No. 04-4125, Doc. 69 (E.D. Pa. June 20, 2018); Marshall v. Wetzel, No. 03-3308, Doc. 172 (E.D. Pa. June 25, 2018). Whitaker v. Mooney, No. 14-2321, Doc. 68 (E.D. Pa. June 27, 2018). In each of these cases, the court accepted the Commonwealth's concession. See Speight v. Beard, 2017 WL 914907 at *17 (E.D. Pa. March 3, 2017) (memorandum opinion of Quinones Alejandro, J.) (accepting concession of capital penalty phase relief); Lambert v. Folino, No. 10-01339, Doc. 95 (E.D. Pa. April 26, 2018) (order of Joyner, J.) (accepting concession of grant of new trial); Mason v. Wetzel, No. 17-3759, Doc. 31, at 2 (E.D. Pa. Aug. 7, 2018) (so-ordered stipulation of

Beetlestone, J.) (accepting concession of capital penalty phase relief); Brown v. Beard, No. 04-4125, Doc. 71 (E.D. Pa. June 27, 2018) (order of Pratter, J.) (accepting concession of grant of new trial); Marshall v. Wetzel, 2018 WL 5801313 at *37 (E.D. Pa. Nov. 6, 2018) (opinion of Leeson, J.) (accepting concession of capital penalty phase relief); Whitaker v. Mooney, No. 14-2321, Doc. 69 (E.D. Pa. June 27, 2018) (order of Smith, J.) (accepting concession of grant of new trial). Indeed, as far as this Office is aware, there has not been a prior instance where a court in this district has declined to accept a concession of relief by the Commonwealth in a pending habeas case.

This Office's considered judgment to concede penalty phase relief under the specific circumstances of this case, while not binding on this Court, is entitled to great weight. See Young v. United States, 315 U.S. 257, 258-259 (1942) ("The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight").

In short, a prosecutor is ethically obligated to concede relief when the prosecutor believes that the circumstances so require, and in this situation, a court may, but is not bound to, accept that concession.

## II. If the record is insufficient to rule on the remaining claim, the Court can conduct an evidentiary hearing.

This Court has concluded that it "cannot independently evaluate the merits of the [r]emaining [s]entencing [c]laim on the current record." Wharton, 2019 WL 1014729 at *7. To the extent this remains the Court's view following consideration of the responsive filings of the parties, including any motion to expand the record under Habeas Rule 7 filed by petitioner, this Office has no opposition to the Court holding an evidentiary hearing.

Respectfully submitted,

MAX C. KAUFMAN
Supervisor, Federal Litigation Unit
PAUL M. GEORGE
Assistant Supervisor, Law Division
NANCY WINKELMAN
Supervisor, Law Division

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT WHARTON, Petitioner | : | CIVIL ACTION |
| v. | : | |
| TAMMY FERGUSON, Respondent | : | NO. 01-6049 |

## CERTIFICATE OF SERVICE

I, MAX C. KAUFMAN, hereby certify that on April 3, 2019, a copy of the foregoing pleading was served by placing same, first-class postage prepaid, in the United States mail addressed to:

Claudia Van Wyk, Esquire
Victor J. Abreu, Esquire
Defender Association of Philadelphia
Federal Court Division
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106
(215) 928-0520

Max C. Kaufman
Supervisor, Federal Litigation Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
(215) 686-5747

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT WHARTON,** | **CIVIL ACTION** |
| **Petitioner,** | **No. 01-6049** |
| **v.** | **THIS IS A CAPITAL CASE** |
| **DONALD T. VAUGHN, et al.** | |
| **Respondents.** | |

**ORDER**

**AND NOW**, this 7th day of May, 2019, upon consideration of the Philadelphia District Attorney's Office's Brief in Response to the Court's March 4, 2019, Memorandum Opinion and Order (Doc. No. 162), and Petitioner's "Motion to Expand Record, Motion for Approval of Proposed Settlement, and Consolidated Memorandum of Law Ordered by the Court" (Doc. No. 163), I find as follows:

1. In January 2018, the United States Court of Appeals for the Third Circuit remanded this capital habeas matter to this Court, concluding that Petitioner is entitled to an evidentiary hearing on a single penalty-phase claim, pertaining to whether Petitioner's counsel was ineffective for failing to place before the penalty-phase jury evidence of Petitioner's adjustment to prison.

2. Shortly before a status-of-counsel hearing was scheduled to take place before me, the Philadelphia District Attorney's Office submitted notice that it would no longer contest the remaining penalty-phase claim and would not seek a new death sentence in state court. Despite the fact that this case involves a double homicide and a

sentence of death, this notice did not provide an explanation for the concession. The parties also submitted a one-page proposed order, requesting that I grant habeas relief on the remaining claim. (Doc. Nos. 155, 156.)

3. Thereafter, on March 4, 2019, I issued an Order declining to summarily grant habeas relief. In the Memorandum Opinion accompanying that Order, I explained that I could not make the required independent evaluation of the merits of the remaining habeas claim on the current record, and permitted the parties to further brief the issue. (Doc. Nos. 160, 161.)

4. In accordance with my March 4, 2019, Memorandum Opinion and Order, both Petitioner and the District Attorney's Office have submitted briefs. In his Brief, Petitioner requests that I expand the record under Rule 7 of the Rules Governing Section 2254 Cases. Petitioner has submitted for inclusion in the record a declaration from trial counsel, as well as additional prison records, and an expert report of a psychologist that reviewed those records. Petitioner contends that these records are sufficient for me to determine whether Petitioner is entitled to relief. (Doc. Nos. 162, 163.)

5. In its brief, the District Attorney's Office notes generally that it has "carefully reviewed the facts and law" in this case and "determined that [Petitioner's] remaining habeas claim . . . is not lacking in merit." (Doc. No. 162 at 4.) However, the District Attorney's Brief does not note whether it has sought out any facts beyond those that are either currently in the record or that have been submitted by Petitioner for inclusion under Rule 7. The District Attorney fails to indicate whether it did any investigation regarding Petitioner's adverse or negative adjustment to prison. Nor

does the District Attorney comment on the expert report submitted by Petitioner, that expert's qualifications, or whether the District Attorney's Office has even considered consulting with its own expert. Rather, it appears as though the District Attorney's Office has accepted the additional evidence offered by Petitioner at face value, without exploring whether contrary views may be viable and worth considering.

6. Having considered the parties' briefs, and noting that the parties are not adverse as to whether relief should be granted on Petitioner's remaining habeas claim, I find that the presentation of an additional perspective by an amicus curiae, on whether the District Attorney's concession is proper, would be helpful.

7. "A district court has inherent authority to designate amici curiae to assist it in a proceeding." Liberty Resources, Inc. v. Phila. Hous. Auth., 395 F. Supp. 2d 206, 209 (E.D. Pa. 2005). "[P]articipation of an amicus [is] especially proper where the amicus will ensure complete and plenary presentation of difficult issues so that the court may reach a proper decision." Id.

8. In determining an appropriate amicus, I note that the Attorney General of Pennsylvania has the statutory authority, under certain circumstances, to participate in "criminal actions in which there is an appeal." 71 Pa. Stat. § 732-205(c).

9. Accordingly, I will request the Office of the Attorney General of Pennsylvania (hereinafter "the Pennsylvania Attorney General") to submit an amicus brief in this matter, setting out its position as to whether Petitioner is entitled to relief on his remaining habeas claim.

**WHEREFORE,** is **ORDERED** that:

- Petitioner's "Motion to Expand Record, Motion for Approval of Proposed Settlement, and Consolidated Memorandum of Law Ordered by the Court" (Doc. No. 163) is **GRANTED IN PART AND DENIED WITHOUT PREJUDICE IN PART**. Specifically, Petitioner's Motion is **GRANTED** insofar as it seeks to expand the record, pursuant to Rule 7 of the Rules Governing Section 2254 Cases, to include the documents attached to the Motion. However, insofar as the Motion requests that the Court grant habeas relief, the Motion is **DENIED WIHTOUT PREJUDICE.**
- The Pennsylvania Attorney General is requested to submit an amicus brief on the issue of whether relief should be granted on Petitioner's remaining habeas claim based on the current record or whether the record before me should be expanded. The amicus brief must be submitted **within 45 days of the date of this Order**. The District Attorney's Office is **DIRECTED** to provide a copy of this Order to the Pennsylvania Attorney General. Should the Pennsylvania Attorney General decline to file an amicus brief, it shall so **NOTIFY** the Court promptly, and no later **than 45 days from the date of this Order**.
- After considering any amicus brief filed by the Pennsylvania Attorney General, the Court will determine the appropriate course of action in this matter.

**BY THE COURT:**

***/s/ Mitchell S. Goldberg***

**Mitchell S. Goldberg, J.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT WHARTON** | : | **CIVIL ACTION** |
| | : | |
| **Petitioner** | : | **No. 01-6049** |
| | : | |
| **v.** | : | **CAPITAL CASE** |
| | : | |
| **TAMMY FERGUSON,** | : | |
| **Superintendent,** | : | |
| | : | |
| **Respondent** | : | |

**BRIEF OF *AMICIS CURIAE***
**PENNSYLVANIA OFFICE OF ATTORNEY GENERAL**

By Order dated May 7, 2019, this Court requested that the Pennsylvania Office of Attorney General ("OAG") "submit an amicus brief in this matter, setting out its position as to whether Petitioner is entitled to relief on his remaining habeas claim": whether trial counsel was ineffective for failing to introduce evidence regarding Petitioner's "positive" adjustment to prison between his two penalty phase hearings. The Court's order identified several specific questions on which it required further information in order to carry out its duty to resolve Petitioner's legal claim. The OAG files this *amicus* brief pursuant to that order. As an *amicus curiae* -- literally, a friend of the court -- the OAG neither supersedes the local prosecutor under Pennsylvania law nor limits the proper exercise of prosecutorial discretion as delineated by the Pennsylvania Supreme Court. *See Commonwealth v.*

*Brown*, 196 A.3d 130 (Pa. 2018). Rather, this *amicus* brief attempts only to provide the assistance requested by this Court on the narrow factual and legal issues before it.

## I. INTRODUCTION

In 1984, Petitioner Robert Wharton and a cohort murdered Bradley and Ferne Hart in their Mount Airy home, leaving their infant daughter to fend for herself in the unheated home in the dead of winter. The murders were the culmination of a series of crimes Wharton committed against the victims to avenge a disputed debt for construction work Wharton had performed in the summer of 1983. Two different juries sentenced Wharton to death.

Over the last three decades, the Supreme Court of Pennsylvania affirmed Wharton's judgment of sentence on direct appeal and affirmed the denial of relief under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546, and this Court, during its initial review, denied all of Wharton's claims for habeas corpus relief under 28 U.S.C. § 2254.

Currently pending before the Court is Wharton's remaining claim of ineffective assistance of trial counsel for failing to investigate and present evidence of Wharton's "positive" prison adjustment at the second penalty phase hearing in 1992, a claim the Third Circuit remanded for an evidentiary hearing. This Honorable Court noted that, after advocating for decades to uphold Wharton's

death sentences, the Philadelphia District Attorney's Office now seeks to concede this claim and agree to habeas corpus relief.

In light of this proposed concession, by Order dated May 7, 2019, this Court requested that the OAG submit a brief as *amicus curiae*, setting forth its position as to whether the law requires relief on this remaining claim. Inquiry into the areas designated by the Court has provided evidence of Wharton's overwhelmingly negative prison adjustment, including his repeated attempts to escape custody, a recent declaration from trial counsel, William T. Cannon, Esquire, discussing what his strategy would have been if Wharton's prison records reflected negative behavior while incarcerated, and a report from forensic psychiatrist John S. O'Brien, III, M.D., J.D., opining that Dr. Krop's conclusions do not reflect "a balanced inquiry into [Wharton's] history, documented behavior or correctional adjustment and cannot be accepted at face value." This information suggests that Wharton is not entitled to relief on his ineffective assistance of counsel claim. Moreover, despite the statement in the Notice of Concession of Penalty Phase Relief filed in this matter (Doc. No. 155), family members of Bradley Hart and Ferne Hart have indicated that they were never contacted about the status of the case prior to the concession and that they are against penalty phase relief.

## II. FACTS AND PROCEDURAL HISTORY

### A. Wharton's Burglaries, Vandalism and Brutal Murders of the Two Victims

The Court has adopted the following facts supporting Wharton's first-degree murder convictions, as described by the Supreme Court of Pennsylvania:

> The murders of Bradley Hart and his wife Fern[e] were the culmination of a series of crimes committed by [Wharton] and his cohorts against the Hart family in retribution for a dispute over the quality of home improvement work [Wharton] performed in the summer of 1983 at the Harts' residence and at a radio station owned by Hart's father, the Reverend Samuel Hart. When Hart refused to pay [Wharton]'s employer for the work, [Wharton] complained bitterly and blamed Bradley Hart for his lost wages. He vowed to make the Hart family pay.[1]
>
> [Wharton] began victimizing the Harts by burglarizing their home with Larue Owens on Sunday, August 14, 1983, at a time when [Wharton] and Owens knew the Harts would be at church. [Wharton] returned the following week [on August 22, 1983] with Owens and Eric Mason, and stole additional property. This time they also vandalized the Harts' home by slashing furniture; ransacking closets; mutilating family photographs; pouring different liquids such as bleach, paint, and oil throughout the house; and, defecating and urinating on the floors.[2] On September 4, 1983, [Wharton]

---

[1] Approximately three or four months before the victims' murders, Wharton told Bradley Hart's brother that Bradley owed him money and that if he did not pay, he was going to kill him. (N.T. 12/15/92, 64-66)

[2] After the first burglary on August 14, 1983, the victims implemented extra security measures at their home, which included putting bars on various windows and installing a home alarm system. (N.T. 12/14/92, 118-19; N.T. 12/15/92, 112, 122; N.T. 12/16/92, 45)

During the August 22, 1983 burglary, Wharton and his cohorts left a note at the scene, taunting the victim's failed efforts to safeguard his family. The note documented the items stolen and stated: "Thanks Bradly G.I. Hart. You have to go better than this to keep us out. Clean up good, didn't we. Thank you. Ha, ha." (N.T. 12/14/92, 90, 117-18) As if suggesting what was to

burglarized Reverend Hart's church, stole cash and computer equipment, and pinned a photograph of Bradley Hart to a wall with a letter opener. Then, in early January of 1984, Wharton, Mason and Thomas Nixon went to the Harts' home intending to rob them. The men abandoned their plan when they discovered the Harts had another person visiting in the house.

Finally, in the late evening of January 30, 1984, while Bradley and Fern[e] Hart were home alone with their seven-month-old daughter, [Wharton] and Mason came to the Harts' home. When Bradley Hart answered the door, [Wharton] and Mason forced their way in at knifepoint. Initially, they coerced Bradley Hart into writing [Wharton] a check for nine hundred and thirty four dollars as settlement for the debt [Wharton] felt was owed to him. Next, the two men tied up the Harts on a couch holding them captive, while the intruders watched television and talked for several hours. Eventually, they decided to separate the couple. [Wharton] took Fern[e] Hart upstairs where he bound her hands and legs; covered her eyes, nose, and mouth with duct tape; strangled her with a necktie; and ultimately drowned her in a bathtub. Meanwhile, Mason took Bradley Hart to the basement where Mason forced Bradley Hart to lie with his face in a pan of water; placed his foot on Bradley Hart's back; and strangled him to death with an electrical cord. [Wharton] and Mason fled, but not before they turned off the heat in the house and abandoned the Harts' infant child on a bed in an upstairs bedroom.[[3]]

On February 2, 1984, concerned that he had not heard from his son or daughter-in-law, Reverend Hart went to the home and discovered their bodies. When he found the infant, she was suffering from dehydration

(continued . . . )
come next, Wharton also left a doll with a rope tied around its neck on the floor in the dining room closet. (N.T. 12/14/92, 83-84)

[3] Police and the medical examiner who responded to the crime scene noted the cold temperature inside the victims' home when seven-month-old Lisa Hart was discovered next to her mother's body. One detective testified that it was so cold that he could see his breath coming from his mouth when speaking. The thermostat in the home had been turned down to approximately 50 degrees during the dead of winter. Outside temperatures from January 30, 1984 to February 2, 1984, averaged at 24 degrees. Snow and ice were still on the ground from the previous snowfall. (N.T. 12/14/92, 61; N.T. 12/16/92, 14-28; N.T. 12/18/92, 8, 34)

> and neglect. She was immediately transported to a hospital where she experienced respiratory arrest brought on by shock and hypothermia. She eventually recovered.
>
> An investigation immediately led police to suspect [Wharton]. When police executed search warrants on his girlfriend's house, they discovered items belonging to the Harts and obtained a warrant for [Wharton's] arrest. When he was taken into custody on February 7, 1984, he confessed and named Eric Mason as his accomplice in the murders.

*Wharton v. Vaughn*, 2012 WL 3535866, at *2-3 (E.D. Pa. Aug. 16, 2012), *aff'd in part, vacated in part*, 722 F. App'x 268 (3d Cir. 2018) (quoting *Commonwealth v. Wharton*, 886 A.2d 1120, 1121-22 (Pa. 2005)).

In his confession, Wharton detailed the home invasion and his murder of Ferne Hart:

> … Brad opened the door and we talked in the doorway, and I pulled a knife out of my pocket, and I told him to get back in the house and sit down on the couch. His wife Ferne was downstairs in the living room, and I told them, both of them to sit down on the couch. Then I went to the door and let Eric in. … We tied them up and made them sit back down on the couch, and me and Eric just sat around messing around looking at T.V.
>
> Then we put Brad in the basement, then we took Ferne upstairs. I think that's when Mason probably turned the heat off, I'm not sure. Then we put all the stuff in Brad's car and we went back to his house. Then we went down the basement and put tape around his face and neck, and … I went upstairs to the second floor. I left Eric in the basement.
>
> Later in the car Eric said he got some water from the kitchen, put it in a bucket, and put Brad's face in it. I went upstairs to the bedroom and got Ferne and took her to the bathroom. I ran some water in the tub and dunked her head in the water. I had put this tape around her face

> from her eyebrows down to her chin while we was in the bathroom first before I dunked her head in the water. I held her head down in the water till the bubbles stopped after a while.

(N.T. 12/17/92, 8-18) Wharton further told police that he tried to strangle Ferne Hart with a tie before drowning her in the tub. Wharton explained that he killed the victims "cause they knew me and would turn us in." (N.T. 12/17/92, 8-18)[4]

After the murders, police recovered from Wharton's home and his girlfriend's home proceeds from each of the robberies, including the robbery of the Hart's home on the night of their murders. (N.T. 12/16/92, 106-09; N.T. 12/17/92, 37-42; N.T. 12/18/92, 61-70) In a separate statement, Wharton admitted burglarizing the Hart's home on August 14, 1983, and August 22, 1983. (N.T. 12/16/92, 98, 101)

---

[4] Wharton left Ferne Hart's body draped over the bathtub with her face submerged in the water, her pants pulled down, and her shirt pulled up, exposing her breasts. Her hands and feet were bound and a necktie had been pulled tightly around her neck. (N.T. 12/14/92, 43-58, 72-73; N.T. 12/15/92, 98; N.T. 12/16/92, 38-40) The medical examiner determined that the cause of her death was mechanical asphyxia due to partial obstruction of her airway by the duct tape covering her face and drowning. (N.T. 12/18/92, 9-10, 25-26, 34)

Police discovered Bradley Hart lying face down on the floor with his face submerged in a pail of water. His hands were tied behind his back, his feet were tied with a necktie, silver duct tape was wrapped around his entire face (front to back), one electrical cord was tightly wrapped around his neck approximately three times and another extension cord was wrapped around his neck and encircled his body. (N.T. 12/14/92, 36-42; N.T. 12/15/92, 99; N.T. 12/16/92, 33-35) The medical examiner determined that the cause of death for Bradley Hart was mechanical asphyxia due to combined effects of ligature and duct tape across his face involving his nose and mouth. Bradley Hart was alive and may have been conscious when he was strangled. The medical examiner opined that it was possible that Bradley Hart's face in the pail of water could have contributed to his death by obstructing his breathing. (N.T. 12/18/92, 6-15, 33, 44)

### B. Wharton's Murder Trials and Related State Court Proceedings

Following a 1985 trial before the Honorable Francis A. Biunno, the jury convicted Wharton of two counts of first-degree murder and related offenses.[5] Following the penalty phase, the jury sentenced Wharton to death for each of the murders. The Supreme Court of Pennsylvania affirmed Wharton's convictions but vacated the death sentence due to an erroneous jury charge and remanded the matter for a new penalty hearing. *Commonwealth v. Wharton*, 607 A.2d 710 (Pa. 1992).

Wharton's second penalty phase hearing began on December 14, 1992. At the penalty hearing, the defense presented two mitigating circumstances: (1) Wharton's age at the time of the murders (twenty) (42 Pa.C.S. § 9711(e)(4)); and (2) the "catch-all mitigator" of any other evidence "concerning the character and record of the defendant and the circumstances of his offense" (42 Pa.C.S. § 9711(e)(8)). In support of these mitigating circumstances, trial counsel presented testimony from Wharton's family members regarding his positive attributes as a child and adult both before the murders and during the years between his two penalty phase hearings.

[5] In addition to his convictions for first-degree murder, robbery, burglary and criminal conspiracy arising out of the February 2, 1984, crimes against the murder victims, on July 2, 1985, Wharton
was convicted of burglary and related offenses arising out of the August 14, 1983 and August 22, 1983 burglaries at the victims' home, as well as the burglary at the Hart's church in September 1983 (N.T. 12/15/92, 14-18).

On December 23, 1992, the jury unanimously concluded that the two aggravators it found—(1) that Wharton committed the killings during the perpetration of a felony (42 Pa.C.S. § 9711(d)(6)); and (2) that Wharton had been convicted of another offense punishable by life imprisonment or death (42 Pa.C.S. § 9711(d)(10))—outweighed the "catch-all" mitigating circumstance that it found. 42 Pa.C.S. § 9711(e)(8)).[6] The jury sentenced Wharton to death for each of the victim's murders. As it did following the 1985 trial, the trial court imposed those two death sentences consecutively. William T. Cannon, Esquire, represented Wharton at his 1985 trial and at his second penalty phase hearing in 1992.

The Supreme Court of Pennsylvania affirmed the death sentences. *Commonwealth v. Wharton*, 665 A.2d 458 (Pa. 1995). On June 10, 1996, the Supreme Court of the United States denied Wharton's petition for a writ of certiorari. *Wharton v. Pennsylvania*, 517 U.S. 1247 (1996).

Wharton subsequently sought relief under the PCRA, which was denied by the Honorable Gary S. Glazer without an evidentiary hearing on June 23, 1997. The Supreme Court of Pennsylvania affirmed the denial of PCRA relief on November 25, 2002. *Commonwealth v. Wharton*, 811 A.2d 978 (Pa. 2002).

---

[6] In reaching this conclusion, the jury noted three things that one or more jurors found to be mitigating: (1) Wharton did not murder baby Lisa Hart; (2) Wharton was a "good family member"; and (3) Wharton cooperated with police concerning the crimes.

### C. Wharton's Habeas Corpus Proceedings

On October 7, 2003, Wharton filed in this Court a petition for writ of habeas corpus raising twenty-three claims, one of which was that trial counsel was ineffective for failing to present evidence of his alleged "positive adjustment" in prison during the years between his two penalty phase hearings (1985 to 1992). On August 16, 2012, the Court denied relief on each of the claims and concluded that a certificate of appealability ("COA") was warranted on two claims. Wharton sought reconsideration, which was denied on April 30, 2013.

Wharton filed a notice of appeal to the United States Court of Appeals for the Third Circuit and requested that the Court expand the COA. The Third Circuit expanded the COA to include a third claim: that trial counsel was ineffective for failing to introduce mitigating evidence regarding Wharton's positive adjustment to incarceration.

On January 11, 2018, the Third Circuit affirmed the denial of habeas corpus relief with respect to the first two issues but remanded the matter to this Court for an evidentiary hearing regarding the claim that trial counsel was ineffective for failing to present evidence of Wharton's positive prison adjustment. Following that decision, Wharton filed a petition for a writ of certiorari in the Supreme Court of the United States that was denied on December 3, 2018. *Wharton v. Vaughn*, 139 S. Ct. 594 (2018) (memorandum order).

On remand, in February 2019, the District Attorney's Office filed a Notice of Concession of Penalty Phase Relief, indicating that it was conceding relief on this penalty phase claim and that it would not pursue the death penalty in state court. The Notice of Concession provided that the decision to concede was made "[f]ollowing review of this case by the Capital Case Review Committee of the Philadelphia District Attorney's Office, communication with the victims' family, and notice to [Wharton's] counsel." (Doc. No. 155) The parties subsequently submitted to the Court a Proposed Order that would grant habeas corpus relief.

By Order dated March 4, 2019, the Court noted that the Proposed Order failed to set out reasons why the merits of Wharton's remaining penalty phase claim "is apparent on the current record, such that the evidentiary hearing ordered by the Third Circuit is not required." The Court concluded that it could not make an independent evaluation of the merits of the penalty phase claim on the current record and permitted the parties to further brief the issue. In accordance with that Order, Wharton submitted a brief and requested that the Court expand the record to include a declaration, dated July 3, 2018, from trial counsel, William T. Cannon, Esquire. The District Attorney's Office also submitted a brief reiterating its new position that Wharton's remaining penalty phase claim was "not lacking in merit."

By Order dated May 7, 2019, this Court indicated that, in its brief, the District Attorney's Office "fails to indicate whether it did any investigation

regarding [Wharton's] adverse or negative adjustment to prison," fails to "comment on the expert report [of Dr. Krop] submitted by [Wharton]," and appears to have "accepted the additional evidence offered by [Wharton] at face value, without exploring whether contrary views may be viable and worth considering." Order at 2-3 ¶ 5. Under these circumstances, this Court requested the perspective of the OAG, as *amicus curiae*, to help determine whether the law entitles Wharton to relief on this claim.

As stated below, information gathered in response to the Court's concerns suggests that Wharton's claim is not supported by law.

## III. FACTS CONTRADICT WHARTON'S CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR NOT CLAIMING THAT HE HAD A POSITIVE PRISON ADJUSTMENT.

To prevail on his ineffectiveness claim, Wharton must show that: (1) counsel's performance was deficient in that it fell below "an objective standard of reasonableness"; and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). The facts in this case suggest that Wharton cannot meet this burden.

Review of Wharton's record reveals additional facts not previously provided to the Court. These include Wharton's numerous prison misconducts between 1985 and 1992 (two of which involved the possession of contraband that constituted both an "implement of escape" and potential weapon), Wharton's

attempted escape from City Hall while in the custody of Philadelphia deputy sheriffs, and the fact that the Pennsylvania Department of Corrections (DOC) identified Wharton's areas of concerns as "assaultiveness" and "escape." These facts suggest that trial counsel's performance in not presenting evidence of Wharton's so-called "positive" prison adjustment did not fall below this objective standard of reasonableness.

Moreover, given the evidence presented at the penalty phase hearing detailing Wharton's terrorization of the victims during the months leading up to the murders, the heinous nature of the victims' murders, and the aggravating circumstances, it appears that Wharton would be unable to establish a reasonable probability that the jury would have voted for a sentence of life imprisonment if only it had heard about Wharton's so-called "positive" prison adjustment, which was *de minimis* at best and substantially outweighed by the evidence of his adverse prison behavior.

### A. Wharton's Adverse Prison Adjustment

Wharton's prison records reveal that, from 1986 to 1992, he had adverse prison adjustment.[7] Many of these DOC records do not appear to have ever been

[7] Wharton entered SCI-Graterford on May 2, 1986, and was transferred to SCI-Huntingdon on September 25, 1986, where he remained during the time period between his two penalty phase hearings.

presented to the state court during the 1997 PCRA proceedings or this Court during the pendency of these habeas corpus proceedings over the last eighteen years.[8]

**1. Wharton's Numerous Prison Misconducts**[9]

**a. *Possession of Contraband—Implements of Escape***

On May 15, 1989, a routine security search of Wharton's single cell revealed that he had hidden two pieces of metal antenna in the mounting of a toilet. One of the pieces of antenna had been fashioned into a handcuff key. Wharton was charged with "possession of contraband, implements of escape." (Misconduct #220037)[10] Wharton entered a "not guilty" plea to the charge. Following a hearing on May 17, 1989, the Hearing Examiner/Committee found Wharton guilty of the

---

[8] Wharton's ineffectiveness claim regarding his prison adjustment was first raised during his 1997 PCRA proceedings. In conjunction with those proceedings, Wharton proffered, *inter alia*, his numerous prison grievances, his monthly-generated Program Review Committee ("PRC") reviews, the short periodic reports prepared by a prison psychiatrist, and the declaration from Dr. Krop. The only addition to the record has been the July 2018 declaration from trial counsel, William T. Cannon, Esquire, that the defense recently provided to this Court when asking to expand the record.

The attached records have apparently never before been disclosed to the state and federal courts in order to provide a complete and genuine picture of Wharton's adjustment in prison. Because the attached records pertaining to Wharton's negative prison adjustment are essential to complete the record given the issue before the Court, the OAG respectfully requests that the record be expanded to include these records.

[9] The records pertaining to Wharton's misconducts are collectively attached as Exhibit A.

[10] For purposes of this charge, the DOC's Inmate Discipline Procedures Manual (DC-ADM 801) describes contraband, including an "implement of escape," as an item "which in the hands of an inmate present a threat to the inmate, others or to the security of the facility." *See* https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/801%20Inmate%20Discipline.pdf

charge, concluding that the confiscated evidence "clearly represents a handcuff key" and it was "more likely than not that the key was possessed and under the control of Wharton," who occupied a single cell. Wharton was sanctioned to 90 days of Disciplinary Custody ("DC").[11] Wharton appealed the guilty finding and, on review, the Program Review Committee ("PRC") found that "the misconduct is easily supported by the evidence" and that "[p]ossession of contraband such as a homemade handcuff key is an extremely serious misconduct."

On May 19, 1989, just two days after Wharton was found guilty of the above charge, prison officials conducted a random search of Wharton's cell and discovered a 4" piece of broken metal antenna hidden in the binding of his legal material. Wharton again was charged with "possession of contraband, implements of escape." (Misconduct #220044) Wharton entered a "not guilty" plea to the charge. Following a hearing on May 23, 1989, the Hearing Examiner/Committee found Wharton guilty of the charge, noting that Wharton was in a single cell and had sole control over his possessions. The Hearing Examiner also referred to Wharton's previous misconduct (#220037), in which "a handcuff key was fashioned out of such a piece [of] material." Wharton again was sanctioned to 90 days of DC status. Wharton appealed and, on June 2, 1989, the PRC sustained the

[11] An inmate on DC status is housed in a cell separate from general population and Administrative Custody inmates, and loses various privileges, including the loss of radio, television, telephone calls, and personal property unless approved by the Program Review Committee ("PRC"). Visits and exercise are also limited.

action of the Hearing Examiner. The PRC found that "[i]t is quite credible and actual that the material was used to make a handcuff key," similar to what Wharton had done just days earlier. The PRC commented, "Since the material was found in Mr. Wharton's cell and it is established that the material can be used as an implement of escape, the committee finds the evidence to be sufficient."

During the time following these misconducts, the PRC repeatedly referred to the serious nature of these particular misconducts. At Wharton's review on September 13, 1989, the PRC commented on this "very serious" misconduct and noted that Wharton "was less than truthful with PRC and denied having anything to do with the confiscated weapon or handcuff key." Likewise, at Wharton's PRC review on December 6, 1989, the PRC referred to Wharton's "past misconducts for abusing/modifying his antennas." And, a year later, on December 10, 1990, the PRC denied Wharton's request to restore his television privileges, stating that he "refused to even discuss why he had pieces of aerial and two lengths of antennas. He said he didn't have to. He did the time."[12]

[12] While the PRC mentioned some of these misconducts in Wharton's periodic PRC reports (which are a part of the current record in this case), the reports contain only fleeting and vague references that fail to convey any of the details of the misconducts or the gravity of the violations.

**b. *Other Misconducts***

On July 21, 1986, Wharton was found guilty of refusing to obey an order (Misconduct #295858). Wharton was sanctioned with one week of DC status. Wharton appealed the finding of misconduct and, on July 30, 1986, the PRC sustained the action taken by the Hearing Examiner/Committee.

On May 21, 1988, Wharton was charged with (1) refusing to obey an oral or written order and (2) disruption or interference with the security or orderly running of the institution. A corrections officer had ordered Wharton to return to his cell and he refused to comply, twice. (Misconduct #168416) On May 26, 1988, Wharton was found guilty and sanctioned with a reprimand and warning.

On March 19, 1989, Wharton was charged with possession or circulation of a petition. (Misconduct #229068) The Hearing Examiner/Committee found Wharton guilty of the charge on March 22, 1989, and he was sanctioned with a reprimand and warning.

On January 12, 1992, Wharton was charged with refusing to obey an oral or written order (Misconduct #480813) after corrections officers observed him performing martial arts with another inmate in the yard. A corrections officer noted that, on two earlier occasions (December 10, 1991, and January 5, 1992), Wharton had been ordered to stop doing martial arts and he refused to comply. The inmate handbook also precluded inmates from practicing martial arts. Wharton entered a

"not guilty" plea to the charge and, on January 14, 1992, the Hearing Examiner/Committee found him guilty. The Hearing Examiner noted that Wharton had previously been ordered to cease doing martial arts, but he failed to comply. He was sanctioned with a reprimand and warning.

### 2. Wharton's 1986 Escape From City Hall

Wharton's escape attempts started years before his prison misconducts for fashioning handcuff keys from metal contraband. On April 21, 1986, after less than a year on death row, Wharton attempted to escape the custody of Philadelphia deputy sheriffs when he was brought to City Hall for sentencing in an unrelated home invasion/robbery case before the Honorable Samuel M. Lehrer. *Commonwealth v. Robert Wharton*, No. CP-51-CR-0426921-1984.[13]

The Arrest Report provides that, while in the custody of deputy sheriffs after his sentencing before Judge Lehrer, Wharton pushed a deputy sheriff into the elevator door and ran downstairs from the second floor to the first floor of City Hall. The Arrest Report provides that during his attempted escape, Wharton "used [a] handcuff key to open his handcuffs." The deputy sheriff fired two shots at Wharton to prevent his escape, wounding him in the thigh and buttocks. Wharton was apprehended on the sidewalk outside of City Hall. Wharton was charged with escape, simple assault, and weapons or implements of escape. *See* Exhibit B.

---

[13] The documents pertaining to Wharton's escape from City Hall are collectively attached as Exhibit B.

A memo to Erskind DeRamus, former Deputy Commissioner of the DOC, from staff members at the Eastern Diagnostic and Classification Center reflects that, while in the sheriff's custody in City Hall for a court matter, Wharton "attempted to escape when he was temporarily left alone by the sheriff's office staff." The memo reflects that, on April 21, 1986, Wharton had been sentenced on a criminal matter (unrelated to his capital murder case), in which he had been convicted of robbery, criminal conspiracy, and burglary. *See* Exhibit B.

The assistant district attorney from the District Attorney's Office who was present during Wharton's robbery sentencing before Judge Lehrer on April 21, 1986, has a vivid recollection of Wharton's escape attempt. *See* Exhibit B.

Newspaper articles from the *Philadelphia Daily News* and *The Philadelphia Inquirer*, dated April 22, 1986, detailed how Wharton managed to open his handcuffs and snap apart a plastic cast that had been on his purportedly injured arm before breaking away and bolting from deputy sheriffs in City Hall. Wharton fled down the staircase in City Hall and exited the building before a deputy sheriff recaptured him by shooting him twice during his flight. *See* Exhibit B.

On December 3, 1986, Wharton pled guilty to escape and was sentenced to one to three years imprisonment (*Commonwealth v. Robert Wharton*, CP-51-CR-0819311-1986).[14] *See* Exhibit B.

Thus, Wharton made his first attempt to escape custody in April of 1986, just a year after commencing his incarceration on death row and,[15] by May of 1989, Wharton was still making efforts to escape state custody through his makeshift handcuff key (in addition to his habit of practicing martial arts).

**3. Wharton's Prescriptive Program Plans Identifying Assaultiveness and Escape as Areas of Concern**

During the years leading up to his second penalty phase hearing in 1992, Wharton's DOC Prescriptive Program Plans identified his "Areas of Concern" as "Assaultiveness" and "Escape."[16]

Wharton's Prescriptive Program Plan for May 1989 identifies his "Areas of Concern" as "Assaultiveness" and "Escape." To assist Wharton with addressing these areas of concern, a DOC staff member recommended that Wharton have misconduct-free behavior, positive housing reports, and continue post-secondary

---

[14] The DOC's memo providing that Wharton was not prosecuted for the escape is inconsistent with the attached documentation from the court file reflecting that he was in fact prosecuted.

[15] Wharton subsequently filed a civil action in this district alleging that his civil rights were violated when he was shot during his attempted escape from custody. Civil Action No. 87-4976. The Court dismissed his claim, noting that "shooting an escaping convict is [not] a violation of that person's civil rights." *See* Exhibit B.

[16] Wharton's Prescriptive Program Plans are attached as Exhibit C.

school, as available. Upon reviewing Wharton's progress a year later, in May 1990, the staff member noted that he had received two Class I misconducts for possession of contraband, implements of escape.

Wharton's Prescriptive Program Plan initiated on May 17, 1990, continued to identify "Assaultiveness" and "Escape" as his "Areas of Concern."

Likewise, Wharton's Prescriptive Program Plan initiated a year later, on May 23, 1991, identified Wharton's "Areas of Concern" as "Assaultiveness" and "Escape." The DOC staff member recommended that Wharton, *inter alia*, maintain misconduct-free behavior. However, at his progress review approximately a year later, it was noted that Wharton had received a misconduct for which he was sanctioned with a reprimand and warning (presumably referring to Wharton's misconduct for refusing to obey an oral or written order, Misconduct #480813).

Wharton's Prescriptive Program Plan initiated on September 14, 1992, continued to identify "Assaultiveness" and "Escape" as Wharton's "Areas of Concern."

**B. The Relevant Facts Regarding Wharton's Adverse Prison Adjustment Tend to Negate the Claim That Trial Counsel Was Deficient in His Performance.**

Wharton must demonstrate that trial counsel's conduct "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as

the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. The law presumes that counsel was effective:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689. In accordance with these standards, it is "only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." *United States v. Kauffman,* 109 F.3d 186, 190 (3d Cir.1997) (quoting *United States v. Gray,* 878 F.2d 702, 711 (3d Cir.1989)). Given the applicable legal standard and the complete facts concerning Wharton's conduct in the period before the second penalty hearing, a court likely could not hold that trial counsel's performance fell below an objective standard of reasonableness.

Trial counsel's strategy at the penalty phase was to present evidence of Wharton's *positive* attributes through various family members. Consistent with that

strategy, Wharton's brother testified that Wharton was athletic, "always kind," helpful, and that he looked up to Wharton. (N.T. 12/18/92, 72-75) Wharton's brother-in-law testified that "you'd want your child to be like" Wharton in that he was "a loving person," protective family member, helpful to others, an excellent athlete, a leader in the community, "very kind," humble, supportive, and giving. (N.T. 12/18/92, 86-92) Wharton's aunt testified that Wharton was a "loveable," "innocent" and "wonderful" person who was artistic and creative. (N.T. 12/18/92, 106-08) Wharton's sister testified that he was a good big brother and father-figure. Wharton also helped her when she was sick. (N.T. 12/18/92, 112-14)

Wharton's mother testified that as a child Wharton was "bright," "artistic," "very kind," motivated, and helpful. He did not cause trouble. Wharton also helped her support and care for Wharton's father after he had a stroke and Wharton performed errands for elderly neighbors. Wharton's mother further testified that he excelled at sports, had "always been a kind hearted person," and helped her care for the children in her day care center. Wharton's mother pleaded for the jury to spare her son's life and sentence him to life imprisonment, emphasizing that he would never be free from prison. (N.T. 12/21/92, 17-39)

In addition to presenting testimony from Wharton's family members regarding his positive attributes prior to the victims' murders, trial counsel presented testimony from family regarding his positive attributes while

incarcerated. For example, Wharton's cousin testified that, during the previous five years of Wharton's incarceration, he helped her with her hot dog cart business by creating menus and flyers to help her generate business. According to his cousin, for the prior ten years, Wharton was "just a real good human being." Wharton's sister-in-law also testified that, since his incarceration, Wharton had accepted religion into his life. (N.T. 12/18/92, 95-101; N.T. 12/21/92, 9-11)

Trial counsel's strategy was to humanize Wharton by highlighting his positive attributes as a family member. Presenting tidbits of Wharton's "positive" behavior in prison in an attempt to add to this trial strategy would have been problematic for the defense. Had trial counsel presented records pertaining to Wharton's "positive" prison adjustment, he would have opened the door for the Commonwealth to rebut with the extensive damaging prison information detailed above.

Evidence of Wharton's numerous misconducts (including his possession of "implements of escape" that also could have been used as a weapon to harm prison staff or other inmates), his escape from City Hall not even a year after being on death row when he was brought to Philadelphia for sentencing in yet another home invasion/robbery, and the fact that he was consistently identified as having issues with "Assaultiveness" and "Escape," would have been detrimental to the defense

strategy of portraying Wharton as a kind, loving, innocent, and helpful person. It would have undermined the strategy trial counsel did use at the penalty hearing.

If anything, the jury would likely have found the full prison records *aggravating* rather than mitigating. If trial counsel had opened the door to evidence of Wharton's bad prison adjustment, he would likely be facing a challenge for doing exactly what he is now challenged for not doing. *See Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (counsel was not ineffective for failing to present the additional mitigation evidence where "the worst kind of bad evidence would have come in with the good" and "[t]he only reason it did not was because [counsel] was careful in his mitigation case"); *Burger v. Kemp*, 483 U.S. 776, 792 (1987) (counsel was not ineffective for declining to present mitigating evidence that might have opened the door to damaging rebuttal evidence); *Darden v. Wainwright*, 477 U.S. 168, 186 (1986) (counsel was not ineffective for declining to present mental health evidence that would have opened the door for rebuttal testimony that the defendant was a sociopath and had prior convictions).[17]

[17] Other federal courts have declined to find trial counsel ineffective under similar circumstances where introducing the purported positive prison records would have opened the door to evidence adverse to the defendant. *See Morgan v. Branker*, 2012 WL 2917841, at *20 (W.D.N.C. July 17, 2012) (trial counsel had a reasonable basis for declining to present records of the defendant's positive prison adjustment when doing so would have allowed the prosecutor to cross-examine DOC officials or introduce rebuttal evidence about, *inter alia*, the defendant's negative prison records detailing his infractions for fighting and disobeying orders); *Deck v. Steele*, 249 F. Supp. 3d 991, 1041 (E.D. Mo. 2017) (trial counsel not ineffective for failing to introduce the defendant's DOC records documenting, *inter alia*, his behavior, disciplinary actions, and grievances while incarcerated where the evidence would not be mitigating, but rather, would

Trial counsel, William T. Cannon, Esquire, contradicts Wharton's assertion that he was deficient in his performance. On May 31, 2019, trial counsel provided a declaration in which he stated that, before presenting evidence of Wharton's prison adjustment, he would have considered whether the prison records reflecting positive adjustment could have caused more harm than good to the defense by opening the door to the Commonwealth presenting evidence pertaining to Wharton's negative prison behavior. *See* Declaration of William Cannon, Esquire, attached as Exhibit D.[18]

Furthermore, presenting evidence of Wharton's "positive" prison adjustment could have impeded trial counsel's closing argument to the jury. In zealously arguing to the jury during his closing argument that a sentence of life in prison was appropriate, trial counsel repeatedly emphasized that, if Wharton was sentenced to life imprisonment, he would never leave the prison. Trial counsel impressed upon

(continued . . . )
support a finding that the defendant is a criminal offender unable to be rehabilitated); *see also Peterka v. McNeil*, 532 F.3d 1199 (11th Cir. 2008) (defense counsel did not perform deficiently in penalty phase by failing to introduce evidence of the defendant's prison record as mitigation where the evidence was minimal, consisting only of corrections officer's testimony that the defendant had been "a little better" than the normal person incarcerated for violent crime, and that the defendant had tried to "act properly" in prison).

[18] At the time Mr. Cannon gave his declaration to the defense on July 3, 2018, and was asked about why he did not obtain the DOC records regarding Wharton's "positive prison adjustment," the defense did not show him a single DOC document. *See* Exhibit D. Nor did the defense inquire as to what his strategy would have been if those records contained any *negative* information regarding Wharton.

the jury that Wharton would remain there for the rest of his life. (N.T. 12/21/92, 70, 89-90)

Evidence of Wharton's full record, however, would have led to rebuttal evidence that Wharton was an escape artist who, on one occasion, escaped the deputy sheriff's custody in City Hall and had to be shot twice to be recaptured, and who, on two later occasions, was found in possession of "implements of escape" in the form of makeshift handcuff keys, and who was known to practice martial arts. Such evidence would have either prevented or negated one of counsel's main arguments for a life sentence: given his risk of escape, there was no guarantee that Wharton would remain incarcerated for the rest of his life if sentenced to life imprisonment. Undoubtedly, in its own closing argument the Commonwealth would have argued that, by possessing "implements of escape" (pieces of mental antenna) that also could very well have been used as a weapon, along with his determined practice of martial arts, Wharton repeatedly demonstrated that he was an escape risk and posed a danger to others in prison and thus the only appropriate sentence to ensure the safety of those in prison and the community at large was death.

For these reasons, a court could not likely hold under the law that trial counsel performed below an objective standard of reasonableness by not presenting evidence of Wharton's "positive" prison adjustment.

### C. Wharton Likely Cannot Establish the Required Prejudice – that is, a Reasonable Probability That the Outcome of His Penalty Phase Would Have Been Different if Only the Jury Had Heard Evidence of His "Positive" Prison Adjustment.

The applicable law suggests that Wharton cannot make the requisite showing of prejudice to prevail on his ineffectiveness claim. To establish prejudice, Wharton "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011) (quoting *Strickland,* 466 U.S. at 694). A "reasonable probability" is one "sufficient to undermine confidence in the outcome" and is "less demanding than the preponderance standard." *Jermyn v. Horn,* 266 F.3d 257, 282 (3d Cir. 2001) (quoting *Baker v. Barbo,* 177 F.3d 149, 154 (3d Cir. 1999)); *see also Woodford v. Visciotti,* 537 U.S. 19, 22 (2002) (*Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered").

In assessing whether there was prejudice, courts must "consider *all* the relevant evidence that the jury would have had before it if [counsel] had pursued [a] different path." *Williams*, 637 F.3d at 227 (quoting *Wong v. Belmontes*, 558 U.S. 15, 20 (2009)). "In so doing, we cannot merely consider the mitigation evidence that went unmentioned in the first instance; we must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut

the petitioner's mitigation testimony." *Id.* (citing *Wong,* 558 U.S. at 26) (stating that "the reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice"). Once the court has reconstructed the record, it must "reweigh the evidence in aggravation against the totality of available mitigation evidence." *Id.* (quoting *Wiggins v. Smith,* 539 U.S. 510, 534 (2003)). Only then can the court determine whether there is a reasonable probability that, but for counsel's ineffectiveness, the result of the proceeding would have been different. *Williams*, 637 F.3d at 227. Thus, even if counsel's performance was deficient, a petitioner cannot prevail if counsel's error "had no effect on the judgment." *Strickland*, 466 U.S. at 691.

In this case, the penalty phase record and aggravating circumstances, coupled with Wharton's negative prison behavior, suggest that, under the law, Wharton cannot establish a reasonable probability that the jury would have sentenced him to life imprisonment if it had heard about his prison adjustment.

**1. The Penalty Phase Record and Aggravators**

Over the course of six days, the jury heard testimony regarding the details of Wharton's terrorization, destruction, and burglaries of the victims' home and church prior to the murders over a debt that he believed was owed to him (N.T. 12/14/92, 79-110); the jury heard testimony regarding the details of how the victims were separated, bound, masked with duct tape, strangled and/or drowned

even after Wharton forced Bradley Hart to write him a check to satisfy the purported debt (N.T. 12/14/92, 36-58, 72-73; N.T. 12/15/92, 98-99; N.T. 12/16/92, 33-44; N.T. 12/18/92, 6-16, 26-30); the jury heard testimony about how Wharton left the victims' baby girl alone in the unheated home in subfreezing temperatures after killing her parents (N.T. 12/14/92, 61; N.T. 12/15/92, 33-39; N.T. 12/16/92, 14-28; N.T. 12/18/92, 8, 34); the jury heard testimony regarding the events leading up to Wharton's arrest, during which police recovered proceeds from the series of burglaries/robberies at the victims' home (N.T. 12/16/92, 83-111; N.T. 12/17/92, 37-38; N.T. 12/18/92, 61-70); and the jury heard Wharton's confession to the brutal murders ("I had put this tape around her face from her eyebrows down to her chin while we was in the bathroom first before I dunked her head in the water. I held her head down in the water till the bubbles stopped after a while"), and his explanation for why he killed them ("cause they knew me and would turn us in") (N.T. 12/17/92, 8-22).

In addition, the jury viewed extensive physical evidence of Wharton's crimes, including the ligatures, bindings, and duct tape that he used to subdue, mask, and strangle the victims. (N.T. 12/18/92, 55-59) The jury also viewed numerous photographs depicting the lifeless victims bound, masked, strangled and/or drowned at the crime scene: Ferne Hart on her knees, bent over the bathtub, with her face submerged in water, her hands and feet bound, her face masked with

duct tape, a necktie wrapped tightly around her neck, her shirt pulled up exposing her breasts, and her pants down to her ankles; and Bradley Hart lying face down on the ground with his face in a pail of water, his hands and feet bound, his face mummified with duct tape, two electrical cords tightly wrapped around his neck and a sneaker print visible on the back of his shirt. Photographs depicted the victims at the medical examiner's office, the duct tape that had been removed from the victims' bodies, and the family that existed before Wharton murdered the young couple and orphaned their child. (N.T. 12/15/92, 37; N.T. 12/16/92, 3-4)

In light of the particularly heinous nature of Wharton's crime spree and murders, coupled with the aggravating circumstances (killing while perpetrating a robbery/burglary and the fact that Wharton committed two murders), it appears unlikely that the jury would have reached a different result on the basis of brief, boilerplate comments in some monthly PRC reports noting that Wharton had periods where his adjustment was "routine," "positive," "satisfactory," "problem-free," or "uneventful."[19] The sentencing phase record and aggravating

[19] The PRC's monthly-generated reports upon which Wharton heavily relies also appear at times inaccurate, incomplete, or inconsistent. For example, Wharton's PRC review dated March 6, 1987, provides that "[t]here are no misconducts on record." Yet there was a misconduct on record at that time: Wharton had been found guilty of refusing to obey an order (Misconduct #295858). Similarly, the PRC's comments from June 3, 1987, reflect that Wharton's counselor stated that Wharton "makes no requests or raises no concerns" but is "a rather quiet individual who seldom makes a request or initiates any interaction." However, by June 3, 1987, Wharton had already filed numerous grievances complaining about trivial matters (such as the dessert on his food tray being placed too close to his meat). Likewise, Wharton's PRC review dated June 7, 1989, provides that Wharton has had "routine contacts" during the past month (*i.e.*, from May 3,

circumstances would likely have overwhelmed any evidence regarding Wharton's spurts of "satisfactory" adjustment in between his misconducts and attempts to escape custody.

Under the law, therefore, Wharton is unlikely to meet his burden to show that he was prejudiced by trial counsel's failure to investigate and present his so-called "positive" prison adjustment records. *See Woodford v. Visciotti*, 537 U.S. 19 (2002) (the defendant was not prejudiced by trial counsel's failure to present evidence that he grew up in a dysfunctional family and suffered continuous psychological abuse where the cold-blooded circumstances of the murder and the aggravating evidence of the defendant's violent felony convictions were so severe that they completely overwhelmed the proffered mitigation); *Williams*, 637 F.3d at 236-37 (given the nature of the brutal crimes and aggravating circumstances, and the equivocal nature of the mitigation evidence, Williams could not meet "his burden of demonstrating there was a reasonable probability [that] the presentation

---

(continued . . . )
1989, to June 7, 1989), even though he had two serious misconducts during the month before for possession of contraband constituting "implements of escape." The PRC review covering that time period (the last PRC review being May 3, 1989) neglects to mention these misconducts other than to say that Wharton was appealing them.

Wharton's prison records also contain monthly updates, consisting of a few sentences or less, from a prison consulting psychiatrist. These brief and general updates indicate only that Wharton "had no evidence of a treatable mental disorder."

of [mitigating] evidence would have resulted in a life sentence instead of the death penalty”).[20]

### 2. Dr. Krop’s Assertions of Good Prison Adjustment Do Not Account for the Facts Now Before this Court.

Wharton proffers a declaration from Dr. Harry Krop in which he opines that Wharton made a “positive adjustment to prison life,” would be a “prime candidate for constructive rehabilitation in the general prison population,” and “would not pose a future danger to the prison community” if “he were to serve a sentence of life imprisonment.” In support of his conclusion, Dr. Krop relies primarily on: (1) the “reports from prison mental health personnel and correctional counselors” (presumably, Wharton’s PRC reviews and the few generic sentences generated by the consulting prison psychiatrist on a monthly basis); and (2) the large number of prison grievances filed by Wharton demonstrating his “relative acceptance of his incarceration” which is “an important element of his adjustment and shows that he will likely not be a future danger.”

[20] *See also Trice v. Ward*, 196 F.3d 1151, 1163 (10th Cir. 1999) (the defendant failed to demonstrate that the outcome of the sentencing phase would have been different had counsel presented his positive prison records where the underlying facts of the defendant’s crimes were horrific and the defendant confessed to the crimes); *Spreitzer v. Peters*, 1999 WL 688757, at *8 (N.D. Ill. Apr. 16, 1999), *aff'd sub nom, Spreitzer v. Schomig*, 219 F.3d 639 (7th Cir. 2000) (rejecting the defendant’s claim of ineffectiveness assistance of counsel for failing to present evidence showing that he behaved well in prison where the neglected mitigating evidence was significantly outweighed by the aggravating evidence).

An experienced forensic psychiatrist, John S. O'Brien, III, M.D., J.D., has reviewed Dr. Krop's findings and concludes that they do not "reflect[] a balanced inquiry into Mr. Wharton's history, documented behavior or correctional adjustment and cannot be accepted at face value without exploring whether contrary views or opinions might be viable and worth considering." *See* Report of Dr. O'Brien, dated July 15, 2019, attached as Exhibit E, p.7.[21] Dr. O'Brien was "struck by the degree to which the declaration by Dr. Krop overstates the positive and ignores the negative of Mr. Wharton's history and record," and opines that this "posture limits the accuracy and validity of Dr. Krop's opinions or conclusions." *See* Exhibit E, pp. 6-7.

Referring to Wharton's burglaries and vandalisms of the Hart's home and church, his burglaries of the Germantown Boys Club, and his robbery and burglary of a couple in their South Philadelphia home, Dr. O'Brien opines that Wharton's "pattern of illegal and antisocial behavior for a significant period of time prior to the Hart murders" is "inconsistent" with Dr. Krop's opinion that the charges for which Wharton was sentenced to death were "anomalous and out of character" for Wharton. *See* Exhibit E, p.2.

---

[21] As indicated in his report, Dr. O'Brien was consulted for the limited purpose of opining whether Dr. Krop's conclusions "can be accepted at face value without exploration or consideration of contrary views or opinions." *See* Exhibit E, p.1.

Dr. O'Brien further comments on Dr. Krop's failure to acknowledge Wharton's criminal history prior to the murders, his prison misconducts involving possession of contraband and implements of escape, and his attempt to escape City Hall in 1986. Dr. O'Brien states:

> Despite his report of review of various records, it appears that Dr. Krop may have been wholly unaware of Mr. Wharton's extensive history of criminal behavior aside from his participation in the murders of Bradley and Ferne Hart. Dr. Krop makes no reference to Mr. Wharton's escape attempt in 1986 or to his having been found to be in possession of contraband and implements of escape in 1989, including what was identified as a handcuff key fashioned from an antenna, behavior strikingly similar to his escape attempt during which it appeared that Mr. Wharton removed his handcuff with a key.

*See* Exhibit E, p.6.

In addition, Dr. O'Brien discusses Wharton's negative prison adjustment as reflected in the DOC records, including his inability to be "truthful" with the PRC following his "very serious" misconducts of possessing implements of escape and his refusal to even discuss his misconducts with the PRC because he "did the time" in DC status:

> The Program Review Committee records document Mr. Wharton to be significantly limited in both his participation as well as in his open communication with the Committee and unable or unwilling to demonstrate insight into or remorse for his behavior both prior to and during his incarceration. The records document ongoing serious behavioral transgression consistent with surreptitious future planning while portraying himself as polite, pleasant and well-adjusted.

*See* Exhibit E, pp. 4-5. Dr. O'Brien finds it significant that Dr. Krop failed to make any reference to these records reflecting Wharton's adverse prison adjustment.

> Dr. Krop does not make reference to, or even document awareness of, Mr. Wharton's limited participation in Program Review Committee meetings, his reticence to discuss any issues or substance or his absolute refusal to discuss the May 15, 1989 misconduct that resulted in a lengthy period of disciplinary custody and a prolonged period afterward during which his radio and television privileges were not restored.

*See* Exhibit E, p.6.[22]

Dr. O'Brien also differed with Dr. Krop on the significance of Wharton's prison grievances. As noted by Dr. O'Brien, many of Wharton's grievances concerned his repeated requests for the restoration of radio and television privileges after he was placed on DC status in May of 1989. Wharton repeatedly claimed that the PRC was continuing to "punish him" for the conduct that resulted in his DC status and the removal of privileges (*i.e.*, his possession of contraband that constituted implements of escape). Dr. O'Brien opines that Wharton "at no

---

[22] It is unclear from the Krop declaration whether he was ever provided with the full prison records. Moreover, the declaration is undated and, thus, it is unknown exactly when it was generated. All that is known is that it was created at some point before or during the pendency of the 1997 PCRA proceedings. Dr. Krop did state that he conducted a forensic psychological evaluation and clinical interview of Wharton, but failed to specify when he did these things.

In addition, while Dr. Krop stated that he reviewed psychological tests administered to Wharton, he failed to identify those tests and when they were administered. As Dr. O'Brien notes, Dr. Krop "does not specify when the tests were administered, by whom, or in what context. There are a wide array of psychological tests that psychologists administer and interpret. Dr. Krop does not specify what specific tests he reviewed nor provide the raw data from the testing as an attachment or appendix to the declaration." *See* Exhibit E, p.5.

point demonstrated insight into the obvious reasons for the continued restriction." *See* Exhibit E, p.3.[23] Dr. O'Brien also addresses the shortcomings of the PRC's records upon which Dr. Krop relied. Dr. O'Brien notes that the PRC records fail to reflect Wharton's most serious misconduct from May 1989, when he was in possession of contraband and implements of escape, other than to note in June 7,

---

[23] Examples of the grievances Wharton filed include the following:

- In 1986, Wharton complained that he had been denied a chess set;
- In 1987, Wharton filed grievances complaining that the dessert on his food tray was too close to the meat, which made it "inedible;" that he did not receive his daily newspaper; and that his sink leaked hot water and made his cell too hot;
- In 1988, Wharton filed grievances complaining that corrections officers were whistling while they worked on the block after 10:00 a.m.; that two spoons were missing from his cell; that the corrections officer yelled too loud when it was time for inmates to exercise; that he did not "get jelly for each piece of toast" and for over a week he had "not gotten his jelly at all;" and that a corrections officer slapped a newspaper against his cell door and gave him a "dirty look;"
- In 1989, Wharton filed grievances complaining that a handball was confiscated from him while he was on disciplinary custody maximum status and not permitted to be in possession of it; that the price of cigarettes in the commissary was too high; and that his hairbrush was missing;
- In 1990, Wharton filed a grievance complaining that his sneakers were missing;
- In 1991, Wharton filed grievances complaining that his pillow was missing from his bed and that his blanket was too small; and that he did not like the type of sneakers he was required to wear; and
- In 1992, Wharton filed a grievance complaining that a newspaper and peanut butter were missing from his possessions.

In addition to the grievances, Wharton filed three unsuccessful civil actions in federal court between 1985 and 1992 (and afterwards). *See Wharton v. Cassella, et al.*, CIV. A. No. 87-4976 (alleging civil rights violation when shot during his escape from City Hall), Exhibit B and note 15 *supra*; *Wharton, et al. v. Isett*, 3:88-cv-00800-SHR (prisoner civil rights action); *Wharton v. Conrad, et al.*, 3:89-cv-01402-SHR (prisoner civil rights action).

1989 that he was "appealing his misconducts" and that he had disciplinary sanctions imposed.

Furthermore, Dr. O'Brien calls into question Dr. Krop's opinion that Wharton does not meet the criteria of an Antisocial Personality Disorder and his conclusions that the victims' murders were an "out of character" and "anomalous" act on Wharton's part. Dr. O'Brien opines that Wharton's lengthy criminal history prior to the Hart murders exemplifies "a pervasive behavior pattern" that "is consistent with the very diagnosis Dr. Krop indicates that in his opinion, Mr. Wharton does not have." Dr. O'Brien explains:

> The nature of the killings of Bradley and Ferne Hart and the reasons for them reflect a callous disregard for, and violation of, the rights of others. Mr. Wharton's documented pattern of illegal behaviors during the period of time leading up to the murders of the Harts clearly reflect him to fail to conform to social norms with respect to lawful behaviors and to exhibit deceitfulness, impulsivity, aggressiveness, irresponsibility, lack of remorse, and reckless disregard for the safety of others.

*See* Exhibit E, p.7.

Given the limitations of the Krop declaration as highlighted by Dr. O'Brien's report, Dr. Krop's opinion of Wharton's "positive" prison adjustment would not likely have carried weight with the jury.[24] Under these circumstances, it

[24] To the contrary, it is significant to note that had Dr. Krop testified at the 1992 penalty phase hearing that the charges for which Wharton was sentenced to death were "anomalous and out-of-
(continued . . . )
character" for Wharton, the Commonwealth would have rebutted with all of the details regarding Wharton's extensive criminal history leading up to the Hart murders. The jury would have heard

appears that Wharton could not make the requisite showing of prejudice to prevail on his ineffectiveness claim.

## IV. OTHER MATTERS FOR THE COURT'S CONSIDERATION

In addition to the issues discussed above, there are two other relevant matters for the Court's consideration as it relates to the ineffective assistance of counsel claim. These include the standard of review that applies to a hearing on this matter and the requirements of victims' rights provisions.

### A. Standard of Review

In its mandate, the Third Circuit directed: "[I]t is now hereby ORDERED and ADJUDGED by this Court that the judgment of the District Court entered May 1, 2013, is affirmed in part, vacated in part, and remanded for further proceedings. … All of the above in accordance with the opinion of this Court." Judgment dated January 11, 2018. In its Opinion, the Third Circuit directed: "Based on the foregoing, we will affirm in part and vacate in part the District Court's denial of Wharton's habeas petition, and we will remand for further proceedings consistent with this opinion." *Wharton v. Vaughn*, No. 13-9002, slip op. at 32 (3d Cir. January 11, 2018).

---

all about Wharton's series of burglaries of the Germantown Boy's Club in 1983, and his home invasion/robbery of another couple in South Philadelphia in early 1984 (just weeks before the Hart murders).

In its Opinion, the Third Circuit analyzed the reasoning of the Supreme Court of Pennsylvania relating to Wharton's positive adjustment claim. *Id.* at 23-26. The Third Circuit's analysis increases the difficulty faced by this Court in its own analysis for several reasons.

First, the Third Circuit stated that the record does not reflect whether Attorney Cannon ever sought or reviewed Wharton's prison records and, if not, his conduct can never be considered reasonable. *Id.* at 23-24. The problem, however, is that this standard conflicts with the law, which is that an attorney is not ineffective for failing to undertake a futile action, because the relevant question under *Strickland* is whether no competent attorney would think the challenged omission would fail. *See Premo v. Moore*, 563 U.S. 115, 124 (2011) ("Of course [possibly conceding that a motion to suppress would have succeeded] is not the same as a concession that no competent attorney would think a motion to suppress would have failed, which is the relevant question under *Strickland*.") (citing *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986); *Harrington v. Richter*, 569 U.S. 86, 109-110 (2011)).

Also, merely obtaining the records would not have satisfied *Strickland* because an attorney simply having possession of records does not benefit a client. It would only be the introduction of such records that might benefit the client. For purposes of *Strickland*, the correct question here would have been, to paraphrase

*Premo*, whether no competent lawyer would have disbelieved that presenting Wharton's prison records to the jury would have led to a sentence of life imprisonment rather than death. For purposes of federal habeas corpus review, the question has another layer, which is whether the state courts were unreasonable in concluding that no competent lawyer would believe that the prison records would not have changed the outcome. *See* 28 U.S.C. § 2254(d).

With respect to the prejudice prong, the Third Circuit held that the Supreme Court of Pennsylvania erred by applying a quantitative analysis, as opposed to a qualitative analysis, to Wharton's proffered evidence. Slip op. at 25. This holding, however, was premised on a misapprehension of the Supreme Court's analysis.

The Third Circuit quoted what it perceived as the Supreme Court's analysis as follows:

> [I]t is notable that the equivocal prison record evidence, had it been introduced, would have sounded under the catch-all mitigating circumstance, which the jury in fact found . . . . [Wharton] has not demonstrated that he was prejudiced by [Cannon's] failure to introduce this equivocal prison record evidence as additional proof of this mitigating circumstance found by the jury.

Slip op. at 24 (quoting *Commonwealth v. Wharton*, 811 A.2d 978, 989 (Pa. 2002); bracketed material added in Third Circuit Opinion).

However, the full statement by the Supreme Court of Pennsylvania was:

> Moreover, in assailing counsel's performance, it is notable that appellant never discusses the penalty phase presentation actually made by counsel, with the aim of demonstrating why the course counsel is

> faulted for failing to pursue should be deemed to offer a greater prospect for success than the course counsel actually pursued. In this regard, it is notable that the equivocal prison record evidence, had it been introduced, would have sounded under the catch-all mitigating circumstance, which the jury in fact found in appellant's second penalty phase hearing. Appellant has not demonstrated that he was prejudiced by his counsel's failure to introduce this equivocal prison record evidence as additional proof of this mitigating circumstance found by the jury.

*Wharton*, 811 A.2d at 989.

Reading the entirety of this statement shows that the Supreme Court was not stating that the prison record evidence was cumulative because the jury already had found the relevant mitigating circumstance or that the Supreme Court was merely counting the two sets of factors to see which was greater. Slip op. at 25. The Supreme Court stated instead that, given that the jury had found the relevant mitigating circumstance, Wharton was required to show that presenting the prison records (the "additional proof" of the mitigating circumstance) would have offered "a greater prospect for success"; given the equivocal nature of the evidence and the failure to place that evidence into the context of the evidence otherwise introduced by counsel (and, as noted, into the context of the Commonwealth's evidence and likely-to-be-introduced evidence), Wharton failed to meet his burden.

Nothing in the record indicates why the Respondent did not file a petition for rehearing or a petition for writ of *certiorari* to further examine the rulings of the court of appeals. Based on that failure, it is now the law of the case that the holding

of the Supreme Court of Pennsylvania was unreasonable and that this Court must conduct a hearing on Wharton's claim of positive adjustment to prison life. The Third Circuit identified this stage of the proceedings as a *de novo* review of the claim. Slip op. at 26. Importantly, however, the Third Circuit indicated that an evidentiary hearing is subject to § 2254(e)(2) (Slip op. at 31 and n.22), which provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
> **(A)** the claim relies on—
> **(i)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> **(ii)** a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> **(B)** the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). This provision must be read *in pari materia* with § 2254(e)(1), which provides that the state court record is presumed to be correct and may be rebutted only by clear and convincing evidence.

Based on the foregoing, Wharton now has the burden of proving, by clear and convincing evidence, that Attorney Cannon unreasonably failed to investigate Wharton's prison adjustment *and* failed to present evidence of Wharton's purported "positive adjustment" to prison life, and that Wharton was prejudiced by

those failures. As noted by the Third Circuit (Slip op. at 28-29), the record is not limited to the prison records proffered by Wharton, but would include both the evidence presented in state court and the additional records relative to Wharton's lack of "positive adjustment" and actual negative adjustment proffered by the Commonwealth.

In this context, it should be noted that Dr. Harry Krop, Wharton's expert psychologist, stated in his report (Petitioner's Motion to Expand Record, etc., Exhibit 3) that "the charges for which he [Wharton] was sentenced to death are anomalous and out-of-character for Mr. Wharton, particularly when viewed in the context of his history and psychological makeup." *Id.* at 1-2 ¶ 3. As discussed above, Wharton's complete prison records are not consistent with this conclusion. Additionally, his criminal record includes additional offenses that would have been presented by the Commonwealth to rebut the opinion that Wharton's behavior was "out-of-character" for him. Dr. Krop did not discuss this evidence, apparently because it was not made available to him. This Court, in contrast, is required to consider all such evidence relevant in assessing prejudice, the Opinion of the Third Circuit makes clear. *See esp.* Slip op. at 28-29 (to assess prejudice arising from alleged deficient performance, court must reconstruct record and assess it anew, including evidence that went unmentioned as well as any anti-mitigation evidence the Commonwealth would have presented).

### B. Crime Victims' Rights

Consultation with the victims of crime, or the family members of homicide victims, is required under both federal and state law and is at issue in this matter before the Court. *See* DAO Notice of Concession of Penalty Phase Relief (Doc. No. 155).

The federal statute providing rights to the victims of crime provides in part:

> **(a) Rights of crime victims.**—A crime victim has the following rights:
> …
>> **(3)** The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.
>> **(4)** The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.
>> ...
>> **(7)** The right to proceedings free from unreasonable delay.
>> **(8)** The right to be treated with fairness and with respect for the victim's dignity and privacy.
>> …

18 U.S.C. § 3771(a).

These rights apply to proceedings under § 2254:

> **(2) Habeas corpus proceedings.**—
>> **(A) In general.**—In a Federal habeas corpus proceeding arising out of a State conviction, the court shall ensure that a crime victim is afforded the rights described in paragraphs (3), (4), (7), and (8) of subsection (a).
>> **(B) Enforcement.**—

**(i) In general.**—These rights may be enforced by the crime victim or the crime victim's lawful representative in the manner described in paragraphs (1) and (3) of subsection (d).
**(ii) Multiple victims.**—In a case involving multiple victims, subsection (d)(2) shall also apply.

**(C) Limitation.**—This paragraph relates to the duties of a court in relation to the rights of a crime victim in Federal habeas corpus proceedings arising out of a State conviction, and does not give rise to any obligation or requirement applicable to personnel of any agency of the Executive Branch of the Federal Government.

**(D) Definition.**—For purposes of this paragraph, the term "crime victim" means the person against whom the State offense is committed or, if that person is killed or incapacitated, that person's family member or other lawful representative.

18 U.S.C. § 3771(b)(2).

The victims of crime have analogous rights under state law:

Victims of crime have the following rights:
…

(4) In cases involving a personal injury crime or burglary, to submit prior comment to the prosecutor's office or juvenile probation office, as appropriate to the circumstances of the case, on the potential reduction or dropping of any charge or changing of a plea in a criminal or delinquency proceeding, or, diversion of any case, including an informal adjustment or consent decree.

(5) To have opportunity to offer prior comment on the sentencing of a defendant or the disposition of a delinquent child, to include the submission of a written and oral victim impact statement detailing the physical, psychological and economic effects of the crime on the victim and the victim's family. The written statement shall be included in any predisposition or presentence report submitted to the court. Victim-impact statements shall be considered by a court when determining the disposition of a juvenile or sentence of an adult.
…

18 P.S. § 11.201.

Prosecutors have complementary duties to ensure that the victims' rights are honored:

> …
> **(b) Pleading.**—In a personal injury crime or burglary, the prosecutor's office shall provide notice of and offer the opportunity to submit prior comment on the potential reduction or dropping of any charge or changing of a plea, a diversion of any case, including informal adjustment and consent decree, unless such notice is provided by the juvenile probation office.
> …
> **(e) Disposition.**—In a personal injury crime, if the prosecutor's office has advance notice of dispositional proceeding, the prosecutor shall make reasonable efforts to notify a victim of the time and place of the proceeding.
> **(f) Notice.**—The prosecutor's office shall provide all of the following to the victim:
>> (1) Upon request of the victim, notice of the disposition and sentence of an adult, including sentence modifications.
>> (2) Upon request in a personal injury crime, reasonable attempts to notify the victim as soon as possible when the adult is released from incarceration at sentencing.
>> (3) If the prosecutor's office is prosecuting a personal injury crime, notice prior to the entry of a consent decree.
>> …
>> (6) Upon request in a personal injury crime, notice of the filing, hearing or disposition of appeals.
>> …

18 P.S. § 11.213(b), (e), (f).

The letters of the family members of Bradley Hart and Ferne Hart and the sole surviving victim establish that these provisions of law have not been satisfied.

In their letters, the family members of the deceased state that they were not contacted about this case and that they oppose penalty phase relief. *See* Exhibit F.

In her letter for the Court, Lisa Hart-Newman states that she was seven months old when Wharton murdered her parents and left her alone to die in the unheated family home. She states that "[a]t no point was I contacted by … anyone … to ascertain what my views are. Seeing as I was also a victim in this tragedy, my opinion should have been sought and should carry weight." Ms. Hart-Newman further states that agreement to relief in this case "is an affront to justice and has shown a total disregard for the life of my parents, my own life, and the impact that this would have on our family." *See* Exhibit F.

Michael F.L. Allen is Ferne Hart's brother. In his letter for the Court, he states that "[a]t no time did any one … contact me concerning this matter." Mr. Allen states that agreement to relief "is nothing less than an egregious insult to injury and an affront to the sensibilities of a responsible community which holds its members accountable for their acts." He further states that he knows "of no members of the Allen or Hart family who supports [agreement to relief]. I oppose the vacating of Robert Wharton's death penalty." *See* Exhibit F.

Patrice Carr is Bradley Hart's sister. In her letter for the Court, she states that she "was never contacted" about vacating Wharton's death sentence and that she "would have never, ever agreed to it and never will. Justice was served in

1985, and in 1992, justice was confirmed. The idea that this is even a consideration is unbearably painful and shocking." *See* Exhibit F.

Dr. Tony Hart, Bradley Hart's brother, was spoken to by the District Attorney's Office about the concession. In Dr. Hart's letter for the Court, he states that he was misadvised about the posture of the case. Dr. Hart states that he was told "that Mr. Wharton had won an appeal and that in order to avoid a new trial a plea deal was offered and accepted." Dr. Hart further states that "[t]he family is in one accord asking that [Wharton's] status not change" and requests that the court "please not accept any such plea." *See* Exhibit F.

These letters are attached to assist in assuring compliance with the provisions of the Federal Crime Victims' Rights Act and the Pennsylvania Crime Victims Act.

## V. CONCLUSION

WHEREFORE, the OAG respectfully submits the above-stated facts in accordance with this Honorable Court's request for additional information to assist it in resolving Petitioner's remaining ineffective assistance of counsel claim.

Respectfully submitted,

By: */s/ James P. Barker*

James P. Barker
Chief Deputy Attorney General
Office of Attorney General
Criminal Law Division
Appeals and Legal Services Section
16th Floor, Strawberry Square
Harrisburg, PA 17120
(717) 783-6896
jbarker@attorneygeneral.gov

Date: July 22, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused the foregoing *Brief Of Amicis Curiae Pennsylvania Office Of Attorney General* to be served on the following persons via ECF or by first class mail:

Via ECF and/or First Class Mail

Victor J. Abreu, Esquire
Claudia Van Wyk, Esquire
Federal Community Defender Office
Capital Habeas Corpus Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(Counsel for Petitioner)

Max Cooper Kaufman
Paul M. George
Thomas W. Dolgenos
District Attorney's Office
3 South Penn Square
Philadelphia, PA 19107
(Counsel for Respondent)

By: */s/ James P. Barker*

James P. Barker
Chief Deputy Attorney General
Pennsylvania Office of Attorney General
Criminal Law Division
Appeals and Legal Services Section
16th Floor—Strawberry Square
Harrisburg, PA 17120
(717) 787-6348
jbarker@attorneygeneral.gov

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**ROBERT WHARTON, Petitioner** **No. 01-cv-6049**

**v.**

**TAMMY FERGUSON, Superintendent, Respondent**

## AFFIDAVIT OF HEATHER WAMES VICTIM/WITNESS COORDINATOR, LAW DIVISION PHILADELPHIA DISTRICT ATTORNEY'S OFFICE

I am the Victim/Witness Coordinator for the Law Division of the Philadelphia District Attorney's Office. My responsibilities include ensuring compliance with Federal and State Law in terms of consultation with the victims of direct crime, or, in this case, of homicide, with the family members of those victims. I view and treat my communications with victims/family members as private matters.

However, in this case, the Pennsylvania Office of the Attorney General has filed a brief that includes representations about the Philadelphia District Attorneys Office's communications with the family members of the two victims in this case and attached letters from some of those family members, including David Hart, the family member with whom I communicated with regarding a possible change in status of this case. This brief and the attached letters put my private communications into issue, and into public record. Because of this, I feel obligated to set forth the factual record that demonstrates the steps I took to ensure that the Philadelphia District Attorney's Office fully complied with Federal and State law with regard to victims' rights. While I respect that a victim/family member has the right to change his/her view of a situation, that does not change the underlying facts of my communications with that person.

1. On November 30, 2018, I was given this case in order to locate and contact the victims' family regarding the habeas case pending in federal court, and, in particular, the death penalty aspect of that case.

2. On December 13, 2018, I contacted David Hart a/k/a "Tony" (to his family and friends). Mr. Hart is one of the siblings of Bradley Hart, one of the two decedents

in this case. I explained to Mr. Hart that this case was in federal habeas proceedings and that our office was reviewing the death penalty phase of the case. I inquired as to Mr. Hart's position on death penalty relief. Mr. Hart stated that he did not feel a certain way about the death penalty, but was adamant that defendant not be released. I confirmed with Mr. Hart that his mother and father had passed away in 2012 and asked him to provide me with contact information for anyone else in his family who he thought may want to know about the possible case status change. Mr. Hart stated he would talk to his sister, brother, his brother-in-law (Ferne's brother) and his niece, Lisa (daughter of decedents Bradley and Ferne) and would provide them with my contact information. Mr. Hart stated that Ferne's brother, Michael Allen, is an attorney in the Bahamas and also stated that his niece, Lisa, who has her own children now, was visiting the family in Bahamas. I sent a follow-up email to Mr. Hart confirming our conversation and invited his other family members to contact me. (A copy of my email to Mr. Hart is attached here.)

3. On January 23, 2019, I spoke with Mr. Hart and advised him that the office intended to agree to death penalty relief in the defendant's pending habeas case. I informed Mr. Hart that, if death penalty relief was granted, the defendant would be serving a sentence of life without parole. I informed Mr. Hart that eventually there would most likely be a re-sentencing hearing. Mr. Hart stated that both he and his brother would like to attend the re-sentencing hearing. I told Mr. Hart I would keep him informed him of the date when I received it.

4. On April 4, 2019, I spoke with Mr. Hart (I returned his call as he had left me a voicemail) regarding the re-sentencing hearing. I informed Mr. Hart that any re-sentencing hearing would be a ways off and explained that the federal court had refused to accept the parties' agreement that defendant is entitled to penalty phase relief, indicated that it intended to hold an evidentiary hearing, and asked the parties to file briefs on that issue. I further informed Mr. Hart that briefs were filed on April 3, 2019. I told him I would keep him posted. Mr. Hart stated that he will be away a lot due to missionary travel to Uganda in June, India in November, and Jamaica in December and asked that, if/when the Court decides to conduct a hearing, we should keep his travel schedule in mind.

5. On July 3, 2019, I spoke with Mr. Hart to explain that this case was still held up in the courts. Mr. Hart informed me that the AG's office had reached out to him and his family and that the AG's office had told him that if the defendant received death penalty relief, it was more likely he would be released. Mr. Hart stated that both Michael Allen and Lisa are opposed to any such relief. I told Mr. Hart that I was unsure of what the outcome of this case would be, but I was sure that death

penalty relief did not mean that the defendant would be released. I told Mr. Hart I would keep him posted moving forward.

6. After my July 3rd correspondence with Mr. Hart, I never received any phone calls or correspondence from any other family member nor did Mr. Hart provide me with their views regarding death penalty relief for the defendant.

Heather Wames, Victim/Witness Coordinator
Law Division, Philadelphia District Attorney's Office

Date: 7/31/19

Sworn to and subscribed before me this 31st day of July 20 19.

Susan Hackett

Commonwealth of Pennsylvania - Notary Seal
SUSAN HACKETT, Notary Public
Philadelphia County
My Commission Expires June 16, 2022
Commission Number 1064744

# Commonwealth v. Robert Wharton

Heather Wames

Thu 12/13/2018 10:30 AM

To: tonyhartsprint@gmail.com <tonyhartsprint@gmail.com>;

Hello David,
It was a pleasure speaking with you today. As discussed, our office is currently reviewing the death penalty phase of the above-mentioned matter. If we decide to remove the death penalty the defendant will be serving life without parole. As we move forward I will keep you apprised of the decision and if/when a re-sentencing hearing will occur. Please provide my contact information to your siblings as well as Bradley & Ferne's daughter. If they have any questions or just simply want to give their input, let them know that I would be happy to assist in any way I can. The same goes for you, David. If you have any questions or I can be of any assistance in this matter, please do not hesitate to contact me.
Regards,
Heather

**Heather Wames**
Victims/Witness Coordinator - Law Division
Philadelphia District Attorney's Office
3 South Penn Square
Philadelphia, Pennsylvania 19107
heather.wames@phila.gov
215-686-5768

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

--------------------------------x

ROBERT WHARTON, : 2:01-cv-06049-MSG
v. :
DONALD VAUGHN, ET AL, :
:
:

--------------------------------x

TRIAL

DATE: Tuesday, March 16th, 2021
TIME: 9:09 a.m.
BEFORE: Honorable Mitchell S. Goldberg
LOCATION: United States District Court of PA
Clerk's Office
601 Market Street
Philadelphia, PA 19106-1732
JOB No.: 4509137

A P P E A R A N C E S

ON BEHALF OF PETITIONER:
ELIZABETH MCHUGH, ESQUIRE
CLAUDIA VANWYK, ESQUIRE
Federal Public Defender's Office
601 Walnut Street, Suite 545 West
Philadelphia, Pennsylvania 19106

ON BEHALF OF RESPONDENT:
PAUL GEORGE, ESQUIRE (VIA VIDEO)
NANCY WINKELMAN, ESQUIRE
Philadelphia District
Attorney's Office
3 Scott Penn Square
Philadelphia, Pennsylvania 19107

JAMES BARKER, ESQUIRE
CARI L. MAHLER, ESQUIRE
Pennsylvania Attorney General's Office
16th Floor
Strawberry Square
Harrisburg, Pennsylvania 17120

C O N T E N T S


| OPENING STATEMENT | | | | PAGE |
|---|---|---|---|---|
| None. | | | | |

| WITNESS: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| JOHN O'BRIEN | | | | |
| By Ms. McHugh | | 6 | | |
| By Mr. George | | 64 | | |
| By Mr. Barker | | | 74 | |
| By Ms. McHugh | | | | 80 |
| LISA HART | | | | |
| By Ms. Mahler | 86 | | | |
| By Mr. George | | 96 | | |
| By Ms. McHugh | | 100 | | |
| CARLOS VEGA | | | | |
| By Ms. Mahler | 102 | | | |
| By Ms. McHugh | | 112 | | |
| By Ms. Mahler | | | 128 | |
| PATRICE CARR | | | | |
| By Ms. Mahler | 131 | | | |
| By Mr. George | | 141 | | |
| DANIEL HAYES (VIA VIDEO) | | | | |
| By Ms. Mahler | 149 | | | |
| By Ms. McHugh | | 167 | | |

| WITNESS: | DX | CX | RDX | RCX |
|---|---|---|---|---|
| By Mr. George | | 174 | | |
| GEORGE H. CONRAD (VIA TELEPHONE) | | | | |
| By Ms. Mahler | 184 | | | |
| By Ms. McHugh | | 207 | | |
| MICHAEL ALLEN (VIA VIDEO) | | | | |
| By Ms. Mahler | 218 | | | |
| By Mr. George | | 226 | | |
| By Ms. Mahler | | | 229 | |

E X H I B I T S

| EXHIBIT | DESCRIPTION | MARKED | ADMITTED |
|---|---|---|---|
| 40 | Layout of City Hall/Floor 2 | 118 | 118 |

P R O C E E D I N G S

THE CLERK: All rise. The court is now open, Judge Mitchell S. Goldberg presiding.

THE COURT: Good morning. Just get me a second to get settled. Have a seat. He's here. You can hold on to this. You can just have him (inaudible).

All right. This is a continuation of the Wharton habeas matter. Just to keep everything straight, it looks like everyone is ready to go. I appreciate all the logistical work.

Mr. Barker and Ms. Mahler are here for the Attorney General's Office. Good morning.

MR. BARKER: Good morning, Your Honor.

MS. MAHLER: Good morning, Your Honor.

THE COURT: Ms. McHugh and Ms. Vanwyk for Mr. Wharton. Good morning.

MS. MCHUGH: Good morning, Your Honor.

MS. VANWYK: Good morning, Your Honor.

THE COURT: Mr. George, I see you by video. Yes?

MR. GEORGE: Yes.

THE COURT: Good morning. Ms. Winkelman, good morning. You're here for the DA's office?

MS. WINKELMAN: Yes, Your Honor.

THE COURT: The witness, Mr. O'Brien -- Dr. O'Brien, excuse me, is here. And Mr. Wharton is on video, I believe at SEI Phoenix. Mr. Wharton, can you hear and see us?

MR. WHARTON: Yes, I can.

THE COURT: Okay. Before we start, I had asked counsel for Mr. Wharton whether they wanted to press Mr. Wharton's pro se motion for a recusal and they said they would get back to me. Do you want to discuss that now, or do you want to table that?

MS. MCHUGH: Could we -- yeah. If we could take a break and --

THE COURT: Sure.

MS. MCHUGH: -- we'll discuss it later? I had forgotten that, Your Honor.

THE COURT: No problem. Just let's not forget, because it's docketed. All right?

MS. MCHUGH: I understand.

THE COURT: Okay. Are you ready to continue with your cross?

MS. MCHUGH: Yes, I am.

THE COURT: Go ahead.

CROSS EXAMINATION

BY MS. MCHUGH:

Q Dr. O'Brien, good morning.

A Good morning.
Q When we left off last week, we -- I believe we were discussing Mr. Wharton's time in the disciplinary custody from May of '89. And --
A I'm sorry? Time in disciplinary custody? Okay.
Q Yes. From May of '89 to November of '89?
A Yes.
Q Okay. And if you -- I believe I left up there the other -- the exhibits that you were working with last week, plus a couple of more. And let me know when you have Exhibit 4, Volume 4 in front of you.
A Volume 4? Okay.
Q Okay. Turning to page 951 of Volume 4.
A August 2, '89?
Q Correct.
A Okay.
Q And this is a PRC report for August 2nd of '89?
A Yes.
Q Okay. And in the middle paragraph it states that the PRC was noted that he was moved to DC close, meaning DC custody, and that his disciplinary time runs to 11/23/89. Do you see that?

A Yes, I did.
Q Okay. Turning to Page 954,
A November 1, 1989?
Q Right. And that is a PRC report from November 1st of '89?
A Yes, it is.
Q Okay. And in the second paragraph, or the last paragraph on that page, it says, "In view of the Department of Corrections policy as it relates to capital case, and since Mr. Wharton has been making a positive adjustment free of misconduct, he will be moved to AC Max status. So you understand that to mean that he was moved up disciplinary status?
A That's what it says, yes.
Q Okay. And on November 1st of '89, that was three weeks prior to the expiration of his disciplinary custody?
A I forgot the date.
Q 11/23.
A Okay.
Q Okay. So they were a few weeks before he was due to expire on disciplinary custody they gave him back to AC status?
A That's correct.
Q Okay. And you don't have that notation of

his good behavior being rewarded in that way in your report?

A No. My reports are not that specific. And I documented his positive adjustment in my first report.

Q Okay. But in terms of the positive adjustment that you noted, you don't have this particular piece of positive?

A No. As I said, my report is not that detailed, otherwise it would be far more voluminous.

Q And you did not testify to this last week?

A Test to what -- testify?

Q You did not testify that you considered this piece of positive adjustment in your conclusion?

A Not specifically, but I did consider it.

Q Okay. And turning to your first report, if you would?

A Sure.

Q I believe that's Attorney General Exhibit 1, Page 5. And at the top of the page you note that the records -- meaning the DOC records -- document ongoing serous behavioral transgression consistent with surreptitious future planning while portraying himself as polite, pleasant, and well-adjusted. Okay.

A Yeah.

Q Anything that you saw in the -- was there any

notation in any of the DOC records that you reviewed where the DOC personnel labeled Mr. Wharton an ongoing serious behavioral transgression? Did they describe him in that manner?
A No. Not in that manner.
Q Okay.
A It was my reference, or my language, pertaining to the 1989 misconduct.
Q Okay. So when you said the records document an ongoing serious behavioral transgression, that's your interpretation of the record?
A That's my language.
Q Okay. And same with consistent with surreptitious future planning. There's no concerns mentioned in the Department of Corrections records that Mr. Wharton -- that they're concerned with Mr. Wharton engaging in surreptitious future planning? That's not noted in any of the DOC documents?
A Not specifically. However, the 1989 misconducts are identified as serious.
Q Right. But do they use the word surreptitious future planning? That's --
A No. Again, that's my language.
Q -- from you? That's your language?
A Yes.

Q And then you --the rest of that sentence you say, "While portraying himself as polite, pleasant, and well-adjusted."
A Which is what I documented on the preceding page to have been his description in his records prior to those misconducts.
Q And I take it from the way that's written, you're -- at the top of Page 5 -- that you're concluding based on your review of the records that his -- that the documented behavior of Mr. Wharton being polite, pleasant, and well-adjusted is insincere?
A No. It's not my interpretation at all. It's part of the documentation, as is the documentation about the misconduct. And the language on Page 5 is my language, it's my interpretation about it -- what it may reveal.
Q Well, when you say while portraying himself, you're not -- you're saying that you take at face value everything in the DOC records where they describe his behavior as positive, as his demeanor as polite, you're not quibbling with that?
A I can't quibble with that.
Q Okay. Because as you testified last week, they're in the best position to evaluate his conduct?

The DOC guards?

A Well, yes. Yes, to the extent that the misconducts in 1989 were surprising to them. Because they were -- they seemed to be out of character.

Q Well, where did they -- the RPC reports. Was there any documentation that members of the DOC were surprised by this?

A Not specifically in those terms.

Q Okay. Now turning to the misconducts that you've discussed in your direct - in your testimony. I want to draw your attention to that same report, the previous page. This is Exhibit 1, Page 4.

A I'm sorry, what -- I'm confused.

Q Your first report.

A Oh, I'm sorry. I thought you were referring to your exhibits.

Q No.

A Sorry, I'm confused. Sorry. Page 4?

Q Yeah, that's AG Exhibit.

A Okay.

THE COURT: Hey, Steve, just a bit -- a little lower on his volume? Just a smidge.

BY MS. MCHUGH:

Q At the top of Page 4, you noted that the discovery -- you're referring to the 1989 misconduct

of discover of a handcuff key and a piece of antenna. It says, the discovery of these materials in Mr. Wharton's cell was, "Described in the prison records as a very serious misconduct in the context of his escape attempt during court transfer three years before."

Dr. O'Brien, there was no notation in the prison records, in any of the DOC records, that the PRC evaluated that misconduct along with the 1986 escape.

A Not specifically. My quotation is the -- around the words very serious.

Q Right.

A The rest of it is just merely my assessment of the factual underpinnings, or the history behind the 1989 misconduct.

Q Okay. So when it says it was described in the prison records as very serious in the context of his escape attempt, the latter part of that sentence if your evaluation of it?

A Yes.

Q Okay.

A And --

THE COURT: Could you remind me? PRC is an acronym for?

MS. MCHUGH: It's Program Review Committee.
THE COURT: Thank you. Go ahead.
BY MS. HUGH:
Q Now, with respect to the -- Mr. Wharton's conviction for escape from 1986, you testified, I believe, "You can't really say -- I can't really say what the facts were, but the documentation suggested advanced planning. That it was no opportunistic." Do you recall that testimony?
A Yes. And I agree with it still.
Q Okay. And when you say you can't say what the facts were, is that because the news accounts you reviewed gave conflicting accounts of what happened?
A No. It's the type of information that is not documented in a way to indicate that it's factual.
Q Okay. So you're referring to the Daily New article and the Inquirer article?
A Yes. And the other material that I reviewed in reference to the escape attempt. Yes.
Q Okay. The other material that you reviewed, you did not review any interviews with the sheriffs who were involved in the incident?
A I did not.
Q You did not see a property receipt documenting any type of handcuff key recovered?

A I did not. I don't know if a property receipt would have been generated, but no, I did not.
Q Okay. You did not review any testimony from the sheriffs or anybody involved in the incident?
A I believe he pled guilty, so no. I did not.
Q Okay. But no testimony from the preliminary hearing?
A I did not see that, no.
Q Okay. And so your conclusion that there was advanced planning was based on what facts?
A It was suggestive of advanced planning, it's not a conclusion that there was.
Q Well, you testified that you were struck by the fact that it was not opportunistic and that it suggested advanced planning. So you're not sure about that?
A Of course not.
Q Okay. And that's because you don't have enough information to make that conclusion?
A Yes. And also the nature of the sources of information. Yes.
Q Okay. Are somewhat unreliable?
A No, not necessarily but you take them at face value. I didn't assume they were factual.
Q Okay. Well, did you -- let me ask you this

question, did you notice that there was a discrepancy in the accounts between the Inquirer and the Daily News?

A Not specifically, no.

Q Okay. But the article -- okay. You also testified that he is shifting responsibility -- meaning Mr. Wharton -- for the consequences of the outcome of the escape onto somebody else, and that's a pattern that he has of not being responsible. Do you recall that testimony?

A It would have been testimony related to the representation of that in Dr. Blumberg's report. That escape. It wasn't from the material I reviewed regarding the escape.

Q Okay. So he pled guilty to the escape charge, right?

A Yes, that's correct.

Q He accepted responsibility for what he did?

A In that sense, yes.

Q And you saw that he pled guilty to escape and that the charge of implements of escape and simple assault were nolle prossed by the Commonwealth?

A Yes.

Q Okay. You also testified that you were struck by -- or I think you put this in your first

report specifically, that the possession of the handcuff key in 1989 that was recovered from his cell was behavior strikingly similar to his 1986 escape attempt. Do you remember that testimony?

A Yes. Assuming that the possession of the handcuff key was factual earlier on.

Q All right. And the striking similarity between these two incidents is a handcuff key, right?

A Yes.

Q There's no pushing -- Mr. Wharton wasn't involved in 1989 in pushing a sheriff's - or a corrections officer. Right?

A Not that -- no. Not that I saw.

Q There's no indication that the entire time that Mr. Wharton is in the Department of Corrections that he made any attempt to escape the facility .

A Not during that time, except for the 1989 misconducts which suggest that he may have been planning it.

Q Did you see any -- or strike that. There's no evidence that Mr. Wharton ever used the handcuff key that was found in his cell.

A No. Not that I saw.

Q Okay. When you were discussing the misconducts last week, you said that he accepts

responsibility for none of them.
A This was from Dr. Blumberg's second report.
Q Well, that -- this is from --
A And his notes.
Q -- your testimony. Page 24. You said --
THE COURT: Don’t talk over each other.
THE WITNESS: Okay. Sorry.
THE COURT: It's okay.
BY MS. HUGH:
Q On Page 24 of your -- of the transcript from last week, you said the he does not accept responsibility for any of his misconducts.
A Based upon Dr. Blumberg's second report and his notes.
Q Well, you reviewed the misconducts, right?
A I didn't find any of that material in misconducts. It was all from Dr. Blumberg's materials.
Q You didn't review the Attorney General's exhibits in this case?
A I did review the misconducts.
Q Okay.
A I already said that.
Q Okay. So in the AG Exhibit 21. If you could pull that up, please.

A AG Exhibit 21. Oh, sorry. I forget that I have all these exhibits here. Okay.
Q And the second page of that exhibit is the hearing examiner's report. Do you see that?
A Yes. This is pertaining to a misconduct in 1988.
Q Correct.
A Okay.
Q And that was the misconduct where he was given a reprimand and warning, along with 20-some other inmate because they refused to leave the yard or something. Do you see that, that's the first page.
A Yes.
Q Okay. And then on the second page it indicates that Mr. Wharton pled guilty.
A That's what it says.
Q Okay. So when you testified that he didn't accept responsibility for any of his misconducts, that would be one exception there.
A No. it was based upon Dr. Blumberg's information --
Q You're talking --
A -- gleaned from the defendant, or from Mr. Wharton.
Q Okay. But did you -- in 1988 when he got the

misconduct he pled guilty. We can agree on that?
A That's what it says.
Q Okay. Now, you also testified that you felt that the prolonged period of time that he was restricted from his TV and radio was important in assessing the seriousness of the 1989 misconducts.
A Yes. And it persisted longer than his disciplinary custody.
Q Correct. And on Page 3 of your first report, AG Exhibit 1, the bottom of -- the very last sentence of the third paragraph you state that he at no point demonstrated insight into the obvious reasons for his continued restriction.
A That's not -- they -- yes. That's what it says.
Q Okay.
A And that's based upon my review of the materials.
Q Right. And, in fact, in your second report, on Page 5 -- I'm just trying to find where it is on the page -- oh, I'm sorry. I'm in the first report. One second, Doctor. And it's about three-quarters of the way through that first paragraph, when you're discussing Ms. Lane [ph] and you say she does not reference his documented failure to demonstrate

insight into, or remorse for the behavior, or comprehension of the prolonged restrictions that resulted from it. And that's what you're referring to, is the denial of his TV and radio after the disciplinary hearing?

A Yes. The prolonged restrictions. Yes.

Q Okay. If you could take a look at Petitioner's Exhibit 4 --

A Petitioner's Exhibit --

Q Volume 4.

A Okay. Yes.

Q And Page 871.

A 12/6/84?

Q I believe that's 12/6/89.

A Oh, I'm sorry. Okay, yes. I'm sorry.

Q It's a little hard to read. It's a handwritten document by -- it's Official Inmate Grievance. Is that the page you have?

A Yes, and it's very hard to read.

Q Okay.

A Sorry.

Q And if you take a look at -- in the section where it says Statement of Grievance -- the one, two, three -- fourth line down. Mr. Wharton writes, "My privileges were suspended until November 12th of '89,

my DC status has ended." And he's asking for restoration of his privileges because his -- of his TV and radio privileges because his -- he believes that they're -- he's entitled to that based on his disciplinary status ending. Is that what you understand?

A Yes. And he refers to it as a blatant violation.

Q Of the ICU consent decree?

A Yes.

Q Okay. And in --

A That's not insight into it.

Q Turning to the next page, 872.

A Yes.

Q And this is the prison's response to his request?

A It appears to be, yes.

Q Okay. And taking a look at that long -- the big paragraph, it says -- starting with the sentence, "When an inmate is assigned." Do you see where I am?

A No. Where?

Q It's about --

A Oh, okay. It's about a third of the way down?

Q Five lines down?

A Yes.
Q "When an inmate is assigned to administrative custody status at the expiration of disciplinary custody time, he is not automatically provided with his radio and TV privileges and idle pay. That if and when those privileges are restored it's at the sole discretion of -- "
A I'm sorry. I'm missing it here.
Q Okay.
A Because it seems like you skipped something.
Q I don't think so.
A Oh, okay.
Q "If and when these privileges are restored." Do you see that?
A Okay. Yes.
Q "Is at the sole discretion of the Program Review Committee. The Program Review Committee generally requires an inmate to serve a reasonable period of time in Administrative Custody status before favorably considering restoration of radio, TV privileges, and idle pay." That's what they responded to Mr. Wharton.
A Yes.
Q Okay .
A And it must have been the Program Review

Committee that elected to keep those restrictions going.

Q And so from reading that document, it's a policy of the prison to require Mr. Wharton to behave well before they're going to -- they don't automatically give him back his TV privileges when the gets back to AC status. That's how you read that document? 87 --

A No. No, that's not how I read the document. It just obviously indicates that the Program Review Committee is the determiner.

Q Right. I understand that. But what I'm saying is that on the sentence before that it says, "When an inmate is assigned to Administrative Custody status, at the expiration of Disciplinary Custody time he is not automatically provided with the radio/TV privileges." Do you see that?

A I see that.

Q Okay. Now turning to - so basically they're saying the PRC is going to require you to have good behavior in order to get them back?

A That's not what it says.

THE COURT: Hold on. Hold on. Hold on. Let her answer the question. One second. Go ahead. What's the question?

BY MS. HUGH:
Q Okay. Turning --
MS. MCHUGH: I'm going to move on.
THE COURT: Okay.
BY MS. HUGH:
Q Turning to Page 955.
A Let's see, 12/6/89?
Q Correct. He asked for his radio and TV back, and they deny that. Correct?
A Program Review Committee? Yes.
Q Okay. Turning to the next page, January 10th of 1990.
A Yes.
Q Okay. And they say -- he asked for it again, and they say no. And they -- the counselor notes that he's maintained a problem-free adjustment. Do you see that in the first paragraph?
A Yes. They also note that Mr. Wharton refused to even discuss why he had pieces of aerial [ph] and two lengths of antenna.
Q Okay. And then turning to the next page, 2/7 of '90?
A Yes.
Q Okay. The counselor notes that there's no significant concerns or difficulties. Do you see

that?

A Yes. After noting that Mr. Wharton's major request deals with restoration of television privileges.

Q Right. And then on the following page, 958, on March 7th, that he's had routine conducts, the past month has been satisfactory, and that they restored his radio and TV privileges.

A Yes, that's true.

Q Okay.

A That's correct.

Q You didn't see any documentation in those prison records where the prison required -- the DOC required him to express remorse in order to restore the privileges?

A Only documentation that he refused to even discuss the misconducts.

Q I understand that. None of his misconducts in the records you reviewed involved assaulting a Department of Corrections employee?

A Not that I saw, no.

Q None of the misconducts involved threatening a Department of Corrections employee?

A Not that I saw, no.

Q No -- none of his misconducts involved

assaulting another inmate at the Department of Corrections?

A Not that I saw, no.

Q No of -- none of his misconduct involved threatening an inmate in the Department of Corrections?

A Not that I saw, no.

Q You saw in the records you reviewed that there were numerous times when Mr. Wharton, during this 1986 --

THE COURT: Excuse me one second. Sir? Sir, in the back? I'm sorry to bother you. You have to pull your mask up. Okay?

UNIDENTIFIED MALE: Okay.

THE COURT: Thank you. Go ahead.

BY MS. HUGH:

Q You testified that -- I'm sorry. I'm going to go back for a second. So you saw that there were numerous times when he left the institution to go to court between 1986 and 1992?

A There must have been. I didn't see specific documentation. I'm sure it exists. I didn't notice it, but --

Q Did you -- I'm sorry. Did you notice when they would reference that Mr. Wharton was ATA?

A Yes.
Q Okay.
A And there was also a documented misconduct, or grievance, rather, about him alleging that he was not permitted to go to court.
Q Okay.
THE COURT: What's ATA?
MS. MCHUGH: Authorized Temporary Absence. Okay.
BY MS. HUGH:
Q And you would agree with me, Doctor, that -- based on your experience, that there are some extra security concerns when an inmate travels and leaves the institution?
A Always, yes.
Q Okay. And you saw nothing in the records that there were any problems that during these multiple court trips that Mr. Wharton had any difficulties, or tried to escape, or was engaged in any misconducts during that.
A Not during, no. Just the misconducts of 1989 were suggestive of the possibility of planning something.
Q Okay. And you also said that the martial arts -- that when Mr. Wharton was practicing martial

arts that that was serious when you consider the -- when you consider it through the lens of the 1986 escape charge.

A Well, yes. In my opinion, it is.

Q Okay. And that was because -- let me ask you this question, Doctor. There was no evidence in the record your reviewed that Mr. Wharton was ever practicing martial arts outside of the exercise area. Right?

A Not that I saw, no.

Q Okay. And the exercise area that the inmates in RHU had at that time was actually a cage.

A I believe that's documented somewhere.

Q Okay. And so -- and that the misconduct involving the martial arts was him and another inmate inside this cage?

A Yes, as far as I can recollect. Yes.

Q And you would agree with me that part of his yearly reviews, the prison required him to continue with exercise. Right?

A I don't know if it was required or encouraged. I --

Q Encouraged. And he did comply with that.

A Well, he accepted and responded to the encouragement.

Q Okay. And if Mr. Wharton had been doing, you know, push-ups or any kind chin-ups in this stage would that also be considered dangerous in the lens of the escape?

A Apparently not, because it was never the basis of a misconduct.

Q All right. Now your -- you also reviewed as part of your -- as part of the DOC records a number of grievances that were filed by Mr. Wharton?

A Yes.

Q Okay. And grievances in the Department of Correction are a method for inmates to express a -- you know, a problem that they might be having, or a request that they might have. That's your understanding of the grievance process?

A Yes.

Q Okay. And there's a lot of forms that you have to fill out when you file a grievance.

A I don't know if there's a large number. There are forms.

Q Okay. And you saw that Mr. Wharton filled those forms out routinely throughout his time at the Department of Corrections?

A Well, I wouldn't call it routinely. He did fill out forms.

Q Okay.
A When he had something he wanted to draw attention to.
Q And on those forms they tell you -- they tell the inmate you have to try to work this out first, and note on the form what you -- what steps you took to work it out before you filed the grievance. You noticed that, right?
A I can't tell you what's written on the form with specificity. It seems to be my recollection, but I'd have to refer to a form.
Q All right. And would you agree with me that Mr. Wharton's use of the grievance process was him showing that he's abiding by the rules of the institution?
A In terms of the grievances? Yes.
Q Okay. And you would -- so you would agree with Dr. Blumberg that his use of a grievance process demonstrates a willingness to utilize appropriate methods for resolving difficulties.
A Yes.
Q Okay. The alternate being the inmate may act out when they're -- when they have a problem. Right?
A That's one potential alternative, yes.
Q And you didn't see any evidence of Mr.

Wharton acting out? He expressed his problems through the grievance process.

A Except for the grievance about the group -- whatever it was -- misconduct of not -- not basically responding to directives.

Q Okay. And that was the one he pled guilty to?

A Yes.

Q All right. And Doctor, you -- from your experience you know that, although the RHU is a restrictive environment within the prison setting, that there is certainly an opportunity for inmates to get into trouble at the RHU. Right?

A I suppose, yes.

Q All right.

A Perhaps less so than in general population, but yes.

Q Okay. But you -- an inmate, even if handcuffed, can spit at a Department of Correction employee. Right?

A That's correct. Unless there's a barrier in place.

Q Okay. And they can -- and you've often seen cases where inmates have thrown urine and feces at guards and staff members?

A Yes.

THE COURT: Is it -- Ms. McHugh, is it your position that Trial Attorney Cannon [ph] was deficient in his representation because he didn't introduce to the death penalty jury that Mr. Wharton didn't spit at prison guards?

MS. MCHUGH: No, Your Honor. What I'm responding to is the Attorney General's arguments that Mr. Wharton's positive conduct during these six years was somehow lessened by the fact that he was in RHU.

THE COURT: Okay.

BY MS. HUGH:

Q And, Doctor, your review of the mental health reports indicated -- from the DOC indicated that Mr. Wharton did not suffer from any major mental illness during that time period?

A During that time period. Apparently he was treated for anxiety and depression later, which is documented in Dr. Blumberg's notes.

Q Mm-hmm. And so your final opinion with respect to Mr. Wharton's adjustment to prison was that you had no basis to conclude that he made a good adjustment because halfway through this six year period he engaged in behavior that harkened back to the behavior that appears to have been part and parcel

of his escape attempt in 1986.
A Yes. It would be difficult for me to not represent a balanced inquiry into Mr. Wharton's history, as well as his behavior in prison, without considering the 1989 misconducts and the context of the earlier escape attempt.
Q Understood. You're going to include them in your evaluation. Right?
A Yes.
Q Okay.
A Unlike Dr. Blumberg or Dr. Carter [ph].
Q Okay. And you called that opinion, and despite the fact that you didn't include in your report or in your testimony there was -- other than the two serious misconducts, numerous references by the PRC that Mr. Wharton was adjusting positively. Right?
A Yes. Which makes me even more concerned about the 1989 misconduct.
Q Okay. But -- and you find -- you hold that conclusion despite considering all the times the Mr. Wharton utilized the grievance process to resolve his difficulties in the prison.
THE COURT: You've covered that, for sure.
MS. MCHUGH: Okay.

BY MS. HUGH:

Q Dr. O'Brien, if you were called to testify in 1992 at his sentencing hearing, and you were asked the question whether Mr. Wharton met the diagnostic criteria for anti-social personality disorder, your answer to that question would be no. Correct?

A No. My answer would be that he does have most of the -- or fulfills most of the criteria. Callous disregard for in violation of the rights of others, failure to conform to social norms regarding lawful behaviors, deceitfulness, aggressiveness, irresponsibility, lack of remorse, reckless disregard for the safety of others, but it is unclear and not well-established whether or not he had symptoms before the age of 15.

Q Okay. So the diagnosis of anti-social personality disorder under the DSM3R requires one to find that the individual had a demonstrated conduct disorder with onset prior to the age of 15.

A Just like the current criteria require evidence of misbehavior before the age of 15. Yes.

Q And in 1992, and today, your testimony is that you do not have enough evidence to find a conduct disorder?

A No, I do not.

Q Okay. And without being able to diagnose that conduct disorder, you cannot find that Mr. Wharton meets the diagnostic criteria for the antisocial personality disorder?
A That's correct.
Q All right.
A Only identify anti-social personality traits.
Q And what you were referring to earlier is the anti-social traits that you've identified. Right?
A I just said so, yes.
Q Okay. And the antisocial traits are part of that diagnosis. Right?
A Well, they serve as a portion of what's required to arrive at an anti-social personality diagnosis.
Q Okay. And you -- so you agree with Dr. Blumberg that there is not evidence of a conduct disorder with onset prior to age 15?
A I agree. No clear evidence.
Q All right. Now the anti-social traits that you've referred to are not a major mental illness. They're not a mental health disorder recognized in the DSM?
A Not in terms of diagnosis.
Q Okay.

A But they are relevant because they can serve -- as all maladaptive personality traits can -- as major issues for the individual and cause problems for them and for those around them.

Q Okay. But my question was whether or not you could -- whether or not anti-social traits alone are a diagnosable mental health disorder.

A I think that's been asked and answered.

Q Oh -- well, I think that's not your --

THE COURT: Well, it -- or that's -- I'll determine that.

THE WITNESS: Okay.

THE COURT: And it has -- and I agree with the witness. It has been asked and answered. He answered, as I heard it, traits are not -- individual traits are different than diagnosis.

MS. MCHUGH: Okay.

THE COURT: Is that what you're saying?

THE WITNESS: Yes.

THE COURT: Okay. Next question.

BY MS. HUGH:

Q Now, despite the fact that you didn't find the conduct -- or that you cannot diagnose the conduct disorder, you did discuss in your direct testimony that you reviewed education records of Mr. Wharton.

A I did. That was prior to completion of my second report.

Q All right. And I just want to make this clear. Those schools records, despite what your conclusions were for them, they are not sufficient evidence for the conduct disorder. Right?

A In my opinion, they aren't. They suggest conduct difficulties in the first, second, third, fourth, and fifth grade. And then document a reduction in his attendance and academic performance in junior high and high school.

Q All right. And you -- let's see. I'm not going to go through all of these educational records with you, Doctor, but I would like to have you take a look at your second report.

A Sure.

THE COURT: What years are you going to go through education-wise, Ms. McHugh?

MS. MCHUGH: I just have a question about something in his report. I'm not sure of the year just --

THE COURT: Okay.

MS. MCHUGH: -- right off the top of my heard. Okay.

BY MS. HUGH:

Q And I'm referring to --
A Page 2, perhaps?
Q Page 2, about halfway through that first paragraph you state, "As early as the first grade Mr. Wharton was described as appearing to 'Enjoy being a rough guy,' and 'always seems to be getting into scrapes.'" Do you see that?
A Yes, I do.
Q Okay. I would like to just have you look at the school records. That's Volume 9.
A (Inaudible)?
Q I believe you have that up there. Pardon me. And just take a look at the third block -- I'm sorry, Page 4412.
A Some of these pages are not paginated.
THE COURT: Take your time.
BY MS. HUGH:
Q It's PE4412.
A Okay.
Q Okay, and the third block down I think is where you're getting that quote from. And you say it seems -- he seems to enjoy being a rough guy. That's where the sentence starts?
A Yes. That's the block that those quotes were taken from.

Q Okay. And the actual sentence reads, "He seems to enjoy being a rough guy with some of his buddies. And they always seem to be getting into scrapes." Is that what that says?

A Yes.

Q Okay. And you also testified that there were numerous conferences between the school and his parents. What grade were you referring to when you said that?

A I'd have to -- I don't recall which grade, or grades. I just recall that it was referenced more than once or twice, and so I'd have to go through the records to find the specific notations. Perhaps you can help me.

THE COURT: Well --

MS. MCHUGH: I've looked through the records, Doctor, and I --

THE COURT: Well, hold on.

MS. MCHUGH: -- don't see anything about a conference.

THE COURT: Okay.

MS. MCHUGH: So that's why I'm asking you. Because you --

THE COURT: Well, I'm asking you, Ms. McHugh, what grade are we talking about here?

MS. MCHUGH: Well, I can't tell you that, Your Honor. Because Dr. O'Brien has testified that there were numerous conferences, and I've gone through the school records and I'm trying to find where that is.

THE COURT: Okay. So --

THE WITNESS: I can try to find it in my notes. A record.

MS. MCHUGH: And I'm just asking him if he has a page number.

THE COURT: It's okay. So I'm losing the thread again, Ms. McHugh, as to how --

MS. MCHUGH: Okay.

THE COURT: I'm just asking a question, so hold on. Let me ask my question, please. How a conference in school, and whether that was first grade, second grade, or fifth grade, I don't -- I'm not following the point you're trying to make as to how that pertains to whether trial counsel was ineffective for failure to present positive prison adjustment. Which is the directive we all have from the 3rd Circuit. How is this relevant?

MS. MCHUGH: I don't think it's relevant. The --

THE COURT: Then why are you asking the

question?

MS. MCHUGH: -- Attorney General's Office has raised it, and he has testified as to observations he made of the education record.

THE COURT: Yeah, but I said the same thing to the Attorney General's Office. I believe. If my memory is right. Like what is this -- we're --

MS. MCHUGH: Right. I --

THE COURT: I think this is very off-point. So I'll allow you to continue, but I'm not following why this is at all relevant.

MS. MCHUGH: Okay.

THE COURT: Go ahead.

BY MS. HUGH:

Q Doctor, there's no evidence of Mr. Wharton being expelled in the school records?

A No, not that I saw.

Q And there's no evidence of repeated suspensions in school?

A No.

Q Okay. And --

A And as I testified, he doesn't clearly have a conduct disorder.

Q Got you. You also noted that Mr. Wharton may not have been disciplined in the same manner because

his mom was home and school president. Right?

A Dr. Blumberg documented that she was home and school president, and I did note that he was subject to -- and I was not able to find them, but I could if I looked -- to disciplinary conferences with the family. And I wasn't sure if that had an influence or not.

Q Okay. So you say this may have influenced the manner in which his disciplinary problems were handled, and the degree to which he was subject to the disciplinary action. That was in your second report?

A Yes, and --

THE COURT: In school?

MS. MCHUGH: Okay.

THE WITNESS: Yes.

THE COURT: You're talking about school again, right?

MS. MCHUGH: Yeah, just --

THE WITNESS: And that --

MS. MCHUGH: I only have a few more questions, Your Honor.

THE WITNESS: And, again, that's may. I don't know if it did or not.

BY MS. HUGH:

Q Okay. So you have no information -- you

have no basis for that? You're speculating?
A I'm saying may have. Yes.
Q Now the anti-social traits that you discussed, they are -- if I understand your direct testimony correctly, that they are based primarily on Mr. Wharton's criminal record?
A Yes. And the --
Q All right.
A -- details of the various criminal cases.
Q All right. And you described Mr. Wharton's criminal history as lengthy.
A It's lengthy in terms of the number of different infractions .
Q All right. Well, his first arrest is in 1983 and the last is 1986.
A That's correct. And there is indication in the records that he had a pattern of giving people gifts of things that he had stolen.
Q All right. Well, so from 1983 to -- 1983 is his first arrest. Right?
A Yes.
Q All right. There's no juvenile arrests?
A Not that I saw documented, no.
Q All right. Now you testified on direct examination that people with anti-social traits can

present at planners who are able to keep their behavior under control. And I think you said that this applied to Mr. Wharton. Is that right?

A Well, it's my opinion that his clinical presentation once in custody is consistent with that, and in -- if one considers the escape attempt and the 1989 misconduct it certainly is suggestive that that is the pattern. Frequently the actual presentation -- clinical presentation -- of anti-social personality disorder is influenced by concurrent diagnosis. Such as Attention Deficit Hyperactivity Disorder. He has none of those.

Q Okay.

A So he doesn't have any impulsive features based upon concurrent diagnoses.

Q So when you say that he flies under the radar, is it your opinion that Mr. Wharton has been flying under the radar for the last 32 years?

A Well, the other thing is that I've seen on multiple occasions in my work individuals who meet the diagnostic criteria historically and on testing of anti-social personality disorder who have flown under the radar for lengthy periods of time. So yes, it's my opinion that that is possible.

Q And you're aware that Mr. Wharton has had no

misconducts in the last 32 years?

MR. BARKER: Objection, that's outside the time frame, Your Honor.

THE COURT: it is. I'll allow it. Answer the question.

THE WITNESS: I have no knowledge, because I did not review any records -- Correctional records -- after 1992.

MS. MCHUGH: Okay.

BY MS. HUGH:

Q Now, just -- you reviewed some pre-sentence reports, I think you testified in your direct examination, regarding Mr. Wharton?

A Yes. There was one report that was adopted into later -- or adopted in connection with later charges that really was not modified after the original report was formulated.

Q And if I could ask you to take a look at 35P, that's the AG's Exhibit 35P.

A Oh, I'm sorry. Thanks for -- 35. Okay.

Q I believe that's the letter. I'll just double-check.

A I have one subsection 35, so it's in that subsection?

Q Yes. I believe they're -- that each page is

lettered consecutively --

A Oh, I see that.

Q -- with the alphabet.

A Sorry about that. Okay.

Q And this is the preset -- you have that page?

A Yes, I do.

Q Okay. And turning to 35S --

A I'm sorry? Another section?

Q The whole report is from 35P to 35S, right?

A Oh, okay. I'm sorry.

Q I'm just asking if that's the presentence report you're referring to.

A Let me look. Yes, it is. Yes, it is. Sorry.

Q Okay. And you testified that the -- that presentence report documented, "A well-established pattern of anti-social behavior on behalf of Mr. Wharton."

A Yes. It's on Page 4 at the bottom.

Q Okay. And that report is authored by a Deborah Dunn [ph], do you see that?

A Yes. An Investigator for the --

Q Okay. She's not a mental health professional, is that right?

A No.

Q Okay. She's an employee of the probation department?
A Yes. I don't know what her educational background is.
Q You also noted -- and I'm referring to your second report, Page 4.
A Okay. Okay.
Q That was your -- at the top paragraph, or the first paragraph, is your discussion of that presentence report, and you noted that in the presentence report that Mr. Wharton had reported working as a carpenter. Do you see that?
A Well, actually, the subsection refers to all the records from the Philadelphia Probation Department, and that included psychiatric evaluation report and the pre-sentence report. And so you're on Page 4, and where are you?
Q The middle of the first paragraph. He reported having worked as a carpenter?
A Yes.
Q Okay. And then you commented that even though other materials reflect that his employment was terminated as a result of poor work performance.
A Yes, and he report to the probation officer that he had been laid off.

Q Okay. And your note -- that's your notation that this was conflicting with his -- with other accounts that he had been terminated as a result of poor work performance?

A Yes.

Q Okay. And you reviewed the notes of testimony from the second sentencing, the December 1992 transcript?

A I'm not sure that I did. Did I document that I did?

Q You did.

A Okay. Well, I don't recollect specifics from it, so.

Q Okay. So you don't recall that his employer in the carpentry business testified that he was not dismissed due to poor performance? You don't remember that?

THE COURT: What does - what does that question have to do with the issue that's before us, Ms. McHugh?

MS. MCHUGH: Well, because first of all it's in his report, and secondly because work history is relevant to ASPD. So.

THE COURT: What's ASPD?

MS. MCHUGH: The anti-social personality

disorder.

THE WITNESS: Which he doesn't have.

THE COURT: I'm talking to Ms. McHugh.

THE WITNESS: Sorry.

THE COURT: So, and all this connects -- you're talking about work history, even though we're talking about positive adjustment to prison?

MS. MCHUGH: Well, for starters, I would say, Your Honor, that, number one, it's something that he represented in his report as a fact that's not accurate.

THE COURT: Yeah, but -- but everything he says in his report doesn't connect to the issue that's in front -- that's we're dealing with here.

MS. MCHUGH: Well --

THE COURT: So please focus on what the 3rd Circuit has directed us to focus on. Please continue.

MS. MCHUGH: I'm just going to clarify.

BY MS. HUGH:

Q Doctor, you don't recall that testimony?

A No, but I did see other documentation about termination. And the documentation discrepancies would be similar to the documentation about his having graduated or not from high school.

Q Well, actually, he told Dr. Blumberg that he

-- that he finished the 12th grade. You recall -- that's what you're talking about?
A He finished school in 1981.
Q Okay. So he did finish the 12th grade, he just didn't have enough credits to graduate?
A Yes. He's also documented elsewhere -- and I think possibly even to the probation officer -- to have graduated from high school.
Q So this information -- to answer the Court's question -- is significant to you because you feel that there's inconsistencies in his account of what happened. Right?
A Potentially so, yes.
Q Okay. And when you noted that he stated that he was laid off, you said that there was other information that it was because of poor work performance, and therefore he wasn't telling the truth. Right?
A No. Not that he wasn't telling the truth. That there are variations in the documentation, and it's --
Q Okay. And --
A -- hard to know what the -- where reality lies when an individual is representing themselves variably.

Q So the testimony of his employer that he was not laid off for poor performance would not be sufficient for you?
A No. And I do recollect that --
Q Okay.
A -- that the material suggested he was removed from jobs because of poor work performance.
Q Okay. Now you've testified that anti-social personality disorder is irrelevant to prison adjustment.
A It can be, but as I already testified, individuals with that diagnosis on testing and historically can behave perfectly fine.
Q Okay. So I just want to make sure I’m clarifying your opinion that it's irrelevant to whether he made a good adjustment to prison in your opinion?
A It is a factor to consider. It is irrelevant when it's irrelevant.
Q I don't know what you mean by that. You --
A When there's no --
Q It's a fact to consider, but it's irrelevant?
A Yes. Because it -- if there's no manifestation of it on a day-to-day basis, then it doesn't have relevance to the person's adjustment.

Q Okay. So when you were discussing the ability to predict, you said even the -- you were talking about Dr. Blumberg, and you said even the structured instruments that are used to assess risk of future violence and dangerousness look at a wide array of different variables that have been identified in studies to be relevant to the risk of future misbehavior.

A Yes, and that includes all past behavior.

Q Okay. So forensic mental health assessments can evaluate a future risk for violence?

A They present information that is suggestive. It's not definitive.

Q Well, when someone is asking in a clinical setting to do risk assessment for future violence there's certain risk factors that you would take into account. Correct?

A Yes. There are risk factors and protective factors, and you include consideration of all behavior because past behavior is the best single predictor for future behavior.

Q All right. And it's true that a history of a major mental health disorder is an increase for the risk of violence?

A It can be. It depends on what type of

disorder.
Q Okay. But there's no -- Mr. Wharton doesn't have any history of major mental disorder?
A Not until recently, and he was treated.
Q Okay. Well, you don't know -- you didn't read those records, so you have no information about what that was about?
A I read about that in Dr. Blumberg's materials. His notes and his second report.
Q And substance abuse would also be a risk -- history of substance abuse would be a risk factor?
A It is one risk factor, yes.
Q Okay. There's no history of substance abuse from Mr. Wharton?
A No. Not that I saw documented.
Q There is also -- a risk factor is early violence -- exposure -- or early violence by the -- by the person?
A Yes. That can be a risk factor.
Q Okay. And you have no information on that?
A I didn't see any documentation on that.
Q Okay. Relationship instability is also a risk factor.
A It can be, yes. And it can --
Q Okay. And --

A -- span different relationships, not just family relationships.

Q And there was no information that you reviewed that Mr. Wharton had any history of relationship instability?

A Not that I saw. Other than the documentation of his -- a friend of his, presumably a girlfriend -- not presumably, I think she was represented as a girlfriend reporting that he was giving her stolen good.

Q Okay. But is that relationship instability?

A It can lead to it, sure.

Q Okay. Employment instability? You had no information on that, except for what we've previously discussed?

A Conflictual information, or conflicted information.

Q All right. And anti-social personality disorder is a -- if you are diagnosed with that, that can be a risk factor?

A As can traits.

Q Okay. He does not have that?

A He does have traits, in my opinion.

Q All right. Well, does the risk factor include traits?

A Yes.
Q All right. Adverse childhood experiences. That's also a risk factor?
A It can be, yes.
Q You didn't have any information that Mr. Wharton had those?
A No. I thought that -- like many times -- the family's testimony was compelling and potentially influential in terms of the determination of what was to be done.
Q Trauma and victimization of an individual is also a risk factor for future violence?
A Can be.
Q All right. There was no indication of that here?
A Not that I saw.
Q You would consider all of these when you're saying that this -- these risk factors that Mr. Wharton does not -- that you did not see. Those would be considered pertinent negatives in a violence risk assessment. Correct?
A Yes. But the behavior associated with his offensive would be very significant positives, and also the escape attempt and the misconduct in 1989. Misconducts.

Q And so when you say that the single most valid predictor of future behavior is past behavior, that would --

A Past -- Ms. --

Q That would include his -- I've not finished my question.

A Okay.

Q That would include the crimes as well as his behavior in prison. Right?

A It would include the crimes. We're talking about the worst possibly scenario.

Q Okay. Well, when you say the past behavior, the past behavior that you would have had in 1992 was both his criminal record -- right?

A Right.

Q And his adjustment to prison up to that point. Right?

A Yes. But you would have to conclude consideration of all past behavior. And then past behavior I'm talking about, when you're talking about risk assessment of dangerousness or violence, you're specifically looking at prior behavior of dangerousness or violence. And that is the best predictor of future behavior.

Q Okay, but my question is very simple. I'm

asking you whether when you're looking at his prior behavior you're looking at his behavior prior to when he arrives in prison -- right? The crimes that you've discussed.

A Yes.

Q Is that correct?

A Yes.

Q Okay. And his prior behavior during the time that he's in custody is also a behavior that you're considering?

A That's why you do the risk assessment and you look at different categories, yes.

Q All right. So you have to -- and that would include his positive adjustment in prison, as well as his negative adjustment.

A Yes, in order --

THE COURT: Yes. Yes, yes, yes, He's considered both. Right?

THE WITNESS: Yes. In order to do a balanced inquiry you have to have, or include, consideration of both.

BY MS. HUGH:

Q All right. And, in fact, you criticized Dr. Blumberg and you testified that you were struck because Dr. Blumberg doesn't mention the escape

attempt, or any similarity between it and his -- meaning Mr. Wharton's -- later misconduct, and there's no discussion of the offense. Do you recall that testimony?

A Yes. And it's consistent with his testimony about his very narrow window of consideration.

Q All right. And I believe in that testimony you were referring to Mr. Wharton -- or, excuse, me, Dr. Blumberg's first report. That there was no discussion of -- and I'll read the testimony to you. Maybe that will be easier. Maybe I won't. I don't have that page in front of me. But you recall that you were concerned because he didn't discuss the escape and the offense, meaning the homicide case?

A Yes, and hence it was not a balanced inquiry.

Q And in fact, you went on to testify that the absence of serious consideration of aspects of the offense itself, as well as the track from the point of view of other criminal acts he had participated in, as well as the escape attempt undercut or, in my opinion, potentially challenge the validity or accuracy of his conclusions. That was your assessment of Dr. Blumberg's opinion?

A Yes.

Q Okay. Now I've asked you to take a look at -

- I believe you have up there Dr. Blumberg's report dated -- I believe it's June of 2020?
A Five of 2020. Yes.
Q If you can just give me a minute to pull that out. I believe it's dated June 5th of 2020, and that's Petitioner's Exhibit 13. Page 3?
A Yes.
Q Okay. And taking a look at that Page 3, the second paragraph. The last sentence. Dr. Blumberg notes that Mr. Wharton and others burglarized the Hart residence twice, and burglarized the Hart's church in September of 1983. Do you see that?
A Where on that page is it? I'm sorry.
Q Second paragraph.
A Yes.
Q Okay. So he mentions his prior history of burglaries.
A Yes.
Q And then the next paragraph is his summary of the homicide offense. Right?
A yes.
Q All right. And then the one, two -- I think it's the fourth paragraph he discusses the April 21st, 2986 escape conviction and the facts surrounding that.
A Yes. In fact -- the fact that he'd been

found guilty, yes.

Q And then in that next paragraph he discusses the misconducts from 1989.

A Yes. And in his conclusions he excludes consideration of those.

Q Well --

A Focusing on prison adjustment between 1986 and 1992.

Q Well, I'll get to his conclusions in a minute.

A Okay.

Q But I'm asking you about your testimony where you said you were struck that he didn't mention in that first report the escape attempt, or any similarity between it and his later misconduct, and that there's no discussion of the offense?

THE COURT: Is your point to say that Dr. Blumberg did mention these things in his report? Is that your point, Ms. McHugh?

MS. MCHUGH: Dr. Blumberg did mention them in his report.

THE COURT: Did. I said did.

MS. MCHUGH: He testified that he did not.

THE COURT: Okay. They're in the report. You've read them.

MS. MCHUGH: Okay.
THE WITNESS: I misspoke.
BY MS. HUGH:
Q And you were here, Doctor, when Dr. Blumberg testified on cross-examination that he was well aware of what happened with the escape, and that he viewed that as a potential risk factor in doing his assessment. You were here for that testimony?
A Yes, I was.
Q Okay. And you were also here for his testimony that the 1989 misconduct, that the prison viewed it as a potential for escaping again, so it was of concern. Do you recall that testimony?
A Not specifically, but I wouldn't be surprised if he said that.
Q Okay. And you also recall that he testified that the offense behavior -- meaning the homicide - increases the risk for violence. Do you recall that?
A I don't recall that.
Q All right. And you recall that he testified that, "I took all of the evidence of the case involving the Harts into consideration." Do you recall that testimony?
A No, I don't.
Q Okay. Do you recall his testimony, that, "I

assume that the Corrections description of the misconducts were accurate." Do you recall that testimony?

A Not specifically.

Q All right. And you said, "I disagree with Dr. Blumberg because he chose to take a narrow view.

A I do disagree with a narrow view.

Q Okay. You disagree in the ultimate conclusion about his adjustment. Right?

A His conclusion about having made a positive adjustment between 1986 and 1992.

Q Okay. But you would agree with me, based on the testimony that I just summarized for you, that Dr. Blumberg did consider all of those negative factors?

A Apparently.

Q Okay. I have no further questions. Thank you.

THE COURT: Okay. So where we were was this witness was called by the AG. Mr. Barker, you did the direct, is that right?

MR. BARKER: Yes, Your Honor.

THE COURT: Okay. So cross -- Mr. George, do you have any questions? Do you or Ms. --

MR. GEORGE: Yes.

THE COURT: -- Winkelman?

MR. GEORGE: Yes.

CROSS EXAMINATION

BY MR. GEORGE:

Q Sir, you've testified that you did not see any records after 1992. Is that correct?

A No prison records.

Q Well, I would like to ask you to imagine a hypothetical situation where a Defendant has all of this Defendant's prior history up until 1992, and who for then the following 28 years or so his adjustment in the prison is unremarkable and free of significant disciplinary activity.

THE COURT: Hold on. I'm having trouble hearing you. So you were describing your hypothetical. Is there any way you can make yourself a little more -- your audible more clear, Mr. George? I can't hear you. Try it again, please.

MR. GEORGE: All right. I'm going to speak slowly in the hopes that it's clearer.

THE COURT: Thank you.

BY MR. GEORGE:

Q I asked you to imagine a Defendant with all of this Defendant's prior history up until 1992. And to imagine that for the next 28 years his disciplinary record in the prison is unremarkable. He has no

significant misconduct. In such a case, if the jury in 1992 was told that his prognosis for good prison adjustment in the future was poor, that prediction would have been false. Isn't that correct?

MR. BARKER: Your Honor, once again I would object to this consideration of the time period after 1992. And the prediction is not necessarily false under those circumstances. The risk is still there.

THE COURT: I think it's a -- I think I'll allow the answer, but I -- and I'll think about it. But right now, as I hear the question, I don't know how much weight, if any, it deserves. But I haven't heard the answer. So, do you understand the question?

THE WITNESS: Yes.

THE COURT: Answer, please.

THE WITNESS: I would not render an opinion that it was false. I would, by necessity, indicate that the opinion was contradicted potentially, arguably, by the subsequent behavior.

BY MR. GEORGE:

Q And in that situation, if an expert had told the jury in 1992 that the man would be unlikely to adjust well over the ensuing 28 years, then the Commonwealth would have been able to ask for the death penalty on the basis of an opinion that turned out to

be contradicted by the fact. Isn't that correct?

MR. BARKER: Once again, I would object to the question.

THE COURT: That's -- I think that's -- there's woo many irrelevant hypotheticals. The objection is sustained.

MR. GEORGE: Your Honor, I'd ask to be allowed to make a record about why I think that is an appropriate question.

THE COURT: Go ahead.

MR. GEORGE: Because the idea, apparently, is that if the Defense had presented an expert to give a confident prognosis then the Commonwealth would have been able to call someone such as this expert to contradict it. And I think that it should be a matter of record that if that expert had been called, and if they had predicted that this man's behavior would be bad, based on his past behavior, that prediction would have been inaccurate and the jury would have been asked to return a death penalty on the basis of that inaccurate prediction.

THE COURT: The objection is sustained.

BY MR. GEORGE:

Q Did you ever ask the see the 1990 -- post-1992 prison records of this man?

A I did not know that the issues pertained to anything other than the interval of time up until 1992.

THE COURT: So the answer is no?

THE WITNESS: No.

BY MR. GEORGE:

Q Were you interested in whether or not the prediction based on past behavior as of 1992 would have been accurate?

A I was at --

MR. BARKER: Your Honor --

THE WITNESS: I'm sorry.

MR. BARKER: Your Honor, I would object. I don't think the Doctor's interests are really relevant to this.

THE COURT: You can answer.

THE WITNESS: I was asked to express opinions about whether or not the documentation I reviewed reflected a balanced inquiry. And that has basically been my opinion, and the basis for my subsequent inquiry into and review of records, and subsequent opinions.

BY MR. GEORGE:

Q So you were not interested. Is -- that would be the answer to my question?

A My -- it was not a question of interest. My focus was whether or not the inquiry and the documentation provided in connection with the prison adjustment was balanced. And in my opinion it wasn't.

Q Are you troubled by the fact that any prediction of poor prognosis in the future would have been inaccurate?

MR. BARKER: Your Honor, I object again. His interest, and his troubling, and all of this is really not relevant to the question before the Court.

THE COURT: The objection is sustained.

BY MR. GEORGE:

Q And you would agree that many people who have had anti-social personality diagnoses have adjusted well in prison, despite poor behavior up until their incarceration.

A I have seen that happen. Yes.

Q And you would agree that often it happens as the individual ages in the prison setting. Isn't that correct?

A That question pertains to the observed basically clinical course of anti-social personality, which is frequently associated with an attenuation of the severity of the symptoms and their manifestations with age. I would not associate a person who's anti-

social, or has anti-social personality traits and yet can exhibit good behavior as an individual who would necessarily even exhibit that attenuation because they're already able to control the manifestations.

Q And since they can control it, then their behavior in the prison setting would have been good behavior. For whatever reason. Correct?

A Not predictably so, but it could be.

Q And as 28 years went by, and the person has not revealed their true nature over that period of time, you would say that that person had adjusted well to the prison setting. Would you not?

MR. BARKER: Objection again, Your Honor.

THE COURT: Sustained. We're not going to be talking about anything past 1992, and the second hearing. That's not what the 3rd Circuit directed us to do. Sustained.

MR. GEORGE: Well, I think the 3rd Circuit has asked us to assess the value of the kind of predications that this expert would be presenting to the jury in 1992, and the value of those predictions are certainly, it would seem to be it would be relevant whether or not those predictions proved to be valid.

THE COURT: The objection is sustained.

BY MR. GEORGE:
Q Doctor --
THE COURT: I'm sorry ?
MR. GEORGE: -- are you talking about --
THE COURT: Oh, go ahead. I'm sorry.
BY MR. GEORGE:
Q When you're talking about an individual who is going to be serving a life sentence, or a lengthy sentence of any kind, sometimes that person's past behavior turns out to be no predictor at all with respect to their future prison adjustment. Isn't that correct?
A Many individuals who have difficulty controlling their behavior do better in structured settings. And so that those individuals would be expected to -- if they actually had that kind of -- or exhibited -- or experienced that kind of effect from a structured setting, would --
THE COURT: I'm sorry to interrupt. I think his question is your testimony is past behavior is a good predictor of future behavior, but that doesn't always prove to be true. Mr. George, is that your question?
MR. GEORGE: Yes. And with particular reference to the prison setting.

THE COURT: Okay.

MR. GEORGE: Which is what it's talking about here, and whether or not --

THE COURT: Of course.

MR. GEORGE: -- an expert would have reliably predicted good behavior for this individual in the prison setting.

THE COURT: In the prison setting, of course. Could you answer that question, please, Doctor?

THE WITNESS: Yes. It's a complicated assessment. It doesn't change the inclusion and consideration of past behavior, or the fact that past behavior -- dangerous or aggressive behavior -- is the best predictor of future behavior. Everybody who enters custody reacts to the structure differently, and some adapt to it well. And, as I indicated already, there are people that fulfil the diagnostic criteria of an anti-social personality disorder historically and in terms of up to date testing, who are able to behave themselves in prison. That is not predictable, in terms of which category an individual at the time of evaluation falls into.

THE COURT: But just so it's clear, there are exceptions to the -- your premise that past behavior is the best predictor. Right?

THE WITNESS: Yes. In the sense that --
THE COURT: Okay.
THE WITNESS: -- the behavior may never be manifest again, because of the circumstances --
THE COURT: Okay.
THE WITNESS: -- the individual's in.
THE COURT: I think he's answered your question, Mr. George.
BY MR. GEORGE:
Q Oh, I have -- I think that it's most accurate to say that those people are the exception, because it happens routinely in the prison setting Isn't that true, Doc?
MR. BARKER: Argumentative, Your Honor.
THE COURT: Well, could you rephrase it, and --
MR. GEORGE: He --
THE COURT: Hold on. There's an objection, I'd like to rule on it. I'm just asking you to rephrase your question, Mr. George. Could you do that, please?
BY MR. GEORGE:
Q It's not an exception that somebody who has exhibited violent behavior in the past adjusts well to prison. It happens on a routine basis, based on your

experience in the criminal justice setting.

A Is that a question?

THE COURT: It's -- yeah. Do you not understand his question?

THE WITNESS: No, I do understand it. It sounded like a statement to me. The fact of the matter is that one cannot predict how an individual is going to respond to time in custody. My experience with this in a more illustrative context is my experience with juvenile offenders, and how some do very well, and even report struggling to do well, in structured settings. And then offend quickly after they're released. So the issue of whether or not an individual has demonstrated sustained benefit from structured placement is very, very difficult, if not impossible, to predict.

MR. GEORGE: I have no more questions.

THE COURT: Okay. So we've had a very thorough examination of Dr. O'Brien. I'm a little reluctant to start a new round of questioning through re-direct. But if there's something you want -- the AG wants clarified, that they need clarification, with the understanding we're certainly not going to re-do everything he said. Is there any questions the AG wants to ask?

MR. BARKER: Your Honor, I just have a couple of questions.

THE COURT: Go on.

MR. BARKER: I'll keep this brief.

THE COURT: Okay.

RE-DIRECT EXAMINATION

BY MR. BARKER:

Q Doctor, you were cross-examined at length about the PRC reports. Do you recall that?

A Yes.

Q One of the questions had to do with your estimate of Mr. Wharton not appearing for 60 percent of those meetings. Do you recall that?

A Yes.

Q Now, of the 72 meetings, he didn't attend 43. By my math, that's 59.72 percent. Is that consistent with your assessment of the 60 percent?

A That would have been the source of my assessment.

Q And of the 29 where he was present on -- I believe it was five occasions, but I think we can add a sixth where Mr. Wharton simply appeared and said he was appealing his misconducts. So that would leave us with 23 times he appeared and asked for things. Does that sound right?

A I didn't do that math, but it --
Q Okay.
A It certainly sounds reasonable.
Q Is that consistent with your pattern that he would appear when he had something to ask for?
A Yes. But as I testified, that's not atypical.
Q Right . Now, you were also asked -- about Page 4 of your first report -- and I'm looking at the full -- I guess it's the first paragraph there where you said, "The PRC meeting documentation indicates that Mr. Wharton would attend the meetings when he had complaints or specific requests." So that's -- do you see that?
A And is that -- where in that paragraph is that? Just so --
Q It's about three or four sentences down.
A Okay.
Q It's right after your 60 percent estimate.
A Okay. Yes.
Q Did you state the obverse that he would only attend when he had things to ask for?
A No.
Q You were asked about the comments within those reports where the PRC said that Mr. Wharton was

conversant with them. Does that sound familiar ?
A Yes. I forgot if -- how many times they used that term, but yes. Communicative with them. Sure.
Q Okay. Was he conversant about his misconducts?
A Yes. I guess. Go ahead.
Q With the Program Review Committee?
A Well, he would -- I saw documentation -- a variety of documentation about his willingness to communicate about his conduct.
Q Was he willing to explain himself to the Program Review Committee?
A Well, with specific reference to the 1989 misconducts, no. He was not.
Q You were asked today about the escape and the news reports, compared to whether or not there was an official interview of the Deputy Sheriffs that were involved in the escape. Do you recall talking about that?
A Yes, I was.
Q Did you noted in the news reports that one of the people interviewed was a Deputy Sheriff that was involved?
A Yes.
MS. MCHUGH: Object. It's not clear from the

--

THE COURT: Did he -- the question is did you note in the news report that one of the people interviewed was a Deputy Sheriff?

THE WITNESS: I believe that that was the case.

THE COURT: Okay.

THE WITNESS: In terms of how it was written.

THE COURT: I would have overruled the objection anyway. So he answered it.

BY MR. BARKER:

Q You were asked also about exercise today, and whether or not Mr. Wharton was encouraged to do that.

A Yes.

Q Was he encouraged to engage in martial arts, that you are aware of based on the records?

A Apparently not.

Q Now, the behavior prior to being incarcerated, the two probably most serious offenses would be the murder charges that we're talking about today, as well as the Progdo [ph] home invasion robbery. Does that sound familiar?

A Yes. But there were a variety of robberies, but yes.

Q Now does the fact that Mr. Wharton and his co-conspirators gained control of those situations affect your analysis of his future dangerousness? In other words, if he gained control in the prison would we have potential for different behavior?

MS. MCHUGH: I'll object to that question.

THE COURT: What do you mean, gain control? Do you mean like with the Harts where he bound them in duct tape? Is that what you mean by --

MR. BARKER: Correct. And he --

THE COURT: -- gained control?

MR. BARKER: And he did the same thing with the Progdo's as well.

THE COURT: All right. And with that definition of gained control, your question is what, Mr. Barker?

MR. BARKER: If he were to gain control of a situation within the prison would we be looking at a higher risk of violent behavior?

THE COURT: Okay. What's the basis of your objection?

MS. MCHUGH: The objection is two-fold. One, it's speculative, because there's no evidence in this Court that Mr. Wharton ever did any of those things. And for 28 years hasn't done those things. So --

THE COURT: In prison?
MS. MCHUGH: -- it's speculating as to that.
THE COURT: Okay. Yeah.
MS. MCHUGH: Secondly, it's -- he's asking about what he did with his co-defendants, and this is a hearing about Mr. Wharton . And so to discuss those two things together is convoluting the question .
THE COURT: Okay. I hear what you're saying. Speculation is part of an opinion. The objection is overruled. You can answer.
THE WITNESS: I would not be able to rule out the possibility that if he were given the opportunity to be in control he would make different decisions and behave differently than he does on a day-to-day basis when that control is in place. I would have concerns about that, but I wouldn't really be able to give a predication to any reasonable degree of certainty.
BY MR. BARKER:
Q You were also asked about this -- the prognosis, I guess is the word that was used. Does that happen routinely in both psychiatric situations in medical experts where a prognosis is not really fulfilled?
A I think in many instances, as a forensic expert, one is not predicting with certainty future

events. One is expressing an opinion about the issues that are germane to the situation at hand. And frequently there is -- I have had occasions where I've had longitudinal involvement in a case. But in the majority of cases, the involvement is related to that specific issue, those specific proceedings.

And so I really am not, in my experience, had the opportunity to follow the individual defendant for a lengthy period of time in order to develop a sense of prognosis. And usually prognosis isn't really part of the original opinion to begin with. A prediction of dangerousness is merely considering the various factors, and rendering an opinion . And it's not -- again, it's not an opinion that has the weight of factual information.

MR. BARKER: No other questions, Your Honor.

THE COURT: Ms. McHugh, anything else?

MS. MCHUGH: I do have a very brief follow-up.

RE-CROSS EXAMINATION

BY MS. MCHUGH:

Q Doctor O'Brien, you would agree that in 1992 that the literature widely held that violent behavior decreases significantly after the age of 40?

A You'd have -- I don't know that literature in

terms of being able to quote it with reliability. And I don't know, in many instances in the scientific literature, if you look at a variety of different article there's a spectrum or a range. And so I would not be in a position to affirm that.

Q Okay. So you don't know that to be true?

A No.

Q All right. And you said that the prediction of future behavior is -- I believe your testimony was it's the weight of fact that informs the decision. That you have to weigh facts. Is that what you said?

A No.

Q Okay.

A I don't -- I hope I didn't.

Q I -- so -- but you did have a number of -- there were a number of facts that you can weigh as of 1992 regarding Mr. Wharton to make that assessment?

A Factors to consider in arriving at an opinion about risk of future dangerous behavior.

MS. MCHUGH: Okay. I have no further questions, thank you.

THE COURT: Mr. George, anything else?

MR. GEORGE: No.

THE COURT: I'm sorry, did you say no? I can't hear you.

MR. GEORGE: No, I have no more questions.
THE COURT: Okay. Thank you, Doctor.
THE WITNESS: Thank you, Your Honor.
THE COURT: So let's take a break. It's 10:30, until 10:45. And who's going to be the next witness? Who do we have?
THE CLERK: Lisa Hart, Your Honor. Lisa Hart Newman [ph].
THE COURT: Lisa Hart? Okay. 10:45.
MS. MCHUGH: Your Honor, we're -- can we please speak to Mr. Wharton?
THE COURT: Yes.
MS. MCHUGH: Okay. That's --
THE COURT: I mean, we'll do the same procedures.
MS. MCHUGH: Thank you.
MR. BARKER: Thank you. Thank you, Your Honor.
(A break was taken.)
THE COURT: Okay. Next witness.
MS. MCHUGH: Your Honor, before the next witness, I'd just like to --
THE COURT: Speak up a little bit?
MS. MCHUGH: I'd like to place on the record a few things about the testimony of the victim's

family members, and elaborate --

THE COURT: Yeah. Didn't we -- I'm going to let you talk, of course, but didn't we talk about this before?

MS. MCHUGH: We had briefed it in a couple of prior pleadings, yes. I want to elaborate a little bit on the reasons why certain aspects of the testimony are constitutionally inadmissible. Under the Constitution, characterizations and opinions about the crime the Defendant is sentenced are not permissible, even if some victim impact testimony is allowed.

THE COURT: Yeah. I think I --

MS. MCHUGH: And --

THE COURT: I think I said before -- I'm reserving my right to change my mind, but my impression is that the -- and this is going to be -- the first family member is Lisa Hart. Right?

MS. MCHUGH: Yes, Your Honor.

THE COURT: Who is the seven-month-old who was left?

MS. MCHUGH: Yes. Yes.

THE COURT: Yeah. I think --

MS. MCHUGH: So --

THE COURT: I think I said it before, but

it's probable -- reserving my right to change my mind -- that this testimony, the victim-impact testimony, or testimony regarding the family being consulted probably doesn't fit into the Strickland analysis. So we'll --

MS. MCHUGH: Yes.

THE COURT: I want to sort all this out later, but go ahead. I'm sorry.

MS. MCHUGH: Oh, okay. That's our global position. I just wanted to make clear --

THE COURT: Understood.

MS. MCHUGH: -- a piece of our position has to do with the constitutional limitations, even when some testimony is allowed and aspects of the statements we've received include characterizations about the fairness of the trial, about the appropriate sentence and characterizations of Mr. Wharton. So even if the Court puts aside all the other reasons we've itemized, that part of the testimony should not be allowed because it would not be permitted under the Constitution.

And then, of course, as we've enumerated before, it's irrelevant under Federal Law of Evidence 401, it wouldn't have been admissible by statute in Pennsylvania in 1992. Categorically, when the statute

changed it did not apply to crimes committed previously, and it's not the kind of input that's contemplated under the Crime Victim's Rights Act under the federal statute.

THE COURT: I'm looking at some cases. I've seen cases that say even in the 2254 where you're talking about a penalty issue, which we're talking about here, there is precedent that says the victims have a right to be heard. Do you agree with that?

MS. MCHUGH: I agree if it concerns sentencing. I don't know whether it would concern a Strickland analysis.

THE COURT: Okay.

MS. MCHUGH: Thank you.

THE COURT: Your position is preserved. Thank you.

MS. MCHUGH: Thank you.

MR. GEORGE: And I would join that.

THE COURT: Noted. The DA's office is -- their position calling for the exclusion of Lisa Hart to testify is noted. Anything else, Mr. George?

MR. GEORGE: No.

THE COURT: Call the witness.

MS. MAHLER: Your Honor, the Office of Attorney General calls Lisa Hart Newman, who is

present in the courtroom.

THE COURT: Okay. Take -- can you -- are you comfortable taking the witness stand?

THE WITNESS: Yes.

MS. MAHLER: Can she come this way, Your Honor?

THE COURT: Sure.

MS. MAHLER: Thank you.

THE CLERK: Could you please raise your right hand?

LISA HART NEWMAN, WITNESS, SWORN

THE CLERK: And could you please state your name?

THE WITNESS: Lisa Hart Newman.

THE CLERK: Thank you. You can have a seat.

THE COURT: Ms. Hart, you seem very soft-spoken, so try to keep your voice up. Okay?

THE WITNESS: Okay.

THE COURT: Okay, thank you.

MS. MAHLER: May I, Your Honor?

THE COURT: Go ahead. Sure.

DIRECT EXAMINATION

BY MS. MAHLER:

Q Ms. Hart Newman? Can you hear me okay from here?

A Yes.
Q Okay. How have you held yourself out over the many -- last many years? By name?
A Lisa Hart Newman.
Q And how old are you today?
A Thirty-seven.
Q How were Ferne Allen and Bradley Hart related to you?
A They were my parents.
Q And I correct that around January, February of 1984, around that time period, you were seven to eight months old when Robert Wharton murdered your parents.
A Yes.
Q You were present in the family home when the murders occurred?
A Yes.
Q And after the murders you were left alone in the unheated home until your grandfather discovered you days later?
A Yes.
Q So you were the sole surviving victim of Wharton's crimes against you and your parents.
A Yes.
Q Tony Hart -- am I correct that Tony Hart is

your uncle on you father's side?
A Yes.
Q And Patrice Carr is your aunt on your father's side?
A Yes.
Q And Sharon Thomas [ph] is your aunt on your father's side?
A Yes.
Q And Michael Allen is your uncle on your mother's side?
A Yes.
Q As the surviving victim in this case, and as the daughter of the two murdered victims, did you ever tell the Philadelphia District Attorney's Office at any point over the last two decades that you did not want to be contacted about any developments in this case?
A No, I did not.
Q Did you ever tell the Philadelphia District Attorney's Office at any point over the last two decades that your uncle, Tony Hart, had been designated at the Hart-Allen family representative, or contact person, for any issue pertaining to the Wharton matter?
A No, I did not.

Q Prior to February 6th, 2019 where were you living?
A Dallas, Texas.
Q Prior to February 2019 did you identify yourself as, or hold yourself out as, Lisa Hart Newman?
A Yes.
Q So in other words, you weren't living under an alias?
A No.
Q Prior to February 6th, 2019, did anyone from the Philadelphia District Attorney's Office every contact you in any way -- by phone, email, or letter -- to discuss the status of this case?
A No.
Q So to your knowledge, for the last two decades while you were an adult, nothing had happened that could possibly change the status of Robert Warton's two death sentences in this case.
A No.
Q AT some point after February 6th, 2019 did you learn that the District Attorney's Office had done something to try to change the status of the two death sentences for Robert Wharton in this case?
A Yes.

Q And do you recall when you learned that?
A Around May, maybe, of 2019.
Q Okay. How did you feel when you learned that the Philadelphia District Attorney's Office had done something to try to change the status of the two death sentences in this case?
A Confused about what was happening. Hurt. Outraged. As though everything that I've experienced over these last 37 years, being a direct victim of this crime, as though I'm insignificant. As I had no idea what was going on. And by the time I even found out what was going on it was as though, well, it's already done, and there's nothing you can do about it. There's -- you don't matter, essentially.
Q Okay. And I think you just said that, but when you learned that this had occurred, that something had been done to try to change the two death sentences in this case, did you believe that there was anything that you could do at that point to try and change it?
A No.
Q If the Philadelphia District Attorney's Office had contacted you about its desire to vacate the two death sentences in this case for Robert Wharton, what if anything would you have said in

response?

A Please don't do this. I don't in any way agree with the position that you've taken in this matter, and as a victim I feel like that should matter. Everything that I've gone through, the effects of the consequences of his actions can in no way be lessened for me. Why is he able to lessen his consequences? None of the effects can ever be lessened. It's irreparable, the damage that was done.

Q Okay. At any point before February 6th, 2019 did you uncle, Dr. Tony Hart, tell you that the Philadelphia District Attorney's Office had reached out to him to discuss a possible change in the status of the death sentences?

A No.

Q Focusing on the time period of 2018 to February 6th, 2019, how much contact did you have with your uncle Tony Hart -- Dr. Tony Hart?

A One, maybe two phone calls.

Q Okay. So not a lot of contact during that time period?

A No.

MS. MAHLER: Your Honor, if I may, I'd like to show Ms. Hart Newman OAG Exhibit 32, which is the letter that she wrote to the Court.

THE COURT: Yes.

MS. MAHLER: May I approach?

THE COURT: Sure.

MS. MAHLER: Thank you.

BY MS. MAHLER:

Q Ms. Hart Newman, I'm showing you what's been identified as Office of Attorney General Exhibit 33. Can you please identify that?

A Yes. This is the letter that I wrote.

Q Okay. Is that your -- I think you signed it. Is that your signature on there as well?

A Yes.

Q Okay. And why did you write that letter?

A This was in response to learning that -- what the District Attorney's Office was doing, and that maybe now at this point we did possibly have a say. Or just at least trying to have a say.

Q Okay. So that was your opportunity to say how you felt about the whole situation. Is that fair?

A Yes.

Q Okay.

MS. MAHLER: With the Court's permission, if Ms. Hart Newman would like to maybe read her letter, Your Honor, into the record?

THE COURT: Yes.

BY MS. MAHLER:
Q Would you want to do that, Ms. Hart Newman?
A I think I can.
Q Okay. Okay.
A Okay. After speaking with my uncle, Tony Hart, I was made aware that changes were being proposed in Robert Wharton's sentencing. He had a meeting coming up with the Attorney General, and the plan was made to include me in it.
I was contacted by the Attorney General's Office on June 6th and made aware of the status of the case. I was extremely disappointed to learn of the District Attorney's stance, and very troubled that he implied that the family approved of his viewpoint. At no point was I contacted by the District Attorney, or anyone in his office, to ascertain what my views are. Seeing as I was also a victim in this tragedy, my opinion should have been sought and should carry weight.
At seven months old, after my parents had been murdered, I was left in a house where the heat had been intentionally turned off in hopes that I would die. I am the sole survivor of this tragedy, and I am alive despite his efforts. Every day I live with the effects of that horrific night. Who is he to demand

relief from his circumstances when I, the victim, can get no relief from mine?

Each milestone of my life, every occasion that is to be celebrated, is colored with the heartbreak of my parents not being here to share in it with me. And even the hard times are made harder by the reality that my parents are not here to render support.

As a parent myself now, I can only imagine that their final thoughts must have been when they realized that they were going to die. I know they must have been of me, as mine would be of my daughter. The older I get, the greater my understanding of their suffering grows. My grief intensifies instead of lessening.

The District Attorney's stance in this case is an affront to justice and has shown a total disregard for the life of my parents, my own life, and the impact that this would have on our family. The one high point in this entire situation has been the fact that justice was served when the verdict was rendered. I have held onto that from a child, and even more so as an adult. But now attempts are being made to undo justice. To take away the one positive thing that can be held onto in a tragedy like this.

Does a victim's life matter less the older the

case gets? Is it diminished by the perpetrator's want of a more comfortable existence? I sincerely hope not. It is my belief that Robert Wharton's death penalty should be carried out, or that otherwise he should remain on death row for the remainder of his natural life.

Q At any point after you gave this letter to the Office of Attorney General to present to the Court, did you hear from the Philadelphia District Attorney's Office about this case?

A No.

Q Ms. Hart Newman, is there anything else that you would like to tell Judge Goldberg about your position on vacating the death sentences in this case that you haven't already said?

MS. MAHLER: With His Honor's permission, of course.

THE COURT: Sure.

THE WITNESS: I believe that I summed it up really well in my letter how I feel, and especially that this was the one high point, the one bit of consolation in all of it. And I would ask -- I know you have to follow the laws and the rules, but I would ask that you not take that away from me.

MS. MAHLER: I have nothing further, Your

Honor. Thank you.

THE COURT: Does Mr. Wharton's counsel have any questions?

MS. MCHUGH: No, Your Honor.

THE COURT: Mr. George? Do you have any questions?

MR. GEORGE: Yes. Yes.

THE COURT: Go ahead.

CROSS-EXAMINATION

BY MR. GEORGE:

Q Ma'am, can you hear me all right?

A Yes, I can.

Q You are related to Tony Hart. Is that correct, ma'am?

A Yes.

Q Did he ever tell you that the District Attorney's Office had contacted him?

THE COURT: At what, Mr. George?

BY MR. GEORGE:

Q Did Tony Hart ever tell you, ma'am, that the District Attorney's Office had contacted him?

A In May of 2019.

Q Is that when he told you that the Attorney General contacted him? Or that the District Attorney had contacted him?

A They both came fairly close together.

Q Did Tony ever tell you that someone from the District Attorney's Office had left her email address and phone number and told Tony that anyone in the family who wanted to talk to her could use that contact information?

A No, he did not.

Q And -- so if that information was passed to him, there wouldn't have been any way for you to know about it if he did not tell you. Is that correct?

A Can you repeat the question? I'm sorry .

Q Yes, ma'am. No problem. If someone from the District Attorney's Office gave that information to him, and told him he could pass it on to other members of the Hart family, you wouldn't know that, would you? Unless he told you?

A That is true. But I would also expect that I should be contacted.

Q I don't have any other questions. Thank you, ma'am.

THE COURT: All right. I have a few, if that's okay?

THE WITNESS: Yeah, that's okay.

THE COURT: In your letter, in the first sentence, it says, "After speaking with my uncle, Tony

Hart, I was made aware that changes were being proposed in Robert Wharton's sentencing." Could you explain what your uncle, Tony Hart, said to you that made you think that?

THE WITNESS: So he was fairly unclear in what he even understood was going on. And so he's telling me that he was contacted and these -- they're trying to remove the death sentence somehow. But in his mind, he was also saying that it was already done is how it was presented to him.

There's nothing we can do, and this is the stance that they've taken, and they've moving ahead on this, and that's just the end of it. His -- apparently he would end up with a life sentence instead of a death sentence, and that just is what it is.

THE COURT: And when you say they've already decided, who is the they we're talking about?

THE WITNESS: Everything with the District Attorney's Office. So that would have been what he would have said to me.

THE COURT: Okay. Part of the submissions in the case is a letter from Tony Hart. And I want to make sure I have his -- his real name is David, right? But everyone calls him Tony?

THE WITNESS: Yes.

THE COURT: Okay. So we'll call him Tony. The letter says that he was contacted by Heather [ph] from the District Attorney's Office a couple of months ago. She -- I think Tony's letter means Heather -- "told me that Mr. Wharton had won an appeal, and that in order to avoid a new trial a plea deal was offered and accepted." And my question to you is did Tony Hart explain any of that to you?

THE WITNESS: No.

THE COURT: Okay.

THE WITNESS: No.

THE COURT: Did you get the impression from anybody -- either Mr. Hart or anyone else -- that Mr. Wharton had actually won his appeal?

THE WITNESS: No.

THE COURT: Okay. All right. And just give me one second. I think that's all the questions I have. I just want to review your letter. Just bear with me, please. Excuse me one second. Samantha [ph]? Okay, Ms. Hart. Sorry for your loss. That's all I have. Does anyone else have any other questions?

MS. MAHLER: I would like to just ask one question, Your Honor.

THE COURT: Sure, go ahead.

CROSS EXAMINATION

BY MS. MCHUGH:

Q Ms. Hart Newman, Judge Goldberg asked you about that sentence in your letter where you refer to a conversation with your uncle Tony. Do you recall that?

A Yes.

Q Can you state as best as you can when that conversation occurred? In terms of time?

A May. Sometime in May.

Q May 2019?

A Yes.

Q So that was after you had -- after he had told you that something had -- that the DA's office had done something to change the death sentences in this case?

A Yes.

Q Meaning that it had already been done?

A Yes.

Q Okay. Thank you.

THE COURT: Okay, thank you.

THE WITNESS: Do I take this? do I leave this?

THE COURT: Why don't you -- she can leave

that there, right?

MS. MAHLER: I can take it back from her, Your Honor.

THE COURT: Okay. Okay.

MS. MAHLER: If that's okay?

THE COURT: All right. Next witness, please.

MS. MAHLER: Your Honor, if I may step out to see if Mr. Vega is here?

THE COURT: Thank you.

MS. MCHUGH: Your Honor, I think for the record we should probably put that there was a proffer to stipulate, and we agreed to stipulate, but that was not acceptable to the AG.

THE COURT: As it relates to Mr. Vega?

MS. MCHUGH: Yes.

THE COURT: Okay.

MR. BARKER: Your Honor, just to complete that. There were limitations put on our stipulated facts that we just didn't think made sense.

THE COURT: Whatever the proposal was, my understanding is that an advocate is not obligated to accept the stipulation, but it's noted. Mr. Vega? The witness stand, sir.

THE CLERK: Good morning, sir. Would you please raise your right hand?

CARLOS VEGA, WITNESS, SWORN

THE CLERK: If you could please state your name.

THE WITNESS: Carlos Vega, V-E-G-A.

THE CLERK: Thank you. You can have a seat.

THE WITNESS: Good morning, Your Honor.

THE COURT: Good morning. Proceed.

MS. MAHLER: May I, Your Honor?

THE COURT: Thank you.

DIRECT EXAMINATION

BY MS. MAHLER:

Q Good afternoon, Mr. Vega.

A Good afternoon.

Q Back in April of 1986, where were you employed?

A I was in the major trials unit in the District Attorney's Office in Philadelphia.

Q At that point in time, how long had you been employed by the Philadelphia District Attorney's Office?

A I started PDOS [ph] in 1982.

Q Okay, so by that point four years?

A Right. I guess.

Q Okay. Okay. And you said in April of 1986 you were assigned to the major trial unit. Was that

also known as juries?

A At that time we called it juries.

Q Okay. Were you assigned to a particular courtroom?

A Yes. I was assigned in courtroom 225, Judge Lair [ph].

Q Judge Samuel Lair?

A Yes.

Q Okay. And that was City Hall, and the second floor of City Hall?

A Yes.

Q Okay. Were you assigned to a partner in that courtroom?

A Yes. A Robert Lavin [ph].

Q And how did that partnership work in Judge Lair's room?

A In that room we had all the cases, with the exception of rape cases. So we prepared all the lists for the month, or sometimes beyond that point. So we would take turns alternating what trials we did. So he was on trial one week, I would do the second one after him. So we would pick and choose which cases we were doing, and he was the senior DA, so I was learning from him.

Q Okay . And did you -- during the partnership

did you prep the cases together essentially?
A Yes.
Q Okay. And is Mr. Lavin alive today?
A No. He passed away.
Q Okay. I'd like to direct your attention to the date of April 21st, 1986. Were you assigned to Judge Lair's courtroom that day?
A Yes.
Q And was Mr. Lavin with you as well?
A yes.
Q Were you present in the courtroom when Robert Wharton was sentenced by Judge Lair in connection with the home invasion robbery case for which he had already been convicted?
A Yes.
Q Did you handle the sentencing that day?
A No, I did not.
Q Mr. Lavin handled the sentencing that day?
A Yes, he did.
Q Okay. While Mr. Lavin handled the sentencing that day, were you still familiar with the facts of the home invasion robbery case?
MS. MCHUGH: Object to the characterization of home invasion robbery. I don't think that would be admissible at the 1992 sentencing, so I'm going to ask

to strike references to the facts of that case.

THE COURT: Are you objecting -- I'm not sure what you're objecting to?

MS. MCHUGH: I'm objecting to she's referring to home invasion robbery, and my --

THE COURT: Okay.

MS. MCHUGH: -- objection is that that evidence would not be permissible at the sentencing court in 1992. The fact that he was there for a sentencing I agree with, I agree that it was on a case number whatever, but I don't agree that it would be admissible to the sentencing court what the facts of that sentence -- what the facts of that case were about.

THE COURT: Right. And here's why I'm not -- here's where I'm confused. You're saying that the facts of the sentencing of the home invasion wouldn't be admissible to the sentencing judge?

MS. MCHUGH: To the capital sentencing court. Mr. Wharton's capital sentencing.

THE COURT: Okay.

MS. MCHUGH: In other words --

THE COURT: Ah. Okay. I'm following you. So you're objecting that the facts of the home invasion robbery are not germane to this proceeding

because they would not go in front of the capital jury that imposed the death penalty?

MS. MCHUGH: Correct.

THE COURT: Okay. Are you going to go into the facts?

MS. MAHLER: No, Your Honor. That --

THE COURT: Okay. All right. Well --

MS. MAHLER: That was the only --

THE COURT: -- we're good. You're not going into the fact.

MS. MAHLER: I was just going to -- just ask him if --

MS. MCHUGH: So I would just ask to strike. I'm sorry. I would just ask to strike any references that have already been testified to.

MS. MAHLER: Well --

THE COURT: I don't think he gave any facts.

MS. MCHUGH: Well, home invasion robbery, I think is the --

THE COURT: Well, what does the docket sheet show he was convicted of and sentenced for?

MS. MAHLER: Robbery and conspiracy, Your Honor.

THE COURT: Okay. Let's just --

MS. MCHUGH: And our objection is

specifically --

THE COURT: Let's just -- excuse me. Let's just call it robbery.

MS. MAHLER: Okay. Okay.

MS. MCHUGH: And, again, Your Honor, I don't think that the charges that he was found guilty of would be admissible at the sentencing court.

THE COURT: Okay.

MS. MCHUGH: And so --

THE COURT: Just so we can get the -- to the point of, I think, Mr. Vega's testimony, we're going to agree to call it a robbery.

MS. MAHLER: Okay.

THE COURT: Continue.

MS. MAHLER: Thank you, Your Honor. I'll ask that question again, Your Honor.

BY MS. MAHLER:

Q Mr. Vega, while Mr. Lavin handled the sentencing, were you familiar with the facts of the robbery case, you know, being partners with Mr. Lavin?

A Yes. Because I prepared the case also with Mr. Lavin.

Q Okay. Okay. And having prepared the case with Mr. Lavin, were you also familiar with Mr. Wharton's criminal history up to that point?

A Yes, I was.
Q And how did you know about his criminal history?
A Well, when you receive a file you look -- in addition to looking at the file you look at the criminal abstract. I became aware the he had been convicted of a homicide. At which point we went up to the homicide floor and looked at the evidence in that case, just in case we could use evidence in that homicide in our trial.
Q Okay. And when you say you were -- you reviewed the homicide file, would that have included all of the physical evidence, the crime scene photos -- the whole file?
A I would have reviewed all the statements, as well as photographs. In terms of physical evidence -- for example, let's say clothing or a weapon -- that would not be at the DA's office. It would be held in City Hall in the evidence room.
Q Okay.
A So I would not have looked at physical evidence, only the photographs of those items.
Q Crime scene photos?
A Yes.
Q Did you see Robert Wharton in the courtroom

for sentencing on April 21st, 1986?
A Yes, I did.
Q And what did you observe when you saw him in the courtroom?
A He was -- as I recall, his left hand was in a sling, and he has something that either was a cast or an ACE bandage around it, and he was not handcuffed in the traditional manner of both hands behind the back. His left hand was free, since it was in a sling with some type of cast on it. His right hand was cuffed to what we call a waist belt. So his right hand would not be able to move, but his left hand was free.
Q Okay. So one arm cuffed, and the other arm was in a sling, or with a cast or something else around it. Is that fair?
A That is correct.
Q Okay. And did you have any concerns about security as a result of that?
A Yes. Being aware of what he had been convicted of previously, which is the double homicide, and that we were on the second floor, I was concerned that there could be a potential of escape.
Q Okay. Can you tell us about an event that occurred after Wharton was sentenced on April 21st, 1986 that brought you here today?

A After the Defendant was sentenced, he left the room with the Sheriff. Moments later I heard shots and screaming, and then a lot of commotion outside of people running back and forth, and -- you know, when the doors opened lots of sheriffs were coming down.

Q Okay. Do you recall how many shots you heard?

A I heard at least two shots.

Q Okay. Mr. Vega, you're telling us about an incident that occurred approximately 35 years ago. How are you able to recall these details?

A Well, number one, it's not every day that a Defendant escapes from the rule and gets shot. Secondly, although the rest of my career was in homicide, at that time I had never reviewed a homicide case, and what stuck in my mind were those crime scene photos because it showed the bodies of both victims. The husband and wife, with masking tape, or electrical tape, wrapped around their faces. I remember the female being near the bathtub, and then the male in another room with a bucket. And I was aware that they were strangled. So I -- I recall that.

Q Okay. Do you --did you have any further involvement with Robert Wharton's criminal matters at

any time during your career?

A Other than that, watching the trial of the robbery case and the sentencing, I've never had any other contact with him.

Q Did you give a statement to Special Agent Tim Barrar on June 20 of 2019 in connection with the events that you just described to us?

A Yes, I did.

Q Okay.

MS. MAHLER: Your Honor, may I approach and refer Mr. Vega to what's been marked as OAG 30?

BY MS. MAHLER:

Q Mr. Vega, is that the statement that was just discussed that you gave to Agent Barrar?

A Yes.

Q Is that your signature?

A Yes, it is.

Q Does this statement accurately reflect what you told Agent Barrar back on June 20 of 2019?

A Yes.

MS. MAHLER: One moment, Your Honor. I have nothing further.

THE COURT: It's Agent who? Who is that?

MS. MAHLER: Barrar, B-A-R-R-A-R.

THE COURT: And is he a Attorney General --

MS. MAHLER: Yes. Yes, Your Honor.
THE COURT: -- investigator? Okay.
MS. MAHLER: Yes.
THE COURT: Okay. And you said no other questions?
MS. MAHLER: No other questions.
THE COURT: Defense?
MS. MCHUGH: Yes, thank you.

CROSS EXAMINATION

BY MS. MCHUGH:
Q Mr. Vega, when you were assigned to 225, that was a major trials room. You had been a DA for a number -- a couple of years at that point. Right?
A Since '82, correct.
Q All right. And when you said that -- that you remember the day of Mr. Wharton being in the courtroom, because of the cast and the other things that you mentioned, right?
A Yes.
Q All right. And when he left the courtroom that day there were two sheriffs escorting him into the hallway?
A Yes.
Q All right. And after he left the courtroom you didn't see anything that happened after that?

A No, I did not.
Q All right. And you said that you were concerned about security because of the manner in which he was handcuffed and that you were on the second floor. Right?
A Right.
Q All right. And at that time did you address the Court, either at sidebar, or ask Mr. Lavin to take the Court to sidebar and express your concerns about the security fears that you had?
A No.
Q Okay. And you're aware that as a law enforcement -- you're a law enforcement officer, right? As a member of the District Attorney's office -- that you have an obligation to protect the public. Right?
A Yes.
Q Okay. And at that time in City Hall, the prisoners were actually escorted through the public hallway. Right?
A Yes.
Q All right. So when he left that courtroom he went into the hallway with other attorneys, citizens, judges, the mayor's office is there. Is that right?
A Yes. I -- if I recall correctly, it was late

afternoon.

MS. MCHUGH: I apologize, Your Honor. I thought this was off. Sorry.

THE COURT: It's okay. I think the question was the prisoners are escorted through the hallway and the general public is out in the hallway.

THE WITNESS: That is correct.

THE COURT: Is that the -- is that what you wanted to --

MS. MCHUGH: Yes.

THE WITNESS: That is correct.

THE COURT: Yeah. And he said right.

BY MS. MCHUGH:

Q And you're aware that you can address the Court and ask for -- at that time you were aware that you could ask the Court to bring additional sheriffs into the room if you felt that there was -- I think as you testified, potential for escape?

A I'm aware I could state anything to the Court, except for the fact that the sheriffs are the professionals in terms of security and the handling of a prisoner. So in my mind, knowing what he had been convicted of, and the fact, the way he was cuffed, and the location of the courtroom on the second floor, I was concerned. But I believed that the sheriffs, in

handling high-risk prisoners, know what they are doing. So I would not invade that province of telling them what to do.

Q So you never just told the sheriff in the courtroom, well, you're not doing the sentencing. Right?

MS. MAHLER: Objection.

THE COURT: I'm sorry? One second. What? Repeat the question.

BY MS. MCHUGH:

Q Yeah. You weren't involved in the sentencing, right? You were sitting in the courtroom?

THE COURT: Excuse me, one second. Do you have an objection to that question?

MS. MAHLER: I do. I think we've already established that he didn't say anything. It's already where the question is going.

MS. MCHUGH: Well, this is cross-examination. I --

MS. MAHLER: It's already been asked and answered.

THE COURT: Right. But there -- all right -- but there are still. Even in cross-examination, the opposing lawyers are allowed to make relevancy objections.

MS. MCHUGH: I understand.

THE COURT: Just -- it's not -- they're still -- the rules of evidence apply to cross, so he -- what is it you're trying to establish?

MS. MCHUGH: I'm questioning about the circumstances of his concern about an escape.

THE COURT: Okay. Are you raising the concern that the escape was somehow Mr. Vega's fault?

MS. MCHUGH: No.

THE COURT: Okay. What's your next question?

BY MS. MCHUGH:

Q So after your -- Mr. Lavin is handling the sentencing, you never spoke to either of the sheriffs and expressed your concern?

A No, I did not.

Q All right. And you've had occasions since that time, Mr. Vega, to have those kinds of discussions with sheriffs or with the Court, in a courtroom. Right?

A No. I -- sheriffs handle the prisoners and I handle the case.

Q Okay. So you've never expressed to the Court, hey, I think we have a problem here. I want to draw your attention to this.

A No. Usually what occurs, in my career, if

there was a security issue the supervisor to the Sheriff's Department would address the Court at sidebar. Because at -- sometimes they were prisoners that maybe were -- their feet were shackled, and that doesn't happen all the time. So they would have to explain to the Court why this person would have been shackled or something.

Q And so as I understand your testimony you were of the impression that the sheriff's deputies were aware of Mr. Wharton's prior criminal history?

A I assume that being sheriffs they know who they are handling.

Q Okay. Now when you -- when this incident happened you were not interviewed by anybody from Central Detective Division about what you observed?

A No.

Q And you were not interviewed by any of the investigators or detectives -- excuse me, any members of the District Attorney's Office who were prosecuting the case. You were never interviewed by them?

A No.

Q All right. And that was because you weren't really a witness to anything. Right?

A Well --

MS. MAHLER: Objection.

THE COURT: The question is do you know why you weren't interviewed. Is that your question?

MS. MAHLER: Yeah, did you -- you weren't --

THE COURT: You can answer that question. Go ahead.

THE WITNESS: I do not know why I was not interviewed.

MS. MCHUGH: Okay. And, Your Honor, may I approach with an Exhibit? I'm going to ask to have this marked as -- Counsel has seen it -- I don't know what our last exhibit is. I think it's --

THE COURT: Here.

MS. MCHUGH: -- this should be Petitioner's 40.

(PETITIONER'S Exhibit 40 was marked for identification.)

THE COURT: Yeah. I mean, subject to the witnesses comfort level with --

MS. MCHUGH: Correct.

THE COURT: -- distancing and all that. You're okay what that?

MS. MCHUGH: I can put it on the side if that's --

THE WITNESS: I'm fine.

MS. MCHUGH: -- more acceptable.

THE COURT: Yeah. He's indicated he's okay, and we're all masked. So just be cognizant. Just leave it with him, I think is the best thing to do. Right?

MS. MCHUGH: Yes. I have a copy of it, Your Honor.

THE COURT: Okay, thanks.

BY MS. MCHUGH:

Q Mr. Vega, do you recognize what is depicted in that Exhibit? I'm calling it 40 for now. They'll correct me if that number is incorrect.

A It's a layout of City Hall.

Q And is that the second floor of City Hall?

A Because of the numbers, it should be.

Q Okay. And do you see courtroom 225 on there, by the east portal?

A Yes, I do.

Q Okay. And is that consistent with your recollection of where the courtroom was?

A Yes.

Q Okay. And the southwest stairwell. Are you familiar where that is in City Hall?

A Okay, let --

Q It's marked on there if you can see it.

A What I’m having trouble with, I don't know

which was is north or south, because it's not indicated here. So --

Q Okay Well, if you look at --

A -- can you give me a room number, to orient me?

Q Sure. If you're looking at courtroom 225.

A Yes.

Q Okay. And then you -- if you were coming out of that courtroom facing the east portal and make a right --

A Okay.

Q -- down that hallway.

A Mm-hmm. Yes.

Q And when you get to the end of that hallway, and making another right.

A Yes.

Q Okay. And all the way down at the end of that hallway it says southwest stairs. Do you see that in the corner, a spiral staircase?

A Yes, I see it.

Q Okay. And is that consistent with your recollection of where the southwest stairs were in City Hall?

A Yes.

Q From courtroom 225?

A Yes.
Q Okay. Now, you said that you spoke to Mr. Barrar from the Attorney General's Office, and I believe your statement is dated June 20th of 2019.
A Yes.
Q Okay. And prior to June 20th of 2019 you had never spoken to anybody from the District -- from your former office, the District Attorney's Office about Mr. Wharton's case?
A No.
Q Okay. You testified that the pictures were very -- made a big impression on you, and that's how you're able to remember the incident?
A Well, it's a collection of things, but yes. Those pictures -- I recall them now.
Q As well as the fact that there was an escape?
A Yes.
Q Okay. And during that time -- from 1986, during the entire time of Mr. Wharton's appeals, and you never had any occasion to ask any of your former colleagues at the District Attorney's Office what was happening with the case?
A No. I was busy with my career and my cases.
Q All right. And in -- when you spoke to the Attorney General in 2019, how did that -- or, excuse

me, the investigator for the Attorney General's Office -- how did that contact originate?

A He called me and asked me -- I can't recall if he said if I could appear that day, or what dates were convenient for me.

Q And prior to the -- that was the investigator that contacted you, or someone else?

A It was the investigator.

Q And prior to that investigator contacting you, had you had any conversations with members of the Attorney General's Office -- either your former colleagues or not -- about Mr. Wharton's case?

A I think somebody reached out and did I have any memory of this case.

Q You don't remember who what was?

A I believe it would be Counsel here present.

Q That was prior to the investigator contacting you?

A Correct.

Q Okay. And that was a phone conversation?

A Yes.

Q All right. And any other conversations with any other members of the Attorney General's Office about Mr. Wharton's case prior to that?

A No.

Q Prior to Counsel here reaching out to you, were you aware that Mr. Wharton's case had appeared in the news on March 4th of 2019?

A No.

Q Okay. Were there any emails that you had with respect -- with members of the Attorney General's Office regarding Mr. Wharton's case?

A Are you -- prior to making this statement, or --

Q Well, prior to your statement of June 20th '19 and afterwards.

A None before the investigator spoke to me. In terms of any emails sent to me would be from Counsel, who sent me the notes of testimony, and your exhibit.

Q Okay. And --

THE COURT: Notes of testimony from the sentencing hearing?

THE WITNESS: Correct.

BY MS. MCHUGH:

Q And did you -- on this past Friday afternoon did you weigh in on whether you agreed to a stipulation to your testimony with the Attorney General?

A No, I don't -- that Counsel will do -- will work whatever stipulations according to (inaudible).

Q Okay. I'm just asking if you were contacted about that.
A No. I was contacted that I -- was I available to come to court.
Q Okay.
A And the possibility there might be a stipulation.
Q Okay. And prior to giving your statement in June 20th of 2019 you were -- you left the -- you were forced to leave the District Attorney's Office that's under the current administration. Is that correct?
MS. MAHLER: Objection.
THE COURT: One second. You were -- he was forced to leave?
MS. MCHUGH: Well, that's my understanding of how it happened.
THE COURT: Okay. All right. And so what's the basis of your objection?
MS. MAHLER: Well, Your Honor, I thought we, you know, were going to stay on a certain path. We are not --
THE COURT: Yeah.
MS. MAHLER: And we did that. We did that.
MS. MCHUGH: Well --
THE COURT: Okay. I guess this could go to

since the DA's Office -- the current administration of the DA's Office. Not prior administrations, but the current administration has taken the -- a position that the death penalty should be vacated, and the Attorney General has called this witness, I suppose that could go to possible bias. I'm going to allow him to answer. What's your -- he was -- the question is were you forced to leave the DA's Office? You can answer.

THE WITNESS: Yes, Your Honor. I was fired.

THE COURT: Okay.

BY MS. MCHUGH:

Q Okay. And that's prior to this statement of June 20th, 2019.

A I was fired January 5th, 2018.

Q And prior to giving your statement on June 20th of 2019 you filed a complaint with the Equal Employment Opportunity Commission. EEOC. I'm going to have to say it that way. Regarding that your termination was based on age discrimination. Is that right?

MS. MAHLER: Same objection.

THE COURT: One -- yeah. I think as I've laid it out, I'm going to allow it.

MS. MAHLER: Okay.

THE WITNESS: Your Honor, if I may address the Court so I don't do anything correctly? This matter is in litigation.

THE COURT: Yeah.

THE WITNESS: Counsel for the District Attorney has moved to have everything sealed from that record.

THE COURT: Mm-hm.

THE WITNESS: So I don't believe it is appropriate based on Judge Pratter's order --

THE COURT: Okay. Right.

THE WITNESS: -- for me to discuss anything in this litigation.

THE COURT: Okay. Noted. I think her question was just have you sued the District Attorney for age discrimination. And before you -- before we get into that, is that your question?

MS. MCHUGH: Correct.

THE COURT: Do you feel comfortable within the bounds that Judge Pratter has set, to answer that question?

THE WITNESS: No. Because the reasons for that motion to seal so it would not be all in the public eye, in the newspaper, and I don't know if there's any news media here right now that would

report this.

THE COURT: Okay. So you don't feel comfortable answering whether you've sued the District Attorney for age discrimination?

THE WITNESS: Correct.

THE COURT: Okay. So let's -- I don't -- I'm not familiar with the parameters that Judge Pratter has set. Let's table that question and we can talk about it later. If the Defense thinks that's an important point, I'll go back and look at what Judge Pratter did and figure that out. So the question is held under advisement and you don't have to answer it right now. But, Ms. McHugh, we can revisit it if you think it's important. Okay?

MS. MCHUGH: And just --

THE COURT: Does that work, Ms. McHugh?

MS. MCHUGH: Yes.

THE COURT: Does that work with you?

THE WITNESS: It's fine.

THE COURT: Go ahead.

BY MS. MCHUGH:

Q And just one last question, sir. You are currently running against the current District Attorney's administration. You're running against Mr. Crasner for the position of District Attorney of

Philadelphia?

A Yes. I’m running as a candidate for the District Attorney in Philadelphia.

MS. MCHUGH: I don't have anything further.

THE COURT: Mr. George, do you have any questions?

MR. GEORGE: No questions.

THE COURT: Okay. Any follow-up?

MS. MAHLER: Yes, a few if I may?

THE COURT: Go ahead. Sure.

RE-DIRECT EXAMINATION

BY MS. MAHLER:

Q Mr. Vega, in 1986, after having been in the DA's Office for just four years, did you think that you were in charge of prison security of Judge Lari's courtroom?

A No.

Q And the statement that you gave to Agent Barrar in -- I believe it was 2019. What's the date of the date of that statement in front of you, Mr. Vega?

A It's June 20th, 2019.

Q Okay. Did you give that statement and the facts contained therein because you were mad you got fired?

A Not at all.
Q Okay.
A If I may, I've testified numerous times in the Criminal Justice Center for appellate issues on my cases, and I've appeared and honored every subpoena ever given to me.
Q And are you making up the facts that you testified to as to what you observed in the courtroom in 1986 because you're mad that the administration -- the current administration fired you in 2018?
A Absolutely not.
MS. MAHLER: I have nothing further, Your Honor.
THE COURT: Okay. Thank you, Mr. Vega. I think you're excused. Thank you.
THE WITNESS: Thank you.
THE COURT: Do we have another witness ready?
MS. MAHLER: Yes.
THE COURT: Or what do you want to do?
MS. MAHLER: Your Honor, OAG would call Patrice Carr to the stand.
THE COURT: Okay.
MR. BARKER: Your Honor, may I be excused momentarily just to talk to Mr. Vega?
THE COURT: Yeah, go ahead.

MR. BARKER: Thank you.
THE COURT: We'll wait for you.
MR. BAKER: You -- there's no reason.
THE COURT: Keep going?
MR. BAKER: She's going to handle this.
THE COURT: Okay, very well. And Ms. Carr, as I understand it, she's the sister of Bradley Hart. Is that right?
MS. MAHLER: Yes. That's correct, Your Honor.
THE COURT: Okay.
THE CLERK: Good morning. Could you please raise your right hand?
PATRICE CARR, WITNESS, SWORN
THE CLERK: Can you please state your name?
THE WITNESS: Patrice Carr.
THE CLERK: Thank you. You can have a seat.
THE COURT: and you're also very soft-spoken. So try to keep your voice up a little bit. Pull that mic a little closer, maybe? And Mr. Sonnie will give you an assist.
THE WITNESS: Okay. Is that good?
THE COURT: Okay.
MS. MAHLER: Let me just have one -- 30 seconds, Your Honor? Not a minute?

THE COURT: Sure. Mm-hmm.
THE WITNESS: All right.
THE COURT: Do you want some?
THE WITNESS: No, thank you.
MS. MAHLER: May I, Your Honor?
THE COURT: Whenever you're ready, sure.
MS. MAHLER: Okay. Thank you.

DIRECT EXAMINATION

BY MS. MAHLER:
Q Good morning, Ms. Carr.
A Good morning.
Q Can you hear me okay from over here?
A Yes, I can.
Q Thank you. Is your maiden name Patrice Hart?
A Yes.
Q And what's your relationship to the victims in this case, Bradley Hart and Ferne Allen?
A Bradley Hart is my brother, and Ferne Allen is my sister-in-law.
Q Okay. And was Bradley your older or younger brother?
A Older.
Q Okay. And was Ferne also your good friend?
A Yes. Very good friend.
Q Lisa Hart Newman is your niece. Correct?

A Yes.
Q And Tony Hart's your brother?
A Yes.
Q And Sharon Thomas is your sister?
A Yes.
Q And Michael Allen is Ferne's brother?
A That's right.
Q You -- do you recall giving a statement to police in this case February 3rd, 1984 regarding the last time that you spoke to your brother Bradley before he was murdered?
A Yes.
Q Were you present at the Defendant's trial in this case? His trial?
A Yes.
Q After Mr. Wharton was sentenced to death the second time, in 1992, did you ever tell the Philadelphia District Attorney's Office that you did not want to be notified about any changes or developments in this case?
A No.
Q After Wharton was sentenced to death the second in 1992, did you ever tell the Philadelphia District Attorney's Office that Dr. Tony Hart had been designated as the Hart-Ferne -- or, I'm sorry, the

Hart-Allen family representative or contact person for any matter involving Mr. Wharton?

A No.

Q At any point prior to February 2019 did anyone from the Philadelphia District Attorney's Office reach out to you in any way -- by phone, by letter, by email -- to discuss the status of this case?

A No.

Q Have you since learned that in February of 2019 the Philadelphia District Attorney's Office did something to try to vacate the two death sentences in this case?

A I'm sorry, repeat --

Q Sure.

A Before 2019?

Q Yeah. Have you since learned --

A Oh.

Q -- that in February 2019 the Philadelphia District Attorney's Office did something to change the status of the death sentences in this case?

A Right. I have since learned. Yes.

Q Okay. Did you ever have any communications with anyone from the Philadelphia District Attorney's Office about vacating the death sentences in this

case?

A No.

Q How did you feel when you learned that this had occurred?

A I felt that it was not a good thing. That -- I felt that justice had already been spoken, and had already been done, and now we were taking it away. Not we. They wanted to take it away. I was no in favor of it at all.

Q And you might have already answered this, but if the Philadelphia District Attorney's Office had reached out to you to discuss about how you felt about vacating the death sentences in this case, what if anything would you have said in response?

A I would have told them don't do it, that I didn't think it was a good idea. Again, that justice had already been done and it should remain. That any -- that his good behavior, or positive adjustment apparently just would benefit him. It wouldn’t benefit my family. It wouldn't bring back my brother and my sister-in-law. It wouldn't take away the experience that my niece has gone through, and the rest of our family has gone through. It would only benefit him, and I don't understand how that doesn't matter.

I just feel strongly that justice was done, and it should remain that way, and that nothing hie can do -- good or bad -- at this point, can take away the crimes that he's already committed, take away the effects of them, and that he should live the consequences of it.

Q Okay. Ms. Carr, I'd like to show you the letter that you wrote in June of 2019.

MS. MAHLER: If I may approach, Your Honor? Thank you.

THE COURT: Are you comfortable with that? With the whole --

THE WITNESS: Yes. Yes.

THE COURT: -- distancing COVID thing? Okay.

MS. MAHLER: Or I'm happy to leave it over here --

THE WITNESS: It's fine.

THE COURT: Yeah. It's just a -- just another added --

THE WITNESS: Right. I understand.

THE COURT: -- hoop now we all have to go through to get into a courtroom. I just want to make sure you're comfortable. Could -- before you go forward with questioning, I want to re-refresh myself with this letter. This is the one dated June 8th, 2019?

THE WITNESS: Yes.
THE COURT: Okay. Just give me a second. Go ahead.
MS. MAHLER: Thank you.
BY MS. MAHLER:
Q Ms. Carr, can you tell us why you wrote that letter?
A Mr. Barrar, the Attorney General Office, contacted me and asked me similar questions to what you've asked me, and asked me if I would be willing to write a letter about how I felt about it.
Q And, with His Honor's permission, are you comfortable reading the letter, or would you like -- are you up for that, or --
A No, I can read it.
Q Okay. If you can do so, thank you.
A Dear Mr. Tim Barrar, my name is Patrice Carr. I'm the sister of Bradley Hart. He was murdered along with his wife, Ferne, back in January 1984. Their infant baby, Lisa, survived but was not -- but was left to die by these monsters of men. That was 35 years ago.
The killers were found and arrested within a week or two of their murders, then tried and convicted of multiple charges in 1985. I believe justice was served

where one of the two murderers was sentenced to death. This kind of sentence did not bring a sense of relief, or satisfaction, but I felt that justice was served.

I, as well as the rest of my family, have had to deal and cope with this loss. My brother Bradley was my best from birth to the day he died. Out of five siblings, he was number four and I was number five. Growing up we did everything together. He was someone I could trust and confide in. We played together, laughed together, vacationed together, sang together, celebrated life together. We loved each other very much.

Our family knew Ferne many years before she and Bradley started dating. Our parents had been long-time friends. So when they started dating my brother still let me hang out with them. I might have been a third wheel, but I didn't care. Ferne soon became a very close and dear friend to me. She was such a wonderful person, so sweet, and generous, and kind. So it turned into the three of us doing everything together.

I can't put into words how much I miss them. How heartbroken I am that they weren't a part of my wedding, they never met the man I fell in love with. My children never met two people that I was very close

to, and would have been a great aunt and uncle to them. Every birthday, Christmas, graduation, every milestone is a reminder that they are no longer with us. I will say knowing that Bob Wharton is behind bars, sentenced to death, along with the healing that comes with the passage of time, I am more at peace and my memories of them are more joyful.

But this situation has brought up all the sadness and pain all over again. I remember my adopted sister Lydia and I calling them from that Tuesday through that Thursday, wondering where they were. We drove to their house, and knocked on their door, but no answer. And because their car was not there we thought that they went on a trip somewhere. We kept saying they're grown people. They don't have to tell anyone where they're going, or what they're doing, but it was so not like them. We talked every day, and saw each other several times during the week.

I'll never forget when my parents came back home from a conference that Thursday. I asked if they had heard from Bradley and Ferne. They said no. My father, who was the only one with a key to their house, headed over there right away. He came back a short while later, with Lisa in his arms, and told us what he saw. What a horrifying and horrendous

experience. I grabbed Lisa, and between my mother and I we tried to warm her up and get her out of her wet, soiled diaper. I won't say much more about that, except that we had to throw out our clothes -- and, of course, hers -- because the smell just wouldn't wash out. She was eight months old, and I was left in the -- and was left in the house for three days in cold January. They had turned the heat off in the house. My father found her next to her dead mother.

This was no accident. This was planned out and executed. For the rest of his life, my father suffered from nightmares and depression. Both of my parents never really got over this horrific experience. As far as removing or releasing the death sentences from Bob Wharton is concerned, I was never contacted or asked about it. I would have never, ever agreed to it, and never will. Justice was served in 1985, and in 1992 justice was confirmed.

The idea that this is even a consideration is unbearably painful and shocking. I'm just glad that my parents are not here to have to relive this ordeal all over again. My heart hurts for Lisa, who has lost the most, and now is confronted with this unsettling and very distressing idea.

Q Thank you, Ms. Carr. Is there anything else,

with His Honor's permission, that you would like to tell Judge Goldberg at this time?

A I would just like to ask you to please not undo what the two juries very thoughtfully decided on. I believe they wanted to do justice, and that's what they did, and I ask you to just honor that. And consider our family, and consider Lisa in that decision.

THE COURT: Thank you for your testimony. And, you know, but I'll repeat. I'm obligated (inaudible) to follow the facts and the law, and I will do that.

THE WITNESS: I understand.

THE COURT: But thank you so much for your input.

THE WITNESS: Okay.

MS. MAHLER: Thank you, Ms. Carr.

THE WITNESS: Thank you for the opportunity.

THE COURT: You bet. Oh, wait. I'm sorry.

THE WITNESS: Oh.

THE COURT: I forgot about the other lawyers. I apologize. Does Defense have any questions?

MS. MCHUGH: No, Your Honor.

THE COURT: Does the DA's Office have any

questions?

MR. GEORGE: Yes.

THE COURT: Go ahead.

CROSS-EXAMINATION

BY MR. GEORGE:

Q Ms. Carr, can you hear me all right?

A Yeah. There's some background noise, but I think I can hear you.

Q Did your brother David ever give you contact information from the District Attorney's Office and tell you that a representative was willing to talk if you wanted to?

A No. He didn't.

MR. GEORGE: Thank you, ma'am. I have no more questions.

THE COURT: I have a question, if you don't mind. We have -- there -- submitted into evidence is a letter from Dr. Tony Hart. So that's your other --

THE WITNESS: That's my brother.

THE COURT: How many were you? How many?

THE WITNESS: There were five in my family.

THE COURT: Five. What was the order? Of the --

THE WITNESS: My sister's the oldest, Tony is the second, my brother Robbie is three, Bradley was

four, I'm five.

THE COURT: You're the youngest?

THE WITNESS: I'm the youngest.

THE COURT: Okay. So the letter from Dr. Tony Hart, brother of Bradley Hart, states: I was contacted by Heather from the District Attorney's Office a couple of months ago. She told me that Mr. Wharton had won an appeal, and that in order to avoid a new trial a plea deal was offered and accepted. Had you heard anything about this from any of your siblings or Dr. Tony Hart?

THE WITNESS: No. It was much later that I heard -- that, you know, Tony and I talked and he said that whatever it is that the District Attorney told him, he thought that they would have contacted him further, or given him more information. And that's why he never like told us anything, because he thought there was more information to come. And he didn't realize -- at least he didn't let me think he realized I needed to know something.

THE COURT: Okay. Just to make sure I understand your answer -- which I do, but this letter indicates that Tony Hart believed that someone from the District Attorney's Office had told him that Mr. Wharton had won an appeal. Had you heard anything

about that around this time period?

THE WITNESS: No.

THE COURT: Okay.

THE WITNESS: I don't recall. And if you knew my life, it's very, very complicated, so --

THE COURT: We're not asking you to tell me about that. Okay. I think you've answered my question. Any other questions?

MS. MAHLER: No, Your Honor. Thank you.

THE COURT: Defense? Mr. George?

MR. GEORGE: No, Your Honor.

THE COURT: Thank you.

THE WITNESS: Thank you.

THE COURT: Sorry for your loss, ma'am.

THE WITNESS: Thank you.

MS. MAHLER: Your Honor, I would like to switch gears and turn to our fact Corrections witnesses, if I may? If I may take five minutes to call them and ask the first one to sign on? Daniel.

THE COURT: Who is that?

MS. MAHLER: We have our two Corrections witnesses.

THE COURT: Okay.

MS. MAHLER: The former CO and the former hearing examiner.

THE COURT: Okay.

MS. MAHLER: I'd like to get them done.

THE COURT: I mean, I'm flexible for the rest of the day. Do you want to call them now, do you want to -- logistically, Steve, what's our deal with the -- Mr. Wharton in Phoenix and let everyone -- do you want to call them now?

MS. MAHLER: I would like to call them and tell them to jump on the video if I can.

THE COURT: Okay. They're going to be by video?

MS. MAHLER: Yes, they are. Both of them.

THE COURT: Okay. And these are the two officers regarding the 1989 incidents?

MS. MAHLER: Correct.

THE COURT: Okay. And -- all right. So you want five minutes to get them on. Is that okay with Defense, logistically?

MS. MCHUGH: Yes, Your Honor.

THE COURT: All right. Mr. George? You good to keep going?

MR. GEORGE: Sure.

THE COURT: Okay. And Steve, can we keep going?

THE CLERK: Yeah. Sure, Judge.

THE COURT: We have Mr. Wharton? That's no problem?

THE CLERK: Yeah. Until 4:00.

THE COURT: Okay. All right. Why don't we say -- I have about noon. I'll come back in ten minutes.

MS. MAHLER: Thank you, Your Honor.

THE COURT: Okay. Let's do that.

MS. MAHLER: Hopefully we have no technological glitches. We did the best we could preparing.

THE COURT: Thank you.

(A break was taken.)

MS. MAHLER: We're just waiting for the Judge, Mr. Hayes, so thank you for your patience.

THE WITNESS: Not a problem.

THE CLERK: Please remain seated. Court is now in session.

THE COURT: All right. What happened to Mr. George?

MS. MAHLER: I see him, Your Honor.

MR. BAKER: He's here, Judge.

MR. GEORGIE: I'm here.

THE COURT: Oh. Did I just imagine that, or was there someone else?

MS. MCHUGH: He was in the little square.
THE COURT: Oh, okay. Who was that person that was just up on the screen?
MR. BAKER: That's Mr. Hayes, Your Honor.
THE COURT: Mister who?
MR. BAKER: Hayes.
MS. MAHLER: That's the --
MR. BAKER: Hayes. He's the corrections officer. Former corrections officer.
THE COURT: Got it. So before I forget, Ms. McHugh or Ms. Vanwyk, I'm happy -- the way I think I think I can easily -- let me back up. If you want, off record -- if it's important to you, and it's your call.
I don't -- I'm -- I don't care one way or the other -- that Mr. Vega has sued the DA Larry Crasner for age discrimination, the question that we punted on, I think the easiest resolution is for me to just call -- with everyone's permission and transparency -- just call Judge Pratter, get an explanation from her as to what's sealed and what's not, and get a take from her as to whether -- just the fact that that lawsuit has occurred would violate -- and I'm not -- I don't know whether it has or not -- I'm in the dark as well, I don't know.

But I could just do it that way. And if she says the fact that there's a lawsuit, if that's not outside the bounds of any sealing order she has, then we can just somehow, you know, move that into the record by way of stipulation. Does that work with you, Ms. McHugh?

MS. MCHUGH: Yes, that's fine.

THE COURT: Okay.

MS. MCHUGH: I can't imagine that it's part of a sealed order.

THE COURT: Yeah, me, either.

MS. MCHUGH: Because it's on the docket.

THE COURT: I agree. I think --

MS. MCHUGH: I mean, I wouldn't know that if it was sealed. So.

THE COURT: Mr. Vega, I think, was just being cautious and respectful and Judge Pratter. I assume everyone else is okay with that process? Which is me calling Judge Pratter, which is the easiest path to figure this out.

MS. MAHLER: Yes, Your Honor.

THE COURT: And I'll just do that and I'll report back to everybody. Okay?

THE WITNESS: My TV screen just went blank.

THE COURT: What happened? Who just spoke?

THE WITNESS: My TV screen is suddenly blank. I can still hear, but I can't see.

MS. MAHLER: Oh.

THE COURT: Is that the correction officer?

MS. MAHLER: It is. May I address him, Your Honor, just to say that --

THE COURT: Yeah.

MS. MAHLER: Mr. Hayes, we can still see you, so is your tech expert with you? Your wife? So as to help?

THE WITNESS: Oh, yeah. She's in the kitchen.

MS. MAHLER: Okay.

THE WITNESS: Hey, hun. The screen went blank.

MS. MAHLER: This is the world we're in now, Judge, I'm sorry.

THE COURT: Strange world indeed, right?

MS. MAHLER: We're doing our best?

MS. HAYES: I don't know why, the light -- the camera light's on.

THE COURT: Steve, off the record. Let's go off the record.

THE CLERK: Yes, sir.

(A break was taken.)

THE WITNESS: Oh, the -- okay. Are we --
MS. MAHLER: That direction?
THE WITNESS: -- had to do was move the mouse.
MS. MAHLER: Okay.
THE COURT: Let's swear the -- let's swear the witness in.
THE CLERK: Good afternoon, sir. Could you please raise your right hand? Mr. Hayes?
THE WITNESS: Was that directed to me? I didn't hear who --
THE CLERK: Yes, sir. Yeah.
THE WITNESS: Okay.
THE COURT: Do it again, Steve.

DANIEL HAYES, WITNESS, SWORN

THE CLERK: And can you please state your name?
THE WITNESS: Daniel Hayes.
THE CLERK: Thank you.
MS. MAHLER: May I, Your Honor? Thank you.

DIRECT EXAMINATION

BY MS. MAHLER:
Q Good afternoon, Mr. Hayes.
A Good afternoon.
Q Can you hear me and see me okay?

A Yes, I can.
Q Okay. And I'm wearing a mask, so if at any time you can't understand what I'm saying or hear me, please let me know before you answer the questions or try to answer the question. Okay?
A Will do.
Q Okay. Thank you. Back in May of 1989, where were you employed?
A SEI Huntington.
Q In May of 1989 what was your job at SEI Huntington?
A I believe I was the (inaudible) officer on the 2:00 to 10:00 shift.
Q The what officer?
A The Corrections Officer.
Q Corrections Officer.
A Training.
Q Okay. Thank you. And by May of 1989 how long had you been a CO at SEI Huntington?
A Approximately five years.
Q Okay. During your time as a CO at SEI Huntington, were any parts of your shift sent in the RHU?
A Yes.
Q Okay.

THE COURT: And for the record RHU is restrictive housing unit. Correct?

MS. MAHLER: Correct, Your Honor. Thank you.

THE WITNESS: That is correct.

BY MS. MAHLER:

Q Overall, how long were you a CO at SEI Huntington?

A Until the incident, or until I was promoted?

Q Just until you were promoted.

A I was --

Q So from 1984 when you started being a CO when did you stop being a CO and become something else?

A Probably '92.

Q Okay. And then in '92 what happened?

A I became the Sergeant.

Q And then what happened after that?

A I retired.

Q Did you become a Lieutenant in there at any time?

A I did.

Q Okay. Okay. And when did you retire? What year?

A In -- April 1st, 2011.

Q Okay. So you were an employee of the DOC for approximately 28 years. Correct?

A That is correct.
Q Okay. Turning back to your time as a CO in the RHU, back in 1989, can you tell us how, if at all, handcuffs and handcuff keys were used by the COs in the RHU?
A At the time that -- anytime an inmate -- I'm sorry, anytime a resident was out of their cell in the RHU they had handcuffs on. They were used all the time.
Q Okay.
MS. MCHUGH: I'm sorry, I couldn't hear -- understand the last response.
THE COURT: Me, either. Could you repeat what you heard?
MS. MAHLER: Yes.
BY MS. MAHLER:
Q So Mr. Hayes, what you said was anytime a resident is out of their cell in the RHU they're in handcuffs. Did I summarize that correctly?
A That is correct, yes.
Q Okay. And when you say resident you mean an inmate housed there?
A That is correct.
Q Okay.
A That is correct.

Q Okay. So in the RHU the inmates are in their cells, and whenever they're out of their cells they're cuffed. Correct?

A That is -- that is correct. Yes.

Q Okay. And was that a DOC regulation, or policy? In otherwise -- in other words, was that your rule or was that something you were directed to do by the DOC?

A I just had the -- that is a rule directed by other employees to the officers working the RHU.

Q Okay. Okay. So during your time as a CO in the RHU, were handcuffs and handcuff keys something you used regularly to do your job?

A Every day.

Q Something you used with the inmates, or residents, on a daily basis?

A That is correct.

Q And something you saw your fellow COs use on a regular basis as well in the RHU?

A That is correct.

Q I'd like to turn your attention now to the reason why you're here today. If you can turn, Mr. Hayes, or pull out what's been identified for these proceedings as OAG Exhibit 17A. And this is going to be the misconduct report, Mr. Hayes.

A Correct.
Q Okay. And you have in front of you a misconduct report for Robert Wharton?
A I do.
Q Can you tell us, sir, what the incident date is and the report date for this misconduct report?
THE COURT: What exhibit is this?
MS. MAHLER: 17A, Your Honor.
THE COURT: Thank you.
THE WITNESS: Okay. The incident date is 5/15/89, the date of report is 5/15/89.
BY MS. MAHLER:
Q Okay. And in terms of the place of the incident, what's identified there?
A B -- It's under quarters, B601.
Q Okay. And place of incident it says B block. Is that the RHU?
A That is the RHU. It was at the time, yes.
Q Okay. Have you had a chance to recently review this document from May of 1989, sir?
A I have.
Q Okay. At the bottom left, where it says reporting staff member, signature, and title it says D. Hayes, CO1. Is that you, Mr. Hayes?
A That is here. That is correct.

Q Okay. And that's your signature?
A Yes, it is.
Q So you were the CO who wrote down what you observed that led to the misconduct report?
A That is correct.
Q Okay. And where it says staff member's version, is that your handwriting?
A Where it says what?
Q See where it says staff member's version?
A Yeah.
Q Okay.
A Yes.
Q Is that your handwriting, Mr. Hayes? That you wrote that up?
A That is my signature.
Q Your signature and the contents of the version of events? Is that you handwriting?
A Say that again, please?
Q Yeah. See where it says staff member's version, and then it says sir?
A Oh, that -- okay The (inaudible) of misconduct. Yes.
Q Yeah. So your wrote that version of events?
A That is correct.
Q Okay. Can you please tell us what the

misconduct charge is on the report?
A Possession of implement -- possession of contraband implement (inaudible) cuff key.
Q Okay. Is that your handwriting as well?
A That is.
Q Okay. Can you please read to us what you wrote in this section that says staff member's version?
A Correct.
Q Can you read it to us?
A Sir, on this date at approximately 1400 hours I performed a routine security check on cell 601 of B block. A6874, Wharton, is presently assigned to cell 601. A6874, Wharton, was showering in the RHU shower room at the time of the security check. While checking the mounting roll to the hopper, I discovered a 1 1/2 inch length of antenna concealed in the hopper mounting hole. The second swipe of the same mounting hole revealed another piece of antenna, approximately 3/4 of an inch long, fashioned into a handcuff key.
In as much as A6874 Wharton is assigned to cell 601, and the two lengths of antenna were found in cell 601, AY6874 Wharton is charged with possession of contraband and pulling out -- implements of escape.
Q Okay. So you did a routine security check of

cell 601. Right?
A Correct.
Q Okay. And cell 601 of B block was a single cell, correct?
A That is correct, also.
Q And so Mr. Wharton was the only one housed there?
A That is correct.
Q Okay. While conducting your routine security check in the RHU was it your practice to check the mounting bolts of the toilet?
A Yes. I checked them all the time.
Q And why did you look there all the time?
A It was just a place that they could put something small if they wanted to have it unobserved in their cell.
Q Okay. A good place to hide small things?
A Yes.
Q Okay. A few lines down from where you read it says confiscated items received number 291850. Mr. Hayes, do you --
A Correct.
Q -- have that confiscated receipt in front of you, sir?
A I do.

MS. MAHLER: And for the record, Your Honor, I'm referring to OAG Exhibit 16.
THE COURT: Thank you.
BY MS. MAHLER:
Q And is this -- with the numbers 291850 at the top -- the confiscated items received that's referred to in the misconduct report, Mr. Hayes?
A Correct.
Q Is that your handwriting on this document as well?
A Yes, it is.
Q Okay. Can you read to us what you wrote, describing the items confiscated?
A Two pieces of an antenna, one fashioned like a handcuff key.
Q Okay. So now turning back to the misconduct report itself, which is 17 -- Exhibit 17 -- do you have that in front of you, Mr. Hayes?
A I do.
Q Okay. At the bottom we see misconduct category, and Class 1 is checked. Right?
A Correct.
Q Okay. Can you tell us from your time as a CO in the RHU what did a Class 1 misconduct mean as opposed to a Class 2 misconduct? What's the

difference?

A A Class 1 is more severe.

Q Okay. From your time as a CO in the RHU, do you know why possession of contraband, implements of escape, was identified as a Class 1 misconduct?

A It's a more serious offense.

Q And what -- why -- what makes it a more serious offense? In otherwise, what could happen with that? With those implements of escape?

MS. MCHUGH: Objection.

THE COURT: Basis?

THE WITNESS: Just the fact that the method --

THE COURT: One second.

MS. MAHLER: Hold on, Mr. --

THE COURT: Sir, one second. One second. What's the basis?

MS. MCHUGH: Speculation.

THE COURT: Overruled. Re-ask the question.

BY MS. MAHLER:

Q Okay. I'm going to repeat the question, Mr. Hayes. What could an inmate do with an implement of escape that made it a Class 1 misconduct? What was the problem with that?

A I'm sure I don't -- I don't understand your

question.

Q Okay. Okay.

THE COURT: I think he's -- when he understands the question he's going to say I'm guessing escape? That would be the problem? Go ahead, read us the question.

MS. MAHLER: Okay.

BY MS. MAHLER:

Q What could an inmate do with an implement of escape? Why is it a Class 1 misconduct?

A We're used to the inmates being restrained. If he has a handcuff key and access to the holes in the cuffs he could actually be basically hand on hand with us.

Q Okay. Mr. Hayes, do you see where it says action reviewed and approved by ranking CO on duty?

A Okay.

Q Okay? And it says C Kyle CO4. Are you with me, sir?

A That is correct.

Q And was C. Kyle your supervisor on the block at the time? In other works, someone higher ranking than you.

A He was higher ranking than me, but he wouldn't have been -- necessarily been on block.

Q Okay. But before -- so C. Kyle had to sign off on this misconduct report?
A He did.
Q Okay. So before CO Kyle would sign off on the misconduct report did you show him the report and did you show him the contraband that you had found before he signed off on it?
A Yes. Correct.
Q Okay. I'd like to direct your attention to where it says pre-hearing confinement. Do you see that box above where it has your name?
A I do.
Q Okay. And we see here that it says no is checked. Right?
A That is correct.
Q Okay. What does that reflect to you?
A That was -- well, first off his initials, I believe, are in the box that says yes or no under pre-hearing confinement. And he checked no. I believe he checked no because he -- the --
MS. MCHUGH: I'll object to what --
THE WITNESS: Whether Wharton was --
THE COURT: One second. One second. One second. One second. What -- his belief is to what his supervisor thought. The objection is sustained.

MS. MAHLER: Okay.
BY MS. MAHLER:
Q Okay. Mr. Hayes, are inmates housed in the RHU subject to pre-hearing confinement when they get charged with possession of contraband implements of escape.
A They can be, yes.
Q Okay. Okay. So inmates in general population, if they get charged with possession of contraband implements of escape, do you know if they get pre-hearing confinement?
A They can, and they would be moved to the RHU if space was available.
Q Okay. So an inmate already in the RHU, would they have pre-hearing confinement in the RHU for a charge like this?
A They could, but they wouldn't necessarily have to be moved.
Q Okay. Because they're already in a very regimented secure environment?
MS. MCHUGH: Objection to the leading with this witness.
THE COURT: Yeah, it's leading but it's okay. Given the Zoom and the videos and all that. Did you hear Restate the question. Try not to lead. Okay?

MS. MAHLER: Okay. Okay.
BY MS. MAHLER:
Q So Mr. Hayes, for an inmate currently housed in the RHU -- meaning back in 1989 -- would there be a reason to put them in a pre-hearing confinement?
A Not necessarily, no.
Q Okay. And why is that?
A Because they're basically already secured under the same restraints.
Q Okay. As you sit here today, Mr. Hayes, do you remember this misconduct from May of 1989?
A Do I remember it?
Q Yes. Do you remember this misconduct?
A Yes, I wrote it. Yes, I remember it.
Q Okay. And why do you remember this?
A The misconduct or something else?
Q Why do you remember this misconduct? Why do you remember what we just went over?
A The fact that I found the handcuff key, it was the only time I ever found one in my career there.
Q Okay. So of your 28 years as a CO, this was the only time that you ever found a makeshift handcuff key?
A Correct. That I thought would work.
Q Okay. That you thought would work. So it

looks like a pretty good one, in your opinion?

MS. MCHUGH: Objection.

THE COURT: Overruled.

BY MS. MAHLER:

Q You can answer, sir. It looked like a pretty good one, in your opinion?

A Again, it looked like it could have worked, yeah.

Q Okay. All right. Let's -- if I can direct you back to your version of events, Mr. Hayes. You stated that the second piece of antenna that you found, approximately 3/4 in length, was, "fashioned into a handcuff key." Do you see where I read that?

A I do.

Q Okay. When you stated that it had been fashioned into a handcuff key, in your opinion how closely did it resemble an actual handcuff key that you had as a CO?

MS. MCHUGH: And I'll object. This is not an expert witness. She's asking him for his opinion, and I'm going to object to that.

THE COURT: Overruled.

BY MS. MAHLER:

Q You can answer, sir.

A Yes, again it looked like it could work.

THE COURT: Where -- could you tell me again where did you find -- there were two antennas. One fashioned into a key. Could you specify again where you found each antenna, and the one -- where each one was found?

THE WITNESS: There's a -- there were two mounting bolts in the hopper. The hopper being the combination of the sink and toilet. If you were sitting on the toilet, you'd be very close to a wall on your right-hand side. If you would get close to the wall, and to look, you could actually see that mounting device space that was taken up with a nut and a bolt. But it kept the toilet from moving.

What I did is simply put my little finger around the bolt, and found first the larger piece of antenna, and then in the second sweep I found the one that was fashioned into a cuff key. But they came out of the same mounting device opening, to secure the toilet to the wall.

BY MS. MAHLER:

Q Okay. Mr. Hayes, as a CO in the RHU back in May of 1989, did you view this possession of contraband implements of escape misconduct as serious?

A Yes.

Q Why?

A You don't expect an inmate to have the cuff key. He's restrained for a reason.

Q Okay. Are you aware, Mr. Hayes, that just four days after you found the implements of escape in Mr. Wharton's cell 601 another random search of the same cell revealed a 4 inch piece of metal antenna in the binding of his legal materials?

MS. MCHUGH: I'm going to object. Based on this witnesses statement, he has no personal knowledge of incidents thereafter, and so I'm going to object to it.

THE COURT: She's just asking was he aware. Were you aware of that, sir?

THE WITNESS: I was made aware of that in January of this year.

THE COURT: Okay. Objection sustained.

MS. MAHLER: Okay.

THE COURT: We'll strike that testimony.

MS. MAHLER: Okay.

THE COURT: Go ahead.

BY MS. MAHLER:

Q Mr. Hayes, would you have been available and willing to testify to all of this before the jury back in December of 1992?

A Yes, I would have.

Q Okay. Would you also have been able to show the jury in 1992 what your actual CO handcuff key looked like that you used in the RHU on a regular basis?

A They are used on a regular basis, yes.

Q Would you have been able to bring that into court and show the jury your key? Your handcuff key?

A Yes. Yes, I could have.

Q Okay.

MS. MAHLER: Nothing further, Your Honor.

THE COURT: All right. Defense?

MS. MCHUGH: Yes, thank you.

CROSS-EXAMINATION

BY MS. MCHUGH:

Q Good afternoon, Mr. Hayes. I have a few questions for you. Can you see me?

A Okay. Can you speak up slightly?

Q Yes, I can. I'm going to hold my microphone. Can you hear me better now?

A Yeah, that's better.

Q Okay. Mr. Hayes, during your tenure at the Department of Correction that was entirely at SEI Huntington?

A That is correct.

Q All right. And you started, I guess,

sometime around 1984?

A Actually, I was a trainee in 1983. I was hired right around Labor Day of '83

Q Okay. During your tenure at the DOC you said that -- or strike that. During your tenure at the DOC was there a change in the policy of handcuffing inmates in the RHU that you recall?

A There could have been changes to policy, the same as B block was now D block, and D block was C block. But yeah, there were changes all the time.

Q Okay. So do you recall a period of time at Huntington where the inmates in the RHU were not handcuffed every time they came out of the cell.

MS. MAHLER: Objection. I would like her to (inaudible) that.

THE COURT: One second, sir. One second.

MS. MCHUGH: I would like her to give him a specific time period, as opposed to a 28-year time frame. I think that would be helpful.

THE COURT: That's fair.

MS. MAHLER: I --

THE COURT: Would you -- could you rephrase?

BY MS. MCHUGH:

Q Yeah. During the 1980s until the early 1990s, do you recall anytime during the '80s that

inmates in the RHU were not handcuffed every time they came out of the cell?

A Yes, I do.

Q Okay. So one of those examples would be when they would go to the yard. The doors would open and they would come out. The inmates?

A Well, no. I believe they were restrained when they went to go -- go outside or exercise pretty well. I'm referring to they would come down to chow to get their tray.

Q Okay.

A And carry their tray back up to their cell.

Q So at least one instance was when they would come down they would leave their cell to get their food tray. Is that what you're referring to?

A Yeah, once -- once every -- three -- three times a day, yes.

Q Okay. So that's one instance where they weren't handcuffed. Is there another instance that you can think of back at that time when they weren't handcuffed?

A We're looking back 30 years, there's been many changes.

Q Okay.

A Initially those trays were carried

individually, one at a time, and the next thing you know they have inmates carrying five trays up on the tier at a time. And they were not even allowed to come out of their cell at that point.

Q Okay.

THE COURT: Mr. Hayes, if you don't remember, then just say I don't remember. That's an acceptable answer.

THE WITNESS: Okay.

BY MS. MCHUGH:

Q And Mr. Hayes, back at that time when the inmates were -- in the RHU were exercising they were confined to a cage?

A They were secured exercise units.

Q Secured exercise unit?

A Yeah.

Q Is that what you said? Okay. And there would be two inmates to one of those exercise units. Is that right?

A One, maybe two.

Q Okay. And they're not handcuffed while inside the cage, right?

A I'm sorry? What?

Q They're not handcuffed while they're inside the cage, right? The two -- if there's two inmates?

A No. The restraints are removed after they've been placed inside.
Q Okay. Now just going back to -- you have your report there from the misconduct?
A I do.
Q Okay. And taking you to the part where you're describing your version of what happened, and you -- the last paragraph there you say, "In as much as Y6874 -- " That's Mr. Wharton, right?
A Right. 6874.
Q Okay. "In as much as Y6874 is assigned to cell 601, and the antenna was -- and the two lengths of antenna were found in cell 601, Y687 Wharton is charged with possession of the contraband." Do you see that part there?
A Correct.
Q Okay. And there was no further investigation done about the incident after you wrote up this report. Correct?
A Well, Captain Kyle would have done some investigating of it.
Q Okay. And that would have been presented at the hearing?
A Not necessarily.
Q All right.

A He cold have just asked the (inaudible) Sergeant what happened, where'd this come from. (Inaudible) not solely on my report.

Q Okay. So is there anything noted on any of the paperwork that you have that Sergeant Kyle conducted an investigating beyond that -- beyond what you wrote?

A Repeat the question, please?

Q Sure. In any of the paperwork you reviewed of this misconduct from 1989, is there any indication that Sergeant Kyle conducted any additional investigation?

A One more time, I'm --

Q Sure.

A -- not getting the specific of the question.

Q Okay. I'm sorry. So the paperwork that you have there, that you've reviewed on this misconduct.

A Correct.

Q All right. Is there any -- you said that Sergeant Kyle might have done an investigation. Is there any paperwork that you have there that indicates whether that was done, or what was done?

A No.

Q Okay. And the place where you recovered the two pieces of antenna. If you're standing in the

cell, or using the sink/toilet combination, you wouldn't be able to see the antenna pieces or the -- you know, whatever -- what you've described as a handcuff key. You wouldn't be able to see them unless you bent down behind the toilet and reached your hand into this area that you found them. Is that right?

A Basically, yes. I mean, it's just a finger. They would use -- you know, I've seen it -- my little finger is what I used most of the time.

Q Okay. So you don't have to actually look down there to get them. Right?

A Oh, no. I didn't see them until they came out.

Q Right. That's my question. And so you have no recollection of any contact you had with cell 601 beyond this date that recorded in the paperwork. Is that right?

A Correct.

MS. MCHUGH: If I may just have a minute.

THE COURT: Sure.

BY MS. MCHUGH:

Q Oh, and it -- you said that the handcuff key looked to be a good one. You didn't check to see if it worked. Is that right?

A No, I didn't. No, I did not. I didn't want

to make it look any different than what it was when I found it.

Q Okay. And just a couple of other questions. Back at that time, in the 1980s in Huntington, inmates at some point were not given the antenna with their radio and TV. Is that right? As DOC policy?

A I'm not entirely sure of that.

Q Okay.

MS. MCHUGH: I have nothing else, thank you.

THE COURT: Mr. George, do you have any questions?

MR. GEORGE: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. GEORGE:

Q Good afternoon, sir.

A Good afternoon.

Q Me?

A I'm sorry?

Q I'm saying -- I'm asking, sir, if you're able to hear me.

A Yes, I can now. It just broke up for one moment in that -- but, yes, I'm fine.

Q Sir, from 1986 until May of 1989 did your duties have you as a correction officer assigned to the RHU?

A I don't believe I was regularly assigned there, but I was there on other staff's not being there.

Q And from 1989 in May, until 1992 did you also have assignment to the RHU at least some of the time?

A Yes, probably.

Q And based on anything that you remember, or that you have been shown, you did not have any other disciplinary type interaction with Mr. Wharton. Is that correct?

A Not that I'm aware of, no.

Q And if you had been called to testify you would have been also able to say that.

A Correct.

Q If you -- correct, sir?

A Correct.

Q Thanks.

MR. GEORGE: I don't have any more questions. Thank you for your time, sir.

THE COURT: Okay. Thank you, sir.

MS. MAHLER: Thank you, Mr. Hayes.

THE WITNESS: We're all done?

MS. MAHLER: Yes, you're all done. You can thank your tech support, too. Thank you so much for your time.

THE WITNESS: Will do, thank you.
MS. MAHLER: Take care, sir. Thank you.
THE COURT: Now, you have a second similar witness?
MS. MAHLER: I do, Your Honor.
THE COURT: Do you need -- do you want to keep going and let's get that done?
MS. MAHLER: I would love to call him, but it's just going to be a five minute phone call, and hopefully.
THE COURT: We'll do the same thing. I'll come back in ten minutes. Okay?
MS. MAHLER: Thank you for your patience, Your Honor.
THE COURT: Yeah, of course. Ten minute recess?
THE WITNESS: Okay, I'm signing off.
MS. MAHLER: Okay. Bye, Mr. Hayes. Thank you.
THE WITNESS: Goodbye.
THE COURT: And what are we -- let's do this, and I'll be back. We'll talk about logistics in a second.
(A break was taken.)
THE COURT: Would there be any objection to

the witness testifying by phone? If we could somehow get him on -- I haven't checked with Steve yet, so I don't know. But it seems to be it's the video connection. If we could somehow get a verbal, we -- and everyone agrees to, we may be able to do it that way. Is that workable, Steve?

THE CLERK: Yeah, as far as I know. I can either have him call into us or we can call him. I don't see why it wouldn't work. Just put him on speakerphone.

THE COURT: Then you could put the phone up to the microphone?

THE CLERK: Yeah.

THE COURT: And we would have it transcribed?

THE CLERK: Well, you know, (inaudible).

MS. MAHLER: Or is Facetime an option, Your Honor?

THE COURT: Or what?

MS. MAHLER: Facetime?

THE COURT: Uhm, okay.

MS. MAHLER: To at least have the picture? Just throwing it out there.

THE COURT: Okay. I don't know how that would work, but sure. What's the Defense's position? Do you object that we don't have a visual of the

witness but we would have a verbal?

MS. MCHUGH: No, I don't have an objection.

MS. MAHLER: No objections.

THE COURT: No objection? Mr. George? If we can hook it up, you good with that?

MR. GEORGE: Yes.

THE COURT: All right. Who's in touch with the witness? Do you want to suggest that to the -- are you in touch with the witness?

MS. MAHLER: Yes.

THE COURT: Could you check and see if this looks like we're -- you know, I don't mind waiting another five, ten minutes to see if we can get him visually.

MS. MAHLER: Okay.

THE COURT: But if that's not going to work, let's go to Plan B. Everyone agrees.

MS. MAHLER: Okay. I'll call.

THE COURT: Do you want to check?

MS. MAHLER: Yes.

THE COURT: And see where we are? And get a phone number, you know, where we can reach the witness.

MS. MAHLER: Okay. I have his phone number Your Honor.

THE WITNESS: Press 88 (inaudible).

MS. MAHLER: Calling.

THE WITNESS: And now I'm seeing who has (inaudible).

THE COURT: It's not working. He keeps -- the picture keeps going off. Ask him if he can just -- we can just call him. Tell him to --

MS. MAHLER: Okay.

THE COURT: -- just pick up his cell, and we'll try to get it audible.

MS. MAHLER: So I think -- Mr. Conrad?

THE WITNESS: Yes?

MS. MAHLER: Hi. I think we're just going to try and go to just audio. Does it seem like you're able to make headway with Mr. Jones at all? Or should we just move to Plan B, which is audio?

THE WITNESS: Yeah, I can (inaudible) the courtroom. He's going in and out --

MS. MAHLER: Okay.

THE WITNESS: -- right now. (Inaudible). So yes, I'm going to have to go with the audio like you said.

MS. MAHLER: Okay. Okay. So we'll go to audio. Okay. So should we just use this phone, Your Honor?

THE COURT: No. I think Steve -- you want to use -

THE WITNESS: The picture of the courtroom (inaudible).

THE COURT: Let's use this phone, because it's hooked up to the mic.

MS. MAHLER: Okay. So Mr. --

THE COURT: I need his. We need his phone number.

MS. MAHLER: I have his phone number. Okay, so we're just going to call you back on a different phone, Mr. Conrad. Okay?

MR. JONES: Mr. Conrad can call in on the line. I'm going to give him the information to call in.

MS. MAHLER: Okay. Okay. Thank you, Mr. Jones.

THE COURT: Hey, Bill? We'll be --

UNIDENTIFIED FEMALE: (Inaudible). Okay, okay. Thank you, Mr. Jones.

THE WITNESS: Yeah. Okay. I do see you guys now. And what's the number to call in?

THE COURT: Well, now we can see him. And hear him. Hold on.

MS. MAHLER: Should we give this a shot, or?

THE COURT: Yeah. We can see --
THE WITNESS: 215.
MS. MAHLER: Mr. Conrad?
THE WITNESS: Okay.
THE COURT: Can you hear us, sir?
MR. GEORGE: No. (Inaudible).
THE WITNESS: Yes, I see you.
THE COURT: Can you hear us?
THE WITNESS: Excuse me?
THE COURT: Can you hear us?
THE WITNESS: I am. I see you. Yes.
THE COURT: This is Judge Goldberg. Can you hear what I'm saying?
THE WITNESS: Yes.
THE COURT: State your name.
THE WITNESS: Yes, sir.
THE COURT: State your name, please.
THE WITNESS: George H. Conrad, CO NRA (inaudible).
THE COURT: Do you swear the tell the truth, the whole truth, nothing but the truth, so help you, God?
THE WITNESS: George, middle initial H, Conrad.
THE COURT: Let's go to audio. Just -- we're

going to --

THE WITNESS: I do.

THE COURT: Just tell him let's cut the feed and Mr. Sonnie's going call. And that's what we're going to do. Steve, ask Bill to cut the feed.

THE WITNESS: Okay. Well, I still see everyone.

THE COURT: We're going to call you. We're going to cut the video --

THE WITNESS: There's a gentleman just to the right --

THE COURT: We're going to call you, sir. We're going to cut the video feed. Steve, you're in control now.

THE WITNESS: All right. That's fine.

THE CLERK: Ms. Mahler, what's the number?

MS. MAHLER: Sure. 814-386-6054.

THE COURT: I don't want to do the feed.

MS. MCHUGH: No, no, no. But there's a phone line to go into that link.

THE COURT: All right. The link is being unreliable. We're just going to use the old -- we're just going to use the phone. I don't trust it. I think it's his internet. So just -- we're going to use the phone and it's simple and straight ahead. Go

ahead, Steve.

THE CLERK: Hey, Mr. Conrad, can you hear me?

THE WITNESS: Yes.

THE CLERK: Everybody else, can you hear Mr. Conrad?

THE COURT: No, we can't. So Mr. --

THE WITNESS: I can hear it, yes.

THE COURT: We need to get it mic'd Steve. Can you get it mic'd?

THE CLERK: Yes. How about now, Mr. Conrad?

THE WITNESS: I can hear you fine.

THE COURT: Can counsel hear? Mr. Conrad, could you state your name?

THE WITNESS: Eric H. Conrad.

THE COURT: It's very raspy. Sir --

MR. JONES: Judge, I'm (inaudible) the conference line so it can be on this line so you can hear him better.

THE COURT: Okay, let's try that.

MR. JONES: Just hold on, please.

THE COURT: Okay. Is he -- Bill, is he on?

MR. JONES: He's not.

THE COURT: Okay. Let us know when you've got him back on.

MR. JONES: Let him know he can call in --

okay. Okay. He's going to call in, Judge.

THE COURT: Thank you.

MR. JONES: You're welcome.

THE WITNESS: Hello?

THE COURT: Hi. Thanks for your patience. Can you hear me? This is Judge Goldberg.

THE WITNESS: Yes, Judge, I can.

THE COURT: And we can hear you well in the courtroom. Mr. Sonnie -- just so I'm on a roll here.

GEORGE H. CONRAD, WITNESS, SWORN

THE COURT: State your name.

THE WITNESS: George H. Conrad.

THE COURT: George Conrad. Okay. Mr. Sonnie, are we on the record?

THE WITNESS: Sure.

THE CLERK: Yes, sir.

THE COURT: Proceed.

DIRECT EXAMINATION

BY MS. MAHLER:

Q Mr. Conrad, good afternoon.

A Thank you, good afternoon.

Q Can you hear me okay, sir?

A I can.

Q Okay. If at any point you can't hear me -- I'm also wearing a mask -- please let me know and I'll

repeat the question and I'll speak louder. Okay, sir?
A Certainly, yes.
Q Thank you. Back in May of 1989 where you were employed?
A For the Pennsylvania Department of Corrections.
Q What was the time frame in which you were employed by the Pennsylvania Department of Corrections? From when to when?
A From 1973 to 1993, or 20 years -- 19 years, eight months.
Q Okay. In May of 1989 what was your job with the DOC?
A Hearing examiner.
Q As a hearing examiner, were you assigned to a specific institution, or did you hear misconducts at various institutions?
A I heard misconducts at various institutions, but predominantly SEII.
Q Okay. By May 1989 how long had you been a hearing examiner?
A I'm going to say five to six years. Probably over five, less than six.
Q Okay. Prior to being a hearing examiner with the DOC were you employed in any other roles in the

DOC?

A I was. I commenced employment as a correctional counselor, advanced to a casework supervisor, and then ultimately to the hearing examiner position .

Q And how did you get to be in the hearing examiner position? Can you tell us what that process entailed, please?

A There was a lawsuit which changed the way disciplinary hearings were conducted. It went from being, you know, quote/unquote captain's court where a uniformed officer adjudicated to a civilian employee doing it. And I was aware of that because I was in the system and it was a testing interview, and I was hired.

Q Okay. When you say a testing -- I think you said a testing process. Tell us was it a statewide process, or --

A Sure.

Q -- tell us about that.

A Yeah, sure. There was a written test, and, then there was a series of interviews to decide who was going to fill those positions.

Q Okay. And how long overall were you a hearing examiner in the DOC? During your 20 years in

the DOC?
A Ten. Approximately the last ten years of the employment.
Q And when you left the DOC -- I think you said around 1993 -- where did you go to work after that?
A The Department of Labor and Industry as a UC referee, adjudicating unemployment appeal hearings.
Q Okay. And you're now retired, Mr. Conrad?
A I am.
Q Good for you. Okay. Can you please describe your job as a hearing examiner with the Pennsylvania Department of Corrections?
A An employee of the institution would write a misconduct report citing an inmate for any number of infractions that were described in a manual labeled the 801. And once they wrote that misconduct, it was reviewed by a Captain or Lieutenant and then sent to a hearing examiner's clerk to schedule for a hearing .
Q Okay. And let's --
A And I would adjudicate the hearing.
Q Okay. Okay. And in connection with adjudicating the hearings, did you -- you know, review evidence and hear witnesses, determine guilt or innocence, and impose sanctions. Is that the -- sort of the -- summarized your job?

A That summarizes it very succinctly. Yes.
Q Okay.
A That's exactly right.
Q As a hearing examiner in the DOC did you have experience, or extensive knowledge, about the prison system in general?
A Yes.
Q And how about the Department of Corrections 801 Disciplinary Manual?
A I know it very well.
Q How about the various misconduct categories such as Class 1 versus Class 2 misconducts?
A Yes. And there were -- there was two separate categories, the Class 2 being a less serious offense than the Class 1.
Q Okay. And also did you have to have extensive knowledge about the misconduct sanctions if there was a finding of guilty?
A Yes.
Q And were you also familiar with the inmate handbook?
A Yes.
Q And how about the -- just the general rules and regulations of the prison?
A I was aware of them.

Q And were you familiar, as a hearing examiner, with the misconduct process in general, including -- I think you told us -- the hearing process?
A Yes.
Q Okay. Did you also have to have specific familiarity with the various sections of the prison? And what I mean by that is general population versus the RHU?
A Yes.
Q As a hearing examiner, did you have first-hand knowledge of how the RHU operated?
A Yes. Very much so.
Q Okay. During your time as a hearing examiner, can you please give us a sense as to how many misconducts you presided over? And I'm looking for just an estimate, Mr. Conrad, if you can.
A Well, I -- I'm going to say this with a smile on my face. We'd do anywhere from three or four, to ten a day, five days a week, at -- not only Huntington, but various prisons. So doing it for ten years it would have been in the thousands.
Q Okay. Did you see less or the same amount of misconducts from inmates in the RHU than inmates in general population?
A Fewer from the RHU, I would say.

Q And why would it be fewer? Why was that?
A Because they're under lock and key 23 hours a day. There's less opportunity to violate the rules.
Q Okay. Tell us about the environment in the RHU back in the late 80's/early 90's.
A Specifically what are you asking, Counselor?
Q Tell me was it regimented? Was it structured? Was it disciplined? How was it run? Just general sense of the RHU as a part of the prison compared to general pop in the late 80's/early 90's. Just an overview.
A Sure. The Restricted Housing Unit was all single cells, it was a two-sides block, three tiers high. Everyone -- no one went to their meals at (inaudible) in the RHU. You were fed three meals a day in your cell. Exercise was an hour a day, and that was sometime -- it's limited by staff availability. Shower in very small groups of three or four, escorted by two officers. If you're in the Restricted Housing Unit and you come to a hearing for an infraction you come in handcuffs.
Q Okay. So would you characterize the RHU as structured and regimented?
A Very.
Q Okay. I'd like to turn your attention to the

reason that you're here today, Mr. Conrad. If I can refer you to what has been identified during these proceedings as OAG Exhibit 17A, and this -- for your purposes, Mr. Conrad -- is the misconduct report that I believe I provided to you.

A Correct. I'm looking at it.

Q Okay. Am I correct that the misconduct report for Robert Wharton, that we've identified as 17A, is something that you would have been familiar with as a hearing examiner hearing this misconduct?

A Yes. It's a standard form that misconducts came to me on. A misconduct report. Correct.

Q Okay. And I see it has an incident date of 5/15/89, a report date of 5/15/89, and B block -- specifically B601 -- as the place of the incident.

A Yes.

Q Is that -- okay. And B block, B601, is that the RHU, Mr. Conrad?

A That's correct. At least it was in 1989. I believe it still is.

Q Okay. Can you please tell us what the misconduct charge is on this document?

A Charge three possession of contraband, specifically implements of escape. And in parenthesis the officer's put cuff key.

Q Okay. And have you had a chance to review this document in connection with your testimony today?

A I have.

Q Okay. So you saw that the gist of the staff member's version, the facts supporting the misconduct charge, were that an RHU CO was conducting a routine search of cell 601, belonging to Wharton, and found a 1 1/2 length of antenna in the toilet mounting hole? Correct?

A Correct.

Q Okay. And that the CO also found a second piece of antenna, approximately 3/4 inch in length, "fashioned into a handcuff key." Do you see that Mr. Conrad?

A I do.

Q Okay. And then a few lines down we see it says confiscated items receipt number 291850. I'm going to refer you to another document entitled confiscated items receipt. Do you have that in font of you, Mr. Conrad?

A I do.

Q Okay.

MS. MAHLER: And this is OAG 16, for the record, Your Honor.

THE COURT: Thank you.

BY MS. MAHLER:
Q Is that the confiscated items receipt referred to on the misconduct report, Mr. Conrad?
A It is.
Q So the seized contraband is then placed on the receipt and retained by the DOC?
A That's correct. It would be retained by the Security Captain.
Q Okay. And turning back to the misconduct report itself, at the bottom we see misconduct category Class 1, Class 2, and on here Class 1 is checked. From your experience as a hearing examiner, can you please tell us the difference between a Class 1 misconduct and a Class 2 misconduct category?
A Class 1's, as I stated earlier, are certainly more serious. Which would involve assaults and implements of escape. In fact, that's the number three charge in the directive, so I -- it's very high up in the importance. Any kind of assault, threatening, would be a Class 1 misconduct.
Q Okay.
A A slag sandwich from the kitchen, or not tucking your shirttail in would be a more trivial kind of thing, or playing your radio too loud, would be a Class 2 misconduct. This is a Class 1.

Q From your experience as a hearing examiner, why did the DOC classify possession of contraband implements of escape as a Class 1 misconduct?

A Because of it's degree of importance. Possession of contraband and implements of escape is certainly a serious threat to a prison system.

Q Okay. And when you say a threat the system -- prison system, do you mean threats to the prison staff, the inmate, or other inmates, or all of the above?

A All the above.

Q Okay. Mr. Conrad, I --

A I would add the community to that also.

Q I'm sorry?

A When you said threat to other inmates or staff, I would also add it's a threat to the community.

Q The rest of the community? Meaning outside the prison?

A Correct.

Q For an escape attempt, or a successful escape?

A Correct.

Q Okay.

A Yes.

Q Thank you. Mr. Conrad, back to the misconduct report. Do you see a box on there that says pre-hearing confinement and then it's checked no. Right?

A Yes.

Q Would an inmate already housed --

A I see that.

Q Okay. Would an inmate already housed in the RHU have a pre-hearing confinement due to a misconduct?

A No.

Q And why is that?

A Because they're already confined. It's for inmates in general population who would kind of go to a county jail without bail. You're in general population, you can get pre-hearing confinement and go into the RHU because of the degree of threat, and await a disciplinary hearing. But if you're already in the RHU there's no pre-hearing confinement because you are pre-hearing confined.

Q Okay. If I can direct you now to what we've identified as OAG Exhibit 17C. Tell me when you have that in front of you, Mr. Conrad. This would be the disciplinary hearing report.

A I have it.

Q Okay. And you see it's dated hearing date 5/17/89? And is that your name at the bottom --
A Correct.
Q -- Mr. Conrad? Mr. George H. Conrad?
A It is.
Q Okay. Identifying you as the hearing examiner?
A Correct.
Q Can you tell us procedurally how the hearing works, please?
A Well, if someone were in the RHU, as is in this case, they would be escorted to the hearing by two officers, the inmate would be handcuffed. I would read the misconduct and ask the inmate to plead guilty or not guilty. In this case, as I'm looking at 17C, the inmate -- rather than me write what the inmate had verbalized, he submitted a written version which became part of the record. So -- and there was a not guilty plea, and my decision was to find him guilty of the infraction.
Q Okay. So before we get to the guilty, can you tell us where a misconduct hearing is held?
A There's a hearing room right outside -- adjacent to the Restricted Housing Unit, so inmates can be brought in one door from general population

hearings, and through the RHU, and through another drill if they're in restricted housing. So it's a room adjacent to the RHU with both access to the general population and into the RHU.

Q Okay. So I think you said this before, but an inmate in the RHU would be escorted to you in handcuffs for a misconduct hearing?

A That's correct.

Q Okay. If I can refer you, Mr. Conrad, to the findings of fact, is that your handwriting in that section?

A It is.

Q Can you please read us that findings of fact section, please? That you wrote?

A Yes. Inmate pleads not guilty, submits a version, physical evidence is at the hearing and it clearly represents a handcuff key. The key was found in a single cell occupied by Wharton for several months. It is more likely than not that the key was possessed and under the control of Wharton.

Q Okay. You state in that section physical evidence at the hearing. Does that mean that you had the contraband that had been seized from Wharton's cell in front of you to examine for yourself at the hearing?

A That's correct.
Q And that would have been the evidence identified in OAG Exhibit 16, on the confiscated items receipt?
A Yes, the same thing that was on the confiscated items receipt was at the hearing.
Q Okay. And you also state in this section, clearly represents -- physical evidence at the hearing, and it clearly represents a handcuff key. Explain to us what you mean by that statement, please.
A Well, I picked it up and -- I mean, I always pick up the evidence and look at it. A handcuff key is nothing more than a barrel about the size of an antenna or an ink pen refill.
And when it is made into a handcuff key, a small section -- minute section about the size of a matchhead -- is bent up, much like the handcuff keys that come with the real handcuffs, and it will open a pair of handcuffs.
Q Would you have said, Mr. Conrad, clearly represents a handcuff key if you were unsure in any way as to whether the antenna had been fashioned into a handcuff key?
A Absolutely not. It was a handcuff key. If I wrote it was, it was. And again, it had to have that

small flap bent up which makes it into a key. It was not a straight piece of metal.

Q Okay. Prior to May 17, 1989, the date of the misconduct hearing, had you seen handcuff keys before while employed in the DOC. And if so, can you please tell us about that?

A Well, I saw them daily. With corrections officers have them on their key belt. They would come into the hearings -- you know, inmates would be -- if they were found not guilty many times they would be unhandcuffed and sent to population. But I'd also seen makeshift handcuff keys made by prisoners on several occasions before this one.

Q Okay. So would you say you were familiar from your experience in the DOC with what a handcuff key -- a real handcuff key, and a makeshift handcuff key -- looks like?

A Yes.

Q So your decision for this misconduct was guilty, and you note in your findings of fact that it had been a single cell occupied by Wharton for several months. Right?

A Yes.

Q And when you said that, were you meaning that he was the only inmate living in that cell, and

therefore had exclusive control over that cell?
A That's correct. And all the cells in the Restricted Housing Unit are single cells.
Q okay. Okay. Mr. Conrad, you mentioned in the findings of fact that Mr. Wharton had submitted a version. And at the bottom of the disciplinary hearing report, it also states that the opportunity to have the inmate's version reported as part of the record was given. And then there's a check in the yes box. Do you see where I'm at, sir?
A Yes.
Q Okay. Would that version that we're referring to be what's set out in OAG Exhibit 17B, which is the inmate's version that you have in front of you?
MS. MCHUGH: Are you saying B or D?
THE WITNESS: That's correct.
MS. MAHLER: I'm sorry, B as in boy. B.
MS. MCHUGH: Okay. Okay.
BY MS. MAHLER:
Q And this document's entitled Inmate Version and Witness Statements?
A Yes.
Q Okay. Mr. Conrad, have you had an opportunity to refresh your memory on the contents of

this document?
A I have read through it, yes.
Q Okay. So Mr. Wharton essentially says I never possessed or manufactured anything out of an antenna. Right?
A Correct.
Q And he says that the contraband must have been in the toilet mounting of single cell 601 before he got there. Meaning somebody else who was there before me left it there, and it's not mine. Is that the gist of his version?
A Yes.
Q Okay. As the hearing examination -- examiner, are you making determinations of credibility? Is that part of your job?
A It is.
Q As the hearing examiner in this case, did you find what Mr. Wharton was saying in his version credible?
A I did not find it credible.
Q And why not?
A Well, the officer certainly had no reason to invent that he found the handcuff key. The handcuff key was there. It was in a cell occupied solely by Mr. Wharton, and to the claim that perhaps it was left

there by somebody else was not found credible. As a handcuff key inside a master security prison is not something one leaves behind. If someone else was in that cell the months before Wharton, they would have taken that with them.

Q Okay. So would those pieces of antenna -- including the one fashioned into a handcuff key -- be a valuable commodity in the RHU?

A Yes.

Q Something valuable for an inmate to have in their possession, or to sell to somebody else?

A They have in their possession, or to sell if they decided they weren't going to use it, or became afraid of it.

Q Okay. Mr. Conrad, you imposed a sanction of 90 days DC, meaning disciplinary custody status?

A Correct.

Q Can you tell us what Disciplinary Custody status was during that time in the late '80s, please?

A There was Administrative Custody, which was less restrictive, and Disciplinary Custody. A move to Disciplinary Custody means you lose certain privileges. You lose perhaps a radio, I believe that they were just putting televisions into some of the administrative cells. You'd get less time out of your

cell. It's just more restricted.

Q Okay. And is it the most restrictive status of confinement to which an inmate found guilty of Class 1 misconducts may be committed?

A Yes.

Q Okay. Where are RHU inmates who get DC status housed?

A On one side of the Restricted Housing Unit the Administrative Custody's were on the left side, the Disciplinary Custody's were on the right side. And again, both -- that cell block, I believe, was three tiers high.

Q Okay. So it's just a separate section of the RHU?

A Yes.

Q Okay. And for an inmate in the RHU -- for an inmate already housed in the RHU, what's the difference between the single cell for the inmate in AC custody status and the single cell for the inmate in DC custody status? Or if there's no difference, tell us that.

A It's just a change in -- in the things that you're allowed. For instance, like I said, a TV, a radio, probably magazines. Limited ability to make a phone call at all. It was just very limiting.

Q Okay. So when you say limiting, are you talking about a loss of more privileges?

A Yes.

Q Okay. So the cell itself, there's no change the structural aspect of the cell in DC status, or the accommodations, so to speak, in the cell.

A They're identical.

Q Okay. So you still have a bed, you still have a toilet, you still have a sink, you still have lights on. It's not like the hole in Shawshank Redemption?

A No. It's not.

Q Okay. As the hearing examiner for this misconduct, and as having been a hearing examiner for ten years in the DOC, did you consider Mr. Wharton's May 15th, 2989 possession of contraband implements of escape as a serious misconduct?

A Yes. Absolutely.

Q And why is that?

A There can't be any good reason for an inmate to make this handcuff -- make a handcuff key and free himself from handcuffs. It's not like it's to go play basketball, because that's not why they're on there. When you take your handcuffs off, you're going to assault. I mean, it's basically -- for me it spells

you're going to assault someone. Either staff or another inmate.

Q While Mr. Wharton -- well, we know Mr. Wharton was in the Restricted Housing Unit at SEI Huntington, and you told us that was a restricted and regimented environment. Even with a handcuff key --

A Yes.

Q -- or an implement of escape in his possession, is it still possible for an inmate in the RHU to escape custody?

MS. MCHUGH: Objection.

THE COURT: What's the basis?

MS. MCHUGH: Speculation.

THE COURT: Overruled.

MS. MCHUGH: Unless he has any personal knowledge.

THE COURT: Overruled.

BY MS. MAHLER:

Q You can answer that, Mr. Conrad. Do you need me to repeat the question?

A Thank you. Yes. Can an inmate from a Restricted Housing Unit escape? I recall a Norman Johnston -- one of the infamous Johnston Brothers -- escaped August the 2nd, 1999 from the RHU at SEI Huntington. And at that time he was serving four

consecutive life sentences.
Q Okay. And you have first-hand knowledge of that?
A Yes.
Q Okay. How many times during your ten years as a hearing examiner did you discover that an inmate had fashioned a handcuff key out of a piece of antenna?
A I would say ten, 12.
Q Okay. Ten to 12 out of, I believe you said, the thousands of cases, misconducts, you presided over during your ten years?
A I can't imagine it was more than a dozen times we had handcuff keys that -- yes.
Q So would you say it was a common or uncommon occurrence for you to see that?
A Uncommon.
Q Mr. Conrad, would you have been available and willing to testify to all of this before the jury back in December of 1992?
A Yes.
Q One moment, sir.
MS. MAHLER: I have nothing further, Your Honor. Thank you.
THE COURT: Defense?

MS. MCHUGH: Thank you.

CROSS-EXAMINATION

BY MS. MCHUGH:

Q Mr. Conrad, can you hear me okay?

A I can.

Q Okay, great. I want to ask you a question, and maybe I didn't hear this, but did you say that you worked as a corrections officer ever, or no?

A I never worked as a corrections officer.

Q Okay. So your familiarity with the RHU was based on your work as -- I think you said you were a counselor at one point?

A A counselor, then a casework supervisor. I supervised all of the counselors, and the psychologists, and the psychiatrists.

Q Okay. And then you worked as the hearing examiner after that?

A Correct.

Q All right. And in your time handling misconducts as a hearing examiner, you certainly saw incidents where inmates in the RHU committed assaults and serious Class 1 -- assaults and -- against guards or inmates, right?

A Yes.

Q All right. And that could involve like

spitting? Even if they have handcuffs on. Right?
A Yes.
Q It could involve throwing --
A I'm sorry -- did you -- I'm sorry, what was the question again?
Q So in your experience as a hearing examiner, you had occasion for inmates in the RHU to assault via spitting. If they were handcuffed?
A Assault someone sitting?
Q Spitting.
A I -- I have seen inmates assault other inmates with handcuffs on.
Q Okay. And is it your recollection, sir, during your tenure at the DOC that the policies of how the RHU inmates were handcuffed -- like in other words during their time out of the cell -- did that change over the time that you were there?
A No.
Q That you recall?
A Not that I recall.
Q Okay. So when inmates came down to get their trays, you're saying they were always handcuffed?
A They never came down to get their trays. They were fed in their cells.
Q Okay. And you said that the -- hold on one

second. You said that when you did this particular misconduct -- you don't have any personal recollection of this. Is that right? You're just looking at the records, as I understand it.

A That's correct.

Q All right. And you have no knowledge of Mr. Wharton other than this paperwork that you've been provided?

A None.

Q Okay. And you said that a handcuff key would not be something that an inmate would leave behind in their cell. Is that my -- a correct characterization of your testimony?

A Yes.

Q All right. And you would agree with me that there are certain instances where an inmate is taken out of their cell unexpectedly?

A Yes, they're -- yeah, they -- they're brought out of their cells for searches. Correct. Yes.

Q And, in fact, there would be times when they're taken out of their cell during like a cell extraction? Do you know what I'm talking about?

A Correct.

Q All right. And so they wouldn't have time to --

A Yes.
Q -- gather any contraband in their cell during a cell extraction?
A That's correct.
Q And another example of that would be if an inmate had a medical emergency. They would not have -- they would be taken out of the cell to deal with that. Is that right?
A Correct.
Q And if an inmate goes to a disciplinary hearing and is found guilty, they would be taken straight from your hearing examiner hearing room and taken directly to the Disciplinary Custody area, if that's what they were sentenced to?
A If they were coming in out of general population, and they were found guilty of a Class 1 misconduct, and given RHU time, they would go from general population directly into the RHU. If an inmate were to go from Administrative Custody to Disciplinary custody they would wait for the evening shift to make the change from one side of the cell block to the other.
Q So there were instances where if -- if, perhaps, they were being taken over to Disciplinary Custody they wouldn't have time to -- time alone in

their cell to get their contraband together. Is that right?

A Well, if they were going from Administrative Custody to Disciplinary Custody they would, because it doesn't happen immediately because you're already locked up. So there's no need for immediate transfer from one side to the other. A general population inmate would go from general population to (inaudible) custody without having time to go back to the cell. Correct.

Q And the information that you had at the hearing itself was the information provided by Correction Officer Hayes. Is that right?

A Yes.

Q And the standard for review at these hearings is more likely than not?

A Correct. It's a preponderance.

Q And you were not presented at the time of the hearing any evidence regarding the last time that cell 601 was searched in that area?

A Not given what, again, Counselor?

Q I said at the time of the hearing you were not presented with any evidence as to when cell 601's toilet mounting had prior -- had been searched prior to that date?

A No. The evidence I had was the report and the handcuff key, physically there.

Q And you didn't attempt to try the handcuff key to see if it worked. Is that right?

A You know, I don't know. I mean, I can't -- I cannot possibly say I did. I will tell you that I always did, but did I do that one? You know, I -- this was 30-some years ago. I don't remember if I did, but if I -- I would be amazed if I didn't, because I always picked them up and tried them. But did I do this one? I can't say for sure.

Q Oh, one other question I had, Mr. Conrad, is another instance where an inmate might be taken out of their cell unexpectedly is when they are ATA, or Authorized Temporary Absence. Is that right?

A Yes, but they're given plenty of time to pack.

Q Okay. And that's with the supervision of a guard. Correct?

A Correct. But I don't -- you know, I can't answer. I don't know.

Q Okay. And the PRC, or the Program Review Committee is the entity in the prison that is responsible for evaluating an inmates adjustment to incarceration. Is that right?

A Correct. It's kind of like a -- an appeal committee.

Q Okay. And if the PRC evaluations of Mr. Wharton indicated that he was adjusting positively, you have no dispute with that?

MS. MAHLER: Objection.

THE COURT: What's the basis?

MS. MAHLER: I'm sorry, Your Honor?

THE COURT: Basis?

MS. MAHLER: Well, first of all it goes outside the scope, and second of all he wasn't provided with any of the PRC documents. He was only asked to testify regarding the documents.

THE COURT: Yeah. All right. Sustained, and the PRC documents are in evidence. You can make use of them as you wish at the end of the hearing.

MS. MCHUGH: Okay.

THE COURT: Sustained.

MS. MCHUGH: Okay.

BY MS. MAHLER:

Q So I'll just clarify, Mr. Conrad, that the PRC was the entity responsible for evaluating adjustment. Is that right?

A That's correct.

THE COURT: I just --

MS. MCHUGH: Okay. I have nothing else. Thank you.

THE COURT: Mr. George?

MR. GEORGE: No question.

THE COURT: Anything else?

MS. MAHLER: No. No. Thank you very much, Mr. Conrad.

THE COURT: Thank you, sir. So --

THE WITNESS: All right. Thank you.

THE COURT: Thank you.

THE WITNESS: Have a great day in Philadelphia.

MS. MAHLER: Thank you.

THE WITNESS: Bye.

THE COURT: It's always a great day in Philadelphia. Does the AG -- who else do you have on tap for today? Because I don't want to be a slavedriver here. We've been working since 9:00 straight.

MS. MAHLER: I would like to try and get Michael Allen on the -- to testify by video if we can --

THE COURT: And who -- oh, that is the brother of --

MS. MAHLER: Of Ferne.

THE COURT: -- of Ferne? Okay.
MS. MAHLER: Allen.
THE COURT: And who else today?
MS. MAHLER: Well, I think we missed our window with Dr. Hart. I know he had a scheduling issue, and we wanted to get these fact witnesses on today, Your Honor, so.
THE COURT: We wanted to do what? I'm sorry?
MS. MAHLER: These fact witnesses on.
THE COURT: Yeah.
MS. MAHLER: These three?
THE COURT: Okay.
MS. MAHLER: So we can do Dr. Hart another time, but we have Mr. Allen we can try and get on.
THE COURT: Okay. Why don't we do that.
MS. MAHLER: Okay.
THE COURT: And we still have to -- I -- we're going to have to have another date, because of the issue with the illness. With the AG's witness, Ms. Link [ph]. So why don't we try to finish this next witness, if it's okay with everybody, and then we can chat about logistics the next time, and then we'll call it a day. Does that work?
MS. MAHLER: Yes. That's great, Your Honor.
THE COURT: Does that work?

MS. MCHUGH: Yes.
THE COURT: Mr. George, you good?
MR. GEORGE: Yes.
THE COURT: Okay. So I'll be back at 2:00?
MS. MAHLER: Yeah. Finger's crossed, Your Honor.
THE COURT: Okay. Fingers -- the fingers are crossed.
MS. MCHUGH: Could we have an opportunity to speak with Mr. Wharton at this juncture? Would that be convenient for the Court?
THE COURT: Can we wait? Can we just do the next witness, and then I'll --
MS. MCHUGH: Okay.
THE COURT: I'll make that happen after the next witness.
MS. MCHUGH: Okay.
THE COURT: Okay.
(A break was taken.)
MS. MAHLER: Mr. Allen, do you have your letter handy?
THE WITNESS: I do have that available, yes.
MS. MAHLER: Okay, great. I just wanted to make sure you have everything at hand. Thank you.
THE COURT: Sit.

THE CLERK: Please be seated.
THE COURT: We're all set?
MS. MAHLER: Yes.
THE COURT: Is this by phone? Video? What is this?
MS. MAHLER: We have a working video.
THE COURT: We do? Okay.
MS. MAHLER: There's Mr. Allen.
THE COURT: I don't see anybody.
MS. MAHLER: Yeah, he's here. Mr. Allen?
THE WITNESS: I'm here.
MS. MAHLER: There he is.
THE COURT: All right. Mr. Sonnie?
THE CLERK: Yes, sir?
THE COURT: Swear the witness in, and identify the witness.
THE CLERK: Yeah. Good afternoon, Mr. Allen, could you please raise your right hand?
THE WITNESS: I'm sorry . Is that a voice in my direction?
THE CLERK: Yes. Yes, it is.
THE COURT: Yeah. Steve, slow down. Do it again, slow down.
THE CLERK: Yeah.
THE WITNESS: I can hear (inaudible).

THE CLERK: Okay. Are you all set? Can you hear me now? Mr. Allen, can you hear me?

THE WITNESS: I can hear you yet.

THE CLERK: Okay.

MICHAEL ALLEN, WITNESS, SWORN

THE CLERK: Thank you. Could you please state your name?

THE COURT: State your name.

THE WITNESS: I'm sorry, could you repeat? Oh, my full -- my name is Michael Allen.

THE CLERK: Thank you.

THE COURT: And, Mr. Allen, this is Judge Goldberg. Just to keep the family tree straight here, you are the brother of Ferne Hart. Is that correct?

THE WITNESS: That's correct, sir.

THE COURT: Okay. You can --

MS. MAHLER: May I, Your Honor?

THE COURT: You can lead on preliminaries, if you want.

MS. MAHLER: Okay, thank you so much.

DIRECT EXAMINATION

BY MS. MAHLER:

Q Mr. Allen, can you hear me okay?

A I can hear you very well, yes.

Q Okay, great. So Lisa Hart Newman is your

niece?

A That's correct.

Q And she was raised in your home, with your parents, in the Bahamas after Bradley and Ferne were murdered?

A That's correct. Yes.

Q After Robert Wharton was sentenced to death the second time, in 1992, did you ever tell the Philadelphia District Attorney's Office that you did not want to be contacted about this case?

A The answer is no. I had no contact at all with the District Attorney's office.

Q Okay. So I think I know the answer to the next question, but after Mr. Wharton was sentenced to death the second time in 1992, did you ever tell the Philadelphia District Attorney's Office that Dr. Tony Hart would be designated as the Hart-Allen family representative or contact person for any matter pertaining to the Wharton case?

A I did not.

Q Okay. At any point prior to February 2019, did anyone from the Philadelphia District Attorney's Office reach out to you in any way- by that I mean phone, email, letter -- to discuss this case?

A I received no communication or contact from

that office.

Q Okay. Have you since learned that in February 2019 the Philadelphia District Attorney's Office did something to try to vacate the two death sentences in this case?

A I did become aware of that, yes.

Q Okay. How did you feel when you learned about the Philadelphia District Attorney's Office's attempts to vacate the death sentences in this case?

A I think the first reaction was that it was a panic and maybe a bit of a curiosity that that would happen. I understand there's a certain level of complexity with the court proceedings in the U.S., and certainly that there would be ongoing proceedings. But this was, it seemed to me, very exceptional and somewhat upsetting to note that the District Attorney's office would almost turn coat in their proceedings and be advancing a position on behalf of the murderer. So this is obviously a very significant concern, and somewhat upsetting, that that would occur.

Q Okay. If the Philadelphia --

THE COURT: Did you say -- I'm sorry. It was upsetting that -- I didn't hear the phrase used. Did you say turn coat?

THE WITNESS: I'm sorry. Yeah, my understanding is that the District Attorney's office certainly would be the office that was involved in the prosecution. My exposure hands on with this matter was to be, I think, available at the preliminary hearing. I think that was driven by the District Attorney's office. And so to find that the District Attorney's office would now be advancing a position on behalf of the -- the convict was a bit curious to me. And, to some extent, somewhat upsetting.

BY MS. MAHLER:

Q Okay. And Mr. Allen, you referred to -- I think the court system in our country. Are you currently living in the Bahamas? Is that what you mean by that?

A I'm currently in the Bahamas.

Q Okay.

A That's correct. Yes.

Q Okay. If the Philadelphia District Attorney's Office had consulted you about how you felt about vacating the death sentences in this case, what if anything would you have said in response?

A I -- there would be an objection to that. I couldn't understand why that would be a position to take. Simply because it was a fair trial, and a

determination made before (inaudible) in court, as I understood it. And no reason at all for this matter to be revisited in my opinion. And the death sentence ought to be upheld.

Q Okay.

A And not vacated.

Q Mr. Allen, do you have in front of you the letter that you wrote to the Court dated June 7th, 2019?

A I do have that with me, yes.

Q Okay. And at the top it's called Statement of Michael Allen? Is that the letter that you submitted with the Office of Attorney General to provide to the Court?

A That's correct. I think it's dated 7th of June 2019.

Q Okay. With the Court's permission, would you like to read that into the record?

A Certainly.

Q Okay.

MS. MAHLER: Is that all right, Your Honor?

THE COURT: Yes. But Mr. Allen, just speak a little bit slower, because we have to transcribe through the video and the audio, and it's a little difficult. So just take your time.

THE WITNESS: (Inaudible). And so my letter reads. It's my statement. Ferne was my sister. Etched in my memory and crystallized on being told of her murder is the image of Ferne and Bradley together, in the airport terminal in the Bahamas, moments before they walked through the doorway leading to the U.S. Customs and Immigration pre-clearance facility. It was the last time that I saw her alive. A few months later, while a university student in England, I received a telephone call and learned of her death.

Fern was as delicate as the plant from which her name is borrowed. Bradley, her husband, was her strength. Robert Wharton displayed great capacity of a diabolical nature in the cold-hearted killing of the innocent. There were extraordinary days following the discovery of the lifeless and abandoned bodies of Ferne and Bradley, and the recovery of the infant body of their daughter, Lisa, who was left by Wharton clinging to life.

The Philadelphia investigating offices assigned to Ferne's case, along with the prosecutors from the District Attorney's office were nothing les than brilliant in their handling of matters. Within days after the murders Robert Wharton would be before the Philadelphia court charged with the murder of

Ferne. In the midst of worrisome uncertainty, an estimable comfort came from an investigative department, and the judicial system which works for us and the people of (inaudible) area, injecting back into life a measure of sanity and confidence.

Robert Wharton is a murderer who was convicted in a fair trial, by a competent court, and his guilty of heinous acts, who has violated the sanctity of life -- more than one life. He has disqualified himself from membership in a free society, and has overstayed his time on the peripheral (inaudible) society. He should do the noble thing by abandoning his appeal and giving himself over to the consequence of his crime, or his crimes.

I've noted the history of Wharton's attempts to extricate himself from just consequences for his acts, leading to the current proceedings. I also am aware of the position taken by the current District Attorney, having read published information. Having been briefed by Agent Tim Barrar on the 7th June 2019.

At no time did anyone from the District Attorney's Office contact me concerning this matter. I understand that the District Attorney's Office, the DA's Office, has gone on record to say that they communicated with the family of Wharton's victims. I

understand that they have represented, either expressly or quietly that the family agrees with the outrageous position they have taken to seek to vacate Wharton's death penalty.

The position of the DA's Office is nothing less than an egregious insult to injury, an affront for the extensibilities of a responsible community, which holds its members accountable for their acts.

As a matter of opinion, after further discussion with Tony Hart, Ferne's brother-in-law, regarding communication with personnel from the DA's Office, it would appear that there was a substantially deficient briefing by the DA's Office regarding the significance and implications for vacating Wharton's death penalty. Perhaps it should be explored as to whether that communication was, in effect, a conversation clearly directed by one who knew all seeking to achieve a desired result from family members without full disclosure regarding consequences for vacating the death penalty.

I know of no member of the Allen or Hart family who supports what the DA Office intends. I oppose the vacating of Robert Wharton's death penalty.

THE COURT: Sir, I just want to make sure that -- I think you misspoke. I read the letter to

say perhaps it should be explored as to whether that communication was, in effect, a conversation -- and I think you said clearly, but the letter says cleverly directed by one who knew all.

THE WITNESS: Correct.

THE COURT: It's cleverly. Correct?

THE WITNESS: Yes. Yes. That's correct, sir.

THE COURT: Okay. Thank you. Ms. Mahler?

CROSS EXAMINATION

BY MS. MAHLER:

Q Mr. Allen, is there anything else you would like to tell Judge Goldberg about your position on vacating the death sentences in this case?

A only that I appreciate the initiative which has been advanced to allow the family to respond to this. Part of my reading in the early days of this matter concern the report on, I think, the Judge's pause in response to the District Attorney's initiative, or application. And I just found that that was notable, to see the Court taking initiative to want to ensure that both sides are heard on this. And so there's just an element of appreciation that we at least have the opportunity to represent our position here.

Q Thank you.

THE COURT: The victims should always be heard, sir.

THE WITNESS: I very much appreciate it.

MS. MAHLER: Thank you.

BY MS. MAHLER:

Q And, Mr. Allen, was Ferne your older or younger sister?

A Ferne was my older sister.

MS. MAHLER: I have nothing further, Your Honor.

THE COURT: Defense?

MS. MCHUGH: Nothing, Your Honor.

THE COURT: Mr. George?

CROSS-EXAMINATION

BY MR. GEORGE:

Q Mr. Allen, can you hear me, sir?

A I can hear you very well, sir.

Q Thank you. Did Tony Hart ever tell you that there was a representative of the District Attorney's Office that you could talk to if you wanted to?

A I don't recall that conversation. I'd have to say no. I don’t think Tony ever mentioned this to me.

Q Did he ever give you a phone number and an

email address for a victim services person at the District Attorney's Office?

A I don't recall receiving anything from Tony having to do with a connection to the District Attorney's Office.

Q And I take it that he never told you that she had expressed her willingness to speak to anyone in the family who wanted to speak to her. You never got that message from Mr. Hart. Is that correct, sir?

A I never got that message from Tony Hart.

Q Thank you.

MR. GEORGE: I have no further questions.

THE COURT: Sir, I have a question. This is Judge Goldberg. Submitted as evidence in the case is a letter from Dr. Tony Hart, brother of Bradley Hart, and it says -- and I'll read you the part I want to ask you about. "I was contacted by Heather from the District Attorney's Office a couple of months ago. She told me that Mr. Wharton had won an appeal, and that in order to avoid a new trial a plea deal was offered and accepted." So my question to you, sir, is did you have any conversation with Mr. Hart or anyone else about the topic of Mr. Wharton winning his case on appeal?

THE WITNESS: I don't recall that

conversation. I believe there were some initial discussions possibly with my niece regarding the fact that something was developing with this case, and then I was contacted by, I think, Agent Barrar. But I don't recall any information coming to me from Tony Hart in connection with this matter.

THE COURT: Thank you, sir. Anyone else have any questions?

MS. MAHLER: If I just may follow up with --

THE COURT: Yes.

RE-DIRECT EXAMINATION

BY MS. MAHLER:

Q Mr. Allen, you mentioned that, you know, if you heard anything it was maybe from your niece, Lisa Hart. Was that after February 2019?

A This would have been just days prior to my interaction with Agent Barrar, which would --

Q Okay.

A -- I think would have been in June of 2019, so --

Q Okay.

A -- this was shortly just before Agent Barrar contacted me with this.

Q Okay.

A Yeah.

Q The first you heard about anything going on with possible changes in this case was around the time you spoke to Agent Barrar in June of 2019 when you gave your letter?

A That's correct.

Q Okay.

A It would have been that -- a very fresh something unfolding at about that time.

Q Okay. Thank you, sir.

MS. MAHLER: I have nothing further, Your Honor.

THE COURT: Any follow-up from Defense Counsel?

MS. MCHUGH: No, Your Honor.

THE COURT: Mr. George, anything else, sir?

MR. GEORGE: No.

THE COURT: All right, sir. Thank you for your time, Mr. Allen. Thank you.

THE WITNESS: Thank you, sir.

MS. MAHLER: Thank you.

THE COURT: All right. So I appreciate everyone's patience. We haven't really taken much of a break. It's -- I think what we have left to accomplish is a replacement expert for Cynthia Link. I think we had a phone -- a phone call -- I'm losing

track of time, but a couple of days ago, and it was expressed to me, I believe -- I think -- we were not on the record, or were we? I forget?

THE CLERK: No.

THE COURT: No. So let's recapture that conversation and place that on the record. It was relayed to me that Defense witness, Cynthia Link, who is a former superintendent at SEI being offered on prison records and also adjustment of prison life -- that her illness is serious and that the Defense is going to have to find a replacement witness. And that they wanted to pursue that, and that they were, in fact, pursuing it, and they believed that it would not further, you know, delay the matter substantially. And I think -- who's taking the lead on that from the Defense? Is that you, Ms. Vanwyk?

MS. VANWYK: Well, I can describe, you know, our conference from the other day, Your Honor.

THE COURT: Is that -- did I capture our conference accurately?

MS. VANWYK: Yes. Yes.

THE COURT: Okay. Is there anything else I missed?

MS. VANWYK: Just that we are, you know, making strides. We're still not really,

unfortunately, in a position to give you a specific date, but --

THE COURT: Okay.

MS. VANWYK: -- we're working on it.

THE COURT: Okay. And then I guess the Attorney General would react to the replacement expert witness. Perhaps, hopefully, your possibly rebuttal witness, Jeffery Beard [ph] would, of course, get the opportunity to see the report prepared by the replacement expert witness for the defense. And then we could figure out do you need a new report. Is the existing report sufficient. But let's take one step at a time.

MS. MAHLER: That's correct. Thank you, Your Honor.

THE COURT: Okay. And then aside from those two witnesses, the only other witness that I'm aware of is -- and that would be David A.K.A. Tony Hart. And is he going to come in live, or by video?

MR. BARKER: Your Honor, I believe he would be by video.

THE COURT: Okay.

MR. BARKER: That's how we intended to do it.

THE COURT: All right. That could be a to be determined. So. So how long do you think your

process is going to take, Ms. Vanwyk? And I'm not pressing you, I'm just wondering.

MS. VANWYK: I guess we were thinking we might -- we should be able to give you a sense of a timeframe sometime next week.

THE COURT: Great. Perfect. Okay.

MS. VANWYK: I don't know what --

THE COURT: And if that's okay with everyone --

MS. VANWYK: -- the timeframe would be, but I think we would know by then what (inaudible).

THE COURT: Just a status. Yeah. And if it's okay with everyone else, I think an email to Mr. Sonnie, or my law clerk, with everyone copied on it, and then I can read that, see where you're at, decide whether we want to get on the phone or not. And then is -- does the AG's Office intend on calling the DA's Office victim witness coordinator?

MR. BARKER: No, Your Honor. It was our understanding that the District Attorney's Office was planning on calling her.

THE COURT: Okay. Mr. George, are you calling that witness?

MR. GEORGE: I expect so, Your Honor.

THE COURT: Okay.

MR. GEORGE: Although it might depend on what Mr. Hart says, but I expect so.

THE COURT: Understood. Okay. So why don't we just not set a date -- well, maybe we'll try to fill in a date. I'll talk to my staff. I mean, getting a courtroom and getting dates is, you know, a major accomplishment here. But we'll work on that on our end. We'll look for your status email -- can I say a week from -- no later than a week from today?

MS. VANWYK: Okay, Your Honor.

THE COURT: Does that work?

MS. VANWYK: Yes.

THE COURT: Okay. All right. Anything else?

MS. MCHUGH: I just --

THE COURT: I think we have a -- yes.

MS. MCHUGH: I do have one point.

THE COURT: Sure.

MS. MCHUGH: This morning the public video feed was not working, and Dr. Blumberg was set to watch Dr. O'Brien's testimony to see if there was any need for rebuttal. And he'll have to read the notes now.

THE COURT: That's fine.

MS. MCHUGH: So I just wanted to alert the Court that I may seek request to present rebuttal

testimony, but I don't know that yet.
THE COURT: Sure. And that's certainly a fair request. The public video feed was not working all morning?
MS. MCHUGH: That's my understanding.
THE COURT: Okay.
THE CLERK: I think (inaudible) Dr. O'Brien (inaudible).
THE COURT: Okay.
THE CLERK: (Inaudible).
THE COURT: Okay. All right. Very well. Thank you.
MS. MCHUGH: Thank you, Your Honor.
MS. MAHLER: Thank you, Judge.
THE COURT: Yeah, at some point, Counsel, I have a motion pending for recusal. So.
MS. MCHUGH: Oh, Your Honor, we -- you -- I believe your request was whether -- you asked us whether you should rule on it, or -- and I would say yes, you can rule on it.
THE COURT: Well, I'd probably say the same thing. It's a pro se motion for recusal. I've read it. I -- but it's been a couple of weeks, so I'd have to -- I'm going to read it again .
MS. MCHUGH: Okay.

THE COURT: But my question to you, I think, was you're counsel. Are you adopting it as counsel? Are you asking for my recusal? Or is it a separate pro se motion? That's my questions.

MS. MCHUGH: It's a pro se motion, Your Honor.

THE COURT: Pro se motion? All right. Then let me -- out of respect for Mr. Wharton's position, let me re-review that because it's not fresh in my mind, and I'll -- it's very unlikely I will recuse, but I will re-read it because it's not fresh in my mind, and I -- we'll take care of that before we meet the next time.

MS. MCHUGH: Thank you.

THE COURT: All right. Thank you.

(Whereupon, at 2:20 p.m., the proceeding was concluded.)

CERTIFICATE OF NOTARY PUBLIC

I, STEPHEN SONNIE, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

STEPHEN SONNIE
Notary Public in and for the
State of Philadelphia

CERTIFICATE OF TRANSCRIBER

I, JESSICA EIDSON, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JESSICA EIDSON

**0**

**06049** 1:4

**1**

**1** 8:3 9:18 12:12 20:10 156:17 158:21,24 159:2,5 159:23 160:10 188:12,15 192:8 193:11,11,14,20 193:25 194:3 203:4 207:22 210:16
**1's** 193:15
**1/2** 156:17 192:8
**100** 3:14
**102** 3:16
**10:00** 150:13
**10:30** 82:5
**10:45** 82:5,9
**10th** 25:11
**11/23** 8:19
**11/23/89** 7:25
**112** 3:17
**118** 4:14,14
**12** 206:9,10
**12/6/84** 21:13
**12/6/89** 21:14 25:7
**128** 3:18
**12th** 21:25 51:1,4
**13** 60:6
**131** 3:20
**1400** 156:11
**141** 3:21
**149** 3:23
**15** 35:15,19,21 36:18
**15th** 204:16
**16** 158:2 192:23 198:3
**167** 3:24
**16th** 1:11 2:20
**17** 158:17,17 199:3
**17120** 2:22
**174** 4:2
**17a** 153:24 154:8 191:3,9
**17b** 200:13
**17c** 195:22 196:15
**184** 4:4
**19** 123:11 185:10
**19106** 2:7
**19106-1732** 1:17
**19107** 2:15
**1973** 185:10
**1980s** 168:24 174:4
**1981** 51:3
**1982** 102:21
**1983** 44:14,19,19 60:12 168:2
**1984** 87:11 132:9 136:19 151:11 168:1
**1985** 136:25 139:18
**1986** 13:9 14:5 17:3 27:10,20 29:2 34:1 44:15 61:7 63:11 102:14 102:24 104:6 109:1,25 121:18 128:13 129:9 174:23
**1988** 19:6,25
**1989** 8:3 10:8,19 12:3,25 13:16 17:2,11,17 20:6 28:21 34:5,19 45:7 56:24 61:3 62:11 76:13 144:14 150:7,10 150:18 152:3 154:20 163:4,11 165:22 172:10 174:23 175:4 185:3,12,20 191:19 199:3
**1990** 25:12 66:24
**1990s** 168:25
**1992** 27:20 35:3,22 46:8 49:8 57:13 61:8 63:11 64:5,9 64:23 65:2,7,22 66:25 67:3,8 69:15,21 80:22 81:17 84:25 104:25 105:9 132:17,23 139:18 166:24 167:2 175:4 206:20 219:8,15
**1993** 185:10 187:5
**1999** 205:24
**1st** 8:5,15 151:23

**2**

**2** 4:14 7:16 39:2,3 158:25 188:12,14 193:11,14,25
**2/7** 25:21
**20** 19:10 111:6,19 185:10 186:25
**2011** 151:23
**2018** 91:16 125:15 129:10
**2019** 89:1,4,11,21 90:2 91:10,17 96:22 100:12 111:6,19 121:4,6 121:25 123:3 124:9 125:14,17 128:19,22 133:4 133:11,16,19 135:7,25 219:21 220:3 222:9,16 224:20 229:15,19 230:3
**2020** 60:2,3,5
**2021** 1:11
**207** 4:5
**20th** 121:4,6 123:10 124:9 125:14,17 128:22
**21** 18:24 19:1
**215** 181:2
**218** 4:7
**21st** 60:23 104:6 109:1,24
**225** 103:5 112:11 119:15 120:6,25
**2254** 85:6
**226** 4:8
**229** 4:9
**23** 74:24 190:2
**24** 18:5,10
**28** 64:10,24 65:23 69:9 78:25 151:25 163:21 168:18
**29** 74:20
**291850** 157:20 158:5 192:17
**2986** 60:24
**2989** 204:16
**2:00** 150:13 216:4
**2:01** 1:4
**2:20** 236:16
**2nd** 7:19 205:24

**3**

**3** 2:14 20:9 60:6,8
**3/4** 156:20 164:12 192:12
**30** 111:11 130:24 169:22 212:8

**32** 45:18 46:1 91:24
**33** 92:7
**35** 46:20,23 110:11 136:21
**35p** 46:18,19 47:9
**35s** 47:7,9
**37** 90:9
**3rd** 41:22 50:16 69:16,18 132:9

**4**

**4** 7:12,12,14,15 12:12,18,24 21:8 21:10 47:19 48:6 48:17 75:9 166:6
**40** 4:14 80:24 118:14,15 119:10
**401** 84:24
**43** 74:15
**4412** 39:14
**4509137** 1:18
**4:00** 145:3
**4th** 123:3

**5**

**5** 9:19 11:8,15 20:20
**5/15/89** 154:11,11 191:14,14
**5/17/89** 196:2
**545** 2:6
**59.72** 74:16
**5th** 60:5 125:15

**6**

**6** 3:7
**60** 74:12,17 75:19
**601** 1:16 2:6 156:12,14,22,23 157:1,3 166:5 171:12,13 173:15 192:7 201:8 211:20
**601's** 211:23
**64** 3:8
**6874** 171:10
**6th** 89:1,11,21 91:10,17 93:11

**7**

**72** 74:15
**74** 3:9
**7th** 26:6 222:8,15 224:20

**8**

**80** 3:10
**80's** 190:5,10
**801** 187:16 188:9
**80s** 168:25 202:19
**814-386-6054** 182:17
**82** 112:14
**83** 168:3
**86** 3:12
**87** 24:8
**871** 21:12
**872** 22:13
**88** 179:1
**89** 7:4,7,7,16,20 8:5,15 21:25
**8th** 135:24

**9**

**9** 39:10
**90** 25:22 202:16
**90's** 190:5,10
**92** 151:13,14
**951** 7:15
**954** 8:2
**955** 25:6
**958** 26:5
**96** 3:13
**9:09** 1:12

**a**

**a.k.a.** 232:18
**a.m.** 1:12
**a6874** 156:13,14 156:21
**abandoned** 223:16
**abandoning** 224:13
**abiding** 31:14
**ability** 53:2 203:24 237:11 238:7
**able** 36:1 43:4 45:1 65:24 66:14 69:4 71:20 79:11 79:16 81:1 91:7 109:12 110:12 121:13 167:1,6 173:2,4 174:19 175:13 177:5 179:15 233:4
**absence** 28:8 59:17 212:15
**absolutely** 129:11 198:24 204:18
**abstract** 108:6
**abuse** 54:10,11,13
**ac** 8:12,23 24:7 203:19
**academic** 38:10
**accept** 18:11 19:18 101:22
**acceptable** 101:13 118:25 170:7
**accepted** 16:18 29:24 99:8 142:9 228:21
**accepts** 17:25
**access** 160:12 197:3
**accident** 139:10
**accommodations** 204:6
**accomplish** 230:24
**accomplishment** 234:7
**account** 51:11 53:17
**accountable** 225:8
**accounts** 14:12,13 16:2 49:3
**accuracy** 59:21
**accurate** 50:11 63:2 67:9 72:10 237:10 238:5
**accurately** 111:18 231:20
**ace** 109:7
**achieve** 225:18
**acronym** 13:25
**act** 31:22 85:3
**acting** 32:1
**action** 43:11 160:16 237:13,17 238:8,12
**actions** 91:6
**activity** 64:12
**acts** 59:19 224:8 224:17 225:8
**actual** 40:1 45:8 164:17 167:2
**adapt** 71:16
**add** 74:21 194:13 194:16
**added** 135:18
**addition** 108:5
**additional** 114:16 172:11
**address** 97:3 113:7 114:14 117:2 126:1 148:5 228:1

**adjacent** 196:24 197:3
**adjudicate** 187:20
**adjudicated** 186:12
**adjudicating** 187:7,22
**adjust** 65:23
**adjusted** 9:23 11:3 11:11 68:14 69:11
**adjusting** 34:16 213:4
**adjustment** 8:11 9:4,6,13 25:16 33:21,23 41:21 50:7 52:10,16,25 57:16 58:14,15 61:7 63:9,11 64:10 65:3 68:4 70:11 134:18 212:24 213:23 231:9
**adjusts** 72:24
**administration** 124:11 125:1,3 127:24 129:9,10
**administrations** 125:2
**administrative** 23:2,19 24:14 202:20,25 203:9 210:19 211:3
**admissible** 84:24 104:25 105:12,18 107:7
**admitted** 4:12
**adopted** 46:14,15 138:9
**adopting** 236:2
**adult** 89:17 94:22
**advanced** 14:8 15:10,11,15 186:3 226:16
**advancing** 220:18 221:8
**adverse** 56:2
**advisement** 127:12
**advocate** 101:21
**aerial** 25:19
**affect** 78:3
**affirm** 81:5
**affront** 94:16 225:6
**afraid** 202:14
**afternoon** 102:12 102:13 114:1 123:20 149:8,23 149:24 167:15 174:15,16 184:20 184:21 217:17
**ag** 12:19 18:24 19:1 20:10 63:19 73:22,24 101:13 214:16
**ag's** 46:19 215:19 233:17
**age** 35:15,19,21 36:18 68:25 80:24 125:20 126:16 127:4 146:17
**agent** 111:5,14,19 111:23 128:18 224:20 229:4,17 229:22 230:3
**ages** 68:19
**aggressive** 71:13
**aggressiveness** 35:11
**ago** 99:5 110:11 136:22 142:7 212:8 228:18 231:1
**agree** 14:10 20:1 28:11 29:18 31:12 31:17 36:16,19 37:13 63:12 68:13 68:18 80:22 85:9 85:10 91:3 105:10 105:10,11 107:12 147:13 209:15
**agreed** 101:12 123:21 139:17
**agrees** 177:5 178:17 225:2
**ah** 105:23
**ahead** 6:22 14:2 24:24 27:15 42:13 66:10 70:5 76:6 84:8 86:21 96:8 98:12 100:1 118:5 127:20 128:10 129:25 136:3 141:3 160:6 166:20 182:25 183:1
**airport** 223:5
**al** 1:6
**alert** 234:24
**alias** 89:9
**alive** 93:24 104:3 223:8
**alleging** 28:4
**allen** 4:6 87:7 88:9 88:22 131:17,18 132:6 133:1 214:21 215:2,14 216:20 217:8,10 217:17 218:2,5,10 218:12,23 219:17 221:12 222:7,12 222:22 225:21 226:12 227:7,17 229:13 230:18
**allow** 42:10 46:4 65:10 125:6,24 226:16
**allowed** 66:8 83:12 84:14,20 115:24 170:3 203:23
**alphabet** 47:3
**alternate** 31:22
**alternating** 103:20
**alternative** 31:24
**amazed** 212:9
**amount** 189:22
**analysis** 78:3 84:4 85:12
**answer** 24:24 35:6 35:7 46:4 51:9 65:10,13,15 67:4 67:16,25 71:9 79:10 118:4 125:7 125:9 126:20 127:12 138:12 142:22 150:4,5 164:5,24 170:8 205:19 212:21 219:11,13
**answered** 37:8,14 37:15 72:7 77:11 115:21 134:10 143:7
**answering** 127:3
**antenna** 13:1 25:20 156:17,19 156:22 158:14 164:11 165:4,16 166:6 171:12,13 172:25 173:2 174:5 192:8,12 198:14,22 201:5

202:6 206:8
**antennas** 165:2
**anti** 35:5,16 36:7,9 36:14,20 37:6 44:3,25 45:9,22 47:17 49:25 52:8 55:18 68:14,22,25 69:1 71:18
**antisocial** 36:4,11
**anxiety** 33:18
**anybody** 15:4 99:14 117:14 121:7 217:9
**anytime** 152:6,7 152:17 168:25
**anyway** 77:11
**apologize** 114:2 140:22
**apparently** 30:5 33:17 63:15 66:11 77:18 98:14 134:19
**appeal** 99:6,15 142:8,25 187:7 213:1 224:13 228:19,24
**appealing** 74:23
**appeals** 121:19
**appear** 75:5 122:4 225:12
**appeared** 74:22,24 123:2 129:5
**appearing** 39:5 74:12
**appears** 22:17 33:25
**appellate** 129:4
**application** 226:20
**applied** 45:3
**apply** 85:1 116:3
**appreciate** 5:11 226:15 227:4 230:21
**appreciation** 226:23
**approach** 92:2 111:10 118:9 135:8
**appropriate** 31:19 66:9 84:16 126:10
**approved** 93:14 160:16
**approximately** 110:11 150:20 151:25 156:11,19 164:12 187:2 192:12
**april** 60:23 102:14 102:24 104:6 109:1,24 151:23
**area** 29:8,11 173:6 210:13 211:20 224:4
**arguably** 65:19
**argumentative** 72:14
**arguments** 33:8
**arm** 109:13,13
**arms** 138:24
**array** 53:5
**arrest** 44:14,20
**arrested** 136:23
**arrests** 44:22
**arrive** 36:14
**arrives** 58:3
**arriving** 81:18
**article** 14:17,17 16:5 81:4
**arts** 28:25 29:1,8 29:15 77:16
**ascertain** 93:16
**aside** 84:18 232:16
**asked** 6:7 25:8,14 35:3 37:8,14 59:25 64:22 66:20 67:17 69:19 74:24 75:8,24 76:15 77:13 79:19 100:4 115:20 122:3 136:9,10,10 138:20 139:16 172:1 213:13 235:18
**asking** 22:1 40:22 40:24 41:9,14,25 47:11 53:14 58:1 61:12 72:19 79:4 124:1 143:6 164:20 166:12 174:19 190:6 236:3
**aspd** 49:23,24
**aspect** 204:5
**aspects** 59:17 83:7 84:14
**assault** 16:22 193:19 204:25 205:1 208:7,9,11
**assaulting** 26:19 27:1
**assaults** 193:16 207:21,22
**assess** 53:4 69:19
**assessing** 20:6
**assessment** 13:14 53:15 56:21 57:21 58:11 59:22 62:8 71:11 74:17,19 81:17
**assessments** 53:10
**assigned** 22:20 23:2 24:14 102:25 103:3,5,12 104:6 112:11 156:13,21 171:11 174:24 175:1 185:15 223:21
**assignment** 175:5
**assist** 130:21
**associate** 68:25
**associated** 56:22 68:23
**assume** 15:24 63:1 117:11 147:17
**assuming** 17:5
**ata** 27:25 28:7 212:14
**attempt** 13:5,19 14:19 17:4,16 34:1,6 45:6 56:24 59:1,20 61:14 194:21 212:3
**attempts** 94:22 220:9 224:15
**attend** 74:15 75:12 75:22
**attendance** 38:10
**attention** 12:11 31:3 45:11 104:5 116:24 153:21 161:9 190:25
**attenuation** 68:23 69:3
**attorney** 2:19 5:13 9:18 18:19 33:3,8 42:2,6 85:25 92:7 93:8,10,15 95:8 96:23,24 111:25 121:3,25 122:1,11 122:23 123:6,22 125:5 126:6,15

127:4,25 128:3 136:8 142:14 222:13 224:19 232:6 237:15 238:10
**attorney's** 2:13 88:14,20 89:12,22 90:4,22 91:12 92:15 93:13 94:15 95:10 96:17,21 97:3,13 98:20 99:4 102:17,19 113:14 117:19 121:8,21 124:10 127:24 132:18,24 133:5,11,20,24 134:11 141:10 142:6,24 219:9,12 219:16,22 220:3,8 220:17 221:2,7,8 221:20 223:22 224:22,23 226:19 227:20 228:2,5,18 233:20
**attorneys** 113:23
**atypical** 75:7
**audible** 64:16 179:10
**audio** 179:14,16 179:21,24 181:25 222:24 237:9 238:3
**august** 7:16,19 205:24
**aunt** 88:3,6 138:1
**authored** 47:20
**authorized** 28:8 212:15
**automatically** 23:4 24:6,16
**availability** 190:18
**available** 124:4 162:13 166:22 206:18 216:22 221:5
**avoid** 99:7 142:8 228:20
**await** 195:18
**aware** 45:25 62:5 77:17 93:6,11 98:1 108:6 109:19 110:22 113:12 114:14,15,19 117:10 123:2 166:3,12,13,14 175:11 186:13 188:25 220:6 224:18 232:17
**ay6874** 156:23

**b**

**b** 4:11 111:24 154:15,16 156:12 157:3 168:9 178:17 179:16 191:14,17 200:16 200:18,18
**b601** 154:15 191:15,17
**baby** 136:20
**back** 6:9 8:23 24:6 24:7,21 25:8 27:12,18 33:24 101:2 102:14 109:8 110:4 111:19 127:10 134:20 136:19 138:19,23 145:5 146:12 147:23 150:7 152:2,3 158:16 163:4 164:10 165:21 166:23 169:12,20 169:22 170:11 171:3 174:4 176:12,22 180:11 183:24 185:3 190:5 193:9 195:1 206:19 211:9 216:4 224:4
**background** 48:4 141:7
**bad** 66:18 135:3
**bahamas** 219:4 221:14,16 223:5
**bail** 195:15
**baker** 130:3,5 145:22 146:4,6,8
**balanced** 34:3 58:19 59:15 67:19 68:4
**bandage** 109:7
**barker** 2:17 3:9 5:12,14 46:2 63:19,21 65:5 66:2 67:11,13 68:8 69:13 72:14 74:1,4,7 77:12 78:10,12,16,17 79:18 80:16 82:17 101:17 129:23 130:1 232:20,23 233:19
**barrar** 111:6,14 111:19,24 121:3 128:19 136:8,17 224:20 229:4,17 229:22 230:3
**barrel** 198:13
**barrier** 32:21
**bars** 138:5
**based** 11:9 15:10 18:13 19:20 20:17 22:4 28:12 44:5 45:15 63:12 66:18 67:8 72:25 77:17 125:20 126:10 166:8 175:7 207:11
**basically** 24:19 32:4 67:19 68:22 160:13 163:8 173:7 204:25
**basis** 30:6 33:22 44:1 52:24 65:25 66:20 67:20 72:25 78:20 79:14 124:18 153:16,19 159:11,17 167:4,5 205:12 213:7,9
**basketball** 204:23
**bathtub** 110:21
**bear** 99:19
**beard** 232:8
**bed** 204:8
**behalf** 2:2,9 47:17 220:18 221:9
**behave** 24:4 52:13 71:20 79:14
**behavior** 9:1 11:10,21 17:3 21:1 24:21 33:24 33:25 34:4 45:2 47:17 53:9,19,20 53:21 56:22 57:2 57:2,9,12,13,19,20 57:22,24 58:2,2,8 58:9 62:17 65:19 66:17,18 67:8 68:15 69:2,6,7 70:10,14,20,21 71:6,12,13,13,14

71:24 72:3,24 77:19 78:5,19 80:23 81:9,19 134:18
**behavioral** 9:21 10:3,10
**behaviors** 35:11
**belief** 95:3 161:24
**believe** 6:3 7:2,9 9:18 14:6 15:5 21:14 29:13 39:12 42:6 46:21,25 59:7 60:1,2,5 74:21 77:5 81:9 90:18 95:19 121:4 122:16 126:9 128:19 136:25 140:5 150:12 161:18,19 169:7 175:1 191:5,20 202:23 203:11 206:10 229:1 231:2 232:20 235:18
**believed** 114:25 142:23 231:13
**believes** 22:3
**belonging** 192:7
**belt** 109:11 199:8
**benefit** 73:14 134:19,20,24
**bent** 173:5 198:17 199:1
**best** 11:25 53:20 57:23 71:14,25 100:9 119:3 137:6 145:10 148:19 237:10 238:6
**bet** 140:19
**better** 70:14 167:19,20 183:18
**beyond** 103:19 172:6,6 173:16
**bias** 125:6
**big** 22:19 121:12
**bill** 180:18 182:5 183:21
**binding** 166:7
**birth** 137:6
**birthday** 138:2
**bit** 12:21 82:23 83:7 95:21 130:19 220:11 221:9 222:23
**blank** 147:24 148:1,15
**blatant** 22:7
**block** 39:13,20,24 154:16 156:13 157:3 160:21,25 168:9,9,9,10 190:13 191:14,17 203:11 210:22
**blumberg** 31:18 34:11 36:17 43:2 50:25 53:3 58:24 58:25 60:9 61:18 61:20 62:4 63:6 63:14 234:19
**blumberg's** 16:12 18:2,13,17 19:20 33:19 54:8 59:9 59:23 60:1
**bob** 138:4 139:15
**bodies** 110:18 223:16
**body** 223:17
**bolt** 165:13,15
**bolts** 157:11 165:7
**borrowed** 223:12
**bother** 27:12
**bottom** 20:10 47:19 154:22 158:20 193:10 196:2 200:6
**bound** 78:8
**bounds** 126:20 147:3
**box** 161:11,18 195:2 200:10
**boy** 200:18
**bradley** 87:7 130:7 131:17,18 131:20 132:10 136:18 137:5,14 138:21 141:25 142:5 219:4 223:4 223:12,17 228:15
**break** 6:12 82:4,19 145:13 148:25 176:24 216:19 230:23
**brief** 74:4 80:18
**briefed** 83:5 224:20
**briefing** 225:13
**brilliant** 223:23
**bring** 114:16 134:20 137:2 167:6
**broke** 174:21
**brother** 131:18,21 132:2,6,10 134:20 137:5,15 141:9,19 141:25 142:5 214:24 218:14 225:10 228:15
**brothers** 205:23
**brought** 109:25 138:8 196:25 209:18
**bucket** 110:22
**buddies** 40:3
**burglaries** 60:17
**burglarized** 60:10 60:11
**business** 49:15
**busy** 121:23
**bye** 176:18 214:14

**c**

**c** 2:1 3:1 5:1 160:18,21 161:1 168:9
**cage** 29:12,16 170:13,22,25
**call** 30:24 66:14 85:23 99:2 107:3 107:12 109:11 129:20 143:19 144:4,7,8 146:14 146:19,20 176:8,9 177:8,8 178:18 179:7 180:11,13 180:14,22 182:4,8 182:12 183:25 184:1 203:25 215:23 223:10 230:25
**called** 34:12 35:2 63:19 66:16 103:2 122:3 125:5 175:12 222:11
**calling** 85:20 119:10 138:10 147:19 179:2 233:17,21,23
**callous** 35:9
**calls** 85:25 91:19 98:25
**camera** 148:21
**candidate** 128:2

**cannon** 33:3
**capacity** 223:13
**capital** 8:10 105:19,20 106:1
**captain** 171:20 187:17 193:8
**captain's** 186:11
**capture** 231:19
**car** 138:13
**care** 137:17 146:15 176:2 236:12
**career** 110:15 111:1 116:25 121:23 163:20
**cari** 2:18
**carlos** 3:15 102:1 102:4
**carpenter** 48:12 48:19
**carpentry** 49:15
**carr** 3:19 88:3 129:21 130:6,14 130:16 131:10 135:6 136:6,17 139:25 140:17 141:6
**carried** 95:4 169:25
**carry** 93:18 169:12
**carrying** 170:2
**carter** 34:11
**case** 8:10 18:20 59:14 62:21 65:1 77:6 80:4 88:12 88:17 89:14,19,24 90:6,18,24 93:11 94:15 95:1,10,14 98:23 100:17 104:13,22 105:1 105:10,13 107:20 107:21,23 108:9,9 110:17 111:3 116:21 117:20 121:9,22 122:12 122:14,24 123:2,7 131:17 132:9,14 132:20 133:8,13 133:21 134:1,13 196:12,15 201:17 219:10,19,24 220:5,9 221:21 223:21 226:14 228:14,23 229:3 230:2
**cases** 32:24 44:9 80:5 85:5,6 103:17,18,22 104:1 121:23 129:5 206:11
**casework** 186:3 207:13
**cast** 109:6,10,14 112:17
**categorically** 84:25
**categories** 58:12 188:11,14
**category** 71:21 158:21 193:11,14
**cause** 37:3
**cautious** 147:17
**celebrated** 94:4 137:11
**cell** 13:3 17:2,22 152:7,18 156:12 156:13,21,22 157:1,3,4,16 166:5 166:6 168:13 169:2,12,14 170:4 171:12,13 173:1 173:15 179:9 190:16 192:7 197:18,24 199:21 199:25 200:1 201:8,24 202:4 203:1,11,18,19 204:4,5,6 208:16 209:12,17,21,21 210:2,3,7,21 211:1 211:9,19,23 212:14
**cells** 153:2,2 190:13 200:2,3 202:25 208:24 209:19
**center** 129:4
**central** 117:15
**certain** 53:16 83:7 124:20 202:22 209:16 220:12
**certainly** 32:12 45:7 69:22 73:23 75:3 185:2 193:15 194:6 201:22 207:20 220:14 221:3 222:19 235:2
**certainty** 79:17,25
**certificate** 237:2 238:1
**certify** 237:4 238:2
**challenge** 59:21
**chance** 154:19 192:1
**change** 71:11 83:16 84:1 89:18 89:23 90:5,17,20 91:13 100:16 133:20 168:6 203:22 204:4 208:16 210:21
**changed** 85:1 186:9
**changes** 93:6 98:1 132:19 168:8,10 169:23 230:2
**character** 12:4
**characterization** 104:23 209:12
**characterizations** 83:9 84:15,17
**characterize** 190:22
**charge** 16:16,21 29:3 128:15 156:1 162:16 191:22,23 192:6 193:18
**charged** 156:23 162:5,9 171:14 223:25
**charges** 46:16 77:21 107:6 136:25
**chat** 215:22
**check** 46:22 156:12,15,25 157:10,10 173:23 178:11,19 200:9
**checked** 157:12 158:21 161:14,19 161:20 177:2 193:12 195:3
**checking** 156:16
**child** 94:21
**childhood** 56:2
**children** 137:25
**chin** 30:2
**choose** 103:22
**chose** 63:6
**chow** 169:9

**christmas** 138:2
**church** 60:11
**circuit** 41:22 50:17 69:16,18
**circumstances** 65:8 72:4 94:1 116:6
**citing** 187:14
**citizens** 113:23
**city** 4:14 103:9,10 108:19 113:18 119:12,13,22 120:23
**civilian** 186:12
**claim** 201:25
**clarification** 73:22
**clarified** 73:22
**clarify** 50:18 213:21
**clarifying** 52:15
**class** 158:21,24,25 159:2,5,23 160:10 188:12,12,14,15 193:11,11,11,13 193:14,15,20,25 193:25 194:3 203:4 207:22 210:16
**classify** 194:2
**claudia** 2:4
**clear** 36:19 38:4 64:16 71:23 76:25 84:10
**clearance** 223:7
**clearer** 64:19
**clearly** 42:22 197:17 198:8,9,20 225:17 226:3
**clerk** 5:2 82:7 86:9 86:12,15 101:24 102:2,5 130:12,15 130:17 144:25 145:3,17 148:24 149:8,12,16,19 177:7,13,15 182:16 183:2,4,10 184:16 187:18 217:1,14,17,21,24 218:1,4,6,11 231:4 233:14 235:7,10
**clerk's** 1:15
**cleverly** 226:3,6
**clinging** 223:19
**clinical** 45:4,9 53:14 68:22
**close** 7:23 97:1 137:18,25 165:9 165:10
**closely** 164:17
**closer** 130:20
**clothes** 139:4
**clothing** 108:17
**co1** 154:24
**co4** 160:18
**coat** 220:17,25
**cognizant** 119:2
**cold** 139:7 172:1 223:14
**colleagues** 121:21 122:12
**collection** 121:14
**colored** 94:4
**combination** 165:8 173:1
**come** 86:5 124:4 142:18 145:5 169:6,9,14 170:4 172:2 176:12 190:20,21 198:18 199:8 232:19
**comes** 138:6
**comfort** 118:18 224:2
**comfortable** 86:3 95:2 126:19 127:3 135:10,22 136:13
**coming** 93:8 110:6 120:8 210:15 229:5
**commenced** 186:2
**commented** 48:21
**comments** 75:24
**commission** 125:18
**committed** 85:1 135:4 203:4 207:21
**committee** 14:1 23:17,17 24:1,11 25:10 76:7,12 212:23 213:2
**commodity** 202:8
**common** 206:15
**commonwealth** 16:22 65:24 66:13
**commotion** 110:3
**communicate** 76:10
**communicated** 224:25
**communication** 219:25 225:11,16 226:2
**communications** 133:23
**communicative** 76:3
**community** 194:13,17,18 225:7
**compared** 76:16 190:10
**compelling** 56:8
**competent** 224:7
**complaint** 125:17
**complaints** 75:13
**complete** 101:17
**completion** 38:1
**complexity** 220:13
**complicated** 71:10 143:5
**comply** 29:23
**comprehension** 21:2
**concealed** 156:17
**concern** 62:13 85:11 116:6,8,14 220:20 226:18
**concerned** 10:16 34:18 59:13 109:21 113:3 114:25 139:15
**concerning** 224:22
**concerns** 10:14 25:25 28:13 79:15 85:10 109:17 113:9
**conclude** 33:22 57:18
**concluded** 236:17
**concluding** 11:9
**conclusion** 9:13 15:9,12,19 34:21 63:9,10
**conclusions** 38:5 59:22 61:4,9
**concurrent** 45:10 45:15
**conduct** 11:25 33:9 35:18,23 36:2,17 37:23,23 38:6,8 42:23 76:10

**conducted** 172:6 172:11 186:10
**conducting** 157:9 192:6
**conducts** 26:6
**conference** 40:20 41:16 138:20 183:17 231:18,20
**conferences** 40:7 41:3 43:5
**confide** 137:9
**confidence** 224:5
**confident** 66:13
**confined** 170:13 195:13,20
**confinement** 161:10,19 162:4 162:11,15 163:5 195:3,9,16,19 203:3
**confirmed** 139:18
**confiscated** 157:20 157:23 158:6,13 192:17,19 193:2 198:3,6
**conflicted** 55:16
**conflicting** 14:13 49:2
**conflictual** 55:16
**conform** 35:10
**confronted** 139:23
**confused** 12:13,18 90:7 105:16
**connect** 50:13
**connection** 46:15 68:3 104:12 111:6 177:4 187:21 192:2 228:4 229:6
**connects** 50:5
**conrad** 4:3 179:11 180:12,13 181:3 181:18,24 183:2,5 183:10,12,14 184:10,12,13,20 187:8 189:16 191:1,4,18 192:14 192:20 193:3 194:12 195:1,23 196:4,4 197:9 198:20 200:4,24 202:15 205:19 206:18 207:4 212:12 213:21 214:7
**consecutive** 206:1
**consecutively** 47:1
**consent** 22:9
**consequence** 224:14
**consequences** 16:7 91:6,8 135:5 224:16 225:19
**consider** 9:14 29:1 29:2 52:18,22 56:17 63:14 81:18 140:7,7 204:15
**consideration** 53:19 57:19 58:20 59:6,17 61:5 62:22 65:6 71:12 139:19
**considered** 9:12 30:3 56:20 58:18
**considering** 23:20 34:5,21 58:10 80:12
**considers** 45:6
**consistent** 9:21 10:13 45:5 59:5 74:16 75:4 119:18 120:21
**consolation** 95:22
**conspiracy** 106:22
**conspirators** 78:2
**constitution** 83:9 84:21
**constitutional** 84:13
**constitutionally** 83:8
**consulted** 84:3 221:20
**contact** 88:23 89:13 91:17,20 97:6 111:4 122:2 133:1 141:9 173:15 219:11,18 219:25 224:22
**contacted** 88:16 90:23 93:10,15 96:17,21,24,25 97:18 98:7 99:3 122:7 124:1,3 136:9 139:16 142:6,15 219:10 228:17 229:4,23
**contacting** 122:9 122:17
**contained** 128:24
**contemplated** 85:3
**contents** 155:16 200:25
**context** 13:4,18 34:5 73:9
**continuation** 5:8
**continue** 6:19 29:19 42:10 50:17 107:14
**continued** 20:13
**contraband** 156:3 156:24 159:4 161:6 162:5,10 165:23 171:14 191:23 193:5 194:2,5 197:23 201:7 204:16 210:2 211:1
**contradict** 66:15
**contradicted** 65:18 66:1
**control** 45:2 69:4 69:5 78:2,4,7,11 78:15,17 79:13,15 182:14 197:20 200:1
**controlling** 70:14
**convenient** 122:5 216:11
**conversant** 76:1,4
**conversation** 100:6,10 122:20 225:17 226:2 227:22 228:22 229:1 231:6
**conversations** 122:10,22
**convict** 221:9
**convicted** 104:14 106:21 108:7 109:20 114:23 136:24 224:7
**conviction** 14:5 60:24
**convoluting** 79:7
**coordinator** 233:18
**cope** 137:5
**copied** 233:14
**copy** 119:5
**corner** 120:19
**correct** 7:17 8:24 16:17 19:7 20:9 25:8,9 26:11

32:21 35:6 36:5 44:16 53:17 56:21 58:6 64:5 65:4 66:1 68:20 69:7 70:12 78:10 87:10 87:25 96:14 97:10 106:3 109:16 112:14 114:7,11 118:19 119:11 122:19 123:18 124:11 126:18 127:5 130:9 131:25 144:15 151:2,3,4,25 152:1 152:20,23,25 153:3,4,17,20 154:1,25 155:5,24 156:9 157:2,4,5,8 157:22 158:8,22 160:20 161:8,15 163:24 167:24 171:16,19 172:18 173:18 175:10,14 175:15,16 191:6,7 191:12,19 192:9 192:10 193:7 194:20,23 196:3,8 197:8 198:1 200:2 200:17 201:6 202:17 207:18 209:5,12,19,23 210:4,9 211:10,17 212:19,20 213:1 213:24 218:14,15 219:2,6 221:18 222:15 226:5,6,7 228:9 230:5 232:14

**correction** 30:12 32:19 148:4 167:22 174:24 211:13

**correctional** 46:7 186:3

**corrections** 8:9 10:15 17:12,15 26:20,23 27:2,6 30:23 63:1 143:17 143:21 146:8,9 150:15,16 185:6,9 187:12 188:8 199:7 207:8,9

**correctly** 44:5 113:25 126:2 152:19

**cos** 152:4 153:18

**counsel** 6:7 41:19 96:2 118:10 122:16 123:1,13 123:24 126:5 183:12 230:13 235:15 236:2,2 237:11,14 238:7 238:10

**counselor** 25:15 25:24 186:3 190:6 207:12,13 211:21

**counselors** 207:14

**country** 221:13

**county** 195:15

**couple** 7:11 74:1 83:5 99:4 112:13 142:7 174:3 228:18 231:1 235:23

**course** 15:17 68:22 71:4,8 83:3 84:22 95:17 139:5 176:15 232:8

**court** 1:1,14 5:2,4 5:16,20,23 6:1,6 6:13,16,19,22 12:21 13:5,24 14:2 18:6,8 24:23 25:4 27:11,15,20 28:5,7,18 33:2,11 34:24 37:10,13,18 37:20 38:17,22 39:16 40:15,18,21 40:24 41:6,11,14 41:25 42:5,9,13 43:13,16 46:4 49:18,24 50:3,5,12 50:16 58:17 61:17 61:22,24 63:18,22 63:25 64:13,20 65:9,15 66:4,10,22 67:4,16 68:10,11 69:14,25 70:3,5,19 71:1,4,8,23 72:2,5 72:7,15,18 73:3,18 74:3,5 77:2,7,10 78:7,11,14,20,24 79:1,3,8 80:17 81:22,24 82:2,4,9 82:12,14,20,23 83:2,13,15,20,23 83:25 84:7,11,18 85:5,13,15,19,23 86:2,7,16,19,21 91:25 92:1,3,25 95:9,18 96:2,5,8 96:18 97:21,24 98:17,22 99:2,11 99:13,17 100:1,22 100:25 101:4,6,9 101:14,16,20 102:7,9 105:2,6,9 105:12,15,19,21 105:23 106:4,7,9 106:17,20,24 107:2,7,8,10,14 111:23,25 112:2,4 112:7 113:8,9 114:4,8,12,15,16 114:20 115:8,13 115:22 116:2,7,10 116:18,23 117:2,6 118:1,4,12,17,20 119:1,7 123:16 124:4,13,17,22,25 125:11,23 126:2,4 126:8,11,14,19 127:2,6,16,18,20 128:5,8,10 129:14 129:17,19,22,25 130:2,4,6,11,18,23 131:1,3,6 135:10 135:13,17,20 136:2 140:9,14,19 140:21,25 141:3 141:16,20,22 142:2,4,21 143:3,6 143:10,12,14,20 143:23 144:1,3,10 144:13,16,20,23 145:1,4,8,12,17,19 145:24 146:2,5,10 147:8,11,13,16,22 147:25 148:4,7,18 148:22 149:6,14 151:1 152:13 154:7,9 158:3 159:11,14,16,19 160:3 161:23 162:23 164:3,22 165:1 166:12,16 166:18,20 167:7 167:11 168:16,20 168:22 170:6 173:20 174:10 175:20 176:3,6,11 176:15,21,25 177:11,14,18,20

177:23 178:4,7,11 178:16,19,21 179:5,9 180:1,5,8 180:18,23 181:1,5 181:8,10,12,15,17 181:20,25 182:3,8 182:12,18,21 183:6,8,12,15,19 183:21,23 184:2,5 184:8,11,13,17 186:11 192:25 205:12,14,17 206:25 213:7,9,14 213:18,25 214:3,5 214:8,10,15,23 215:1,3,8,10,12,15 215:17,25 216:2,4 216:7,11,12,15,18 216:25 217:2,4,7,9 217:13,15,22 218:8,12,16,18 220:13,23 221:13 222:1,8,14,22 223:25 224:7 225:24 226:6,9,21 227:2,12,14 228:13 229:7,10 230:12,15,17,21 231:5,19,22 232:3 232:5,16,22,24 233:6,8,12,22,25 234:3,11,13,15,17 234:23,25 235:2,6 235:9,11,15,21 236:1,7,15
**court's** 51:9 92:22 222:17
**courtroom** 86:1 103:4,5,13 104:7 104:11 108:25 109:4 112:17,20 112:24 113:22 114:24 115:5,12 116:19 119:15,19 120:6,9,25 128:16 129:8 135:21 179:18 180:3 184:9 234:6
**covered** 34:24
**covid** 135:13
**crasner** 127:25 146:16
**credibility** 201:15
**credible** 201:19,20 202:1
**credits** 51:5
**crime** 83:10 85:3 90:10 108:13,23 110:17 224:14
**crimes** 57:8,10 58:3 85:1 87:23 135:3 224:14
**criminal** 44:6,9,11 57:14 59:19 73:1 107:25 108:2,6 110:25 117:10 129:4
**criteria** 35:5,8,20 36:3 45:21 71:18
**criticized** 58:23
**cross** 6:20,23 62:5 63:22 64:2 74:8 80:20 96:9 100:2 112:9 115:18,23 116:3 141:4 167:13 174:13 207:2 226:10 227:15
**crossed** 216:5,8
**crystallized** 223:3
**cuff** 156:3 165:17 166:1 191:25
**cuffed** 109:10,13 114:23 153:3
**cuffs** 160:13
**curiosity** 220:11
**curious** 221:9
**current** 35:20 124:11 125:1,3 127:23 129:10 224:17,18
**currently** 127:23 163:3 221:14,16
**custody** 7:4,5,24 8:17,22 20:8 23:3 23:4,19 24:14,15 45:5 58:9 71:15 73:8 202:16,18,20 202:21,22 203:19 203:20 205:10 210:13,19,20,25 211:4,4,9
**custody's** 203:9,10
**customs** 223:7
**cut** 182:3,5,9,13
**cv** 1:4
**cx** 3:5 4:1
**cynthia** 230:24 231:7

**d**

**d** 5:1 154:24 168:9 168:9 200:16
**da** 103:23 112:12 146:16 225:22
**da's** 5:24 85:19 100:15 108:18 125:1,2,8 128:14 140:25 224:24 225:5,11,13 233:17
**daily** 14:16 16:2 153:16 199:7
**dallas** 89:3
**damage** 91:9
**dangerous** 30:3 71:13 81:19
**dangerousness** 53:5 57:21,23 78:3 80:12
**daniel** 3:22 143:19 149:15,18
**dark** 146:24
**date** 1:11 8:18 71:19 104:6 128:19,20 154:5,6 154:10,11 156:11 173:16 191:13,14 196:1 199:3 211:25 215:18 232:2 234:4,5
**dated** 60:2,5 121:4 135:24 196:1 222:8,15
**dates** 122:4 234:6
**dating** 137:14,15
**daughter** 88:13 94:11 223:18
**david** 98:24 141:9 232:18
**day** 52:24,24 79:14,14 93:24 104:7,16,18,21 110:13 112:16,21 122:4 137:6 138:17 144:4 153:14 168:3 169:17 189:19 190:3,16,16 214:11,15 215:23 231:18
**days** 87:20 139:7 166:4 189:19 202:16 223:15,24

226:17 229:16 231:1
**dc** 7:23,24 22:1 202:16 203:6,20 204:5
**dead** 139:9
**deal** 99:7 137:5 142:9 144:5 210:7 228:20
**dealing** 50:14
**deals** 26:3
**dear** 136:17 137:18
**death** 33:5 65:24 66:20 89:19,23 90:5,17,24 91:14 95:3,5,14 98:8,15 100:16 106:2 125:4 132:16,22 133:12,21,25 134:13 137:1 138:5 139:14 219:7,15 220:4,9 221:21 222:3 223:10 225:4,15 225:20,23 226:14
**deborah** 47:21
**decades** 88:15,21 89:17
**deceitfulness** 35:11
**december** 49:7 166:24 206:20
**decide** 186:22 233:15
**decided** 98:18 140:4 202:13
**decision** 81:10 140:8 196:19 199:19
**decisions** 79:13
**decreases** 80:24
**decree** 22:9
**defendant** 19:23 64:8,22 80:8 83:10 110:1,14
**defendant's** 64:9 64:23 132:13
**defendants** 79:5
**defender's** 2:5
**defense** 66:12 112:7 127:9 140:22 143:10 144:18 167:11 206:25 227:12 230:12 231:7,10 231:16 232:10
**defense's** 177:24
**deficient** 33:3 225:13
**deficit** 45:11
**definition** 78:15
**definitive** 53:13
**degree** 43:10 79:17 194:4 195:17
**delay** 231:14
**delicate** 223:11
**demand** 93:25
**demeanor** 11:21
**demonstrate** 20:25
**demonstrated** 20:12 35:18 73:14
**demonstrates** 31:19
**denial** 21:4
**deny** 25:9
**department** 8:9 10:15 17:15 26:20 26:23 27:1,5 30:11,23 32:19 48:2,15 117:2 167:22 185:5,8 187:6,12 188:8 224:3
**depend** 234:1
**depends** 53:25
**depicted** 119:9
**depression** 33:18 139:12
**deputies** 117:9
**deputy** 76:17,22 77:4
**describe** 10:3 11:21 187:10 231:17
**described** 13:3,17 39:5 44:10 111:7 173:3 187:15
**describing** 64:14 158:13 171:7
**description** 4:12 11:5 63:1
**deserves** 65:12
**designated** 88:22 132:25 219:17
**desire** 90:23
**desired** 225:18
**despite** 34:13,21 37:22 38:4 68:15 93:24
**detailed** 9:9
**details** 44:9 110:12
**detective** 117:15
**detectives** 117:18
**determination** 56:9 222:1
**determinations** 201:14
**determine** 37:11 187:23
**determined** 232:25
**determiner** 24:11
**develop** 80:9
**developing** 229:3
**developments** 88:16 132:20
**device** 165:12,18
**diabolical** 223:14
**diagnosable** 37:7
**diagnose** 36:1 37:23
**diagnosed** 55:19
**diagnoses** 45:15 68:14
**diagnosis** 35:16 36:12,15,24 37:16 45:10 52:12
**diagnostic** 35:4 36:3 45:21 71:17
**diaper** 139:3
**didn’t** 27:22
**die** 93:23 94:10 136:21
**died** 137:6
**difference** 159:1 193:13 203:18,20
**different** 37:16 44:13 53:6 55:1 58:12 78:5 79:13 81:3 174:1 180:11
**differently** 71:15 79:14
**difficult** 34:2 73:15 222:25
**difficulties** 25:25 28:19 31:20 34:23 38:8

**difficulty** 70:13
**digital** 237:9 238:3
**diminished** 95:1
**direct** 12:10 37:24 44:4,24 46:12 63:20 73:21 74:6 86:22 90:9 102:10 104:5 128:11 131:8 149:21 161:9 164:9 184:18 195:21 218:21 229:11
**directed** 50:17 69:16 149:10 153:7,9 225:17 226:4
**direction** 149:2 217:20
**directive** 41:21 193:18
**directives** 32:5
**directly** 210:13,18
**disagree** 63:5,7,8
**disappointed** 93:12
**disciplinary** 7:4,5 7:24 8:13,17,22 20:8 21:5 22:5 23:3 24:15 43:5,9 43:11 64:12,24 175:9 186:10 188:9 195:18,24 200:6 202:16,18 202:21,22 203:10 210:10,13,20,24 211:4
**disciplined** 42:25 190:8
**disclosure** 225:19
**discover** 13:1 206:6
**discovered** 87:19 156:16
**discovery** 12:25 13:2 223:16
**discrepancies** 50:22
**discrepancy** 16:1
**discretion** 23:7,16
**discrimination** 125:20 126:16 127:4 146:17
**discuss** 6:10,14 25:19 26:17 37:24 59:13 79:6 89:14 91:13 126:12 133:7 134:12 219:24
**discussed** 12:10 44:4 55:15 58:4 111:14
**discusses** 60:23 61:2
**discussing** 7:3 17:24 20:24 53:1
**discussion** 48:9 59:3,10 61:16 225:10
**discussions** 116:18 229:2
**dismissed** 49:16
**disorder** 35:5,17 35:19,24 36:2,4,18 36:22 37:7,24 38:6 42:23 45:10 45:11,22 50:1 52:9 53:23 54:1,3 55:19 71:18
**displayed** 223:13
**dispute** 213:5
**disqualified** 224:10
**disregard** 35:9,12 94:16
**distancing** 118:20 135:13
**distressing** 139:24
**district** 1:1,2,14 2:12 88:14,19 89:12,22 90:4,22 91:12 92:15 93:12 93:15 94:15 95:9 96:16,21,24 97:3 97:13 98:19 99:4 102:17,19 113:14 117:19 121:7,8,21 124:10 126:5,15 127:3,23,25 128:3 132:18,24 133:5 133:11,20,24 134:11 141:10 142:6,14,24 219:9 219:12,16,22 220:3,8,16 221:2,6 221:7,19 223:22 224:18,21,23 226:19 227:20 228:2,4,18 233:20
**division** 117:15
**doc** 9:20 10:1,2,18 11:20 12:1,6 13:8 26:13 30:8 33:14 72:13 151:24 153:5,8 168:4,5 174:6 185:13,25 186:1,25 187:1,4 188:4 193:6 194:2 199:5,15 204:15 208:14
**docket** 106:20 147:12
**docketed** 6:17
**doctor** 20:22 28:11 29:6 32:9 33:13 38:14 40:17 42:15 50:20 62:4 70:2 71:9 74:8 80:22 82:2
**doctor's** 67:14
**document** 9:20 10:9 21:17 24:3,8 24:9 38:9 49:9 154:20 158:9 191:22 192:2,18 201:1
**document's** 200:21
**documentation** 11:14,14 12:6 14:7 26:12,16 27:22 50:21,22,23 51:20 54:21 55:6 67:18 68:3 75:11 76:8,9
**documented** 9:4 11:4,10 14:15 20:25 28:3 29:13 33:19 43:2 44:23 47:16 51:6 54:15
**documenting** 14:25
**documents** 10:18 213:12,13,15
**doing** 30:1 62:7 92:15 103:23 115:2,5 137:20 138:16 148:19 186:13 189:20
**donald** 1:6
**don’t** 18:6 227:23
**door** 138:12 196:25

**doors** 110:5 169:5
**doorway** 223:6
**double** 46:22 109:20
**dozen** 206:13
**dr** 6:1,25 13:7 16:12 18:2,13,17 19:20 31:18 33:19 34:11,11 35:2 36:16 41:2 43:2 50:25 53:3 54:8 58:23,25 59:9,22 60:1,9 61:17,20 62:4 63:6,13 73:19 91:11,18 132:24 141:18 142:4,11 215:5,13 219:16 228:15 234:19,20 235:7
**draw** 12:11 31:2 116:24
**drill** 197:2
**driven** 221:6
**drove** 138:11
**dsm** 36:23
**dsm3r** 35:17
**duct** 78:9
**due** 8:22 49:16 195:9
**duly** 237:6
**dunn** 47:21
**duties** 174:24
**duty** 160:16
**dx** 3:5 4:1

**e**

**e** 2:1,1 3:1 4:11 5:1 5:1 102:4
**earlier** 17:6 34:6 36:8 193:15
**early** 39:4 54:16 54:17 168:24
190:5,10 226:17
**easier** 59:11
**easiest** 146:18 147:19
**easily** 146:12
**east** 119:16 120:9
**eastern** 1:2
**education** 37:25 38:18 42:4
**educational** 38:13 48:3
**eeoc** 125:18
**effect** 70:17 225:16 226:2
**effects** 91:6,8 93:25 135:4
**efforts** 93:24
**egregious** 225:6
**eidson** 238:2,15
**eight** 87:12 139:6 185:11
**either** 99:14 109:6 113:8 116:13 122:11 147:11 152:13 177:8 205:1 225:1
**elaborate** 83:1,6
**elected** 24:1
**electrical** 110:19
**element** 226:23
**elizabeth** 2:3
**email** 89:13 97:3 133:7 219:24 228:1 233:13 234:8
**emails** 123:5,13
**emergency** 210:6
**employed** 102:15 102:19 150:8 185:4,8,25 199:5 237:12,15 238:8
238:11
**employee** 26:20,23 32:20 48:1 151:24 186:12 187:13 237:14 238:10
**employees** 153:10
**employer** 49:14 52:1
**employment** 48:22 55:13 125:18 186:2 187:3
**encouraged** 29:22 29:23 77:14,16
**encouragement** 29:25
**ended** 22:1
**enforcement** 113:13,13
**engage** 77:16
**engaged** 28:19 33:24
**engaging** 10:17
**england** 223:9
**enjoy** 39:5,22 40:2
**ensuing** 65:23
**ensure** 226:22
**entailed** 186:8
**enters** 71:15
**entire** 17:14 94:19 121:19
**entirely** 167:22 174:7
**entitled** 22:4 192:18 200:21
**entity** 212:23 213:22
**enumerated** 84:22
**environment** 32:11 162:20 190:4 205:6
**equal** 125:17
**eric** 183:14
**es** 237:5
**escape** 13:5,10,19 14:5,19 16:8,13,14 16:15,20,21 17:3 17:16 28:19 29:3 30:4 34:1,6 45:6 56:24 58:25 59:14 59:20 60:24 61:14 62:6 76:15,18 109:22 114:18 116:6,8 121:16 156:24 159:5,9,23 160:5,10 162:6,10 165:23 166:4 191:24 193:17 194:3,5,21,22 204:17 205:8,10 205:22
**escaped** 205:24
**escapes** 110:14
**escaping** 62:12
**escorted** 113:19 114:5 190:19 196:12 197:6
**escorting** 112:21
**especially** 95:20
**esquire** 2:3,4,10 2:11,17,18
**essentially** 90:14 104:1 201:3
**establish** 116:4
**established** 35:14 47:16 115:16
**estimable** 224:2
**estimate** 74:12 75:19 189:16
**et** 1:6
**etched** 223:3

**evaluate** 11:25 53:11
**evaluated** 13:9
**evaluating** 212:24 213:22
**evaluation** 13:20 34:8 48:15 71:22
**evaluations** 213:3
**evening** 210:20
**event** 109:23
**events** 80:1 111:7 155:17,23 164:10
**everybody** 71:14 147:23 183:4 215:21
**everyone's** 146:19 230:22
**evidence** 17:21 29:6 31:25 35:21 35:23 36:17,19 38:6 42:15,18 62:21 78:23 84:23 105:8 108:8,9,13 108:16,19,22 116:3 141:17 187:23 197:16,22 198:2,8,12 211:19 211:23 212:1 213:15 228:14
**exactly** 188:3
**examination** 6:23 44:25 46:13 62:5 64:2 73:19 74:6 80:20 86:22 96:9 100:2 102:10 112:9 115:18,23 128:11 131:8 141:4 149:21 167:13 174:13 184:18 201:13 207:2 218:21 226:10 227:15 229:11
**examine** 197:24
**examined** 74:8
**examiner** 143:25 185:14,15,21,24 186:5,7,25 187:11 188:4 189:1,10,14 191:10 193:12 194:1 196:7 201:14,17 204:13 204:14 206:6 207:17,20 208:6 210:12
**examiner's** 19:4 187:18
**example** 108:17 210:5
**examples** 169:4
**exception** 19:19 72:11,23 103:18
**exceptional** 220:15
**exceptions** 71:24
**excludes** 61:4
**exclusion** 85:20
**exclusive** 200:1
**excuse** 6:2 27:11 59:8 99:20 107:2 115:13 117:18 121:25 181:9
**excused** 129:15,23
**executed** 139:11
**exercise** 29:8,11 29:20 77:13 169:8 170:14,15,18 190:16
**exercising** 170:12
**exhibit** 4:12 7:12 9:18 12:12,19 18:24 19:1,3 20:10 21:8,9 46:19 60:6 69:2,3 91:24 92:7 118:9 118:11,15 119:10 123:14 153:24 154:7 158:2,17 191:3 195:22 198:3 200:13
**exhibited** 70:17 72:24
**exhibits** 7:10 12:16 18:20 19:2
**existence** 95:2
**existing** 232:12
**exists** 27:22
**expect** 97:17 166:1 233:24 234:2
**expected** 70:16
**expelled** 42:16
**experience** 28:12 32:10 73:1,8,10 80:7 134:22 139:1 139:14 188:5 193:12 194:1 199:15 208:6
**experienced** 70:17 90:8
**experiences** 56:2
**expert** 65:21 66:12 66:14,16 69:20 71:5 79:25 148:9 164:20 230:24 232:6,10
**experts** 79:22
**expiration** 8:16 23:3 24:15
**expire** 8:22
**explain** 76:11 98:3 99:9 117:6 198:10
**explanation** 146:20
**explored** 225:15 226:1
**exposure** 54:17 221:4
**express** 26:14 30:12 67:17 113:9
**expressed** 32:1 116:14,22 228:7 231:2
**expressing** 80:1
**expressly** 225:2
**extensibilities** 225:7
**extensive** 188:5,17
**extent** 12:2 221:10
**extra** 28:12
**extraction** 209:22 210:3
**extraordinary** 223:15
**extremely** 93:12
**extricate** 224:16
**eye** 126:24

**f**

**face** 11:19 15:23 189:18
**faces** 110:20
**facetime** 177:16 177:19
**facility** 17:16 223:7
**facing** 120:9
**fact** 15:14 20:19 33:10 34:13 37:22 50:10 52:22 58:23 59:16 60:25,25 66:1 68:5 71:12 73:6 78:1 81:10 94:19 105:9 106:10 114:20,23 121:16 143:17

146:22 147:2 159:12 163:19 193:17 197:10,13 199:20 200:5 209:20 215:6,9 229:2 231:13
**factor** 52:18 54:11 54:12,16,19,23 55:20,24 56:3,12 62:7
**factors** 53:16,18 53:19 56:18 63:14 80:13 81:18
**facts** 14:7,12 15:10 60:24 81:11,16 101:19 104:21 105:1,12,13,17,24 106:5,17 107:19 128:24 129:7 140:11 192:5
**factual** 13:15 14:15 15:24 17:6 80:15
**failure** 20:25 35:10 41:20
**fair** 92:19 109:15 168:20 221:25 224:7 235:3
**fairly** 97:1 98:5
**fairness** 84:16
**falls** 71:22
**false** 65:4,7,17
**familiar** 76:1 77:23 104:21 107:19,24 119:22 127:7 188:20 189:1 191:9 199:14
**familiarity** 189:6 207:10
**family** 43:6 55:2 83:1,18 84:3 87:15 88:22 93:14 94:18 97:5,15 133:1 134:20,23 137:4,13 140:7 141:21 218:13 219:17 224:25 225:2,18,22 226:16 228:8
**family's** 56:8
**far** 9:9 29:17 139:14 177:7
**fashioned** 156:20 158:14 164:12,16 165:3,17 192:13 198:22 202:7 206:7
**father** 138:22 139:9,11
**father's** 88:1,4,7
**fault** 116:8
**favor** 134:9
**favorably** 23:20
**fears** 113:10
**features** 45:14
**february** 87:10 89:1,4,11,21 91:10 91:17 132:9 133:4 133:10,19 219:21 220:3 229:15
**feces** 32:24
**fed** 190:15 208:24
**federal** 2:5 84:23 85:4
**feed** 182:3,5,13,18 234:19 235:3
**feel** 51:10 90:3 91:4 95:20 126:19 127:2 134:3 135:1 220:7
**feet** 117:4
**fell** 137:24
**fellow** 153:18
**felt** 20:3 92:19 114:17 134:5,6,12 136:11 137:3 221:20
**female** 110:21 180:19
**fern** 223:11
**ferne** 87:7 131:17 131:18,23 132:25 136:19 137:13,17 138:21 214:25 215:1 218:14 219:4 223:2,4,17 224:1 227:7,9
**ferne's** 132:6 223:21 225:10
**fewer** 189:25 190:1
**fifth** 38:9 41:17
**figure** 127:11 147:20 232:11
**file** 30:18 108:4,5 108:12,14
**filed** 30:9 31:7 125:17
**fill** 30:18,25 186:23 234:5
**filled** 30:21
**final** 33:20 94:9
**financially** 237:16 238:11
**find** 18:16 20:20 34:20 35:18,23 36:2 37:22 40:13 41:4,7 43:4 165:2 196:19 201:18,20 221:7 231:11
**finding** 188:18
**findings** 197:10,13 199:20 200:5
**fine** 52:13 118:24 127:19 135:16 147:7 174:22 182:15 183:11 234:23
**finger** 165:14 173:7,9
**finger's** 216:5
**fingers** 216:7,7
**finish** 51:4 215:20
**finished** 51:1,3 57:5
**fired** 125:10,15 128:25 129:10
**first** 9:4,15 12:14 16:25 19:12 20:9 20:21,23 25:17 31:5 38:8 39:3,4 41:16 44:14,20 48:9,18 49:21 59:9 61:14 75:9 75:10 83:18 97:24 143:19 161:17 165:15 189:10 206:2 213:10 220:10 230:1
**fit** 84:4
**five** 22:25 60:3 74:21 137:7,8 141:21,22 142:1 143:18 144:17 150:20 170:2 176:9 178:13 185:22,23 189:19
**flap** 199:1
**flexible** 144:3
**flies** 45:16

**floor** 2:20 4:14 103:10 108:8 109:21 113:5 114:24 119:13
**flown** 45:22
**flying** 45:18
**focus** 50:16,17 68:2
**focusing** 61:7 91:16
**fold** 78:22
**follow** 80:8,18 95:23 128:8 140:11 229:9 230:12
**following** 26:5 41:18 42:10 64:10 105:23 223:15
**font** 192:19
**food** 169:15
**forced** 124:10,14 125:8
**foregoing** 237:4,5 238:4
**forensic** 53:10 79:24
**forget** 6:17 19:1 138:19 146:10 231:3
**forgot** 8:18 76:2 140:21
**forgotten** 6:15
**form** 31:6,9,11 191:11
**former** 121:8,20 122:11 143:24,24 146:9 231:8
**forms** 30:17,20,22 30:25 31:4
**formulated** 46:17
**forth** 110:4
**forward** 135:23
**found** 17:22 61:1 90:11 107:6 136:23 139:9 156:22 161:6 163:19,20,22 164:12 165:4,5,15 165:16 166:4 171:13 173:6 174:2 192:7,11 197:17 199:10 201:23 202:1 203:3 210:11,16 226:20
**four** 75:17 102:22 128:14 137:7 142:1 166:4 189:18 190:19 205:25
**fourth** 21:24 38:9 60:23
**frame** 46:3 168:19 185:7
**free** 8:11 25:16 64:11 109:9,12 204:21 224:10
**frequently** 45:8 68:23 80:3
**fresh** 230:7 236:9 236:11
**friday** 123:20
**friend** 55:7 131:23 131:24 137:18
**friends** 137:15
**front** 7:12 50:14 59:12 106:1 128:20 154:2 157:23 158:18 195:23 197:24 200:14 222:7
**fulfil** 71:17
**fulfilled** 79:23
**fulfills** 35:8
**full** 75:10 218:10 225:19
**further** 63:16 81:20 95:25 110:24 111:22 128:4 129:12 142:16 167:10 171:17 206:23 225:9 227:10 228:12 230:10 231:14 237:13 238:9
**future** 9:22 10:14 10:17,22 53:5,7,11 53:15,21 56:12 57:2,24 65:3 68:6 70:11,21 71:14 78:3 79:25 81:9 81:19

**g**

**g** 5:1 102:4
**gain** 78:7,17
**gained** 78:2,4,11 78:15
**gather** 210:2
**gears** 143:17
**general** 9:18 32:16 85:25 92:7 93:8 95:8 96:24 111:25 114:6 121:25 123:23 125:5 136:8 162:8 188:6 188:23 189:2,7,24 190:9,10 195:14 195:15 196:25 197:4 210:15,18 211:7,8 222:13 232:6
**general's** 2:19 5:13 18:19 33:8 42:2,6 93:10 121:3 122:1,11,23 123:6
**generally** 23:18
**generated** 15:2
**generous** 137:19
**gentleman** 182:10
**george** 2:10 3:8,13 3:21 4:2,3,8 5:20 5:22 63:22,24 64:1,3,16,18,21 65:20 66:7,11,23 67:6,23 68:12 69:18 70:1,4,6,22 70:24 71:2,5 72:8 72:9,17,20,22 73:17 81:22,23 82:1 85:18,21,22 96:5,7,10,18,19 128:5,7 141:2,5,14 143:10,11 144:20 144:22 145:20 174:10,12,14 175:18 178:4,6 181:6,18,23 184:10,12,13 196:4 214:3,4 216:2,3 227:14,16 228:12 230:15,16 233:22,24 234:1
**georgie** 145:23
**germane** 80:2 105:25
**getting** 39:6,21 40:3 172:15 234:6 234:6
**gifts** 44:18
**girlfriend** 55:7,9

**gist** 192:4 201:11
**give** 24:6 60:4 66:12 79:16 99:17 111:5 120:4 128:23 130:20 136:2 141:9 168:17 180:14,25 189:14 227:25 232:1 233:4
**given** 19:10 79:12 129:6 142:16 162:24 174:5 200:9 210:17 211:21 212:16
**giving** 44:17 55:9 124:8 125:16 132:8 224:13
**glad** 139:20
**gleaned** 19:23
**glitches** 145:10
**global** 84:9
**go** 5:10 6:22 14:2 24:24 27:15,18,19 28:5 38:13,17 40:12 42:13 66:10 70:5 74:3 76:6 84:8 86:21 96:8 100:1 106:1,4 118:4 124:25 125:6 127:10,20 128:10 129:25 135:20,22 136:2 141:3 148:22 160:5 166:20 169:5,8,8 178:17 179:14,21,23 181:25 182:20,25 187:5 195:14,16 204:22 210:17,19 211:8,9
**god** 181:22
**goes** 210:10 213:10
**going** 24:2,5,20 25:3 27:17 34:7 38:13,17 50:18 64:18 69:14 70:8 73:8,23 82:5 83:2 83:17 90:11,12 94:10 98:6 104:25 106:4,9,11 107:11 115:17 118:9 124:20 125:6,18 125:24 130:4,5 138:16 144:10,21 144:24 153:24 159:21 160:4 164:21 166:8,10 167:18 171:3 176:7,9 178:16 179:6,13,18,21 180:11,14 182:1,4 182:5,8,9,12,13,22 182:23,24 184:1 185:22 186:23 189:17 192:18 202:13 204:24 205:1 211:3 215:18 230:1 231:11 232:19 233:1 235:24
**goldberg** 1:13 5:3 95:13 100:4 140:2 181:12 184:6 218:13 226:13 228:14
**good** 5:4,13,14,15 5:17,18,19,23,24 6:25 7:1 9:1 24:20 33:22 52:16 55:10 65:2 69:2,6 70:21 71:6 101:24 102:6 102:7,12,13 106:9 130:12,22 131:10 131:11,23,24 134:5,16,18 135:3 144:20 149:8,23 149:24 157:17 164:1,6 167:15 173:23 174:15,16 178:5 184:20,21 187:10 204:20 216:2 217:17
**goodbye** 176:20
**grabbed** 139:1
**grade** 38:9 39:4 40:8,10,25 41:17 41:17,17 51:1,4
**grades** 40:11
**graduate** 51:5
**graduated** 50:24 51:8
**graduation** 138:2
**grandfather** 87:19
**great** 138:1 207:6 214:11,15 215:24 216:23 218:25 223:13 233:6
**greater** 94:12
**grief** 94:13
**grievance** 21:18 21:23 28:4 30:15 30:18 31:7,13,18 32:2,3 34:22
**grievances** 30:9,11 31:16
**group** 32:3
**groups** 190:18
**growing** 137:8
**grown** 138:15
**grows** 94:13
**guard** 212:19
**guards** 12:1 32:25 33:6 207:22
**guess** 75:10 76:6 79:20 102:23 124:25 167:25 232:5 233:3
**guessing** 160:5
**guilt** 187:23
**guilty** 15:5 16:15 16:20 19:15 20:1 32:6 61:1 107:6 188:18 196:14,15 196:19,19,21 197:15 199:10,20 203:3 210:11,16 224:8
**guy** 39:6,22 40:2
**guys** 180:21

**h**

**h** 4:3,11 181:18,23 183:14 184:10,12 196:4
**habeas** 5:9
**halfway** 33:23 39:3
**hall** 4:14 103:9,10 108:19 113:18 119:12,13,22 120:23
**hallway** 112:22 113:20,23 114:5,6 120:12,14,18
**hand** 80:2 86:10 101:25 109:5,9,10 109:11,12 130:13 149:9 160:13,13 165:10 173:5 189:11 206:2 216:24 217:18

**handbook** 188:21
**handcuff** 13:1 14:25 17:2,6,8,21 152:4 153:12 156:20 158:15 160:12 163:19,22 164:13,16,17 167:2,7 173:4,22 192:13 197:17 198:9,12,15,17,21 198:23,24 199:4 199:12,15,16,16 201:23,23 202:2,7 204:21,21 205:6 206:7,14 209:10 212:2,3
**handcuffed** 32:19 109:7 113:4 168:13 169:1,19 169:21 170:21,24 196:13 208:8,15 208:22
**handcuffing** 168:6
**handcuffs** 152:4,8 152:19 153:12 190:21 197:7 198:18,19 204:22 204:24 208:1,12
**handle** 104:16 116:20,21 130:5
**handled** 43:10 104:18,20 107:18
**handling** 114:21 115:1 116:12 117:12 207:19 223:23
**hands** 109:8 221:4
**handwriting** 155:7,13,17 156:4 158:9 197:10
**handwritten** 21:17
**handy** 216:21
**hang** 137:16
**happen** 68:17 79:21 117:5 159:8 211:5 216:15 220:12
**happened** 14:13 51:12 62:6 89:17 112:25 117:14 124:16 145:19 147:25 151:14,16 171:7 172:2
**happening** 90:7 121:22
**happens** 68:18 72:12,25
**happy** 135:14 146:11
**hard** 21:16,19 51:23 94:6
**harder** 94:6
**harkened** 33:24
**harrisburg** 2:22
**hart** 3:11 60:10 82:7,7,9 83:18 85:20,25 86:11,14 86:16,24 87:4,7,25 87:25 88:21,22 89:5 91:11,18,18 91:24 92:6,23 93:2,6 95:12 96:13,20 97:15 98:1,3,23 99:9,14 99:21 100:4 130:7 131:14,17,18,25 132:24,25 133:1 136:18 141:18 142:5,5,11,23 215:5,13 218:14 218:25 219:17,17 225:10,21 227:19 228:9,10,15,15,22 229:6,15 232:18 234:2
**hart's** 60:11 132:2
**harts** 62:22 78:8
**hayes** 3:22 145:15 146:4,6,8 148:8,20 149:9,15,18,23 152:17 153:23,25 154:24,24 155:13 157:21 158:7,18 159:22 160:15 162:3 163:3,10 164:10 165:21 166:3,22 167:15 167:21 170:6,11 175:21 176:18 211:13
**he'll** 234:21
**headed** 138:23
**headway** 179:15
**healing** 138:5
**health** 33:13 36:22 37:7 47:23 53:10 53:23
**hear** 6:4 64:17 65:11 79:8 81:25 86:24 95:9 96:11 131:12 141:6,8 148:2 149:11,25 150:3 152:11 162:25 167:19 174:20 180:24 181:5,8,10,13 183:2,4,7,11,12,18 184:6,8,22,24 185:16 187:23 207:4,7 217:25 218:2,2,3,23,24 220:24 227:17,18
**heard** 37:15 38:24 65:13 85:9 110:2 110:8,9 138:21 142:10,13,25 152:14 185:18 226:22 227:3 229:14 230:1
**hearing** 15:7 19:4 21:5 35:3 64:14 69:16 79:6 123:17 143:25 161:10,19 162:4,11,15 163:5 171:23 185:14,15 185:21,24 186:4,6 186:25 187:11,18 187:18,20 188:4 189:1,3,10,13 190:20 191:10,10 193:12 194:1 195:3,9,16,18,19 195:20,24 196:1,6 196:9,12,22,23 197:7,16,22,25 198:6,9 199:4 200:7 201:13,17 204:13,14 206:6 207:16,20 208:6 210:11,12,12 211:12,19,22 213:16 221:6
**hearings** 186:10 187:7,22 197:1 199:9 211:15
**heart** 139:22
**heartbreak** 94:4
**heartbroken** 137:23
**hearted** 223:14
**heat** 93:21 139:8

**heather** 99:3,5 142:6 228:17
**heinous** 224:8
**held** 80:23 87:2 94:21,24 108:18 127:12 196:22
**hello** 184:4
**help** 40:14 148:10 181:21
**helpful** 168:19
**hereto** 237:15 238:11
**hey** 12:21 116:23 148:14 180:18 183:2
**hi** 179:13 184:5
**hide** 157:17
**hie** 135:2
**high** 38:11,11 50:24 51:8 94:18 95:21 115:1 190:14 193:18 203:12
**higher** 78:19 160:22,24
**hired** 168:3 186:15
**historically** 45:21 52:13 71:19
**history** 13:15 34:4 44:11 49:22 50:6 53:22 54:3,11,13 55:4 60:16 64:9 64:23 107:25 108:3 117:10 224:15
**hm** 126:8
**hmm** 33:20 120:13 131:1
**hold** 5:6 24:23,23 24:23 34:20 40:18 41:15 64:13 72:18 89:5 159:15 167:18 180:24 183:20 208:25
**holds** 225:8
**hole** 156:18,19 192:8 204:10
**holes** 160:12
**home** 43:1,2 77:22 87:15,19 104:13 104:22,24 105:5 105:17,24 106:18 138:20 219:3
**homicide** 59:14 60:20 62:17 108:7 108:8,10,12 109:20 110:16,16
**honor** 5:14,15,18 5:19,25 6:15 33:7 41:2 43:21 46:3 50:9 63:21 65:5 66:7 67:11,13 68:8 69:13 72:14 74:1 80:16 82:3,7 82:10,18,21 83:19 85:24 86:6,20 91:23 92:24 96:1 96:4 99:25 101:3 101:7,10,17 102:6 102:8 106:6,23 107:5,15,16 111:10,21 112:1 114:2 118:8 119:6 124:19 125:10 126:1 129:13,20 129:23 130:10,25 131:5 135:8 140:6 140:24 143:9,11 143:16 144:19 145:7,21 146:4 147:21 148:6 149:20 151:3 154:8 158:1 167:10 174:12 176:5,14 177:17 178:25 179:25 192:24 206:24 213:8 215:7,24 216:6 218:17 222:21 227:11,13 230:11,14 231:18 232:15,20 233:19 233:24 234:10 235:13,17 236:6
**honor's** 95:16 136:12 140:1
**honorable** 1:13
**honored** 129:5
**hook** 178:5
**hooked** 180:6
**hoop** 135:20
**hope** 81:14 95:2
**hopefully** 145:9 176:10 232:7
**hopes** 64:19 93:22
**hopper** 156:16,17 165:7,7
**horrendous** 138:25
**horrific** 93:25 139:13
**horrifying** 138:25
**hour** 190:16
**hours** 156:11 190:2
**house** 93:21 138:12,23 139:7,8
**housed** 152:22 157:6 162:3 163:3 195:6,8 203:7,17
**housing** 151:2 190:12,20 196:24 197:2 200:3 203:8 205:4,22
**hugh** 14:3 18:9 25:1,5 27:16 28:10 33:12 35:1 37:21 38:25 39:17 42:14 43:24 46:10 50:19 58:22 62:3
**hun** 148:14
**huntington** 150:9 150:11,19,22 151:7 167:23 168:12 174:4 189:20 205:5,25
**hurt** 90:7
**hurts** 139:22
**husband** 110:19 223:12
**hyperactivity** 45:11
**hypothetical** 64:8 64:15
**hypotheticals** 66:5

**i**

**icu** 22:9
**idea** 66:11 90:11 134:16 139:19,24
**identical** 204:7
**identification** 118:16
**identified** 10:20 36:9 53:6 92:7 153:23 154:14 159:5 191:2,8 195:22 198:3
**identify** 36:7 89:4 92:8 217:16
**identifying** 196:6
**idle** 23:5,21
**illness** 33:15 36:21 215:19 231:10

**illustrative** 73:9
**image** 223:4
**imagine** 64:7,22 64:24 94:8 145:24 147:9 206:13
**immediate** 211:6
**immediately** 211:5
**immigration** 223:7
**impact** 83:11 84:2 94:17
**implement** 156:2 156:3 159:22 160:9 205:8
**implements** 16:21 156:24 159:4,9 162:5,10 165:23 166:4 191:24 193:17 194:3,5 204:16
**implications** 225:14
**implied** 93:13
**importance** 193:19 194:4
**important** 20:5 127:10,14 146:13
**impose** 187:24
**imposed** 106:2 202:15
**impossible** 73:16
**impression** 83:17 99:13 117:9 121:12
**impulsive** 45:14
**inaccurate** 66:19 66:21 68:7
**inadmissible** 83:8
**inaudible** 5:7 39:11 123:25 140:11 150:12 155:21 156:3 168:15 172:1,3 177:15 179:1,4,17 179:20 180:4,19 181:6,19 183:16 190:15 211:8 217:25 222:1 223:1 224:4,12 233:11 235:7,8,10
**incarcerated** 77:20
**incarceration** 68:16 212:25
**inch** 156:17,20 166:6 192:12
**incident** 14:22 15:4 110:11 117:13 121:13 151:8 154:5,10,14 154:16 171:18 191:13,15
**incidents** 17:8 144:14 166:10 207:21
**include** 34:7,13 53:19 55:25 57:5 57:8,10 58:14,20 84:15 93:9
**included** 48:15 108:12
**includes** 53:9
**including** 189:2 202:7
**inclusion** 71:11
**inconsistencies** 51:11
**incorrect** 119:11
**increase** 53:23
**increases** 62:18
**indicate** 14:15 65:17
**indicated** 33:14,14 71:16 119:1 120:2 213:4
**indicates** 19:15 24:10 75:11 142:23 172:21
**indication** 17:14 44:16 56:14 172:10
**individual** 35:18 37:3,15 51:24 56:11 68:19 69:2 70:7 71:6,21 73:7 73:14 80:8
**individual's** 72:6
**individually** 170:1
**individuals** 45:20 52:12 70:13,15
**industry** 187:6
**ineffective** 41:20
**infamous** 205:23
**infant** 136:20 223:17
**influence** 43:6
**influenced** 43:8 45:10
**influential** 56:9
**information** 14:14 15:19,21 19:21 43:25 51:9,16 53:12 54:6,20 55:3,14,16,17 56:5 80:15 97:6,8,13 141:10 142:16,18 180:14 211:11,12 224:19 229:5
**informs** 81:10
**infraction** 190:21 196:20
**infractions** 44:13 187:15
**initial** 181:23 229:1
**initially** 169:25
**initials** 161:17
**initiative** 226:15 226:20,21
**injecting** 224:4
**injury** 225:6
**ink** 198:14
**inmate** 19:11 21:17 22:20 23:2 23:18 24:14 27:1 27:5 28:13 29:15 31:5,22 32:18 152:6,22 159:22 160:9 162:14 163:3 166:1 187:14 188:20 194:9 195:6,8 196:13,14,16,16 197:6,15 199:25 200:21 202:10 203:3,16,17,18,19 204:20 205:2,9,21 206:6 209:11,16 210:6,10,19 211:8 212:13
**inmate's** 200:8,14
**inmates** 29:11 30:12 32:12,24 153:1,15 160:11 162:3,8 168:7,12 169:1,6 170:2,12 170:18,25 174:4 189:23,23 194:9 194:15 195:14 196:24 199:9 203:6 207:21,23 208:7,11,12,15,21 212:24

**innocence** 187:24
**innocent** 223:15
**input** 85:2 140:15
**inquirer** 14:17 16:2
**inquiry** 34:3 58:20 59:15 67:19,21 68:2
**inside** 29:16 170:22,24 171:2 202:2
**insight** 20:12 21:1 22:12
**insignificant** 90:10
**insincere** 11:12
**instability** 54:22 55:5,11,13
**instance** 169:13,18 169:19 203:23 212:13
**instances** 79:24 81:2 209:16 210:23
**institution** 27:19 28:14 31:15 185:16 187:13
**institutions** 185:17 185:18
**instruments** 53:4
**insult** 225:6
**intend** 233:17
**intended** 232:23
**intends** 225:22
**intensifies** 94:13
**intentionally** 93:22
**interaction** 175:9 229:17
**interest** 68:1,9
**interested** 67:7,24 237:16 238:12
**interests** 67:14
**internet** 182:24
**interpretation** 10:11 11:13,16
**interrupt** 70:19
**interval** 67:2
**interview** 76:17 186:14
**interviewed** 76:22 77:4 117:14,17,20 118:2,7
**interviews** 14:21 186:22
**introduce** 33:4
**invade** 115:2
**invasion** 77:22 104:13,22,24 105:5,17,25 106:18
**invent** 201:23
**investigating** 171:21 172:6 223:20
**investigation** 171:17 172:12,20
**investigative** 224:2
**investigator** 47:22 112:2 122:1,6,8,9 122:17 123:12
**investigators** 117:18
**involve** 193:16 207:25 208:3
**involved** 14:22 15:4 17:11 26:19 26:22,25 27:4 76:18,23 115:11 221:3
**involvement** 80:4 80:5 110:25
**involving** 29:15 62:22 133:2
**irrelevant** 52:9,15 52:18,19,22 66:5 84:23
**irreparable** 91:9
**irresponsibility** 35:12
**issue** 49:19 50:13 73:13 80:6 85:7 88:23 117:1 215:6 215:19
**issues** 37:3 67:1 80:1 129:4
**itemized** 84:19
**items** 108:22 157:20 158:6,13 192:17,19 193:2 198:3,6
**i'm** 42:10 52:14 119:25 128:2

**j**

**jail** 195:15
**james** 2:17
**january** 25:11 87:10 125:15 136:19 139:8 166:15
**jeffery** 232:8
**jessica** 238:2,15
**job** 1:18 150:10 153:13 185:12 187:11,25 201:15
**jobs** 52:7
**john** 3:6
**johnston** 205:23 205:23
**join** 85:18
**jones** 179:15 180:13,17,20 183:16,20,22,25 184:3
**joyful** 138:7
**judge** 5:3 95:13 100:4 103:5,7,15 104:7,12 105:18 126:10,20 127:7 127:10 128:15 140:2 144:25 145:15,22 146:20 147:17,19 148:17 181:12 183:16 184:1,6,7 218:12 226:13 228:14 235:14
**judge's** 226:18
**judges** 113:24
**judicial** 224:3
**jump** 144:9
**juncture** 216:10
**june** 60:2,5 93:11 111:6,19 121:4,6 123:10 124:9 125:14,16 128:22 135:7,24 222:8,16 224:20 229:19 230:3
**junior** 38:11
**juries** 103:1,2 140:4
**jury** 33:5 65:1,22 66:19 69:21 106:1 166:23 167:2,7 206:19
**justice** 73:1 94:16 94:20,23 129:4 134:6,16 135:1 136:25 137:3 139:17,18 140:5
**juvenile** 44:22 73:10

k

**keep** 5:9 24:1 45:1 74:4 86:17 130:4 130:19 144:21,23 176:7 218:13
**keeps** 179:5,6
**kept** 138:14 165:13
**key** 13:1 14:25 17:2,6,8,22 138:22 156:3,20 158:15 160:12 163:19,23 164:13,16,17 165:3,17 166:2 167:2,7,7 173:4,22 190:2 191:25 192:13 197:17,17 197:19 198:9,12 198:15,21,23,24 199:1,8,16,16,17 201:23,24 202:2,7 204:21 205:6 206:7 209:10 212:2,4
**keys** 152:4 153:12 198:17 199:4,12 206:14
**killers** 136:23
**killing** 223:14
**kind** 30:2 69:19 70:9,16,17 85:2 137:2,19 193:19 193:23 195:14 213:1
**kinds** 116:17
**kitchen** 148:12 193:22
**knew** 137:13 143:5 225:17 226:4
**knocked** 138:12
**know** 7:12 15:1 29:21 30:2,13,19 32:10 43:23 48:3 51:23 52:20 54:5 65:11 67:1 80:25 81:2,6 85:11 94:10 95:22 97:9 97:15 107:20 108:2 110:5 115:1 117:11 118:1,6,10 119:25 124:20 126:24 140:10 142:13,20 146:24 146:25 147:4,14 148:20 150:4 159:4 162:10 170:2 173:3,8 177:3,7,15,23 178:12,22 183:23 183:25 184:25 186:11 187:22 188:10 199:9 205:3 209:22 212:5,5,7,20,21 215:5 219:13 225:21 229:13 231:14,17,24 233:7,11 234:6 235:1
**knowing** 114:22 138:4
**knowledge** 46:6 89:16 166:9 188:5 188:17 189:11 205:16 206:2 209:6 237:10 238:6
**known** 103:1
**kyle** 160:18,21 161:1,4 171:20 172:5,11,20

l

**l** 2:18
**labeled** 10:2 187:15
**labor** 168:3 187:6
**lack** 35:12
**laid** 48:25 51:15 52:2 125:24
**lair** 103:6,7 104:12
**lair's** 103:16 104:7
**lane** 20:24
**language** 10:7,12 10:23,24 11:15,16
**large** 30:19
**larger** 165:15
**lari's** 128:15
**larry** 146:16
**late** 113:25 190:5 190:10 202:19
**laughed** 137:10
**lavin** 103:14 104:3 104:9,18,20 107:18,20,22,24 113:8 116:12
**law** 84:23 113:12 113:13 131:19 134:21 140:11 225:10 233:14
**lawful** 35:11
**laws** 95:23
**lawsuit** 146:23 147:2 186:9
**lawyers** 115:24 140:22
**layout** 4:14 119:12
**lead** 55:12 162:25 218:18 231:15
**leading** 162:21,23 223:6 224:17
**learn** 89:22 93:12
**learned** 90:1,3,16 133:10,17,22 134:3 220:2,7 223:10
**learning** 92:14 103:24
**leave** 19:11 74:23 100:23,25 119:3 124:10,14 125:8 135:14 169:14 209:11
**leaves** 28:13 202:3
**led** 155:4
**left** 7:2,9 27:19 83:21 87:18 93:21 97:3 109:5,9,12 110:1 112:20,24 113:22 124:9 136:21 139:6,7 154:22 187:4 201:10,25 203:9 223:18 230:23
**legal** 166:7
**length** 74:8 156:17 164:12 192:8,12
**lengths** 25:20 156:22 171:12
**lengthy** 44:11,12 45:23 70:8 80:9
**lens** 29:2 30:3
**les** 223:22
**lessen** 91:7
**lessened** 33:10 91:7,9
**lessening** 94:14
**letter** 46:21 89:13 91:25 92:9,13,23 95:7,20 97:24 98:23 99:3,5,19 100:5 133:7 135:7

135:24 136:7,11 136:13 141:18 142:4,22 216:21 219:24 222:8,12 223:1 225:25 226:3 228:15 230:4
**lettered** 47:1
**level** 118:18 220:12
**lies** 51:24
**lieutenant** 151:18 187:17
**life** 70:8 94:3,17 94:17,25 95:6 98:14 137:11 139:11 143:5 206:1 223:19 224:5,9,9 231:9
**lifeless** 223:16
**light** 148:20
**light's** 148:21
**lights** 204:10
**limitations** 84:13 101:18
**limited** 190:17 203:24
**limiting** 203:25 204:1
**line** 21:24 180:14 182:20 183:17,17
**lines** 22:25 157:19 192:16
**link** 182:20,21 215:20 230:24 231:7
**lisa** 3:11 82:7,7,9 83:18 85:20,25 86:11,14 87:4 89:5 131:25 136:20 138:24 139:1,22 140:7 218:25 223:18 229:14
**lists** 103:18
**literature** 80:23 80:25 81:3
**litigation** 126:3,13
**little** 12:22 21:16 64:16 73:19 82:23 83:6 130:19,20 146:1 165:14 173:8 222:23,24
**live** 93:24 135:5 232:19
**living** 89:2,8 199:25 221:14
**location** 1:14 114:24
**lock** 190:2
**locked** 211:6
**logistical** 5:11
**logistically** 144:5 144:18
**logistics** 176:22 215:22
**long** 22:18 102:18 137:14 150:19 151:6 156:20 185:20 186:24 232:25
**longer** 20:7 138:3
**longitudinal** 80:4
**look** 21:7,22 22:18 38:15 39:9,13 46:18 47:13 53:5 58:12 59:25 60:8 81:3 108:4,5 120:3 127:10 157:13 165:11 173:10 174:1 198:12 234:8
**looked** 40:16 43:5 108:8,21 164:5,7 164:25 167:3 173:23
**looking** 57:22 58:1 58:2 75:9 78:18 85:5 108:5 120:6 169:22 189:15 191:6 196:15 209:3
**looks** 5:10 164:1 178:12 199:17
**lose** 202:22,23
**losing** 41:11 230:25
**loss** 99:21 137:5 143:14 204:2
**lost** 139:22
**lot** 30:17 91:20 110:3
**lots** 110:5
**loud** 193:24
**louder** 185:1
**love** 137:24 176:8
**loved** 137:11
**lower** 12:22
**lydia** 138:10

**m**

**ma'am** 96:11,14 96:20 97:12,20 141:14 143:14
**mad** 128:24 129:9
**magazines** 203:24
**mahler** 2:18 3:12 3:16,18,20,23 4:4 4:7,9 5:12,15 85:24 86:5,8,20,23 91:23 92:2,4,5,22 93:1 95:16,25 99:24 101:2,5,7 102:8,11 106:6,8 106:11,16,22 107:4,13,15,17 111:10,12,21,24 112:1,3,6 115:7,15 115:20 117:25 118:3 124:12,19 124:23 125:22,25 128:9,12 129:12 129:18,20 130:9 130:24 131:5,7,9 135:8,14 136:4,5 140:17 143:9,16 143:21,24 144:2,8 144:12,15 145:7,9 145:14,21 146:7 147:21 148:3,5,8 148:13,16,19 149:2,5,20,22 151:3,5 152:15,16 154:8,12 158:1,4 159:15,20 160:7,8 162:1,2 163:1,2 164:4,23 165:20 166:17,19,21 167:10 168:14,21 175:21,23 176:2,5 176:8,13,18 177:16,19,21 178:3,10,15,18,20 178:24 179:2,8,11 179:13,19,23 180:7,10,16,25 181:3 182:16,17 184:19 192:23 193:1 200:18,20 205:18 206:23 213:6,8,10,20 214:6,13,20,25 215:2,4,9,11,13,16 215:24 216:5,20 216:23 217:3,6,8

217:10,12 218:17 218:20,22 221:11 222:21 226:9,11 227:5,6,10 229:9 229:12 230:10,20 232:14 235:14
**maiden** 131:14
**maintained** 25:16
**major** 26:2 33:15 36:21 37:3 53:23 54:3 102:16,25 112:12 234:7
**majority** 80:5
**makeshift** 163:22 199:12,16
**making** 8:10 120:15 123:8 129:7 201:14 231:25
**maladaptive** 37:2
**male** 27:14 110:21
**man** 65:22 66:25 137:24
**man's** 66:17
**manifest** 72:4
**manifestation** 52:24
**manifestations** 68:24 69:4
**manner** 10:4,5 42:25 43:9 109:8 113:3
**manual** 187:15 188:9
**manufactured** 201:4
**march** 1:11 26:6 123:3
**marked** 4:12 111:11 118:10,15 119:24
**market** 1:16
**martial** 28:24,25 29:8,15 77:16
**mask** 27:13 150:2 184:25
**masked** 119:2
**masking** 110:19
**master** 202:2
**matchhead** 198:17
**material** 14:18,20 16:13 18:16 52:6
**materials** 13:2 18:18 20:18 48:22 54:9 166:7
**math** 74:16 75:1
**matter** 5:9 66:15 73:7 88:24 90:14 91:4,5 94:25 126:3 133:2 134:25 219:18 221:4 222:2 224:22 225:9 226:18 229:6 231:14
**matters** 110:25 223:23
**max** 8:12
**mayor's** 113:24
**mchugh** 2:3 3:7,10 3:14,17,24 4:5 5:16,18 6:11,14,18 6:21,24 12:23 14:1 25:3 28:8 33:2,7 34:25 37:17 38:18,19,23 40:16,19,22,24 41:1,9,12,13,23 42:2,8,12 43:14,18 43:20 46:9 49:20 49:21,25 50:3,8,15 50:18 61:19,20,23 62:1 76:25 78:6 78:22 79:2,4 80:17,18,21 81:20 82:10,13,16,21,24 83:5,14,19,22,24 84:6,9,12 85:10,14 85:17 96:4 100:3 101:10,15 104:23 105:4,7,19,22 106:3,13,18,25 107:5,9 112:8,10 114:2,10,13 115:10,18 116:1,5 116:9,11 118:8,13 118:19,22,25 119:5,8 123:19 124:15,24 125:12 126:18 127:13,15 127:16,17,21 128:4 140:24 144:19 146:1,11 147:6,7,9,12,14 152:11 159:10,18 161:21 162:21 164:2,19 166:8 167:12,14 168:17 168:23 170:10 173:19,21 174:9 178:2 182:19 200:16,19 205:11 205:13,15 207:1,3 213:17,19 214:1 216:1,9,14,17 227:13 230:14 234:14,16,18,24 235:5,13,17,25 236:5,14
**meals** 190:14,15
**mean** 8:13 52:20 78:7,8,9 82:14 118:17 144:3 147:14 152:21 158:24 173:7 189:7 194:8 197:22 198:10,11 204:25 212:5 219:23 221:15 234:5
**meaning** 7:24 9:20 16:7 59:2,14 62:17 100:19 163:4 194:18 199:24 201:9 202:16
**means** 99:5 202:22
**measure** 224:5
**media** 126:25
**medical** 79:22 210:6
**meet** 45:20 236:12
**meeting** 75:11 93:8
**meetings** 74:13,15 75:12
**meets** 36:3
**member** 83:18 113:14 154:23 225:21
**member's** 155:6,9 155:19 156:7 192:5
**members** 12:6 32:25 83:1 97:14 117:18 122:10,23 123:6 225:8,19
**membership** 224:10
**memories** 138:7
**memory** 42:7 122:14 200:25 223:3

**men** 136:21
**mental** 33:13,15 36:21,22 37:7 47:23 53:10,23 54:3
**mention** 58:25 61:13,18,20
**mentioned** 10:15 112:18 200:4 227:23 229:13
**mentions** 60:16
**merely** 13:14 80:12
**message** 228:9,10
**met** 35:4 137:24 137:25
**metal** 166:6 199:2
**method** 30:12 159:12
**methods** 31:20
**mic** 130:20 180:6
**mic'd** 183:8,9
**michael** 4:6 88:9 132:6 214:21 218:5,10 222:12
**microphone** 167:18 177:12
**middle** 7:22 48:18 181:23
**midst** 224:1
**milestone** 94:3 138:3
**mind** 83:16 84:1 98:9 110:17 114:22 141:17 178:12 236:10,12
**mine** 94:2,11 201:10
**minute** 60:4 61:10 130:25 173:19 176:9,15 198:16
**minutes** 143:18 144:17 145:6 176:12 178:13
**misbehavior** 35:21 53:8
**misconduct** 8:11 10:8 11:15 12:25 13:4,9,16 19:5,9 20:1 27:4 28:3 29:14 30:6 32:4 34:19 45:7 56:24 59:2 61:15 62:11 65:1 153:25 154:3 154:6 155:4,22 156:1 158:7,16,20 158:24,25 159:5 159:23 160:10 161:2,5 163:11,13 163:16,17 165:23 171:4 172:10,17 187:14,16 188:11 188:17 189:2 191:4,7,10,12,22 192:5 193:3,9,10 193:14,14,20,25 194:3 195:2,10 196:14,22 197:7 199:4,19 204:14 204:17 209:2 210:17
**misconducts** 10:20 11:6 12:3,9 17:18 17:25 18:12,15,17 18:21 19:18 20:6 26:17,18,22,25 28:20,21 34:5,15 46:1 56:25 61:3 63:2 74:23 76:5 76:14 185:16,18 188:12 189:15,23 191:11 203:4 206:11 207:20
**missed** 215:4 231:23
**missing** 23:8
**misspoke** 62:2 225:25
**mister** 146:5
**mitchell** 1:13 5:3
**mm** 33:20 120:13 126:8 131:1
**modified** 46:16
**mom** 43:1
**moment** 111:21 174:22 206:22
**momentarily** 129:24
**moments** 110:2 223:5
**monsters** 136:21
**month** 26:7 83:20 103:19
**months** 87:12 93:20 99:4 139:6 142:7 185:11 197:19 199:22 202:4 223:8 228:18
**morning** 5:4,13,14 5:15,17,18,19,23 5:24 6:25 7:1 101:24 102:6,7 130:12 131:10,11 234:18 235:4
**mother** 139:1,9
**mother's** 88:10
**motion** 6:8 126:23 235:16,22 236:4,5 236:7
**mounting** 156:16 156:18,18 157:11 165:7,12,18 192:8 201:8 211:24
**mouse** 149:4
**move** 25:3 109:12 147:4 149:3 179:16 202:21
**moved** 7:23 8:12 8:13 126:6 162:12 162:18
**moving** 98:12 165:13
**msg** 1:4
**multiple** 28:18 45:20 136:25
**murder** 77:21 223:4,25
**murdered** 87:12 88:13 93:21 132:11 136:18 219:5
**murderer** 220:19 224:6
**murderers** 137:1
**murders** 87:16,18 136:24 223:24

**n**

**n** 2:1 3:1,1 5:1
**name** 86:13 87:3 98:24 102:3 130:15 131:14 136:17 149:17 161:11 181:15,17 183:13 184:11 196:2 218:7,8,10 223:12
**nancy** 2:11
**narrow** 59:6 63:6 63:7
**natural** 95:6
**nature** 15:20 69:10 223:14

**near** 110:21
**necessarily** 15:23 65:7 69:3 160:25 162:17 163:6 171:24
**necessity** 65:17
**need** 73:22 176:6 180:8,8 183:8 205:19 211:6 232:11 234:21
**needed** 142:20
**negative** 58:15 63:14
**negatives** 56:20
**neither** 237:11 238:7
**never** 30:5 72:3 110:16 111:3 115:4 116:13,22 117:20 121:7,20 137:24,25 138:19 139:13,15,16,17 142:17 201:4 207:9 208:23 228:6,8,10
**new** 14:16 73:20 99:7 142:9 228:20 232:11
**newman** 82:8 85:25 86:11,14,24 87:4 89:6 91:24 92:6,23 93:2 95:12 100:4 131:25 218:25
**news** 14:12 16:3 76:16,21 77:3 123:3 126:25
**newspaper** 126:24
**niece** 131:25 134:22 219:1 229:2,14
**night** 93:25
**nightmares** 139:12
**noble** 224:12
**noise** 141:7
**nolle** 16:22
**noon** 145:5
**norman** 205:22
**norms** 35:10
**north** 120:1
**notable** 226:21
**notary** 237:2,20
**notation** 8:25 10:1 13:7 49:1
**notations** 40:13
**note** 9:19 25:18 31:6 43:3 49:1 77:3 199:20 220:16
**noted** 7:23 9:6 10:18 12:24 42:24 48:5,10 51:14 76:21 85:19,21 101:22 126:14 172:4 224:15
**notes** 18:4,14 25:15,24 33:19 41:8 49:6 54:9 60:10 123:14,16 234:21
**notice** 16:1 27:22 27:24
**noticed** 31:8
**notified** 132:19
**noting** 26:2
**november** 7:7 8:3 8:5,15 21:25
**nra** 181:18
**number** 30:8,19 41:10 44:12 50:9 81:15,16 97:4 105:11 110:13 112:13 119:11 120:4 137:7,7 157:20 178:22,24 180:9,10,22 182:16 187:14 192:17 193:17 227:25
**numbers** 119:14 158:5
**numerous** 27:9,19 34:15 40:7 41:3 129:3
**nut** 165:12

**o**

**o** 3:1 5:1
**o'brien** 3:6 6:1,2 6:25 13:7 35:2 41:2 73:19 80:22 235:7
**o'brien's** 234:20
**oag** 91:24 111:11 129:20 153:24 158:2 191:3 192:23 195:22 198:3 200:13
**object** 65:6 66:2 67:13 68:8 76:25 78:6 104:23 161:21 164:19,21 166:8,10 177:25
**objecting** 105:2,3 105:4,24
**objection** 46:2 66:6,22 68:11 69:13,25 72:18 77:11 78:21,22 79:9 105:7 106:25 115:7,14 117:25 124:12,18 125:22 159:10 161:25 162:21 164:2 166:16 168:14 176:25 178:2,4 205:11 213:6 221:23
**objections** 115:25 178:3
**obligated** 101:21 140:10
**obligation** 113:15
**observations** 42:3
**observe** 109:3
**observed** 68:21 117:15 129:8 155:4
**obverse** 75:21
**obvious** 20:12
**obviously** 24:10 220:19
**occasion** 94:3 121:20 208:7
**occasions** 45:20 74:21 80:3 116:16 199:13
**occupied** 197:18 199:21 201:24
**occur** 220:21
**occurred** 87:16 90:16 100:10 109:24 110:11 134:4 146:23
**occurrence** 206:16
**occurs** 116:25
**offend** 73:12
**offenders** 73:10
**offense** 59:3,14,18 60:20 61:16 62:17 159:6,8 188:14
**offenses** 77:20
**offensive** 56:23

**offered** 99:7 142:9 228:21 231:8
**office** 1:15 2:5,13 2:19 5:13,24 42:2 42:6 85:19,24 88:14,20 89:12,22 90:4,23 91:12 92:7,15 93:10,16 95:8,10 96:17,21 97:3,13 98:20 99:4 100:15 102:17,20 108:18 113:14,24 117:19 121:3,8,8,21 122:1 122:11,23 123:7 124:10 125:1,2,8 128:14 132:18,24 133:6,11,20,25 134:11 136:8 140:25 141:10 142:7,24 219:9,12 219:16,23 220:1,4 220:17 221:2,3,7,8 221:20 222:13 223:22 224:22,23 224:24 225:5,12 225:13,22 227:21 228:2,5,18 233:17 233:18,20
**office's** 220:8
**officer** 17:12 48:24 51:7 113:13 146:9,9 148:4 150:12,14,15,16 174:24 186:12 201:22 207:8,9 211:13 237:3
**officer's** 191:25
**officers** 144:14 153:10 190:19 196:13 199:8
**offices** 223:20
**official** 21:17 76:17
**oh** 12:15 19:1 20:21 21:15 22:23 23:12 37:9 46:20 47:2,10 70:5 72:10 84:9 133:18 140:19,20 145:24 146:2 148:3,11 149:1 155:21 173:12,22 212:12 214:23 218:10 235:17
**okay** 6:6,19 7:6,9 7:14,15,18,22 8:2 8:7,15,20,21,25 9:5,15,23 10:6,9 10:13 11:24 12:9 12:20 13:17,22 14:11,16,20 15:3,6 15:9,18,22,25 16:5 16:5,15,24 17:24 18:7,8,22,24 19:2 19:8,14,17,25 20:3 20:16 21:7,11,15 21:20 22:11,18,23 23:9,12,15,24 24:19 25:2,4,11,14 25:21,24 26:10 27:13,14 28:2,6,9 28:16,24 29:5,11 29:14 30:1,11,17 30:21 31:1,17,22 32:6,18,23 33:11 34:10,12,20,25 35:16 36:1,11,16 36:25 37:5,12,17 37:20 38:22,24 39:9,19,20 40:1,6 40:21 41:6,11,13 42:12,21 43:8,14 43:25 45:13 46:9 46:20 47:4,7,10,15 47:20,23 48:1,7,7 48:21 49:1,6,12,14 51:4,14,22 52:5,8 52:14 53:1,10 54:2,5,13,20,22,25 55:11,13,22 57:7 57:12,25 58:8 59:25 60:8,16 61:11,24 62:1,10 62:16,25 63:8,12 63:16,18,22 71:1 72:2,5 73:18 74:5 75:2,18,20 76:4 77:7 78:20 79:3,8 81:6,13,20 82:2,9 82:13,20 84:9 85:13 86:2,17,18 86:19,24 87:2 90:3,15 91:10,20 92:10,13,18,21 93:4,4,5 97:22,23 98:22 99:2,11,17 99:21 100:21,22 101:4,4,5,16 102:22,24,24 103:3,9,12,25 104:3,5,20 105:6 105:21,23 106:4,7 106:24 107:4,4,8 107:13,23,23 108:11,20 109:13 109:17,23 110:7 110:10,24 111:9 112:2,4 113:12,18 114:4 116:7,10,22 117:13 118:8,21 119:1,7,15,18,21 119:23 120:3,8,11 120:17,21 121:2,6 121:11,18 122:20 123:5,15 124:1,5,8 124:17,25 125:11 125:13,25 126:11 126:14 127:2,6,14 128:8,23 129:2,14 129:22 130:6,11 130:22,23 131:7 131:12,20,23 133:23 135:6,13 136:2,16 140:16 142:4,21 143:3,7 143:23 144:1,10 144:13,16,17,23 145:4,8 146:2 147:8,18,23 148:13 149:1,5,13 149:25 150:2,5,7 150:18,21,25 151:14,21,21,24 152:2,10,21,24 153:1,5,11,11 154:2,10,13,16,19 154:22 155:1,6,11 155:21,25 156:4,6 156:25 157:3,9,17 157:19 158:12,16 158:20,23 159:3 159:21 160:2,2,7 160:15,17,18 161:1,4,9,13,16 162:1,3,8,8,14,19 162:23,25 163:1,1 163:7,10,15,21,25 164:9,15 165:21 166:3,16,17,19 167:1,9,17,21 168:4,11 169:4,11 169:18,24 170:5,9 170:17,21 171:3,6

171:11,17,22 172:4,16,24 173:10 174:3,8 175:20 176:12,17 176:18 177:20,23 178:15,18,24 179:8,19,23,23,24 180:7,10,12,16,16 180:19,20,21 181:4 182:6 183:19,21,23 184:1,1,13,22,24 185:1,12,20,24 186:16,24 187:8 187:10,19,21,21 188:2,16 189:5,13 189:22 190:4,22 190:25 191:7,13 191:17,21 192:1,4 192:11,16,22 193:9,21 194:7,12 194:24 195:8,21 196:1,6,21 197:5,9 197:21 198:7 199:3,14 200:4,4 200:12,19,19,24 201:3,13 202:6,15 203:2,6,13,16 204:1,4,8,13 206:2 206:5,10 207:4,6 207:10,16 208:13 208:21,25 209:10 212:18,22 213:3 213:17,19 214:1 215:1,12,15,16,21 216:4,7,14,17,18 216:23 217:7 218:1,4,16,20,23 218:25 219:13,21 220:2,7,22 221:12 221:17,19 222:5 222:11,17,20 226:9 229:18,21 229:24 230:6,9 231:22 232:3,5,16 232:22 233:6,8,13 233:22,25 234:3 234:10,13 235:6,9 235:11,25

**old** 83:20 87:5,12 93:20 139:6 182:22
**older** 94:12,25 131:20,22 227:7,9
**oldest** 141:24
**once** 40:12 45:5 65:5 66:2 169:16 169:16 187:16
**ongoing** 9:20 10:2 10:10 220:14
**onset** 35:19 36:18
**open** 5:2 169:5 198:18
**opened** 110:5
**opening** 3:2 165:18
**operated** 189:11
**opinion** 29:4 33:20 34:12 38:7 45:4 45:17,24 52:15,17 55:23 59:20,23 65:16,18,25 67:20 68:4 79:9 80:1,11 80:13,14 81:18 93:18 164:1,6,16 164:20 222:3 225:9
**opinions** 67:17,22 83:9
**opportunistic** 14:8 15:14
**opportunity** 32:12 79:12 80:8 92:18 125:18 140:18 190:3 200:7,25 216:9 226:24 232:9
**oppose** 225:23
**opposed** 158:25 168:18
**opposing** 115:24
**option** 177:16
**ordeal** 139:21
**order** 24:21 26:14 58:16,19 80:9 99:7 126:10 141:22 142:8 147:3,10 228:20
**orient** 120:4
**original** 46:17 80:11
**originate** 122:2
**ought** 222:4
**outcome** 16:8 237:16 238:12
**outraged** 90:8
**outrageous** 225:3
**outside** 29:8 46:2 110:4 147:3 169:8 194:18 196:23 213:11
**overall** 151:6 186:24
**overruled** 77:10 79:10 159:19 164:3,22 205:14 205:17
**overstayed** 224:11
**overview** 190:11

**p**

**p** 2:1,1 5:1
**p.m.** 236:16
**pa** 1:14,17
**pack** 212:17
**page** 3:2 7:15 8:2 8:8 9:19,19 11:5,8 11:15 12:12,12,18 12:24 18:5,10 19:3,12,14 20:9,20 20:21 21:12,18 22:13 25:6,11,21 26:5 39:2,3,14 41:10 46:25 47:5 47:19 48:6,17 59:12 60:6,8,13 75:9
**pages** 39:15
**paginated** 39:15
**pain** 138:9
**painful** 139:20
**pair** 198:19
**panic** 220:11
**paperwork** 172:5 172:9,16,21 173:16 209:7
**paragraph** 7:22 8:7,8 20:11,23 22:19 25:17 39:4 48:8,9,18 60:9,14 60:19,23 61:2 75:10,15 171:8
**parameters** 127:7
**parcel** 33:25
**pardon** 39:12
**parent** 94:8
**parenthesis** 191:24
**parents** 40:8 87:9 87:13,23 93:20 94:5,7,17 137:14

138:19 139:13,21 219:4
**part** 11:14 13:19 29:18 30:8,8 33:25 36:11 79:9 80:10 84:19 98:22 137:23 147:9 171:6,15 190:9 196:18 200:8 201:15 226:17 228:16
**participated** 59:19
**particular** 9:7 70:24 103:3 209:1
**parties** 237:12,15 238:8,11
**partner** 103:12
**partners** 107:20
**partnership** 103:15,25
**parts** 150:22
**pass** 97:14
**passage** 138:6
**passed** 97:8 104:4
**path** 124:20 147:19
**patience** 145:15 176:13 184:5 230:22
**patrice** 3:19 88:3 129:21 130:14,16 131:14 136:17
**pattern** 16:9 44:17 45:8 47:17 75:4
**paul** 2:10
**pause** 226:19
**pay** 23:5,21
**pdos** 102:21
**pe4412** 39:18
**peace** 138:6
**pen** 198:14
**penalty** 33:5 65:25 66:20 85:7 95:4 106:2 125:4 225:4 225:15,20,23
**pending** 235:16
**penn** 2:14
**pennsylvania** 1:2 2:7,15,19,22 84:25 185:5,8 187:11
**people** 44:17,25 68:13 71:17 72:11 76:22 77:3 110:4 137:25 138:15 224:4
**percent** 74:12,16 74:17 75:19
**perfect** 233:6
**perfectly** 52:13
**performance** 38:10 48:23 49:4 49:16 51:17 52:2 52:7
**performed** 156:12
**period** 20:4 23:19 33:16,17,24 65:6 69:10 80:9 87:11 91:16,21 143:1 168:11,18
**periods** 45:23
**peripheral** 224:11
**permissible** 83:11 105:8
**permission** 92:22 95:16 136:12 140:1 146:19 222:17
**permitted** 28:5 84:20
**perpetrator's** 95:1
**persisted** 20:7
**person** 54:18 68:25 69:9,11 88:23 117:6 133:1 137:19 146:2 219:18 228:1
**person's** 52:25 70:9
**personal** 166:9 205:15 209:2
**personality** 35:5 35:17 36:4,7,14 37:2 45:9,22 49:25 52:9 55:18 68:14,22 69:1 71:18
**personnel** 10:2 225:11
**pertained** 67:1
**pertaining** 10:8 19:5 88:23 219:19
**pertains** 41:19 68:21
**pertinent** 56:20
**petitioner** 2:2
**petitioner's** 21:8,9 60:6 118:13,15
**ph** 20:24 25:19 33:3 34:11 47:21 77:22 82:8 88:6 99:3,21 102:21 103:6,14 215:20 232:8
**philadelphia** 1:17 2:7,12,15 48:14 88:14,19 89:12 90:4,22 91:12 95:9 102:17,19 128:1,3 132:18,23 133:5,11,19,24 134:11 214:12,16 219:9,16,22 220:3 220:8,22 221:19 223:20,25 237:21
**phoenix** 6:3 144:6
**phone** 89:13 91:19 97:4 122:20 133:6 176:9 177:1,11 178:22,24 179:24 180:5,8,10,12 182:19,23,25 203:25 217:4 219:24 227:25 230:25,25 233:16
**photographs** 108:16,22
**photos** 108:13,23 110:18
**phrase** 220:24
**physical** 108:13,16 108:21 197:16,21 198:8
**physically** 212:2
**pick** 103:22 179:9 198:12
**picked** 198:11 212:10
**picture** 177:21 179:6 180:3
**pictures** 121:11,15
**piece** 9:7,13 13:1 84:12 156:19 164:11 165:15 166:6 192:12 199:2 206:7
**pieces** 25:19 158:14 172:25 173:2 202:6
**place** 32:22 79:15 82:24 154:13,16 157:14,17 172:24 191:15 231:6

**placed** 171:2 193:5
**placement** 73:15
**plan** 93:9 178:17 179:16
**planned** 139:10
**planners** 45:1
**planning** 9:22 10:14,17,22 14:8 15:10,11,15 17:19 28:22 233:21
**plant** 223:11
**play** 204:22
**played** 137:9
**playing** 193:24
**plea** 99:7 142:9 196:19 228:20
**plead** 196:14
**pleadings** 83:6
**pleads** 197:15
**pleasant** 9:23 11:2 11:11
**please** 18:25 41:15 50:16,17 64:17 65:15 71:9 72:21 82:11 86:9,12 91:2 92:8 99:20 101:6,25 102:2 130:12,15 140:3 145:17 149:9,16 150:4 155:18,25 156:6 172:8 181:17 183:20 184:25 186:8 187:10 189:14 191:21 193:13 196:10 197:13,14 198:10 199:5 202:19 217:1,18 218:6
**pled** 15:5 16:15,20 19:15 20:1 32:6
**plenty** 212:16
**plus** 7:11
**point** 20:11 41:18 42:9 57:17 59:18 61:17,19 88:15,20 89:21 90:19 91:10 92:16 93:15 94:19 95:7,21 102:18,22 103:19 107:11,25 108:7 112:13 127:10 133:4 135:3 170:4 174:5 184:24 207:12 219:21 234:16 235:15
**police** 132:9
**policies** 208:14
**policy** 8:9 24:4 153:6 168:6,8 174:6
**polite** 9:23 11:2,11 11:22
**poor** 48:23 49:4,16 51:16 52:2,7 65:3 68:6,15
**pop** 190:10
**population** 32:16 162:9 189:7,24 195:14,16 196:25 197:4 199:11 210:16,18 211:7,8
**portal** 119:16 120:9
**portion** 36:13
**portraying** 9:22 11:2,18
**position** 11:25 33:3 81:5 84:10 84:12 85:15,20 91:3 95:14 125:3 127:25 177:24 186:5,7 220:18 221:8,24 224:18 225:3,5 226:13,25 232:1 236:8
**positions** 186:23
**positive** 8:11 9:4,5 9:7,13 11:21 33:9 41:20 50:7 58:14 63:10 94:23 134:18
**positively** 34:16 213:4
**positives** 56:23
**possessed** 197:20 201:4
**possession** 17:1,5 156:2,2,23 159:4 162:5,9 165:22 171:14 191:23 194:2,5 202:11,12 204:16 205:9
**possibility** 28:22 79:12 124:6
**possible** 45:24 91:13 125:6 205:9 230:2
**possibly** 51:7 57:11 89:18 92:16 212:6 229:2 232:7
**post** 66:24
**potential** 31:24 62:7,12 78:5 109:22 114:18
**potentially** 51:13 56:8 59:21 65:18
**practice** 157:10
**practicing** 28:25 29:8
**pratter** 126:20 127:7,11 146:20 147:17,19
**pratter's** 126:10
**prc** 7:19,23 8:4 13:9,24 24:20 34:16 74:9 75:11 75:25 212:22 213:3,12,15,22
**pre** 46:11 48:16 161:10,18 162:4 162:11,15 163:5 195:3,9,16,19,20 223:7
**precedent** 85:8
**preceding** 11:4
**predication** 79:17
**predications** 69:20
**predict** 53:2 73:7 73:16
**predictable** 71:21
**predictably** 69:8
**predicted** 66:17 71:6
**predicting** 79:25
**prediction** 65:3,7 66:18,21 67:8 68:6 80:11 81:8
**predictions** 69:21 69:23
**predictor** 53:20 57:2,24 70:10,21 71:14,25
**predominantly** 185:19
**preliminaries** 218:18
**preliminary** 15:6 221:5
**premise** 71:24

**prep** 104:1
**prepared** 103:18 107:21,23 232:9 238:3
**preparing** 145:11
**preponderance** 211:17
**present** 41:20 45:1 53:12 74:20 86:1 87:15 95:8 104:11 122:16 132:13 234:25
**presentation** 45:5 45:8,9
**presented** 66:12 98:10 171:22 211:18,23
**presentence** 47:11 47:16 48:10,11
**presenting** 69:20
**presently** 156:13
**preserved** 85:15
**preset** 47:5
**presided** 189:15 206:11
**president** 43:1,3
**presiding** 5:3
**press** 6:8 179:1
**pressing** 233:2
**presumably** 55:7 55:8
**pretty** 164:1,5 169:8
**previous** 12:12
**previously** 55:14 85:2 109:20
**primarily** 44:5
**prior** 8:16 11:5 35:19 36:18 38:1 57:22 58:1,2,8 60:16 64:9,23 77:19 83:6 89:1,4 89:11 117:10 121:6 122:6,9,17 122:24 123:1,8,10 124:8 125:2,13,16 133:4 185:24 199:3 211:24,24 219:21 229:16 237:6
**prison** 13:3,8,18 24:4 26:13,13 29:19 32:11 33:6 33:21 34:4,23 41:20 50:7 52:9 52:16 57:9,16 58:3,14 61:7 62:11 64:6,11,25 65:2 66:25 68:3 68:15,19 69:6,12 70:11,25 71:7,8,20 72:12,25 78:4,18 79:1 128:15 188:5 188:24 189:6 190:9 194:6,8,8,19 202:2 212:23 231:9,9
**prison's** 22:15
**prisoner** 114:22
**prisoners** 113:19 114:5 115:1 116:20 117:3 199:12
**prisons** 189:20
**privileges** 21:25 22:2,3 23:5,6,13 23:21 24:6,17 26:4,8,15 202:23 204:2
**pro** 6:8 235:22 236:4,5,7
**probable** 84:1
**probably** 77:20 84:4 101:11 151:13 175:6 185:22 203:24 235:21
**probation** 48:1,14 48:24 51:7
**problem** 6:16 25:16 30:13 31:23 97:12 116:23 145:2,16 159:24 160:5
**problems** 28:17 32:1 37:3 43:9
**procedurally** 196:9
**procedures** 82:15
**proceed** 102:7 184:17
**proceeding** 105:25 236:16 238:4
**proceedings** 80:6 153:24 191:3 220:13,14,18 224:17 237:4,5,7,9 238:6
**process** 30:15 31:13,18 32:2 34:22 147:18 186:7,17,18 189:2 189:3 233:1
**professional** 47:24
**professionals** 114:21
**proffer** 101:11
**progdo** 77:22
**progdo's** 78:13
**prognosis** 65:2 66:13 68:6 79:20 79:22 80:10,10
**program** 14:1 23:16,17,25 24:10 25:10 76:7,12 212:22
**prolonged** 20:4 21:2,6
**promoted** 151:8,9
**property** 14:24 15:1
**proposal** 101:20
**proposed** 93:7 98:2
**prosecuting** 117:19
**prosecution** 221:4
**prosecutors** 223:21
**prossed** 16:22
**protect** 113:15
**protective** 53:18
**prove** 70:22
**proved** 69:23
**provide** 222:14
**provided** 23:4 24:16 68:3 191:5 209:8 211:12 213:12
**province** 115:2
**psychiatric** 48:15 79:21
**psychiatrists** 207:15
**psychologists** 207:15
**public** 2:5 113:15 113:19 114:6 126:24 234:18 235:3 237:2,20
**published** 224:19
**pull** 18:25 27:13 60:4 130:19

153:23
**pulling** 156:24
**punted** 146:17
**purposes** 191:4
**pursue** 231:12
**pursuing** 231:13
**push** 30:2
**pushing** 17:10,11
**put** 16:25 101:11 101:18 118:22 137:22 157:14 163:5 165:14 177:9,11 191:25
**puts** 84:18
**putting** 202:24

**q**

**qualified** 237:8
**quarters** 20:22 154:15
**question** 16:1 24:24,25 29:6 35:4,6 37:5,20 38:19 41:14,15 42:1 46:5 49:19 51:10 57:6,25 65:11,13 66:3,9 67:25 68:1,10,21 70:20,23 71:9 72:8,20 73:2,4 77:2 78:6,15 79:7 97:11 99:8,25 107:16 114:4 115:9,14,17 116:10 118:1,2,4 125:7 126:15,17 126:21 127:8,11 127:22 141:16 143:8 146:17 150:5 159:19,21 160:1,4,6 162:25 172:8,15 173:14 185:1 205:20 207:6 208:5 212:12 214:4 219:14 228:13,21 236:1
**questioning** 73:20 116:5 135:23
**questions** 43:21 63:16,23 73:17,24 74:2,11 80:16 81:21 82:1 96:3,6 97:19 99:18,23 112:5,6 128:6,7 136:9 140:23 141:1,15 143:8 150:4 167:16 174:3,11 175:18 228:12 229:8 236:4
**quibble** 11:23
**quibbling** 11:22
**quickly** 73:12
**quietly** 225:2
**quotation** 13:11
**quote** 39:21 81:1 186:11
**quotes** 39:24

**r**

**r** 2:1 5:1 111:24,24 111:24
**radar** 45:17,18,23
**radio** 20:5 21:4 22:3 23:5,20 24:16 25:8 26:8 174:6 193:24 202:23 203:24
**raise** 86:9 101:25 130:13 149:9 217:18
**raised** 42:3 219:3
**raising** 116:7
**random** 166:5
**range** 81:4
**ranking** 160:16,22 160:24
**rape** 103:18
**raspy** 183:15
**rcx** 3:5 4:1
**rdx** 3:5 4:1
**reach** 133:6 178:22 219:23
**reached** 91:12 122:13 134:12 173:5
**reaching** 123:1
**react** 232:6
**reaction** 220:10
**reacts** 71:15
**read** 21:16,19 24:7 24:9 54:6,8 59:10 61:25 92:23 136:15 156:6,10 157:19 158:12 160:6 164:13 196:14 197:13 201:2 222:18 224:19 225:25 228:16 233:15 234:21 235:22,24 236:11
**reading** 24:3 136:13 226:17
**reads** 40:1 223:2
**ready** 5:10 6:19 129:17 131:6
**real** 98:24 198:18 199:16
**reality** 51:23 94:6
**realize** 142:19
**realized** 94:9 142:19
**really** 14:6,6 46:16 67:14 68:9 79:16 79:22 80:7,10 95:20 117:23 139:13 230:22 231:25
**reason** 69:7 130:3 153:22 163:5 166:2 191:1 201:22 204:20 222:2
**reasonable** 23:18 75:3 79:17
**reasons** 20:12 83:7 84:18 126:22
**rebuttal** 232:7 234:21,25
**recall** 14:9 16:10 40:10,11 49:14 50:20 51:1 59:3 59:12 62:13,16,18 62:19,20,23,25 63:2 74:9,13 76:18 90:1 100:6 109:5 110:7,12,23 113:25 121:15 122:3 132:8 143:4 168:7,11,25 205:22 208:19,20 227:22 228:3,25 229:5
**recapture** 231:5
**receipt** 14:24 15:2 157:23 192:17,19 193:2,6 198:4,6
**receive** 108:4
**received** 84:15 157:20 158:6 219:25 223:10
**receiving** 228:3

**recess** 176:16
**reckless** 35:12
**recognize** 119:9
**recognized** 36:22
**recollect** 29:17 49:12 52:4
**recollection** 31:10 119:19 120:22 173:15 208:13 209:2
**record** 10:11 29:7 41:8 42:4 44:6 57:14 64:25 66:8 66:16 82:24 92:24 101:11 126:7 146:13 147:5 148:22,23 151:1 158:1 184:14 192:24 196:18 200:9 222:18 224:24 231:3,6 237:10 238:5
**recorded** 173:16 237:7
**recording** 237:9 238:4
**records** 9:20,20 10:1,9,15 11:5,9 11:20 13:3,8,8,18 26:13,19 27:8 28:16 30:8 37:25 38:4,13 39:10 40:13,16 41:4 42:16 44:17 46:7 46:7 48:14 54:6 64:5,6 66:25 67:21 77:17 209:4 231:9
**recovered** 14:25 17:2 172:24
**recovery** 223:17
**recusal** 6:8 235:16 235:22 236:3
**recuse** 236:10
**redemption** 204:11
**reduced** 237:7
**reduction** 38:10
**refer** 31:11 100:5 111:11 191:2 192:18 197:9
**referee** 187:7
**reference** 10:7 14:19 20:25 27:25 70:25 76:13
**referenced** 40:11
**references** 34:15 105:1 106:14
**referred** 36:21 158:6 193:3 221:12
**referring** 12:15,25 14:16 21:3 36:8 39:1 40:8 47:12 48:5 59:8 105:4 158:2 169:9,15 200:13
**refers** 22:7 48:13
**refill** 198:14
**reflect** 48:22 111:18 161:16
**reflected** 67:19
**refresh** 135:23 200:25
**refused** 19:11 25:18 26:16
**regarding** 16:14 35:10 46:13 81:17 84:3 123:7 125:19 132:9 144:14 211:19 213:13 225:11,13,19 229:2
**regimented** 162:20 190:7,23 205:6
**regular** 153:19 167:3,5
**regularly** 153:13 175:1
**regulation** 153:5
**regulations** 188:24
**related** 16:11 80:5 87:7 96:13 237:12 238:7
**relates** 8:9 101:14
**relationship** 54:22 55:5,11 131:16
**relationships** 55:1 55:2
**relative** 237:14 238:10
**relayed** 231:7
**released** 73:13
**releasing** 139:14
**relevance** 52:25
**relevancy** 115:24
**relevant** 37:1 41:22,23 42:11 49:23 53:7 67:14 68:10 69:23
**reliability** 81:1
**reliably** 71:5
**relief** 94:1,2 137:2
**relive** 139:21
**reluctant** 73:20
**remain** 95:5 134:17 135:2 145:17
**remainder** 95:5
**remember** 17:4 49:16 110:20 112:16 121:13 122:15 138:9 163:11,12,13,14 163:15,17,18 170:6,7 175:7 212:8
**remind** 13:24
**reminder** 138:3
**remorse** 21:1 26:14 35:12
**remove** 98:8
**removed** 52:6 171:1
**removing** 139:14
**render** 65:16 94:7
**rendered** 94:20
**rendering** 80:13
**repeat** 97:11 115:9 133:14 140:10 152:13 159:21 172:8 185:1 205:20 218:9
**repeated** 42:18
**rephrase** 72:15,20 168:22
**replacement** 230:24 231:11 232:6,10
**report** 7:19 8:4 9:2 9:4,8,15 12:11,14 16:12 17:1 18:2 18:13 19:4 20:9 20:19,21 34:14 38:2,15,20 43:11 46:14,17 47:9,12 47:16,20 48:6,10 48:11,16,16,24 49:22 50:10,13 54:9 59:9 60:1 61:14,18,21,24 73:11 75:9 77:3

127:1 147:23 153:25 154:3,6,6 154:11 155:4 156:1 158:7,17 161:2,5,5 171:4,19 172:3 187:14 191:4,8,12,14 193:3,10 195:2,24 200:7 212:1 226:18 232:9,11 232:12
**reported** 48:11,19 200:8
**reporting** 55:9 154:23
**reports** 9:3 12:5 33:14 46:12 74:9 75:25 76:16,21
**represent** 34:3 226:24
**representation** 16:12 33:4
**representative** 88:22 133:1 141:11 219:18 227:20
**represented** 50:10 55:8 225:1
**representing** 51:24
**represents** 197:17 198:8,9,21
**reprimand** 19:10
**request** 22:16 26:3 30:14 234:25 235:3,18
**requests** 75:13
**require** 24:4,20 35:20
**required** 26:13,14 29:19,21 36:14
**requires** 23:18 35:17
**resemble** 164:17
**reserving** 83:16 84:1
**residence** 60:11
**resident** 152:7,18 152:21
**residents** 153:16
**resolution** 146:18
**resolve** 34:22
**resolving** 31:20
**respect** 14:4 33:21 70:11 123:6 236:8
**respectful** 147:17
**respond** 73:8 226:16
**responded** 23:21 29:24
**respondent** 2:9
**responding** 32:5 33:8
**response** 22:15 91:1 92:14 134:14 152:12 221:22 226:19
**responsibility** 16:6,18 18:1,12 19:18
**responsible** 16:9 212:24 213:22 225:7
**rest** 11:1 13:14 110:15 134:23 137:4 139:11 144:3 194:18
**restate** 162:25
**restoration** 22:2 23:20 26:3
**restore** 26:14
**restored** 23:6,13 26:7
**restrained** 160:11 166:2 169:7
**restraints** 163:9 171:1
**restricted** 20:5 190:12,20 196:24 197:2 200:3 203:1 203:8 205:4,5,22
**restriction** 20:13
**restrictions** 21:2,6 24:1
**restrictive** 32:11 151:2 202:21 203:2
**result** 48:23 49:3 109:18 225:18
**resulted** 21:3
**retained** 193:6,7
**retire** 151:21
**retired** 151:17 187:8
**return** 66:20
**reveal** 11:17
**revealed** 69:10 156:19 166:6
**review** 11:9 14:1 14:21 15:3 18:19 18:21 20:17 23:17 23:17,25 24:10 25:10 33:13 46:7 67:21 76:7,12 99:19 154:20 187:22 192:1 211:15 212:22 236:9
**reviewed** 10:1 14:13,18,20 16:13 18:15 26:19 27:8 29:7 30:7 37:25 46:11 49:6 55:4 67:18 108:12,15 110:16 160:16 172:9,17 187:17
**reviews** 29:19
**revisit** 127:13
**revisited** 222:3
**rewarded** 9:1
**rhu** 29:12 32:10 32:13 33:10 150:23 151:1 152:3,5,8,18 153:1 153:10,12,19 154:17,18 156:14 157:10 158:24 159:3 162:4,12,14 162:15 163:4 165:21 167:3 168:7,12 169:1 170:12 174:25 175:5 189:8,11,23 189:25 190:5,9,15 190:22 191:18 192:6 195:9,17,19 196:11 197:1,3,4,6 202:8 203:6,14,16 203:17 205:10,24 207:10,21 208:7 208:15 210:17,18
**right** 5:8 6:17 8:4 10:21 13:13 16:16 17:7,8,12 18:15 20:19 24:12 26:5 29:9,20 30:7 31:8 31:12,23 32:9,13 32:15,20 34:8,17 36:6,9,12,20 38:3 38:6,12,23 42:7,8 43:1,17 44:8,10,14 44:19,20,22,24 45:3 47:9,24

51:12,18 53:22 55:18,24 56:2,14 57:9,14,15,17 58:3 58:13,18,23 59:7 60:20,22 62:20 63:5,9,20 64:18 65:11 71:25 74:25 75:8,19 78:14 81:8 83:16,18 84:1 85:9 86:9 96:11 97:21 98:24 99:17 101:1,6,25 102:23 105:15 106:7 109:10,11 112:13,15,18,20 112:24 113:2,5,6,7 113:14,16,20,22 113:24 114:12 115:6,12,22,22 116:16,19 117:22 117:23 119:4 120:10,15 121:24 122:22 124:17 125:21 126:11,25 127:13 130:8,13 131:2 132:7 133:22 135:19 138:23 141:6 144:16,20 145:4 145:19 148:18 149:9 157:1 158:21 161:14 164:9 165:10 167:11,25 168:3 170:19,22,25 171:9,10,25 172:19 173:6,11 173:14,17,24 174:6 178:7 179:20 182:11,15 182:21 188:3 195:4 196:23 199:22 201:5 203:10 207:19,23 207:25 208:1 209:3,6,15,24 210:8 211:2,13 212:4,15,25 213:14,23 214:9 217:13,18 222:21 230:17,21 232:24 234:13 235:11 236:7,15

**rights** 35:9 85:3
**rise** 5:2
**risk** 53:4,7,11,15 53:16,18,24 54:10 54:11,12,16,19,23 55:20,24 56:3,12 56:18,20 57:21 58:11 62:7,18 65:8 78:19 81:19 115:1
**robberies** 77:24
**robbery** 77:23 104:13,22,24 105:5,25 106:18 106:22 107:3,12 107:20 111:3
**robbie** 141:25
**robert** 1:4 87:12 89:18,24 90:24 93:7 95:3 98:2 103:14 104:11 108:25 110:25 154:3 191:8 219:7 223:13,24 224:6 225:23
**roles** 185:25
**roll** 156:16 184:9
**room** 103:16,17 108:19 110:2,22 112:12 114:17 120:4 156:15 196:23 197:3 210:12
**rough** 39:6,22 40:2
**round** 73:20
**routine** 26:6 72:25 156:12,25 157:9 192:6
**routinely** 30:22,24 72:12 79:21
**row** 95:5
**rpc** 12:5
**rule** 72:19 79:11 110:14 153:7,9 235:19,20
**rules** 31:14 95:23 116:3 188:23 190:3
**run** 190:8
**running** 110:4 127:23,24 128:2
**runs** 7:25

**s**

**s** 1:13 2:1 3:1 4:11 5:1,3
**sadness** 138:8
**safety** 35:13
**samantha** 99:20
**samuel** 103:7
**sanction** 202:15
**sanctions** 187:24 188:17
**sanctity** 224:9
**sandwich** 193:22
**sang** 137:10
**sanity** 224:5
**satisfaction** 137:3
**satisfactory** 26:7
**saw** 9:25 16:20 17:13,23 26:21,24 27:3,7,8,18 28:16 29:10 30:21 42:17 44:23 54:15 55:6 56:16 76:8 109:3 138:17,25 153:18 192:4 199:7 207:20 223:8
**saying** 11:19 24:13 24:20 37:18 44:2 56:18 79:8 98:9 105:16 138:14 150:3 174:19 181:13 200:16 201:18 208:22
**says** 8:8,14 13:2 13:17 19:16 20:2 20:15 21:23 22:19 24:13,22 40:4 50:13 85:8 97:25 99:3 120:18 147:2 154:16,22,23 155:6,8,9,19,20 156:7 157:20 160:15,18 161:10 161:13,18 192:17 195:3 201:3,7 226:3 228:16 234:2
**scenario** 57:11
**scene** 108:13,23 110:17
**schedule** 187:18
**scheduling** 215:5
**school** 38:11 39:10 40:7 41:4,16 42:16,19 43:1,3,13 43:16 50:24 51:3 51:8

**schools** 38:4
**scientific** 81:2
**scope** 213:11
**scott** 2:14
**scrapes** 39:7 40:4
**screaming** 110:3
**screen** 146:3 147:24 148:1,14
**se** 6:8 235:22 236:4,5,7
**seal** 126:23
**sealed** 126:6 146:21 147:10,15
**sealing** 147:3
**search** 166:5 192:7
**searched** 211:20 211:24
**searches** 209:19
**seat** 5:5 86:15 102:5 130:17
**seated** 145:17 217:1
**second** 5:5 8:7 18:2,13 19:3,14 20:19,22 24:24 27:11,18 38:2,8,15 41:17 43:11 48:6 49:7 54:9 60:9,14 69:15 99:18,20 103:9,21 109:21 113:5 114:24 115:8,13 119:13 124:13 132:17,23 136:2 141:25 156:18 159:14,16 159:16 161:23,23 161:24,24 164:11 165:16 168:16,16 176:3,23 192:11 209:1 213:11 219:8,15
**secondly** 49:22 79:4 110:15
**seconds** 130:25
**section** 21:22 47:8 156:7 197:11,14 197:21 198:7,16 198:16 203:13
**sections** 189:6
**secure** 162:20 165:18
**secured** 163:8 170:14,15
**security** 28:13 109:18 113:3,10 114:21 117:1 128:15 156:12,15 156:25 157:9 193:8 202:2
**see** 5:20 6:4 7:25 14:24 15:8 17:20 19:4,12 22:20 23:14 24:17,18 25:7,16,25 26:12 27:21 31:25 38:12 39:7 40:19 47:2 47:21 48:12 50:21 54:21 56:19 60:12 64:4 66:24 75:14 101:8 108:25 112:25 119:15,24 120:18,20 145:21 148:2,8 149:25 155:9,19 158:20 160:15 161:10,13 164:13 165:11 167:16 171:15 173:2,4,12,23 177:9 178:11,13 178:21 180:21,23 181:1,7,11 182:6 189:22 191:13 192:13,16 193:10 195:2,7 196:1 200:10 206:16 212:4 217:9 226:21 232:9 233:15 234:20
**seeing** 93:17 179:3
**seek** 225:3 234:25
**seeking** 225:18
**seen** 32:23 45:19 68:17 85:6 118:10 173:8 199:4,12 208:11
**sei** 6:3 150:9,10,19 150:21 151:6 167:22 205:4,24 231:8
**seii** 185:19
**seized** 193:5 197:23
**sell** 202:11,12
**senior** 103:23
**sense** 16:19 72:1 80:9 101:19 137:2 189:14 190:9 233:4
**sent** 123:13,14 150:22 187:17 199:11
**sentence** 11:1 13:19 20:10 22:19 24:13 39:23 40:1 46:11 48:16 60:9 70:8,9 84:17 97:25 98:8,14,15 100:5 105:13 137:2 222:3
**sentenced** 83:10 104:12 106:21 109:24 110:1 132:16,22 137:1 138:5 210:14 219:7,14
**sentences** 75:17 89:19,24 90:6,18 90:24 91:14 95:14 100:16 133:12,21 133:25 134:13 139:15 206:1 220:5,9 221:21 226:14
**sentencing** 35:3 49:7 85:11 93:7 98:2 104:16,18,20 104:25 105:8,10 105:12,17,18,19 105:20 107:7,19 109:1 111:3 115:5 115:12 116:13 123:17
**separate** 188:13 203:13 236:3
**september** 60:12
**sergeant** 151:15 172:2,5,11,20
**series** 186:22
**serious** 10:3,10,20 13:4,12,18 29:1 34:15 59:17 77:20 159:6,8 165:23 188:14 193:16 194:6 204:17 207:22 231:10
**seriousness** 20:6
**serous** 9:21
**serve** 23:18 36:13 37:1
**served** 94:20 136:25 137:3 139:17

**services** 228:1
**serving** 70:8 205:25
**session** 145:18
**set** 126:20 127:8 200:13 217:2 218:1 234:4,19
**setting** 32:11 53:15 68:19 69:6 69:12 70:18,25 71:7,8 72:12 73:1
**settings** 70:15 73:12
**settled** 5:5
**seven** 83:20 87:6 87:11 93:20
**severe** 159:2
**severity** 68:24
**shackled** 117:4,7
**share** 94:5
**sharon** 88:6 132:4
**shawshank** 204:10
**sheet** 106:20
**sheriff** 76:22 77:4 110:2 115:4
**sheriff's** 17:11 117:2,9
**sheriffs** 14:21 15:4 76:17 110:5 112:21 114:16,20 114:25 116:13,18 116:20 117:11
**shift** 150:13,22 210:21
**shifting** 16:6
**shirttail** 193:23
**shocking** 139:20
**short** 138:24
**shortly** 229:22
**shot** 110:14 180:25
**shots** 110:3,7,9
**show** 91:24 106:21 135:6 161:5,6 167:1,7
**showed** 110:18
**shower** 156:14 190:18
**showering** 156:14
**showing** 31:14 92:6
**shown** 94:16 175:8
**siblings** 137:7 142:11
**side** 88:1,4,7,10 118:22 165:10 203:8,9,10 210:21 211:7
**sidebar** 113:8,9 117:3
**sides** 190:13 226:22
**sign** 143:19 161:1 161:4
**signature** 92:11 111:16 154:23 155:1,15,16
**signed** 92:10 161:7
**significance** 225:14
**significant** 25:25 51:10 56:23 64:11 65:1 220:19
**significantly** 80:24
**signing** 176:17
**similar** 17:3 50:23 136:9 176:3
**similarity** 17:7 59:1 61:15
**simple** 16:21 57:25 182:25
**simply** 74:22 165:14 221:25
**sincerely** 95:2
**single** 53:20 57:1 157:3 190:13 197:18 199:21 200:3 201:8 203:18,19
**sink** 165:8 173:1 204:9
**sir** 27:11,12 64:4 101:23,24 127:22 148:24 149:8,12 154:5,20 155:20 156:11 157:24 159:16 160:19 164:5,24 166:13 168:16 174:15,19 174:23 175:15,19 175:20 176:2 181:5,16 182:12 183:15 184:16,22 185:1 200:10 206:22 208:13 214:8 217:14 218:15 225:24 226:8 227:3,17,18 228:9,13,21 229:7 230:9,15,17,19
**sister** 130:7 131:19 132:4 134:21 136:18 138:9 223:2 227:8 227:9
**sister's** 141:24
**sit** 163:10 216:25
**sitting** 115:12 165:9 208:9
**situation** 64:8 65:21 78:18 80:2 92:19 94:19 138:8
**situations** 78:2 79:21
**six** 33:9,23 185:22 185:23
**sixth** 74:22
**size** 198:13,16
**skills** 237:11 238:6
**skipped** 23:10
**slag** 193:22
**slavedriver** 214:18
**slightly** 167:17
**sling** 109:6,9,14
**slow** 217:22,23
**slower** 222:23
**slowly** 64:19
**small** 157:15,17 190:18 198:15 199:1
**smell** 139:5
**smidge** 12:22
**smile** 189:17
**social** 35:5,10,16 36:7,9,14,20 37:6 44:3,25 45:9,22 47:17 49:25 52:8 55:18 68:14,22 69:1,1 71:18
**society** 224:11,12
**soft** 86:16 130:18
**soiled** 139:3
**sole** 23:6,16 87:22 93:23
**solely** 172:3 201:24
**somebody** 16:8 72:23 122:13 201:9 202:1,11
**somewhat** 15:22 220:16,20 221:10
**sonnie** 130:20 184:9,14 217:13

233:14 237:3,19
**sonnie's** 182:4
**soon** 137:17
**sorry** 7:5 12:13,15 12:18,18 18:7 19:1 20:21 21:15 21:15,21 23:8 27:12,17,24 39:13 46:20 47:4,8,10,14 50:4 60:13 67:12 70:3,5,19 81:24 84:8 97:11 99:21 106:14 114:3 115:8 132:25 133:14 140:19 143:14 148:17 152:7,11 170:23 172:16 174:18 194:14 200:18 208:4,4 213:8 215:8 217:19 218:9 220:23 221:1
**sort** 84:7 187:24
**sought** 93:18
**sound** 74:25 76:1 77:23
**sounded** 73:6
**sounds** 75:3
**source** 74:18
**sources** 15:20
**south** 120:1
**southwest** 119:21 120:18,22
**space** 162:13 165:12
**span** 55:1
**speak** 64:18 82:11 82:23 167:17 185:1 204:6 216:10 222:22
228:7,8
**speakerphone** 177:10
**speaking** 93:5 97:25
**special** 111:5
**specific** 9:3 27:21 40:13 75:13 76:13 80:6,6 168:18 172:15 185:16 189:5 232:1
**specifically** 9:14 10:19 12:8 13:11 16:4 17:1 57:22 62:14 63:4 107:1 190:6 191:15,24
**specificity** 31:10
**specifics** 49:12
**specify** 165:3
**spectrum** 81:4
**speculating** 44:1 79:2
**speculation** 79:9 159:18 205:13
**speculative** 78:23
**spells** 204:25
**spiral** 120:19
**spit** 32:19 33:5
**spitting** 208:1,8,10
**spoke** 116:13 121:2,24 123:12 132:10 147:25 230:3
**spoken** 86:17 121:7 130:18 134:6
**square** 2:14,21 146:1
**staff** 32:25 154:23 155:6,9,19 156:7 190:17 192:4
194:9,16 205:1 234:5
**staff's** 175:2
**stage** 30:2
**staircase** 120:19
**stairs** 120:18,22
**stairwell** 119:21
**stance** 93:13 94:15 98:12
**stand** 86:3 101:23 129:21
**standard** 191:11 211:15
**standing** 172:25
**start** 6:6 73:20
**started** 102:21 137:14,15 151:11 167:25
**starters** 50:8
**starting** 22:19
**starts** 39:23
**state** 20:11 39:4 75:21 86:12 100:9 102:2 114:19 130:15 149:16 181:15,17 183:13 184:11 197:21 198:7 218:7,8 237:21
**stated** 51:14 164:11,15 193:15
**statement** 3:2 21:23 73:6 111:5 111:13,18 121:4 123:8,10 124:8 125:13,16 128:18 128:20,23 132:8 166:9 198:10 222:11 223:2
**statements** 84:15 108:15 200:22
**states** 1:1,14 7:22 142:5 200:7
**statewide** 186:17
**status** 8:12,13,23 22:1,5 23:3,19 24:7,15 89:14,18 89:23 90:5 91:13 93:11 133:7,21 202:16,19 203:2,7 203:19,20 204:5 233:12 234:8
**statute** 84:24,25 85:4
**stay** 124:20
**step** 101:7 232:12
**stephen** 237:3,19
**steps** 31:6
**steve** 12:21 144:5 144:23 148:22 149:14 177:2,6 180:1 182:5,13 183:1,8 217:22
**stipulate** 101:12 101:12
**stipulated** 101:18
**stipulation** 101:22 123:22 124:7 147:5
**stipulations** 123:25
**stolen** 44:18 55:9
**stop** 151:12
**straight** 5:10 182:25 199:2 210:12 214:19 218:13
**strange** 148:18
**strangled** 110:23
**strawberry** 2:21
**street** 1:16 2:6

**strength** 223:13
**strickland** 84:4 85:12
**strides** 231:25
**strike** 17:20 105:1 106:13,14 166:18 168:5
**striking** 17:7
**strikingly** 17:3
**strongly** 135:1
**struck** 15:13 16:25 58:24 61:13
**structural** 204:5
**structure** 71:15
**structured** 53:4 70:14,18 73:12,15 190:8,23
**struggling** 73:11
**stuck** 110:17
**student** 223:9
**studies** 53:7
**subject** 43:3,10 118:17 162:4
**submissions** 98:22
**submits** 197:15
**submitted** 141:17 196:17 200:5 222:13 228:14
**subpoena** 129:5
**subsection** 46:23 46:24 48:13
**subsequent** 65:19 67:20,21
**substance** 54:10 54:11,13
**substantially** 225:12 231:14
**successful** 194:21
**succinctly** 188:1
**suddenly** 148:1
**sued** 126:15 127:3 146:16
**suffer** 33:15
**suffered** 139:12
**suffering** 94:13
**sufficient** 38:5 52:3 232:12
**suggest** 17:18 38:7 178:8
**suggested** 14:7 15:15 52:6
**suggestive** 15:11 28:22 45:7 53:12
**suite** 2:6
**summarize** 152:19
**summarized** 63:13 187:25
**summarizes** 188:1
**summary** 60:19
**summed** 95:19
**superintendent** 231:8
**supervised** 207:14
**supervision** 212:18
**supervisor** 117:1 160:21 161:25 186:4 207:13
**support** 94:7 175:24
**supporting** 192:5
**supports** 225:22
**suppose** 32:14 125:5
**sure** 6:13 9:17 15:15 27:22 34:24 38:16,20 43:6 49:9 52:14 55:12 76:3 86:7,21 92:3 95:18 98:24 100:1 105:2 120:6 128:10 131:1,6 133:15 135:22 142:21 144:22,25 159:25 172:9,14 173:20 174:7 177:24 182:17 184:15 186:19,21 190:12 212:11 216:24 225:24 234:17 235:2
**surprised** 12:7 62:14
**surprising** 12:3
**surreptitious** 9:22 10:14,17,22
**surrounding** 60:24
**survived** 136:20
**surviving** 87:22 88:12
**survivor** 93:23
**suspended** 21:25
**suspensions** 42:19
**sustained** 66:6,22 68:11 69:14,17,25 73:14 161:25 166:16 213:14,18
**swear** 149:6,6 181:20 217:15
**sweep** 165:16
**sweet** 137:19
**swipe** 156:18
**switch** 143:17
**sworn** 86:11 102:1 130:14 149:15 184:10 218:5 237:6
**symptoms** 35:14 68:24
**system** 186:14 188:6 194:6,7,8 221:13 224:3

**t**

**t** 3:1,1 4:11
**table** 6:10 127:8
**take** 6:12 11:7,19 15:23 21:7,22 38:14 39:13,16 46:18 53:16 59:25 63:6 82:4 86:2 94:23 95:24 100:23 101:2 103:20 113:8 134:8,21 135:3,4 143:18 146:21 176:2 204:24 221:25 222:25 228:6 232:12 233:1 236:12
**taken** 39:25 82:19 91:3 98:12 125:3 145:13 148:25 165:12 176:24 202:5 209:16,21 210:7,11,13,24 212:13 216:19 224:18 225:3 230:22 237:4,13 238:9
**talk** 18:6 83:3,3 97:5 127:8 129:24 141:11 176:22 227:21 234:5
**talked** 138:17 142:13
**talking** 19:22 40:25 43:16 50:3 50:6,7 51:2 53:3 57:10,20,20 69:15 70:4,7 71:2 76:18 77:21 85:7,7 98:18 204:2

209:22
**tap** 214:17
**tape** 78:9 110:19 110:20
**tech** 148:9 175:24
**technological** 145:10
**telephone** 4:3 223:10
**television** 26:3
**televisions** 202:24
**tell** 31:4,4,9 41:1 88:14,19 91:11 95:13 96:16,20 97:2,10 109:23 132:17,23 136:6 138:15 140:2 141:11 143:6 144:9 152:3 154:5 155:25 158:23 165:1 179:7 181:20 182:3 186:7,17,20 190:4 190:7 191:21 193:13 195:22 196:9,22 199:6 202:18 203:21 212:6 219:8,15 226:13 227:19
**telling** 51:17,19 98:7 110:10 115:2
**temporary** 28:8 212:15
**ten** 145:5 176:12 176:15 178:13 187:2,2 189:19,20 204:15 206:5,9,10 206:12
**tenure** 167:21 168:4,5 208:14
**term** 76:3
**terminal** 223:5
**terminated** 48:23 49:3
**termination** 50:22 125:20
**terms** 9:5 12:8 31:16 36:24 44:12 56:9 71:19,21 77:8 81:1 100:10 108:16 114:21 123:13 154:13
**test** 9:11 186:21
**testified** 11:24 14:5 15:13 16:6 16:24 19:17 20:3 27:17 40:6 41:2 42:3,22 44:24 46:12 47:15 49:15 52:8,11 58:24 61:23 62:5,16,20 64:4 75:6 106:15 114:18 121:11 129:3,8
**testify** 9:10,11,12 35:2 59:16 85:21 166:23 175:12 206:19 213:13 214:21
**testifying** 177:1 237:6
**testimony** 12:10 14:9 15:3,6 16:10 16:11 17:4 18:5 34:14 35:22 37:24 44:5 49:7 50:20 52:1 56:8 59:4,5,7 59:10 61:12 62:8 62:11,13,23,25 63:3,13 70:20 81:9 82:25 83:8 83:11 84:2,2,3,14 84:19 107:11 117:8 123:14,16 123:22 140:9 166:18 192:2 209:13 234:20 235:1
**testing** 45:21 52:12 71:19 186:14,16,17
**texas** 89:3
**thank** 14:2 27:15 63:16 64:20 81:21 82:2,3,16,17,17 85:14,16,17 86:8 86:15,19 92:4 96:1 97:19 100:21 100:22 101:9 102:5,9 107:15 112:8 129:14,15 129:16 130:1,17 131:4,7,14 135:9 136:4,16 139:25 140:9,14,17,18 141:14 143:9,12 143:13,15 145:7 145:12,15 149:19 149:20 150:7,18 151:3 154:9 158:3 167:12 174:9 175:19,20,21,24 175:24 176:1,2,13 176:18 180:16,20 184:2,21 185:3 192:25 195:1 205:21 206:24 207:1 214:2,6,8,9 214:10,13 216:24 218:6,11,20 226:9 227:1,5,19 228:11 229:7 230:9,17,18 230:19,20 232:14 235:12,13,14 236:14,15
**thanks** 46:20 119:7 175:17 184:5
**thing** 42:5 45:19 78:12 94:23 119:3 134:5 135:13 170:1 176:11 193:24 198:5 224:12 235:22
**things** 44:18 61:18 74:24 75:22 78:24 78:25 79:7 82:25 112:17 121:14 157:17 203:22
**think** 16:25 23:11 37:8,9 39:20 41:23 42:9 45:2 46:12 51:7 55:8 60:22 65:9,9,10 66:4,8,15 67:14 69:18 70:19 72:7 72:10 74:21 79:24 83:13,15,23,25 90:15 92:10 93:3 98:4 99:5,18 101:10,19 104:24 106:17,19 107:6 107:11 114:4,17 115:15 116:23 118:11 119:3 122:13 125:23 126:14 127:14 128:14 129:15 134:16 141:8 142:19 143:7 146:11,12,18 147:13,16 160:3 168:19 169:20

179:11,13 180:1 182:24 186:16 187:4 189:3 197:5 207:11 215:4 219:13 220:10 221:5,6,13 222:15 225:25 226:3,18 227:23 229:4,19 230:23,25 231:2 231:15 232:25 233:11,13 234:15 235:7 236:1
**thinking** 233:3
**thinks** 127:9
**third** 20:11 22:23 38:8 39:13,20 137:17
**thirty** 87:6
**thomas** 88:6 132:4
**thorough** 73:19
**thought** 12:15 56:7 114:3 124:19 138:13 142:15,17 161:25 163:24,25
**thoughtfully** 140:4
**thoughts** 94:9
**thousands** 189:21 206:11
**thread** 41:12
**threat** 194:6,7,15 194:16 195:17
**threatening** 26:22 27:5 193:20
**threats** 194:8
**three** 8:16 13:5 20:22 21:24 75:17 137:20 139:7 141:25 169:16,16 189:18 190:13,15 190:18 191:23 193:18 203:12 215:11
**throw** 139:4
**throwing** 177:22 208:3
**thrown** 32:24
**thursday** 138:11 138:20
**tier** 170:3
**tiers** 190:13 203:12
**tim** 111:5 136:17 224:20
**time** 1:12 7:3,5,24 17:14,17 20:4 23:4,19 24:15 29:12 30:22 33:16 33:17 39:16 45:23 46:3 58:8 65:6 67:2 69:11 71:22 73:8 80:9 87:11 90:11 91:16,21 100:10 102:18 103:2 110:16 111:1 113:7,18 114:15 116:17 117:5 121:18,19 132:10,17 137:15 138:6 140:2 143:1 150:3,21 151:19 152:2,6,9 153:11 154:18 156:15 157:12,13 158:23 159:3 160:22 163:20,22 168:10 168:11,13,18,18 169:1,20 170:1,3 170:11 172:13 173:9 174:4 175:5 175:19,25 185:7 189:13 202:19,25 205:25 207:19 208:16,17 209:24 210:17,25,25 211:9,18,19,22 212:16 215:14,22 219:8,15 222:25 223:8 224:11,21 230:2,8,18 231:1 232:13 236:13
**timeframe** 233:5 233:10
**times** 27:9,19 34:21 56:7 74:24 76:2 94:6 129:3 138:18 169:17 199:10 206:5,14 209:20
**title** 154:23
**today** 35:22 76:15 77:13,22 87:5 104:3 109:25 153:22 163:10 191:1 192:2 214:17 215:3,7 234:9
**toilet** 157:11 165:8 165:9,13,19 173:1 173:5 192:8 201:8 204:9 211:24
**told** 50:25 65:2,21 96:23 97:4,14,16 99:6 100:15 111:19 115:4 134:15 138:24 142:7,14,17,24 189:3 205:5 223:3 228:6,19
**tony** 87:25,25 88:21 91:11,18,18 93:5 96:13,20 97:2,4,25 98:3,23 98:25 99:2,8 100:6 132:2,24 141:18,24 142:5 142:11,13,23 219:16 225:10 227:19,23 228:3 228:10,15 229:5 232:18
**tony's** 99:5
**top** 9:19 11:8 12:24 38:23 48:8 158:6 222:11
**topic** 228:23
**total** 94:16
**touch** 178:7,9
**track** 59:18 231:1
**traditional** 109:8
**tragedy** 93:17,23 94:24
**trainee** 168:2
**training** 150:17
**traits** 36:7,9,11,20 37:2,6,15,16 44:3 44:25 55:21,23,25 69:1
**transcribe** 222:23
**transcribed** 177:14
**transcriber** 238:1
**transcript** 18:10 49:8 238:3,5
**transcriptionist** 237:8
**transfer** 13:5 211:6
**transgression** 9:21 10:3,10
**transparency** 146:19
**trauma** 56:11

**travels** 28:13
**tray** 169:10,12,15
**trays** 169:25 170:2 208:22,23
**treated** 33:18 54:4
**tree** 218:13
**trial** 1:10 33:3 41:19 84:16 99:7 102:25 103:21 108:10 111:2 132:13,14 142:9 221:25 224:7 228:20
**trials** 102:16 103:20 112:12
**tried** 28:19 136:24 139:2 212:10
**trip** 138:14
**trips** 28:18
**trivial** 193:23
**trouble** 32:13 64:13 119:25
**troubled** 68:5 93:13
**troubling** 68:9
**true** 26:9 53:22 69:10 70:22 72:13 81:6 97:17 237:10 238:5
**trust** 137:9 182:23
**truth** 51:18,19 181:20,21,21
**try** 31:5 41:7 64:17 86:17 89:23 90:5,17,19 130:19 133:12 150:5 162:25 179:10,14 183:19 212:3 214:20 215:14,20 220:4 234:4
**trying** 20:20 41:4 41:18 92:17 98:8 116:4
**tucking** 193:23
**tuesday** 1:11 138:10
**turn** 143:17 153:21,22 190:25 220:17,25
**turned** 65:25 93:22 137:20 139:8
**turning** 7:15 8:2 9:15 12:9 22:13 24:19 25:2,6,11,21 47:7 152:2 158:16 193:9
**turns** 70:10 103:20
**tv** 20:5 21:4 22:2 23:5,20 24:6,16 25:8 26:8 147:24 148:1 174:6 203:23
**twice** 40:12 60:11
**two** 17:8 21:23 25:20 34:15 60:22 77:20 78:22 79:7 88:13,15,20 89:16 89:19,23 90:5,17 90:24 91:19 110:9 112:21 133:12 136:24 137:1,25 140:4 143:21 144:13 156:22 158:14 165:2,6 170:18,20,25,25 171:12 172:25 188:13 190:13,19 196:13 220:4 232:17
**type** 14:14,25 53:25 109:10 175:9
**typewriting** 237:8

**u**

**u.s.** 220:13 223:6
**uc** 187:6
**uhm** 177:20
**ultimate** 63:8
**ultimately** 186:4
**unbearably** 139:20
**uncertainty** 224:1
**uncle** 88:1,9,21 91:11,18 93:5 97:25 98:3 100:6 138:1
**unclear** 35:13 98:5
**uncommon** 206:15 206:17
**undercut** 59:20
**underpinnings** 13:15
**understand** 6:18 8:12 22:6 24:12 26:18 44:4 65:13 73:4,5 116:1 117:8 130:7 134:24 135:19 140:13 142:22 150:3 152:12 159:25 209:4 220:12 221:24 224:23 225:1
**understanding** 30:15 73:23 94:12 101:21 124:15 221:2 233:20 235:5
**understands** 160:4
**understood** 34:7 84:11 98:6 222:2 234:3
**undo** 94:22 140:4
**unemployment** 187:7
**unexpectedly** 209:17 212:14
**unfolding** 230:8
**unfortunately** 232:1
**unhandcuffed** 199:11
**unheated** 87:19
**unidentified** 27:14 180:19
**uniformed** 186:12
**unit** 102:16,25 151:2 170:15 190:12,20 196:24 200:3 203:8 205:4 205:22
**united** 1:1,14
**units** 170:14,18
**university** 223:9
**unobserved** 157:15
**unquote** 186:11
**unreliable** 15:22 182:22
**unremarkable** 64:11,25
**unsettling** 139:23
**unsure** 198:21
**upheld** 222:4
**ups** 30:2,2
**upsetting** 220:16 220:20,24 221:10
**urine** 32:24
**use** 10:21 31:13,18 97:5 108:9 153:18

173:8 179:24 180:2,5 182:22,23 182:25 202:13 213:15
**usually** 80:10 116:25
**utilize** 31:19
**utilized** 34:22

**v**

**v** 1:5 102:4
**vacate** 90:23 133:12 220:4,9 225:3
**vacated** 125:4 222:6
**vacating** 95:14 133:25 134:13 221:21 225:14,20 225:23 226:14
**vacationed** 137:10
**valid** 57:2 69:24
**validity** 59:21
**valuable** 202:8,10
**value** 11:20 15:24 69:19,21
**vanwyk** 2:4 5:16 5:19 146:11 231:16,17,21,24 232:4 233:1,3,7,10 234:10,12
**variables** 53:6
**variably** 51:25
**variations** 51:20
**variety** 76:9 77:24 81:3
**various** 44:9 80:12 185:17,18 188:11 189:6,20
**vaughn** 1:6
**vega** 3:15 101:8,14 101:22 102:1,4,12 107:18 110:10 111:11,13 112:11 116:17 119:9 128:13,21 129:14 129:24 146:16 147:16
**vega's** 107:11 116:8
**verbal** 177:4 178:1
**verbalized** 196:17
**verdict** 94:20
**version** 155:7,9,17 155:20,23 156:8 164:10 171:7 192:5 196:17 197:16 200:6,8,12 200:14,21 201:11 201:18
**versus** 188:12 189:7
**victim** 83:11 84:2 87:22 88:12 90:9 91:4 93:17 94:1 228:1 233:18
**victim's** 82:25 85:3 94:25
**victimization** 56:11
**victims** 85:8 88:13 110:18 131:16 224:25 227:2
**video** 2:10 3:22 4:6 5:20 6:3 144:9 144:11 177:3 182:9,13 214:21 217:4,6 222:24 232:19,21 234:18 235:3
**videos** 162:24
**view** 8:8 59:19 63:6,7 165:22
**viewed** 62:6,12
**viewpoint** 93:14
**views** 93:16
**violate** 146:23 190:3
**violated** 224:8
**violation** 22:8 35:9
**violence** 53:5,11 53:15,24 54:17,17 56:12,20 57:21,23 62:18
**violent** 72:24 78:19 80:23
**visual** 177:25
**visually** 178:14
**voice** 86:17 130:19 217:19
**volume** 7:12,14,15 12:22 21:10 39:10
**voluminous** 9:9

**w**

**waist** 109:11
**wait** 130:2 140:19 210:20 216:12
**waiting** 145:14 178:12
**walked** 223:6
**wall** 165:9,11,19
**walnut** 2:6
**want** 6:9,10 12:11 38:3 52:14 73:21 83:6 84:7 88:16 93:2 95:1 98:23 99:19 116:23 129:19 131:3 132:19 135:21,23 144:4,4,6,17 146:12 173:25 176:6 178:8,19 180:1 182:18 207:6 214:17 218:19 219:10 225:24 226:22 228:16 233:16
**wanted** 6:7 31:2 84:10 97:5 114:9 134:8 140:5 141:12 157:15 215:6,8 216:23 227:21 228:8 231:12 234:24
**wants** 73:22,25
**warm** 139:2
**warning** 19:10
**warton's** 89:19
**wash** 139:5
**watch** 234:20
**watching** 111:2
**way** 9:1 11:7 14:15 20:23 22:23 64:15 86:5 89:13 91:2,7 97:9 114:23 120:17 125:19 133:6 135:2 146:11,15 147:1,5 177:6 186:9 198:22 219:23
**we've** 55:14 73:18 84:15,19,22 115:15 191:8 195:21 214:18
**weapon** 108:17
**wearing** 150:2 184:25
**wedding** 137:24
**week** 7:2,11 9:10 11:24 17:25 18:11 103:21 136:23 138:18 189:19 233:5 234:9,9

**weeks** 8:16,21 235:23
**weigh** 81:11,16 123:21
**weight** 65:12 80:14 81:10 93:19
**welcome** 184:3
**went** 59:16 69:9 108:7 113:23 138:14 147:24 148:14 163:18 169:8 186:10 190:14
**west** 2:6
**wet** 139:2
**wharton** 1:4 5:9 5:17 6:2,3,5,7 8:10 10:2,16,17 11:10 16:7 17:10 17:15,21 19:15,24 21:24 23:22 24:4 25:18 27:9,25 28:18,25 29:7 30:1,9,21 32:1 33:5,15 34:16,22 35:4 36:3 37:25 39:5 42:15,24 45:3,17,25 46:13 47:18 48:11 54:2 54:14 55:4 56:6 56:19 59:8 60:10 74:12,22 75:12,25 77:14 78:1,24 79:6 81:17 82:11 84:17 87:12 88:24 89:24 90:25 99:6 99:15 104:12 108:25 109:24 112:16 132:16,22 133:2 138:4 139:15 142:8,25 144:6 145:1 154:3 156:13,14,21,23 157:6 161:22 171:9,13 175:9 191:8 192:7 197:18,20 199:21 200:5 201:3,18,25 202:4 205:3,4 209:7 213:4 216:10 219:7,14 219:19 223:13,18 223:24 224:6 228:19,23
**wharton's** 6:8 7:3 13:3 14:4 26:2 31:13 33:9,21 34:3 44:6,10 59:2 87:23 93:7 95:3 96:2 98:2 105:20 107:25 110:25 117:10 121:9,19 122:12,24 123:2,7 166:5 197:23 204:15 224:15,25 225:4,14,23 236:8
**wheel** 137:17
**where'd** 172:2
**wide** 53:5
**widely** 80:23
**wife** 110:19 136:19 148:9
**willing** 76:11 136:10 141:11 166:23 206:19
**willingness** 31:19 76:9 228:7
**window** 59:6 215:5
**winkelman** 2:11 5:23,25 63:25
**winning** 228:23
**wise** 38:18
**wish** 213:16
**witness** 3:5 4:1 6:1 18:7 37:12,14,19 41:7 43:15,19,22 46:6 50:2,4 58:19 62:2 63:19 65:14 65:16 67:5,12,17 71:10 72:1,3,6 73:5 77:5,8 79:11 82:3,6,20,22 85:23 86:3,4,11,14,18 95:19 97:23 98:5 98:19 99:1,10,12 99:16 100:23 101:6,23 102:1,4,6 114:7,11 117:23 118:6,24 123:18 125:5,10 126:1,5,9 126:12,22 127:5 127:19 129:16,17 130:14,16,22 131:2,4 135:12,16 135:19 136:1 140:13,16,18,20 141:19,21,24 142:3,12 143:2,4 143:13,15 145:16 147:24 148:1,11 148:14 149:1,3,7 149:10,13,15,18 151:4 154:10 159:12 161:22 162:22 164:20 165:6 166:14 170:9 175:22 176:1,4,17,20 177:1 178:1,8,9,23 179:1,3,12,17,20 180:3,21 181:2,4,7 181:9,11,14,16,18 181:23 182:2,6,10 182:15 183:3,7,11 183:14 184:4,7,10 184:12,15 200:17 200:22 214:9,11 214:14 215:19,21 216:13,16,22 217:11,15,16,19 217:25 218:3,5,9 218:15 221:1 223:1 226:5,7 227:4 228:25 230:19 231:7,11 232:7,8,10,17 233:18,23 237:5
**witnesses** 118:18 143:18,22 166:9 187:23 215:6,9 232:17
**won** 99:6,15 142:8 142:25 228:19
**wonderful** 137:19
**wondering** 138:11 233:2
**woo** 66:5
**word** 10:21 79:20
**words** 13:12 78:4 89:8 105:22 137:22 153:6 208:15
**work** 5:11 31:5,7 45:20 48:23 49:4 49:22 50:6 51:16 52:7 103:15 123:25 127:16,18 147:5 163:24,25 164:25 177:9,24 178:16 187:5 207:11 215:23,25 234:7,11

**workable** 177:6
**worked** 48:19 164:7 173:24 207:8,9,16 212:4
**working** 7:10 48:12 153:10 179:5 214:18 217:6 232:4 234:19 235:3
**works** 160:22 196:10 224:3
**world** 148:16,18
**worrisome** 224:1
**worst** 57:11
**wouldn't** 134:19
**wrapped** 110:20
**write** 92:13 136:11 187:13 196:16
**writes** 21:24
**written** 11:7 31:9 77:9 186:21 196:17
**wrote** 91:25 92:9 135:7 136:6 155:3 155:14,23 156:7 158:12 163:14 171:18 172:7 187:16 197:14 198:25 222:8

**x**

**x** 1:3,9 4:11

**y**

**y687** 171:13
**y6874** 171:9,11
**yard** 19:11 169:5
**yeah** 6:11 9:24 12:19 42:5 43:18 50:12 73:3 79:3 83:2,13,23 97:23 114:12 115:11 118:3,17 119:1 124:22 125:23 126:4 129:25 133:17 135:17 141:7 144:25 145:3 147:11 148:7,11 149:12 155:10,19,23 162:23 164:8 167:20 168:10,24 169:16 170:16 176:15 177:7,13 179:17 180:21 181:1 186:21 209:18 213:14 215:10 216:5 217:10,17,22,24 221:1 229:25 233:12 235:15
**year** 33:23 38:20 151:22 166:15 168:18
**yearly** 29:19
**years** 13:5 33:9 38:17 45:18 46:1 64:10,24 65:23 69:9 78:25 87:3 90:9 102:22 110:11 112:13 128:14 136:22 137:13 150:20 151:25 163:21 169:22 185:10,10 185:22 186:25 187:2 189:21 204:15 206:5,12 212:8
**younger** 131:20 227:8
**youngest** 142:2,3

**z**

**zoom** 162:24

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ROBERT WHARTON,** *Petitioner,* *v.* **DONALD T. VAUGHN,** *Respondent.* | **Civil Action** **No. 01-cv-6049** |

**ORDER**

**AND NOW**, this 11th day of May, 2022, on remand from the Court of Appeals for the Third Circuit, and following evidentiary hearings held on February 25, 2021, March 8, 2021, March 16, 2021, May 11, 2021, and August 5, 2021, and upon consideration of Petitioner Robert Wharton's "Petition for a Writ of Habeas Corpus and Consolidated Memorandum of Law" (ECF No. 22), Petitioner's "Amendment to Petition for Writ of Habeas Corpus" (ECF No. 33), Petitioner's Second "Amendment to Petition for Writ of Habeas Corpus" (ECF No. 90), the responses and replies thereto, and the post-hearing briefs and reply (ECF Nos. 278, 279, 280, and 281), and for the reasons set out in the accompanying memorandum opinion, it is hereby **ORDERED** that:

1. The Petition for a Writ of Habeas Corpus is **DENIED**.
2. A Certificate of Appealability shall **ISSUE**.[1]

[1] A Certificate of Appealability may only issue upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Although I have concluded that Petitioner's Sixth Amendment rights were not violated, I nevertheless find that this standard has been met.

**BY THE COURT:**

***/s/ Mitchell S. Goldberg***

**MITCHELL S. GOLDBERG, J.**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT WHARTON, | : | Case No. 2:01-cv-06049-MSG |
| | : | |
| Petitioner, | : | |
| v. | : | Philadelphia, Pennsylvania |
| | : | June 23, 2022 |
| DONALD T. VAUGHN et al. | : | 8:58 a.m. |
| | : | |
| Respondents. | : | |
| . . . . . . . . . . . . . | . | |

TRANSCRIPT OF SHOW CAUSE HEARING
BEFORE THE HONORABLE MITCHELL S. GOLDBERG
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Petitioner: | Elizabeth McHugh, Esquire<br>Federal Community Defender Office EDPA<br>Suite 545 West, The Curtis Center<br>601 Walnut Street<br>Philadelphia, PA 19106 |
| For The Philadelphia: District Attorney's Office | David Rudovsky, Esquire<br>Kairys Rudovsky Messing Feinberg & Lin, LLP<br>The Cast Iron Building<br>Suite 501 South<br>718 Arch Street<br>Philadelphia, PA 19106 |
| | John S. Summers, Esquire<br>Andrew M. Erdlen, Esquire<br>Hangley Aronchick Segal & Pudlin<br>One Logan Square 27th Floor<br>Philadelphia, PA 19103 |
| For Donald T. Vaughn: | Max Cooper Kaufman, Esquire<br>Nancy Winkelman, Esquire<br>Paul M. George, Esquire<br>Philadelphia District Atty's Office<br>3 South Penn Square<br>Philadelphia, PA 19107 |

| | |
|---|---|
| For the Pennsylvania Office: of Attorney General | James P. Barker, Esquire<br>PA Attorney General's Office<br>16th Floor Strawberry Square<br>Harrisburg, PA 17120 |
| | Cari L. Mahler, Esquire<br>PA Office of Attorney General<br>1000 Madison Avenue<br>Suite 310<br>Norristown, PA 19403 |
| Court Reporter/Deputy Clerk: | Jimmy Cruz |
| Transcription Service: | O'Connor Legal, Medical & Media Services, LLC<br>P.O. Box 384<br>South Sutton, NH 03273 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(Call to Order of the Court)

THE DEPUTY CLERK: All, rise. United States District Court for the Eastern District of Pennsylvania is now in session. The Honorable Mitchell S. Goldberg presiding.

THE COURT: Good morning.

ANDREW ERDLEN: Morning, Your Honor.

THE COURT: Have a seat.

DAVID RUDOVSKY: Good morning, Your Honor.

THE COURT: Good morning.

ELIZABETH MCHUGH: Morning, Your Honor.

JAMES BARKER: Morning, Your Honor.

PAUL GEORGE: Good morning, Your Honor.

THE COURT: I'll never tire of starting a court proceeding asking this question. Is there anyone in the room who is not fully vaccinated? There's a lot of people here. So, okay. We're all fully vaccinated.

So, good morning. This is the matter of Wharton v. Vaughn. We are here for an exploration of a concern I have raised regarding the Philadelphia District Attorney's Office litigation conduct in this matter, as it relates to their obligation to be candid with the Court, pursuant to their ethical obligations, and also whether, separately, there should be any type of sanctions levied, based on my independent authority to oversee the case.

So, let's start with identification of who's here for

who. And Jimmy, do you have a legal pad there for me, or could you grab one? Thank you. All right. Who is here, on behalf of the DA's Office?

MR. RUDOVSKY: Your Honor, David Rudovsky, point Counsel, and Co-Counsel.

THE COURT: Morning.

JOHN SUMMERS: John Summers, Your Honor. Good morning, Your Honor.

THE COURT: Good morning.

MR. ERDLEN: Good morning, Your Honor. Andrew Erdlen.

THE COURT: Good morning.

MR. ERDLEN: Good morning.

THE COURT: And I think I asked you before, Mr. Erdlen. Would you spell your last name for me?

MR. ERDLEN: Yes, it's E-R-D-L-E-N.

THE COURT: Okay.

MR. ERDLEN: And I'm with the Hangley Aronchick firm.

THE COURT: Yes, as is Mr. Summers, correct?

MR. ERDLEN: (No audible response).

THE COURT: Okay. And for the Attorney General?

MR. BARKER: Morning, Your Honor. James Barker from the Attorney General's Office.

CARI MAHLER: Good morning, Your Honor.

Cari Mahler on behalf of the Office of Attorney General.

THE COURT: Hi, good morning. And I think I asked Counsel for Mr. Wharton to appear. Are they here?

MS. MCHUGH: Good morning, Your Honor.

THE COURT: Yes.

MS. MCHUGH: Elizabeth McHugh from the Federal Defender on behalf of -

THE COURT: Good morning -

MS. MCHUGH: - Mr. Wharton.

THE COURT: - Ms. McHugh. Okay. All right. I'm certainly not going to take the time to relay my concerns that are, I think, laid out hopefully clearly in my Opinion on this matter.

So, I said I wanted to provide the District Attorney's Office with an opportunity to provide explanation, should they deem it appropriate, or they want to, regarding the concerns I've raised.

And unless someone wants to say something further before we start, we will give you that opportunity. So, go ahead.

MR. RUDOVSKY: I have a few comments, if I can -

THE COURT: Yeah.

MR. RUDOVSKY: - make, Judge.

THE COURT: Go ahead.

MR. RUDOVSKY: For the record, number 1 -

THE COURT: Sure.

MR. RUDOVSKY: - we have moved very broadly to preclude this hearing, based first on your initial Opinion, which raised only the issues concerning lack of duty of candor, under the Rules of Professional Responsibility.

And our Motion to Preclude this hearing included any inquiry into any conduct that could ultimately be sanctionable, because your Ruling yesterday seemed to change the focus of where this hearing was going.

We had prepared for hearing in which you were going to look into the issues of the duty of candor. That's why we asked that this matter be referred for Three-Judge Court, with appropriately confidentiality and all those kinds of issues.

In response, in your Ruling yesterday, you now say that your concern is -- or what you want to look at today, is that the District Attorney's Office may have litigated this case in a way that threatened to undermine the limited role Federal Habeas Corpus Jurisdiction is intended to play in the State Criminal Justice System.

THE COURT: Well, I said a lot more in my Opinion -

MR. RUDOVSKY: I -

THE COURT: - than that.

MR. RUDOVSKY: You did. I want to be clear that you also said that your initial Opinion included that, as well.

THE COURT: It did.

MR. RUDOVSKY: We read that somewhat differently.

THE COURT: Um-hmm.

MR. RUDOVSKY: But that that'll be dispute we can address later. But there is a new focus here. I mean, those words were never used in the Opinion.

THE COURT: They weren't?

MR. RUDOVSKY: And it raises for us -

THE COURT: Nothing, I -

MR. RUDOVSKY: I -

THE COURT: I don't want to get into a situation where we're going to pull out the Opinion. But I will, if I have to.

But I think that was a big part of the Opinion, that my concern clearly involved the possible improper use of the District Attorney's Office to circumvent the very limited focus that a Federal Court has when they are examining a Federal Habeas case.

That has been where a jury has concluded that a death penalty's appropriate. And the Pennsylvania Supreme Court has concluded that that verdict is sound and should be affirmed. I mean, Mr. Rudovsky, certainly we won't quibble that -

MR. RUDOVSKY: Right.

THE COURT: - a Federal Court has very limited -- let me just finish my thought.

MR. RUDOVSKY: Yeah, oh, sure. No, no.

THE COURT: Yeah.

MR. RUDOVSKY: For sure.

THE COURT: A Federal Court has very limited jurisdiction when it comes to a Federal Habeas matter and can only get involved when there's been a constitutional violation. So when you say a new focus, I'm sure I addressed this in my Opinion, as it relates to the DA's Office conduct.

I'm concerned that they tried to circumvent that well-established caselaw. So, go ahead. I'm -

MR. RUDOVSKY: Well -

THE COURT: - sorry to interrupt you.

MR. RUDOVSKY: So, I -

THE COURT: Yeah.

MR. RUDOVSKY: And we understand ultimately -

THE COURT: Yeah.

MR. RUDOVSKY: - you ruled that, on the ineffectiveness of assistance of Counsel issue, which was remanded by the Third Circuit, that, while Counsel may have acted deficiently, there was no prejudice, right? That was the issue.

THE COURT: Yeah.

MR. RUDOVSKY: There were arguments made on both sides. Lawyers often will make arguments that may seen inconsistent with Doctrine, which may ask you to change Doctrine.

That's what Lawyers do. That's what District Attorneys do. That's what Defense Lawyers do, all appropriate.

What we're concerned with is an inquiry into the decision-making process of the District Attorney's Office as to why they took certain positions raises issues of our deliberative process, work product.

There are cases, for example, that Circuit Courts have ruled that Defendants are not entitled to the inner workings of Death Penalty Committees of the Department of Justice, where -

THE COURT: But I'm not a Counsel -

MR. RUDOVSKY: And -

THE COURT: - for the Defendant.

MR. RUDOVSKY: Right, I understand that.

THE COURT: I'm a -

MR. RUDOVSKY: But -

THE COURT: - independent Federal Judge, who's has to make Decisions based on facts given to me.

MR. RUDOVSKY: And we understand that. And there's Decisions that say that what the internal deliberations of Government Officials -- and this is District Attorneys. This is the Department of Justice. This is any Government Agency -- should not be done with a fishbowl. So, I just raise that because we were concerned that this language -

THE COURT: Sure.

MR. RUDOVSKY: - could indicate a hearing that went well-beyond an appropriate scope of inquiry. We're -

THE COURT: I understand.

MR. RUDOVSKY: - ready to proceed and object on those grounds. But I -

THE COURT: Sure.

MR. RUDOVSKY: - wanted to preserve those issues -

THE COURT: Right.

MR. RUDOVSKY: - for the record, and -

THE COURT: So, can I comment on that point?

MR. RUDOVSKY: Please.

THE COURT: I understand what you're saying now. And my suggestion would be, rather like your input, my suggestion would be let's take it one step at a time.

And I don't hear you saying you're going to blanketly object to any inquiry. I don't hear you saying you're going to instruct the Lawyers from the DA's Office not to answer.

But, you certainly reserve your right. And I want you to have a comfort level. If you think that my inquiries, or if the other Lawyers have inquiries, impede or infringe on the privileges that you've raised, object.

MR. RUDOVSKY: Yeah.

THE COURT: And we will -

MR. RUDOVSKY: I know.

THE COURT: - talk about it.
MR. RUDOVSKY: I think we're on -
THE COURT: Yeah.
MR. RUDOVSKY: - the same page.
THE COURT: We are.
MR. RUDOVSKY: We've preserved -
THE COURT: We are.
MR. RUDOVSKY: - our objection to the hearing. I -
THE COURT: Understood.
MR. RUDOVSKY: I'm not going to instruct -
THE COURT: Yeah.
MR. RUDOVSKY: - our witnesses not to -
THE COURT: Okay.
MR. RUDOVSKY: - say anything, for sure.
THE COURT: Okay.
MR. RUDOVSKY: And I'll object, if we think the -
THE COURT: As is your -
MR. RUDOVSKY: - line is being crossed.
THE COURT: - absolute right.
MR. RUDOVSKY: Right; now, you also introduced this by saying that you're holding this hearing to give the Office of the District Attorney and the Respondents here an opportunity to explain what they did.

Our position at this point, just to be clear, is that we don't think any explanation is necessary. You can obviously

ask questions. But -

THE COURT: Sure.

MR. RUDOVSKY: - we are not bringing them in to explain anything.

THE COURT: Understood.

MR. RUDOVSKY: We've made all the arguments in the briefs. You know our position that they did not violate any lack of candor.

They were never asked for specific information. That's why they didn't give it. They had no duty under the Rules. We have an Expert Report on that.

That's our position. But obviously if the Court wants to proceed with this inquiry, we will abide by those rules.

THE COURT: Understood; I have a couple preliminary questions, Mr. Rudovsky. Excuse me. As to the hierarchy in the District Attorney's Office, am I to -- do I understand it correctly that Mr. Kaufman -- and by the way, is Mr. Kaufman here?

MAX KAUFMAN: Yes, Your Honor.

MR. RUDOVSKY: Yes.

THE COURT: Mr. Kaufman, good morning.

MR. KAUFMAN: Good morning.

THE COURT: Mr. Kaufman, at the -- you can have a seat, sir -- Mr. Kaufman, at the time -- at the pertinent time

period was Chief of the Federal Habeas Unit. Mr. George, who litigated the proceeding in front of me, was the Assistant Chief of the Appeals Unit.

And Ms. Winkelman was the Chief, I think. Maybe they still have these positions. I know Mr. Kaufman has gone onto a job for a Supreme Court Justice -- Pennsylvania Supreme Court Justice.

MR. RUDOVSKY: The exact -

THE COURT: Ms. Winkelman was head of Appeals? Did I have -

MR. RUDOVSKY: No.

THE COURT: - that right?

MR. RUDOVSKY: The exact title is Ms. Winkelman was head of the -- let her say.

NANCY WINKELMAN: Your Honor, I'm the Supervisor of the Law Division at the Philadelphia DA's Office.

THE COURT: Okay. All right. So, with your permission, Mr. Rudovsky, I wanted to start with -- given the hierarchy -- I wanted to start with Ms. Winkelman and ask a couple questions. Okay?

It's been suggested to me, Ms. Winkelman. Where are you going to be comfortable sitting? Is right there okay? You don't need to -- you want to take the witness stand or -

MS. WINKELMAN: No, I don't.

MR. RUDOVSKY: I -

THE COURT: It's been suggested to me that -

MR. RUDOVSKY: It may be easier -

THE COURT: - I should swear -

MR. RUDOVSKY: - if the -

THE COURT: - you in. I'm not going to do that. You're an Officer of the Court. It's expected your answers are going to be completely honest. So, you want to -

MS. WINKELMAN: Yes.

THE COURT: I'd rather just look at you rather than have you in the witness stand. Could you just sit right there? Are you comfortable sitting right there?

MR. RUDOVSKY: Actually, can -

THE COURT: Or Counsel Table?

MR. RUDOVSKY: - we bring a chair right here?

THE COURT: Yeah, do you -

MR. RUDOVSKY: Yeah.

THE COURT: Mr. Cruz, can we bring a chair?

(Asides)

THE COURT: All right. So, I want to -- there's a lot of background in this case. And we've been on sort of a long path.

The Third Circuit issued its Opinion back in January of 2018 and directed that we hold a hearing on -- and I'm not going to certainly recapture the entire procedural history. You're aware of it. I'm aware of it. It would take an entire

day to relay it.

But the Third Circuit affirmed all of my denials of Mr. Wharton's Claims that were raised by the Capital Habeas Unit of the Federal Defender's Office except one. There was not a reversal. It was a remand.

And the remand was regarding my Decision that a hearing was not necessary. An evidentiary hearing was not necessary to explore the following issue.

And we all know the issue, but I just want to state it. The issue is: was Trial Counsel, Mr. Cannon, ineffective? That is, was there a violation of the Sixth Amendment to effective assistance of Counsel, such that he failed to properly investigate Prison adjustment and Prison conduct on the part of Mr. Wharton, such that that could have been presented to the death penalty jury and wasn't? And was Mr. Cannon's deficiency in not investigating and presenting that evidence, did that present a violation?

So, of course, Ms. Winkelman, we can agree that the Third Circuit directed a hearing on that issue. But importantly, and to get to my first question, they said -- and I want to read this part, because this is how I understood it -- Third Circuit directed -- and I quote:

"As for Strickland's prejudice prong to determine whether Wharton's proffered evidence had a reasonable probability of changing at least one juror's vote, we

must" --

Not may.

-- "We must reconstruct the record and assess it anew. In doing so, we cannot merely consider the mitigation evidence that went unmentioned in the first instance. We must also take account of the anti-mitigation evidence that the Commonwealth would have presented to rebut the Petitioner's mitigation testimony."

I don't think -- and you can certainly disagree with me -- there's any vagueness in that statement at all. I read it to say the hearing must include not only positive mitigation evidence of Prison adjustment, but also negative evidence.

The Third Circuit went on to say, "Of course, had Wharton presented the testimony of Dr. Crop" -- and that was an Expert presented in the State proceeding in his favor -- "the Commonwealth might have countered with other evidence holding a contrary opinion. To-date, though, the Commonwealth has yet to proffer any such testimony," which I think further confirms my view that you were obligated to present both evidence in favor of Mr. Wharton -- and by the way, you are the Prosecutor.

We have a Defense Attorney very capable of doing that. But it was expected that you would present not only favorable evidence, but evidence that would not be favorable.

And you withheld the fact that Mr. Wharton violently

escaped from a City Hall Courtroom. So why did you do that? Why did -

MR. RUDOVSKY: Your Honor -

THE COURT: - you withhold that information?

MR. RUDOVSKY: - I object to the conclusion that anybody withheld any information that was ever requested by this Court on the remand. In fact, it's just to the contrary.

What the District Attorney's Office did was file a Notice that, after having reviewed the case, they agreed there was merit to the Defendant's Claim, having reviewed whatever evidence they had at that time, therefore consistent with what they'd been doing for years, before Larry Krasner was District Attorney, and while he was. They simply filed a Notice saying that's our position.

You followed up, Judge, with an Order not for any information, pro or con, as to why they did it, or their legal reasoning, or the caselaw, or anything like that. What you did was issue a very limited Order saying whether you were bound by that concession. And if you were not, should there be a hearing?

They responded in kind. And they said, as we all know, no, you're not bound by the concession. It's something you might give some -- a deference to, when the Prosecutor makes that kind of concession. Judges do that, completely up to you. And if you think an evidentiary hearing, where all

these facts would come out, is necessary, that's fine.

THE COURT: I -

MR. RUDOVSKY: And -

THE COURT: - didn't think -

MR. RUDOVSKY: - that's what you did.

THE COURT: - an evidentiary hearing was -

MR. RUDOVSKY: You didn't ask -

THE COURT: - necessary.

MR. RUDOVSKY: - for any of that information.

THE COURT: The Third Circuit ordered the hearing.

MR. RUDOVSKY: The Third Circuit ordered the hearing. They didn't say when and where, number 1, any Party had -

THE COURT: Okay.

MR. RUDOVSKY: - to produce any evidence, other than at a hearing.

THE COURT: Okay.

MR. RUDOVSKY: And what the District Attorney's Office did, as Lawyers do all the time, they fight some issues and they concede some issues. And when they concede an issue, they'll often say we don't take our position to what, in this case, the Petitioner has said.

The Lawyer was on the prong of a Sixth Amendment Claim, the performance prong, clearly ineffective, did not know he could present this kind of evidence. And in our view, given

all the circumstances, we think it was prejudicial, given our Expert Report, given the fact the jury was deadlocked, so on and so forth.

That was their position. They did what Lawyers do all the time and said, under those circumstances, we agree with our Opponent. Lawyers do it in civil cases. They do it in criminal cases. It goes on all the time.

The Solicitor General changes position before the Supreme Court with new Administrations on basic legal Doctrine. There are cases where State Attorney Generals on a Defendant's Petition for Review of a Criminal Conviction have said to the Supreme Court, on review of this case again, even though we defended the conviction below, we think the Defendant's Constitutional Claims are right.

Supreme Court doesn't ask for the reasons. They appoint an Amicus, which is what you did, to argue the other side.

What the District Attorney's Office did here was completely consistent with their internal Policies and what Government Lawyers do all the time. And so, when you say in that last -- that's why I object -- that last point -

THE COURT: It's quite a long -

MR. RUDOVSKY: - you had an -

THE COURT: - objection.

MR. RUDOVSKY: - obligation by what the

Third Circuit said to immediately provide you with all this information. We don't think that there was any obligation, under the rules, your internal rules.

You could have had rules that say, if you -- and we'd suggest this -- if you come before me to concede an issue on a case like this, give me the reasons. That's fine. You can have that internal rule. There was no internal rule.

We have a half-dozen Judges in this District who we've submitted similar concessions to. Nobody's ever said, wait a minute. You got to give me the reasons. And not only do you have to give me the reasons, but I'm going to find you possibly sanctionable misconduct for not doing so. Prior Administrations have done it. Lawyers do it all the time.

So I only take issue with the last premise of your question that the Third Circuit had somehow ordered the District Attorney's Office to provide this Court immediately with all the evidence in the case. You wait for a hearing, if you even have a hearing.

THE COURT: Okay. Your multifaceted objection is preserved. Ms. Winkelman, did you read the Third Circuit Opinion, as I did, as directing your Office to provide negative -- I'll read it again. "We must also take in account of the anti-mitigation evidence."

Did you read the Third Circuit as directing that any hearing must also take into account anti-mitigation evidence?

And if you did, why didn't you provide me with the information that Mr. Wharton escaped from a City Hall Courtroom, was 20, 30 feet from Broad Street, and had to be shot to prevent the escape? Why didn't you provide me with that information?

MS. WINKELMAN: So, Your Honor, thank you for giving me the opportunity to explain. I want to just start by saying I started my career in this Courthouse 30-some years ago clerking for Dolores Sloviter.

I then went to the Schnader Firm, where I worked for 29 years, until I came to the DA's Office in 2018. My professional reputation is extraordinarily important to me.

THE COURT: Of course, it is. And you have an excellent professional reputation, as far as I've heard.

MS. WINKELMAN: So, if I may continue?

THE COURT: Sure.

MS. WINKELMAN: My integrity, my reputation, my candor, my ethics have never been questioned. And it's something I take very, very seriously. I was stunned to read the last 10 pages of your May 11th -

THE COURT: All right. I'm going to -

MS. WINKELMAN: - Opinion.

THE COURT: - interrupt you and say, respectfully, Mr. Rudovsky, in response to my question, repeated everything that has been said in a Brief, which I've carefully read. I don't -- we haven't had cases together before. But, Lawyers

talk. And I agree. Your reputation in the legal community is exemplary.

I am here to ask questions. Are you going to answer my -- I'd rather avoid all the speeches. I just want answers to questions, so I can try to give you the benefit of the doubt. So will you answer my question or not?

MS. WINKELMAN: I absolutely will.

THE COURT: Thank you.

MS. WINKELMAN: And I -

THE COURT: Please.

MS. WINKELMAN: - needed to get that off my chest.

THE COURT: Understood.

MS. WINKELMAN: So if -

THE COURT: Okay.

MS. WINKELMAN: - it felt like a little grandstanding, I apologize.

THE COURT: It -

MS. WINKELMAN: This is -

THE COURT: I understand.

MS. WINKELMAN: - a big deal to me.

THE COURT: I've lost countless hours of sleep over this. This is not something that I take at all lightly. Trust me. This has been very difficult for everyone involved. I get that.

But, this is my obligation to make sure that, when I

make Decisions -- now, I'm going to grandstand for a second -- when I make Decisions like life-and-death Decisions as to whether to vacate a death penalty on one of the most horrific crimes I've ever witnessed in my 35 years of practice, that I am given ample information to make that Decision.

So I'm going to ask the question for the third time. Did you read the Third Circuit Opinion, as I did. And if you did, why didn't you tell me that Mr. Wharton, in his rehabilitation as a Prisoner, had escaped?

MS. WINKELMAN: So, when the case was remanded -- and I am trying to answer -

THE COURT: Okay.

MS. WINKELMAN: - your question as -

THE COURT: And I won't -

MS. WINKELMAN: - directly -

THE COURT: - interrupt you. Go -

MS. WINKELMAN: So -

THE COURT: - ahead.

MS. WINKELMAN: - give me a little -

THE COURT: I will.

MS. WINKELMAN: - space, please.

THE COURT: I will.

MS. WINKELMAN: When the case was remanded, as we were looking at capital cases that had an active -- something active going on, we -- when the case was remanded from the

Third Circuit -- we looked at this case. We had a decision point about what to do with it. We ended up -

THE COURT: Who's we? May I ask who we is?

MS. WINKELMAN: The Office has a Capital Case Review Committee.

THE COURT: I'm asking, who's on the Committee?

MS. WINKELMAN: Well, first I should say the Committee reports to the District Attorney, makes recommendations to the District Attorney. The high-level Executives in the Office, the First Assistants, the Supervisors of several Units in the Office, including Victim's Services Unit, Homicide Unit, Law Division, Conviction Integrity -- and I say including because I'm not sure if I'm missing someone -- looks at these capital cases.

And I can't remember the discussion on this particular case. I do know that there was a recommendation that we concede penalty phase relief in this case.

We followed the practice of former Administrations in the form of Notice of Concession that we filed with this Court. It was substantially similar to numerous other Notices. And we've provided those to the Court, that we have filed in other cases before DA Krasner, or Nancy Winkelman, or anybody else came into this Office.

We had never, to my knowledge, had a Court ask -- have a problem with our Notice of Concession. We view that as

part of the role of a Prosecutor, part of our ethical obligations. So that's what we filed.

In response to that Notice of Concession, the Court entered an Order. And the Court asked us to brief two discrete issues.

THE COURT: But my question was, prior to filing the Notice of Concession, if you read the Third Circuit Opinion as I did, again, requiring the exploration of anti-mitigation evidence, why did you not tell me that there was anti-mitigation evidence?

MS. WINKELMAN: Your Honor, we didn't tell you anything. And this isn't a question of withholding. This is a question of our practice, our practice.

And again, this was prior to DA Krasner. The practice of the Office, when -

THE COURT: But I'm asking you to focus on what the Third Circuit directed us to do -- me to do, explore anti-mitigation evidence. You read that, of course. Would you agree that escaping from a City Hall Courtroom is anti-mitigation?

MS. WINKELMAN: I'm not trying to evade your question. I feel that, at that point, the Office had a decision to make about what to do with the penalty phase.

THE COURT: Yeah.

MS. WINKELMAN: The capital -

THE COURT: Respectfully -
MS. WINKELMAN: - punishment.
THE COURT: - I do think you're evading my question.
MR. RUDOVSKY: And Judge, I -
THE COURT: And I'm going to ask -- well, no. I'm talking to Ms. Winkelman -- going to ask -
MR. RUDOVSKY: I'd just object -
THE COURT: - it one more time.
MR. RUDOVSKY: - to that line of questioning.
THE COURT: Okay. Well, why did you decide -- why did your Committee decide to withhold anti-mitigation evidence from this Court, when we were directed to explore that?
MS. WINKELMAN: We did not withhold evidence. We followed a practice that the Office had followed in numerous other cases. Can I tell you that, in those other cases, there was a lot else that could have been -
THE COURT: I don't -
MS. WINKELMAN: - said?
THE COURT: I'm not concerned with other cases. I'm concerned with Mr. Wharton's case.
MS. WINKELMAN: And I'm concerned with -- our process was no different. And I just want to continue, because the Court then asked two questions.
And we answered those questions. We were meticulous in answering the questions the Court asked. If the Court had

asked other questions, if the Court had asked for a fulsome explanation, we would have provided that.

Well, Mr. Kaufman filed, along with you and Mr. George, on April 3rd, a Brief. And in that Brief, you laid out -- this is after I didn't accept the concession -- you laid out reasons for your concession.

And I'm on page 3. You said -- you cited Mr. Cannon's Declaration, which said that he wasn't operating under any strategy.

And you cited a fact. That's a fact. And you cited the fact that the jury for the -- the death penalty jury for a period of time had been deadlocked. And this is on the issue of prejudice.

But you didn't mention the escape. Why? So you got into the facts, but not all of them.

MS. WINKELMAN: Well, we got in the facts at a very high level. And I -

THE COURT: You don't think an escape from City Hall's a high level?

MS. WINKELMAN: - did not know about the escape -

MR. RUDOVSKY: And Judge, may -

MS. WINKELMAN: - Your Honor.

MR. RUDOVSKY: - I just say that -

THE COURT: Sure.

MR. RUDOVSKY: - on the escape attempt, what is so

interesting to us is that, as you say, the zealous Advocates in the District Attorney's Office who sought the death penalty, right, and defended it for 25 years.

You use the word "zealous". The word was used in the hearing of the former District Attorney for the death penalty. We respect that. That was their position.

At the first -- at the death penalty hearing, when Mr. Wharton presented evidence of good character, right, that could have been impeached with this escape attempt. District Attorney never used it. It was not in any of the Opinions. It was almost to them irrelevant.

If they didn't use it then, even under your theory here that the District Attorney somehow had to give you everything at this point, you're assuming that that was something that was considered relevant and so on, and so forth.

That was for the full hearing, which you had. All they were doing was saying, we've reviewed it. We have a basis for deciding, based on what has been provided to us that the Lawyer was ineffective and that there was prejudice.

We're just giving you a Notice. That's all Mr. Kaufman did. He didn't lie about anything. He said, here's the Notice, and then waited for further instructions from you.

And what you did was two things: ask the legal questions. Can I have a hearing? They said yes. And then,

participate in that hearing.

How that could either violate a duty of candor, or, even more broadly, undermine Federal Habeas Law, Lawyers have no way of undermining Federal Habeas Law, unless they act, right, corruptly. Judges control Federal Habeas Law. You made a Ruling.

THE COURT: Well, Judges need information to make informed Rulings.

MR. RUDOVSKY: And you got it all at the hearing. You got everything you needed at the hearing. You made a Ruling. And you found -

THE COURT: At what hearing?

MR. RUDOVSKY: - at the end -- and you found at the end --

THE COURT: Excuse me. What hearing?

MR. RUDOVSKY: When you had the full evidentiary hearing in this case, after appointing the Attorney General.

THE COURT: And it wasn't until the Attorney General was appointed and midway through the hearing that I had to ask Mr. George, did you have this information about the escape? And he said, yes.

MR. RUDOVSKY: No, no, no. The question was, did the District Attorney's Office know of the escape? Well -

THE COURT: Okay.

MR. RUDOVSKY: - obviously, they knew of the escape.

They prosecuted Mr. Wharton.

THE COURT: Right.

MR. RUDOVSKY: That was how many years ago, right? That was over 40 years ago. No evidence that he either personally knew about it, and the District Attorney had never even used it before, when they could have. My point -

THE COURT: That was -

MR. RUDOVSKY: - is -

THE COURT: - their decision -

MR. RUDOVSKY: My point is simply -

THE COURT: - if that's right.

MR. RUDOVSKY: - all of that came out. And not only was there no lack of duty of candor, but how does a Lawyer, by conceding an issue, or by arguing a position, undermine Federal Habeas Law? They can't do it.

You have the power to do it, extend it, restrict it. The Third Circuit has that power. The Supreme Court has that power. They go back-and-forth.

You had the Martinez case 10 years ago. Now, you got Shin, right? They change their positions on Habeas Corpus Doctrines all the time. Lawyers make arguments to extend or restrict.

And when a Prosecutor decides whether to fight an issue, they have the same considerations. They have no power to undermine anything, unless you're right that they acted

corruptly in some way.
But that's the ethical issue. That's the ethical issue. And that's why we think this thing is completely inappropriate. I've said it. I won't say it again.
THE COURT: So you know, honestly, I don't think you've answered my question. But I'm going to move on, okay, unless you want to say something more, or else I'm going on.
MS. WINKELMAN: The answer -
THE COURT: You want me to ask it again, or you want to move on?
MS. WINKELMAN: I answered the best that I -
THE COURT: Okay.
MS. WINKELMAN: - can.
THE COURT: Okay. As Chief of the Appeals Division for the Philadelphia District Attorney's Office, I'm going to assume you were aware of the Pennsylvania Supreme Court's Decision in Commonwealth v. Brown, which was decided in 2018, prior to your issuance of your concession.
Again, I'm sorry. I'm going to have to quote from some language to get to my question. So, the Supreme Court of Pennsylvania -- and I believe it is a very similar case.
It was a death penalty case. It was a PCRA matter. State collateral review matter; this is a Federal matter. The District Attorney -- the current District Attorney, your Office, Mr. Krasner's Office, presented a concession along the

same lines to the death penalty.

And the Supreme Court of Pennsylvania rejected that process in my view. That's the way I read the case. And it said the following.

The jury -- and I'm going to paraphrase some of this -- the jury, having rendered a verdict, neither the Parties, by agreement, nor this Court, absent a Finding of legal error, have the power or ability to order that the jury's verdict be commuted to a life sentence. The Pennsylvania Supreme Court went on to say:

"After the jury in this case reached its decision and entered a verdict recommending a death sentence, the District Attorney lost any prosecutorial discretion to alter that verdict. The power of a Court amounts to nothing more than the power to do exactly what the Parties" --

I'm sorry.

"If the power of a Court amounts to do nothing more than the power to do exactly what the Parties tell it to do, simply because they said so, without any actual merits review, it is not judicial power at all. The District Attorney cannot now seek to implement a different result based upon differing view of the current Officeholder."

And the important part I take away from that,

Ms. Winkelman, is that my read of what your Supreme Court -- Pennsylvania Supreme Court told you in these type of matters is that the only way a Decision can be made to take a death penalty verdict affirmed by the Highest Court off the table was through a merits review. That's what they're saying, merits review.

So my question, then, is: how could I have a merits review without knowing there was anti-mitigation evidence? How did you expect me to do that without telling me that Mr. Wharton had escaped?

MS. WINKELMAN: So, Your Honor, in the Brief that we filed -- I believe it was April 3rd -- that you were referencing, we were very clear that the Court was not obligated to accept our concession.

I understand what the Supreme Court said in the Lavar Brown case. And we have filed the Notice in this court and Notices since Lavar Brown in other courts, with a Notice of Concession.

It is not our position that a Court is bound by that. The Court is fully within its power to do exactly what this Court did and say, I'm not going to accept this concession. I want to hear more.

And we had days of evidentiary hearings. That is the role of a Prosecutor. And that is the role of a Court. We coexist. I don't see -

THE COURT: Are you telling me, when we went to the hearings, at some point your Office was going to -- if I hadn't appointed the Attorney General, who were the ones to tell me about the escape -- and we haven't talked about what the victim's view in the case was.

But, are you telling me that, when I had the hearing that the Third Circuit ordered, at some point your Office was -- if I didn't have the Attorney General as an Advocate, your Office was going to tell me about the escape?

MS. WINKELMAN: I have to tell you I was not aware of the escape. And I am perplexed. I -

THE COURT: But you weren't -- when did you become aware of the escape?

MS. WINKELMAN: I've tried to remember, Your Honor. And I don't know. But I was not -

THE COURT: Were you part of the Committee that recommended the concession?

MS. WINKELMAN: Yes.

THE COURT: Were you aware of the escape then?

MR. RUDOVSKY: Your Honor -

MS. WINKELMAN: I -

MR. RUDOVSKY: - I'm going to object here. This goes right into that deliberative process that I talked about.

THE COURT: Um-hmm.

MR. RUDOVSKY: I can give you case cites on

deliberative process. This is an area that I think I'm going instruct her not to answer, both work product and deliberative process.

Let me quote from a Circuit Court case on that issue. Case called the Assembly of the State of California, Ninth Circuit case, 968 F.2d 916.

"Government Agencies should not have to operate in a fishbowl. We encourage internal debates. We encourage devil's advocates' positions.

"We encourage Governmental Agencies to explore all possibilities of what their litigation position should be and the reasons for it. And none of that should be made public."

That's all protected by the privilege. And I mentioned the other cases before, several cases where Lawyers have tried to just do the same thing.

What is the DA/DOJ position? Why did they recommend the death penalty in this case? Was there something improper about it?

And what the Courts have said uniformly, all the Circuit Courts that have addressed it, is that that's not an area where they have to disclose anything about their internal deliberations.

You're now asking about the internal deliberations of this Committee, which resulted in -- and the final result we

know -- that there was merit to the Claim that was made by Mr. Wharton. And that's all they did.

They notified you of that. And you were free. And you did, as we've said, hold a full hearing. And you had all the facts.

And in fact, you found -- even though you found no prejudice -- you found that it was a plausible issue, because you issued a Certificate of Appealability. And we appreciate that. That'll be up in the Third Circuit.

It's not as if this was an implausible position, even after a full hearing with all the evidence and Experts on both sides, and pro and con. And I go back to the fact that this surfaced for the first time, this evidence of the escape, when it had never been used before and could have been used before -

THE COURT: Yeah.

MR. RUDOVSKY: - by the -

THE COURT: You -

MR. RUDOVSKY: - zealous Advocates -

THE COURT: - said that -

MR. RUDOVSKY: - for the death penalty.

THE COURT: - very clearly. So, I haven't looked at the cases you've cited, and I'm certainly not prepared to instruct your Client to answer right now. So I -

MR. RUDOVSKY: I appreciate it.

THE COURT: - haven't looked at those cases and I

will. But I do have a question for you, Mr. Rudovsky, which is don't you think -- this is not a law firm.

This is the DA's Office of the City of Philadelphia. They represent the Commonwealth, the people. Don't you think the public has a right to know the deliberative process that that office made when conceding a death penalty?

MR. RUDOVSKY: Absolutely not.

THE COURT: No?

MR. RUDOVSKY: Absolutely -

THE COURT: Okay.

MR. RUDOVSKY: - not. As with -

THE COURT: Why not?

MR. RUDOVSKY: And it's not whether it's a private law office, it's a Governmental Agency. All these cases say that they should be free to have internal debates.

Pre-decisional discussions should be free-flowing. They shouldn't be in a fishbowl. Neither the public and we suggest this Court is entitled to know what went into -

THE COURT: How about the victims?

MR. RUDOVSKY: - those deliberations.

THE COURT: Do they have a right to know?

MR. RUDOVSKY: If you disagreed with their conclusion, which you did, at the end of the day when they said, we think there's merit to the Claim here, both on the performance prong and the prejudice prong, you're free to

reject that. That's what they told you, and hold a full hearing.

You issued a Ruling. You stand by that and we appealed it. Mr. Wharton appealed it. We will see what the Third Circuit says.

But having decided, as Lawyers do, Government Agencies do, the Solicitor General does all the time, change positions on strongly held views of the prior Administration.

So, sure, the prior Administration pushed for the death penalty in this case. This Office said, given the Ineffectiveness Claim, we don't think the death penalty can stand. He's entitled to a new hearing.

THE COURT: Do the victims -

MR. RUDOVSKY: That goes on all the time.

THE COURT: - have a right to know the basis for the District Attorney's decision, which may or may not have included -- I mean, I thought I heard Ms. Winkelman say that, at some point, the DA's Office was aware of the escape. Do the victims have a right to know the deliberative process and that that included a concession, even though Mr. Wharton escaped?

MR. RUDOVSKY: The victims have certain rights, both under Federal and State Law, to be notified, communicated with about the status of the case. That was done, we understand, or that could have been done more with the young victim, right.

It wasn't, but the family was. You heard a lot of evidence about that. I won't go into that.

The victims on the other hand have absolutely no say, none -- and we've briefed this. And we haven't heard anything in contrary -- that either the District Attorney or this Court would take their views into account on the constitutional issue. That is, if a victim says, don't concede on Sixth Amendment -

THE COURT: No, I'm not -

MR. RUDOVSKY: - violations -

THE COURT: - saying take their views into account. I'm saying, do the victims and the public have a right to know -- well, let's just stick to the victims, because you've answered the public part. So let me rephrase.

Do the victims have a right to know the deliberative process of an Elected Official, the DA of Philadelphia, as it relates to whether to concede a death penalty case where the Defendant had escaped?

MR. RUDOVSKY: They have a right to know of the decision. They have the right to know that there was a decision-making process. They were informed of that. As to the particulars, as to what went on and who said what, what the reasons were, absolutely not.

THE COURT: Not, okay. So, I'm going to respect your objection. I haven't looked at those cases. I'm going to

rephrase my question and we will see, Mr. Rudovsky, if you have a problem with the rephrase, which is asking Ms. Winkelman specifically, you were part of the Committee that made the decision to concede. Were you aware at the time that Mr. Wharton had escaped from a City Hall Courtroom?

MR. RUDOVSKY: Same objection, but -

THE COURT: You'll allow it?

MR. RUDOVSKY: - she can -

THE COURT: Okay.

MR. RUDOVSKY: Yeah, yeah.

MS. WINKELMAN: I was not.

THE COURT: You were not aware?

MS. WINKELMAN: I was not aware.

THE COURT: Okay. Were you a voting member of that Committee?

MS. WINKELMAN: Yes.

THE COURT: Okay. Was -- who was aware?

MR. RUDOVSKY: You're assuming, Judge, that anybody was aware. She -

THE COURT: Okay.

MR. RUDOVSKY: - was not aware. Nobody -- apparently, if she was not aware -

THE COURT: Now, I'm confused.

MR. RUDOVSKY: - then nobody said anything.

THE COURT: I thought we established that the

DA's Office was -- I mean, you just said, of course we're aware. It happened -

MR. RUDOVSKY: Well, right.

THE COURT: - six -

MR. RUDOVSKY: So this -

THE COURT: Twelve years ago.

MR. RUDOVSKY: - is an entity that's been around for 200 years. And in 1984, whenever that escape attempt was -- and I have the year wrong, right? Obviously people knew about it, that he was prosecuted.

THE COURT: Yeah, but I asked Mr. George during the hearing, was the DA's Office aware that Mr. Wharton escaped when you conceded, and he said yes.

MR. RUDOVSKY: And you didn't ask him if he was aware or if anybody in this Committee was aware. You simply -

THE COURT: All right.

MR. RUDOVSKY: - just asked -

THE COURT: Who was aware?

MR. RUDOVSKY: - that question.

THE COURT: Who was aware of his escape at your office?

MS. WINKELMAN: I couldn't answer.

THE COURT: Was Mr. Krasner aware?

MS. WINKELMAN: I could not answer that.

THE COURT: Was Mr. Krasner advised that you were

conceding, even though the issue was Prison adjustment and Mr. Wharton had escaped from a City Hall Courtroom? Was he aware of that?

MR. RUDOVSKY: I would object to what Mr. Krasner knew or didn't know. It'd be hearsay if it -

THE COURT: Okay.

MR. RUDOVSKY: - was.

THE COURT: Is that an instruction, or you're going to allow it?

MR. RUDOVSKY: It's an objection.

THE COURT: Got it; what's the answer?

MS. WINKELMAN: I'm sorry. Could you rephrase the -

THE COURT: Was Mr. Krasner aware, when you -- let me back up. Did Mr. Krasner approve of the concession?

MS. WINKELMAN: The final decision was Mr. Krasner's.

THE COURT: Was he -- oh, you said you weren't aware. You're not sure who was aware. Do you know if anyone advised Mr. Krasner, before he approved the concession, that Mr. Wharton had escaped from a City Hall Courtroom?

MS. WINKELMAN: I don't know.

THE COURT: Don't know, okay. All right.

MS. WINKELMAN: Your Honor, may I -

THE COURT: Yes?

MS. WINKELMAN: - say something -

THE COURT: Of course, of course.

MS. WINKELMAN: - on the issue of the escape is -

THE COURT: Yes.

MS. WINKELMAN: - I don't believe -- and you started this conversation with me by reading the Third Circuit's Opinion, language from the Opinion -- I don't believe there was anything in that Opinion about the escape.

I don't believe there was anything in the Pennsylvania Supreme Court's Opinion affirming this case and the penalty about the escape. I don't believe that in the numerous Briefs that the District Attorney's Office filed in this case that there was -- including about this particular Claim -- that there was discussion about the escape. I am perplexed as to why that is. I do appreciate -

THE COURT: As to why what is? I'm sorry.

MS. WINKELMAN: Why it is that the escape was not part of the briefing and the Opinions in this case.

THE COURT: Whose briefing?

MS. WINKELMAN: The DA's briefing seeking to uphold the death penalty; I don't believe that the escape was part of the arguments there. I'm perplexed as to why, if I'm correct about that. I'm perplexed as to why that would be.

THE COURT: But you're Chief of the Appeals Unit.

MR. RUDOVSKY: Judge, we're referring to the previous Briefs on appeal, which you've referred to. The

Pennsylvania Supreme Court case -
THE COURT: Oh, not the current case?
MR. RUDOVSKY: That's right.
THE COURT: Got it.
MR. RUDOVSKY: The PCRA -
THE COURT: Okay.
MS. RUDOVSKY: - Opinion and -
THE COURT: I misunderstood.
MS. RUDOVSKY: - the Third Circuit Opinion -
THE COURT: Right, right.
MR. RUDOVSKY: - no argument by the prior -- right, that was the prior Administration -
THE COURT: Right.
MR. RUDOVSKY: - who argued it.
THE COURT: Prior DA's Office?
MR. RUDOVSKY: Right, prior DA's Office -
THE COURT: Um-hmm.
MR. RUDOVSKY: - seeking to uphold the death penalty.
THE COURT: Um-hmm.
MR. RUDOVSKY: Not only didn't they use that evidence, right, at the hearing, they didn't make any reference to it to the Pennsylvania Supreme Court. They made no reference it to the Third Circuit. I -
THE COURT: But she's in charge. She's -

MR. RUDOVSKY: At what -

THE COURT: - got a very serious position. She's at the Head of Appeals of the -

MR. RUDOVSKY: Right.

THE COURT: - fourth, fifth, whatever, largest -

MR. RUDOVSKY: And -

THE COURT: - DA's Office in the -

MR. RUDOVSKY: - she can -

THE COURT: - country.

MR. RUDOVSKY: - look as to what the zealous DAs did before and what they considered relevant. There's no hint to anybody.

If you put yourself in her position, or anybody's position in that Office, when this case gets remanded, we knew some of the information. We knew his background. We knew the mitigation evidence that was presented and the aggravating circumstances that were presented to the jury. Nothing about the escape attempt was presented; it wasn't on the radar screen of anybody.

MS. WINKELMAN: And I mean -

THE COURT: I mean, and not to be argumentative, but it was on the radar screen of the Third Circuit in my opinion, because they -

MR. RUDOVSKY: Why wouldn't they have mentioned that? Why wouldn't they have said, for example -

THE COURT: How would they know? It wasn't part -

MR. RUDOVSKY: Well -

THE COURT: - of the record.

MR. RUDOVSKY: - they have way -

THE COURT: No one told them.

MR. RUDOVSKY: No way of knowing, and there was nobody in the office at this point who would either recall that, or think it was relevant, if it hadn't been used before. That's my simple -

THE COURT: Okay.

MR. RUDOVSKY: - point.

THE COURT: All right. Did you want to finish? I'm sorry.

MS. WINKELMAN: No, huh-uh.

THE COURT: Okay.

(Asides)

THE COURT: During your participation -- respecting Mr. Rudovsky's concerns -- during your participating in the Committee that recommended and told Mr. Kaufman to concede, what was your understanding as to the victims' position as to whether they were in favor or not of the concession, understanding Mr. Rudovsky's statement, which was said in a Brief and said eloquently again that the ultimate decision lies with your Office?

But did you understand? Well, what was your

understanding of their position as to whether they were in favor of the concession?

MS. WINKELMAN: My understanding was through our Victim Witness Coordinator, who you heard from -

THE COURT: Um-hmm.

MS. WINKELMAN: - that she had spoken with I believe the eldest brother of one of the victims. This man is in some sort of minister or kind of -- some kind of religious work.

Her sense -- Ms. Wanes' sense was that he was somewhat of the spokesperson, the patriarch of the family. He did not express a view that he was strongly against the concession.

Ms. Wanes invited him to give her contact information to the other members of the family and to the surviving victim, Ms. Hart. And encouraged him to have them contact her if she -- if they wanted to discuss this with her. And she was not contacted by them. So that's my understanding -

THE COURT: Thank you.

MS. WINKELMAN: - at the time of the -

THE COURT: Um-hmm.

MS. WINKELMAN: - communications with the victims' family.

THE COURT: You were, I assume, somewhat familiar with the case. So you understood that there was a victim that had survived. The mother and father were murdered.

Seven-month-old, eight-month-old -- I forget the exact age. An infant was left by Mr. Wharton in the house to freeze to death.

Did you -- since you're of a high supervisory position in the Office, before the concession was agreed to and recommended to the DA, who approved it, did you direct anyone to contact the surviving victim to get her views?

MS. WINKELMAN: Your Honor, it would not be my authority, my role. There's a Supervisor of Victim Witnesses. I am not a Victim Witness person/specialist. I don't know that area and the best practices.

We have stated to the Court in our Post-Hearing Brief that it would have been -- in looking back on it, that would have been an appropriate -- and something we should have done. We recognize our mistake.

But it wouldn't have been my responsibility or my role. I'm not the Supervisor of the Victim Witness -- anybody in the Victim Witnesses Service to tell them who to contact, who not to contact, how to make contact, what kind of discussions to have. That's not my lane. And Your Honor, a couple times you've called me the Chief of Appeals.

THE COURT: Am I -

MS. WINKELMAN: Just so you understand -

THE COURT: - giving you more authority or less in either?

MS. WINKELMAN: Well -

THE COURT: What's your title? I'm sorry.

MS. WINKELMAN: - I'm the Supervisor of the Law Division. And just -

THE COURT: The Law Division.

MS. WINKELMAN: - so the Court understands, the Law Division includes an Appeals Unit -

THE COURT: Right.

MS. WINKELMAN: - which has its Supervisor.

THE COURT: Um-hmm.

MS. WINKELMAN: It includes PCRA Unit -

THE COURT: Um-hmm.

MS. WINKELMAN: - which has a Supervisor. It includes the Federal Litigation Unit, Federal Habeas Unit, which has a Supervisor. And it includes Civil Litigation, which has -

THE COURT: I -

MS. WINKELMAN: - a Supervisor.

THE COURT: I've diminished your authority. I apologize. You have a lot more authority than that.

(Asides)

THE COURT: If it was the Committee's decision -- and I'm a little muddled in my notes. So I just want to go back, just to be sure the record's clear.

When the decision was made to concede by the

Committee that you were on, you can't remember whether you were aware of the escape or not. Is that right?

MS. WINKELMAN: (No audible response).

THE COURT: Were you?

MS. WINKELMAN: I was not aware.

THE COURT: You were not aware. Okay. So you remember that you were not aware?

MS. WINKELMAN: At that time.

THE COURT: At that -

MS. WINKELMAN: Correct.

THE COURT: - time, okay. And you -- I think the objection was posed when I asked you who on the Committee was aware. We can maybe revisit that later, after I read the cases Mr. Rudovsky cited. And you're unaware as to whether Mr. Krasner was aware of the escape?

MS. WINKELMAN: Correct.

THE COURT: Okay. But he did approve the concession?

MS. WINKELMAN: Yes.

THE COURT: Okay. Was Mr. Kaufman -- as I understand Mr. Kaufman's Affidavit, he was not part of that Committee?

MS. WINKELMAN: Correct.

THE COURT: Why did you, or others, decide to have Mr. Kaufman file the concession, when he didn't have any

decision-making authority, as it relates to the concession?

MS. WINKELMAN: Mr. Kaufman was the Supervisor of the Federal Litigation Unit. And it was normal practice before Mr. Krasner or me, or 2018, for the Supervisor of the Federal Litigation Unit to file the -- a Notice of Concession when the Office was conceding penalty phase relief.

So we were just following -- we were following what -- the way the prior Administrations had handled it. Seemed appropriate and reasonable, no question about the process, when the Office was going to concede penalty phase relief.

We've filed substantially similar Notices of Concession. And they were filed by the Head of the Federal Litigation Unit, in this case Mr. Kaufman.

(Asides)

THE COURT: Rule 11 of the Federal Rules of Civil Procedure requires that every Pleading that's filed by an Attorney -- and Mr. Kaufman filed -- was the Signator on the matters that were filed with me.

It requires that the Signator has certified that, to the best of the person's knowledge, information, and belief that the information -- and I'm paraphrasing -- are warranted by existing law. And the factual contentions have evidentiary support. Why was Mr. Kaufman -

MS. WINKELMAN: I'm sorry.

MR. RUDOVSKY: No. Yeah.

THE COURT: You need a second?

MR. RUDOVSKY: No, no, no.

THE COURT: Okay.

MR. RUDOVSKY: I just gave her a copy of the Rule.

THE COURT: Okay, thank you. And I have a copy if you need one. Why was Mr. Kaufman asked to sign Pleadings on a very substantial matter, but not told the basis of what he was signing at all, as I understand his Affidavit, in light of the edicts of Rule 11?

MS. WINKELMAN: This is how the Office had operated. This is not a Mr. Krasner Policy. The Office had, before 2018, and has, since 2018, filed the Notices of Concession. And our Supervisor of Federal Litigations -

THE COURT: Yeah, listen. I don't want to get too far out of the record. But, Mr. Krasner has very publicly stated that he's going to do things a lot different than other Administrations have done. And that's his right, as an Elected Official. But you keep saying this is the way other Administrations have done things.

MS. WINKELMAN: That's -

THE COURT: So, that's your answer?

MS. WINKELMAN: The fact of the matter is, Your Honor -- and I certainly -- I know what Mr. Krasner has said, that he's doing things differently. But in this, the fact is that, before Mr. Krasner came into the Office, the

Office had filed these Notices of Concession of Penalty Phase Relief -- and Your Honor has now seen them, as I've said before. We've provided them to you -- before Mr. Krasner came into the office and since -

THE COURT: Okay.

MS. WINKELMAN: - that are substantially similar. In the many radical things that my Boss could be, we could talk about. This is not one of them.

THE COURT: Okay.

MR. RUDOVSKY: And Judge -

THE COURT: I -

MR. RUDOVSKY: - may I just say that -

THE COURT: Sure.

MR. RUDOVSKY: - I understand your point about Rule 11. We go back to the basic point we made in our Brief, which I think you appreciate.

The Notice was a Notice. It simply said the Office position is we're not contesting.

THE COURT: Yeah, but it's -

MR. RUDOVSKY: It wasn't an advocacy point.

THE COURT: It was a Pleading, right, some -

MR. RUDOVSKY: It was -

THE COURT: - sort of -

MR. RUDOVSKY: - a Notice Pleading.

THE COURT: Okay.

MR. RUDOVSKY: Under the Rules of Civil Procedure, it's a Notice Pleading. This is our position only.

THE COURT: Um-hmm.

MR. RUDOVSKY: No advocacy one way or the other, and he's instructed -- on Mr. Kaufman's part -- he's instructed by his Supervisors just to file this. It's perfectly appropriate to have the Head of the Unit file it. And whether he filed or somebody from the Committee filed it, or Larry Krasner filed it, I think makes no difference ultimately on the candor issue.

THE COURT: Okay. I understand your answer to be -- and I'll give you a chance to elaborate -- we asked Mr. Kaufman to file Pleadings, Notice of Concessions, whatever you want to call them. I think they're Pleadings. And we did that and asked him to do it without any information, because that's the way other Administrations have done it.

MR. RUDOVSKY: Objection, Your Honor.

THE COURT: Okay.

MR. RUDOVSKY: I think that misstates it.

THE COURT: Okay.

MR. RUDOVSKY: The -

THE COURT: How so?

MR. RUDOVSKY: - people who instructed him to do it had made a reasonable decision, based on everything they looked at on remand, that they were not going to contest this Claim. They had every discretionary right to do it, absent some kind

of corruption that somebody paid them all $50,000 to do it, or something like that.

They followed Office Policy. They read the law. They decided the Defendant was right on this issue. They made the legal conclusion as to what they're going to do. And they simply told Mr. Kaufman, as Head of the Unit, file a Notice of our conclusion.

THE COURT: I understand all -

MR. RUDOVSKY: And that's -

THE COURT: - that.

MR. RUDOVSKY: - all he did. But -

THE COURT: My question is why? Why didn't he -- Mr. Kaufman's Supervisors advise him of the basis of what was being conceded, and the investigation that was done or not done? And I heard your Client's answer to be, because this is the way other Administrations have -

MR. RUDOVSKY: And -

THE COURT: - done it.

MR. RUDOVSKY: - there was nothing to provide. I'll go deeper with you, right?

THE COURT: Okay.

MR. RUDOVSKY: Why didn't they do it? Because all he's doing is acting kind of -- it's a ministerial act. I'm advising the Court of the decision of the District Attorney of Philadelphia that we are not going to contest this issue.

That's all he did. He didn't have to know the reasons one way or the other. He had no authority to countermand that, I mean, just in terms of -

THE COURT: Okay.

MR. RUDOVSKY: - chain of command in the Office.

THE COURT: So he was just a Filer?

MR. RUDOVSKY: File it, notify the Judge.

THE COURT: Right.

MR. RUDOVSKY: And then, it's in your hands.

THE COURT: Head of the Habeas Unit of the DA's Office, okay. Jimmy, could you show this? I don't know whether you have this in front of you.

I want to ask you a question about this Proposed Order that you submitted. I want to give you a chance to read it before I ask you a question about it. Show this to Ms. Winkelman, please.

MS. WINKELMAN: Thank you.

THE COURT: I may have written some notes on that. So please don't read them, Mr. Rudovsky. Jimmy, go get that back, please, when they're done.

(Asides)

THE COURT: Thank you.

MR. RUDOVSKY: Judge, could I just suggest that it be marked, so if we're going to -

THE COURT: Yeah.

MR. RUDOVSKY: Is that right?

MS. WINKELMAN: Right.

THE COURT: Well, we can't mark this, because I -- I've -

MR. RUDOVSKY: Oh, right, well -

THE COURT: On the back -

MR. RUDOVSKY: - one of the original ones.

THE COURT: - is written down the train schedule of when I was supposed to pick up my dad last week. So we're not going to mark it, include that into evidence.

But we will make it park of the record. And it's identified as a Docket Number. So, that'll suffice. It's Document 156, filed February 8th, 2019.

So this is filed by Max Kaufman and the Federal Defender's Unit. And it comes right after the concession, if my memory's right, a couple days after the concession.

And it's a Proposed Order. And in the Proposed Order, after the concession, you're asking me to sign an Order which says -- and I'll read it verbatim -- "And upon careful and independent review of the Parties' submissions and all prior proceedings in this matter, it is hereby ordered that" -- and then it grants the relief.

So, my question is: did you -- first of all, did you have a part in drafting this document? Or was this Mr. Kaufman?

MS. WINKELMAN: I did not have a part in drafting that document -

THE COURT: Okay.

MS. WINKELMAN: - to my recollection.

THE COURT: Okay. As Supervisor of the Law Division, do you now have a concern that you have asked a Federal Judge in a death penalty matter to sign off on an Order which says that the Judge has done an independent review, knowing that the Judge didn't have information about an escape?

MS. WINKELMAN: Your question permits me to comment. And I will answer the question. But it's been floating around with me that part of the dynamic here is that we filed these -- I'm going to call them -- Form Notices of Concession of Penalty Phase Relief in other cases, as I've said a number of times, before the Krasner Administration and since. And we have not had an experience with a Judge rejecting the concession.

Your Honor has raised a concern. And we're here. But this language was, I suspect, form language. We hadn't had any Judge question it, or have any problems with it, much less to the point of violating a duty of candor that we take so seriously.

So, that's how I want to answer your question. It was, I suspect, form language. And nobody -- no other Federal Judge prior or since has had the concern that this Court has had.

THE COURT: Do you believe that, had I signed this Order, it would be accurate such that I had conducted a careful and independent review, not knowing about the escape?

MS. WINKELMAN: I can't answer that question for the Court.

THE COURT: Okay.

(Asides)

THE COURT: And by the way -- and I really don't want this to devolve into what other Judges have done. But I do disagree with your assertion that other Judges in this court have not questioned stipulations submitted by your Office, disagree. Want to take a brief recess?

MR. RUDOVSKY: Thank you, Your Honor.

THE COURT: Ten minutes.

(Recess at 10:11 a.m., until 10:22 a.m.)

THE COURT: I wanted to ask Mr. George some questions. Thank you.

MR. RUDOVSKY: Just I'll make the same objections I made before, and -

THE COURT: Preserved.

MR. RUDOVSKY: - are guided by them. Thank you, Your Honor.

THE COURT: Understood. I'll say the same thing I said to Ms. Winkelman, say it to you. It was suggest that I should -- any Q&A between myself and the Lawyers should be done

under oath.

But you're an Officer of the Court. I don't think that's necessary. I'm not going to do that. Were you part of -- Mr. George -- were you part of the Committee that determined that the death penalty should be conceded?

MR. GEORGE: I was part of the Committee. I did not make the determination. Mr. Krasner did that.

THE COURT: Okay. Were you aware? Well, so is it a recommendation to Mr. Krasner?

MR. GEORGE: Yes.

THE COURT: Okay. And were you aware, when your Committee, for lack of a better word deliberated -- if that's the right word -- well, let me back up. Mr. Rudovsky, are you okay with me asking him who was on the Committee?

MR. RUDOVSKY: Yeah, I think -

THE COURT: Who's on the -

MR. RUDOVSKY: Yeah.

THE COURT: - Committee?

MR. RUDOVSKY: For sure.

THE COURT: Okay. Who's on the Committee? Who was on the Committee, not present?

MR. GEORGE: The First Assistants -

THE COURT: Um-hmm.

MR. GEORGE: - each of them is on the Committee. The Chief of this Conviction Integrity Unit; the Chief of the

Homicide -

THE COURT: Who was that -

MR. GEORGE: - Division.

THE COURT: - at the time, Chief of the Conviction Integrity Unit?

MR. GEORGE: Patricia Cummings, at that time.

THE COURT: Um-hmm.

MR. GEORGE: The Chief of the Homicide Unit, which was Anthony Bocci at that time. If there's somebody else that was on the Committee at that time, I can't remember who -

THE COURT: Okay.

MR. GEORGE: - it was.

THE COURT: Fair enough; I think Ms. Winkelman said she was unaware.

MR. GEORGE: She was on the Committee. Pardon -

THE COURT: And -

MR. GEORGE: - me, yes.

THE COURT: - she -- yes.

MR. GEORGE: Yes.

THE COURT: We established that.

MR. GEORGE: Yeah.

THE COURT: She was unaware of the Wharton escape, at the time she participated in those deliberations. Were you aware?

MR. GEORGE: No, not at that time.

THE COURT: Was anyone on the Committee aware?

MR. GEORGE: I don't believe so. It's certainly to my recollection. And I don't remember the details of the Committee discussions. And there would have been more than one.

THE COURT: Um-hmm.

MR. GEORGE: I don't remember that being -- that coming up.

THE COURT: Okay.

MR. GEORGE: I mean, I should say that, in the 1980's, of course, I would have been aware of it, because I was -- had a cordial, professional relationship with Mr. Vega. But that -

THE COURT: Who was that?

MR. GEORGE: - I would not connect -

THE COURT: Who?

MR. GEORGE: - that with this case -

THE COURT: Yeah, yeah.

MR. GEORGE: - in 2019 or 2018.

THE COURT: Okay. So -- and I'm not trying to put words in your mouth. I'm just trying to sort of get through this.

So fair to say -- well, let me just ask. Was there any discussion amongst the Committee, before you made a recommendation to Mr. Krasner, about the escape?

MR. GEORGE: No, I would have prepared myself for -

THE COURT: The wit -

MR. GEORGE: - those -

THE COURT: The witness answered before the Lawyer could object.

MR. RUDOVSKY: And this limited question, I will not object to, Judge.

THE COURT: All right, go ahead.

MR. GEORGE: I wanted to say that my own preparation for those meetings included reading the Opinions and Briefs that have already been referred to by Ms. Winkelman, Briefs filed by the prior Administration, Opinions in Appellate Courts addressing the issues. And that escape attempt was not ever mentioned in any of them.

And I also read that the jury determined, as one of the mitigating factors that they weighed, in coming to their decision, that Wharton had no significant criminal history. So, at the point in time when the Committee was engaged in these discussions, the escape was not addressed.

THE COURT: Did you, in your capacity as a Committee Member, and having reviewed -- I assume you reviewed the Third Circuit Remand Opinion?

MR. GEORGE: Yes.

THE COURT: Where the Third Circuit said we must take into account the anti-mitigation evidence that the

Commonwealth would have presented to rebut the Petitioner's mitigation testimony, and the further comment -- and I'm going to paraphrase -- that the Third Circuit noted that the hearing before me should also explore anti-mitigation evidence.

Did you or anyone on the Committee, before you made your recommendation to Mr. Krasner, suggest that your office should do an investigation to determine whether there was, in fact, anti-mitigation evidence?

MR. GEORGE: No, I did not read the Opinion to require our Office to maintain the position that it had previously maintained under the prior Administration.

THE COURT: Yeah, I'm not sure I understand your -- maybe I asked a bad question.

MR. GEORGE: In other words, I didn't read the Opinion to say that the Office had to keep on advocating the position that it had advocated before, and therefore -

THE COURT: Sure.

MR. GEORGE: - do the -

THE COURT: Okay.

MR. GEORGE: - do the things that it would have done, had it determined to -

THE COURT: Right.

MR. GEORGE: - continue to advocate that position.

THE COURT: Right, okay. So I had a good discussion with Ms. Winkelman about this. So I won't beat a dead horse.

But, when the Third Circuit says that the hearing -- and I'm paraphrasing. And maybe I shouldn't.

But when the Third Circuit says that the hearing that they ordered me to hold should take into account any mitigation evidence, isn't it your obligation, as an Advocate, and the only -- I mean, I can't do an investigation. So, that's why I appointed the Attorney General.

But you didn't do the investigation. Why? Why didn't you and your Office, why didn't you recommend to Mr. Krasner or the Committee that you look into anti-mitigation evidence, which we now know is an escape, before you conceded?

MR. GEORGE: I don't think that the way the question is phrased accurately reflects what happens in the Committee. There is give-and-take. There is debate. There is discussion.

THE COURT: Yeah, not my question.

MR. GEORGE: And -

THE COURT: I don't think I'm being clear. My question, I'll try to really make it pithy. Given the Third Circuit's Opinion, which references anti-mitigation evidence that had to be considered, why didn't your Office do an investigation into anti-mitigation evidence before you recommended a concession?

MR. GEORGE: I believe that whatever might be said about the thoroughness of the investigation, that that did occur. I mean, certainly the facts of this case are incredibly

grim. And certainly that would have been discussed thoroughly at the meetings of this Committee. So that the suggestion that the pros and cons of whether or not Mr. Wharton's issue had merit weren't discussed would be -- that would be an inaccurate suggestion.

THE COURT: Well, I'm not -- I'm really trying hard not to be argumentative with you. But, I'm not suggesting that your Committee didn't factor in the pros and cons, including the heinous nature of the crime. I'm not saying that. Of course, you did. I assume you did. My question is: why didn't you do the investigation, which the AG's Office did, to determine that there was substantial, in my view, anti-mitigation evidence?

MR. RUDOVSKY: I object again on the grounds I said before about the inquiry into what this Office should have done, what they should have done. In fact, he's already given you a response that the jury found no pertinent criminal history, based on what the prior Administration had actually produced.

Why should they even go beyond that at that point, assuming we get into any questions about how they weighed all this evidence? I mean, he -

THE COURT: Okay.

MR. RUDOVSKY: I think he's given you an honest answer about what they knew. He knew nothing about the escape

attempt then. Nancy Winkelman didn't.

Nobody raised it. Nobody should have raised it, because nobody thought it was relevant, or knew about it at the time. And -

THE COURT: Well, the AG's Office thought it was relevant.

MR. RUDOVSKY: Well, yeah. That's kind of right. So, later, that they came in and now kind of said we want to add stuff. We could have used it before. Well, I'm not sure why we didn't use it before. But we will use it now. That's fine, and you heard it.

THE COURT: Okay.

MR. RUDOVSKY: And at all pertinent -- absolutely pertinent to your Opinion, we agreed with that. You could consider it.

We disagree obviously on the weight you would give to that, and what the question's on prejudice. But that has nothing to do with this Committee's deliberations, Your Honor.

MR. BARKER: Your Honor, may I make a point?

THE COURT: Sure.

MR. BARKER: Our argument was just characterized inaccurately. We didn't say that we should have used it before. We never said that.

I don't believe that the escape was admissible under the evidence that was presented at trial. And as far as the

prior history goes -

THE COURT: Wait, wait. Say that again.

MR. BARKER: I don't believe that the escape would have been admissible in response to the mitigation that was presented by the Commonwealth at the time. The evidence that was presented was he's a nice guy. Don't kill him, basically, is a summary.

The only time that anyone came close to this was when Mr. Wharton's mother testified something along the lines of, I know he's never going to get out of Prison. But don't give him the death penalty. That's as close as it got.

That has nothing to do with his escape. What she knows or doesn't know about whether he's going to get out of there, this doesn't rebut that.

So I don't believe it's accurate to say that this was admissible at any time. You have to remember that the escape happened after the murder.

So as far as his prior history of being violent, has -- it would not have been admissible. And again -

THE COURT: But -

MR. BARKER: - I -

THE COURT: - what about the Third Circuit's statement that anti-mitigation evidence would be fair game?

MR. BARKER: - I believe it was. But what they're asking for is to say that other mitigation evidence should have

been presented. That's what makes the escape admissible. That evidence wasn't presented.

THE COURT: I'm having a little -

MR. BARKER: That's why we're -

THE COURT: - trouble -

MR. BARKER: - here.

THE COURT: - following what you're saying. So let me say it back to you. I'll come back to you.

MR. RUDOVSKY: Yeah.

THE COURT: And just -

MR. RUDOVSKY: No, I'm sorry.

THE COURT: - have a seat. Actually, I'm not understanding what you're saying.

MR. BARKER: Okay.

THE COURT: Try it again.

MR. BARKER: Well, to start with, the Notice of Aggravating Circumstances was filed back, I believe, in 1985 -

THE COURT: Um-hmm.

MR. BARKER: - before the escape attempt.

THE COURT: Um-hmm.

MR. BARKER: So as far as that being admissible as part of an aggravator, the -

THE COURT: That -

MR. BARKER: - aggravator -

THE COURT: - meaning -

MR. BARKER: The escape.
THE COURT: Go ahead.
MR. BARKER: That would not have existed at the time the Notice of Aggravating Circumstances was filed. So it wasn't relevant to the circumstances that were filed.
THE COURT: Um-hmm; you're saying it was relevant when Mr. Cannon put into evidence what?
MR. BARKER: I'm saying that, as close as Mr. Cannon came was the evidence of Mr. Wharton's mother saying, my son's going to spend the rest of his life in Prison. That's about as close as it came for the escape to be admissible during the penalty phase.
THE COURT: Okay.
MR. BARKER: And I don't believe that that's fair rebuttal, at all, to say that an escape that she may or may not have known about somehow should have been inquired into. And it's certainly not admissible as substantive evidence. It's still not a mitigating -- or still not an aggravating circumstance.
THE COURT: Okay.
MR. BARKER: And it wasn't proper rebuttal to the mitigating evidence that was presented originally. What I'm saying is, it becomes relevant only if Mr. Cannon had tried to go down this path of, well, he was a nice guy in jail. He hasn't killed anybody or done anything bad, once he was

arrested.

THE COURT: Okay. So where were we?

MR. RUDOVSKY: Just let me just say, we've briefed that issue on once Mr. Wharton, at the second penalty hearing, presented evidence of good character, non-dangerousness, under the Pennsylvania Rules, at death penalty hearings, it's an open field.

He could have well-been impeached. But, wait a minute. He's not dangerous. He's of good character. Here's a guy that escaped and was shot in City Hall, absolutely impeaching evidence, never used. And we -- I'm not going to go into it -- we gave you the cases on Pennsylvania -

THE COURT: Yeah.

MR. RUDOVSKY: - Law -

THE COURT: Okay.

MR. RUDOVSKY: - on the death penalty in our briefing.

THE COURT: Okay.

(Asides)

THE COURT: Lot of information, so I just want to sort of make sure I recap what you said, which is you didn't know about the escape during the Committee's deliberations. And you don't remember whether it was even discussed, or what was your answer, Mr. George?

MR. GEORGE: My -

THE COURT: I'm sorry.

MR. GEORGE: - recollection is that it was not discussed -

THE COURT: Not discussed.

MR. GEORGE: - because it wasn't -- we weren't aware of it.

THE COURT: Oh, right. And then, when I asked you why didn't you do further investigation, you said, we discussed the pros and cons extensively. We didn't think we had to. Is that a fair -

MR. GEORGE: Yes, sir.

THE COURT: - characterization? Okay. When did you find out that Mr. Wharton had escaped?

MR. GEORGE: I don't know that I found out about it prior to the AG's filings.

THE COURT: Okay. And so, you learned about it from the AG?

MR. GEORGE: That's my recollection, yes.

THE COURT: When they filed their papers and said there had been an escape?

MR. GEORGE: Yes.

THE COURT: Okay.

MR. GEORGE: Yes.

THE COURT: Did the Committee reconvene, once you learned that information?

MR. GEORGE: I don't -
THE COURT: Was there any -
MR. GEORGE: - believe -
THE COURT: - discussion?
MR. GEORGE: - so.
THE COURT: And -
MR. GEORGE: It -
THE COURT: - this may sort of bleed into Mr. Rudovsky's issue, so he'll state what he needs to state. But, did anyone in your Office say, well, now we know about this? Maybe we ought to reconsider our position, or discuss it, or anything like that.
MR. GEORGE: I don't recall that there was another meeting. There could have been, however. The Committee meets regularly.
THE COURT: Um-hmm.
MR. GEORGE: So, something that might not be on the Agenda at any particular meeting could come up, because just because the meetings occurred every couple of weeks. But I don't recall whether that ever did or did not come up again.
(Asides)
THE COURT: I mean, it may be prudent for me to get the transcript, which I can. But I recall in the hearings that we held, where you were Counsel and the AG represented, I asked you, was the DA's Office aware of the escape prior to your

concession, and you said yes. Is my memory wrong? Could be.

MR. GEORGE: No, I think that was the answer I gave. And of course, it was so. The Office had prosecuted the guy. So, yes, the District Attorney's Office was aware of it, clearly.

However, I'm telling you that it was not something that was on our radar during preparation for our Committee meetings with respect to this case, and it wasn't something that was discussed at those meeting.

THE COURT: Are you saying, when I asked you, was the DA's Office aware of the escape prior to the concession, and your answer was yes, you meant to say the DA's Office going back two decades?

I mean, clearly my question was the current DA's Office. Is that -

MR. GEORGE: I -

THE COURT: - what you're saying?

MR. RUDOVSKY: Your Honor, I have the exact words here, if I -

THE COURT: Yeah, could you -

MR. RUDOVSKY: - could put it on?

THE COURT: - read them?

MR. RUDOVSKY: Yeah, yeah. And -

THE COURT: Thank you.

MR. RUDOVSKY: - I think you're actually very close

to what was said.

THE COURT: Yeah.

MR. RUDOVSKY: I have a question. It's page 66 of the transcript of -- it's either November 5th, '21 or -

THE COURT: It's cited in my -

MR. RUDOVSKY: - May 11th.

THE COURT: - Opinion.

MR. RUDOVSKY: But we know what we're referring to.

THE COURT: Yeah.

MR. RUDOVSKY: The question from the Court was, I have a question before you start, to Mr. George.

THE COURT: Yes.

MR. RUDOVSKY: Was the District Attorney's Office aware of the escape from City Hall prior to filing the Notice of Concession? Answer, yes.

THE COURT: That's it.

MR. RUDOVSKY: There was no follow-up questions.

THE COURT: Yeah.

MR. RUDOVSKY: Were you -

THE COURT: That's it.

MR. RUDOVSKY: - aware or anything -

THE COURT: Yeah.

MR. RUDOVSKY: - like that?

THE COURT: So by that -- thank you -- by that, did you mean the District Attorney's Office throughout the last

three decades? Or by that, did you mean the current District Attorney's Office?

MR. GEORGE: No, I meant the District Attorney's Office, as an entity -

THE COURT: As an entity.

MR. GEORGE: - was clearly aware, because they -

THE COURT: Right.

MR. GEORGE: - had prosecuted the guy.

THE COURT: Um-hmm.

MR. GEORGE: There was no inquiry as to the deliberative process of the Sentencing Review Committee at that time. And I would have had the same kind of questions then as are being now about -

THE COURT: Um-hmm.

MR. GEORGE: - talking about what happens in one of these meetings.

THE COURT: Okay. So you didn't know about the escape in the Concession Committee meeting. And your answer was, we knew about it because we're the DA's Office, not just the Krasner Administration, but all other DA's Office. So -

MR. GEORGE: Yes.

THE COURT: - my question is, why didn't you explain that to me, when I asked you the question?

MR. GEORGE: I didn't understand that this Court wanted an inquiry into the deliberative processes. And as I

said, I would have been uncomfortable.

I'm pretty far down on the ladder in terms of whether or not I should be discussing the deliberative processes of a Committee chaired by the First Assistants and attended by the District Attorney. I -- that's -

THE COURT: Okay.

MR. GEORGE: In other words, I would have had to say, look, I need permission from somebody, before I start talking about the internal -

THE COURT: I understand.

MR. GEORGE: - functioning of -

THE COURT: I understand your answer.

MR. GEORGE: - some Committee that I'm just a member of.

THE COURT: I understand your answer. Was Mr. -- when you learned, vis-à-vis the AG's filing, that there had been an escape, do you know if Mr. Krasner was advised that there was an escape?

MR. GEORGE: I do not. But I did not advise him, to my memory.

THE COURT: Okay. Did you have any part in the process of deciding that Mr. Kaufman should file the Concessions and other Pleadings, or was that above your -

MR. GEORGE: No, I would have been part of informing Mr. Kaufman of the Committee's decision. I don't remember

specifically doing that in this case. But I do remember that that's what happened in those cases that -- where I would inform him, the Committee has decided this-or-that, with respect to a case.

THE COURT: Okay.

(Asides)

THE COURT: All right. I think Ms. Winkelman answered most of the questions I had for you and her jointly so. Thank you.

MR. GEORGE: Okay.

MR. RUDOVSKY: And we have no questions.

THE COURT: Okay.

MR. RUDOVSKY: Thank you.

THE COURT: And of course, Mr. Rudovsky, if you want to, I didn't give you the chance to ask Ms. Winkelman questions. But if -

MR. RUDOVSKY: Yeah, I -

THE COURT: - you wanted to do that, you have that absolute right.

MR. RUDOVSKY: I understand that and we -

THE COURT: Yeah, okay.

MR. RUDOVSKY: - had no questions -

THE COURT: Great.

MR. RUDOVSKY: - for her.

THE COURT: All right. Then, I want to ask

Mr. Kaufman a couple questions, if I may.

(Asides)

THE COURT: Mr. Kaufman, I don't know whether this is necessary. I'll say the same thing to you I said to Ms. Winkelman and to Mr. George.

This is -- I understand this is difficult and it's not something that I relish doing, or take any join it. It's caused me quite a bit of angst. So -

MR. KAUFMAN: Appreciate that, Your Honor.

THE COURT: Okay. I wanted to mostly ask you questions about your Affidavit. So, does he have a copy? Could someone give him a copy? I think it'd be easier.

MR. RUDOVSKY: Yes, I -

MR. BARKER: I -

MR. RUDOVSKY: - will.

THE COURT: Yeah, thank you.

MR. BARKER: - brought a copy.

MR. RUDOVSKY: Yeah.

MR. BARKER: I'll give him.

MR. RUDOVSKY: Okay.

THE COURT: Okay.

(Asides)

THE COURT: You were -

MR. KAUFMAN: I have -

THE COURT: - at the pertinent time Head of the

Federal Habeas Unit for the District Attorney's Office?

MR. KAUFMAN: That's correct, Your Honor, Supervisor of the Federal Litigation Unit.

THE COURT: Got it; okay. I assume you're familiar with Rule 11 of the Federal Rules of Civil Procedure?

MR. KAUFMAN: Yes, Your Honor.

THE COURT: Okay. When your Affidavit indicates at paragraph 11, you were -- and I'm going to paraphrase, and then I'll read directly -- you were told, it says, I think, by Mr. George, the Committee had made a financial decision.

And it's unclear you directed you. It looks like Mr. George. I don't know that that's of any great consequences. But someone -- it appears to be Mr. George -- directed you to file the Concession. And you say, in paragraph 11:

"At the time I filed the Notice of Concession, I was not personally aware of Wharton's attempted escape in 1986, or other negative Prison adjustment evidence noted by the Attorney General.

"Because I had no authority to unilaterally reconsider a change in the decision of the Committee or concede death penalty relief, I did not conduct any independent investigation or evaluation of the case before filing the Notice."

I don't want to read Rule 11 verbatim. But it -- I

think it says that someone who files something has to do some type of investigation. So, did you have any concerns about being asked to file a Concession in a death penalty case without ever having received the basis for that instruction?

MR. KAUFMAN: Well, my read on the Rule, Your Honor, is that it requires a reasonable investigation under the circumstances. And I would submit that, under these circumstances here, where I had assumed that there had been a reasonable and diligent investigation by the Capital Case Review Committee, I was not familiar with all the details of how that Committee operated.

But it was certainly my understanding that they had investigated and reviewed it. So, it's my -- it was my thought that that was reasonable under these circumstances that I didn't have to do a second investigation beyond which had already taken place by a Committee of my Superiors.

(Asides)

THE COURT: I think I have exactly what you said right. But let me make sure I understand it.

MR. KAUFMAN: Yes, Your Honor.

THE COURT: Your view is that because your Supervisors had done an investigation, that complied with your requirements as the Submitter that you conduct a reasonable inquiry, under the circumstances?

MR. KAUFMAN: Under these circumstances where you

have a Notice Pleading, not a -- just essentially alleging that the Office is conceding on the issue, yes -

THE COURT: Right.

MR. KAUFMAN: - Your Honor.

THE COURT: Right; but you've filed other documents. I mean, you filed a Brief where you laid out certain reasons for the concession, after I pressed your Office for that, right?

MR. KAUFMAN: Your Honor, I -

MR. RUDOVSKY: I object, again. We've had testimony on this. I -

THE COURT: Um-hmm.

MR. RUDOVSKY: - think it misrepresents that Brief. You asked two specific questions. They answered them. In background, they gave some information about the case, kind of in a procedural history and -

THE COURT: Um-hmm.

MR. RUDOVSKY: - what was on the record. But, again, it goes to our main point. There was nothing in your Order to which that Brief was responsive to that asked for any facts of any kind.

THE COURT: Okay. So, I'll adopt Mr. Rudovsky's characterization. You filed a subsequent brief, I think, on April 3rd, where I think Mr. Rudovsky's word was you supplied me with further information.

And so, the point I'm trying to -- or the question I'm trying to ask is: on one hand, you're filing a Concession and you're claiming, well, that was enough under Rule 11. But yet, you follow up with a more fulsome explanation?

MR. KAUFMAN: We -- Your Honor, the -- your Briefing Order asked for briefing on two specific legal issues. It didn't ask for a fulsome explanation.

THE COURT: I didn't say that I asked for a fulsome explanation.

MR. RUDOVSKY: Judge -

MR. KAUFMAN: You did that -

THE COURT: I said you provided -

MR. KAUFMAN: - in your Opinion.

THE COURT: - more information.

MR. RUDOVSKY: Judge, I would -

MR. KAUFMAN: Yeah, I -

MR. RUDOVSKY: - point to your Opinion in this case.

THE COURT: Yeah, you've made that point.

MR. RUDOVSKY: But -

THE COURT: Yeah.

MR. RUDOVSKY: - we're using the term "fulsome".

THE COURT: Yeah.

MR. RUDOVSKY: You used the -- you said, I asked for a full -- with respect to this Order, you characterized it as asking for a fulsome explanation -

THE COURT: No.

MR. RUDOVSKY: - of the District -

THE COURT: If I did, I misspoke. He supplied more information than was in the Concession.

MR. RUDOVSKY: And it was -

THE COURT: Can we agree on that?

MR. RUDOVSKY: - totally background and had nothing to do with the points -

THE COURT: No.

MR. RUDOVSKY: - one way or the other.

THE COURT: Yeah, I'm going to disagree with that, because it says -- and Mr. Kaufman wrote this -- he lays out on paragraph 3 a whole recitation of what Mr. Cannon talked about. And I'm going to read it.

MR. RUDOVSKY: Right.

THE COURT: Mr. Cannon said -- you told me Mr. Cannon's not operating under any strategy or tactic, when I did not investigate and present evidence of Mr. Wharton's Prison adjustment.

So, anyway, in my discussion with Mr. Rudovsky, I lost track of my point. So, let me move onto the next question, okay?

MR. RUDOVSKY: Yeah.

THE COURT: Which was, I thought, making sure you and I were on the same page, that I understood your answer,

which was you believed a reasonable investigation had been conducted, because your Supervisors told you they had done that, is that fair?

MR. KAUFMAN: That's fair, Your Honor.

THE COURT: Okay.

MR. KAUFMAN: They had done that through the mechanism of the Capital Case Review Committee, yes.

THE COURT: Understood. When did you become aware that Mr. Wharton had escaped?

MR. KAUFMAN: I became aware, Your Honor, upon the filing of the Attorney General's Brief in, I believe it was April of 2019.

(Asides)

THE COURT: I appreciate your statement in paragraph 12 of your Affidavit, where you say, although it is not -- it was not my intention, it is now apparent to me the admittedly vague communication with the victims' family language was amenable to interpretation that the victims' family agreed with the concession of the penalty phase.

And I don't say I appreciate it because you're agreeing with me that I think it was vague, and I do. I appreciate your candor. So, when you saw the concession, why didn't you, since your name was on it, take steps to make it clearer, since you now acknowledge it was vague?

MR. KAUFMAN: Take steps in 2022, when I filed -

THE COURT: Yeah.

MR. KAUFMAN: - this Affidavit?

THE COURT: When you filed the Concession, yes.

MR. KAUFMAN: To -

MR. RUDOVSKY: No, the -

MR. KAUFMAN: - file a new -

MR. RUDOVSKY: No, the question, I think, was when you filed that Notice of Concession. I would object to that, because the Notice of Concession was simply a statement of the position of the Office. The views of the victims, pro or con, had nothing to do -

THE COURT: Yeah.

MR. RUDOVSKY: - with -

THE COURT: That's in the Affidavit. I -

MR. RUDOVSKY: Right.

THE COURT: - passed over that. I don't want -

MR. RUDOVSKY: No, but -

THE COURT: - to ask him a -

MR. RUDOVSKY: - I -

THE COURT: -- question about that.

MR. RUDOVSKY: - thought you were now asking why he didn't -

THE COURT: No, he's -

MR. RUDOVSKY: - with the Notice -

THE COURT: I'm asking him.

MR. RUDOVSKY: - of Concession -

THE COURT: He's saying -

MR. RUDOVSKY: - talk about the victims.

MR. KAUFMAN: You -

THE COURT: No.

MR. KAUFMAN: Your Honor -

THE COURT: That's not -

MR. KAUFMAN: - I -

THE COURT: No, I -

MR. KAUFMAN: I'm sorry.

THE COURT: Let me re-ask the question.

MR. RUDOVSKY: Okay.

MR. KAUFMAN: Yeah.

THE COURT: Let me re-ask the question.

MR. KAUFMAN: Okay.

THE COURT: Okay. You acknowledge in your Affidavit that the concession was worded in a vague way. And you concede that it lacked clarity. These are your words, in your Affidavit.

MR. KAUFMAN: Yes, Your Honor.

THE COURT: So my question is, why didn't you take the time on such an important matter, when you drafted the concession, to make it not vague and more clear?

MR. KAUFMAN: In all honesty, Your Honor, it did not occur to me that it would be construed in the fashion it was by

Your Honor, in your May Opinion. I could honestly say I -- it was not intended to, and I did not think it would be read to say that the victims' family conceded.

It would be awfully difficult to make such a representation. The victims' family involves numerous members. The idea that they would all universally have the same view is probably farfetched.

THE COURT: Well, it's not -

MR. KAUFMAN: And in any event, it was not -

THE COURT: Excuse me.

MR. KAUFMAN: - my -

THE COURT: Excuse me. It's not farfetched, because now we know that they do oppose the position taken by the District Attorney's Office, especially I mean I -- okay.

Mr. Rudovsky is standing to disagree with me. So let's read what the victims did say.

MR. RUDOVSKY: Your Honor, we have a record of what the victims say after-the-fact. We have what the Victim's Advocate in the Office said they said that they would talk about this. It was never communicated to her before.

And I go back to my primary point. Whether they were in favor of the death penalty, or they would favor the concession, was completely irrelevant to -- hear me out -- to the Notice that we're conceding. That was a legal issue.

Around the country, District Attorneys are told by

victims more often than this case, where the District Attorney decides not to go for the death penalty the victims wanted, where victims' families say, don't ask for the death penalty, Mr. District Attorney. Mr. District Attorney says -

THE COURT: I'm not -

MR. RUDOVSKY: - to them -

THE COURT: - quibbling -

MR. RUDOVSKY: - you know what?

THE COURT: - with that -

MR. RUDOVSKY: I'm -

THE COURT: - point.

MR. RUDOVSKY: - going to do it.

THE COURT: I'm not disagreeing with you.

MR. RUDOVSKY: And -

THE COURT: The ultimate decision, no matter what the victim said, is the District Attorney's, agree.

MR. RUDOVSKY: - which is why the Notice -

THE COURT: Agree.

MR. RUDOVSKY: - of Concession, which was limited to a specific legal issue in the case -

THE COURT: We're not talking -

MR. RUDOVSKY: - was to a -

THE COURT: - about that.

MR. RUDOVSKY: - Sixth Amendment violation.

THE COURT: We're talking past each other now and

I'm going to interrupt you. I'm talking -- we're talking about, I agree. The ultimate decision is the District Attorney's, no matter what the victims say.

What we're talking about is a communication communicated to me, which I have concerns was not communicated in a clear way about the victims' position, and confirmed, confirmed by Mr. Kaufman who said the communication was vague and lacked clarity.

MR. RUDOVSKY: Yeah.

THE COURT: That's -

MR. RUDOVSKY: Okay.

THE COURT: - what I'm asking him about.

MR. RUDOVSKY: And we agree. And the Office, by its -- has already said on several occasions in briefing that, in retrospect, there should have been -

THE COURT: Okay. So my -

MR. RUDOVSKY: - more contact -

THE COURT: - question -

MR. RUDOVSKY: - with them.

THE COURT: - is, why didn't you take the time to be more clear in such an important matter?

MR. KAUFMAN: I did not think it was amenable. It did not occur to me that it was amenable to the interpretation that the victims' family agreed.

In retrospect, in light of your Opinion, obviously it

was amenable to that interpretation. And I apologize.

THE COURT: Well, I'm not saying, I -- maybe I'm wrong. But you've said, it's now apparent to me the admittedly vague communication was amenable to the interpretation that the victims' family agreed with the concession.

MR. KAUFMAN: Right.

THE COURT: Your Affidavit doesn't say, based on your Opinion that it's possible. You've said it. It's amenable to a vague interpretation.

MR. KAUFMAN: A hundred percent.

THE COURT: Paragraph 14, you requested permission to stop working on the case. Why?

MR. KAUFMAN: Well, as I put out in the Affidavit, it looked like it was evolving to a situation where there was going to be advocacy -- active advocacy on behalf -- effectively on behalf of Mr. Wharton.

And they said I had a choice in the matter. It was my preference to work on other matters, where I was kind of on the more traditional side of the V in advocating against granting of relief. And my Supervisors permitted me to do that, to beg off the case.

THE COURT: Because I appreciate your candor in that answer, I'm not going to press you for further details, regarding that topic.

(Asides)

THE COURT: I think I asked you this. I'm sure I did. But just to make sure, you learned about the escape when you read the -- well, did you read the AG's filings? Is that when you learned about the escape?

MR. KAUFMAN: I don't specifically recall. I certainly read it at some point. But I might have initially been informed of it because someone else had it and told me about it very soon after it was filed.

THE COURT: Um-hmm.

MR. KAUFMAN: But, yeah, I do have a distinct memory of only at that point, subsequent to the filing, was when I first found out about the escape.

THE COURT: Um-hmm; did you approach whoever you report to and say -- I'm going to withdraw that question.

(Asides)

THE COURT: Did you have direct communications with Ms. Wanes, before you drafted the Concession?

MR. KAUFMAN: Yes, Your Honor.

THE COURT: Could you relay those communications, what was said?

MR. KAUFMAN: I don't specifically recall what was said. The import of what was said was that there was communication with the victims' family.

But I do not recall the specific conversation. I don't recall whether -- sometimes we would email. Other times,

it would be an in-person conversation.

But I would always, before filing one of these Notices, I would always check in with her. Paul would tell me that the Committee's made a decision. And he would say, check in with Heather to make sure we're okay on the victim's family notification piece of it.

THE COURT: And you did that?

MR. KAUFMAN: Yes, Your Honor.

THE COURT: But you don't recall what she said to you?

MR. KAUFMAN: I don't recall the specifics of what she said to me. Yes, Your Honor.

THE COURT: Okay. Did you make any inquiries as to whether -- understanding Mr. Rudovsky's position that the victim's views don't control the DA's ultimate decision on how to present to the Court. But did you ask her the -- is the family onboard with the concession, or anything like that?

MR. KAUFMAN: I don't recall, Your Honor. Sometimes there was conversations, like speaking generically. Sometimes there was conversations like that that I would have with her. I just don't recall what transpired between us in this particular case.

(Asides)

THE COURT: Paragraph 11, you indicate you were unaware of the escape. And you say, or other additional

negative Prison adjustment evidence.

And that, we all know now, is Mr. Wharton fashioned, on two occasions, escape implements, while he was on death row. You're now aware of that?

MR. KAUFMAN: Yes, Your Honor.

THE COURT: And you weren't aware of that. No one told you that. You didn't do any investigation to find out, like the AG's Office did, about those incidents before you signed the Concession?

MR. KAUFMAN: Correct, Your Honor.

THE COURT: Okay. Who drafted the Notice of Concession?

MR. KAUFMAN: I did, Your Honor.

THE COURT: Did Mr. George, Ms. Winkelman, or Mr. Krasner approve it, before you signed it?

MR. KAUFMAN: I don't believe so. I don't have a specific recollection. But I don't believe so. That was not the practice.

(Asides)

THE COURT: I don't have any more questions, Mr. Kaufman.

MR. KAUFMAN: Okay.

THE COURT: I think I may have asked you this. Did you read the Third Circuit's Opinion on the issue we're here about, at any point in time?

MR. KAUFMAN: Yes, I'm sure, Your Honor.

THE COURT: When they say we must also take account of anti-mitigation evidence, in light of that Directive from the Third Circuit, did you say to any of your Supervisors, have we done that? Have we taken into account any anti-mitigation evidence? Have we done a investigation into that?

MR. KAUFMAN: I did not, Your Honor.

THE COURT: Okay. Excuse me one second.

(Asides)

THE COURT: Okay. I think I'm -- those are the questions I have. So can we take just another five-minute break? Let's do that. Okay? Thank you.

(Recess at 11:06 a.m., until 11:11 a.m.)

THE COURT: Everyone could sit down. All right. I don't have any further questions of Mr. Kaufman. But I think I have, I think, maybe a final -- well, every time Lawyer says -- and I'm a Lawyer -- I only have one more question, that that rule's always broken.

So, I have a question for Mr. Rudovsky. And I'm referring to the Proposed Order that was submitted, the one that I've talked about that says, and upon careful and independent review of the Parties' submissions.

Actually, I wanted to ask Mr. Kaufman about that, sorry. Who prepared this Order? Do you want to see it?

MR. KAUFMAN: No, I think I know what you're talking

about, Your Honor.

THE COURT: Okay. I'm happy to show it to you.

MR. KAUFMAN: Okay, yes. Thank you.

THE COURT: Yeah, just let him eyeball it real quick.

(Asides)

MR. KAUFMAN: I believe, Your Honor, that this was drafted by Defense Counsel and approved by me.

THE COURT: Okay, thanks. Submitted by you and, you're right, Defense Counsel. So my question is, on the part that says, upon careful and independent review of the Parties' submissions, when you submitted this to me, did you have any concerns that there hadn't been a full review of -- I keep harping on, but I think it's important -- the Third Circuit's edict that we take into account anti-mitigation efforts?

MR. KAUFMAN: I did not, Your Honor. And I would just note, in particular, that I, at that point, was not aware of the escape.

THE COURT: Okay. So, thank you. So, Mr. Rudovsky, staying on this Order, does your Client believe, had I signed this Order, do you believe that the -- given the magnitude of the case, the fact that a jury had reached its verdict.

The Pennsylvania Supreme Court had affirmed and, very recently, the Supreme Court said that there must be a review by a Judge through advocacy, before this type of relief is

granted.

Given all of that, does your Client have any concern that I would sign, and you asked me to sign an Order, without any explanation to the public at all as to why I had -- and I didn't sign it. But if I did, doesn't -- does your Client believe that the public deserves any explanation from me, from me?

MR. RUDOVSKY: I think as our Client has said and we've said, if the Court did not think there was enough information on the record, it could order a full hearing, which it did.

If it was satisfied based on the representations that were on the record already about Mr. Cannon, and all the information that both sides had at that time, that the District Attorney had given you all that information and had decided to concede the issue. I don't think it would have been inappropriate for you to sign that.

You looked further. That's fine. And you eventually had a hearing. If I was drafting that, I might draft it differently. But the way it was drafted -- I'm not trying to avoid the question -- simply gave you the choice.

Lawyers propose Orders all the time. Judges sometimes reject them. Judges edit them. Judges reject them. Based on the positions of both sides -- obviously Mr. Wharton on their Advocate -

THE COURT: Who were completely aligned?

MR. RUDOVSKY: - was saying this is the reason why there was ineffectiveness. Everybody agreed Mr. Cannon was ineffective on the performance prong.

The only question was prejudice. And based on the record that had been developed to-date, with Experts and everything else, they said you have enough to make that decision.

Your point at that, when it was remanded, what you've -- which I understand -- what you've focused on with all three witnesses, that you must now, right, provide all the information.

When that case gets remanded, it's like any other issue before a Federal Judge in the District Court. It's kind of like we do it over now, right?

There's no bar on either side changing its position at that point, making different arguments, deciding what evidence to present. And I've said kind of ad nauseum at this point, the District Attorney, the Solicitor General on remand, Supreme Court remands a case to the Circuit.

New Administration comes in. They change their position, perfectly appropriate.

THE COURT: But the Supreme -- the -

MR. RUDOVSKY: And -

THE COURT: - Supreme Court -

MR. RUDOVSKY: - that's what the -
THE COURT: - disagrees -
MR. RUDOVSKY: And that's what this Office -
THE COURT: - with -
MR. RUDOVSKY: - did here.
THE COURT: - that position. The Supreme Court said -- I don't want to, okay, read it again. But Commonwealth v. Brown, the Pennsylvania Supreme Court said, simply because there's a new Administration doesn't mean you can undo jury -
MR. RUDOVSKY: And I -
THE COURT: - verdicts.
MR. RUDOVSKY: And we agree 100 percent with that. You can't just come to us and say, we don't like the death penalty, reverse the conviction. Give us a legal reason.
The legal reason here was we had ineffective assistance of Counsel. What this Court quarrels with is whether that concession was proper.
Our view is, after reviewing everything that was relevant and known to that Committee, they made a reasonable decision, which cannot be questioned by this Court. You can reject it and have a hearing. You weren't bound by it. You're supposed to give it some deference.
But that's why I suggest that what was done was not inappropriate, and certainly not sanctionable. I mean, we're -

THE COURT: Yeah.
MR. RUDOVSKY: - talking about a couple levels here of -
THE COURT: You've taken my question to -- as a good Advocate would -- to argument on a different point. But -- and I promise I'm not trying to put words in your mouth.
MR. RUDOVSKY: No, I -
THE COURT: I -
MR. RUDOVSKY: - understand.
THE COURT: - understand you to say that, had I signed the Order, which your Client asked me to sign saying I had done an independent and careful review, you're -- let me just -
MR. RUDOVSKY: Right, yeah.
THE COURT: - finish my question.
MR. RUDOVSKY: Um-hmm.
THE COURT: That you don't think it was incumbent on me to give the public an explanation as to why I was taking a very significant verdict off the table. Public didn't deserve any explanation -
MR. RUDOVSKY: Right.
THE COURT: - at all.
MR. RUDOVSKY: Because all that's represented, if you had signed that, is -
THE COURT: Yes.

MR. RUDOVSKY: - I have done an independent review of what's been submitted to me so far.
THE COURT: And I'm asking you, does the public deserve to know what that review was? What's the basis?
MR. RUDOVSKY: You could do that in explaining why you're signing -
THE COURT: I'm asking -
MR. RUDOVSKY: - the Order.
THE COURT: - you. Do you think the public deserves to know that?
MR. RUDOVSKY: I don't think the public has a right to know that. You issue the Order. Sometimes Judges write Opinions. Sometimes they just issue Orders. Sometimes they give explanations. Sometimes you have dissents, where that's -
THE COURT: This is -
MR. RUDOVSKY: - up to you.
THE COURT: - a death penalty case.
MR. RUDOVSKY: Yeah.
THE COURT: There's nothing more important that we do.
MR. RUDOVSKY: Exactly, and which is why it was perfectly appropriate of you for -- to have a full hearing, write 30 pages on the issue, which you did. Other Judges have simply accepted it and signed it, and in death penalty cases.
THE COURT: Okay. Thank you. Does the

Attorney General's Office wish to add anything to the conversation?

MR. BARKER: No, Your Honor. I think you've developed your record.

THE COURT: Okay. And how about Counsel for Mr. Wharton?

MS. MCHUGH: No, Your Honor.

THE COURT: Okay, all right. Then, I will conclude the hearing. And say to the Lawyers, particularly Counsel for the District Attorney's Office, I appreciate the way you've conducted yourself in a -- in dignified matter. This -

MR. RUDOVSKY: I appreciate the Court's questions today.

THE COURT: Yes.

MR. RUDOVSKY: If I could just inquire, if the -- I don't know what your next step is going to be. I assume you're going to make some Decision on where we go from here in an Opinion, or however you proceed. If there are any issues you want additional briefing on -

THE COURT: Yeah.

MR. RUDOVSKY: - we're happy to do that.

THE COURT: Yeah, sure. I appreciate the input. And more input -- the more input, the better, ironically. And so, I don't know where we're going to go from here.

I mean, I want to digest what was said. But we will

stay tuned.

MR. RUDOVSKY: Very well.

THE COURT: Okay. All right.

MR. RUDOVSKY: Thank you very much.

THE COURT: Thank you.

(Proceedings concluded at 11:21 a.m.)

**C E R T I F I C A T I O N**

I, VICTORIA O'CONNOR, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

____________________________ June 24, 2022

Victoria O'Connor, CET Date