No. 26-1798

# In The United States Court of Appeals for the Third Circuit

IN RE NANCY WINKELMAN,
Appellant.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania, Misc No. 22-mc-51

**BRIEF OF ETHICS SCHOLARS AS AMICI CURIAE SUPPORTING APPELLANT NANCY WINKELMAN AND SUPPORTING REVERSAL**


David Richman
Michael A. Schwartz
Sean M. Craig
Jessica McClellan
TROUTMAN PEPPER LOCKE LLP
3000 Two Logan Square
Philadelphia, PA 19103
215-981-4000
David.Richman@troutman.com
Michael.Schwartz@troutman.com
Sean.Craig@troutman.com
Jessica.McClellan@troutman.com

*Counsel for Amicus Curiae*


August 27, 2026

## Disclosure Statement and Statement of Consent to File

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Michael A. Schwartz states that no counsel for any party authored any part of this brief, and no person or entity other than Amici and their counsel made a monetary contribution to the preparation or submission of this brief.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), Michael A. Schwartz certifies that counsel for Amici conferred with counsel for Appellant and Disciplinary Counsel Alfred Putnam, and all parties consented to the filing of this brief.

## Table of Contents


**Page**

Disclosure Statement and Statement of Consent to File .......................... i

Statement of Interest ........................................................................ 1

Argument ........................................................................................ 6

I. The District Court's Findings of Professional Misconduct Were Not Established by Clear and Convincing Evidence, and the Imposition of Discipline on this Record Will Result in Both Grave Injustice to the Lawyer and Subvert the Goals of the System of Lawyer Discipline ..................................... 6

A. The Purpose of the Rules of Professional Conduct Is Disserved by a Misconduct Finding and Sanction of a Lawyer Who is Unquestionably Fit to Practice ................... 6

B. There Was a Failure of Proof as to the Intent Necessary to Establish a Violation of Rule 3.3(a)(1) ............. 9

C. As the DAO's Concession to Wharton's Ineffective Assistance Claim Had a Basis in Law and Fact, There was No Violation of Rule 3.1 ..................................... 20

II. Winkelman Was Not Charged with Violating Rule 5.1(c), But She Was Effectively and Wrongly Sanctioned for Having Done So ........................................................................ 21

III. The Sanction Imposed on Winkelman was Inappropriate and Disproportionate ................................................................... 22

A. The Sanction Restricting Winkelman's Right to Practice is Inconsistent with the Objectives of Lawyer Discipline and With the Criteria for Imposing Sanctions ............................................................ 22

B. Disciplinary Precedent of Prosecutors Acting in Their Official Capacity Does Not Support a Three-Year Suspension ................................................................ 26

C. The Three-Year Suspension Imposed on Winkelman Does Not Align with Sanctions Imposed in Pennsylvania for Misconduct by Lawyers Other Than Prosecutors ............................................................... 28

D. A Proper Accounting of Mitigating Factors Precludes a Determination That Winkelman is Unfit to Practice or Poses a Risk of Repeated Misconduct ................ 31

Conclusion ........................................................................................ 32

Certifications ...................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) .......... 12

*Commonwealth v. Brown*,
No. 32 EM 2023 (Pa. August 15, 2024) .......... 18

*Cruzan v. N.Y. Central & Hudson River RR Co.*,
116 N.E. 879 (Mass. 1917) .......... 12-13

*Global-Tech Appliances v. SEB S.A.*, 563 U.S. 754 (2011) .......... 16

*Intel Corp. Invest. Policy Comm. v. Sulyma*,
589 U.S. 178 (2020) .......... 10

*McCarthy v. DEA*,
171 F.4th 245 (3d Cir. 2026) .......... 14

*Off. of Disciplinary Couns. v. Allen*,
190 DB 2020 (Pa. 2022) .......... 29

*Off. of Disciplinary Couns. v. Anonymous Att'y*,
327 A.3d 192 (Pa. 2024) .......... 25

*Off. of Disciplinary Couns. v. Anonymous Att'y*,
331 A.3d 523 (Pa. 2025) .......... 7

*Off. of Disciplinary Couns. v. Barbin*,
97 DB 2020 (Pa. 2022) .......... 29

*Off. of Disciplinary Couns. v. Carbone*,
71 DB 2014 (Pa. 2015) .......... 28

*Off. of Disciplinary Couns. v. Childers-Potts*,
25 DB 2024 (Pa. 2024) .......... 27

*Off. of Disciplinary Couns. v. Csonka*
89 DB 2023 (Pa. 2023) .......... 30

*Off. of Disciplinary Couns. v. Fina*,
225 A.3d 568 (Pa. 2020) (Wecht, J. concurring) .......... 27

*Off. of Disciplinary Couns. v. Heyburn*,
58 DB 2020 (Pa. 2021) .......... 30

*Off. of Disciplinary Couns. v. Marshall*,
136 DB 2019 (Pa. 2021) .......... 30

*Off. of Disciplinary Couns. v. Miller*,
32 DB 2017 (Pa. 2019) .......... 28

*Off. of Disciplinary Couns. v. Pozonsky*,
177 A.3d 830 (Pa. 2018) .......... 6

*Off. of Disciplinary Couns. v. Price*,
732 A.2d 599 (Pa. 1999) .......... 14

*Rompilla v. Beard*,
545 U.S. 374 (2005) .......... 21

*In re Ruffalo*,
390 U.S. 544 (1968) .......... 7

*Wharton v. Super. Graterford SCI*,
95 F.4th 113 (3d Cir. 2024) .......... 20

*Wharton v. Super. Graterford SCI*,
95 F.4th 140 (3d Cir. 2024) .......... *passim*

**Other Authorities**

ABA Standards for Imposing Law. Sanctions,
(Ellyn S. Rosen ed., annotated ed. 2019) .......... 6, 7

Deborah L. Rhode, David Luban & Scott L. Cummings,
*Legal Ethics* 926 (6th ed. 2012) .......... 7

Fed. R. Civ. P. 11 .......... 9, 10, 11, 12, 25

Fred C. Zacharias, *The Purpose of Lawyer Discipline*, 45 Wm. & Mary L. Rev. 675, 710 (2003) ..... 26

Model R. for Law. Disciplinary Enforcement 6.14 ..... 26

Model R. for Law. Disciplinary Enforcement 9(B) ..... 24

Pa. R. Pro. Conduct 1 ..... 10, 13

Pa. R. Pro. Conduct 3.1 ..... *passim*

Pa. R. Pro. Conduct 3.10 ..... 28

Pa. R. Pro. Conduct 3.3(a)(1) ..... *passim*

Pa. R. Pro. Conduct 5.1 ..... 21, 22

Pa. R. Pro. Conduct 8.4(c) ..... 24, 25, 27

Pa. R. Pro. Conduct Scope [21] ..... 14

Restatement (Third) of L. Governing Laws. § 120, cmt. c. ..... 10

## Statement of Interest

Amici are 18 law professors and practitioners whose teaching, scholarship, and practice include a focus on legal ethics. Amici have a common interest in ensuring that the Rules of Professional Conduct are enforced correctly and fairly. They seek correction of the district court's failure to apply the appropriate standard of proof to a determination of professional misconduct, its misapplication of Rules 3.1 and 3.3(a)(1) to the evidence of culpability, and its unreasonably harsh and disproportionate sanction. Amici believe the lower court's errors will have broad adverse consequences, including diluting the burden of proof for findings of professional misconduct, and lowering the appropriately high bar to restricting the practice of lawyers who are demonstrably fit to practice.

A concise description of each Amicus's relevant professional qualifications follows:

*Lara Bazelon* is a Professor of Law and the Barnett Chair in Trial Advocacy at the University of San Francisco and co-chair of the American Bar Association Criminal Justice Section's Ethics Subcommittee;

*Ellen Brotman* focuses her practice on representation of attorneys before the Pennsylvania Disciplinary Board and professional responsibility and legal ethics advising, and she was a

Special Advisor to the American Bar Association Legal Ethics and Professional Responsibility Committee from 2024 to 2026;

*Scott Cummings* is the Robert Henigson Chair in Legal Ethics and Director of the Program on Legal Ethics and Democracy at UCLA School of Law;

*Jennifer Ellis* is a legal ethics attorney with over 25 years of experience who advises attorneys and law firms on ethics compliance;

*Michael Frisch* is ethics counsel at Georgetown University Law Center and a former assistant bar counsel for the District of Columbia;

*Bruce Green* is the Louis Stein Chair at Fordham Law School, where he directs the Stein Center for Law and Ethics, and he is the immediate past chair of the American Bar Association's Standing Committee on Ethics and Professional Responsibility;

*Jennifer Gundlach* is the Emily and Stephen Mendel Distinguished Professor of Law and Clinical Professor of Law at the Maurice A. Deane School of Law at Hofstra University, where she teaches and has published in the areas of Lawyers Ethics, Civil Procedure, and various experiential courses;

*Theodor Liebmann* is the Executive Director of the Freedman Institute for the Study of Legal Ethics at Hofstra Law School and

serves as the Reporter for the Ethics Compendium of the American Immigration Lawyers Association;

*Justin Loughry* has been a legal ethics and criminal defense lawyer for almost 40 years, has taught legal ethics at Rutgers Camden Law School and the Drexel University Thomas R. Kline/Earle Macke School of Law, and has lectured extensively on professional responsibility in New Jersey Continuing Legal Education courses;

*David Luban* is a Distinguished University Professor at Georgetown Law, the co-author of the casebook *Legal Ethics* (9th ed. 2024) and a former member of the District of Columbia Bar Ethics Committee;

*Eleanor Myers*, Associate Professor of Law Emeritus, was a full-time professor at Temple University Law School where she taught and published on Professional Responsibility, and has taught and published internationally on United States legal ethics;

*Arden Olson* has advised and represented lawyers on legal ethics for decades, is a former chair of Oregon's Legal Ethics Committee, and is a former member of the American Bar Association Standing Committee on Ethics and Professional Responsibility;

*Michael Reed* is a retired partner of the firm Troutman Pepper Locke LLP, a former member and chair of a hearing committee of the

Disciplinary Board of the Supreme Court of Pennsylvania, and former chair of the City of Philadelphia Board of Ethics;

*David Richman* is a retired partner of the firm Troutman Pepper Locke LLP, a Fellow of the Pepper Center for Public Service, a retired adjunct professor at Temple University Law School, and a former chief of the appeals division of the Philadelphia District Attorney's Office, who has lectured on the professional responsibilities of prosecutors;

*Abbe Smith* is the Scott K. Ginsburg Professor of Law, Director of the Criminal Defense & Prisoner Advocacy Clinic, and Co-Director of the E. Barrett Prettyman Fellowship Program at the Georgetown University Law Center, and she is the author, with Monroe H. Freedman, of *Understanding Lawyers' Ethics* (Carolina Academic Press, 6th ed. 2023) (and previous editions), and co-editor, with Monroe H. Freedman and Alice Woolley, of *Lawyers' Ethics* (Rutledge 2017);

*Rayman Soloman* is Dean Emeritus at Rutgers Law School and the co-editor and author of a book on legal professionalism;

*Ellen Yaroshefsky* is a Distinguished Professor of Legal Ethics Emerita and Special Ethics Advisor to the American Bar Association Criminal Justice Section Council;

*Steven Zeidman* is Co-Director of the Defenders Clinic at CUNY School of Law and the Founder and Co-Director of the Second

Look Project: Beyond Guilt, and he has authored articles on a range of issues including the ethics of effective assistance of counsel.

## Argument

### I. The District Court's Findings of Professional Misconduct Were Not Established by Clear and Convincing Evidence, and the Imposition of Discipline on this Record Will Result in Both Grave Injustice to the Lawyer and Subvert the Goals of the System of Lawyer Discipline

#### A. The Purpose of the Rules of Professional Conduct Is Disserved by a Misconduct Finding and Sanction of a Lawyer Who is Unquestionably Fit to Practice

In sanctioning Nancy Winkelman for professional misconduct, the District Court lost sight of the purpose of a disciplinary proceeding: It is "not punitive but to inquire into the fitness of the lawyer to continue in that capacity for the protection of the public, the courts, and the legal profession." ABA Standards for Imposing Lawyer Sanctions, Preface at xv (Ellyn S. Rosen ed., annotated ed. 2019).

Pennsylvania agrees. Lawyer discipline "is not intended to be punitive, [rather]…the primary purpose of the disciplinary process…is the protection of the public, the preservation of the integrity of the courts, and the deterrence of unethical conduct." *Off. of Disciplinary Couns. v. Pozonsky*, 177 A.3d 830, 838 (Pa. 2018). Ultimately, the object of the rules is to protect the public and the administration of justice "from lawyers who have demonstrated by their conduct that they are unable or are likely to be unable to properly discharge their professional duties." ABA Standards for Imposing Lawyer Sanctions, *supra*, Standard 1.1.

For the system to produce outcomes that are both fair and perceived as such, it is important that the disciplinary rules and sanctions are applied consistently across cases. *Id.*

Because of the heavy cost to a lawyer's reputation of a finding of professional misconduct, disciplinary proceedings have been recognized as "quasi-criminal," with all that label implies as to the procedural protections owed to the lawyer facing charges of misconduct. *See In re Ruffalo*, 390 U.S. 544, 551 (1968); *Off. of Disciplinary Couns. v. Anonymous Att'y*, 331 A.3d 523, 524-26) (Pa. 2025).

Among those protections is the heavy burden of proof placed on the disciplinary authority. As laid down in Standard 1.3 of the ABA Standards for Imposing Lawyer Sanctions, *supra*, sanctions are only to be imposed "following a determination by clear and convincing evidence that a [lawyer] has violated a provision of the Model Rules of Professional Conduct…." Pennsylvania's adherence to the clear and convincing standard that prevails in the majority of jurisdictions, *see* Deborah L. Rhode, David Luban & Scott L. Cummings, *Legal Ethics* 926 (6th ed. 2012), was made clear in a decision predating the Winkelman disciplinary hearing. *See Off. of Disciplinary Couns. v. Anonymous Att'y*, 331 A.3d at 526 ("[T]he standard of proof in attorney disciplinary matters, which are in the nature of quasi-criminal proceedings, requires … a clear and

convincing evidence standard of proof."). That decision, which predated the hearing below, erased any doubt as to the burden borne by disciplinary counsel.

The finding that Winkelman was guilty of professional misconduct and the imposition of a three-year suspension are both perplexing in light of: (a) the isolated instance of misbehavior with which she was charged; (b) the nature of the misbehavior—mischaracterizing in a brief as "careful" a case review that she reasonably believed was so, performed as it was by her experienced trusted deputy; (c) the absence of prejudice to the administration of justice; and (d) Winkelman's distinguished and unblemished professional history. Harsh and hard to square with the vast run of disciplinary decisions, the misconduct finding and sanction alike are irreconcilable with the objectives and norms of the disciplinary system.

Nothing in the evidence that the disciplinary panel selectively recited in its Report & Recommendation (R&R) remotely warrants the inference that Winkelman is unable or likely to be unable to discharge the professional duties that she has, by any measure, discharged irreproachably for nearly forty years. Judging from the mitigation evidence omitted from the R&R, quite the opposite is demonstrably true.

### B. There Was a Failure of Proof as to the Intent Necessary to Establish a Violation of Rule 3.3(a)(1)

A lawyer violates Rule 3.3(a)(1) by "knowingly" making a "false statement to a tribunal" or by failing "to correct a false statement of material fact or law previously made to the tribunal." Pa. R. Pro. Conduct 3.3(a)(1). In affirming the Rule 11 findings adverse to Winkelman and to Paul George, her assistant supervisor of the law division within the Philadelphia District Attorney's Office (DAO), this Court determined that Winkelman had made a false statement to a tribunal for purposes of Rule 3.3(a)(1). *See Wharton v. Super. Graterford SCI*, 95 F.4th 140, 149 (3d Cir. 2024). DAO filings, including a brief that Winkelman edited and signed, sought to persuade the habeas court to accept the DAO's concession of Wharton's ineffective assistance claim. *Id.*

This assertion clashed with the fact that George's review of Wharton's history generally, and his prison adjustment specifically, had overlooked Wharton's attempted escape from custody. *Id.* Importantly, the gravamen of the Rule 11 violation was not the concession to relief, which the District Attorney was within his rights to make;[1] rather it was asserting that the DAO's "careful review" warranted deference to the concession. *Id.*

---

[1] As expressed in the Court's Rule 11 opinion, "Appellants complain that the District Court sanctioned them for conceding relief. It did not. In our adversarial system, within the bounds of good faith, parties may choose what positions to advocate." *Wharton*, 95 F.4th at 150.

To rise to the level of professional misconduct, Winkelman's false statement had to have been made "knowingly." Rule 3.3(a)(1). "Knowingly" is a defined term: it "denotes actual knowledge of the fact in question." Pa. R. Pro. Conduct 1(f). Hence, to carry his burden of proof on the charge that Winkelman violated Rule 3.3(a)(1), disciplinary counsel had to prove that Winkelman was aware that a "careful review" had not been performed when she told the habeas court otherwise.

When a statute or code demands it, the requirement of actual knowledge is not satisfied by showing that facts readily at hand were ignored or that actual knowledge was attainable by reasonable inquiry. "[T]o have 'actual knowledge' of a piece of information, one must in fact be aware of it." *Intel Corp. Invest. Policy Comm. v. Sulyma*, 589 U.S. 178 (2020). Within the disciplinary system governing lawyers, "actual knowledge" is interpreted just as strictly. "Actual knowledge does not include unknown information, even if a reasonable lawyer would have discovered it through inquiry." Restatement (Third) of The Law Governing Lawyers § 120, cmt. c.

The misstatement that formed the basis of Winkelman's Rule 11 violation also forms the basis of the district court's misconduct finding and sanction. Thus, in the Rule 11 proceeding, the prosecutors were found to have violated their "implied duty of candor" in violation of Rule 11 by their statement that "the District

Attorney's Office carefully reviewed the facts and the law," offered as a reason for conceding Wharton's ineffective assistance of counsel claim. *Wharton*, 95 F.4th at 149.

The same statements formed the basis of the professional misconduct charges: "Winkelman's statements that the DAO conducted a 'careful' review of *Wharton* [that] were false." JA525. Falsity having been determined, the disciplinary panel deemed as its mission to determine if the misstatements "were knowing," that is, made intentionally to deceive and mislead the *Wharton* habeas court. JA511. But this Court already had taken the intent of Winkelman and her deputy into account in deciding whether or to what degree sanctions were appropriate: "Though intent is not required [by Rule 11], it still matters. 'Whether the improper conduct was willful[ ]or negligent' may bear on whether to impose sanctions and what those sanctions should be." *Wharton*, 95 F.4th at 148 (citation omitted).

Critically, this Court agreed in affirming Judge Goldberg's Rule 11 order that the sanctions he imposed, which spared the lawyers from disbarment, suspension or fine, were "mild and fitting" for lawyers who "made mistakes; they should have investigated more before approving the misstatements." *Id*. at 151. Underscoring its assessment of the lawyers' intent, this Court concluded, "The

District Court did not find that [George and Winkelman] misled the court intentionally, nor do we." *Id*.

In applying the Rules of Professional Conduct, the disciplinary panel was not constrained by this Court's Rule 11 decision to find that Winkelman had made an honest mistake. But to come to a different conclusion on the issue of intent, the panel needed new evidence that demonstrated Winkelman's *awareness* that a "careful" review had not been conducted before the DAO decided to concede Wharton's claim. There was none. Disciplinary counsel stood on the averments of his show cause petition, JA358, and did not call any witnesses. The hearing testimony of Winkelman did not fill the gap.

Winkelman denied without equivocation any awareness of the escape attempt until it was revealed by the AG's Office, she denied having any reason to question the adequacy of the review conducted by her deputy, and she denied having ever supported a recommendation of conceding death penalty relief for a reason unrelated to the merits of the claim. JA382:15-25; JA403:3-11; JA469:6-12. The Panel was free to disbelieve her, but it was not free to rest its findings on that disbelief alone.[2] Nor was the intent

[2] *See Anderson v. Liberty Lobby,* 477 U.S. 242, 257-58 (1986) (possibility that a jury might disbelieve a libel defendant's denial of malice will not defeat a motion for summary judgment or directed verdict; "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion'") (citation omitted); *Cruzan v. N.Y. Central &*

element of a Rule 3.3(a)(1) violation made out by attributing to Winkelman a motive to lie to conceal a policy to concede all death penalty challenges. Without any positive evidence, direct or circumstantial, that Winkelman was aware that George's *Wharton* review had been deficient, the evidence of professional misconduct was legally insufficient.

That a lawyer's knowledge "may be inferred from circumstances," Pa. R. Pro. Conduct 1.1, does not mean that proof of constructive knowledge, *i.e.,* what a reasonable lawyer would or should know under the circumstances, suffices. Amici recognize the seeming tension between the actual knowledge requirement of Rule 3.3(a)(1) and the apparently lower standard of intent, that Comment 3 to the Rule applies to "an assertion purporting to be on the lawyer's own knowledge." Assertions of that kind, says Comment 3, "may be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry."

If the Comment is read as modifying the actual knowledge requirement of Rule 3.3(a)(1) by applying a negligence standard of mens rea to a subset of false statements, the Comment conflicts with the Rule and, to that extent, is a nullity. "The Comments are

---

*Hudson River RR Co.*, 116 N.E. 879 (Mass. 1917) (setting aside jury verdict for plaintiff based solely on apparent disbelief of a defense witness who was the only witness whose testimony touched on the issue of negligence and who denied any wrongdoing).

intended as guides to interpretation, but the text of each Rule is authoritative." Pa. R. Pro. Conduct Scope [21]. Rule 3.3(a)(1) does not authorize a finding of professional misconduct based on a lawyer's negligently made false statement of any stripe.

*McCarthy v. DEA*, 171 F.4th 245 (3d Cir. 2026), confirms the point. Despite publishing in this Court briefs speckled with AI-generated hallucinations, and then reiterating his misstatements in a second brief filed after they had been called out, the Court exonerated the offending lawyer of a violation of Rule 3.3(a)(1). That the lawyer had failed to conduct a "reasonably diligent inquiry" into the accuracy of his statements of fact and law did not impede his acquittal. *Id.* at 248-249.

That actual knowledge may sometimes be inferred from the circumstances better explains the decision in *Off. of Disciplinary Couns. v. Price*, 732 A.2d 599 (Pa. 1999), than reading the opinion to abridge the actual knowledge requirement of Rule 3.3(a)(1). Price's awareness of the falsity of his scandalous accusations of criminal conduct and sexual improprieties on the part of multiple judicial officers was inferable from the circumstance that he had no reason to believe that his outrageous accusations were true. *Id.* at 605. His own evidence showed that he relied entirely on "rumors, innuendo and his own perceptions" in casting his aspersions. *Id.* By contrast, Winkelman trusted her assistant supervisor, a seasoned criminal

lawyer with an exemplary record, to have conducted a thorough review of the *Wharton* facts and to have made a reasoned judgment that Wharton's ineffective assistance of counsel claim was substantial.

Besides a paralegal-prepared case summary, which was silent on the scope of the underlying review, Winkelman participated personally in multiple discussions of the DAO's Capital Case Review Committee (CCRC) led by George concerning the *Wharton* case. She also had the benefit of the documentation of George's CCRC process in general, which included reviewing the petitioner's criminal record. JA384:24-JA385:4; JA387:1-18. These circumstances did not justify an inference that Winkelman lacked a reasonable basis for believing that George's review had been careful.

In finding that Winkelman lacked "an objectively reasonable belief" that the DAO had conducted a "careful review" of *Wharton*, JA525, the panel disregarded the undisputed evidence that her belief was founded on the confidence she placed in her deputy and on her own participation in the CCRC meetings concerning *Wharton*. In finding that any ignorance on Winkelman's part "was the result of her failure to conduct the 'reasonably diligent inquiry required . . . [by Rule] 3.3(a)(1) cmt. 3," JA526, the panel substituted a negligence standard for the level of culpability that is actually required for a violation of the duty of candor.

Finally, while finding that Winkelman was "willfully blind" to George's misstatements about his review of *Wharton*, JA511, the panel failed to follow the Supreme Court's definition of the doctrine that "a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Global-Tech Appliances v. SEB S.A.*, 563 U.S. 754, 769 (2011). For the doctrine to apply, disciplinary counsel had to show that Winkelman was aware of a high probability that George had not conducted a careful review of *Wharton*, but no such showing was made.

Suspecting the existence of a DAO policy to concede all post-conviction death penalty challenges without regard to the merits, the panel also undertook to investigate other cases in which the DAO under Mr. Krasner, a publicly avowed opponent of the death penalty, had dropped opposition to a death penalty challenge. So far as can be gleaned from the R&R, the investigation did not reveal another concession to a post-conviction death penalty challenge that was legally unjustified or even arguably tainted by a misrepresentation of fact or law let alone a pattern of the same. In default of such evidence, the panel fell back on the CCRC's history of consistently recommending conceding post-conviction relief in the capital cases that it reviewed, frequently on ineffective assistance of counsel grounds.

The panel inferred from that history that the Krasner DAO had a policy of conceding every post-conviction challenge to a death penalty regardless of its validity. From that premise, the panel drew the further inference that Winkelman had a motive both to contrive a justification for the *Wharton* concession and to blind herself to anti-mitigation evidence "so that she could help implement a DAO policy she denied exists." JA528.

Because it is the crux of the professional misconduct findings, the candor violation cannot stand if it was unreasonable for the panel to draw the inferences that it did from the CCRC's consistent recommendations of death penalty relief in the cases presented to it. And for several reasons that follow it was unreasonable for the panel to infer that the DAO's ensuing concessions were routinely made in bad faith, that is, without a factual and legal foundation, and that Winkelman abetted the practice in *Wharton* knowing that the concession to Wharton's claim was unfounded:

(1) the Panel did not identify a single concession to capital sentencing relief, *Wharton* aside, that lacked a sound legal foundation or was arguably the product of a prosecutor's misrepresentation, and disciplinary counsel acknowledged that the references in his papers to an amicus brief filed by the Attorney General of Pennsylvania in *Commonwealth v. Brown*, No. 32 EM 2023 (Pa. August 15, 2024) was not competent evidence, JA415

("[J]ust to be clear, I don't think that those two briefs [filed by the Attorney General's Office] are evidence as generally submitted in court.");

(2) there is a more obvious explanation than an anti-death penalty office policy for the number and consistency of the CCRC recommendations that death penalty claims be conceded, namely, the well-documented historic inadequacies in the funding of court-appointed counsel in Philadelphia capital cases, inadequacies that largely account for the volume of capital convictions that have been judicially overturned, both before and after the advent of the Krasner administration, s*ee* Br. of Ethics Scholars as Amici Curiae Supporting Appellant Paul George and Supporting Reversal, at 18-21;

(3) if the CCRC review process was a charade and its recommendations preordained, why did the committee devote multiple meetings to a discussion of the *Wharton* claim before deciding on a recommendation to concede the claim?

(4) notwithstanding that this Court ultimately denied it, Wharton's ineffective assistance claim was not insubstantial considering that the performance prong of *Strickland* was satisfied and the prejudice prong turned on whether there was a reasonable probability that a single juror would have had a reasonable doubt

that a death penalty was warranted after weighing aggravating and mitigating evidence, including the escape attempt; and

(5) to infer that Winkelman collaborated with colleagues to implement a policy to mislead post-conviction courts, one must believe that she abandoned the values of honesty and professionalism that characterized her long career.

Without the pattern of evidence of illicit or unjustified concessions that it evidently expected to uncover, the panel was shorn of any basis for discrediting the good faith of Winkelman's misstatement regarding the DAO's pre-concession review of *Wharton* or for finding that her misstatement was made "knowingly."

Separate and apart from the insufficiency of the evidence, the panel departed from Pennsylvania law and best disciplinary practice in not requiring proof of a rule violation by the requisite degree of certainty. The panel never acknowledged that the "clear and convincing" burden of proof applies to determinations of professional misconduct, and it nowhere stated that disciplinary counsel had carried such burden. By not holding disciplinary counsel to the applicable burden of proof, the panel deprived Winkelman of the protection afforded by the clear and convincing standard, and that error requires reversal.

### C. As the DAO's Concession to Wharton's Ineffective Assistance Claim Had a Basis in Law and Fact, There was No Violation of Rule 3.1

The panel found that because it was filed without all of the anti-mitigation evidence having been found and considered, the DAO's Notice of Concession lacked a legal and factual foundation in violation of Rule 3.1. But the predicate for a violation of Rule 3.1 is the assertion of a frivolous claim, defense or issue. A concession to a post-conviction claim for relief presumably qualifies as an assertion of an issue in a proceeding, but whether the assertion is frivolous turns on the issue's intrinsic merits, not on the nature or adequacy of the investigation or analysis that led to it.

Whether informed or uninformed by knowledge of Wharton's escape attempt, the DAO's Notice of Concession had a colorable basis in law and fact. That the *Wharton* claim was far from frivolous is evidenced by Judge Goldberg's issuance of a certificate of appealability of his decision denying habeas relief. Wharton's prison records did contain evidence indicative of a positive prison adjustment, he offered expert testimony favorable to his cause, and the original penalty evidence was close enough that Wharton's 1992 resentencing jury had been deadlocked and deliberated over a period of three days before it returned the death penalty. *Wharton v. Super. Graterford SCI*, 95 F.4th 113, 123-24 (3d Cir. 2024). Although this Court decided ultimately that Wharton failed to carry his burden of establishing prejudice from his lawyer's failure to consult his prison

records for evidence of a positive prison adjustment, his claim was not devoid of merit. It was not irrational on the *Wharton* facts for a prosecutor to forbear from contesting *Strickland* prejudice, a choice that other prosecutors have seen fit to make. *See*, e.g., *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

## II. Winkelman Was Not Charged with Violating Rule 5.1(c), But She Was Effectively and Wrongly Sanctioned for Having Done So

Although Winkelman was charged solely with violations of Rules 3.3(a) and 3.1, the R&R is, in substance, an adjudication of supervisory failures that sound in Rule 5.1. The panel faulted Winkelman for not directing which cases George presented to the CCRC, for not learning what investigation George had conducted before presenting those cases, for not independently reviewing the record in *Wharton*, and for not following up with George after his omission of anti-mitigation evidence became apparent. JA513, JA517, JA529.

In sum, the panel concluded that Winkelman was "willfully blind to, and complicit in, George's misrepresentations." JA511. Each of these findings is essentially a determination that Winkelman failed in her capacity as George's supervisor, the precise conduct that Rule 5.1 was designed to address, and that Rule 5.1 alone governs. The panel erred in recharacterizing supposed failures of supervision as violations of Rules 3.1 and 3.3(a)(1).

Rule 5.1(c) limits vicarious disciplinary liability to circumstances where (1) the supervisor "orders or, with knowledge of the specific conduct, ratifies the conduct involved," or (2) the supervisor "knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action." Pa. R. Pro. Conduct 5.1(c)(1)-(2). By finding Winkelman at fault for her alleged supervisory deficiencies, the panel read Rule 5.1 into a proceeding in which a violation of that rule was not charged.

A supervisory lawyer, especially one with responsibilities as vast as Winkelman's were, is entitled to rely on a subordinate's competence and diligence, particularly where the subordinate was selected precisely for his expertise in the relevant area of practice, as George was. In the real world of practice, a supervisor is entitled to assume competence and trustworthiness on the part of subordinates in the absence of contrary indications.

## III. The Sanction Imposed on Winkelman was Inappropriate and Disproportionate

### A. The Sanction Restricting Winkelman's Right to Practice is Inconsistent with the Objectives of Lawyer Discipline and With the Criteria for Imposing Sanctions

With the precepts in mind that the ethics rules are not meant to be punitive, that like misconduct should be met with like sanctions, and that the touchstone for determining whether or to what extent

sanctions are appropriate is the lawyer's fitness to practice in light of the risk, if any, of future misconduct based on the lawyer's character and history of violations, the three-year suspension imposed on Winkelman is unwarranted and unconscionable.

The ABA has mapped commonly accepted and practiced standards for sanctions. Notably, the ABA Model Rules for Lawyer Disciplinary Enforcement carve out from the universe of professional misconduct a category of misconduct that does not warrant the sanction of disbarment or suspension. Called "lesser misconduct," it is the category that describes Winkelman's alleged misconduct. Thus,

> Lesser misconduct is conduct that does not warrant a sanction restricting the respondent's license to practice law. Conduct shall not be considered lesser misconduct if any of the following considerations apply:
>
> (1) the misconduct involves the misappropriation of funds;
> (2) the misconduct results in or is likely to result in substantial prejudice to a client or other person;
> (3) the respondent has been publicly disciplined in the last three years;
> (4) the misconduct is of the same nature as misconduct for which the respondent has been disciplined in the last five years;
> (5) the misconduct involves dishonesty, deceit, fraud, or misrepresentation by the respondent;

> (6) the misconduct constitutes a 'serious crime' as defined in Rule 19(C); or
> (7) the misconduct is part of a pattern of similar misconduct.

Model Rules for Lawyer Disciplinary Enforcement R. 9(B).

None of the seven factors that would exclude Winkelman's misstatements from the category of lesser misconduct applies in this case. Unlike Rule 8.4(c), Rule 3.3(a)(1) does not involve "dishonesty, deceit, fraud, or misrepresentation by the respondent," and Winkelman was not charged with violating Rule 8.4(c). Suspension of Winkelman for any length of time would therefore be contrary to the Model Rules.

Additional criteria are relevant to determining whether to sanction or how much to sanction an offending lawyer. Misconduct that prejudices the administration of justice may, in some circumstances, warrant the severity of suspension from the practice of law. So, too, may misconduct engaged in for a selfish motive. Neither of these criteria is triggered here.

It is settled in Pennsylvania that "inconvenience to the court as a result of an unnecessarily time-consuming review of a defective petition" does not rise to the level of actual prejudice by thwarting or interfering with the administration of justice "[a]bsent conduct violative

of the rules prohibiting deceit, dishonesty, fraud or misrepresentations." *Off. of Disciplinary Couns. v. Anonymous Att'y*, 327 A.3d 192, 208 (Pa. 2024). Again, Winkelman was not charged with a misrepresentation in violation of Rule 8.4(c), and Judge Goldberg was not deflected by the DAO's improperly justified concession to relief from holding a hearing he deemed necessary to make an independent determination of Wharton's habeas petition or from denying the petition. In these circumstances, any inconvenience to the court did not approach interference with the administration of justice.[3]

If suspension was an excessive sanction in this instance, was any sanction warranted? We think not. For one thing, Winkelman had already suffered the public humiliation of a finding that she violated Rule 11, not an insignificant punishment to a lawyer who has enjoyed the high esteem of her legal community. For another, her

[3] The DAO would have better served the habeas court by supporting its Notice of Concession with a recital of the evidence bearing on whether Wharton had been prejudiced by his lawyer's failure in 1992 to examine his prison records, but that shortcoming was not the basis of any charge against Winkelman who, in any event, had nothing to do with the Notice. JA404:5-12; JA516-517.

misstatements, we firmly believe from the evidence, were made unintentionally, a consideration that cuts against imposing sanctions.

In the words of one legal ethics scholar,

> When a lawyer's misinterpretation of a professional rule is completely inadvertent, educating the lawyer seems sufficient to protect future clients of the lawyer. Deterrence of other lawyers is unlikely to result from punishing the inadvertent offender. When, in contrast, self-interest or character flaws contribute to the lawyer's misinterpretation of a rule, it becomes more reasonable to consider whether the lawyer should be prevented from practicing further[.]

Fred C. Zacharias, *The Purpose of Lawyer Discipline*, 45 Wm. & Mary L. Rev. 675, 710 (2003) (citation modified).

If sanctions were justified, Rule 6.14 of the Model Rules for Lawyer Disciplinary Enforcement provides relevant guidance: When a lawyer "engages in an isolated instance of neglect in determining whether submitted statements or documents are false," the appropriate sanction is "admonition."

### B. Disciplinary Precedent of Prosecutors Acting in Their Official Capacity Does Not Support a Three-Year Suspension

Winkelman's alleged misstatements to the court arose in a single proceeding; she did not knowingly mislead the court nor impair the administration of justice; she accepted responsibility and

drove reforms; and she has nearly 40 years of unblemished practice. While Winkelman was acting in her official capacity as a prosecutor, which is an aggravating factor, we know of no three-year suspension or a sanction of comparable severity that has been imposed in Pennsylvania for a single instance of unintentional prosecutorial misconduct in violation of Rules 3.1 or 3.3.

Apart from Paul George, only four Pennsylvania prosecutors to our knowledge have ever been disbarred or suspended for abuse of their office, and the misconduct of all four was qualitatively different, much more egregious, and, unlike Winkelman's misstatements in a single case, injurious to others and prejudicial to the administration of justice. *See Off. of Disciplinary Couns. v. Childers-Potts*, 25 DB 2024 (D. Bd. Rpt. 6/4/2024) (S. Ct. Order 7/16/2024) (Pa. 2024) (two-year suspension on consent for prosecutor who deprived criminal defendants of liberty and due process by unjustifiably delaying trials and DNA testing that ultimately exonerated the defendant in violation of Rules 1.1, 1.3, 3.1, 3.2, and 8.4(d)); *Off. of Disciplinary Couns. v. Fina*, 225 A.3d 568, 572-73 (Pa. 2020) (Wecht, J. concurring) (chief of the criminal division of the Attorney General's Office suspended for a year and a day for issuing

a grand jury subpoena to a lawyer without judicial authorization in violation of Rule 3.10 and for lying to and misleading the supervising judge); *Off. of Disciplinary Couns. v. Miller*, 32 DB 2017 (D. Bd. Rpt. 12/16/2018) (S. Ct. Order 2/8/2019) (Pa. 2019) (prosecutor suspended for a year and one day for repeatedly engaging in ex parte communications with judges and having her staff create a phony Facebook account for investigative purposes); *Off. of Disciplinary Couns. v. Carbone*, 71 DB 2014 (D. Bd. Rpt. 6/17/2015) (S. Ct. Order 8/12/2015) (Pa. 2015) (prosecutor disbarred after refusing to participate in the disciplinary process that established his repeated misconduct in multiple cases over several years in violation of court orders and that caused multiple convictions to be overturned).

Pennsylvania prosecutors found to have violated multiple rules including Rule 3.3(a)(1) have been privately disciplined. *See* Br. of Ethics Scholars, *supra,* at 25-26.

### C. The Three-Year Suspension Imposed on Winkelman Does Not Align with Sanctions Imposed in Pennsylvania for Misconduct by Lawyers Other Than Prosecutors

Besides comparing sanctions imposed on Pennsylvania prosecutors, it is instructive to compare Winkelman's misstatements in

a single case to the misconduct that has been found to justify lengthy suspensions of Pennsylvania lawyers. Our survey revealed that suspensions of three years or more have been reserved exclusively for the most egregious attorney misconduct, whereas more lenient sanctions have been imposed for misconduct far more serious than that attributed to Winkelman. *See, e.g.*:

- *Off. of Disciplinary Couns. v. Allen,* 190 DB 2020 (D. Bd. Rpt. 1/31/2022) (S. Ct. Order 4/14/2022) (Pa. 2022) (Allen received a two-year suspension because he failed to timely file claims in five separate cases, kept client money in improper accounts, misled clients about costs, and failed to appear for clients, including an intellectually and developmentally disabled client);
- *Off. of Disciplinary Couns. v. Barbin,* 97 DB 2020 (D. Bd. Rpt. 9/30/2021) (S. Ct. Order 11/18/2021) (Pa. 2021) (Barbin received an eighteen-month suspension because he missed filing deadlines, failed to appear at hearings, failed to communicate with clients and other attorneys, filed frivolous litigation and made false statements to the tribunal, threatened to withdraw representation from a *pro bono* client on the grounds that his representation was free; had received prior discipline and showed no remorse);

- *Off. of Disciplinary Couns. v. Csonka* 89 DB 2023 (D. Bd. Rpt. 10/3/2023) (S. Ct. Order 11/9/2023) (Pa. 2023) (Csonka received a one-year suspension on consent because he filed false applications in at least six bankruptcy cases, failed to timely file complete and accurate bankruptcy schedules and statement of financial affairs, and had a prior discipline history).
- *Off. of Disciplinary Couns. v. Heyburn,* 58 DB 2020 (D. Bd. Rpt. 4/28/2021) (S. Ct. Order 6/22/2021) (Pa. 2021) (Heyburn received a three-year suspension after making knowing false statements in a pro hac vice motion, concealing prior discipline and a suspended Pennsylvania license, and having had two opportunities to correct the filings. Heyburn had a history of prior discipline and failed to respond to the disciplinary investigation);
- *Off. of Disciplinary Couns. v. Marshall,* 136 DB 2019 (D. Bd. Rpt. 10/16/2020) (S. Ct. Order 2/12/2021) (Pa. 2021) (Marshall received a thirty-month suspension because he took client payment for a bankruptcy filing, told clients that the bankruptcy petition had been filed when it had not, misled clients as to what services their payments covered, harassed clients for payments, and had a prior discipline history).

We know of no Pennsylvania case in which misstatements in violation of Rules 3.1 or 3.3(a)(1) alone have been deemed to warrant suspension, and private discipline is common. *See* Br. of Ethics Scholars, *supra,* at 29-30. Thus, by every conceivable measure, the three-year suspension imposed on Winkelman was disproportionate to her alleged offense.

### D. A Proper Accounting of Mitigating Factors Precludes a Determination That Winkelman is Unfit to Practice or Poses a Risk of Repeated Misconduct

The Brief for Appellant supplies the mitigating factor information that the R&R did not include. *See* Br. for Appellant at 5-8. Winkelman's long and distinguished career, the honors bestowed upon her, and her services to the community, to the legal profession generally, and to this Court specifically are all attested to in the many letters submitted to the panel attesting to her good character. JA328-54. Her single act of neglect is surely mitigated by her irreproachable professional history, which dispels the need for professional discipline, let alone for a sanction as punitive as that imposed by the District Court. Far from protecting the public from an unfit lawyer, the sanction has the effect of depriving the public of the services of an admirable one, while working a grave injustice on a lawyer who made a mistake.

## Conclusion

For all these reasons, Amici urge that the order of the District Court suspending Nancy Winkelman from practice before the District Court for a period of three years be reversed and that the charge of professional misconduct be dismissed.

Respectfully submitted,

Dated: August 27, 2026

*/s/ Michael A. Schwartz*
DAVID RICHMAN (PA. 4179)
MICHAEL A. SCHWARTZ (PA. 60234)
SEAN M. CRAIG (PA. 331672)
TROUTMAN PEPPER LOCKE LLP
3000 Two Logan Square
Philadelphia, PA 19103
215-981-4000
*David.Richman@troutman.com*
*Michael.Schwartz@troutman.com*
*Sean.Craig@troutman.com*

## Certifications

1. <u>Bar Membership</u>

I hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2. <u>Certificate of Compliance with Rules 29 and 32(a) and LAR 31.1(c)</u>

This brief complies with the type volume, typeface, and typestyle requirements of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(5) and (6), because it contains 6,417 words, exclusive of the cover, tables, and certificates, and has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century Schoolbook font.

In accordance with Third Circuit LAR 31.1(c), I certify that the text of the electronic brief is identical to the text of the paper copies being filed. I further certify that the electronic submission was subjected to a virus scan using Microsoft Defender.

3. <u>Certificate of Service</u>

I hereby certify that, on August 27, 2026, a true and correct copy of this document was served on counsel of record through the Court's CM/ECF system.

Dated: August 27, 2026

*<u>/s/ Michael A. Schwartz</u>*
Michael A. Schwartz