No. 26-1798

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

*In re: Nancy Winkelman*

ON APPEAL FROM THE ORDER ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA IN NO. 2:22-MC-00051 APPROVING THE REPORT AND RECOMMENDATION OF THE DISCIPLINARY PANEL AND SUSPENDING NANCY WINKELMAN

# ANSWERING BRIEF OF APPELLEE

Alfred W. Putnam, Jr. (Pa. No. 28621)
Renée M. Dudek (Pa. No. 325368)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
(215) 988-2700 (telephone) / (215) 988-2757 (facsimile)
alfred.putnam@faegredrinker.com
renee.dudek@faegredrinker.com

*Counsel for the*
*U.S. District Court for the Eastern District of Pennsylvania*

## CORPORATE DISCLOSURE STATEMENT

Appellee the United States District Court for the Eastern District of Pennsylvania is a governmental entity that does not have a parent company or stock; accordingly, no public company holds more than 10% of its stock.

# TABLE OF CONTENTS

**Page(s)**


JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF RELATED CASES AND PROCEEDINGS ........ 2

COUNTER-STATEMENT OF THE ISSUES ........ 3

SUMMARY OF ARGUMENT ........ 3

STANDARD AND SCOPE OF REVIEW ........ 6

COUNTER-STATEMENT OF THE CASE ........ 7

A. Procedural History ........ 7

B. Counter-Statement of Facts ........ 11

1. The DAO's legal position on concessions prior to the Pennsylvania Supreme Court's decision in *Brown I* ........ 13

2. The DAO's post-*Brown I* process for deciding to concede on the merits of post-conviction relief claims ........ 14

3. This Court's remand on Mr. Wharton's claim ........ 16

4. The CCRC recommends, and the DAO approves, conceding relief on Mr. Wharton's claim without reviewing any anti-mitigation evidence ........ 17

5. The DAO tells Judge Goldberg that he does not need to hold a hearing because he can rely on the careful process the DAO used in evaluating the merits of Mr. Wharton's claim ........ 20

6. The OAG's discovery of Mr. Wharton's attempted prison escape ........ 22

7. Ms. Winkelman tries to stop the OAG from participating in the evidentiary hearing ........ 24

8. Ms. Winkelman's defense of her conduct—first before Judge Goldberg and then before the disciplinary panel ........ 26

ARGUMENT ........ 30

I. MS. WINKELMAN'S REPRESENTATIONS TO JUDGE GOLDBERG ABOUT THE THOROUGHNESS OF HER

OFFICE'S REVIEW OF MR. WHARTON'S PRISON RECORD VIOLATED DISCIPLINARY RULE 3.3 ........................ 32

II. THE DISTRICT COURT DID NOT ERR IN CONCLUDING THAT MS. WINKELMAN'S ARGUMENT THAT JUDGE GOLDBERG COULD AND SHOULD DEFER TO THE DAO'S DETERMINATION ON THE MERITS OF MR. WHARTON'S ADJUSTMENT TO PRISON CLAIM WAS A VIOLATION OF RULE 3.1 ........................ 41

III. THE PROCESS THE DISTRICT COURT USES TO ADJUDICATE CASES IS SIMILAR TO THAT USED BY OTHER DISTRICT COURTS, AND MS. WINKELMAN WAS AFFORDED A FAIR HEARING CONSISTENT WITH DUE PROCESS ........................ 44

IV. SEVERAL OF THE ARGUMENTS ADVANCED BY THE *AMICI* ARE UNTETHERED TO THE FACTS OF THE CASE ... 50

CONCLUSION ........................ 54

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adams v. Ford Motor Co.*,
653 F.3d 299 (3d Cir. 2011) .................... 6

*In re Att'y Discipline Matter*,
98 F.3d 1082 (8th Cir. 1996) .................... 32

*In re Barach*,
540 F.3d 82 (1st Cir. 2008) .................... 32

*Commonwealth v. Brown*,
196 A.3d 130 (Pa. 2018) .................... 13, 14, 15, 21

*Commonwealth v. Brown*,
358 A.3d 469 (Pa. 2026) .................... 12

*In re Doherty*,
No. 21-1258, 2021 WL 5190865 (3d Cir. Nov. 9, 2021) .................... 6

*In re George*,
25-3264 (3d Cir. Apr. 30, 2026), Dkt. 41 .................... 48

*Johnson v. Superintendent, Mahanoy SCI*,
144 F.4th 178 (3d Cir. 2025) .................... 12, 38

*In re Justice*,
No. 20-5479, 2021 WL 3808965 (6th Cir. Aug. 26, 2021) .................... 32

*In re Malofiy*,
758 F. App'x 264 (3d Cir. 2018) .................... 6, 7

*Mar. Elec. Co. v. United Jersey Bank*,
959 F.2d 1194 (3d Cir. 1991) .................... 46

*McCann v. Newman Irrevocable Tr.*,
458 F.3d 281 (3d Cir. 2006) .................... 30

*McCarthy v. DEA*,
171 F.4th 245 (3d Cir. 2026) .................... 53, 54

*Off. of Disciplinary Couns. v. Anonymous Att'y*,
331 A.3d 523 (Pa. 2025) .................................................................. 31

*Off. of Disciplinary Couns. v. Anonymous Att'y A*,
714 A.2d 402 (Pa. 1998) .................................................................. 37

*Off. Of Disciplinary Couns. v. Price*,
732 A.2d 599 (Pa. 1999) .............................................................. 31, 37

*Off. of Disciplinary Couns. v. Surrick*,
749 A.2d 441 (Pa. 2000) .................................................................. 37

*Polselli v. Nationwide Mut. Fire Ins. Co.*,
23 F.3d 747 (3d Cir. 1994) ............................................................... 30

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*,
181 F.3d 410 (3d Cir. 1999) ............................................................. 46

*Selkridge v. United of Omaha Life Ins. Co.*,
360 F.3d 155 (3d Cir. 2004) ............................................................. 45

*Strickland v. Washington*,
466 U.S. 668 (1984) ................................................................ 5, 9, 29, 41

*In re Surrick*,
338 F.3d 224 (3d Cir. 2003) ....................................................... *passim*

*Tsirelman v. Daines*,
794 F.3d 310 (2d Cir. 2015) ............................................................. 32

*United States v. Price*,
558 F.3d 270 (3d Cir. 2009) ............................................................... 7

*Wharton v. Superintendent Graterford SCI*,
95 F.4th 113 (3d Cir. 2024) ........................................................... 2, 10

*Wharton v. Superintendent Graterford SCI*,
95 F.4th 140 (3d Cir. 2024) ....................................................... *passim*

*Wharton v. Vaughn*,
722 F. App'x 268 (3d Cir. 2018) ................................................ *passim*

*Wharton v. Vaughn*,
No. 01-cv-06049, 2022 WL 1488038 (E.D. Pa. May 11, 2022) ........ 10, 23

**Statutes, Rules & Regulations**

28 U.S.C. § 1291 ........ 1

28 U.S.C. § 2241(a) ........ 1

D. Del. R. 83.6 ........ 49

D.N.J. Civ. R. 104.1(e)(11) ........ 49

Fed. R. Civ. P. 11 ........ *passim*

L. Civ. R. 83.6 ........ 10, 30

M.D. Pa. L. R. 83.24.4 ........ 49

Pa. R.P.C. 3.1 ........ *passim*

Pa. R.P.C. 3.3 ........ *passim*

Pa. R.P.C. 5.1 ........ 40, 41, 50, 51

Pa. R.P.C. 8.4 ........ 40, 41

S.D.N.Y. L. Civ. R. 1.5 ........ 49

W.D. Pa. Civ. R. 83.3(B)(4) ........ 49

## **JURISDICTIONAL STATEMENT**

The District Court had subject-matter jurisdiction under 28 U.S.C. § 2241(a). *In re Surrick*, 338 F.3d 224, 229 (3d Cir. 2003) ("The District Court has the inherent authority to set requirements for admission to its bar and to discipline attorneys who appear before it."). This Court has jurisdiction to hear an appeal from a final order imposing discipline under 28 U.S.C. § 1291.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

The disciplinary order in this case has not previously been before this Court. There is a disciplinary order in a related case that is before this Court at *In re: Paul M. George*, 25-3264 (appeal of district court docket *In re: Paul M. George*, 2:22-MC-00050-PD). That case has been fully briefed and, because the two cases involve the same facts and law, many parts of this brief repeat argument made in the *George* brief.

The subject matter at issue in these two disciplinary orders was previously before this Court on an appeal from an order imposing sanctions under Federal Rule of Civil Procedure 11. *Wharton v. Superintendent Graterford SCI* ("***Wharton III***"), 95 F.4th 140 (3d Cir. 2024); *see also Wharton v. Superintendent Graterford SCI* ("***Wharton II***"), 95 F.4th 113 (3d Cir. 2024) (appeal in underlying habeas corpus case); *Wharton v. Vaughn* ("***Wharton I***"), 722 F. App'x 268 (3d Cir. 2018) (per curiam) (same).

## COUNTER-STATEMENT OF THE ISSUES

1. Did Ms. Winkelman's false representations to Judge Goldberg about what her office had done to evaluate the merits of Mr. Wharton's remaining habeas claim violate Rule 3.3?

*Suggested answer: Yes.*

2. Did Ms. Winkelman violate Rule 3.1 when she told Judge Goldberg that he could defer to her office's determination on the merits of Mr. Wharton's remaining habeas claim?

*Suggested answer: Yes.*

3. Was Ms. Winkelman given a fair hearing below consistent with the requirements of the due process clause?

*Suggested answer: Yes.*

## SUMMARY OF ARGUMENT

This is an appeal from a decision by the United States District Court for the Eastern District of Pennsylvania suspending the Appellant, Nancy Winkelman, from practicing before that court for three years because she made misrepresentations of fact and law to the court. Decisions regarding the admission or discipline of lawyers appearing before a court are within the inherent authority of that court

and should not be disturbed absent an erroneous view of the law or a clearly erroneous assessment of the evidence.

The disciplinary panel found that Nancy Winkelman participated in the DAO's effort to mislead Judge Goldberg about the investigation the DAO had conducted into the merits of Mr. Wharton's remaining habeas corpus claim. She did so in the hope that she could induce the court into approving the DAO's concession on that claim without conducting a hearing of its own. This was entirely consistent with the DAO's longstanding policy and practice of conceding post-conviction relief in capital cases. The disciplinary panel found this as well. None of these factual findings can be said to constitute "clear error." Indeed, it is hard to see how the panel could have come to any other conclusion. The fact is that Ms. Winkelman and her colleagues had not even checked Mr. Wharton's prison record and did not even know what it was. And, as Ms. Winkelman herself conceded, she was unaware of any instance in which her office had defended a death penalty verdict.

Ms. Winkelman argues on appeal that even if her representations to the court were false, they were not made "knowingly"—that is, that she reasonably believed they were true when made. The disciplinary

panel did not credit this testimony. Moreover, because her representations were made not only about Mr. Wharton but more specifically about what she and her office had done to evaluate his claim, they were made "knowingly" under Rule 3.3 if she had failed to conduct a reasonable inquiry into their basis in fact, which she had not done. And insofar as Ms. Winkelman now attempts to shift to Mr. George the blame for the DAO's failure to conduct a comprehensive investigation, the fact is that she did not advance this explanation for her conduct below, and the panel's findings contradict it.

Ms. Winkelman also argues that she cannot be said to have violated Rule 3.1 because Mr. Wharton's *Strickland* claim, even if ultimately deemed to be meritless, could not be said to be "frivolous." She misses the point. It was not Mr. Wharton's substantive claim that violated Rule 3.1. It was her own argument that Judge Goldberg should defer to her office's concession on that claim even though no competent evaluation of the claim had been done. That argument was unquestionably frivolous. Nor was it her only violation of Rule 3.1.

Finally, Ms. Winkelman, like Mr. George, complains about the process she was afforded below. That complaint is meritless as is her

suggestion that the three members of the disciplinary panel should have been excluded from the full court's decision on her case. The district court's process is entirely consistent with the process used in other district courts, and Disciplinary Counsel has been unable to find any district court that has adopted the quasi-appellate procedure suggested by Ms. Winkelman here.

## STANDARD AND SCOPE OF REVIEW

The district court "has the inherent authority to set requirements for admission to its bar and to discipline attorneys who appear before it." *In re Doherty*, No. 21-1258, 2021 WL 5190865, at *2 (3d Cir. Nov. 9, 2021) (quoting *Surrick*, 338 F.3d at 229). This Court "review[s] district courts' decisions regarding the regulation of attorneys who appear before them for abuse of discretion." *Id.*

When that discretion is based upon the district court's factual findings, this Court reviews those findings only for clear error. *Id.* (citing *Adams v. Ford Motor Co.*, 653 F.3d 299, 304 (3d Cir. 2011)). Clear error review applies to credibility determinations because they are "purely factual." *In re Malofiy*, 758 F. App'x 264, 267 (3d Cir. 2018). Here, both Judge Goldberg and the three-judge disciplinary panel held

hearings and assessed Ms. Winkelman's credibility on that basis. This Court asks only whether the district court's "account of the evidence is plausible in light of the record viewed in its entirety." *Id.* (quoting *United States v. Price*, 558 F.3d 270, 277 (3d Cir. 2009)). This Court does not reverse in such a case even if it would have weighed the evidence differently if it had been the trier of fact. *Id.*

## COUNTER-STATEMENT OF THE CASE

### A. Procedural History

This Court remanded Mr. Wharton's habeas corpus case on January 11, 2018, instructing the district court to consider a single issue: whether Mr. Wharton's trial counsel had been ineffective because he did not present evidence of Mr. Wharton's prison record as a mitigating factor for the jury to consider in the penalty phase of Mr. Wharton's murder trial. In addressing this issue, this Court told the district court (the Honorable Mitchell S. Goldberg) to "reconstruct the record and assess it anew" and that it could not "merely consider the mitigation evidence that went unmentioned in the first instance" but should also "take account of the anti-mitigation evidence that the

Commonwealth would have presented to rebut the petitioner's mitigation testimony." *Wharton I*, 722 F. App'x at 282–83.

Ten months after the remand, the Philadelphia District Attorney's Office ("***DAO***") decided that Mr. Wharton's ineffective assistance of counsel claim was "not lacking in merit," (JA605; *see also* JA517–18; JA598 ¶ 9) and, in February of 2019, it filed a "Notice of Concession" informing Judge Goldberg that the DAO agreed with Mr. Wharton "[f]ollowing review of [his] case by [the DAO's Capital Case Review Committee ("***CCRC***")], communication with the victims' family, and notice to [Mr. Wharton's] counsel[.]" JA598 ¶ 9. Two days later, the DAO and Mr. Wharton's counsel submitted a joint proposed order asking Judge Goldberg to state that he was granting death penalty relief "upon a careful and independent review of all parties' submissions and all prior proceedings in this matter." JA602.

Aware that he himself had not conducted any such careful and independent review of the record and, indeed, that he had not been provided with any facts or analysis explaining the DAO's decision to concede, Judge Goldberg declined to sign the proffered order, but he did give the DAO an opportunity to justify its concession. In response,

Ms. Winkelman filed a supplemental brief in which she assured the court that the DAO had "carefully reviewed the facts and law and determined that Wharton's ineffectiveness claim fulfill[ed] the criteria articulated in *Strickland v. Washington*, 466 U.S. 668 (1984)." JA605. She also told Judge Goldberg that while the district court was not obliged to defer to the DAO's "careful[] review[] [of] the facts and the law," his colleagues on the district court had frequently done so in the past, and deference to the DAO's judgment was entirely appropriate such that the court could sign the order in reliance on what the DAO had done. JA605–07.

Judge Goldberg still declined to do so and, instead, concluded that he would need to hold a hearing on the subject. He also appointed the Pennsylvania Attorney General's Office ("***OAG***") to research the matter and participate as *amicus curiae*. JA613. The OAG looked into Mr. Wharton's prison record and found significant anti-mitigation evidence, including a violent escape attempt and several prison misconducts. Thereafter, Judge Goldberg, over the DAO's objection, permitted the OAG to call and cross-examine witnesses at evidentiary hearings that lasted five days. *See* JA669–952; Transcripts, *Wharton v.*

*Vaughn*, No. 1-cv-06049-MSG (E.D. Pa.), Dkts. 238, 250, 267, 275. Having heard evidence submitted by both the DAO and the OAG, Judge Goldberg ultimately denied Mr. Wharton's ineffective assistance of counsel claim. *Wharton v. Vaughn*, No. 01-cv-06049, 2022 WL 1488038, at *1 (E.D. Pa. May 11, 2022). That holding was subsequently affirmed by this Court. *Wharton II*, 95 F.4th at 127.

Judge Goldberg also questioned the propriety of Ms. Winkelman's conduct in making certain representations to the court. After conducting a sanctions hearing, JA955–1058, he concluded that Ms. Winkelman had violated Federal Rule of Civil Procedure 11 when she told the court that the DAO had conducted a careful review of the facts and law, and that the court could rely upon that review. Judge Goldberg also found that Ms. Winkelman's representations regarding the DAO's communications with the victims' family were misleading and a violation of the rule. Judge Goldberg's Rule 11 sanctions were subsequently affirmed by this Court. *Wharton III*, 95 F.4th at 151.

As contemplated by the district court's local rules, *see* L. Civ. R. 83.6 § V(B), Judge Goldberg referred the question whether Ms. Winkelman should be disciplined for her conduct to the Chief Judge

who, in turn, appointed Disciplinary Counsel and referred the case to a panel of three judges of the court. JA5; JA521. Disciplinary Counsel duly filed a Rule to Show Cause why Ms. Winkelman should not be disciplined for violations of Pennsylvania Rules of Professional Conduct 3.1 and 3.3. JA13–27. The DAO responded, and the disciplinary panel conducted a series of hearings after which it sent an R&R to the whole court. JA510–31. The whole court met and ultimately decided to accept and adopt the R&R. JA4. Ms. Winkelman appeals that order.

### B. Counter-Statement of Facts

The gravamen of the disciplinary complaint against Ms. Winkelman and Mr. George is that they attempted to induce Judge Goldberg to sign an order by misrepresenting what their office had done in evaluating the merits of Mr. Wharton's remaining habeas claim. This Court has already upheld Judge Goldberg's finding that Ms. Winkelman and Mr. George did in fact make false representations about the DAO's supposedly "careful" review of the record in the case when it affirmed the imposition of Rule 11 sanctions on that basis. *Wharton III*, 95 F.4th at 140. It has also said that the DAO's concessions appeared to arise out of an office policy to concede in capital cases rather than an objective

evaluation of the merits of each case. *See Johnson v. Superintendent, Mahanoy SCI*, 144 F.4th 178, 187 (3d Cir. 2025).[1]

The Supreme Court of Pennsylvania came to the exact same conclusion earlier this year in *Commonwealth v. Brown* ("***Brown II***"), 358 A.3d 469, 477 (Pa. 2026).[2] And the district court found the same below. JA511 (R&R 1).

---

[1] This Court held in *Johnson* that the DAO's policy was to concede death penalty relief and that it effectuated that policy in a manner designed to evade judicial review of the merits, stating:

> The DA's office's did not just confess error, . . . . It also sought to evade judicial review of its own confession by waiving its defenses. . . . Johnson's case is one in a striking pattern of state-court murder convictions that have been overturned in recent years using similar alleged stratagems. Since 2018, more than 100 convictions have been overturned via post-conviction concessions from the Philadelphia DA, untested by the adversarial process.

144 F.4th at 187.

[2] The Pennsylvania Supreme Court was so troubled by the DAO's concession policy that it not only reversed the PCRA court's grant of a new trial, it also held "that in any PCRA case in which the DAO concedes relief, the PCRA court shall grant the Office of Attorney General (OAG) notice and the right to intervene in the case before ruling on the concession." *Brown II*, 358 A.3d at 477.

### 1. The DAO's legal position on concessions prior to the Pennsylvania Supreme Court's decision in *Brown I*

To understand the nature and scope of the DAO's handling of capital cases, it is necessary to go back to the position the DAO took shortly after the present District Attorney took office. Prior to the Pennsylvania Supreme Court's opinion in *Commonwealth v. Brown* ("***Brown I***"), 196 A.3d 130 (Pa. 2018), the DAO took the position that it had the unilateral power to concede on the merits of a prisoner's challenge to a death penalty conviction. In *Brown I*, the DAO had conceded death penalty relief and jointly moved with Lavar Brown's counsel to remand so that his death sentence could be vacated on ineffectiveness grounds. *Id.* at 141–42. The DAO argued, in a brief written by Paul George, who was supervised by Ms. Winkelman, that the Court was required to defer to the DAO's decision to concede death penalty relief because a "wide grant of prosecutorial discretion" empowered the DAO "to decide whether to seek or continue to seek the death penalty in view of the facts of any particular case" and that a court may not "second-guess legitimate exercises of prosecutorial discretion." *Id.* at 142–43.

The Pennsylvania Supreme Court rejected the DAO's argument, reasoning that although the DAO had wide discretion in deciding "whether the Commonwealth will seek the death penalty," "[a]fter trial and the entry of a capital verdict, . . . a district attorney's discretion narrows significantly. . . . Prosecutorial discretion provides no power to instruct a court to undo the verdict without all necessary and appropriate judicial review." *Id.* at 145–46. The Court held that a "district attorney's concession of error is not a substitute for independent judicial review." *Id. Brown I* further held that "neither the parties, by agreement, nor this Court, absent a finding of legal error, have the power or ability to order that the jury's verdict be commuted to a life sentence without parole." *Id.* at 144. Thus, after *Brown I*, the DAO's unilateral decision to concede on post-conviction relief could not be said to be dispositive, and an appropriate review of the facts relating to a concession decision was required.

### 2. The DAO's post-*Brown I* process for deciding to concede on the merits of post-conviction relief claims

After *Brown I* was argued but before the opinion was issued, the DAO created a Capital Case Review Committee ("***CCRC***") to which it

referred post-conviction capital cases.[3] The CCRC consisted of the District Attorney, Ms. Winkelman, Mr. George, the Chiefs of Homicide and the Conviction Integrity Unit, and the Victim Witness Coordinator. JA512. It met weekly, but no minutes were kept. *Id.*; JA374:5–7; JA305–06; *see also* JA1027:14–19. Mr. George selected cases for the CCRC's consideration. JA513. Ms. Winkelman supervised Mr. George. *Id.* Typically she did no factual review herself beyond considering the memorandum that Mr. George prepared for each case. *Id.* In the present case, she testified that she believed that if Mr. George or his paralegal had reviewed or was aware of anti-mitigation evidence, it would be in the memorandum they prepared. JA438:23–JA439:1; *see also* JA419-20; JA402:23–JA403:11.

The DAO relied on the CCRC's recommendations in conceding death penalty challenges, and it turned out that in every case the CCRC considered, it invariably recommended that the office should concede death penalty relief. JA513–14. Ms. Winkelman agreed with all of those

[3] *Compare Brown I*, 196 A.3d at 130 (*Brown I* was submitted on September 29, 2017 and decided on October 17, 2018), *with* JA512 (the CCRC was created in the spring of 2018).

recommendations. *Id.* And all were approved by the District Attorney, who was himself a member of the CCRC. JA402:23–JA403:2; JA374:24–JA375:1; *see also* JA121:20–21. There is no record of the CCRC ever coming out the other way and recommending that the DAO should defend a verdict in a post-conviction capital case.

#### 3. This Court's remand on Mr. Wharton's claim

The only remaining habeas claim in Mr. Wharton's case after this Court remanded it to the district court was whether Mr. Wharton's counsel had been ineffective because he had failed to introduce evidence of Mr. Wharton's adjustment to prison as a mitigating factor for the jury to evaluate when considering the imposition of the death penalty.

In order to determine the merits of this one remaining claim, this Court expressly directed the district court to consider, on remand, not only whatever mitigation evidence had gone unmentioned in the first instance, but also to take into account whatever anti-mitigation evidence regarding Mr. Wharton's adjustment to prison that the Commonwealth would have presented to rebut Mr. Wharton's mitigation argument. *Wharton I*, 722 F. App'x at 282–83. In this regard,

this Court specifically noted that Wharton's prison records showed some "very serious misconducts." *Id.* at 283 n.21.

Ms. Winkelman was familiar with this Court's remand order, which she considered to be "unusual" —even unique insofar as it was the only case, to her knowledge, in which this court had expressly directed the District Court to consider specifically identified evidence on remand. JA431:3–14; *see also* JA427:17–JA428:7 (Ms. Winkelman testifying that this Court remanded for an evidentiary hearing to develop anti-mitigation evidence).

#### 4. The CCRC recommends, and the DAO approves, conceding relief on Mr. Wharton's claim without reviewing any anti-mitigation evidence

After remand, the DAO referred the *Wharton* case to the CCRC. But the CCRC was presented with a less than candid review of the facts relevant to Mr. Wharton's claim. In particular, the November 26, 2018 memo submitted to the CCRC on the issue of "[w]hether to pursue capital punishment" in the *Wharton* case, JA538; JA322, told the CCRC that Mr. Wharton had "remained on Graterford's death row for twenty-six years and in that time ha[d] remained a model prisoner." JA326. The memo also cited favorable evidence ostensibly supporting

Mr. Wharton's "[e]xemplary conduct in prison." *Id.* The source of this favorable information was evidently Mr. Wharton's own counsel—and not anyone within the DAO. JA611–12 ¶ 7.

It is undisputed that the memo did not disclose to the CCRC any negative evidence about Mr. Wharton's behavior in prison and did not even mention the anti-mitigation evidence referred to in this Court's remand opinion. JA321–27; JA420:6–12; JA422:3–12.[4] It is also undisputed that neither Ms. Winkelman nor anyone else at the DAO's office had checked to see what Mr. Wharton's prison record actually was. JA517; JA519. Judge Goldberg would later express some concern that the DAO had apparently accepted the information offered by Mr. Wharton's counsel "at face value without exploring whether contrary views [might] be viable and worth considering." JA611–12 ¶ 7. And Ms. Winkelman would, in fact, admit before Judge Goldberg that

[4] While Mr. George testified that he had reviewed the briefs and opinions in the file (which did disclose anti-mitigation evidence), he did not include any of that evidence in his memorandum to the CCRC, nor did he testify that he provided it to the CCRC at a subsequent meeting. Ms. Winkelman had no recollection of anti-mitigation evidence being discussed at a CCRC meeting, *see* JA420:6–12; JA422:10–12, although she may have discussed such evidence with Mr. Krasner after learning of Mr. Wharton's violent attempt to escape from prison. *See* JA129:7–19.

anti-mitigation evidence was "all over the records." JA404:3–7. *See also Wharton I*, 722 F. App'x at 282–83 & n.21 (noting Wharton's prison records showed some "very serious misconducts."); *Wharton III*, 95 F.4th at 149–51 ("Although we told Appellants to look beyond the record and suggested where to do so, they never did.") (affirming Rule 11 sanctions).

Ms. Winkelman, as a member of the CCRC, attended the meeting held on November 26, 2018 about the *Wharton* case and did not herself tell the CCRC that there was any anti-mitigation evidence to consider or that the Court of Appeals had specifically identified such evidence in instructing the District Court what it had to consider in evaluating Mr. Wharton's remaining claim. JA425:10–JA426:12. Nor does she remember anyone else at the meeting saying anything about anti-mitigation evidence. JA420:6–12; JA422:3–12. Nor is there any evidence of record that the CCRC ever considered anti-mitigation evidence at any point in evaluating Mr. Wharton's claim. *See* JA425:10–JA426:12; JA398:6–22; JA402:23–JA403:18; JA431:15–24.[5]

[5] At a later stage of the proceeding, Ms. Winkelman asserted that the CCRC had been provided with anti-mitigation evidence. *See* n.7, *infra*. But neither she nor Mr. George previously testified to that effect, and the

### 5. The DAO tells Judge Goldberg that he does not need to hold a hearing because he can rely on the careful process the DAO used in evaluating the merits of Mr. Wharton's claim

At the time Ms. Winkelman and her office told Judge Goldberg that he could sign the DAO's proposed order, she knew that Judge Goldberg had not himself conducted a careful and independent review of the record and, indeed, she did not necessarily expect that he would. JA422:17–JA426:12; JA527. Ms. Winkelman also knew that the Pennsylvania Supreme Court had held in *Brown I* that ***someone*** had to

---

disciplinary panel did not believe that it was true. *See* JA511; JA516-17. And the record is clear that Ms. Winkelman was well aware that Mr. George was ***not*** telling the CCRC the truth about Mr. Wharton's prison record. When the CCRC met to consider the case, Mr. George reported that Mr. Wharton had been a "model prisoner" for the previous 26 years. Ms. Winkelman knew that that wasn't true. After all, this Court had expressly noted, on remand, that his prison record included instances of serious misconduct, *Wharton I*, 722 F. App'x at 283 n.21, none of which were included in the memorandum Mr. George circulated to the CCRC. In fact, the source for the facts in that memorandum was not anyone at the DAO—it was Mr. Wharton's defense counsel and/or representatives of the Innocence Project. And Ms. Winkelman surely knew at the time that she could not reasonably rely on that source for a balanced recitation of the facts of the case. Nevertheless, she sat through the meeting and never raised the anti-mitigation evidence that she knew this Court had ordered the District Court to consider on remand. Worse, a few months later, Ms. Winkelman was a willing participant in the DAO's effort to convince Judge Goldberg to accept her office's concession on Mr. Wharton's remaining habeas claim. She did not assert that she took this position because she had been fooled by Mr. George.

conduct such an independent review before the proposed relief could be granted. JA424:23–JA425:1. Even so, she cited pre-*Brown I* authority for the proposition that Judge Goldberg did not need to hold a hearing but could and should defer to the DAO's own judgment on this issue. JA15–16 ¶¶ 8–9; JA605–JA607. That is, in essence, what the DAO asked Judge Goldberg to do when it submitted the notice of concession and an order for him to sign in February of 2019 and it was what Ms. Winkelman expressly argued before him in April 2019. JA605–JA607.

Ms. Winkelman was well aware of the *Brown I* decision and that, after *Brown I*, she and her office could no longer argue that a court was required to defer to its concession. *See* JA424:23–JA425:1. So she shifted her argument slightly, contending instead that courts must give "great weight" to the DAO's concessions. JA402:8–11; JA514; JA518 (citing JA605–JA608); *see also* Objection to OAG's Intervention, *Wharton v. Vaughn*, No. 1-cv-06049-MSG (E.D. Pa. Feb. 26, 2021), Dkt. 226. She grounded her deference argument on the premise that her office's purported exercise of prosecutorial discretion in deciding to concede death penalty relief was done after the CCRC had "carefully

reviewed the facts and law" and determined that Wharton's ineffectiveness claim was meritorious. JA518. In fact, the CCRC had not been informed of, much less considered, any anti-mitigation evidence at all. JA402:23–JA403:18; JA420:6–JA426:12; JA517. Ms. Winkelman's representation to Judge Goldberg that her office had conducted a careful review of the relevant facts was false, and it would have been legal error under *Brown I* and a violation of this Court's remand order, *Wharton I*, 722 F. App'x at 282–84, for Judge Goldberg to sign the order submitted to him.

Aware that the DAO was not taking a position adverse to the petitioner, Judge Goldberg, on May 7, 2019, asked the OAG to participate as *amicus curiae* in the case. *See also* JA425:22–JA426:3 (Mr. Winkelman testifying that she knew that, by the time he was being asked to sign the order, Judge Goldberg had said the adversarial process had broken down).

### 6. The OAG's discovery of Mr. Wharton's attempted prison escape

In fact, even though the memo to the CCRC did not mention it, there was ample evidence that Mr. Wharton was not and had not been a "model prisoner" for the last 26 years. This Court had pointed out some

of that evidence when it remanded the case, *see supra* § B.3,and Ms. Winkelman would later testify before Judge Goldberg that the evidence was "all over" the record. JA404. But, as it turned out, there was even more anti-mitigation evidence, and the OAG discovered it while acting as court-appointed *amicus curiae* over the objection of Ms. Winkelman and her office. *Wharton*, 2022 WL 1488038, at *4.

This additional anti-mitigation evidence included a planned escape from a City Hall courtroom and subsequent efforts to manufacture escape tools while in prison. *Id.*; *see also* JA519. The OAG obtained this additional anti-mitigation evidence through a search of Mr. Wharton's prison records—a search that no one at the DAO had bothered to do—and it disclosed the results of its search to the Court on July 19, 2019. JA18 ¶ 12; JA519. Both Ms. Winkelman and Mr. George admit that they "missed" this anti-mitigation evidence, and Ms. Winkelman conceded that it was relevant to the merits of Mr. Wharton's adjustment to prison claim. Yet she also conceded that no effort was made to reconvene the CCRC to consider the newly discovered (or for that matter, the already known) anti-mitigation evidence—evidence that, in her mind, didn't change her judgment on

the merits of Mr. Wharton's claim. *See* JA403:3–11; JA405:3–JA406:23; JA431:15–:JA432:25. To the contrary, Ms. Winkelman saw no reason for the CCRC to discuss the matter, and it never did, choosing instead to rest on the conclusion it had reached shortly after its initial meeting. JA431–JA432:25.

### 7. Ms. Winkelman tries to stop the OAG from participating in the evidentiary hearing

Although she had failed in her effort to persuade the court simply to defer to the DAO's evaluation of Mr. Wharton's claim without conducting a hearing of its own, Ms. Winkelman objected to the OAG participating in the hearing itself, arguing that its participation as *amicus* improperly encroached on the DAO's purview as prosecutor. She complained that the OAG was assessing the factual record and developing it anew. *See* Objection to OAG's Intervention 3, *Wharton v. Vaughn*, No. 1-cv-06049-MSG (E.D. Pa. Feb. 26, 2021), Dkt. 226. She particularly criticized the fact that "[i]n its amicus brief, the AG did not stop at evaluating the record and offering its view about whether the existing record was sufficient for the Court to determine whether habeas relief was appropriate. It instead conducted its own in-depth factual investigation into petitioner's substantive claim, attached

numerous exhibits to its amicus brief, and argued the ultimate question of whether habeas relief was appropriate." *Id.* (citing JA625–34). In other words, she objected to the OAG's doing what the DAO should have done if it expected Judge Goldberg to defer to its evaluation of Mr. Wharton's claim.

In making her argument against the OAG's participation in the hearing, Ms. Winkelman again reverted to the position that the DAO's investigation of the facts of Mr. Wharton's case was reliable because it had been "thorough." *Id.* at 2. By this time, of course, she unquestionably knew that that was false. She also asked Judge Goldberg not to permit the OAG to introduce evidence or to call or cross-examine witnesses and, when the OAG called Lisa Hart-Newman, the survivor of Mr. Wharton's murder of her family, she was allowed to testify only over the DAO's objection. JA753:19–JA754:1. In any event, Judge Goldberg, over the DAO's objection, permitted the OAG to call and cross-examine witnesses at evidentiary hearings that lasted five days. *See* Transcripts, *Wharton v. Vaughn*, No. 1-cv-06049-MSG (E.D. Pa.), Dkts. 238, 250, 267, 275; *see also* JA669–952.

### 8. Ms. Winkelman's defense of her conduct—first before Judge Goldberg and then before the disciplinary panel

Ultimately, Judge Goldberg decided the merits of Mr. Wharton's case and concluded that he was not entitled to relief notwithstanding the concession. Thereafter, Judge Goldberg conducted a hearing on June 24, 2022 to inquire into the scope of the purported thorough review of the evidence and the DAO's reasoning behind its decision to concede. JA955–1058.

Ms. Winkelman and Mr. George attended the June 24 hearing, represented by the same counsel. *See* JA955–1058. During the hearing, Ms. Winkelman's counsel objected to numerous questions and, occasionally, instructed Ms. Winkelman (and also Mr. George) not to answer, asserting a "deliberative process privilege." JA963:4–24; JA965:6–JA966:14; JA988:20–JA990:24. This prevented Judge Goldberg from getting a clear explanation of what the CCRC had (and hadn't) reviewed and why it had made the decision to concede. Instead, Ms. Winkelman argued (via counsel she shared with Mr. George) that her office was not obligated to explain its concession decision to Judge Goldberg, JA520, and that she was under no obligation to inform him of

what, if any, "anti-mitigation" evidence she had been aware of when she asked him to approve the proposed form of order in February of 2019. JA966:6–11.

But she did acknowledge (as did Mr. George) that she and the rest of the CCRC were unaware of the escape evidence at the time the decision was made. JA994:4–13; JA1004:1–8 (Winkelman); *see also* JA1016:1–5 (George).[6] At no point did Ms. Winkelman retract or qualify her misrepresentations to Judge Goldberg that her office had carefully reviewed the facts and the law. *See Wharton III*, 95 F.4th at 148, 151

[6] In her Answer to the Rule to Show Cause, Ms. Winkelman denied that the CCRC was unaware of any anti-mitigation evidence, on the asserted basis that "the concession was based on the CCRC's review of the merits of Wharton's claim, including inspecting the opinions and briefs from prior stages of the case–some of which specifically identified evidence of Wharton's negative prison adjustment." Answer to Order to Show Cause ¶¶ 17–18, *In re Winkelman*, 22-mc-51-PD (E.D. Pa. Oct. 18, 2023), Dkt. 12 ("***Answer to OTSC***"); *see also* JA66. In support, she cited this Court's remand opinion and two pages from the Show Cause Hearing before Judge Goldberg. Answer to OTSC ¶ 18. The first cited page, JA997, contains Ms. Winkelman's testimony that she was "perplexed" as to why the escape wasn't in the briefing or prior opinions in *Wharton*. The second cited page, JA1017, contains Mr. George's testimony that, for his "own preparation" he read prior opinions and briefing from *Wharton* and he also read the Third Circuit's remand opinion. But neither he nor Ms. Winkelman testified that the anti-mitigation evidence referenced in prior briefing or opinions, including this Court's remand order, was ever even mentioned to the CCRC.

(affirming Rule 11 sanctions) ("A month and a half passed between the show-cause order and hearing. That was long enough for [Ms. Winkelman and Mr. George] to retract or qualify their statements. Yet they chose not to.").

Ms. Winkelman did not tell Judge Goldberg that the misrepresentations were someone else's fault. *C.f.* Motion to Exclude Kaufman, *Wharton v. Vaughn*, No. 1-cv-06049-MSG (E.D. Pa. May 24, 2022), Dkt. 287 (asking, in advance of the June 24 hearing before Judge Goldberg, that another member of her office be excused because she and Mr. George would attend). She didn't try to shift blame before the disciplinary panel, either. For example, when the panel held a hearing concerning a potential conflict arising from the fact that Ms. Winkelman and Mr. George were proceeding with joint representation, Ms. Winkelman firmly rejected the proposition that she was making an argument that someone else made misrepresentations and she was not responsible for them. JA110:11–JA111:10; *see also* JA103:18–21; JA107:7–19; JA392:15–29. She also told the panel, regarding the CCRC, that "I'm part of that committee, so I take responsibility for what happened here." JA107:7–19. She emphasized

that, "As the supervisor of the Law Division, I think the buck stops with me." JA110:22–23. When the panel pointedly asked whether she understood it might be to her advantage to say she had nothing to do with any misrepresentations, she testified "It would be to my advantage, but it's not accurate." JA111:6–10.[7]

In her Answer to the Rule to Show Cause, Ms. Winkelman said that her office had conducted an "independent" review of Mr. Wharton's *Strickland* claim, Answer to OTSC ¶ 28, and that even though it had not checked Mr. Wharton's actual prison record, the CCRC had itself reviewed all the briefs and opinions from the prior stages of the case and therefore knew of at least some of the negative evidence regarding his prison adjustment. *Id.* ¶¶ 17–18.

Moreover, she said, the CCRC had no reason to go outside the existing record to discover evidence of the attempted escape from prison

[7] Subsequently, Ms. Winkelman ceased sharing counsel with Mr. George, and instead proceeded before the disciplinary panel with new, separate counsel. On March 28, 2025, in response to her new counsel asking if she had any understanding at the time of whether Mr. Wharton's criminal record was reviewed in anticipation of the CCRC meeting, Ms. Winkelman testified "I thought it was." JA378:15–18. She also abandoned her "deliberative process" and produced the 2018 memo to the CCRC, which described Mr. Wharton as a "model prisoner." JA326.

because the DAO reasonably believed that whatever a review of that record would have revealed was already included in the substantial mitigation and anti-mitigation evidence in the existing record. *Id.* ¶ 12.

## ARGUMENT

Ms. Winkelman and her *Amici* evidently believe that this Court requires the district court to show that its orders invoking attorney discipline be based on "clear and convincing" evidence. It's not clear they're right about that. This Court's cases that Ms. Winkelman's counsel cite for the proposition don't involve attorney discipline and in one of their cases, *McCann*, this Court actually reversed the district court for applying the clear and convincing standard when it should have applied the preponderance of the evidence standard. *See McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 291 (3d Cir. 2006) (regarding issue of domicile for diversity jurisdiction); *see also Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 748 (3d Cir. 1994) (considering insurer bad faith).

The district court's local rules provide that an attorney may be disciplined for misconduct (including violating the Pennsylvania Rules of Professional Conduct) and for good cause shown. L. Civ. R. 83.6

§ IV(A)–(B). Neither this Court nor the district court has restricted what it considers to be "misconduct" or "good cause" under this rule, and, although this Court has held that a violation of the Pennsylvania Rules of Professional Conduct is a basis for discipline, it has not itself established that the district court should apply any particular standard of proof for finding such a violation or for imposing any particular discipline. It is true that, under Pennsylvania law, disciplinary counsel has the initial burden of proving attorney misconduct "by a preponderance of the evidence[,] and the proof must be clear and satisfactory." *Off. Of Disciplinary Couns. v. Price*, 732 A.2d 599, 603 (Pa. 1999). The Pennsylvania Supreme Court has recently held that this "clear and satisfactory" burden of proof is indistinguishable from a "clear and convincing" standard. *See Off. of Disciplinary Couns. v. Anonymous Att'y*, 331 A.3d 523, 534–35 (Pa. 2025). In any event, the burden then shifts to respondent to prove, where the charges relate to the making of false statements, that he or she had an objectively reasonable belief that his or her statements were true based upon a reasonably diligent inquiry. *Surrick*, 338 F.3d at 234–35 (citing *Price*,

732 A.2d at 604).[8] In the present case, however, the debate over the phrasing of the burden of proof is entirely academic because none of the underlying facts can fairly be said to be in dispute.

## I. MS. WINKELMAN'S REPRESENTATIONS TO JUDGE GOLDBERG ABOUT THE THOROUGHNESS OF HER OFFICE'S REVIEW OF MR. WHARTON'S PRISON RECORD VIOLATED DISCIPLINARY RULE 3.3

There is no real dispute that Ms. Winkelman made false representations to Judge Goldberg. Indeed, it is arguably the law of the case. *See Wharton III*, 95 F.4th at 140. What Ms. Winkelman's appellate counsel argues is that she did not make those representations

[8] The district court was not required to apply any particular standard of proof in determining what sanction to impose. Indeed, several circuits recognize that a preponderance of the evidence standard does not offend due process in disciplinary proceedings. *See In re Justice*, No. 20-5479, 2021 WL 3808965, at *4 (6th Cir. Aug. 26, 2021) ("Tennessee's use of a preponderance of the evidence standard [in attorney disciplinary proceedings] did not offend due process"); *see also id.* at *4 n.2 ("Several of our sister circuits have held that a preponderance standard does not offend due process in professional discipline proceedings" (citing *Tsirelman v. Daines*, 794 F.3d 310, 316–17 (2d Cir. 2015) (holding that using a preponderance standard in a physician discipline proceeding was constitutional)); *In re Barach*, 540 F.3d 82, 86–87 (1st Cir. 2008) (holding that a preponderance standard was a "constitutionally permissible choice" in attorney discipline proceedings); *In re Att'y Discipline Matter*, 98 F.3d 1082, 1086–87 (8th Cir. 1996) (affirming a district court's imposition of reciprocal disbarment when the attorney was originally disbarred based on a preponderance of the evidence).

"knowingly." The disciplinary panel found otherwise saying she "knowingly made misrepresentations to effectuate a policy of vacating all death sentences on appeal, at PCRA, or on federal habeas review" and that it did not credit her testimony that there was no such policy. JA511. The record that there was such a policy in fact and that Ms. Winkelman was instrumental in implementing it is not only established by "clear and convincing" evidence, it is effectively undisputed—except for Ms. Winkelman's apparent reluctance to use the term "policy." She could offer no example of the policy not being followed. JA461:7–12. But there is also a legal problem with Ms. Winkelman's "knowingly" argument, and that is that in this case, her misrepresentations were not solely about Mr. Wharton's record—they were also about what the DAO had done. In other words, Ms. Winkelman—the DAO's Supervisor for Law—was telling the Court what her own office had done. And, indeed, she was arguing that the Court could and should rely on what she was saying. Under Rule 3.3, it is not sufficient, in such a case, to argue that "I really didn't know what my office had done." Before making the representations she made, she

was under an obligation to make a reasonably diligent inquiry into their accuracy.

In determining whether a misrepresentation is made "knowingly," Comment 3 to Rule 3.3 draws a distinction regarding certain kinds of representations made by a lawyer:

> An advocate is responsible for pleadings and other documents prepared for litigation, but is usually not required to have personal knowledge of matters asserted therein, for litigation documents ordinarily present assertions by the client, or by someone on the client's behalf, and not assertions by the lawyer. *Compare* Rule 3.1. ***However, an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry.*** There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation.

Pa. R.P.C. 3.3, cmt. 3 (emphasis added).

The applicability of Comment 3 to Ms. Winkelman's misrepresentations in this case should be obvious. Ms. Winkelman and the DAO told the district court that they had decided to concede on Mr. Wharton's case only after undertaking a careful review of the facts and the law applicable to the question to be decided. They also said that their office had communicated with the victims' family prior to reaching

the decision to concede. These were not representations about Mr. Wharton or his conduct—they were representations about what Ms. Winkelman and her office had done.[9] And they were representations made in an effort to persuade Judge Goldberg that he did not need to conduct an evidentiary hearing because he could rely on the "careful review of the facts and law" that DAO had already conducted.

But the incontrovertible fact is that Ms. Winkelman and the DAO had ***not*** conducted a "careful review." Indeed, they had not even looked to see whether there was any anti-mitigation evidence on Mr. Wharton's prison record—even though, as discussed above, this

[9] The disciplinary panel mainly blamed Mr. George, rather than Ms. Winkelman, for misleading Judge Goldberg about the DAO's communications with the victims' family (and the surviving victim herself) about its decision to concede death penalty relief in Mr. Wharton's case. JA521; JA530–31. But Ms. Winkelman was also at fault. She was aware of what the CCRC had considered. She was aware of, and responsible for, her office's representation that the DAO's concession decision was made "[f]ollowing review of [the] case by" the CCRC and "communication with the victims' family." JA598 ¶ 9. So even though Ms. Winkelman was not responsible for the lack of victim communication itself, JA379:9–JA382:25; JA1002:4–20, she was responsible for misrepresenting to Judge Goldberg that such communication had occurred and that it was a basis for the concession.

Court had referred to the need to consider any anti-mitigation evidence when it remanded the case.

Ms. Winkelman's statements to the Court were false and were made without conducting a reasonable (or indeed any) inquiry into their basis in fact. With regard to representations of this kind, it is not sufficient to say "I didn't know what the truth was" if you never conducted a reasonably diligent inquiry to find out. Whatever Ms. Winkelman knew, she and her office certainly failed to conduct the kind of reasonably diligent inquiry they were expected to conduct in order to comply with the Disciplinary Rules and the applicable law.

Ms. Winkelman's *Amici* question the applicability of Comment 3, suggesting that the Rule nevertheless requires a specific intent to mislead. Amici Br. 10–14. They even go so far as to suggest that to the extent that Comment 3 to the Rule says otherwise, the Court should treat it as "a nullity." *Id.* at 13. But Comment 3 is not a nullity and it is entirely consistent with the Rule itself. Sufficient "intention" can be established in connection with a false statement to a court if the statement was made "recklessly." "Recklessness may be described as 'the deliberate closing of one's eyes to facts that one had a duty to see or

stating as fact, things of which one was ignorant.'" *Price*, 732 A.2d at 604 (citing *Off. of Disciplinary Couns. v. Anonymous Att'y A*, 714 A.2d 402, 407 (Pa. 1998)).

Here, Ms. Winkelman told the court that her office had conducted a "careful review of the facts and the law" applicable to Mr. Wharton's case when it had done no such thing. Whether making that false statement to the District Court constituted an ethical violation "hinges upon whether respondent acted recklessly or with the support of a reasonable factual basis." *Off. of Disciplinary Couns. v. Surrick*, 749 A.2d 441, 444 (Pa. 2000). In examining a respondent's asserted belief regarding the truth of statements he or she made, Pennsylvania applies an objective standard. *Price*, 732 A.2d at 604 (rejecting respondent's argument that the Office of Disciplinary Counsel must prove respondent acted with purposeful intent, and "find[ing] that an objective standard, which examines the factual basis for the assertion, is necessary to protect the public, the profession[,] and the courts").

Applying that standard, the disciplinary panel found that Ms. Winkelman "knowingly made misrepresentations to effectuate a policy of vacating all death penalty sentences on appeal, at PCRA, or on

federal habeas review." JA511. *See also Johnson*, 144 F.4th at 187. It also found that Ms. Winkelman "was willfully blind to, and complicit in, George's misrepresentations to Judge Goldberg." JA511. Because it is undisputed that no "careful review" occurred. The statement that it did was false. At best, Ms. Winkelman's eyes were deliberately closed to the fact that no careful review had been done, and that a careful review was not the basis of the concession.

And—before we pass on from the question whether Ms. Winkelman's conduct amounted to some kind of innocent mistake—it may be worth examining what Ms. Winkelman—and her lawyers—said and did once they learned that Mr. Wharton was not, in fact, the "model prisoner" Mr. George had described in his memorandum to the CCRC. Ms. Winkelman says she learned about the anti-mitigation evidence the OAG had "discovered" upon searching Mr. Wharton's prison records on July 22, 2019, when the OAG disclosed it to the district court. But she saw no reason to tell the CCRC about this "newly discovered" evidence or to ascertain whether it changed the CCRC's view on the concession. And she continued to defend the concession and the supposed carefulness of her office's review of the facts and the law

upon which the concession rested. In fact, on February 26, 2021, while urging Judge Goldberg to prohibit the OAG from calling witnesses at the hearing the Court had decided to hold, Ms. Winkelman continued to insist that the investigation her own office had conducted had been "thorough." Surely she "knew" by then that it had not been—yet she still urged the Court to act as if it had been.

Worse, even when it had become obvious that the DAO had failed to conduct the kind of review this Court had contemplated on remand and that Judge Goldberg was considering sanctions, Ms. Winkelman maintained she had done nothing wrong and owed no explanation. *See* JA965:24–JA966:8 ("Our position at this point, just to be clear, is that we don't think any explanation is necessary. . . . You know our position that they did not violate any lack of candor.").

And, in response to the Rule to Show Cause in this case, it's not as if Ms. Winkelman sought to correct what she had told the Court in 2019. To the contrary she told the disciplinary panel that her misrepresentations were "entirely true and were not grounds for any sanction." JA51–52. Indeed, she continued to take the position that "[p]rior to conceding relief, the CCRC conducted a careful review of the

records concerning Wharton's case, which included anti-mitigation evidence (but not the escape attempt)." JA521 (emphasis in R&R); JA66.

Ms. Winkelman was also careful in the District Court to deny that the DAO had a policy and practice of conceding relief in all death penalty cases. Answer to OTSC ¶ 28. The disciplinary panel did not believe her, noting that she had been able to cite no cases in which the DAO ended up defending the imposition of the death penalty and that the OAG had found over 100 in which the DAO had conceded that relief. JA523–28. But the fact is that Ms. Winkelman was disciplined not for her (or her office's) conduct in other cases, but for statements she made to Judge Goldberg in connection with one case—the *Wharton* case. And the false and misleading nature of those statements was not just established by "clear and convincing" evidence—it was and is incontrovertible.[10]

---

[10] Ms. Winkelman's appellate counsel and *Amici* both contend that inasmuch as she relied on her subordinate, Mr. George, to research the facts applicable to Mr. Wharton's case, she cannot be held responsible for the false statements made to Judge Goldberg in the effort to persuade him to sign the order that the DAO and Mr. Wharton's counsel tendered to him. If she could be said to have violated a Rule of Professional Conduct, they say, it would either be Rule 5.1 or Rule 8.4, which impose

## II. THE DISTRICT COURT DID NOT ERR IN CONCLUDING THAT MS. WINKELMAN'S ARGUMENT THAT JUDGE GOLDBERG COULD AND SHOULD DEFER TO THE DAO'S DETERMINATION ON THE MERITS OF MR. WHARTON'S ADJUSTMENT TO PRISON CLAIM WAS A VIOLATION OF RULE 3.1

On appeal, Ms. Winkelman argues that the position she advanced in 2019—that Judge Goldberg could defer to the supposedly independent determination of the DAO on the merits of Mr. Wharton's remaining habeas claim—was not itself frivolous. *See* Winkelman Br. 49–52. *See also* Amici Br. 20–21. But both Ms. Winkelman's counsel and her *Amici* then argue that because this Court and the district court did not find Mr. Wharton's *Strickland* claim to be frivolous, it follows that Ms. Winkelman's argument that Judge Goldberg could defer, without conducting his own investigation and hearing, to the DAO's evaluation of the facts applicable to Mr. Wharton's claim could not have been frivolous. But no one is contending that Mr. Wharton's *Strickland* claim

---

liability on lawyers for the misrepresentations of partners or colleagues. It is certainly true that Disciplinary Counsel did not charge Ms. Winkelman with a violation of Rule 5.1 or Rule 8.4. But it is also true that Ms. Winkelman did ***not*** take the position, in response to the Rule to Show Cause, that the false representations made to Judge Goldberg were the work of Mr. George. To the contrary, *see supra* pp.28-29.

was frivolous. It was merely meritless. It is Ms. Winkelman's "deference" argument that was frivolous and which constituted a violation of Rule 3.1. The fact is that the DAO had not conducted any kind of "independent" evaluation of Mr. Wharton's claim. Indeed, it had not even checked his prison record and did not know what that record was.

It is true that up until 2018, the DAO had taken the position that it alone had the authority to concede on a claim of this kind and that the courts were duty bound to defer to whatever the DAO decided, and, indeed, Ms. Winkelman misleadingly cited a number of pre-*Brown I* cases in telling Judge Goldberg that other judges on the district court had been willing to accept the DAO's decision on concessions. But that was no longer a tenable legal argument after the Supreme Court's decision in *Brown I*. Which is why Ms. Winkelman crafted her argument to say that even if deference to the DAO's judgment was no longer required, that judgment was still entitled to great weight and that, in this case, because the DAO had conducted a careful review of the facts and law, the judge could simply defer to what the DAO had done. But that argument, to be viable after *Brown I*, required (1) that

the DAO itself was an entity capable of providing the independent review that *Brown I* required and (2) that the office's review of the facts and the law was sufficiently careful and thorough that the DAO could represent to the court that the court could fairly rely upon it.

As the facts of this case ultimately revealed, the DAO was not even arguably engaged in an "independent" review of the legal merits of capital cases. To the contrary, it had become an ally of the defense lawyers and the Innocence Project, and on all capital cases it invariably came down on the side of petitioner and not the Commonwealth. Moreover, while it said it had performed a careful review of the facts in this case, it had not, and Ms. Winkelman found herself arguing that the Court could rely on what she said her office had done even though the CCRC had not even been informed of the anti-mitigation evidence expressly identified in the remand order, much less about the other anti-mitigation evidence revealed by the OAG.

Ms. Winkelman's appellate lawyers appear to believe that the DAO's position could not be deemed "frivolous" because this Court had recognized that Mr. Wharton's final claim could have merit (hence the remand) and Judge Goldberg, even though he rejected the claim on the

merits, had issued a certificate of appealability. Winkelman Br. 50–51. And perhaps it could be argued that if the DAO had conducted an independent review of the evidence relevant to Mr. Wharton's adjustment to prison claim and if it had explained its position to Judge Goldberg, he could have relied on that investigation. But because there was no such review and because Ms. Winkelman had inaccurately described the review that had been conducted, there was no possible way that Judge Goldberg could "defer" to what her office had decided and still comply with *Brown I.* It follows that argument that he should do so without holding a hearing was obviously frivolous and, as the panel found, a violation of Rule 3.1.

## III. THE PROCESS THE DISTRICT COURT USES TO ADJUDICATE CASES IS SIMILAR TO THAT USED BY OTHER DISTRICT COURTS, AND MS. WINKELMAN WAS AFFORDED A FAIR HEARING CONSISTENT WITH DUE PROCESS

Like Mr. George did in his appeal, Ms. Winkelman argues that the disciplinary panel was biased against her, did not give her a fair hearing, and should not have been allowed to participate in the full court's decision on the merits of her case. Winkelman Br. 52–61. Some of this argument is hard to follow. For instance, she evidently believes

that the panel should not have "gathered its own information" about, e.g., the District Attorney's views on the death penalty and his perception of his predecessors' handling of death capital cases. *Id.* at 55. Nor, she says, should it have asked any questions about the DAO's filings in cases other than *Wharton*. *Id.* at 56. But the original Rule to Show Cause had alleged that Ms. Winkelman was following a policy and practice at the DAO to concede relief in all death penalty cases. JA24–25 ¶ 28. And, in fact—while she refused to admit to the policy and practice alleged—she herself could not remember a single case in which the CCRC had decided to defend a capital punishment verdict obtained by Mr. Krasner's predecessors. *Id.*; JA461:7–12. Given this consistent practice of the DAO, it is hardly surprising that the three members of the panel, who were all judges on the Court where the DAO was filing its manifold concessions, were familiar with what the office was doing.[11] Nor is it surprising that they were aware of the District

[11] Besides, Ms. Winkelman relied on other proceedings involving death penalty concessions and the DAO's practices regarding same in her submissions to Judge Goldberg. JA56; JA973:18–JA974:18. The DAO's policies regarding conceding death penalty relief are part of the Rule to Show Cause, JA24–25 ¶ 28, and Ms. Winkelman's response thereto. JA74. And, regardless, it is proper for a court to take notice of judicial filings in other proceedings. *Selkridge v. United of Omaha Life Ins. Co.*,

Attorney's publicly stated views on the death penalty and his disagreement with how his predecessors had prosecuted such cases. It may be understandable that Ms. Winkelman's lawyers would have preferred a panel that was completely blind to what the DAO was up to, but the facts were what they were, and the panel was not obliged to ignore them in concluding that Ms. Winkelman, in acting as she did, was following a DAO policy and that her office had not engaged in any careful or independent review of the actual facts of the case.[12]

---

360 F.3d 155, 162 n.8 (3d Cir. 2004); *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 413, 426 (3d Cir. 1999); *Mar. Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991).

[12] It does not follow that either Ms. Winkelman or Mr. George was disciplined for misconduct in any case other than *Wharton*. Indeed, Disciplinary Counsel was not permitted to ask questions about a different case in which the DAO had lied to a Court of Common Pleas. JA433:1–15. And, in Mr. George's case, it was his lawyers who were allowed to introduce evidence from and argument about other cases—even though their characterization of those cases turned out to be inaccurate. JA148–50; JA458:17–JA460:25. In this case, Ms. Winkelman was disciplined for, *inter alia,* "knowingly ma[king] misrepresentations to effectuate a policy of vacating all death sentences on appeal, at PCRA or on federal habeas review." JA511. The misrepresentations at issue were made in the *Wharton* case. This is not to say that Ms. Winkelman, in furtherance of the office policy, made no misrepresentations in other cases. But she was not disciplined for them in this proceeding.

As for the alleged bias of the three judges on the disciplinary panel, it is certainly true that they asked some tough questions and they occasionally expressed skepticism about Ms. Winkelman's answers to those questions. But, with all due respect, the record was what it was. Ms. Winkelman and her colleagues at the DAO did what they did. Their conduct was and is difficult to defend or even explain. The panel's R&R reflected that fact. Ms. Winkelman was not entitled to a judge or judges who were willing to be as willfully blind to the merits of the case as she was to Mr. Wharton's actual prison record.

What Ms. Winkelman was entitled to—and what she got—was constitutionally sufficient due process, including notice, and an opportunity to be heard. She had notice of the charges, including from the Rule to Show Cause. *See* JA13–27. She had notice of the law and standards. *See, e.g.*, *Surrick*, 338 F.3d at 233–34. She was on notice of the procedures the court followed in disciplinary cases, which have been in place for over 40 years. She had repeated opportunities to be heard, and she was heard. She, via her able council, submitted multiple briefs

and made various objections. She testified. It follows that she had due process.[13]

The last point, which is, perhaps, the reason Ms. Winkelman's able counsel presses his due process argument, is his evident belief that the three judges of the panel, having produced the R&R, should have been recused from the full court's consideration of their own findings and recommendations. Winkelman Br. 58–61. As counsel puts it: "an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case." *Id.* 58. Mr. George made a similar argument citation to which Disciplinary Counsel responded. *See* Disc. Couns.'s Ans. Br. 22–25, *In re George*, 25-3264 (3d Cir. Apr. 30, 2026), Dkt. 41.

Rather than repeat that response, it is perhaps sufficient to note that other district courts do exactly what the District Court of the Eastern District of Pennsylvania does—they appoint one or more of their number to hear a disciplinary complaint and then ask them to

[13] It is worth noting that the requirements of due process in attorney disciplinary proceedings are not as demanding as those afforded to a defendant in a criminal proceeding. *Surrick*, 338 F.3d at 233.

report back to the full court with a report and recommendation which the full court then considers with the full participation of the judge or judges who heard the case. Or they delegate the entire case to an appointed committee of judges and the matter is never considered by the full court.[14] Counsel is unaware of any district court that refers

---

[14] *See* S.D.N.Y. L. Civ. R. 1.5(a) ("The chief judge will appoint a committee of the Board of Judges known as the Committee on Grievances, which, under the direction of the chief judge will have charge of all matters relating to the discipline of attorneys. Magistrate judges and district judges may serve on the Committee on Grievances"); *id.* 1.5(d)(1), (4) (providing for evidentiary hearings before a magistrate judge of the court or before a panel of three attorneys and empowering the Committee on Grievances to impose discipline or to take such action as justice and the rules may require). Other district courts also use a panel of judges although the rules don't expressly specify whether the proposed discipline is considered by the full court. *See* W.D. Pa. Civ. R. 83.3(B)(4) (providing "that if the disciplinary proceeding is predicated upon the complaint of a Judge of this Court the hearing shall be conducted before a panel of three other Judges of this Court appointed by the Chief Judge"); M.D. Pa. L. R. 83.24.4 (same); D. Del. R. 83.6(e)(3) ("The show cause hearing shall be conducted by one or more Judges of the Court, as determined by the Chief Judge, and may include the Chief Judge"); *id.* 83.6(e)(4) ("After a show cause hearing, the Court may impose such sanctions as the circumstances warrant, including private admonition, public reprimand, suspension, or disbarment."). In New Jersey, a single judge hears the case but, as here, the ultimate decision is left to the full court. *See* D.N.J. Civ. R. 104.1(e)(11) ("The full Court shall review the findings of fact, conclusions of law[,] and recommendations of the District Judge designated by the Chief Judge to hear the matter, the transcript of the hearings and the briefs previously filed with the Court, if any. The record may be supplemented by the filing of briefs pursuant to a schedule fixed by the Chief Judge for review on the record and briefs, without oral

disciplinary matters to a panel or committee but then excludes that panel or committee—the judges who actually heard the case—from considering their own findings, the evidence presented, or the appropriate discipline. Which, with all due respect, shouldn't come as a surprise. The judges who actually heard the witnesses and considered the evidence presented are more qualified than their colleagues to present their findings and participate in the resolution of the case. Ms. Winkelman (and Mr. George) treat the process as if it is a kind of appeal in which the full court sits in review of the panel as if the panel were a trial court. But that's not what this is. It is the District Court as a whole that decides the case. It is this Court that sits as a Court of Appeals.

## IV. SEVERAL OF THE ARGUMENTS ADVANCED BY THE *AMICI* ARE UNTETHERED TO THE FACTS OF THE CASE

Ms. Winkelman's *Amici* make a number of arguments that are inconsistent with Ms. Winkelman's own testimony and the arguments she herself made below. For instance, they argue that if Ms. Winkelman could be said to violate any disciplinary rule it would be Rule 5.1(c)

---

argument, by the full Court. The full Court shall take whatever action it deems appropriate . . . .").

because of her evident failure to properly supervise Mr. George, who was the actual malefactor in terms of misleading the court. Amici Br. 21–22. Had Ms. Winkelman attempted to argue below that she relied completely on Mr. George and that he misled her about the thoroughness of the office's review of the merits of Mr. Wharton's adjustment to prison claim, it might well be that the disciplinary proceedings would have focused on Rule 5.1(c). But she said no such thing. To the contrary, she said that she was part of the CCRC and that she took responsibility for what happened here. JA107:7–19. "As the supervisor of the Law Division" she testified, "I think the buck stops with me." JA110:22–23. And in response to allegations that she had violated Rule 11, she did not seek to cast blame on Mr. George. Nor did she do so in response to the Rule to Show Cause in the disciplinary case. If *Amici* think that that is the course she should have taken below, perhaps they should have offered to represent her then. But as she told the disciplinary panel, while she understood that that kind of a defense—blaming Mr. George—might be to her advantage, the problem was "it's not accurate." JA111.

The Amici also contend that the CCRC held multiple meetings on the *Wharton* case, asking "why did the committee devote multiple meetings to a discussion of the *Wharton* claim before deciding on a recommendation to concede the claim?" Amici Br. 18. It's not clear why they believe this. It's true that Ms. Winkelman testified that there would typically be multiple meetings of the CCRC before any decision was made, JA376:21–JA377:6, but she had no recollection of any such meeting or meetings in the *Wharton* case. Nor did anyone else. And, of course, we only have the one memorandum to the CCRC which was delivered before the one meeting we know about. In other words, the *Amici* imagine that there were multiple meetings in which there was ongoing discussion about all the relevant evidence (except the evidence yet to be "discovered" by the OAG). But there is no actual evidence of such meetings, and no record, written or oral, of what was discussed. And the disciplinary panel did not believe that the CCRC was ever told about any anti-mitigation evidence. JA521–22.

The *Amici* also seem to believe that there was no proof that the DAO had a policy and practice of granting relief in all capital cases. Amici Br. 17–18. But Ms. Winkelman conceded both that she did not

know of ***any*** case in which the CCRC had ***not*** conceded relief and that her reluctance to call it a "policy" was perhaps a matter of semantics. *See* JA457:18–JA458:2; JA461:7–12. And, of course, the Supreme Court of Pennsylvania has since held that this policy was so uniform that the DAO could no longer be trusted to evaluate claims of this kind and that all such would now need to be referred to the OAG. Although the *Amici* fail to see any "pattern of illicit or unjustified concessions" Amici Br. 19, an unbroken unanimous string of such results would satisfy most observers, and Ms. Winkelman was plainly active in effectuating those results and that policy.

And, the *Amici* say, Rule 3.3 requires actual knowledge that one's statement is false even in cases where a lawyer is making a statement on his or her own knowledge. To the extent that Comment 3 to the Rule says otherwise, they say, it conflicts with the Rule itself and is "a nullity." Amici Br. 13. They cite this Court's opinion in *McCarthy v. DEA*, 171 F.4th 245 (3d Cir. 2026) as "confirm[ing] this point." *Id.* at 14. But they fail to point out that *McCarthy* expressly distinguishes between statements of law (as made in that case) and statements of fact (as made here). The *McCarthy* Court, over a dissent, had declined to

apply the "reckless" standard to misstatements of law where it was debatable whether the lawyer knew his statements were false (because he hadn't read the cases). *See McCarthy*, 171 F.4th at 248. But the Court agreed with the dissent that comment 3 to Rule 3.3(a) would plainly apply to misstatements of fact—a distinction that suggests that this Court doesn't think that comment is in conflict with the Rule or otherwise null and void. *See id.* at 248 & n.2. And, of course, it was misstatements of fact that Ms. Winkelman was making here.

## CONCLUSION

On remand, the evaluation of Mr. Wharton's remaining habeas claim was not particularly complicated. Had Mr. Wharton's trial lawyer been ineffective because he had failed to make an issue of Mr. Wharton's adjustment to prison or was Mr. Wharton's prison record so negative that that argument simply didn't work? Presumably Mr. Wharton's lawyers would argue that his prison record should have been emphasized at the penalty phase of his trial and the Commonwealth would argue that his prison record was such that counsel could not be deemed ineffective for leaving it out of his argument. In Philadelphia, however, the DAO was not in the business

of arguing to uphold verdicts in capital cases and it had no intention of doing so here. Instead, it accepted the facts and argument presented to it by Mr. Wharton's counsel and told the district court that it was conceding the point on the merits.

Had the DAO's lawyers told the district court why they were conceding the point—that they had a policy and practice of conceding in all such cases—they could have been accused of failing to do their job but they could not have been accused of misleading anybody. But instead they told the court that they were conceding on the basis of a careful and thorough review of the facts and law applicable to Mr. Wharton's claim and they invited the district court to defer to the judgment they had reached. In fact, they had not even checked Mr. Wharton's prison record and did not know what it was. Obviously, this is not what this Court expected to happen on remand, as this Court has already made clear in affirming Judge Goldberg's finding of Rule 11 violations. The DAO was trying to induce Judge Goldberg to sign an order he could not legally sign. Its efforts to do so were in violation of Rules 3.1 and 3.3.

After extensive hearings, briefing and argument, the disciplinary panel decided to disbar Mr. George and to suspend Ms. Winkelman. The court as a whole voted to adopt these findings and conclusions. There is no factual or legal basis for this Court to disturb them on appeal. The imposition of the sanction of a three-year suspension on Ms. Winkelman was a reasonable exercise of the district court's discretion and therefore must be affirmed.

Respectfully submitted,

*/s/ Alfred W. Putnam, Jr.*

Alfred W. Putnam, Jr. (Pa. No. 28621)
Renée M. Dudek (Pa. No. 325368)
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000
Philadelphia, Pennsylvania 19103
(215) 988-2700 (telephone)
alfred.putnam@faegredrinker.com
renee.dudek@faegredrinker.com

*Counsel for Appellee U.S. District Court for the Eastern District of Pennsylvania*

Date: September 21, 2026

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 31.1, I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 11,966 words, excluding the parts exempted by Rule 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

3. This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because CrowdStrike Falcon Sensor version 7.36.20805.0 was run on the file containing the electronic version of this brief and no viruses were detected.

*/s/ Alfred W. Putnam, Jr.*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 28.3(d)**

I hereby certify, pursuant to Local Rule 28.3(d), that all attorneys whose names appear on this brief are members of the bar of this Court.

*/s/ Alfred W. Putnam, Jr.*

# CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2026, the foregoing document was filed with the Clerk using the appellate CM/ECF system. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

*/s/Alfred W. Putnam, Jr.*